FILED

2020 May-01  PM 04:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| PEOPLE FIRST OF ALABAMA, ROBERT CLOPTON, ERIC PEEBLES, HOWARD PORTER, JR., ANNIE CAROLYN THOMPSON, GREATER BIRMINGHAM MINISTRIES, and the ALABAMA STATE CONFERENCE OF THE NAACP, <br><br> Plaintiffs, <br><br> v. <br><br> JOHN MERRILL, in his official capacity as the Secretary of State of Alabama, KAY IVEY, in her official capacity as the Governor of the State of Alabama, the STATE OF ALABAMA, ALLEEN BARNETT, in her official capacity as Absentee Election Manager of Mobile County, Alabama; JACQUELINE ANDERSON-SMITH, in her official capacity as Circuit Clerk of Jefferson County, Alabama; KAREN DUNN BURKS, in her official capacity as Deputy Circuit Clerk of the Bessemer Division of Jefferson County, Alabama; and MARY B. ROBERSON, in her official capacity as Circuit Clerk of Lee County, Alabama, <br><br> Defendants. | Case No.: _____ <br><br> COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF |

## **INTRODUCTION**

1.     Plaintiffs People First of Alabama, Robert Clopton, Eric Peebles, Howard Porter,

Jr., Annie Carolyn Thompson, Greater Birmingham Ministries, and the Alabama State Conference

of the NAACP, file this Complaint for immediate injunctive and declaratory relief against the

Defendants Secretary of State John Merrill, Governor Kay Ivey, the State of Alabama, Mobile

County Absentee Election Manager Alleen Barnett, Jefferson County Circuit Clerk Jacqueline Anderson-Smith, Deputy Circuit Clerk of the Bessemer Division of Jefferson County Karen Dunn Burks, and Lee County Circuit Clerk Mary B. Roberson for failing to take adequate steps to protect the fundamental right to vote ahead of the 2020 elections, including the July 14, 2020 primary runoff election, in the midst of the unprecedented national and statewide COVID-19 public health crisis.

2.      The United States and the State of Alabama are in a state of emergency. COVID-19 is spreading rapidly throughout the country, infecting tens of thousands of people, including in Alabama, which has over 7,000 confirmed cases of COVID-19 and 270 deaths. Experts estimate that, for every confirmed COVID-19 case, there could be as many as eleven unconfirmed cases.

3.      As a result, in early April Governor Ivey ordered Alabama residents to stay at home absent specific reasons not to, and the Alabama Department of Public Health and the Centers for Disease Control likewise advised people to remain in their homes and follow social distancing protocols. In a communal effort to slow the spread of the disease and save lives, the Governor also closed government offices, schools, and businesses, strongly urged people to limit person-to-person interactions to their family, and to avoid large gatherings.

4.      On April 28, 2020, Governor Ivey amended Alabama's COVID-19 Health Order, allowing some businesses to open subject to sanitation and social-distancing guidelines, but still encouraged individuals—especially those at higher risk of death or serious illness from COVID-19 infection—to stay home and extended the prohibition on gatherings of ten or more people or where a six-foot distance could not be maintained. This crisis is likely to persist for months or longer.

5.      Given these extraordinary circumstances, Secretary Merrill has waived the excuse

requirement for absentee voters for the July 14, 2020 primary runoff election.

6.      Nonetheless, in this unprecedented situation, multiple provisions of Alabama law, policy, and/or practice that establish requirements for voting in-person and by-mail are now posing direct and severe obstacles to voting. These provisions are: (1) the requirement that the affidavit that must be included with an absentee ballot be signed by the voter in the presence of either a notary or two adult witnesses, Ala. Code §§ 17-11-7 to 17-11-10; (2) the requirement that copies of photo identification accompany absentee ballot applications, *id.* § 17-9-30(b); (3) the requirement that copies of photo identification accompany certain absentee ballots, *id.* §§ 17-11-9 and 17-11-10(c); and (4) the prohibition on curbside voting (collectively, the "Challenged Provisions").

7.      First, Plaintiffs challenge Alabama's requirement that a voter casting an absentee ballot sign it before a notary or two witnesses (the "Witness Requirement"). State law requires that, in addition to the signature of the voter, all mail-in ballots must contain a signed affidavit witnessed by either a notary public or two third-party witnesses over age 18; otherwise, the ballot goes uncounted. In the current environment, this poses an unreasonable obstacle to many thousands of vulnerable Alabamians, like Plaintiffs Thompson and Peebles, who live alone and cannot—and should not have to—risk the threat of contagion in order to vote.

8.      The Witness Requirement threatens to disenfranchise many thousands of voters who, like Plaintiffs Thompson and Peebles, are adhering to social distancing guidelines to protect themselves and others. Indeed, about 30% of households in Alabama constitute people living alone

(555,330),[1] including 165,582 Alabamians over age 18 with a disability[2] and 95,102 persons over age 65 with a disability[3]—that is, two of the groups who are most vulnerable to COVID-19.

9.     The Witness Requirement does not meaningfully advance any valid government interest. Many other provisions of Alabama law safeguard the integrity of absentee voting without putting the lives of voters at risk. Indeed, Alabama is one of only 12 states that require an individual submitting an absentee ballot to have it be witnessed by another. Of those 12, Alabama is one of only three states that require the absentee ballot to be notarized.[4]

10.     Even if the Witness Requirement did offer some additional marginal benefit to any valid state interest, such benefit is greatly outweighed by the risk of disenfranchisement. The Witness Requirement violates the fundamental right to vote under the First and Fourteenth Amendments to the U.S. Constitution, Title II of the Americans with Disabilities Act ("ADA"), and Sections 2, 3(b), and 201 of the Voting Rights Act of 1965 ("VRA").

11.     Second, the requirements that each person who applies for an absentee ballot mail-in a copy of their photo ID, Ala. Code. § 17-9-30(b) ("ID Application Requirement"), and that

---

[1] U.S. Census Bureau, 2010-2018 American Community Survey 1-Year Estimates: Selected Social Characteristics of the United States: Alabama (2018), https://data.census.gov/cedsci/table?q=single%20person%20households&g=0400000US01&hidePreview=true&tid=ACSDP1Y2018.DP02&vintage=2018&layer=VT_2018_040_00_PY_D1&cid=DP02_0001E&moe=false (last visited Apr. 21, 2020).
[2] U.S. Census Bureau, 2010-2018 American Community Survey  1-Year Estimates: Selected Social Characteristics of the United States: Alabama (2018) Samplehttps://data.census.gov/mdat/#/search?ds=ACSPUMS1Y2018&vv=AGEP(18:99)&cv=DIS&rv=ucgid&nv=HHT(4,6)&wt=PWGTP&g=0400000US01
[3] U.S. Census Bureau, 2010-2018 American Community Survey 1-Year Estimates: Selected Social Characteristics of the United States: Alabama (2018), https://data.census.gov/mdat/#/search?ds=ACSPUMS1Y2018&vv=AGEP(65:99)&cv=DIS&rv=ucgid&nv=HHT(4,6)&wt=PWGTP&g=0400000US01.
[4]  Mississippi, Missouri, and Oklahoma require the notarization of absentee ballots. Alaska, Louisiana, Minnesota, North Carolina, Rhode Island, South Carolina, Virginia, and Wisconsin require witness signatures. *Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options*, Nat'l Conf. of State Legislatures (Apr. 14, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx (select tab titled "Processing, Verifying, and Counting Absentee Ballots" and scroll down to the chart "Verifying Authenticity of Absentee/Mailed Ballots.")

certain absentee voters must again submit another copy of their photo ID when casting their ballot, *id*. § 17-11-9 ("ID Ballot Requirement," collectively with the ID Application Requirement, the "Photo ID Requirements"), create nearly insurmountable barriers to exercising the fundamental right to vote amid the COVID-19 pandemic. Many voters who are more susceptible to complications from COVID-19, like Plaintiffs Porter and Thompson, lack a reliable means of photocopying their ID without endangering their lives. Others lack a photo ID at all. The Photo ID Requirements, as applied in the current COVID-19 crisis, violate Title II of the ADA and the fundamental right to vote under the First and Fourteenth Amendments to the U.S. Constitution.

12.     Third, Alabama does not offer either curbside or "drive-thru" voting, which allows voters to cast their ballots in person, but outside of a poll site without leaving the car. Many voters with disabilities are unable to access polling places or vote absentee. Other voters must vote in-person because they require assistance from poll workers. Curbside voting can significantly reduce the opportunities for COVID-19 to spread at in-person poll sites. This is particularly important to voters, like Plaintiffs Clopton and Peebles, who usually vote in-person, but who have a higher susceptibility to death or serious health problems due to COVID-19. Alabama's prohibition on curbside voting, a reasonable accommodation provided in other states, means that significant numbers of vulnerable voters who need to vote in-person have no option for doing so because of the increased risk of infection from traditional in-person voting. This violates the First and Fourteenth Amendments to the U.S. Constitution, the ADA, and Section 2 of the VRA.

13.     Both together and separately, the Witness Requirement, Photo ID Requirements, and the Prohibition on Curbside Voting (collectively, the "Challenged Provisions") needlessly force many thousands of Alabamians to choose between risking their lives or voting in 2020.

14.     The Challenged Provisions directly contradict the specific guidance from the

5

Centers for Disease Control and Prevention ("CDC") concerning safe voting practices during the COVID-19 pandemic. Among other things, the CDC recommends that states and jurisdictions "[e]ncourage voters to use voting methods that minimize direct contact with other people and reduce crowd size at polling stations" and that they "[e]ncourage drive-up voting for eligible voters" as a means of complying with social distancing rules and limiting personal contacts.[5]

15.     Compliance with the Challenged Provisions poses a significant risk to the lives of Plaintiffs and many thousands of other Alabama voters who are seeking a safe method of exercising their right to vote in the upcoming July 14, 2020 runoff election, the August 25, 2020 municipal elections, and the November 3, 2020 general elections, (or any other elections that occur while this crisis continues).

16.     Without emergency intervention from this Court, tens of thousands of Alabama voters are at risk of being disenfranchised. Alabama has no early in-person voting option. Consequently, Alabama voters almost unanimously vote in-person on Election Day. In 2018, for example, only 3.4% of Alabama voters (57,832 people) cast absentee ballots out of the 1,723,694 total people who voted that year. Most Alabama voters are therefore unlikely to be familiar with the absentee voting process. A significant number of Alabama's absentee ballots are often rejected because the absentee ballots do not meet the Witness Requirement. In 2018, Alabama rejected over 2.37% or 1,368 of the absentee ballots cast.[6] The Witness Requirement accounts for about a quarter of those rejected absentee ballots.

---

[5] Ctrs. for Disease Control & Prevention, *Recommendations for Election Polling Locations: Interim guidance to prevent spread of coronavirus disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated March 27, 2020).

[6] Election Assistance Commission, *Election Administration and Voting Survey Report* 27-29 (2018), https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf; Election Assistance Commission, *Election Administration and Voting Survey Report* 23 (2016), https://www.eac.gov/sites/default/files/eac_assets/1/6/2016_EAVS_Comprehensive_Report.pdf.

17.     Contrary to the usual limitations on absentee voting in Alabama, however, for the July 14 primary runoff election, Secretary Merrill has made it clear that any registered voter is permitted to vote absentee in light of the COVID-19 pandemic. Alabama is expecting a large increase in absentee voting in the July 14 election, as well as other elections in 2020. Thus, if just a third of all people who voted in 2018 (or 575,000 people) switched to mail-in absentee voting in the July 14 primary runoff election, up to 34,000 voters could expect to have their ballots rejected because of the Witness Requirement alone.

18.     The risk of disenfranchisement from the Witness Requirement and Prohibition on Curbside Voting fall more heavily on Black voters in Alabama, who are more likely to live alone or with young children, more likely to have a disability than the white population, and who are afflicted by and die from COVID-19 at stunningly disproportionate rates. Black Alabamians are 41% of COVID-19 patients and over 45% of COVID-19-related deaths despite making up just 27% of its total population.[7] Alabama's history of racial discrimination in various areas, such as voting, education, employment, and healthcare, interact with these provisions to hinder Black people's ability to participate effectively in the political process in violation of Section 2 of the VRA.

19.     The Challenged Provisions will each, separately and jointly, unduly burden the right to vote of Alabamians. This is certainly true for the statewide Republican and First Congressional District Democratic primary runoff elections on July 14, 2020 and, given the likelihood that the COVID-19 pandemic will persist, will also be true for the August 25 municipal and November 3 general elections as well (collectively, the "2020 elections").

---

[7] ADPH, *Alabama Public Health Daily Case Characteristics: 4/28/20*, http://www.alabamapublichealth.gov/covid19/assets/cov-al-cases-042520.pdf.

