FILED

2020 May-13  AM 07:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| PEOPLE FIRST OF ALABAMA, et al.,<br><br>       Plaintiffs,<br><br>  v.<br><br>JOHN MERRILL, et al.,<br><br>       Defendants. | Case No.: 2:20-cv-00619-AKK |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND .............................................................................. 4

I.      The COVID-19 Pandemic ..........................................................................4

II.     Public Health Guidance Regarding COVID-19 ...........................................5

III.    The Effect of COVID-19 in Alabama ..........................................................6

IV.     Alabama's Upcoming Elections ...................................................................8

V.      The Risks Posed by the Challenged Provisions in the COVID-19
        Crisis .........................................................................................................10

        A.      The Witness Requirement ...............................................................10

        B.      The Photo ID Requirement .............................................................11

        C.      Curbside Voting Prohibition ...........................................................13

        D.      The Challenged Provisions and COVID-19's Severe Impact on
                Black Voters ...................................................................................14

VI.     Injuries and Irreparable Harm to Plaintiffs................................................16

ARGUMENT .................................................................................................... 20

I.      Plaintiffs Are Likely to Prevail on the Merits of Their Constitutional,
        Section 201, and ADA Claims Against the Challenged Provisions.............20

        A.      The Witness Requirement Violates the Constitution, Section
                201, and the ADA during the COVID-19 Crisis...............................20

                1.      The Witness Requirement severely burdens the
                        fundamental right to vote in violation of the Constitution. ......20

a.    The Witness Requirement forces many thousands of people to face disenfranchisement or risk their safety. .................................................................22

b.    The Witness Requirement's severe burdens on voters far outweigh any nominal State interest in enforcing it. ...................................................26

2.    The Witness Requirement violates Section 201 of the VRA. .........................................................30

3.    The Witness Requirement violates Title II of the ADA. .........32

B.    The Constitution and the ADA Demand the Elimination of the Photo ID Requirement for those Voters who are the Most Vulnerable to COVID-19 ................................................................34

1.    The Photo ID Requirement severely burdens the constitutional rights of vulnerable voters by requiring them to risk COVID-19 exposure. ...............................34

2.    The Photo ID Requirement's burden on vulnerable voters is unjustified because Defendants lack an interest in putting them at risk of COVID-19 infection or in construing this requirement in a manner that violates the fundamental rights of Plaintiffs. ................................36

C.    The Curbside Voting Prohibition Unlawfully Burdens Voters..........39

1.    The Curbside Voting Prohibition is unconstitutional. ..............39

2.    The Curbside Voting Prohibition Violates the ADA................42

II.    Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief ........43

III.    The Balance of Equities and Public Interest Support Injunctive Relief .............................................................................................44

CONCLUSION ..................................................................................... 45

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983)......................................................................20, 36

*Burdick v. Takushi*,
   504 U.S. 428 (1992)..................................................................20, 40, 41

*Charles H. Wesley Educ. Found v. Cox*,
   324 F. Supp. 2d 1358 (N.D. Ga. 2004),
   *aff'd* 408 F.3d 1349 (11th Cir. 2005)........................................38, 44

*Common Cause Ga. v. Kemp*,
   347 F. Supp. 3d 1270 (N.D. Ga. 2018)..............................................44

*Democratic Exec. Comm. of Fla. v. Lee*,
   915 F.3d 1312 (11th Cir. 2019) ................................................*passim*

*Diretto v. Country Inn & Suites by Carlson*,
   No. 16-cv-1037, 2016 WL 4400498 (E.D. Va. Aug. 18, 2016) ........45

*Disabled in Action v. Bd. of Elec. in City of N.Y.*,
   752 F.3d 189 (2d. Cir. 2014) ..............................................32, 39, 42

*Esshaki v. Whitmer*,
   No. 20-cv-10831, 2020 WL 1910154 (E.D. Mich. Apr. 20, 2020)...................22

*Fla. Democratic Party v. Scott*,
   215 F. Supp. 3d 1250 (N.D. Fla. 2016) ................................22, 26, 41

*Frank v. Walker*,
   819 F.3d 384 (7th Cir. 2016) ......................................................37, 38

*Ga. Coal. for the People's Agenda, Inc. v. Kemp*,
   347 F. Supp. 3d 1251 (N.D. Ga. 2018)........................................22, 35

*Ga. Coal. for the Peoples' Agenda, Inc. v. Deal*,
   214 F. Supp. 3d 1344 (S.D. Ga. 2016) ..............................................22

# TABLE OF AUTHORITIES
## (CONTINUED)

**PAGE(S)**

## CASES

*Ga. Muslim Voter Project v. Kemp*,
  918 F.3d 1262 (11th Cir. 2019) ...........................................................30

*Garbett v. Herbert*,
  No. 2:20-cv-245-RJS, 2020 WL 2064101 (D. Utah Apr. 29, 2020) ...........22, 37

*Gun S., Inc. v. Brady*,
  877 F.2d 858 (11th Cir. 1989) .............................................................45

*Hollis v. Davis*,
  941 F.2d 1471 (11th Cir. 1991) ...........................................................20

*Jones v. Governor of Fla.*,
  950 F.3d 795 (11th Cir. 2020) .....................................................*passim*

*League of Women Voters of Fla., Inc. v. Detzner*,
  314 F. Supp. 3d 1205 (N.D. Fla. 2018) ...............................................38

*League of Women Voters of Fla. v. Browning*,
  863 F. Supp. 2d 1155 (N.D. Fla. 2012) ...............................................44

*League of Women Voters of Okla. v. Ziriax*,
  No. 118,765, __ P.3d __, 2020 WL 2111348 (Okla. May 4, 2020) ...................29

*League of Women Voters of Va. v. Va. State. Bd. of Elec.*,
  No. 6:20-cv-0024, __ F. Supp. 3d __, 2020 WL 2158249
  (W.D. Va. May 5, 2020) ...........................................................*passim*

*Libertarian Party of Ill. v. Pritzker*,
  No. 20-cv-2112, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020) ...................22, 35

*Lodge v. Buxton*,
  639 F.2d 1358 (5th Cir. 1981),
  *aff'd sub nom. Rogers v. Lodge*, 458 U.S. 613 (1982) .......................................31

*N.C. State Conf. of NAACP v. Cooper*,
  No. 18-cv-1034, 2019 WL 7372980 (M.D.N.C. Dec. 31, 2019) .......................44

# TABLE OF AUTHORITIES
## (CONTINUED)

**PAGE(S)**

## CASES

*N.W. Austin Mun. Util. Dist. No. One v. Holder*,
  557 U.S. 193 (2009)..................................................................................30

*Nat'l Ass'n of the Deaf v. Florida*,
  945 F.3d 1339 (11th Cir. 2020) ...............................................................32, 33

*Nat'l Fed. of the Blind v. Lamone*,
  813 F. 3d 494 (4th Cir. 2016) ............................................................32, 33, 34

*O'Brien v. Skinner*,
  414 U.S. 524 (1974)...............................................................................26, 31

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) ...............................................................38

*Oregon v. Mitchell*,
  400 U.S. 112 (1970) (opinion of Harlan, J.).......................................31

*Price v. N.Y. State Bd. of Elec.*,
  540 F.3d 101 (2d Cir. 2008) .................................................................22

*Thakker v. Doll*,
  No. 1:20-cv-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020)........................43

*Tolman v. Doe*,
  988 F. Supp. 582 (E.D. Va. 1997) ........................................................45

*U.S. Airways, Inc. v. Barnett*,
  535 U.S. 391 (2002)...............................................................................33

*U.S. ex rel. Osheroff v. Humana, Inc.*,
  776 F.3d 805 (11th Cir. 2015) .............................................................20

*Underwood v. Hunter*,
  730 F.2d 614 (11th Cir. 1984), *aff'd*, 471 U.S. 222 (1985)..............................31

# TABLE OF AUTHORITIES
## (CONTINUED)

PAGE(S)

**CASES**

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012) ...........................................................44

*United States v. Logue*,
  344 F.2d 290 (5th Cir. 1965) ...............................................................31

*United States v. Ward*,
  349 F.2d 795 (5th Cir. 1965) ...............................................................31

*Veasey v. Abbott*,
  830 F.3d 216 (5th Cir. 2016) (en banc) ..............................................31

**STATUTES**

28 U.S.C. § 1746 .......................................................................................28

42 U.S.C. § 12131(2) ................................................................................33

42 U.S.C. § 12132 .....................................................................................32

52 U.S.C. § 10310 .....................................................................................31

52 U.S.C. § 10501 ...............................................................................30, 31

52 U.S.C. § 10508 .....................................................................................40

52 U.S.C. § 20102 .....................................................................................38

Ala. Code § 12-21-83 ................................................................................28

Ala. Code § 13A-10-109 ...........................................................................28

Ala. Code §§ 17-9-1 et seq. .................................................................13, 42

Ala. Code § 17-9-30(d) ....................................................................2, 13, 34

Ala. Code § 17-10-2(a)(3).....................................................................11, 12

Ala. Code § 17-11-3(e) ...............................................................................9

# TABLE OF AUTHORITIES
## (CONTINUED)

**PAGE(S)**

## STATUTES

Ala. Code § 17-11-4 ................................................................................28

Ala. Code § 40-29-115 ............................................................................28

Ala. Code § 17-11-7 ..........................................................................*passim*

Ala. Code §17-11-9 ....................................................................2, 11, 27

Ala. Code § 17-11-10 ........................................................................*passim*

Ala. Code § 17-17-24 ..............................................................................28

Ala. Code § 36-20-74 ..............................................................................26

## OTHER AUTHORITIES

28 C.F.R. § 35.108 ..................................................................................33

28 C.F.R. § 35.130 ..................................................................................33

28 C.F.R. § 35.150 ..................................................................................42

Fed. R. Evid. 201 ....................................................................................20

Senate Rep. 103-6, 1993 WL 54278 (1993) ..........................................28

## INTRODUCTION

Plaintiffs People First of Alabama, Robert Clopton, Eric Peebles, Howard Porter, Jr., Annie Thompson, Greater Birmingham Ministries, and the Alabama State Conference of the NAACP (collectively "Plaintiffs") move to preliminarily enjoin Defendants Secretary of State John Merrill, Governor Kay Ivey, the State of Alabama (collectively, "State Defendants") and Jefferson, Lee, and Mobile counties' absentee election managers (together with the State Defendants, "Defendants").