20.     Plaintiffs therefore ask that the Court enjoin the Challenged Provisions and declare them unconstitutional for the duration of the 2020 election calendar.

## PARTIES

21.     Plaintiff PEOPLE FIRST OF ALABAMA ("People First"), founded in 1988, is a group of people with developmental disabilities dedicated to making their dreams happen by having choices and control over their own lives, including by having opportunities to make decisions and plans for themselves instead of having others make decisions for them. With membership chapters in communities across Alabama, People First assists its members in accessing, among other things, competitive employment, decent housing of their choosing, transportation, and full citizenship with equal rights. This work with members includes securing access to full and equal voting rights.

22.     Because of the Challenged Provisions, during the COVID-19 pandemic, many of People First's members—who are registered voters and plan to vote in the July 14 primary runoff election and subsequent 2020 elections—will be forced to choose between voting and protecting their health because of lack of options to cast their ballot. Specifically, People First members include voters with conditions that put them at higher risk of death or severe complications from COVID-19 and are thus required to self-quarantine. Voting in-person would therefore put the health of those voters at significant risk because of person-to-person contact. Yet, although these voters may qualify for an absentee ballot given Secretary Merrill's emergency order for the July 14 runoff, these voters—many of whom live alone or with one other adult—are unable to comply with the requirement to have their absentee ballot notarized or witnessed by two adults because those activities also require person-to-person contact.

23.     People First members also include voters who do not have access to printers,

8

scanners, copiers, or even internet access, and thus cannot comply with the state's photo ID requirement for absentee ballots. Finally, People First members include voters who use wheelchairs and voters with physical disabilities who are less able to access the inside of their polling place. If Alabama offered curbside or drive-thru voting—especially during the COVID-19 pandemic—these voters would use such an option to safeguard their health while still voting in-person.

24.    Plaintiff ROBERT CLOPTON is 65 years old, Black, and a resident of Mobile County, Alabama. He is a U.S. citizen, and a lawfully registered Alabama voter. He is at high-risk for death or serious illness from contracting COVID-19 because of his age and underlying health conditions, including diabetes and hypertension. Mr. Clopton recently had emergency surgery. On March 3, 2020, the same day he voted in-person in Alabama's primary election, Mr. Clopton was admitted to the hospital. He had emergency surgery on March 5. He was discharged on March 10 and has been recovering at home and sheltering in place since that date. He is not expected to make a full recovery from his surgery until at least four to five months from now. Mr. Clopton is eligible to vote in the July 14, 2020 primary runoff election. He would like to vote absentee. But he only has one witness—his wife, with whom he resides. Given the COVID-19 pandemic and his health status, he would not feel safe voting in-person at a polling place for the July 14, 2020 primary runoff and November 3, 2020 general elections. If given the option, Mr. Clopton would consider curbside voting as a way vote on Election Day in compliance with social distancing rules and to minimize the threat to his health from a COVID-19 infection. If he is required to vote in-person without curbside voting or comply with the Witness Requirement to cast an absentee ballot, he will be prevented from voting because the risk to his life from a COVID-19 infection is too great.

25.    Plaintiff ERIC PEEBLES is a 38-year-old accessibility advocate who lives alone at

his home in Auburn, Alabama. He is white, a U.S. citizen, has never lost his right to vote by reason of a felony conviction or court order, and is a lawfully registered voter in Alabama. Mr. Peebles is at high risk for severe complications from COVID-19 because of his cerebral palsy. Respiratory illnesses, like COVID-19, can be fatal for people with his condition. Due to this elevated risk, Mr. Peebles has been self-isolating since on or around March 12—long before Alabama's stay-at-home order took effect. He has not left his apartment complex since early March. He has been restricting all in-person contact except with his four caregivers who provide 60 hours of in-home care each week. Each caregiver works separate shifts of a few hours each and their shifts do not overlap. At Mr. Peebles' request to protect his health, all four caregivers have been tested for COVID-19 and received negative results. Mr. Peebles typically votes in-person and did so during the March 3, 2020 primary election. Mr. Peebles cannot operate the voting machines unassisted and thus brings an individual into the voting booth to assist him in filling out the ballot. Despite his preference for in-person voting, Mr. Peebles needs to vote by absentee ballot in the general election in November because of the health risks in-person voting presents during the COVID-19 pandemic. The next election in which Mr. Peebles can vote is the November 3, 2020 general election. Mr. Peebles also understands that to vote absentee he must meet the Witness Requirement. Because he lives alone and only comes into contact with his caregivers—who work separate shifts—he will not be able to comply with the Witness Requirement. Finally, Mr. Peebles understands that Alabama does not allow voters—including voters with disabilities—to vote curbside. If curbside voting were available, Mr. Peebles would choose to vote curbside, as it would allow him to avoid the person-to-person contact of voting inside at the polling place that puts his health at severe risk and the Witness Requirement for absentee voting that he is unable to satisfy.

26.     Plaintiff HOWARD PORTER, JR. is a 69-year-old Black male who resides in

10

Mobile County, Alabama. He is a U.S. citizen and has been a lawfully registered voter in Alabama since he was 18. Mr. Porter has Parkinson's Disease and asthma, and it is hard for him to ambulate. He is at high-risk for contracting COVID-19 because of his age and underlying medical conditions. He has not left his home since the Governor issued the April 3 stay-at-home order. Because he is at high-risk, Mr. Porter plans to stay at home for the foreseeable future even after the "Safer at Home" or any other such order is lifted. Mr. Porter has always voted in-person, but he does not want to risk COVID-19 infection. He is eligible to vote in the July 14, 2020 primary runoff. He would feel the safest if he could vote absentee in the 2020 elections. But Mr. Clopton fears that he will be unable to comply with the Photo ID Requirements. Although he has a printer at home, Mr. Porter is retired and only receives Social Security Income. He is therefore worried that he may not be able to afford the ink or paper needed to maintain his printer through the 2020 elections. If given the option, Mr. Porter would be willing to use curbside voting rather than by entering the polling place. If he is required to vote in-person without curbside voting or to comply with the Photo ID Requirements for absentee voting, Mr. Porter will be prevented from voting because the risk to his life from a COVID-19 infection is too great.

27.     Plaintiff ANNIE CAROLYN THOMPSON is a 69-year-old retiree who lives alone at her home in Mobile, Alabama. She is Black, a U.S. citizen, has never lost her right to vote by reason of a felony conviction or court order, and is a lawfully registered voter in Alabama. Ms. Thompson is at higher-risk of contracting and having severe complications from COVID-19 because of her age and preexisting conditions, including diabetes and high blood pressure. After she retired as a cosmetologist, Ms. Thompson began working as a caretaker for people who required extra assistance in assisted living homes. She recently had to leave that job when her patient spiked a very high fever and was taken to the hospital to test for COVID-19 on or around

April 1. Fearing for her own health, Ms. Thompson received a COVID-19 test, which came back negative at that time. Although Ms. Thompson had been taking measures to protect herself, Ms. Thompson has been quarantining herself at home since April 1, 2020, restricting all in-person contact except when her daughter brings her groceries. Ms. Thompson has internet access, but does not have a printer, scanner, or copy machine at her home. She voted in-person in the March 3, 2020 primary election. She is eligible to vote in the July 14 primary runoff but due to the health risks of voting in-person, she plans to vote by absentee ballot in all future 2020 elections. Because she does not have the necessary equipment to obtain a copy of her photo ID, Ms. Thompson has no way to complete the absentee ballot application without endangering her health. Public libraries in Mobile are currently closed. Ms. Thompson's only option is to find a local business that is still open and will allow her to pay for a copy of her photo ID, or she will have to choose between not voting or endangering her health by voting in-person for the July 14, 2020 primary runoff election. Because she lives alone and only comes into contact with her daughter, Ms. Thompson also will not be able to comply with the Witness Requirement without leaving home or endangering her health.

28.     Plaintiff GREATER BIRMINGHAM MINISTRIES ("GBM") was founded in 1969 in response to the urgent human rights and justice needs of the residents of the greater Birmingham, Alabama area.  GBM is a multi-faith, multi-racial membership organization that provides emergency services for members and constituents in need. It engages in community efforts to create systemic change with the goal of building a strong, supportive, and politically active society that pursues justice for all people.

29.     A central goal of GBM is the pursuit of social justice in the governance of Alabama. GBM actively opposes state laws, policies, and practices that result in the exclusion of vulnerable

groups or individuals from the democratic process.  Toward that end, GBM regularly engages in efforts to register, educate, and increase turnout, particularly among Black, Latinx, disabled, and low-income registered voters.

30.     GBM has about 5,000 members. Many of GBM's low-income members lack access to a computer, the internet, or other videoconferencing technology. About a third of GBM's members are senior citizens and about one fifth of all GBM members live alone. Of those members, many are Black, Latinx, disabled, or low-income registered voters who are staying home because they are at a higher risk of death or serious illness from COVID-19 due to age or preexisting medical conditions, like diabetes or hypertension. Because of the Witness Requirement and Prohibition on Curbside Voting, these members are forced to choose between risking their lives (and the lives of others) or not voting in the July 14, August 25 or November 3, 2020 elections.

31.     As a result of the Witness Requirement and the Prohibition on Curbside Voting, GBM is now required to divert a portion of its limited financial and organizational resources away from voter registration and turnout efforts to undertake such new activities as (1) assessing who among its members are unable to comply with the Witness Requirement amid the COVID-19 pandemic; (2) increasing efforts to educate its members and constituents about the Witness Requirement; (3) advocating that Defendants permit curbside voting; and (4) investigating, responding to, mitigating, and addressing the concerns of its members and constituents impacted or who will be disenfranchised by the Witness Requirement, Prohibition on Curbside Voting, and Defendants' inadequate efforts to protect voters from COVID-19 ahead of the 2020 elections. In absence of the Witness Requirement and Prohibition on Curbside Voting, GBM would not have engaged in these activities. As a result, GBM is limited, and will continue to be limited, in the organizational resources that it can devote to its other core goals.

32.     Plaintiff THE ALABAMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ("Alabama NAACP") is a state subsidiary of the National Association for the Advancement of Colored People, Inc.  The Alabama NAACP is the oldest and one of the most significant civil rights organizations in Alabama, and it works to ensure the political, educational, social, and economic equality of African Americans and all other Americans.

33.     Two central goals of the Alabama NAACP are to eliminate racial discrimination in the democratic process, and to enforce federal laws and constitutional provisions securing voting rights.  Toward those ends, the Alabama NAACP regularly engages in efforts to register and educate Black voters and encourages them to engage in the political process by turning out to vote on Election Day.

34.     Many Alabama NAACP members are senior citizens, Black, and/or have medical conditions, like diabetes or hypertension, that put them at higher risk for death or serious illness from COVID-19. Many members also live alone or with only one other adult person. These members and others are staying at home to avoid contracting COVID-19. They will be unable to meet the Witness Requirement. The difficulties already faced by the Alabama NAACP's most vulnerable members in complying with the Witness Requirement are magnified substantially by the COVID-19 crisis. For example, one active member is in her 80s, lives alone, and has breast cancer and heart disease. She is extremely vulnerable to COVID-19. She does not have ready access to videoconferencing technology. She, and other members like her, cannot vote in-person or meet the Witness Requirement without risking her life by coming into contact with others.

35.     As a result of the Witness Requirement and Prohibition on Curbside Voting, the Alabama NAACP is now required to undertake such activities as (1) assessing who, among its

constituency will be unable to comply with the Witness Requirement, while taking protective measures against COVID-19 infection, like staying home; (2) increasing efforts to educate Black and disabled voters, as well as the general public, about the Witness Requirement; and (3) advocating for the adoption of measures like curbside voting that would ease the burdens on voters during the pandemic. In absence of the Witness Requirement and Prohibition on Curbside Voting, the Alabama NAACP would not have had to engage in these activities.

36. Thus, the Witness Requirement and Prohibition on Curbside Voting are causing, and will continue to cause, the Alabama NAACP to divert a portion of its limited financial and other organizational resources to investigating, responding to, mitigating, and addressing the concerns of its members and constituents impacted or who will be disenfranchised by the Witness Requirement, the Prohibition on Curbside Voting, and Defendants' inadequate efforts to protect voters from COVID-19 ahead of the 2020 elections. As a result, the Alabama NAACP is limited, and will continue to be limited, in the organizational resources that it can devote to its other core goals.

37. Defendant JOHN MERRILL is the Secretary of State of the State of Alabama. He is sued in his official capacity. As a constitutional officer and a member of the State's executive department, he is Alabama's chief election official. Ala. Const., art. V, § 112. He is charged with administering elections and enforcing the Challenged Provisions, including instructing probate judges, absentee election managers, and other officials on the proper interpretation and implementation of the Challenged Provisions, issuing related administrative rules, canvassing returns and certifying election results in a manner that is consistent with the Challenged Provisions.