Our country is in an unprecedented state of emergency. COVID-19 has infected over one million people. Alabama alone has over 10,000 confirmed COVID-19 cases and over 400 deaths and there could be up to 11 unconfirmed cases for every confirmed one. This crisis is likely to last for many months or longer.

As a result of COVID-19, in early April Governor Ivey ordered Alabamians to remain at home, and advised people to follow social distancing protocols, like staying six-feet away from people not part of their household. On April 28 and May 8, Governor Ivey amended her order, but continued to instruct individuals—especially those like the individual Plaintiffs who are at higher risk of death or serious illness from COVID-19—to stay home and to follow social distancing rules.

In these extraordinary circumstances, multiple provisions of Alabama law, as interpreted by the State Defendants, pose direct and severe obstacles to voting: (1) the requirement that the affidavit that must be included with an absentee ballot

be notarized or signed by the voter in the presence of two adult witnesses, Ala. Code §§ 17-11-7 to 17-11-10 (the "Witness Requirement"); (2) the requirement that copies of photo identification accompany absentee ballot applications, *id.* § 17-9-30(b), and, in some cases, absentee ballots, *id.* §§ 17-11-9 and 17-11-10(c) (the "Photo ID Requirement"); and (3) the prohibition on curbside voting (the "Curbside Voting Prohibition") (collectively, the "Challenged Provisions").

First, Plaintiffs seek an injunction on behalf of all voters against the Witness Requirement. By requiring another person to vouch for the voter's identity, the Witness Requirement violates Section 201 of the Voting Rights Act ("VRA"). Even beyond this VRA violation, in the current environment, this requirement poses a serious obstacle to many thousands of vulnerable Alabamians, like Plaintiffs, who cannot—and should not have to—risk the threat of contagion to obtain witnesses. The Witness Requirement violates the fundamental right to vote under the U.S. Constitution and the Americans with Disabilities Act ("ADA") because it does not meaningfully advance any valid government interest since many other provisions of state law safeguard the integrity of absentee voting without endangering voters.

Second, Plaintiffs People First of Alabama, Porter, and Thompson seek an injunction against the Photo ID Requirement. This requirement creates an unreasonable barrier for many voters seeking to exercise their fundamental right to vote amid the pandemic. Many voters lack a reliable means of photocopying their

ID, so they would need to leave their homes and come into close contact with other people to do so. Others have no photo ID at all. Secretary Merrill narrowly interprets the existing exemption to the Photo ID Requirement not to apply to voters like Plaintiffs Porter and Thompson who cannot comply with the requirement without violating social distancing protocols and endangering their safety. Given his interpretation, the Photo ID Requirement, as applied in the current crisis, violates the ADA and the U.S. Constitution. Plaintiffs ask that it be enjoined at least as to those voters who are most vulnerable to death or serious illness from COVID-19.

Finally, Plaintiffs seek an injunction against the State Defendants' policy of prohibiting people from voting at their polling location without leaving their vehicle. Many voters must vote in person because they require assistance or cannot satisfy the Witness and Photo ID Requirements. By reducing the number of people coming into close contact at the polls, curbside voting can limit the opportunities for COVID-19 to spread at in-person poll sites. Yet, in violation of the U.S. Constitution and Title II of the ADA, the Curbside Voting Prohibition means that significant numbers of vulnerable voters who need to vote in-person have no option for doing so because of the increased risk of infection from traditional in-person voting.

To ensure voters remain safe during the pandemic, the Centers for Disease Control and Prevention ("CDC") recommends that states "[e]ncourage voters to use voting methods that minimize direct contact with other people" and permit "drive-

up voting." Ex. 1. The Challenged Provisions flout this guidance and pose a risk to the lives of Plaintiffs and many thousands of other voters who are seeking a safe method of exercising their right to vote in the statewide Republican Senatorial and the First Congressional District Democratic July 14, 2020 primary runoff elections.

The burdens of the Witness Requirement and Curbside Voting Prohibition fall more heavily on Black voters, who are more likely to live alone and have a disability and are afflicted by and die from COVID-19 at starkly disproportionate rates. Ex. 2.

At least tens of thousands of Alabama voters are at risk of being disenfranchised. Thus, Plaintiffs ask that the Court enjoin the Challenged Provisions.

## FACTUAL BACKGROUND

### I.    The COVID-19 Pandemic

Since April, the United States has been the epicenter of the global COVID-19 pandemic, leading the world in both cases and deaths. As Plaintiffs' expert Dr. Arthur Reingold explains: the novel coronavirus SARS-CoV-2, causes individuals to contract COVID-19. Reingold Decl. ¶ 6 (attached as Ex. 3).  COVID-19 spreads mainly from person-to-person through close contact and through respiratory droplets when an infected person coughs or sneezes. *Id*. ¶ 7. People infected may transmit the virus even without showing symptoms themselves. *Id*. ¶ 10.

COVID-19 can cause severe consequences, including long-term illness and death. *Id*. ¶ 6. Estimates from early March put the fatality rate for COVID-19 at

about ten times higher than influenza even in a severe season and including in countries with advanced health care systems. Ex. 4. Some survivors will experience long-term drops in lung capacity of 20 to 30%. Ex. 5.

While people of all ages have contracted and died from COVID-19, it is particularly fatal for older individuals. Reingold Decl. ¶ 6. Preliminary reports based on WHO data show a 3.6% mortality rate for individuals between 60-69 years old, and an 8% mortality rate for those 70-79 years old. Ex. 6. COVID-19 also poses greater risks for people with preexisting heart and respiratory conditions, including asthma, and individuals with compromised immune systems. Reingold Decl. ¶ 6

## II.    Public Health Guidance Regarding COVID-19

No vaccine currently exists and will likely not for a year or more, at least for the public at large. Reingold Decl. ¶ 9. Public health experts have explained that social distancing measures, including staying home and maintaining at least six feet of space between people, are the only known effective measures for protecting against COVID-19 transmission. *Id*. Similarly, Governor Ivey has stated: "Maintaining a 6-foot distance between one another is paramount." Ex. 7. And the Alabama Department of Public Health ("ADPH") has instructed the public "to spend as much time as possible at home to prevent an increase in new infections." Ex. 8.

Even maintaining six feet of separation from others does not eliminate the risk of infection. Researchers have demonstrated that particles from a cough may spread

as far as 16 feet, while a sneeze may spread particles as far as 26 feet. Ex. 9.

The CDC has also issued specific guidelines concerning voting during the COVID-19 pandemic. It recommends that states "[e]ncourage voters to use voting methods that minimize direct contact with other people and reduce crowd size at polling stations[,]" including "drive-up voting" and "mail-in methods of voting." Ex. 1. There is no evidence that the virus is spread through the mail. Ex. 10.

The medical risks of widespread in-person voting during the pandemic are increasingly clear, particularly when polling locations are crowded and where mail-in voting is not readily available. In Chicago, a poll worker died from COVID-19. Ex. 11.  In Broward County, Florida, two poll workers tested positive. Ex. 12. And, after its April 7 primary elections, which saw multi-hour waits and lines stretching blocks—in part caused by the lack of a viable absentee voting for all voters—Wisconsin officials have identified at least 52 people who voted in-person or worked as poll workers in the primary and have tested positive for COVID-19. Ex. 13.

## III.    The Effect of COVID-19 in Alabama

Governor Ivey declared a State of Emergency on March 13, 2020. Ex. 14. On March 19, she issued an order closing or limiting the use of facilities like schools, senior centers, and beaches. Ex. 15. On March 26, Governor Ivey closed all schools. Ex. 16. On April 2, she authorized all notaries to use videoconferencing. Ex. 17.

On April 3, Governor Ivey issued a "Stay at Home" order requiring "every

person . . . to stay at his or her place of residence except as necessary to perform" an enumerated list of "essential activities" through April 30. Ex. 18 at 1.

On April 28, Governor Ivey announced a "Safer-at-Home" order effective from April 30 to May 15. The order prohibited all non-work-related gatherings, except between groups of fewer than ten people or those that can maintain six feet of distance between people from different households. Ex. 19 at 2. Some businesses may open subject to sanitation and social distancing rules. *Id*. at 3-5. All Alabamians, but "especially vulnerable persons"—*i.e.*, those who because of age or preexisting conditions are more susceptible to death or serious illness from COVID-19—are encouraged to stay home and stay six feet apart from people outside of their household. *Id*. at 2. On May 8, Governor Ivey extended the Safer-at-Home order to May 22. Ex. 20. She extended the state of emergency until July 12, 2020. Ex. 21.