38. Defendant KAY IVEY is the Governor of the State of Alabama and is sued in her official capacity. The Governor of Alabama is a constitutional officer who is vested with the

supreme executive power of the State. She is the chief magistrate of the State. As such, she is charged with enforcing state election laws and any related administrative rules. Ala. Const., art. V, § 113. Governor Ivey is also vested with the power to declare a state of emergency and substantial powers to act accordingly. During a declared state of emergency, she can alter or amend existing state election laws, including the Challenged Provisions. Ala. Code §§ 31-9-1 *et seq*.

39.     Defendant STATE OF ALABAMA ("State") is a State of the United States, and is being sued pursuant to Sections 2, 3 and 201 of the VRA and Title II of the ADA. Pursuant to the Fourteenth and Fifteenth Amendments of the U.S. Constitution, Congress has validly abrogated the State of Alabama's sovereign immunity in actions brought to enforce the VRA and the ADA. The state receives federal funding under the Help America Vote Act of 2002 ("HAVA").

40.     Defendants ALLEEN BARNETT, in her official capacity as Absentee Ballot Manager of Mobile County; JACQUELINE ANDERSON-SMITH, in her official capacity as Circuit Clerk of Jefferson County; KAREN DUNN BURKS, in her official capacity as Deputy Circuit Clerk of the Bessemer Division of Jefferson County; and MARY B. ROBERSON, in her official capacity as Circuit Clerk of Lee County. Each one serves as the absentee ballot manager for federal, state, and county elections in their respective Alabama counties. As the absentee ballot managers, they are charged with enforcing the Witness and Photo ID Requirements, processing and distributing absentee ballot applications, and validating and canvassing absentee ballots.

## JURISDICTION AND VENUE

41.     This action arises under the First and Fourteenth Amendments to the U.S. Constitution, the ADA, and the VRA, and is brought under 42 U.S.C. §§ 1983 and 1988, 42 U.S.C. §§ 12131, *et seq*., and 52 U.S.C. §§ 10301, 10302(b) and 10501 to seek injunctive and declaratory relief for violations of federal law. This Court therefore has subject matter jurisdiction under 28

U.S.C. §§ 1331 and 1343.

42.     This Court has personal jurisdiction over Defendants, who are sued in their official

capacities as state officials. The violations complained of concern their conduct in such capacities.

43.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

44.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the

events that gave rise to Plaintiffs' claims occurred there.

## STATEMENT OF FACTS

### I.      Transmission of COVID-19 and Public Health Guidelines

45.     Our nation is in the midst of a public health emergency due to the exponential spread

of COVID-19, the respiratory disease caused by the novel coronavirus SARS-CoV-2. According

to the CDC, this coronavirus spreads aggressively, including by asymptomatic people.[8] Persons in

all age groups have contracted the disease.[9]

46.     Since April, the United States has led the world in the total number of COVID-19

cases. As of April 30, 2020, the United States has confirmed over one million cases of COVID-

19[10] and reported 60,999 deaths due to COVID-19 and counting.[11]

47.     Even mild cases of COVID-19 generally involve about two weeks of fevers and dry

---

[8] Ctrs. for Disease Control & Prevention, *How Coronavirus Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Apr. 21, 2020).
[9] Robert Verity, et al., Estimates of the Severity of Coronavirus Disease 2019: A Model-Based Analysis, The Lancet 6Infec Dis (Mar. 30, 2020), https://www.thelancet.com/action/showPdf?pii=S1473-3099%2820%2930243-76.
[10] Lisa Lockerd Maragakis, *Coronavirus Disease 2019 vs. the Flu,* Johns Hopkins Univ. Health, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-disease-2019-vs-the-flu (last visited Apr. 30, 2020); *see also* COVID-19 Dashboard, Johns Hopkins Ctr. for Sys. Sci. & Eng'g, https://www.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6 (last visited Apr. 26, 2020) (GIS map of global COVID-19 cases developed by the Johns Hopkins Ctr. for Sys. Sci. & Engineering).
[11] Maragakis, *supra* n.10.

coughs and are more severe than the flu.[12]

48.   The CDC estimates that approximately 33% of those who are infected by SARS-CoV-2 require hospitalization.[13] COVID-19 can severely damage lung tissue, cause a permanent loss of respiratory capacity, and also damage tissues in the kidney, heart, and liver.[14] The surge of COVID-19 cases also causes mounting strains on healthcare systems, including critical shortages of doctors, nurses, hospital beds, medical equipment, and personal protective equipment.[15]

49.   In serious cases, individuals' lungs "become filled with inflammatory material [and] are unable to get enough oxygen to the bloodstream."[16] Severe cases of COVID-19 cause acute respiratory distress syndrome ("ARDS") in which fluid displaces air in the lungs. COVID-19 patients with ARDS "are essentially drowning in their own blood and fluids because their lungs are so full."[17] The virus frequently causes extreme symptoms, including fever and chills that can last for weeks, excruciating pain, debilitating fatigue, an unremitting cough, uncontrollable diarrhea, and an inability to keep down food and water.[18]

---

[12] Holly Secon & Aria Bendix, *There is a wide misconception of what a 'mild' case of COVID-19 looks like. It can be ugly and brutal.*, Business Insider (Apr. 16, 2020), https://www.businessinsider.com/mild-coronavirus-cases-high-fever-dry-cough-2020-3.

[13] Al Root, *Nearly a Third of Americans With Covid-19 Are Hospitalized*, Barrons (Apr. 6, 2020), https://www.barrons.com/articles/u-s-coronavirus-hospitalizations-approach-30-here-are-the-latest-covid-19-data-51586175360.

[14] Ctrs. for Disease Control & Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited Apr. 21, 2020).

[15] Megan L. Ranney et al., *Critical Supply Shortages — The Need for Ventilators and Personal Protective Equipment during the Covid-19 Pandemic*, New Eng. J. Medicine, Apr. 30, 2020, https://www.nejm.org/doi/full/10.1056/NEJMp2006141; World Health Org., *Shortage of personal protective equipment endangering health workers worldwide* (Mar. 3, 2020), https://www.who.int/news-room/detail/03-03-2020-shortage-of-personal-protective-equipment-endangering-health-workers-worldwide.

[16] Graham Readfearn, *What happens to people's lungs when they get coronavirus?*, The Guardian (Apr. 14, 2020), https://www.theguardian.com/world/2020/apr/15/what-happens-to-your-lungs-with-coronavirus-covid-19.

[17] Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19 — Even in His Young Patients*, ProPublica (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.

[18] *See, e.g.*, *id.*; Leah Groth, *Is Diarrhea a Symptom of COVID-19? New Study Says Digestive Issues May Be Common With Coronavirus*, Health (Mar. 20, 2020), https://www.health.com/condition/infectious-diseases/coronavirus/is-diarrhea-a-symptom-of-covid-19.

50.     People of all ages have contracted COVID-19 and died from it, but the illness poses special risks for the elderly and those with certain preexisting medical conditions. Preliminary reports based on WHO data show a 3.6% mortality rate for individuals between 60-69 years old, and an 8% mortality rate for those 70-79 years old.[19] According to the CDC's analysis, 80% of all COVID-19 related deaths in the U.S. are people aged 65 and older.[20] COVID-19 also poses greater risks for people with preexisting heart and respiratory conditions, individuals with compromised immune systems, and those with many other conditions.[21]

51.     The effects of the pandemic on social life will last well into the summer of 2020, if not far longer. Experts have indicated that seasonal changes are "unlikely to stop transmission."[22] Dr. Anthony Fauci, head of the National Institute of Allergy and Infectious Diseases, recently said that he "can't guarantee" in-person voting will be safe in November, because of a potential resurgence of COVID-19 in the fall.[23]

52.     With no known effective treatment or vaccine, and vaccines months (or more) away, public health officials have been left to urge the public to practice "social distancing," i.e., avoidance of close contact with others.[24]  For purposes of social distancing, the CDC recommends

---

[19] *Sarah Boseley, People in their 60s at higher coronavirus risk too, say scientists, The Guardian (Apr. 22, 2020), https://www.theguardian.com/society/2020/apr/22/people-in-their-60s-at-higher-coronavirus-risk-too-say-scientists.*
[20] *Id.*
[21] Ctrs. for Disease Control & Prevention, *Groups at Higher Risk of Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Apr. 21, 2020).
[22] Marc Lipsitch, Harvard T.H. Chan School of Public Health, Ctr. for Communicable Disease Dynamics, *Seasonality of SARS-CoV-2: Will COVID-19 go away on its own in warmer weather?*, https://ccdd.hsph.harvard.edu/will-covid-19-go-away-on-its-own-in-warmer-weather/ (last visited Apr. 30, 2020).
[23] Jason Silverstein, *Fauci says he "can't guarantee" in-person voting in November will be safe,* CBS News, Apr. 13, 2020, https://www.cbsnews.com/news/coronavirus-fauci-says-he-cant-guarantee-in-person-voting-in-november-will-be-safe/?ftag=CNM-00-10aac3a.
[24] Johns Hopkins Univ., *Coronavirus, Social Distancing and Self-Quarantine*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine (last visited Apr. 30, 2020); Declaration of Dr. Jonathan Louis Golob, at ¶ 8, *Dawson v. Asher*, No. 2:20-cv-00409-JLRMAT (W.D. Wash. Mar. 16, 2020), ECF No. 5.

that individuals stay at least six feet away from others and "stay out of crowded places."[25]

53.    Even maintaining six feet of separation from others is not sufficient to avoid the risk of infection. Researchers have demonstrated that particles from a cough may spread as far as 16 feet, while a sneeze may spread particles as far as 26 feet.[26] When multiple people share a space the concentration of infectious droplets in the air "build[s] up."[27] The CDC has issued guidance informing individuals to avoid public gatherings until at least May 15, 2020.

54.    The CDC has issued specific guidelines concerning voting during the COVID-19 pandemic. Among other things, it recommends that states "[e]ncourage voters to use voting methods that minimize direct contact with other people and reduce crowd size at polling stations" including "mail-in methods of voting if allowed in the jurisdiction" and asked jurisdictions to "[e]ncourage drive-up voting for eligible voters" as a means of complying with social distancing rules and to limit personal contact during in-person voting.[28]

55.    Compliance with these recommendations is essential to ensuring that voters can safely participate in our democracy. There is no evidence that SARS-CoV-2 can be spread through the mail, and the U.S. Postal Service has further changed their policies to "eliminate the requirement that customers sign our Mobile Delivery Devices for delivery" and now require the customer "to step back a safe distance or close the screen door/door so that they may leave the

---

[25] Ctrs. for Disease Control & Prevention, *Public Health Recommendations after Travel-Associated COVID-19 Exposure*, https://www.cdc.gov/coronavirus/2019-ncov/php/risk-assessment.html (last updated Apr. 23, 2020).
[26] Yuliya Parshina-Kottas et al, *This 3-D Simulation Shows Why Social Distancing Is So Important*, N.Y. Times, Apr. 14 2020, https://www.nytimes.com/interactive/2020/04/14/science/coronavirus-transmission-cough-6-feet-ar-ul.html.
[27] *Id.*
[28] Ctrs. for Disease Control & Prevention, *Recommendations for Election Polling Locations: Interim guidance to prevent spread of coronavirus disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated March 27, 2020).

item in the mail receptacle or appropriate location by the customer door."[29]

56.      In contrast, the risks of interpersonal interaction while voting are already evident. During Florida's recent primary, two Broward County poll workers tested positive for COVID-19, one of whom was handling driver's licenses as part of the identification verification process.[30] Elections held on April 7 in Wisconsin saw multi-hour waits and lines stretching blocks upon blocks in places like Milwaukee and Green Bay, in part, because government officials there were unable to create a viable vote-by-mail process for all voters. By April 24, health officials in Milwaukee had identified at least 40 positive COVID-19 cases linked to in-person voting on April 7, including at least six voters and one poll worker.[31] By April 30, 52 people who voted in-person or worked as poll workers in the April 7 Wisconsin primary had tested positive for COVID-19.[32]

## II.      COVID-19 in Alabama

57.      The COVID-19 pandemic has deeply affected Alabama.  As of April 30, 2020, the State had confirmed over 7,00 cases.[33] Over 270 Alabamians have died from the disease.[34]

58.      Models used by health officials project a sustained outbreak in Alabama, even if full social distancing were extended through May.[35] On April 26, Dr. Deborah Birx, the White

---

[29] United States Postal Service, *USPS Statement on Coronavirus* (April 2, 2020), https://about.usps.com/newsroom/statements/usps-statement-on-coronavirus.htm (citing guidance from World Health Organization, CDC, and Surgeon General).