The number of COVID-19 cases are rising in the rural and urban counties. From April 15 to April 30, Mobile County, where the First Congressional District is centered, added 447 new cases—more than the total new case count in any other county in Alabama, except for Jefferson County. Ex. 22. As of May 11, Mobile County had a total of 1,478 confirmed cases of COVID-19. Ex. 23.

Community transmission of COVID-19 is expected to persist. As Dr. Reingold testifies, "transmission of the virus will continue through the population until the development and widespread use of a vaccine and/or herd immunity."

Reingold Decl. ¶ 11. Other coronaviruses "do not appear to demonstrate seasonality of infection" and the "current virus has circulated widely in countries currently in their hot seasons." *Id.* ¶ 15. These facts "suggest that transmission of and infection with the virus may not be affected by the weather." *Id*. On May 4, Alabama's top health officer, Dr. Scott Harris, described the COVID-19 pandemic as "a true state of emergency and one whose end is not yet in sight." Ex. 24.

The rate of transmission in Alabama may have increased since Governor Ivey instituted the Safer-at-Home order. Ex. 25. On April 30, the ADPH reported an increase of 143 new cases. Ex. 26. At that time, the seven-day average of new cases was 177, and the 14-day average of new cases was 194. *Id*. By May 5, the seven-day average of new cases was 241, and the 14-day average of new cases was 222. *Id*.

As of May 11, the ADPH reported 1,245 hospitalizations in Alabama. Ex. 2. The ADPH also reported 10,009 COVID-19 infections and 401 deaths. Ex. 27.

## IV.   Alabama's Upcoming Elections

Throughout 2020 in Alabama, there are major statewide elections on July 14 and November 3, as well as dozens of municipal elections set for August 25. Ex. 28.

The July 14 primary runoff was initially scheduled for March 31, 2020. On March 10, a local columnist asked Secretary Merrill his plan for safely running the primary runoff election amid the pandemic, including whether he would encourage more citizens to vote early and allow curbside voting. Ex. 29. Secretary Merrill

responded "we're not going to talk about that," asserting that "we don't need for people to be concerned about something that may not ever happen. The story that you're thinking about writing is not even important." *Id*.

Three days later, on March 13, Governor Ivey declared a state of emergency. On March 18, Governor Ivey rescheduled the March 31 primary runoff to July 14. Ex. 30. Also on March 18, Secretary Merrill promulgated an emergency rule pursuant to Alabama Code § 17-11-3(e) entitled "Absentee Voting During State of Emergency." Ex. 31. Section (1) of that rule provides as follows:

> [A]ny qualified voter who determines it is impossible or unreasonable to vote at their voting place for the Primary Runoff Election of 2020 due to the declared states of emergency, shall be eligible to check the box on the absentee ballot application which reads as follows: "I have a physical illness or infirmity which prevents my attendance at the polls. [ID REQUIRED]."

*Id*.

This rule effectively permits everyone in Alabama to vote absentee, but it maintains the Witness and Photo ID Requirements. When a voter publicly asked Secretary Merrill how a person without a copier or scanner at home should go about complying with the Photo ID Requirement, the Secretary responded that "People that have a hard time figuring out the answer to that question probably need to vote in person." Ex. 32 at 1. Secretary Merrill later added: "When I come to your house to show you how to use your printer I can also teach you how to tie your shoes and to tie your tie. I could also go with

9

you to Walmart or Kinko's and make sure you know how to get a copy of your ID made while you're buying cigarettes or alcohol." *Id.* at 2.

On March 19 and again on April 17, Plaintiffs GBM, the Alabama NAACP, and others requested that Secretary Merrill take several steps, including removing the Witness Requirement, easing the Photo ID Requirement, and permitting curbside voting, to ensure voters could safely participate in all of the 2020 elections. Ex. 33, Ex. 34. Secretary Merrill did not respond to these letters.

On April 8, Secretary Merrill wrote to the U.S. Election Assistance Commission requesting over $6 million in funds to pay for an anticipated significant increase in absentee voting and other voting changes due to COVID-19. Ex. 35.

## V.    The Risks Posed by the Challenged Provisions in the COVID-19 Crisis

### A.    The Witness Requirement

The Witness Requirement compels voters to sign an affidavit accompanying their absentee ballot before either a notary or two adult witnesses, Ala. Code §§ 17-11-7 to 17-11-10. But thousands of voters do not live with two other adults, and so cannot satisfy this requirement without violating social distancing protocols.

Of the 3.8 million individual Alabamians of voting age, about 1.57 million adults live alone or with only one other person. Cooper Decl. ¶ 13 (attached as Ex. 36). In particular, 14.6% (555,330) adult Alabamians live alone, and 38.9% (215,966) of them are age 65 and older. *Id.* ¶ 7. Around 30% of Alabamians 18 and

older who live alone have a disability, and 44% of those persons 65 and older who live alone have a disability. *Id.* ¶ 8. These numbers are similar in the First Congressional District. *Id*. ¶¶ 19-20.

Out of the 980,850 Black Alabamians of voting age, 186,497 (19.0%) live alone. *Id.* ¶ 9. And 29.7% (55,388) of the Black Alabamians of voting age who live alone are disabled. *Id.* ¶ 11. Of the subset of Black people over age 65 and living alone, 45.9% (22,782) are disabled. *Id.* Whereas, for the subset of Whites over 65 and living alone, 44.0% (70,816) are disabled. *Id.* ¶ 12. Of all Black households (*i.e.*, not individuals), 37.1% contain people who live alone. *Id.* ¶ 16(d). Of all White households, 27.5% contain people who live alone. *Id*. And 14.1% of all Black households are headed by women who live alone with their children under 18 (*i.e.*, not legally competent witnesses) versus just 3.8% of similar White households. *Id.*

### B.    The Photo ID Requirement

The Photo ID Requirement requires a person submitting an absentee ballot application to include a copy of their photo ID. If a voter fails to provide photo ID with the application, once the ballot is received, the voter must mail in a copy of their ID with the ballot. Ala. Code. §§ 17-11-9 and 17-9-30. A voter who fails to provide photo ID with the application cannot receive an absentee ballot. *Id.* § 17-9-30(b). A returned absentee ballot that requires a photo ID will be treated as a provisional ballot if it does not include a copy of the voter's photo ID. *Id.* § 17-10-

1(c). For a provisional absentee ballot to be counted, the voter must travel in person to show photo ID to the board of registrars by 5:00 p.m. on the Friday after election day. Ala. Code § 17-10-2(a)(3). If the voter does not present photo ID by this deadline, their ballot is discarded. *Id.*

Given social distancing guidelines, many offices, county courthouses, public libraries, schools, and businesses remain closed. Yet, many voters lack access to a computer, which is usually needed to make copies at home: 12.8% (over 200,000) of all Alabama households lack a computer, smartphone, or tablet. Attach. A-2 to Cooper Decl., at 9. Over 6% of all Alabamians lack a vehicle, *id.*, and may need to take public transit, increasing the risk of COVID-19 infection. Ex. 9. Even if such a voter could find a way to travel and find a store to copy their IDs, they would have to break social distancing rules to do so, at great risk to their and others' safety.

Moreover, there are tens of thousands of Alabama voters who lack photo ID, and now cannot get one. Since March 23, 2020, nearly every photo ID-issuing office in Alabama, including the Alabama Law Enforcement Agency ("ALEA") offices and county courthouses, are closed. Ex. 37; Ex. 38 at 1. As of May 8, these locations remained closed. Ex. 39; Ex. 40 at 1. To the extent ALEA continues to operate any photo ID-issuing offices, it "[d]iscourages anyone with a weakened or compromised immune system from visiting any Driver License locations." Ex. 37. And there is no evidence that Secretary Merrill has deployed his "mobile ID units" to issue IDs since

12

at least April 3. As of May 11, there are no scheduled mobile ID unit events. Ex. 41.

Secretary Merrill has issued an emergency rule instructing voters that the Photo ID Requirement remains in effect. Ex. 31. He does not interpret the existing exemption to the Photo ID Requirement in Alabama Code § 17-9-30(d) to apply to voters with conditions that put them at a higher risk from COVID-19 infection. *Id.*

### C.    Curbside Voting Prohibition

No provision of Alabama law known to Plaintiffs expressly prohibits curbside or drive-thru voting. *See generally* Ala. Code § 17-9-1 to § 17-9-15. Nonetheless, Secretary Merrill prohibits election officials from offering curbside voting to voters whose disabilities or age prevent them from going inside of a polling location. For example, on November 8, 2016, Secretary Merrill learned that a polling place in Hale County, Alabama was offering curbside voting to assist voters with disabilities. Ex. 42. Secretary Merrill asserted this practice was illegal and ordered the county to immediately stop. The county complied. *Id.*

Secretary Merrill has not indicated he will permit curbside voting even during the COVID-19 pandemic. But, as noted, to protect voters during the pandemic, the CDC has recommended that jurisdictions "[e]ncourage drive-up voting for eligible voters." Ex. 1. Governor Ivey's Safer-at-Home order itself also encourages "drive-in" gatherings to protect individuals—particularly vulnerable persons—from close contact that puts them at higher risk from COVID-19. Ex. 19 at 2. A majority of

13

states permit curbside voting. Ex. 43 at 63. Additional states have used curbside voting as a safety accommodation to voters as a result of the pandemic, including Arkansas (Ex. 44), Ohio (Ex. 45), Wisconsin (Ex. 46), and Wyoming. Ex. 47. There is no indication that curbside voting in any of these states led to fraud or other issues.