[30] Anthony Man, *Two Broward poll workers, including one who handled voters' driver licenses, test positive for coronavirus*, S. Fla. Sun Sentinel, Mar. 26, 2020, https://www.sun-sentinel.com/coronavirus/fl-ne-broward-elections-poll-workers-coronavirus-20200326-wmgy775dvjc5jis2oagxlpmule-story.html.

[31] Teran Powell, *40 Coronavirus Cases In Milwaukee County Linked To Wisconsin Election, Health Official Says*, WUWM 89.7 Milwaukee's NPR, Apr. 24 2020, https://www.wuwm.com/post/40-coronavirus-cases-milwaukee-county-linked-wisconsin-election-health-official-says#stream/0.

[32] Scott Bauer, *52 people who worked or voted in Wisconsin election have COVID-19*, PBS News Hour, Apr. 29, 2020, https://www.pbs.org/newshour/health/52-people-who-worked-or-voted-in-wisconsin-election-have-covid-19.

[33] Ala. Dep't of Public Health, Div. of Infectious Diseases & Outbreaks, *COVID-19 in Alabama*, https://dph1.adph.state.al.us/covid-19/ (last visited Apr. 30, 2020).

[34] *Id.*

[35] *See* Institute for Health Metrics and Evaluation, *COVID-19 Projections, Social distancing assumed until infections minimized and containment implemented: Alabama*, https://covid19.healthdata.org/united-states-of-america/alabama (last visited Apr. 30, 2020).

House coronavirus task force coordinator, stated that social distancing would be required at least through the summer.[36]

59.     As has been the case nationally, Alabamians of all ages have tested positive for COVID-19. At least one confirmed case in Alabama is a patient who is less than one year old; another is 97.[37]

60.     In response, Governor Ivey and the Alabama Department of Public Health ("ADPH") have urged social distancing. Governor Ivey has stated: "Maintaining a 6-foot distance between one another is paramount."[38] Further, the ADPH has instructed the public "to spend as much time as possible at home to prevent an increase in new infections."[39]

61.     To combat viral spread, Governor Ivey and the ADPH have taken a series of steps since early March, including issuing increasing aggressive guidelines and restrictions. These orders have had the incremental effect of closing most "non-essential" businesses and requiring residents of the State to essentially shelter in place.[40]

62.     On March 13, Governor Ivey declared a State of Emergency for Alabama.[41]  On the same day, President Donald Trump proclaimed a National Emergency concerning COVID-19.[42]

---

[36] Ben Kamisar, Birx: *U.S. needs a 'breakthrough' on antigen testing to aid in reopening*, NBC News, Apr. 26, 10:25 a.m., https://www.nbcnews.com/politics/meet-the-press/birx-u-s-needs-breakthrough-antigen-testing-aid-re-opening-n1192901.

[37] Jessica Barnett, *Ivey: Students to work from home for remainder of year*, The News Courier, Mar. 26, 2020, (Mar. 26, 2020), https://www.enewscourier.com/covid-19/ivey-students-to-work-from-home-for-remainder-of-year/article_edd3d2d0-6fad-11ea-aa1a-0bb1baa48e68.html..

[38] Off. of the Gov. of Ala., *Governor Ivey Announces New Primary Runoff Election Date* (Mar. 18, 2020), https://governor.alabama.gov/newsroom/2020/03/governor-ivey-announces-new-primary-runoff-election-date/.

[39] Ala. Dep't of Pub. Health, *It's safer at home; protect yourself and your community from COVID-19* (Mar. 27, 2020), https://www.alabamapublichealth.gov/news/2020/03/27.html.

[40] See Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of Infection by COVID-19 (Apr. 3, 2020), https://governor.alabama.gov/assets/2020/04/Final-Statewide-Order-4.3.2020.pdf (summarizing and extending measures to date).

[41] Proclamation by the Governor of the State of Alabama, State of Emergency: Coronavirus (COVID-19), Mar. 13, 2020, https://governor.alabama.gov/newsroom/2020/03/state-of-emergency-coronavirus-covid-19/.

[42] Proclamation No. 9994, 85 Fed. Reg. 15337 (2020),  https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

63.     On March 19, Governor Ivey and the ADPH issued a statewide health order implementing the following mandatory measures: (a) prohibiting "[a]ll gatherings of 25 persons or more, or gatherings of any size that cannot maintain a consistent six-foot distance between persons"; (b) closing all beaches; (c) closing all Senior Citizen Center gatherings; (d) closing all public and private schools, colleges, and universities; (e) closing most preschools and childcare centers, with an exception for "childcare centers operated for the exclusive benefit of essential employees" of enumerated categories of employers; (f) requiring hospitals and nursing homes to prohibit visitation except for certain compassionate care situations; (g) delaying all elective medical and dental procedures; and (h) prohibiting restaurants, bars, breweries, and similar establishments from permitting "on-premise consumption of food or drink."[43]

64.     The following day, March 20, Governor Ivey authorized the Alabama National Guard to activate up to 100 guardsmen as needed to combat COVID-19.[44]

65.     On March 26, Governor Ivey issued a proclamation ordering "all public K-12 schools" to "implement a plan to complete the 2019-2020 school year using alternative methods of instruction"; extending the licensure period for emergency medical services personnel; authorizing some notaries to notarize signatures through videoconferencing; authorizing state agencies to create, retain, and accept electronic records and signatures; and enabling municipalities to authorize law enforcement officers to issue a summons and complaint in lieu of arrest for most

---

[43] *See* Order of the State Public Health Officer Suspending Certain Public Gatherings Due to Risk of Infection by COVID-19 (Mar. 19, 2020), https://www.alsde.edu/COVID19%20Updates/Alabama%20State%20Health%20Officer%20Statewide%20Social%20Distancing%20Order%20%20%20283.19.20%29.pdf.

[44] Off. of the Gov. of Ala., *Governor Ivey Issues Statement on Authorization of Alabama National Guard on As Needed Basis* (Mar. 20, 2020), https://governor.alabama.gov/newsroom/2020/03/governor-ivey-issues-statement-on-authorization-of-alabama-national-guard-on-as-needed-basis/.

misdemeanors and violations.[45]

66.    On March 30, President Trump approved a major disaster declaration for Alabama, which made federal emergency aid available for pandemic related recovery efforts.[46]

67.    On April 2, Governor Ivey issued a proclamation modifying regulations applicable to health care providers and ordering licensing boards to adopt emergency rules to "expand the capacity of the health care workforce"; modifying or suspending some regulations and laws affecting healthcare facilities; expanding the Governor's March 26 authorization of remote notarizations and witnessing; authorizing governmental entities to postpone or cancel public meetings; enabling corporations to hold remote shareholder meetings; and authorizing measures "to reduce the number of local inmates being held in county jails in a way that does not jeopardize public safety."[47]

68.    On April 3, Governor Ivey and State Health Officer Scott Harris issued a mandatory statewide order requiring "every person . . . to stay at his or her place of residence except as necessary to perform" an enumerated list of "essential activities."[48]

69.    In addition, the April 3 order mandated the closure of entertainment venues, athletic facilities, and close-contact service providers, such as barber shops.[49] In order to remain open, "essential retailers" were required by the order to implement a reduced "emergency maximum occupancy rate," enforce social distancing, and take reasonable steps to comply with CDC and

---

[45] Gov. Kay Ivey, Proclamation by the Governor (Mar. 26, 2020),
https://www.alabamapublichealth.gov/legal/assets/soe-covid19-instruction-032620.pdf.
[46] *See* FEMA, *President Donald J. Trump Approves Major Disaster Declaration for Alabama* (Mar. 30, 2020),
https://www.fema.gov/news-release/2020/03/30/president-donald-j-trump-approves-major-disaster-declaration-alabama.
[47] Gov. Kay Ivey, Proclamation by the Governor (Apr. 2, 2020),
https://www.alabamapublichealth.gov/legal/assets/soe-covid19-040220.pdf.
[48] Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of Infection by COVID-19, at 1 (Apr. 3, 2020), https://governor.alabama.gov/assets/2020/04/Final-Statewide-Order-4.3.2020.pdf.
[49] *Id.* at 7-8.

ADPH sanitation guidelines.[50]

70.    Further, the April 3 order required any non-institutionalized person who has tested positive for COVID-19 to "be quarantined to their place of residence for a period of 14 days after receiving positive test results."[51] The order prohibited persons in quarantine from "leav[ing] their place of residence for any reason other than to seek necessary medical treatment."[52]

71.    In issuing the April 3 order, Governor Ivey's issued a statement describing it as "a Stay at Home order to be applied statewide."[53]

72.    On April 14, during a press conference, Governor Ivey stressed the importance of continuing to practice social distancing and continuing to abide by the State's "Stay at Home" order, stating: "It is imperative that we keep doing what we are doing . . . . Now is not the time to let our guard down and pretend that things are back to normal."[54]

73.    On April 28, Governor Ivey announced a "Safer at Home" order effective from April 30 through May 15.[55] Under the "Safer at Home" order, all non-work related gatherings are prohibited, except between groups of fewer than ten people or those that can maintain six-feet of distance between people from different households.[56] Some businesses may open subject to sanitation and social distancing guidelines, but entertainment venues, athletic facilities, and close-

---

[50] *Id.* at 8.

[51] *Id.* at 8-9.

[52] *Id.* at 8.

[53] Off. of the Gov. of Ala., *Governor Ivey Issues Stay at Home Order* (Apr. 3, 2020), https://governor.alabama.gov/newsroom/2020/04/governor-ivey-issues-stay-at-home-order/.

[54] *See* Chip Brownlee, *Gov. Kay Ivey: Now is not the time to "pretend things are back to normal"*, Ala. Political Reporter (Apr. 14, 2020), https://www.alreporter.com/2020/04/14/gov-kay-ivey-now-is-not-the-time-to-pretend-things-are-back-to-normal/.

[55] Press Release, The Office of Alabama Governor Kay Ivey, Governor Ivey Issues Safer at Home Order (Apr. 28, 2020), https://governor.alabama.gov/newsroom/2020/04/governor-ivey-issues-safer-at-home-order/.

[56] The Office of Alabama Governor Kay Ivey, Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of Infections by COVID-19 at 2 (Amended Apr. 28, 2020), https://governor.alabama.gov/assets/2020/04/Safer-At-Home-Order-Signed-4.28.20.pdf.

contact services like barbershops and hair salons remain closed.[57] Individuals—especially vulnerable persons—are encouraged to stay home, wear face coverings when necessary to leave the home, and follow good sanitation practices.[58]

74.     Yet, the number of COVID-19 cases are continuing to rise in both the rural and urban counties of Alabama.[59] For example, from April 15 to April 30, Mobile County added 447 new COVID-19 cases, which is more than the total new case count in all 67 counties, except for Jefferson County, the most populous county, which added 862 new cases.[60] As of April 30, 42% of the new cases in Alabama in the last day had come from Mobile County alone.[61] The First Congressional District is centered in and around Mobile County.

## III.     COVID-19's Impact on Black Alabamians Given Ongoing and Past Discrimination

75.     The COVID-19 pandemic has had a particularly devastating effect on Black communities. A CDC report published April 8, 2020, which included data from 1,482 patients hospitalized across 14 states, found that Black COVID-19 patients made up 33% of those for whom race or ethnicity information was available, despite representing only 18% of the states' populations.[62]

76.     As Dr. Selwyn M. Vickers, Senior Vice President of Medicine and Dean of the University of Alabama at Birmingham School of Medicine, has explained, across the nation, the

---

[57] *Id.* at 3-5.

[58] *Id.* at 2.

[59] Ramsey Archibald, *Coronavirus cases still rising in pockets across rural Alabama*, Alabama Media Group (Apr. 25, 2020), https://www.al.com/news/2020/04/coronavirus-cases-still-rising-in-pockets-across-rural-alabama.html.

[60] Ramsay Archibald, *Handful of Alabama counties still seeing coronavirus cases rise over last 14 day*, Alabama Media Group, Apr. 30, 2020, https://www.al.com/news/2020/04/handful-of-alabama-counties-still-seeing-coronavirus-cases-rise-over-last-14-days.html.

[61] Leada Gore, *42% of Alabama's new coronavirus cases come from 1 county*, Alabama Media Group, Apr. 30, 2020, https://www.al.com/news/2020/04/42-of-alabamas-new-coronavirus-cases-come-from-1-county.html.

[62] CDC Morbidity and Mortality Weekly Report, Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019—COVID-NET, 14 States, March 1-30, 2020 (Apr. 8, 2020), at 459, https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6915e3-H.pdf.