### D.     The Challenged Provisions and COVID-19's Severe Impact on Black Voters

Nationally, the COVID-19 pandemic has had a particularly devastating effect on Black people. A CDC report published on April 17, 2020, which included data from 1,482 patients hospitalized across 14 states, found that Black patients made up 33% of cases in those states where race information was available, despite being only 18% of the states' populations. Ex. 48 at 459.

Sadly, these racially disparate patterns of illness and mortality due to COVID-19 exist in Alabama as well. As of May 11, the ADPH has reported that Black people in Alabama represented 38.4% of reported COVID-19 cases and 45.5% of related deaths, despite making up just 27% of the state's population. Ex. 2. In Mobile County, as of May 11, Black people accounted for 44.2% of COVID-19 infections, 59.1% of related hospitalizations, and 52.9% of COVID-19 deaths, despite being only 36% of the county's population. Ex. 23. For this reason, Dr. Karen Landers, an officer at the ADPH, has urged Black people in particular to "stay at home" and stringently practice social distancing. Ex. 49.

Plaintiffs' expert, Dr. Courtney Cogburn, explains that racial disparities in

serious illness and death due to COVID-19 are inextricably tied to discrimination in healthcare, housing, and employment. Cogburn Decl. ¶¶ 6-15 (attached as Ex. 50). This includes racial bias in medical care and the rationing of COVID-19 testing and care, higher rates of un-insurance and blue collar "essential" jobs in the Black community, and the increased risk of other diseases linked to housing segregation. *Id.* For example, because of longstanding racial biases in medical care, Black people with symptoms like cough and fever are less likely to be given one of the scarce COVID-19 tests. *Id.* ¶ 15. The CDC agrees that racial disparities related to COVID-19 are the result of "institutional racism" and other socioeconomic barriers. Ex. 51.

Racial discrimination in Alabama has also resulted in inequalities that disadvantage Black people. In Alabama, 20.7% of African Americans and 13.7% of Whites over age 16 work in "blue collar" service occupations—*i.e.*, jobs like grocers, nurses, or other essential workers—who are forced to leave home and face increased exposure to COVID-19. Cooper Decl. ¶ 16(c). By contrast, 39.1% of White people versus only 26.2% of Black Alabamians hold "white collar" jobs that are much more likely to allow employees to continue to work safely at home. *Id.* Black Alabamians are also more likely to lack health insurance (11.5% of African Americans and 8.1% of White people), *id.* ¶ 16(f); have a disability (among people over 65, 42.7% of Black and 38.1% of White people), *id.*; lack a high school degree (16.6% of Black and only 11.4% of White people), *id.* ¶ 16(b); and live below the poverty line (27.7%

of Black and 11.3% of White households), *id.* ¶ 16(a). Similar racial disparities exist in the First Congressional District. *Id*. ¶ 17. Because of racial and other disparities, Dr. Latesha Elopre believes that Alabama's Black Belt region will be hit the hardest by COVID-19. Elopre Decl. ¶¶ 9-14 (attached as Ex. 67).

## VI.   Injuries and Irreparable Harm to Plaintiffs

Individual Plaintiffs Robert Clopton, Eric Peebles, Howard Porter, Jr., and Annie Carolyn Thompson are lawfully registered Alabama voters who plan to vote in the upcoming 2020 elections. Clopton Decl. ¶ 3 (attached as Ex. 52); Peebles Decl. ¶¶ 3, 5, 11 (attached as Ex. 53); Porter Decl. ¶ 1 (attached as Ex. 54); Thompson Decl. ¶¶ 3, 5, 15 (attached as Ex. 55). Plaintiffs Clopton, Porter, and Thompson are eligible to vote in the July 14 primary runoff. Clopton Decl. ¶ 3; Porter Decl. ¶ 4; Thompson Decl. ¶ 15. They all are at high risk of death or serious illness if they contract COVID-19. Mr. Clopton is 65 years old, has diabetes, hypertension, and recently had surgery. Clopton Decl. ¶¶ 1, 4-6. Mr. Peebles has spastic cerebral palsy. Peebles Decl. ¶ 6. Mr. Porter, who is 69 years old, has Parkinson's disease and asthma. Porter Decl. ¶¶ 5-6. Ms. Thompson, who is 69 years old, has diabetes and high blood pressure. Thompson Decl. ¶¶ 3, 6.

Each of the individual Plaintiffs usually vote in person. Clopton Decl. ¶¶ 3, 6; Peebles Decl. ¶ 10; Porter Decl. ¶ 13; Thompson Decl. ¶ 14-16. But, to avoid exposure to COVID-19, they must vote by absentee ballot in the upcoming elections.

Clopton Decl. ¶ 13; Peebles Decl. ¶ 17; Porter Decl. ¶ 14; Thompson Decl. ¶ 24. However, none of these four voters can comply with both the Witness Requirement and the Photo ID Requirements without violating social distancing guidance.

Plaintiffs Peebles and Thompson live alone, and Mr. Clopton lives with only one other person. Clopton ¶ 8; Peebles Decl. ¶¶ 4, 15; Thompson Decl. ¶¶ 4, 21. They cannot comply with the Witness Requirement without leaving home or endangering their health, because they are sheltering in place and none of them normally come into contact with two adults once. Clopton Decl. ¶¶ 8-10; Peebles Decl. ¶ 15; Thompson Decl. ¶ 21. Because they do not feel safe running this risk, they will be forced to make a choice between their health and their vote in the 2020 elections. Clopton Decl. ¶ 14; Peebles Decl. ¶ 17; Thompson Decl. ¶¶ 16, 24.

Ms. Thompson cannot safely comply with the Photo ID Requirement, because she does not have a printer, scanner, or copy machine at her home. Thompson Decl. ¶¶ 18-19. Mr. Porter also fears that he will be unable to comply with the Photo ID Requirement. Porter Decl. ¶¶ 14-15. While he has a printer, Mr. Porter lives on a very limited income. *Id.* He may not be able to afford to maintain his printer through the July election, let alone through November. *Id.* ¶¶ 14-15, 18-19.

If given the option, Plaintiffs Clopton, Peebles, Porter, and Thompson would consider curbside voting to minimize the threat of infection. Clopton Decl. ¶ 14; Peebles Decl. ¶ 16; Porter Decl. ¶ 16; Thompson Decl. ¶ 23. But these Plaintiffs do

not intend to vote in a way that puts them at higher risk of infection. Clopton Decl. ¶ 14; Peebles Decl. ¶¶ 12, 15, 17; Porter Decl. ¶ 17; Thompson Decl. ¶¶ 16, 21, 24.

Plaintiff People First of Alabama ("People First") is a group of people with developmental disabilities. Ellis Decl. ¶ 4 (attached as Ex. 56). People First's members include Alabama registered voters who plan to vote in the July 14 primary runoff but have conditions that put them at higher risk of death or severe complications from COVID-19. *Id*. ¶¶ 8-9. These members must vote by absentee ballot or be disenfranchised. *Id.* ¶ 9. Yet, many of these members live alone or with one other adult and so are unable to comply with the Witness Requirement. *Id.* ¶ 10-11. Members also include voters who must vote absentee or be disenfranchised, but do not have access to the technology or the Internet needed to comply with the Photo ID Requirement. *Id.* ¶ 12. In addition, if curbside voting were available, members with high susceptibility to serious illness from COVID-19 and those with physical disabilities would use it. *Id.* ¶ 13. If the Challenged Provisions remain in place, these members will be disenfranchised. *Id.* ¶¶ 12-13. People First is diverting its resources to assist its members with navigating these provisions. *Id*. ¶ 14.

Plaintiff Greater Birmingham Ministries ("GBM") is a multi-racial and multi-faith membership organization that provides emergency services for members in need. Douglas Decl. ¶ 2 (attached as Ex. 57). Many of GBM's 5,000 members are low-income persons who lack a computer, the internet, or other videoconferencing

technology. *Id.* ¶ 9. About a third of GBM's members are senior citizens and about one fifth of all GBM members live alone. *Id*. Other members live only with one other adult or young children. *Id.* ¶¶ 10-11. Of those members, many are Black, Latinx, disabled, or low-income registered voters who are staying home because they are at a higher risk of death or serious illness from COVID-19 due to age or conditions, like diabetes or hypertension. *Id.* ¶ 9. Members with this higher risk have expressed an interest curbside voting. *Id.* ¶¶ 10-11. GBM is diverting its resources to assist voters with the Witness Requirement and Curbside Voting Prohibition. *Id*. ¶ 7.

Plaintiff the Alabama NAACP has many members who are senior citizens, Black, and/or have medical conditions, like diabetes or hypertension, that put them at higher risk for death or serious illness from COVID-19. Simelton Decl. ¶ 9 (attached as Ex. 58). Many members also live alone or with only one other adult person. *Id*. These members and others are staying at home to avoid contracting COVID-19; thus, they will be unable to meet the Witness Requirement. *Id.* ¶¶ 9-10. An active member is in their 80s, lives alone, and has breast cancer and heart disease. *Id.* ¶ 9. They lack ready access to videoconferencing technology. *Id*. This member, and others like them, cannot vote in-person or meet the Witness Requirement without risking their safety. *Id.* ¶¶ 9-10. In addition, there are members who require help to vote and therefore need access to curbside voting as a safe in-person voting option. *Id.* The Alabama NAACP is diverting its resources to address the Witness

Requirement and Curbside Voting Prohibition. *Id.* ¶¶ 5-6.