"alarming outcomes [for Black COVID-19 patients] are in large part the result of longstanding inequities in an array of health determinants, including limited access to health care (especially primary care)[.]"[63] In many parts of the country, COVID-19 "testing facilities have been concentrated in predominantly white areas" or have been  "drive-through-only or not on public transportation routes, making them less accessible for people who do not own an automobile."[64]

77.     Alabama has likewise reported alarming racially disparate patterns of serious illness and mortality due to COVID-19.[65]  As of April 28, the ADPH has reported that Black people in Alabama represented 41% of reported COVID-19 cases and 45% of related deaths[66] despite making up just 27% of the state's population.[67] In Mobile County, as of April 30, Black people accounted for 28 of 53 COVID-19 deaths,[68] a startling 53% of all COVID-19 deaths in the county, despite representing only 36% of the population.[69]

78.     These racial disparities reflect Alabama's long and ongoing history of discrimination against Black people in health, education, housing, employment, and other areas of socioeconomic life. Due to persistent structural inequities, Black Alabamians have less access to

---

[63] Dr. Selwyn M. Vickers, *Health Disparities and COVID-19: A Crisis Within a Crisis*, UAB News, Apr. 10, 2020, https://www.uab.edu/news/campus/item/11232-health-disparities-and-covid-19-a-crisis-within-a-crisis.
[64] *Id*.; *see also* Blake Farmer, *The Coronavirus Doesn't Discriminate, But U.S. Health Care Showing Familiar Biases*, NPR, Apr. 2, 2020, https://www.npr.org/sections/health-shots/2020/04/02/825730141/the-coronavirus-doesnt-discriminate-but-u-s-health-care-showing-familiar-biases.
[65] *See* Kim Chandler, *Alabama numbers show race disparity in COVID-19 deaths*, Associated Press, Apr. 7, 2020, https://apnews.com/ca48e15ae178c14036ed795ccac857c3.
[66] ADPH, *Alabama Public Health Daily Case Characteristics: 4/28/20*, http://www.alabamapublichealth.gov/covid19/assets/cov-al-cases-042520.pdf.
[67] U.S. Census Bureau, *QuickFacts Alabama*, https://www.census.gov/quickfacts/AL (last visited Apr. 26, 2020).
[68] Mobile County Health Dep't, *Characteristics of COVID-19 Patients–Mobile County, Alabama, 2020* (Apr. 30, 2020), http://mchd.org/Documents/BulkDocuments/News_4302020122506pm_COVIDSURVREPORT04.30.20.pdf.pdf. .
[69] U.S. Census Bureau, *QuickFacts: Mobile County, Alabama*, https://www.census.gov/quickfacts/mobilecountyalabama (last visited Apr. 30, 2020).

healthcare and health insurance.[70] Black voters in the Black Belt counties in particular "have fewer primary care physicians, dentists and mental health providers per resident than other counties."[71]

79.    Disparities in access to transportation further exacerbate Black people's disproportionate lack of access to healthcare. Of those persons who can reach healthcare providers, Black patients showing symptoms like cough and fever are less likely than other patients to be given one of the scarce COVID-19 tests,[72] because of longstanding racial biases in medical care.[73]

80.    Underlying health disparities further render Black Alabamians particularly vulnerable to COVID-19. In Alabama, Black people are more than twice as likely as whites to die from diabetes and nearly three times as likely to die from hypertension or asthma.[74] Many of these underlying conditions result from past and present policies that both relegate Black people to particular neighborhoods and disproportionately allocate landfills, factories, and other environmental risks to Black neighborhoods.[75] On April 10, in light of the racial disparities in infection and death for Black Alabamians, Dr. Karen Landers, an officer at the ADPH, urged Black

---

[70] Heeju Sohn, *Racial and Ethnic Disparities in Health Insurance Coverage: Dynamics of Gaining and Losing Coverage over the Life-Course*, 36 Popul Res Policy Rev. 181 (Apr. 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5370590/ ("African Americans . . . are more likely to be uninsured throughout adulthood than non-Hispanic [white] individuals. Without insurance, people face considerable barriers in receiving health services. Many health care providers require insurance coverage from their patients or charge a prohibitively high fee.").
[71] Anna Maria Barry-Jester, *The Healthcare System is Leaving the Southern Black Belt Behind*, FiveThirtyEight Jun. 28, 2017, https://fivethirtyeight.com/features/the-health-care-system-is-leaving-the-southern-black-belt-behind/; *see also* The Office of Primary Care and Rural Health Alabama Department of Public Health and The Alabama Rural Health Association, *Selected Health Status Indicators* (Oct. 2007), http://www.adph.org/ruralhealth/assets/BBACData.pdf.
[72] *See* Rubix Life Sciences, *Health Data in the COVID-19 Crisis: How Racial Equity is Widening for Patients to Gain Access to Treatment* 3 (Mar. 20, 2020), https://rubixls.com/wp-content/uploads/2020/04/COVID-19-Minority-Health-Access-7-1.pdf; *see also* Farmer, *supra* n.64.
[73] *See, e.g.*, Michael O. Schroeder, *Racial Bias in Medicine Leads to Worse Care for Minorities*, U.S. News, Feb. 11, 2016, https://health.usnews.com/health-news/patient-advice/articles/2016-02-11/racial-bias-in-medicine-leads-to-worse-care-for-minorities.
[74] ADPH, *Selected Health Status Indicators: Alabama's Caucasian and African American Populations* 4-5 (July 2013), http://www.adph.org/minorityhealth/assets/MinorityHealthStatus2013.pdf.
[75] *See, e.g.*, Ihab Mikati et al., *Disparities in Distribution of Particulate Matter Emission Sources by Race and Poverty Status*, 108 Am J. Pub. Health 480-83 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5844406/; Diane Alexander & Janet Currie, *Is it who you are or where you live? Residential segregation and racial gaps in childhood asthma*, 55 J. Health Econ. 186 (2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6112984/.

people in particular to "stay at home" and stringently practice social distancing.[76]

81.      Racial discrimination in Alabama has also resulted in socioeconomic inequalities that disadvantage Black people, like higher rates of unemployment, disability, poverty, and inadequate health insurance than white people. These factors also make it more likely that Black voters in Alabama are forced to work outside the home even during the current pandemic and are therefore more exposed to COVID-19.

82.      Black Americans are, for example, more likely to be part of the "blue collar" essential workforce than white people.[77] In Alabama, the U.S. Census Bureau's 2018 American Community Survey 1-Year Estimates ("ACS") shows that 20.7% of Black people and just 13.7% of white people over age 16 work in service occupations.  Similarly, 25.8% of Black people and just 14.6% of white people work in production, transportation, or material moving occupations. By contrast, 39.1% of white people versus only 26.2% of Black people in Alabama hold management or professional occupations—*i.e.*, "white collar" jobs that are much more likely to allow employees to continue to work safely at home.

## IV.      The COVID-19 Crisis and 2020 Elections in Alabama

83.      Dozens of elections are still scheduled to take place in Alabama between May and the end of the calendar year, including major statewide elections on July 14 and November 3.[78]

84.      Upon information and belief, as of March 10, 2020, Defendant John Merrill had no plan for safely conducting the then-scheduled March 31 runoff election amid the pandemic.

---

[76] *Dr. Karen Landers says large number of COVID-19 deaths are African American*, WHNT-TV Huntsville, Apr. 10, 2020,  https://www.msn.com/en-us/foodanddrink/foodnews/dr-karen-landers-says-large-number-of-covid-19-deaths-are-african-american/vp-BB12rYB6.

[77] Devan Hawkins, *The coronavirus burden is falling heavily on black Americans. Why?*, The Guardian, Apr. 16, 2020, https://www.theguardian.com/commentisfree/2020/apr/16/black-workers-coronavirus-covid-19.

[78] *See* Ala. Sec'y of State, Upcoming Elections, 2020 Election Calendar, https://www.sos.alabama.gov/alabama-votes/voter/upcoming-elections (last visited April 30, 2020).

85.     On March 10, for instance, a local columnist asked Defendant John Merrill his plan for safely running the then-scheduled March 31, 2020 primary runoff election during the pandemic. Among other options, the columnist asked Secretary Merrill about encouraging more citizens to vote early and allowing curbside drop-off for absentee ballots.[79]

86.     Secretary Merrill responded that "we're not going to talk about that," asserting that "we don't need for people to be concerned about something that may not ever happen. The story that you're thinking about writing is not even important."[80] Secretary Merrill said that he would "follow the lead" of Governor Ivey and the ADPH. He refused to discuss any plan for the then-scheduled March 31 election until they told him there was "a concern." When asked if he had a "secret plan." Secretary Merrill answered, "We'll respond accordingly based on what information we have," adding: "We don't have any [coronavirus cases] yet. . . . So we don't need to have our people have an increased level of anxiety."[81]

87.     Three days later, on March 13, there were six confirmed cases of Alabamians with COVID-19.[82]

88.     Also, on March 13, Governor Ivey declared a state of emergency in Alabama. That same day, Secretary Merrill stated that there were no plans to postpone the March 31 primary runoff and that he had no authority under state law to do so.[83]

89.     Two days later, on March 15, Secretary Merrill asked for an emergency opinion

---

[79] Kyle Whitmire, *Election Day epidemic? Alabama has no plan*, Alabama Media Group, Mar. 10, 2020, https://www.al.com/news/2020/03/election-day-epidemic-alabama-has-no-plan.html.
[80] *Id.*
[81] *Id.*
[82] Chip Brownlee, *Tracking COVID-19 cases in Alabama*, Ala. Political Reporter https://www.alreporter.com/mapping-coronavirus-in-alabama/ (last visited Apr. 30, 2020).
[83] Mike Cason, *John Merrill says law doesn't allow postponement of Alabama runoff*, Alabama Media Group, Mar. 13, 2020, https://www.al.com/news/2020/03/john-merrill-says-law-doesnt-allow-postponement-of-alabama-runoff.html.

from the Alabama Attorney General on whether the Governor had the authority pursuant to her emergency powers to move the March 31 runoff election date. "I don't have the authority and the governor does not have the authority, explicit authority, to postpone the election," Secretary Merrill said. "So, with the new information that was introduced today by the governor about the outbreak and the steps that she's taking with state employees, I felt it was important we get a better interpretation about what the potential might be in order to have that exercised for that reason."[84] By then, there were 22 confirmed COVID-19 cases in Alabama.[85]

90.     Secretary Merrill sought the opinion out of a concern that, because of the increasingly strict federal and state guidelines discouraging large gatherings and urging people to practice social distancing, he would be unable to safely conduct the primary runoff.[86]

91.     Local election officials had also urged a postponement of the primary runoff election to reduce the risk of spreading COVID-19 among voters and poll workers, who tend to be older than the general public, putting them at higher risk of death or severe illness from the virus.[87]

92.     On March 17, the Alabama Attorney General issued an opinion finding that Governor Ivey had the authority under the state's emergency management law to postpone the primary runoff until July 14, at the latest. Secretary Merrill agreed that the primary runoff cannot be postponed later than July 14 because further delay will interfere with the November 3 general

---

[84] Mike Cason, *John Merrill says Alabama runoff should be postponed; seeks AG opinion*, Alabama Media Group, Mar. 15, 2020, https://www.al.com/news/2020/03/john-merrill-says-alabama-runoff-should-be-postponed-seeks-ag-opinion.html.
[85] *Brownlee*, *supra* n.82.
[86] Mike Cason, *AG Steve Marshall says governor can postpone March 31 runoff*, Alabama Media Group, Mar. 17, 2020, https://www.al.com/news/2020/03/ag-steve-marshall-says-governor-can-postpone-march-31-runoff.html.
[87] *Id.*

election.[88] That day, there were 39 confirmed COVID-19 cases in Alabama.[89]

93.     On March 18, Governor Ivey rescheduled the March 31 primary runoff to July 14, 2020.[90] The same day, there were 51 confirmed COVID-19 cases in Alabama.[91]

94.     That same day, Secretary Merrill promulgated an emergency rule pursuant to Section 17-11-3(e) of the Alabama Code titled "Absentee Voting During State of Emergency."[92] Section (1) of the emergency rule provided as follows:

> [A]ny qualified voter who determines it is impossible or unreasonable to vote at their voting place for the Primary Runoff Election of 2020 due to the declared states of emergency, shall be eligible to check the box on the absentee ballot application which reads as follows: "I have a physical illness or infirmity which prevents my attendance at the polls. [ID REQUIRED]."[93]

95.     On March 19, Plaintiffs Greater Birmingham Ministries, the Alabama NAACP, and other civil rights organizations requested that Secretary Merrill take a number of steps to ensure voters could safely participate in all of the upcoming 2020 elections, including extend emergency rule 820-2-3-.06-.01ER to all 2020 elections; ease the Photo ID Requirements for voters with the highest susceptibility to COVID-19; extend the deadline for requesting and postmarking absentee ballots to Election Day; and allow curbside voting.