## ARGUMENT

A preliminary injunction is warranted if Plaintiffs show: (1) a likelihood of success on the merits; (2) likelihood of suffering irreparable harm; (3) the balance of hardships favor them; and (4) the injunction serves the public interest. *Jones v. Governor of Fla.*, 950 F.3d 795, 806 (11th Cir. 2020). Here, each factor decisively favors Plaintiffs. In evaluating the burdens on voters, the Court can take judicial notice of census data, voting statistics, public health reports, and newspapers. Fed. R. Evid. 201(b)(2); *see generally U.S. ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 811 (11th Cir. 2015); *Hollis v. Davis*, 941 F.2d 1471, 1474 (11th Cir. 1991).

## I.     Plaintiffs Are Likely to Prevail on the Merits of Their Constitutional, Section 201, and ADA Claims Against the Challenged Provisions

### A.     The Witness Requirement Violates the Constitution, Section 201, and the ADA during the COVID-19 Crisis

#### 1.     The Witness Requirement severely burdens the fundamental right to vote in violation of the Constitution.

The First and Fourteenth Amendments do not allow a state to make voters choose between protecting their health and the health of their families and communities or forfeiting their fundamental rights. Any government burden on the right to vote must be balanced against the stated government interest supporting the burden. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983). Yet, together and separately, the Challenged

Provisions will deprive many thousands of qualified citizens of the right to vote. They will do so by imposing restrictions on the franchise that are at odds with public health guidance expected to remain in place for the foreseeable future.

The *Anderson-Burdick* test requires the Court to "weigh the character and magnitude" of the asserted constitutional injury against Alabama's justifications for the burdens imposed by the challenged rules, "taking into consideration the extent to which those justifications require the burden to plaintiffs' rights." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019) ("*Lee*").

Strict scrutiny applies to any policy that "severely burdens the right to vote." *Id.* Once it is shown that the Challenged Provisions seriously burden the fundamental right to vote, Defendants must prove that the provisions are "narrowly drawn to serve a compelling state interest." *Id.* But, because the right to vote is "'preservative of all rights,'" *id.* at 1315 (citation omitted), "even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Id.* at 1318-19.

In the current crisis, courts have applied strict scrutiny to a similar witness requirement for absentee ballots and to ballot-access laws that conflict with "stay-at-home" orders to severely burden the right to vote. *See League of Women Voters of Va. v. Va. State. Bd. of Elec.,* No. 6:20-cv-0024, __ F. Supp. 3d __, 2020 WL 2158249, at *7-8 (W.D. Va. May 5, 2020) ("*LWVV*") (finding that a witness

requirement's "substantial" burdens outweighed any countervailing state interests and approving a consent decree enjoining it); *Garbett v. Herbert*, No. 2:20-cv-245-RJS, 2020 WL 2064101, at *6-8 (D. Utah Apr. 29, 2020) (finding that, as applied in the "unforeseen, extraordinary circumstances" of COVID-19, a state ballot access law "imposes a serve burden"); *Libertarian Party of Ill. v. Pritzker*, No. 20-cv-2112, 2020 WL 1951687, at *4 (N.D. Ill. Apr. 23, 2020) (same); *Esshaki v. Whitmer*, No. 20-cv-10831, 2020 WL 1910154, at *1 (E.D. Mich. Apr. 20, 2020) (same).

Courts have likewise applied strict scrutiny in non-pandemic emergencies. *See Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1257 (N.D. Fla. 2016) (holding that, because a hurricane "foreclosed the only methods of registering to vote" in the final week of registration, the statutory deadline "severe[ly] burden[ed] . . . the right to vote"); *Ga. Coal. for the Peoples' Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1345-46 (S.D. Ga. 2016) (similar).

In addition, strict scrutiny is appropriate where the effects of the Challenged Provisions bear more heavily on specific groups—like racial minorities, low-income people, the elderly, or people with disabilities. *See Jones*, 950 F.3d at 822; *Ga. Coal. for the People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1264 (N.D. Ga. 2018).

> a.) *The Witness Requirement forces many thousands of people to face disenfranchisement or risk their safety.*

Forcing thousands of people to put their health on the line or face disenfranchisement imposes a severe burden on the right to vote. *See, e.g.*, *Price v.*

*N.Y. State Bd. of Elec.*, 540 F.3d 101, 107 n.8 (2d Cir. 2008) (noting that for "voters who are . . . housebound" the burden of a lack of absentee voting opportunity "could be quite significant"). The breadth and severity of the Witness Requirement's burdens merit strict scrutiny because they needlessly force voters to make unconstitutional choices. The greater the burden that a challenged law places on the right to vote, "the stricter the scrutiny" the law must survive. *Lee*, 915 F.3d at 1319.

The Witness Requirement asks the 1.57 million adults in Alabama who live alone or with only one other person, *supra* at 10, to make the impossible "choice between adhering to guidance that is meant to protect not only their own health, but the health of those around them, and undertaking their fundamental right—and, indeed, their civic duty—to vote in an election." *LWVV*, 2020 WL 2158249, at *8.

Under the Governor's "Safer at Home" order, all Alabamians—but, in particular, "vulnerable persons" like Plaintiffs Clopton, Peebles, and Thompson—are ordered to minimize travel outside the home. *See supra* at 7. Even if people do leave their homes, this order and other public health guidance direct them to maintain at least six feet of distance from people with whom they do not live. *Id*.; *supra* at 5 Additionally, the CDC encourages as many voters as possible "to use voting methods that minimize direct contact with other people." Ex. 1.

"Requiring individuals to have one or more people they are not otherwise being exposed to come into close enough proximity to witness their ballot would

23

place them at increased risk of infection." Reingold Decl. ¶ 18. This risk is even greater for disabled or elderly people, like Plaintiffs, *supra* at 16, who "are at the greatest risk of severe cases, long-term impairment, and death." Reingold Decl. ¶ 6.

Even in normal circumstances, the Witness Requirement causes election officials to reject the ballots of a significant number of absentee voters.  In the 2018 elections, 1,368 Alabama voters had their absentee ballots rejected. Ex. 59 at 29. About a quarter of these ballots were rejected because of the Witness Requirement. Ex. 60. But in that election, only 57,832 people or 3.4% of all voters cast mail-in absentee ballots. Ex. 59 at 29. Voters then did not face COVID-19 related restrictions on obtaining witnesses to vouch for them on those ballots. Secretary Merrill predicts absentee voting to increase exponentially in 2020 because of COVID-19. Ex. 35.

The burdens imposed by the Witness Requirement will disproportionately fall on members of populations at heightened risk of death or severe health complications from COVID-19. As noted above at 10-11, 14.6% of adult Alabamians live alone and, of those adults, 26% are seniors and 30% are people with disabilities.

The Witness Requirement also places a significantly heavier and deadlier burden on Black voters amid the pandemic. As explained above at 14, because of racial discrimination, Black Alabamians are more than twice as likely to contract or die from COVID-19 as White people. Black people in Alabama are also much more

likely to live alone or live as the lone adult among children: 37.1% of all Black households are people living alone, as compared to 27.5% of White households, and 14.1% of all Black households are headed by women who live alone with their children versus just 3.8% of White households. *See supra* at 11.

Plaintiffs' individual circumstances highlight how the Witness Requirement acts as a significant barrier to voters. Plaintiffs Thompson and Peebles live alone, and Plaintiff Clopton lives with only one other person. *See supra* at 17. To satisfy the Witness Requirement, these voters would need to closely interact with one or more people from outside their households. Yet, as noted above at 16, Plaintiffs also have medical conditions that make them more susceptible to death or serious illness from COVID-19. They are the very "vulnerable persons" the Governor and doctors have encouraged to stay at home. *Supra* at 7. Plaintiffs cannot both follow this public health guidance and obtain two witnesses as demanded by the Witness Requirement.

A voter can also have their absentee ballot notarized to satisfy the Witness Requirement. But this alternative is no less risky or burdensome. Traditional notarization would still require a voter's personal interaction with a person outside their home in violation of social distancing rules. Although Governor Ivey issued an executive order permitting notaries to notarize documents using videoconferencing in lieu of personal appearance, *supra* at 6, not all voters (or notaries) have access to videoconferencing technology. *Id*. at 12. Black Alabamians are nearly two times

more likely than White people to lack access to the technology that is necessary for videoconferencing. Cooper Decl. ¶ 16(g). Further, a notary may also require the payment of a $5.00 fee to notarize the absentee ballot affidavit. Ala. Code § 36-20-74. Yet, it is unconstitutional to make "the affluence of the voter or payment of any fee an electoral standard." *Jones*, 950 F.3d at 821 (citation omitted). Finally, remote notarization requires voters to mail their absentee ballot affidavit for notarization, then depend on the notary to mail it back, creating chances for it to be lost or stolen.

When, as here, a law endangers the health of thousands of voters, the most exacting level of scrutiny is required. Plaintiffs are effectively "disabled from voting" because they cannot safely "go to the polls on election day" or meet the Witness Requirement due to the COVID-19 crisis and public health rules. *See O'Brien v. Skinner*, 414 U.S. 524, 527, 530-31 (1974) (enjoining an absentee ballot law as-applied to eligible voters in jail). Even if the Witness Requirement did not usually burden many voters, which it does, "these are not ordinary times." *LWVV*, 2020 WL 2158249, at *8. Alabama cannot impose this requirement when doing so endangers voters' lives. *See Fla. Democratic Party*, 215 F. Supp. 3d at 1258.