96.     Secretary Merrill did not respond to this letter.

97.     On April 17, Plaintiffs GBM and the Alabama NAACP sent a follow up letter to Secretary Merrill. Secretary Merrill also failed to respond to their second letter.

---

[88] *Id.*

[89] *Brownlee*, *supra* n.82.

[90] Gov. Kay Ivey, Proclamation by the Governor (Mar. 18, 2020), available at https://governor.alabama.gov/assets/2020/03/2020-03-18-1st-Supplemental-COVID-19-SOE.pdf.

[91] *Brownlee*, *supra* n.82.

[92] Ala. Sec. of State, *Certification of Emergency Rules Filed with Legislative Services Agency, 820-2-3-.06-.01ER*, Absentee Voting During State of Emergency (Mar. 18, 2020), https://www.alabamapublichealth.gov/legal/assets/order-secretarystate-031820.pdf.

[93] *Id.*

98.     Upon information and belief, Secretary Merrill has corresponded with individual voters and other civic groups who have offered recommendations similar to Plaintiffs.

99.     To date, however, Secretary Merrill has neither adopted nor implemented Plaintiffs' recommendation or any other reasonable accommodations to address their concerns.

100.    On April 8, Secretary Merrill wrote a letter to the Acting Executive Director of the U.S. Election Assistance Commission requesting over $6 million in federal funds to pay for increased absentee voting costs because of the expanded absentee voting options in the runoff, increased rates of absentee voting in the November 3 general election, additional pay for poll workers, and supplies to sanitize in-person polling locations.[94] Secretary Merrill's letter states that he anticipates substantial increases in absentee voting throughout 2020.

101.    Upon information and belief, Secretary Merrill did not request funding for and does not intend to permit local, city, and county election officials to conduct curbside or drive-thru voting in the 2020 elections.[95]

## V.     The Challenged Provisions Unreasonably Burden the Voting Rights of Alabamians

### A.     Alabama's Witness Requirement will deny large numbers of eligible voters the right to vote without meaningfully advancing any valid State interest.

102.    In the current pandemic, many voters have no means to safely satisfy Alabama's Witness Requirement. Individuals living alone, or with only one other individual over age 18, will not be able to sign their absentee ballot in the presence of a notary or two adult witnesses without defying federal and state social distancing guidelines. Getting a notary working under the direction

---

[94] Letter from John H. Merrill, Ala. Sec'y of State, to Mona Harrington, Acting Exec. Director, U.S. Election Assistance Comm'n (Apr. 8, 2020), https://www.eac.gov/sites/default/files/paymentgrants/cares/AL_CARES_Disbursement_RequestLetter.pdf.
[95] *See* Brian Lyman, *Coronavirus in Alabama: Election money will go toward reimbursing polling station prep*, Montgomery Advertiser, Mar. 30, 2020, https://www.montgomeryadvertiser.com/story/news/2020/03/30/coronavirus-alabama-election-money-go-toward-reimbursing-polling-station-prep-covid-19/5086632002/.

of a lawyer to notarize a ballot via videoconferencing is not an option for those voters who cannot afford the potential notary fee, or who lack computer or internet access, or who simply cannot identify a notary who is working under the direction of an attorney amid the extensive business shutdowns. Additionally, even assuming a voter could navigate the process, it is unclear whether an absentee ballot envelope notarized via videoconference would comply with Alabama election law.

103.    Faced with either participating in the political process or potentially facing serious illness or death, the Witness Requirement will likely disenfranchise thousands of eligible voters in Alabama. And for voters forced to take the risk of voting in-person, they are putting themselves and their communities in serious danger.

104.    At present, Alabama has over 3.5 million registered voters.[96] Over 1.1 million Alabamians voted in the April 2020 Democratic and Republican primaries.[97] And in the November 2016 general election, over 2.1 million Alabamians cast ballots.[98]

105.    According to the ACS, 14.6% of Alabamians live alone. Of those Alabamians who live alone, 26% are Alabamians over age 65. Assuming similar voter turnout in the 2020 November general election, over 300,000 Alabamians (i.e., 14.6% of 2.1 million voters) will face the false choice of either risking their safety by voting in-person, leaving their homes to find witnesses for their absentee ballots, or not voting at all. Like Plaintiffs, many of them will be forced not to vote to protect their health and their community.

106.    This burden on the right to vote will fall more heavily upon certain groups—older

---

[96] Ala. Sec'y of State, *Elections Data Downloads* https://www.sos.alabama.gov/alabama-votes/voter/election-data (last visited Apr. 30, 2020)(click on link for "Voter Registration Statistics – 2020").
[97] Ala. Sec'y of State, *Unofficial Election Night Results* (Mar. 9, 2020), https://www2.alabamavotes.gov/electionnight/statewideresultsbycontest.aspx?ecode=1001060.
[98] *Primary/Primary Run-Off/General Election Statistics-State of Alabama* 8, https://www.sos.alabama.gov/sites/default/files/voter-pdfs/turnout.pdf (last updated June 25, 2018).

people, persons with disabilities, and Black Alabamians, among others. For instance, per the ACS, of the 3.8 million individual Alabamians of voting age, 14.6% (555,330) live alone. Of those 555,330 individuals who live alone, 38.9% (215,966) are age 65 and older. Around 30% of Alabamians 18 and older who live alone have a disability, and 44% of Alabamians 65 and older who live alone have a disability. For the 980,850 Black Alabamians of voting age, 186,497 (19.0%) live alone.

107.    According to the ACS, in Alabama, for those Black people who live alone, 29.7% (55,388) are disabled.  For the subset of Black people who are over age 65 and living alone, 45.9% (22,782) are disabled. For white voting age population living alone, 30.2% (107,647) are disabled. For the subset of whites over 65 and living alone, 44.0% (70,816) are disabled.

108.    Of all Black households (*i.e.*, homes with all of their occupants, regardless of number, treated as one unit), 37.1% contain people who live alone, per the ACS.  Of all white households, 27.5% contain people who live alone. And 14.1% of all Black households in Alabama are headed by women who live alone with their children under 18 (*i.e.*, people who are not legally competent witnesses) versus just 3.8% of similar white households.

109.    COVID-19 has a disproportionately harmful effect on Black people because they are more likely to have pre-existing conditions that exacerbate the symptoms of the disease due to environmental and economic factors and because of inequalities in the health care system.[99]

110.    The Witness Requirement will therefore likely prevent thousands of Alabamians who might otherwise cast absentee ballots from doing so this year, with a disproportionate impact falling on older voters, voters with a disability, and Black voters.

---

[99] *Characteristics of COVID-19 Patients–Mobile County, Alabama, supra* n.68; Colleen Walsh, *COVID-19 Targets Communities of Color*, Harvard Gazette, Apr. 14, 2020, https://news.harvard.edu/gazette/story/2020/04/health-care-disparities-in-the-age-of-coronavirus/.

111.    The notary public alternative is not a viable option for most voters, especially during the current pandemic. First, notaries are entitled to a payment of $5.00 for notarizing an absentee ballot affidavit.[100] Second, notarization may still require personal interaction with a third-party witness in violation of social distancing protocols. In acknowledgment of the current barriers to notarizations, Governor Ivey issued an executive order on March 26, which permits attorneys who are also notaries and notaries who work under the supervision of an attorney to notarize documents using videoconferencing in lieu of personal appearance.[101] Videoconferencing is not an option for every notary in Alabama. Notaries who are not attorneys or are not supervised by attorneys must still personally interact with a voter to notarize a ballot. But, even for the videoconferencing option, a voter must have access to videoconferencing technology. Further, it is more burdensome for Black Alabamians who are less likely to be able to afford the potential fees of notarization, the costs of videoconferencing, or sending the affidavit to the notary. Black Alabamians are also less likely to have access to the technology needed for videoconferencing, like broadband internet, a computer, tablet or "smart phone." Some notaries also lack access to the computer, internet, or technology necessary for notarizations via videoconferencing. Further, because Alabama law requires the absentee ballot envelope itself to be notarized, remote notarization may not be a viable option for absentee ballots.

112.    The Witness Requirement does not meaningfully advance the State's interest in election integrity. Alabama election officials are not required to follow up with witnesses to confirm their identity or that they indeed witnessed the signing of the voter's affidavit. *See* Ala. Code § 17-11-10. Instead, officials merely examine the affidavit for the witness signatures. If the

---

[100] Ala. Code § 36-20-74.
[101] Off. of the Ala. Governor, *Fourth Supplemental State of Emergency (Coronavirus: COVID-19)* (Mar. 26, 2020), https://governor.alabama.gov/assets/2020/03/4th-Supplemental-State-of-Emergency-COVID-19.pdf.

information in the affidavit is correct and it contains the witness signatures, then officials "shall certify the findings, open each affidavit envelope, and deposit the plain envelope containing the absentee ballot into a sealed ballot box." *Id*. § 17-11-10(b).

113.    In fact, in 2017, Secretary Merrill supported a bill that would have eliminated the Witness Requirement but added the now-existent ID Application Requirement. Rather than increasing absentee voter fraud, Secretary Merrill thought the bill made it "easier to vote."[102] That is, in light of the Photo ID Requirements, Secretary Merrill does not believe that there is a separate need to enforce the Witness Requirement. Indeed, the District of Columbia and 38 states that have no witness requirement operate absentee balloting systems that are not undermined by fraud.[103]

114.    Alabama has several other vehicles to both confirm the legitimacy of the absentee ballot cast and protect election integrity. First, the affidavit requires an absentee voter to swear or affirm that the information is true and correct. The affidavit warns that it is a criminal offense to knowingly gives false information to illegally vote absentee. This offense is punishable by a fine up to thousand dollars ($1,000) and/or confinement in the county jail for up to six months. Ala. Code § 17-11-7.

115.    Separately, it is also a criminal offense for any person to willfully falsify an absentee ballot application or verification documents. Ala. Code § 17-17-24.

116.    Finally, the absentee ballot application is required to "contain sufficient information to identify the applicant and shall include the applicant's name, residence address, or such other information necessary to verify that the applicant is a registered voter." Ala. Code § 17-11-4. The current absentee ballot application requires a voter to submit either their driver's license number

---

[102] Mike Cason, *Bill would eliminate requirement to give reason for voting absentee*, Alabama Media Group (Jan. 13, 2019), https://www.al.com/news/birmingham/2017/04/bill_would_eliminate_requireme.html.
[103] *Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options*, *supra* n.4.

or the last four digits of their social security number, which allows election officials to verify the voter's identity even before the distribution of the absentee ballot.[104]

117.    Given these criminal penalties and the alternative identification methods, the additional step of requiring a voter to sign their absentee ballot before a notary or two witnesses offers no meaningful protection against fraud. Indeed, while instances of fraud are rare, a person determined to falsely submit an absentee ballot and risk imprisonment could just as easily forge the two witnesses' signatures as they could falsely attest to their identity when signing the absentee ballot affidavit.

118.    The Witness Requirement places an unnecessary and dangerous burden on the voting rights of the many thousands of people in Alabama, particularly elderly, disabled, and Black voters, who will have to choose between casting their ballots safely or disenfranchisement.

**B.    The Photo ID Requirements will endanger the lives of large numbers of voters who lack access to printers and scanners or lack photo ID acceptable for voting.**

119.    The Photo ID Requirements require a person who is submitting an application for an absentee ballot to include a copy of their photo ID and, separately, once the ballot is received, to also return a second copy of the photo ID when mailing in the actual absentee ballot if the absentee election manager determines the voter is required to do so. A voter who fails to provide photo ID with the application cannot receive an absentee ballot. A returned absentee ballot that requires a photo ID will not be counted if it does not include a copy of the voter's photo ID.

120.    Yet, given the federal social distancing guidelines, Governor Ivey's "Safer at Home" order, and the closures of many offices, libraries, schools, and businesses (e.g., FedEx and UPS stores), many voters have no means of meeting the Photo ID Requirements. For example,

---

[104] Ala. Form AV-R1, *Application for Absentee Ballot,* https://www.sos.alabama.gov/sites/default/files/voter-pdfs/absentee/RegularAbsenteeAppFillable.pdf (revised Sept. 3, 2019).

12.8% (over 200,000) of all households in Alabama lack a computer, smartphone or tablet. Without access to the computers, scanners and printers needed to generate copies of the photo ID required to cast absentee ballots, tens of thousands of voters will not be able to vote. And, even if these voters could find a way to travel (6.3% of all Alabama residents lack vehicles) and find a business open to copy their IDs, they would have to break social distancing protocols to do so, at great risk to their safety and that of others. As a result, many Alabama citizens will be unable to obtain the copies of the photo IDs that they need to either return with their absentee ballot or even complete their absentee ballot application.