> b.)   *The Witness Requirement's severe burdens on voters far outweigh any nominal State interest in enforcing it.*

Because the Witness Requirement places voters in significant danger, it is subject to strict scrutiny. Even if a lesser level of scrutiny applied, the risks to voters far outweigh any nominal benefits to Alabama from enforcing this requirement.

Alabama law states that the Witness Requirement "goes to the integrity and sanctity of the ballot and election." Ala. Code § 17-11-10(b). But this requirement does not meaningfully protect the integrity of an absentee ballot. Witnesses are not required to identify themselves by legibly printing their name. Ala. Code §§ 17-11-7, 17-11-9 & 17-11-10. Nor are Alabama election officials required to follow up with witnesses to confirm their identity, their age, or that they indeed witnessed the signing of the voter's affidavit. *Id*. § 17-11-10. Instead, officials merely examine the affidavit for the witness signatures. If the affidavit contains the witness signatures and is otherwise correct, then the ballot is counted. *Id*. § 17-11-10(b). While instances of fraud are very rare,[1] a person determined to falsely submit an absentee ballot and risk imprisonment could just as easily forge the two witnesses' signatures as they could falsely attest to their identity when signing the absentee ballot affidavit.

By contrast, several provisions of Alabama law unrelated to the Witness Requirement do serve the State's interest in election integrity by confirming the legitimacy of the absentee ballot. First, the absentee ballot application is required to "contain sufficient information to identify the applicant and shall include the

---

[1] Even the Heritage Foundation—an organization committed to "[p]reventing, deterring, and prosecuting election fraud"—identifies a little more than a dozen cases of election fraud in Alabama concerning absentee voting in the past 20 years. Ex. 61. None of these convictions involved voter impersonation that plausibly could have been stopped by the Witness Requirement, but a few of the convictions involved falsifying witness signatures. In any event, during the same time period, more than 29 million ballots were cast in Alabama elections. *See* Ex. 62 at 4-9 (reporting vote counts that total 29,146,275 in Alabama elections between March 2000 and June 2018).

applicant's name, residence address, or such other information necessary to verify that the applicant is a registered voter." Ala. Code § 17-11-4. The current absentee ballot application requires a voter to submit either their driver's license number or the last four digits of their social security number, which allows election officials to verify the voter's identity even before they send the absentee ballot. Ex. 63. Second, the affidavit requires an absentee voter to swear that the information is true. Ala. Code § 17-11-7. The affidavit warns that it is a criminal offense to knowingly give false information to illegally vote absentee, punishable by a fine up to $1,000 and/or up to six months in jail. *Id*. Finally, it is a Class C felony for anyone to willfully falsify an absentee ballot application or verification documents. *Id*. § 17-17-24(a).

Given these alternative methods of protecting election integrity, the additional step of requiring the voucher of a notary or two witnesses offers no real protection against fraud. "For the fraudster who would dare to sign the name of another qualified voter at the risk of being charged with [a felony], writing out an illegible scrawl on an envelope to satisfy the witness requirement would seem to present little to no additional obstacle." *LWVV*, 2020 WL 2158249, at *9. In federal and state law, there is a "long practice of relying on the threat of penalty of perjury to guard against dishonesty and fraud." *Lee*, 915 F.3d at 1323; *see, e.g.*, 28 U.S.C. § 1746; Ala. Code §§ 13A-10-109, 12-21-83 & 40-29-115. And, when Congress eliminated all witness requirements for absentee voter registration, it found that "warnings of penalties"

were sufficient to deter fraud.  Senate Rep. 103-6, 1993 WL 54278, at *13 (1993).

In fact, in 2017, Secretary Merrill supported a bill that would have eliminated the Witness Requirement. Secretary Merrill admitted that, given the Photo ID requirement, removing the Witness Requirement would strengthen the absentee voting law while making it easier to vote. Ex. 64. While Plaintiffs seek to enjoin the Witness Requirement, they do not seek a blanket injunction against the Photo ID Requirement. *See supra* at 2-3. Further, the 38 states, including Georgia and Florida, that lack witness requirements are not overrun with absentee voter fraud. Ex. 65.

Amid the COVID-19 crisis, other courts have determined that similar witness requirements are no more effective at preventing voter fraud than self-executed affidavits made under penalty of perjury. *See LWVV*, 2020 WL 2158249, at *9 (finding that a settlement enjoining a witness requirement would not increase voter fraud); *League of Women Voters of Okla. v. Ziriax*, No. 118,765, __ P.3d __, 2020 WL 2111348, at *1 (Okla. May 4, 2020) (permitting the use of self-executed affidavits—rather than third-party notarization—to meet a witness requirement).

Moreover, in *Democratic Executive Committee of Florida v. Lee*, the Eleventh Circuit upheld an injunction against a state law that let election officials reject absentee ballots based solely on these officials' determination that the signature provided with the ballot does not match the voter's signature in the state's records. 915 F.3d at 1315. Even after presuming that (unlike the situation here) this signature

match law was effective at preventing fraud, the Court held that the burden was not sufficiently tailored to justify the barrier it imposed on the right to vote. *Id*. at 1322-23; *see also Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262 (11th Cir. 2019) (mem.) (upholding an injunction against Georgia's similar signature match law).

The Witness Requirement places an even greater unnecessary and dangerous burden on elderly, disabled, Black voters and thousands of others who must choose between their health and their right to vote. "The Constitution does not permit a state to force such a choice on its electorate." *LWVV*, 2020 WL 2158249, at *8. Accordingly, the Witness Requirement cannot survive any modicum of scrutiny.

### 2.     The Witness Requirement violates Section 201 of the VRA.

Section 201 of the VRA mandates that "[n]o citizen shall be denied, because of his failure to comply with any test or device, the right to vote in any Federal, State, or local election conducted in any State or political subdivision of a State." 52 U.S.C. § 10501(a). Section 201 bars any "test or device" that requires any person to "prove his qualifications by the voucher of registered voters or members of any other class." *Id*. § 10501(b)(4). "All literacy tests and similar voting qualifications were abolished" by Section 201 because, "[a]lthough such tests may have been facially neutral, they were easily manipulated to keep blacks from voting." *N.W. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 198 (2009).

Under the Witness Requirement, an absentee ballot that "is not witnessed by

two witnesses 18 years of age or older . . . will not be counted." Ala. Code § 17-11-7. Under the plain text of the VRA, it is *per se* illegal insofar as it is a "prerequisite for voting" that demands a voter to "prove his qualifications by the voucher of registered voters or members of any other class."  52 U.S.C. § 10501(b); *see also* 52 U.S.C. § 10310(c)(1) (defining "voting" in the VRA to include "all action necessary to make a vote effective"). The Witness Requirement is a banned test for all voters. Or, at least, it is an illegal test as-applied to those voters, like Plaintiffs, whose health would be greatly endangered by leaving home to comply with this requirement or vote in person during the pandemic. *Cf. O'Brien*, 414 U.S. at 530.

Alabama law states that the Witness Requirement "goes to the integrity and sanctity of the ballot and election." Ala. Code § 17-11-10(b). That justification, however, cannot overcome the plain text of the VRA, which reflects Congress's judgment that prohibited tests and devices "unduly lend themselves to discriminatory application, either conscious or unconscious." *Oregon v. Mitchell*, 400 U.S. 112, 216 (1970) (opinion of Harlan, J.). Before the VRA, other voucher or "supporting witness" requirements were justified as necessary to identify a voter.[2] *See, e.g.*, *United States v. Ward*, 349 F.2d 795, 799 (5th Cir. 1965); *United States v. Logue*, 344 F.2d 290, 291 (5th Cir. 1965). Whatever the state's interest, the banned

---

[2] Literacy tests were also justified as necessary to decrease fraud. *See Veasey v. Abbott*, 830 F.3d 216, 237 (5th Cir. 2016) (en banc); *Underwood v. Hunter*, 730 F.2d 614, 619 (11th Cir. 1984).

tests are presumptively discriminatory. *See Lodge v. Buxton*, 639 F.2d 1358, 1363 (5th Cir. 1981), *aff'd sub nom. Rogers v. Lodge*, 458 U.S. 613 (1982). And, while proof of a discriminatory effect is irrelevant under Section 201, the Witness Requirement's effect is clear. *See supra* at 23-27.

### 3. The Witness Requirement violates Title II of the ADA.

The ADA seeks to address the "pervasive unequal treatment" of people with disabilities in numerous areas, including voting. *Nat'l Ass'n of the Deaf v. Florida*, 945 F.3d 1339, 1351 (11th Cir. 2020). Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any entity." 42 U.S.C. § 12132.

To prevail under the ADA, Plaintiffs need prove only that (1) they are qualified persons with a disability; (2) they were excluded from participation in or denied the benefits of a public entity's services or activities; and (3) the exclusion or denial of the benefit was by reason of the plaintiff's disability. *See Nat'l Fed. of the Blind v. Lamone*, 813 F. 3d 494, 502-03 (4th Cir. 2016). "Plaintiffs need not, however, prove that they have been disenfranchised or otherwise 'completely prevented from enjoying a service, program, or activity' to establish discrimination" in violation of the voting rights protected by the ADA. *Disabled in Action v. Bd. of Elec. in City of N.Y.*, 752 F.3d 189, 198 (2d. Cir. 2014) (citation omitted).

Once Plaintiffs prove that a Challenged Provision prevents them from voting, Plaintiffs must offer "reasonable modifications to rules, policies, or practices." 42 U.S.C. § 12131(2); *see also* 28 C.F.R. § 35.130(b)(7). A modification to a rule is reasonable if it will not cause "undue hardship." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401-03 (2002). The burden of showing that a modification is reasonable is "not a heavy one" and it "is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Nat'l Fed. of the Blind*, 813 F.3d at 507-08. The determination of reasonableness is "fact-specific." *Id.* at 508.