121.    In particular, elderly voters and voters with disabilities and preexisting conditions, like Plaintiffs Porter and Thompson, cannot obtain copies of their photo IDs to vote absentee in the 2020 elections without putting their lives in serious risk.

122.    On April 21, a voter based in Montgomery directed a question about the Photo ID Requirements to Secretary Merrill via Twitter. "So to exercise my right to vote I need to have a computer, with Internet, a printer, with toner and paper, and a smart phone with a camera or a scanner or a copy machine?" the Montgomery-based voter asked.[105] In response, the official account of the Secretary of State's office asked him to contact them or local officials.

123.    Secretary Merrill, however, mocked the voter via his personal account.

---

[105] Stephen Stetson (@StetsonStephen), Twitter (Apr. 21, 2020, 10:53 AM), https://twitter.com/StetsonStephen/status/1252611322128273408.



124.    When a local reporter simply retweeted Secretary Merrill's response, Secretary Merrill again proved unhelpful. He confirmed that voters, like Plaintiffs Porter and Thompson, must violate social distancing protocols, which endangers their safety, to comply with the Photo ID Requirements.



125.    Moreover, there are tens of thousands of Alabama voters who lack photo ID, and now cannot get one. Since March 23, 2020, nearly every photo ID-issuing office in Alabama,

including the Alabama Law Enforcement Agency ("ALEA") offices and county boards of registrars, has been closed.[106] To the extent ALEA continues to operate any photo ID-issuing offices, it "[d]iscourages anyone with a weakened or compromised immune system from visiting any Driver License locations" and has "begun curbside check-in and screening" to "reduce potential exposure" to COVID-19.[107] And, upon information and belief, Secretary Merrill has not deployed his office staff to issue photo IDs at people's homes or at public events since at least April 3, when Governor Ivey's stay-at-home order was issued.

126.    Secretary Merrill has instructed probate judges and absentee managers to continue to require individuals, like Plaintiff Thomson, who have medical conditions and who cannot comply with the Photo ID Requirements without putting their lives at risk—to submit copies of their photo IDs with the absentee ballot application.[108] Defendants do not consider voters with preexisting medical conditions that put them at a higher risk of death or serious illness from COVID-19 infection to be exempt from the Photo ID Requirements under Alabama Code § 17-9-30(d).

**C.    The Prohibition on Curbside Voting Needlessly Increases the Risks of COVID-19 Infection via Personal Interactions at In-Person Poll Sites in the 2020 Elections.**

127.    Upon information and belief, no provision of Alabama law expressly prohibits curbside or drive-thru voting. *See generally* Ala. Code § 17-9-1 to § 17-9-15.

128.    Nonetheless, Alabama does not offer curbside voting to voters whose disabilities, age, or physical condition prevent them from going into an in-person voting location. Secretary

---

[106] Press Release, *ALEA Continues to Modify its Driver License Division Operations in Response to COVID-19*, Ala. Law Enforcement Agency, (Mar. 23, 2020), https://www.alea.gov/news/alea-continues-modify-its-driver-license-division-operations-response-covid-19.

[107] *Id*.

[108] Ala. Sec. of State, *Certification of Emergency Rules Filed with Legislative Services Agency, 820-2-3-.06-.01ER*, Absentee Voting During State of Emergency (Mar. 18, 2020), http://www.alabamapublichealth.gov/legal/assets/order-secretarystate-031820.pdf

Merrill instructs local, city, and county election officials that Alabama state law prohibits curbside or drive-thru voting. Secretary Merrill has a policy and practice of intervening to prevent local election officials from employing curbside voting to assist people with disabilities.

129.    For example, on November 8, 2016, a polling place in Hale County, Alabama was offering curbside voting. Secretary Merrill was contacted about this practice and he instructed his office to begin an investigation. In response to the investigation, the county's chief election official told Secretary Merrill that curbside voting was being offered by poll workers to assist voters with disabilities by bringing ballots to voters in their cars. Secretary Merrill's office informed the county that the practice was illegal. Secretary Merrill ordered Hale County to immediately cease and desist curbside voting. The county complied.[109]

130.    To protect the lives of voters amid the COVID-19 crisis, however, the CDC has recommended that jurisdictions "[e]ncourage drive-up voting for eligible voters" as a means of complying with social distancing rules and to limit personal contact during in-person voting.[110]

131.    On information and belief, other states have already employed curbside voting as a safety accommodation to voters during the pandemic. In elections held during the COVID-19

---

[109] Ainsley Allison, *Secretary of State's office shuts down curbside voting in Hale County*, ABC News 3040 (Nov. 8, 2016), https://abc3340.com/news/election/secretary-of-states-office-shuts-down-curbside-voting-in-hale-county.
[110] Ctrs. for Disease Control & Prevention, *supra* n.5.

crisis, Arkansas,[111] Ohio,[112] Wisconsin,[113] and Wyoming[114] permitted everyone to vote without leaving their car in adherence to the necessary social distancing protocols. Upon information and belief, none of these states usually permit blanket curbside voting.

132.    Indeed, Defendant Governor Ivey's April 3 stay-at-home order and April 30 "Safer at home" order permit "drive-in" gatherings to protect individuals—particularly vulnerable individuals—from in-person contact that could put them at risk from COVID-19.

133.    Because of the Witness and Photo ID Requirements, many voters with disabilities, including preexisting conditions that make them more susceptible to COVID-19, are completely deprived of any alternative method of voting.

134.    Under these circumstances, Defendants' failure to accommodate voters who are particularly vulnerable to COVID-19 by offering the reasonable accommodation of curbside voting constitutes a severe and undue burden on the right to vote.

## CLAIMS FOR RELIEF

### COUNT ONE
**Violations of the Fundamental Right to Vote
under the First and Fourteenth Amendments (42 U.S.C. § 1983)
(All Plaintiffs against All Defendants, Except the State of Alabama)**

135.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this

---

[111] Rich Klein & MaryAlice Parks, *The Note: Voting in age of coronavirus gets uncertain test runs*, ABC News (Mar. 31, 2020), https://abcnews.go.com/Politics/note-voting-age-coronavirus-uncertain-test-runs/story?id=69877935.
[112] Rick Rouan, *Ohio offering curbside voting, extending absentee deadline for those in hospital in wake of coronavirus*, USA Today (Mar. 16, 2020), https://www.usatoday.com/story/news/politics/elections/2020/03/16/coronavirus-ohio-offering-curbside-voting-states-head-polls-tuesday/5058230002/.
[113] *Early voting: Where you can still cast a ballot in-person before the April 7 election in the Milwaukee area*, Milwaukee Journal Sentinel (Mar. 31, 2020), https://www.jsonline.com/story/news/politics/elections/2020/03/31/coronavirus-wisconsin-where-you-can-still-vote-early/2883706001/.
[114] Quinn Scanlan, *States focus on alternatives to in-person voting as they move forward with primaries amid coronavirus pandemic*, ABC News (Mar. 20, 2020), https://abcnews.go.com/Politics/states-focus-alternatives-person-voting-move-forward-primaries/story?id=69688445.

Complaint and the paragraphs in the counts below as though fully set forth herein.

136.    Eligible individuals have a fundamental right to vote under the First and Fourteenth Amendments of the U.S. Constitution. Under the First and Fourteenth Amendments, a court considering a challenge to a state election law must carefully balance the character and magnitude of the injury to the rights that the plaintiff seeks to vindicate against the justifications put forward by the State. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

137.    As-applied in the COVID-19 pandemic and on their face, the Witness Requirement, the Prohibition on Curbside Voting, and their enforcement severely and unreasonably burden the fundamental right to vote of all Plaintiffs, their members, and other similarly situated Alabama voters. These two provisions will likely prevent thousands of voters from casting effective ballots, with particularly heavy burdens on older Alabamians, voters with disabilities, and Black voters.

138.    As-applied in the COVID-19 pandemic, the Photo ID Requirements and their enforcement severely and unreasonably burden the fundamental right to vote for Plaintiffs Porter, Thompson, and the members of People First of Alabama, as well as other similarly situated Alabama voters. The Photo ID Requirements will likely prevent thousands of voters from casting effective ballots, with particularly heavy burdens on older Alabamians and voters with disabilities.

139.    No valid state interest justifies those burdens. Alabama's Witness Requirement and Photo ID requirements do not advance the State's interest in election integrity. By contrast, the State already has in place numerous other measures that prevent fraud without endangering the safety of voters in the current pandemic.

140.    With respect to the Prohibition on Curbside Voting, Secretary Merrill has publicly equated curbside voting with purported "voting irregularities." To the extent that Defendants assert

that his policy and practice of prohibiting curbside voting is an election security measure, Defendants can address those concerns through other means. For example, a bipartisan group of at least two poll workers and/or a poll observer can meet a voter at their vehicles with the ballot.

141.    Therefore, Defendants, acting under color of state law, by enforcing the Challenged Provisions have and will continue to deprive Plaintiffs of the fundamental right to vote secured to them by the First and Fourteenth Amendments in violation of 42 U.S.C. § 1983.

**COUNT TWO**
**Failure to Provide Reasonable Accommodations in Violation of**
**Title II of the Americans with Disabilities Act (42 U.S.C. §§ 12131, *et seq.*)**
**(All Plaintiffs Against All Defendants)**

142.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count below as though fully set forth herein.

143.    Voting is one of our nation's most fundamental rights and a hallmark of our democracy. Yet for too long, people with disabilities have been excluded from this core aspect of citizenship. People with intellectual or mental health disabilities have been prevented from voting because of prejudicial assumptions about their capabilities. People who use wheelchairs or other mobility aids, such as walkers, have been unable to enter the polling place to cast their ballot because there was no ramp. People who are blind or have low vision could not cast their vote because the ballot was completely inaccessible to them.[115]

144.    Invaluable federal civil rights laws have been enacted to combat such forms of discrimination against those with disabilities and to protect the fundamental right to vote for all Americans. These laws include: the ADA; The Rehabilitation Act of 1973 (the "Rehabilitation Act"); the VRA; the Voting Accessibility for the Elderly and Handicapped Act of 1984 (the

---

[115] See U.S. Dept. of Justice, *The Americans With Disabilities Act and Other Federal Laws Protecting the Rights of Voters With Disabilities* 1, https://www.justice.gov/file/69411/download (last visited Apr. 30, 2020).

"VAEHA"); the National Voter Registration Act of 1993 ("NVRA"); and the Help America Vote Act of 2002 (the "HAVA").

145.    Under Title II of the ADA, state and local governments must not impose requirements on participation in public services, programs, or activities, including voting, that screen out individuals with disabilities from fully and equally enjoying those programs and must make reasonable modifications in policies, practices, or procedures, including voting and election procedures, when the modifications are necessary to avoid discrimination on the basis of disability.

146.    One of the fundamental underpinnings and policy behind the above laws is ensuring policies and procedures do not discriminate against people with disabilities.

147.    Congress has documented a pattern of unequal treatment in the administration of a wide range of public services, programs, and activities, including the penal system, public education, and voting. The U.S. Court of Appeals for the Eleventh Circuit has held that prior U.S. Supreme Court precedent considered the record supporting Title II of the ADA as a whole, and has conclusively held that Congress had documented a sufficient historical predicate of unconstitutional disability discrimination in the provision of public services to justify enactment of a prophylactic remedy under Section 5 of the Fourteenth Amendment to the U.S. Constitution. *See Nat. Assoc. of the Deaf v. Florida*, 945 F. 3d 1339, 1351 (11th Cir. 2020).

148.    Individuals who suffer a significant medical vulnerability that places them at extremely high risk of serious bodily injury or death should they leave the confines of their homes—including Plaintiffs Clopton, Peebles, Porter, Thompson and the members of the organizational Plaintiffs whose health conditions put them at significant risk of severe illness or death should they contract COVID19—have a disability within the meaning of the ADA.

149.    Defendants' failure and refusal to provide reasonable accommodations with respect

46

to the Challenged Provisions for those voters, such as Plaintiffs Clopton, Peebles, Porter, and Thompson and the members of Plaintiffs People First, GBM, and the Alabama NAACP, whose health statuses severely limit their ability to leave home or have any personal contacts with others amid the COVID-19 pandemic, violates the ADA.

150.    Defendants have no valid justification for their failure or refusal to offer the reasonable accommodation of eliminating the Witness Requirement for at least those voters, like Plaintiffs Clopton, Peebles and Thompson, whose health statuses severely limit their ability to leave home or have personal contact with others amid the COVID-19 pandemic.

151.    Defendants have no valid justification for their refusal to offer the reasonable accommodation of interpreting the existing exemptions to the Photo ID Requirements for certain elderly and/or disabled voters as also applicable to Plaintiffs Porter, Thompson and the members of People First of Alabama, and those similarly situated voters, whose health statuses severely limit their ability to leave home or have personal contact with others amid the COVID-19 crisis.