As described above at 16-20, Plaintiffs are otherwise qualified persons with disabilities, which include medical vulnerabilities that place them at extremely high risk of serious bodily injury or death should they leave the confines of their homes. *See* 28 C.F.R. § 35.108. Plaintiffs and their members are also eligible to vote in this year's elections and would do so with reasonable accommodations. Absent a modification to the Challenged Provisions, Plaintiffs will be prevented from voting and completely excluded from the democratic process because of their disabilities. *See Nat'l Ass'n of the Deaf*, 945 F.3d at 1349 (recognizing that the ADA protects the "right to participate in the democratic process," which is a "foundational" right).

As explained above at 28, there are numerous other ways for voters with disabilities, as well as others, to confirm their identity in the absence of the Witness

Requirement. Defendants have no valid reason to refuse to accommodate voters by allowing self-executed affidavits in lieu of this requirement. *See Nat'l Fed. of the Blind*, 813 F.3d at 509 (holding that a state violated the ADA where it failed to show that accommodating voters with disabilities would compromise election integrity).

**B.    The Constitution and the ADA Demand the Elimination of the Photo ID Requirement for those Voters who are the Most Vulnerable to COVID-19**

**1.    The Photo ID Requirement severely burdens the constitutional rights of vulnerable voters by requiring them to risk COVID-19 exposure.**

The Photo ID Requirement demands nearly every voter to submit a photocopy of their photo ID with either their absentee ballot application or the absentee ballot itself. Under existing state law, however, a voter who is entitled to vote by absentee ballot pursuant to the "Uniformed and Overseas Citizens Absentee Voting Act; the Voting Accessibility for the Elderly and Handicapped Act; or any other federal law, shall not be required to produce identification prior to voting." Ala. Code § 17-9-30(d). Interpreting this provision, the absentee ballot application exempts from the Photo ID requirement any voter who is over 65 or has a disability *and* is "unable to access [their] assigned polling place due to a neurological, musculoskeletal, respiratory (including speech organs), cardiovascular, or other life-altering disorder that affects [their] ability to perform manual tasks, stand for any length of time, walk unassisted, see, hear or speak[.]" Ex. 63.

Secretary Merrill does not interpret this exemption to apply to Plaintiffs Porter and Thompson, People First's members, or the many thousands of other voters with health conditions that make COVID-19 particularly dangerous. Rather, his emergency rule for the July 14 runoff expressly states that persons who wish to vote absentee due to COVID-19 must provide photo ID. *See supra* at 9. Secretary Merrill has also instructed voters without access to photocopying technology to leave home in violation of social distancing protocols to make copies. *See supra* at 9-10.

Given the lack of an exemption for people who are most vulnerable for contracting COVID-19, the Photo ID Requirement "go[es] beyond the merely inconvenient" to severely burden the right to vote. *Kemp*, 347 F. Supp. 3d at 1264 (citation omitted).

The Photo ID Requirement demands that these vulnerable voters, particularly those who lack a copier or photo ID, do the opposite of what public health officials have advised them to do. They must leave home; congregate in person at a public space, likely in close proximity to others; and touch various surfaces—like copy machines, counters, or doors—that various other persons also have touched. Otherwise, they must forego their right to vote in July. Thus, for voters who cannot copy their IDs at home, the Photo ID Requirement is a "nearly insurmountable hurdle" because it requires voters to violate the Safer-at-Home order. *See Libertarian Party of Ill.*, 2020 WL 1951687, at *4 (finding that a candidate signature

requirement, which normally posed little burden on the fundamental right to vote, was unconstitutional as applied in the current pandemic).

While it "is a 'basic truth that even one disenfranchised voter—let alone several thousand—is too many,'" *Lee*, 915 F.3d at 1321 (citation omitted), over 200,000 households lack the computer needed to copy photo IDs. *See supra* at 12.

Given the serious burdens that the Photo ID Requirement places on thousands of voters in the current crisis, the Constitution demands that this requirement face strict scrutiny review. *See LWVV*, 2020 WL 2158249, at *7-8 (finding that a witness requirement, which ordinarily "may not be a significant burden," is unconstitutional due to COVID-19). The requirement cannot survive such scrutiny. But, due to the lack of any substantial state interest in applying the Photo ID Requirement to vulnerable voters during this crisis, it also cannot survive a lesser level of scrutiny.

> **2.    The Photo ID Requirement's burden on vulnerable voters is unjustified because Defendants lack any interest in construing it in a manner that endangers Plaintiffs' health and right to vote.**

Defendants cannot claim a discernible interest in compelling citizens to leave home to copy photo IDs or to vote in person in the midst of a dangerous pandemic. While the risk of contagion and bodily harm remains, Defendants cannot state an interest that makes the Photo ID Requirement "necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789.

Nor is the Photo ID Requirement "narrowly drawn" to achieve any asserted

interest, as is required to satisfy strict scrutiny. *Lee*, 915 F.3d at 1318. Although Alabama is justified in employing measures to maintain election integrity and combat COVID-19, Defendants have "failed to implement sufficient complementary measures to account for the stifling effect its response to the COVID-19 pandemic exacted on accessing the ballot." *Garbett*, 2020 WL 2064101, at *14. Even if Defendants could show that the Photo ID Requirement is generally useful in combating fraud (which they cannot), they cannot show that their refusal to include voters who are most vulnerable in this pandemic, like Plaintiffs, as part of the photo ID exemption that already exists to protect some voters, is narrowly tailored.

Plaintiffs "accept the propriety of requiring photo ID from persons who already have or can get it with reasonable effort, while endeavoring to protect the voting rights of those who encounter high hurdles." *Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016). For many voters—especially the elderly and those at greatest risk of hospitalization or death if they contract the virus—the only way to limit exposure to COVID-19 is through "self-isolation," which "involves not physically interacting with those outside one's home" and "maintaining at least six feet of distance between individuals." Reingold Decl. ¶ 9. Similar advice is being given by federal, state, and local health officials. *See supra* at 5-7. Given the steps needed to avoid infection, many elderly or other voters most in danger from the virus, but who lack photo ID or copiers, will be dissuaded from voting. "That substantial burden on

the right to vote [can]not be[] justified by countervailing, demonstrated interests" in the Photo ID Requirement. *LWVV*, 2020 WL 2158249, at *8. The Constitution requires the Court to offer relief to those voters who face serious barriers to satisfying even an otherwise valid photo ID law. *Frank*, 819 F.3d at 387.

To cure this constitutional violation, Defendants could simply construe the existing exemption, Ala. Code § 17-9-30(d), to authorize those voters who are most vulnerable to COVID-19 to vote absentee without meeting providing copies of their photo IDs. Alabama's legislature has already seen fit to offer voters eligible under the Voting Accessibility for the Elderly and Handicapped Act, 52 U.S.C. § 20102, to vote absentee without submitting photo IDs. The State Defendants have rejected a construction that would exempt voters like Plaintiffs Porter and Thompson, opting instead to severely burden the rights of many thousands of vulnerable voters.

The Court can address this constitutional harm: "a federal court can review a state official's interpretation of—or gloss over—state law when it is alleged to violate the United States Constitution." *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1213 (N.D. Fla. 2018). Accordingly, the Court should "enjoin[] the state from enforcing [its] laws as a violation of the First and Fourteenth Amendments." *Id.*; *accord Obama for Am. v. Husted*, 697 F.3d 423, 431 (6th Cir. 2012) (similar); *Charles H. Wesley Educ. Found v. Cox*, 324 F. Supp. 2d 1358, 1366-68 (N.D. Ga. 2004) (similar), *aff'd* 408 F.3d 1349 (11th Cir. 2005). In

fact, because Plaintiffs are protected by the ADA, *supra* at 16-20, Defendants must interpret the Photo ID Requirement in a manner that protects their right to vote.

### C.     The Curbside Voting Prohibition Unlawfully Burdens Voters

Despite the clear danger linked to close personal contact and interacting at polling stations, and the equally clear guidance from the Governor and the CDC, Defendants actively prohibit in-person polling sites from utilizing curbside voting. Yet, the Curbside Voting Prohibition flouts the very social distancing rules recommended by public health officials. In fact, the Safer-at-Home Order itself explicitly encourages "drive-in," rather than person-to-person, gatherings for churches and other events to protect vulnerable and other persons from the forms of close contact that put them at higher risk of COVID-19 exposure. *See supra* at 13-14.

The Curbside Voting Prohibition poses risks to all voters, but especially vulnerable Alabamians. While these voters normally vote in person—and, in some cases, may need to do so due to the Witness and Photo ID Requirements—the Curbside Voting Prohibition makes the prospect of voting in person significantly and needlessly more dangerous. *See Disabled in Action*, 752 F.3d at 198-99 (explaining, in an ADA case, that state policies cannot force voters with disabilities to cast absentee ballots and thereby rob them of the option of voting in person).

### 1.     The Curbside Voting Prohibition is unconstitutional.

The insides of polling locations are a "prime area for increased transmission

of SARS-CoV-2 due to the close proximity of a large number of individuals—voters, observers, poll workers—in a limited space." Reingold Decl. ¶ 16. They also have a "large number of common surfaces that multiple people touch: the doors, the poll books to sign in, pens, voting booths, and voting machines." *Id*.  It is therefore important for state officials to allow people to vote while "minimiz[ing] a person's close contacts with poll workers, other voters, and surfaces at polling locations and thus reduce the spread of COVID-19 via person-to-person contact and environmental surfaces." *Id*. ¶ 17. In the absence of curbside voting, vulnerable voters, like the individual Plaintiffs, must leave their vehicles to vote in person at a place where there is a substantially increased risk of contracting COVID-19.