152.    Defendants also have no valid justification for their refusal to permit curbside voting as a reasonable accommodation for the significant challenges disabled voters, like Plaintiffs Clopton and Peebles and the members of People First, GBM, and the Alabama NAACP, face as a result of the COVID-19 crisis.

153.    The failure to accommodate these voters constitutes a condition on access to the ballot box that has the effect of screening out such individuals from participating in the July 14, August 25, and November 3, 2020 elections, as well as all other 2020 elections, in violation of Title II of the ADA.

154.    Unless the requested relief is granted, Plaintiffs and those similarly situated will suffer irreparable harm in that they will be discriminated against and denied equal access to

absentee and in-person curbside voting, or forced to risk their health, and possibly their lives, to vote in-person within a polling place—a program, service, or activity that impacts their ability to participate in one the most fundamental democratic institutions: voting.

155.    The ADA authorizes injunctive relief as appropriate to remedy acts of discrimination against persons with disabilities. 42 U.S.C. §§ 12188(a)(1)-(2).

**COUNT THREE**
**The Witness Requirement and Prohibition on Curbside Voting**
**Violate Section 2 of the Voting Rights Act (52 U.S.C. § 10301)**
**(All Plaintiffs Against All Defendants)**

156.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

157.    Section 2 of the VRA provides in part that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a).

158.    The "essence of a [Section] 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). Section 2 prohibits both vote denial and vote dilution. *See id.* at 45 n.10.

159.    Vote denial occurs when a state erects "formal barriers to access such as literacy or residency tests" that result in the denial or abridgment of the right to vote on account of race. *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1556 (11th Cir. 1984). To succeed here, Plaintiffs must prove that (1) Black people "have less opportunity than other members of the electorate to participate in the political process" and (2) that the "impact of the contested structure" is linked to historical conditions based on the Senate Factors. *Gingles*, 478 U.S. at 44.

160.    The Witness Requirement, if not enjoined, will materially burden the right to vote, and will have an adverse and disparate impact on Black voters in Alabama. Black voters in Alabama are more likely to work in jobs that expose them to COVID-19, less likely to have insurance or financial resources, more likely to live alone or with young children, more likely to lack computer or internet access, and more likely to suffer from severe health complications and/or to die from COVID-19 than white voters. Black voters are therefore significantly more burdened by the effects of the Witness Requirement.

161.    Likewise, the Prohibition on Curbside Voting, if not enjoined, will materially burden the right to vote, and will have an adverse and disparate impact on Black voters in Alabama. Black voters in Alabama are less likely to have insurance or financial resources. Black voters are more likely to be disabled, to be undereducated and in need of in-person assistance to vote (which can be provided even if voters do not leave their car), and to suffer from severe complications or to die from COVID-19 than white voters. Black voters are therefore significantly more burdened by the effects of the Prohibition on Curbside Voting.

162.    The discriminatory results of the Witness Requirement and Prohibition on Curbside Voting are directly linked to social and historical conditions. Alabama has a long history of voting-related discrimination, including recent uses of discriminatory voter purges, racial gerrymanders, selective annexations, and at-large election systems. From 1965 to 2013, Alabama was covered by the preclearance provisions of the VRA. During that time, the U.S. Department of Justice objected to dozens of proposed voting changes because their potentially discriminatory purpose or effect.

163.    Black people in Alabama continue to suffer from discrimination in other areas such as education, employment, and health, which hinders their ability to participate effectively in the political process. According to the ACS, in Alabama, 11.5% of Black people and 8.1% of white

people lack health insurance; 42.7% of Black people and 38.1% of white people over age 65 have

a disability; 15.8% of Black people and 14.1% of white people age 18 to 64 have a disability;

16.6% of Black people and only 11.4% of white people lack a high school degree; 9.4% of Black

people and 4.2% of white people over age 16 are unemployed; 23.4% of Black households and

7.6% of white households in general lived below the poverty line; 18.3% of Black people  over 65

versus 8.0% of white people over 65 also live in poverty; 12.7% Black households and only 3.9%

of white households lack a vehicle; 18.9% of Black households and 10.7% of white households

lack a computer, tablet, or "smart phone"; even among those people with computers, 29.6% of

Black households and just 17.2% of white households lack broadband internet; 26.3% of Black

households and 8.0% of white households use SNAP/food stamps; and Black median family

income ($43,287) is nearly half that of white families ($73,109).

164.    As discussed above at ¶¶ 75-82, these discriminatory patterns make Black voters

more vulnerable to COVID-19, such that the Witness Requirement and Prohibition on Curbside

Voting, are particularly burdensome and dangerous for them as a group relative to other voters. In

addition, voting is racially polarized in Alabama and Black voters do not hold elected office in

proportion to their population, resulting in state elected officials who are less responsive to the

health, voting, and other concerns of Black voters amid the COVID-19 crisis.

165.    Under the totality of the circumstances, the Witness Requirement and Prohibition

on Curbside Voting interact with these social and historical conditions to abridge and deny Black

people in Alabama the right to vote. As a result of the Challenged Provisions, Black Alabamians

will have less opportunity than other members of the electorate to participate in the political

process and to elect representatives of their choice.

**COUNT FOUR**
**The Witness Requirement Violates Sections 3 and 201 of**

the Voting Rights Act, 52 U.S.C. §§ 10302, 10501
(All Plaintiffs Against All Defendants)

166.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

167.    Section 201 of the VRA categorically prohibits the use of "any test or device" as a "prerequisite for voting or registration for voting," stating that "[n]o citizen shall be denied, because of his failure to comply with any test or device, the right to vote in any Federal, State, or local election conducted in any State or political subdivision of a State." 52 U.S.C. §§ 10501(a)-(b).  Section 201 defines the phrase "test or device" as including "any requirement that a person as a prerequisite for voting . . . prove his qualifications by the voucher of registered voters or members of any other class." 52 U.S.C. § 10501(b)(4).

168.    Section 201 is a "potent weapon" and it applies to "any official with control over any aspect of an election . . . ." *United States v. Bd. of Comm'rs of Sheffield*, 435 U.S. 110, 120-21 (1978).  For that reason, the U.S. Department of Justice has employed the VRA to block discriminatory literacy and witness requirements in the absentee voting process.[116]

169.    "All literacy tests and similar voting qualifications were abolished" by the VRA because, "[a]lthough such tests may have been facially neutral, they were easily manipulated to keep blacks from voting." *N.W. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 198 (2009). This *per se* ban on tests and devices "bars certain types of voting tests and devices altogether" and removes the burden of demonstrating the discriminatory application of a test or

---

[116] Letter from Bill Lann Lee, Acting Assist. Att'y Gen., U.S. Dep't of Just., Civ. Rights Div., to Hon. Robert A. Butterworth, Att'y Gen., State of Florida (Aug. 14, 1998), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/FL-1030.pdf; Letter from Jerris Leonard, Assist. Att'y Gen., U.S. Dep't of Just., Civ. Rights Div., to Hon. MacDonald Gallion, Att'y Gen., State of Alabama (Mar. 13, 1970), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1100.pdf.

device. *Reno v. Bossier Par. Sch. Bd*., 528 U.S. 320, 338 n.6 (2000).

170.   The Witness Requirement is a prohibited "test or device" insofar as it is a "requirement that a person as a prerequisite for voting . . . prove his qualifications by the voucher of registered voters or members of any other class." 52 U.S.C. § 10501(b). An absentee ballot which "is not witnessed by two witnesses 18 years of age or older . . . will not be counted." Ala. Code § 17-11-7. Under the plain text of the VRA, this is *per se* prohibited as an illegal test or device.

171.   In addition, as-applied to Alabama citizens, like Plaintiffs Clopton, Peebles and Thompson, who must strictly adhere to social distancing guidelines for the foreseeable future because they are highly susceptible to death or serious illness from COVID-19, the absentee voting system subject to the Witness Requirement is the only reasonable avenue for them to even attempt to vote.

172.   No governmental justification can overcome the plain text of the VRA. For instance, before the VRA, the purported interest in the authentication of a voter was insufficient to justify other "supporting witness" requirements. *See, e.g.*, *United States v. Ward*, 349 F.2d 795, 799 (5th Cir. 1965); *United States v. Logue*, 344 F.2d 290, 291 (5th Cir. 1965). Even without the Witness Requirement, Alabama law already includes additional means of authenticating a voter, as described above at ¶¶ 112-117.

173.   In light of the COVID-19 pandemic, the Witness Requirement demands that thousands of voters, including Plaintiffs Clopton, Peebles, and Thompson, to either comply with a *per se* illegal "test or device" or have their vote discarded in violation of the VRA.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Declare that Alabama's enforcement of the Witness Requirement (as stated in Ala. Code. §§ 17-11-7, 17-11-8, and 17-11-10), at least while the risk of COVID-19 transmission in Alabama remains, violates the fundamental right to vote under the First and Fourteenth Amendments to the U.S. Constitution, the ADA, and the VRA.

B.      Issue a preliminary and permanent injunction that orders relief including:

    1.      Prohibiting Defendants from enforcing the Witness Requirement (as stated in Ala. Code §§ 17-11-7, 17-11-8, and 17-11-10) for all voters during, at least, all Alabama primary, municipal, and general elections in 2020;

    2.      Prohibiting Defendants from enforcing the Photo ID Requirements (as stated in Ala. Code §§ 17-9-30(b) and 17-11-9) for all voters during, at least, all Alabama primary, municipal, and general elections in 2020;

    3.      Prohibiting Defendants from enforcing the Prohibition on Curbside Voting, during, at least, all Alabama primary, municipal, and general elections in 2020;

    4.      Ordering Defendants to issue guidance instructing all local, city, and county election officials to count otherwise validly cast absentee ballots that are missing the signature(s) of a notary or two witnesses for all Alabama primary, municipal, and general elections in 2020;

    5.      Ordering Defendants to issue guidance instructing all local, city, and county election officials to accept otherwise validly submitted applications for absentee ballots and to count all otherwise validly cast absentee ballots that are missing the copies of photo IDs for all Alabama primary, municipal, and general elections in 2020;

6.     Ordering Defendants to issue guidance instructing all local, city, and county election officials that curbside, drive-thru, and/or drive-up voting at in-person polling sites is permitted for all Alabama primary, municipal, and general elections in 2020;

7.     Ordering Defendants to modify election materials, including absentee ballots, to reflect the elimination of the Challenged Provisions, and conduct a public information campaign informing Alabama voters about the elimination of the Witness and Photo ID Requirements and the availability of curbside, drive-thru, and/or drive-up voting, in coordination with local, city, and county officials before and during the absentee balloting period, and ordering Defendants to issue guidance instructing local, city, and county election officials to issue absentee ballots to all eligible voters and to count otherwise validly cast absentee ballots that are missing witness signatures and copies of photo ID;

C.     Award Plaintiffs attorneys' fees in this action;

D.     Award Plaintiffs their costs of suit; and

E.     Grant such other and further relief as this Court deems just and proper in the circumstances.

DATED this 1st day of May 2020.             Respectfully submitted,


 /s/ Deuel Ross                          /s/ Sara Zampierin
Deuel Ross*                              Sara Zampierin, (ASB-1695-S34H)
Natasha C. Merle*                        SOUTHERN POVERTY LAW CENTER
Liliana Zaragoza*                        400 Washington Avenue
NAACP LEGAL DEFENSE &                     Montgomery, AL 36104
   EDUCATIONAL FUND, INC.                P: (334) 956-8200
40 Rector Street, 5th Floor              F: (334) 956-8481
New York, NY 10006                       sara.zampierin@splcenter.org
Tel.: (212) 965-2200
dross@naacpldf.org                        /s/ Caren E. Short
nmerle@naacpldf.org                      Caren E. Short^ (ASB-0646-P48N)
lzaragoza@naacpldf.org                   Nancy G. Abudu*
                                         SOUTHERN POVERTY LAW CENTER
 /s/ William Van Der Pol                 PO Box 1287
William Van Der Pol [ASB-211214F]        Decatur, GA 30031
Jenny Ryan [ASB–5455-Y84J]               P: (404) 521-6700
ALABAMA DISABILITIES                     F: (404) 221-5857
   ADVOCACY PROGRAM                      caren.short@splcenter.org
Box 870395                               nancy.abudu@splcenter.org
Tuscaloosa, AL 35487
P: (205)348-4928
wvanderpoljr@adap.ua.edu                 * *Pro Hac Vice* Motions forthcoming
jrryan2@adap.ua.edu                      ^Application for admission forthcoming

                                         ***Attorneys for Plaintiffs***