Although absentee voting offers an option for some voters, other voters—including members of the organizational Plaintiffs—require the assistance available in person on Election Day. *See supra* at 19-20. People with physical disabilities, low literacy, or low English proficiency, for example, are more likely to need assistance from poll workers in marking their ballot. Black voters are also both more likely to be disabled and more likely to have less than a high school education than White voters. *See supra* at 15-16. Federal law requires that those voters with disabilities or low literacy receive assistance. *See* 52 U.S.C. § 10508.

Given the serious burdens imposed by the Curbside Voting Prohibition, the Court can sustain the prohibition only if it is "narrowly drawn to advance a state

interest of compelling importance." *Burdick*, 504 U.S. at 434 (citation omitted). Secretary Merrill has indicated the Curbside Voting Prohibition prevents "voting irregularities." Ex. 42. But he has not explained why or how curbside voting risks voter fraud. And if the Secretary could conjure some hypothetical scenario involving voter fraud and curbside voting, that hypothetical pales when compared to the very real danger to all Alabamians, but especially older and vulnerable Alabamians, would face if forced to vote inside of crowded poll sites amid the current pandemic.

Therefore, the Curbside Voting Prohibition is not "narrowly drawn to advance" any interest the State might have. *Burdick*, 504 U.S. at 434 (citation omitted). Defendants can address any purported concerns about potential "voting irregularities" through other means. As an example, a bipartisan group of poll watchers and/or non-partisan poll workers can meet a voter at their vehicles with the ballot. And, as discussed above at 14, most states offer curbside voting, and Arkansas, Ohio, Wisconsin, and Wyoming have expanded curbside voting due to COVID-19. *Accord Fla. Democratic Party*, 215 F. Supp. 3d at 1257 (finding that a state's refusal to extend voting deadlines after a hurricane was unconstitutional in part because "[m]any other states" had voluntarily changed such deadlines).

The Curbside Voting Prohibition places elderly and vulnerable voters who cannot otherwise safely vote absentee because of the Photo ID or Witness Requirements in an untenable position: risk their health to vote inside of a polling

41

site in the midst of the worst pandemic in a century, or altogether forego their right to vote. The Curbside Voting Prohibition thus places a severe burden on voters and cannot stand under any of the stated justifications for the burden.

### 2.     The Curbside Voting Prohibition Violates the ADA.

As discussed above at 16-20, Plaintiffs meet the definition of disabled under the ADA and, therefore, Defendants are required to accommodate them to vote safely amid this crisis. But the Curbside Voting Prohibition excludes Plaintiffs and their members with disabilities from participating in elections in violation the ADA.

The State Defendants must reasonably modify processes at in-person polling places to permit curbside voting. *See* 28 C.F.R. § 35.150(b) (explaining that the ADA may require "delivery of services at alternate accessible sites"). The ADA regulations "explicitly prohibit [Alabama] from denying individuals with disabilities access to its services because its 'facilities are inaccessible to or unusable by [such individuals].'" *Disabled in Action*, 752 F.3d at 197 (quoting 28 C.F.R. § 35.149). The threat of COVID-19 effectively makes every poll site inaccessible to vulnerable voters. And courts have ordered similar relief in much less dire circumstances. *See id*. at 201-02 (ordering the relocation of polling places to accessible locations).

And such an accommodation would be consistent with Alabama law, which does not expressly prohibit or limit curbside voting. *See generally* Ala. Code §§ 17-9-1 to 17-9-15. The CDC has recommended that, amid the pandemic, states should

"[e]ncourage drive-up voting for eligible voters" as a means of complying with social distancing rules and limiting personal contact. Ex. 1. And the U.S. Department of Justice has stated that the ADA requires curbside voting as an "equally effective opportunity" for disabled people to cast their vote in person where, as here, the "only suitable polling site[s] in a precinct might be an inaccessible building." Ex. 66.

Permitting curbside voting is a simple way to ensure people subject to medical vulnerabilities can access the ballot in compliance with the ADA.

## II.  Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief

"The denial of the opportunity to cast a vote that a person may otherwise be entitled to cast—even once—is an irreparable harm." *Jones*, 950 F.3d at 828. Here, Plaintiffs need to vote by absentee ballot or via curbside voting to protect their health. They face an unconscionable risk to their safety and the safety of others if they are compelled to vote in person without curbside voting or forced to have their absentee ballots witnessed or to obtain a copy of their photo ID.  There "can be no injury more irreparable" than "serious, lasting illness or death." *Thakker v. Doll*, No. 1:20-cv-480, 2020 WL 1671563, at *4 (M.D. Pa. Mar. 31, 2020). Courts have "specifically held that COVID-19 constitutes an irreparable harm that supports the grant of a TRO." *Id.* at *7 (collecting cases). A preliminary injunction provides the only effective means for protecting Plaintiffs' and others' rights to vote.

The organizational Plaintiffs also are "irreparably harmed when the right to

vote is wrongfully denied or abridged—whether belonging to [their] membership or the electorate at large." *N.C. State Conf. of NAACP v. Cooper*, No. 18-cv-1034, 2019 WL 7372980, at *24 (M.D.N.C. Dec. 31, 2019). The harm to the organizational Plaintiffs' "interests is coterminous with the harms suffered by its citizen members." *Common Cause Ga. v. Kemp*, 347 F. Supp. 3d 1270, 1295 (N.D. Ga. 2018).

Further, the Challenged Provisions irreparably harm the organizational Plaintiffs' missions of ensuring that qualified citizens are registered to vote. These Plaintiffs will need to continue to divert its limited resources from voter registration to educate its community about the Witness Requirement and Curbside Voting Prohibition. *See supra* at 18-20. These harms are irreparable: "when a plaintiff loses an opportunity to register a voter, the opportunity is gone forever." *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012).

Finally, the harm to Plaintiffs is also imminent. "COVID-19 will continue to transmit widely" through July 14. Reingold Decl. ¶¶ 13, 15; *see* Elopre Decl ¶ 17.

## III. The Balance of Equities and Public Interest Support Injunctive Relief

The "cautious protection of the Plaintiffs' franchise-related rights is without question in the public interest." *Charles H. Wesley Educ. Found., Inc.*, 408 F.3d at 1355. "Frustration of federal statutes and prerogatives are not in the public interest," and Defendants suffer "no harm from the state's nonenforcement of invalid legislation." *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012). The

public has "every interest in ensuring that their peers who are eligible to vote are able to do so in every election." *Jones*, 950 F.3d at 831.

Enjoining the Challenged Provisions also promotes the "paramount government interest" in the "protection of the public's health and safety." *Gun S., Inc. v. Brady*, 877 F.2d 858, 867 (11th Cir. 1989). "The public interest is clearly in remedying dangerous or unhealthy situations and preventing the further spread of disease." *Diretto v. Country Inn & Suites by Carlson*, No. 16-cv-1037, 2016 WL 4400498, at *4 (E.D. Va. Aug. 18, 2016). The State recognizes this and encourages people to stay home. *See supra* at 7. The CDC agrees and recommends that voters "use voting methods that minimize direct contact with other people." Ex. 1. The CDC's views are also "authoritative" because they are "the type of public medical health officials to which courts should defer." *Tolman v. Doe*, 988 F. Supp. 582, 586 (E.D. Va. 1997). Conversely, no public interest is compromised by an injunction that prevents harm to voters and slows the spread of COVID-19.

## CONCLUSION

For the reasons above, Plaintiffs respectfully move the Court to preliminarily enjoin: (1) the Witness Requirement for all voters; (2) the Photo ID Requirement for "vulnerable persons" who are more susceptible to serious illness from COVID-19; and (3) the Curbside Voting Prohibition ahead of the July 14, 2020 primary runoff.

DATED this 12th day of May 2020.     Respectfully submitted,


/s/ Deuel Ross
Deuel Ross*
Natasha C. Merle*
Liliana Zaragoza*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
P: (212) 965-2200
dross@naacpldf.org
nmerle@naacpldf.org
lzaragoza@naacpldf.org


/s/ William Van Der Pol
William Van Der Pol [ASB-211214F]
Jenny Ryan [ASB–5455-Y84J]
ALABAMA DISABILITIES
 ADVOCACY PROGRAM
Box 870395
Tuscaloosa, AL 35487
P: (205)348-4928
wvanderpoljr@adap.ua.edu
jrryan2@adap.ua.edu

/s/ Sara Zampierin
Sara Zampierin (ASB-1695-S34H)
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, AL 36104
P: (334) 956-8200
F: (334) 956-8481
sara.zampierin@splcenter.org


/s/ Caren E. Short
Caren E. Short (ASB-0646-P48N)
Nancy G. Abudu*
SOUTHERN POVERTY LAW CENTER
PO Box 1287
Decatur, GA 30031
P: (404) 521-6700
F: (404) 221-5857
caren.short@splcenter.org
nancy.abudu@splcenter.org


* Admitted *Pro Hac Vice*


**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of May 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification to all counsel of record.

<div style="margin-left:50%;">

 /s/ Deuel Ross

Deuel Ross
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
P: (212) 965-2200
dross@naacpldf.org

</div>