

FILED

2020 May-25  PM 01:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| PEOPLE FIRST OF ALABAMA, *et al.*, | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Civil Action No. 2:20-cv-00619-AKK |
| JOHN H. MERRILL, Secretary of State, *et al.*, | ) ) ) | |
| *Defendants*. | ) ) | |

### DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

James W. Davis (ASB-4063-I58J)
Winfield J. Sinclair (ASB-1750-S81W)
Jeremy S. Weber (ASB-3600-X42G)
Brenton M. Smith (ASB-1656-X27Q)
  Assistant Attorneys General

Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Jim.Davis@AlabamaAG.gov
Winfield.Sinclair@AlabamaAG.gov
Jeremy.Weber@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov

*Counsel for State Defendants
(Secretary of State John Merrill,
Governor Kay Ivey, and the
State of Alabama)*

May 25, 2020

Jay M. Ross (ASB-6378-069J)
A. Patrick Dungan (ASB-0951-Y84D)*
ADAMS AND REESE LLP
11 North Water Street, Suite 23200
Mobile, AL 36602
(251) 433-3234
jay.ross@arlaw.com
patrick.dungan@arlaw.com

Todd D. Engelhardt (ASB-8939-T67D)
Robert F. Dyar (ASB-1876-G12Q)
ADAMS AND REESE LLP
1901 6th Avenue North, Suite 3000
Birmingham, AL 35203
(205) 250-5000
todd.engelhardt@arlaw.com
Robert.dyar@arlaw.com

*Application for admission to the N.D. of
Alabama forthcoming

*Counsel for Defendant Alleen Barnett*

# Table of Contents

I.   Factual Background ...................................................................................1

II.  Preliminary Injunction Standard ..............................................................4

III. Argument ..................................................................................................5

    A.    Plaintiffs Are Not Likely to Succeed on the Merits. ...........................5

        1.    Plaintiffs lack standing and their claims are barred by sovereign immunity. ...............................................................5

            *a.*    *Injury in Fact* ..................................................5

            *b.*    *Traceability* ...................................................10

            *c.*    *Redressability* ................................................13

            *d.*    *Sovereign Immunity* .......................................14

        2.    The challenged provisions do not violate Plaintiffs' constitutional rights................................................................15

        3.    Plaintiffs' ADA claim fails because they have not stated a prima facie case and the relief requested would unreasonably modify or fundamentally alter Alabama elections....................21

        4.    The witness requirement is not a prohibited voucher..............26

    B.    The equities do not favor the grant of a preliminary injunction. ........28

IV. Conclusion. ............................................................................................30

# Table of Authorities

## <u>Cases</u>

*Aketepe v. United States*,
   105 F.3d 1400 (11th Cir. 1997) ...............................................................15

*Alexander v. Sandoval*,
   532 U.S. 275 (2001)..............................................................................27

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983)...............................................................................16

*Baker v. Carr*,
   369 U.S. 186 (1962)...............................................................................15

*Bennett v. Spear*,
   520 U.S. 154 (1997)...............................................................................11

*Bircoll v. Miami-Dade County*,
   480 F.3d 1072 (11th Cir. 2007) ............................................................22

*Burdick v. Takushi*,
   504 U.S. 428 (1992)...............................................................................16

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)................................................................. 7, 11, 24

*Clingman v. Beaver*,
   544 U.S. 581 (2005).......................................................................... 17, 29

*Common Cause Indiana v. Marion County Election Board*,
   311 F. Supp. 3d 949 (S.D. Ind. 2018).....................................................17

*Common Cause/Ga. v. Billups*,
   554 F.3d 1340 (11th Cir. 2009) ............................................................16

*Crawford v. Marion County Election Board*,
   553 U.S. 181 (2008)......................................................................... 17, 18

*Disabled in Action v. Bd. of Elections in N.Y.C.*,
   752 F.3d 189 (2d Cir. 2014)....................................................................23

*Dunn v. Blumstein*,
   405 U.S. 330 (1972)...............................................................................16

*Esshaki v. Whitmer*,
   ___ F. App'x ___, 2020 WL 2185553 (6th Cir. May 5, 2020) ...........................29

*Esshaki v. Whitmer*,
    2020 WL 1910154 (E.D. Mich. Apr. 20, 2020)....................................................16

*Eubanks v. Hale*,
    752 So. 2d 1113 (Ala. 1999)................................................................................23

*Ex parte Levitt*,
    302 U.S. 633 (1937)..............................................................................................5

*Ex parte Young*,
    209 U.S. 123 (1908)...................................................................................... 14, 15

*Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*,
    666 F.3d 1216 (9th Cir. 2012) .............................................................................10

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)..............................................................................................8

*Garbett v. Herbert*,
    2020 WL 2064101 (D. Utah Apr. 29, 2020).......................................................16

*Georgia Coalition for the People's Agenda, Inc. v. Kemp*,
    347 F. Supp. 3d 1251 (N.D. Ga. 2018)...............................................................17

*Greater Birmingham Ministries v. Alabama*,
    2017 WL 782776 (N.D. Ala. 2017) ....................................................................14

*Greater Birmingham Ministries v. Merrill*,
    284 F. Supp. 3d 1253 (N.D. Ala. 2018)..............................................................18

*Greer v. Richardson Indep. Sch. Dist.*,
    472 F. App'x 287 (5th Cir. 2012) .......................................................................23

*Hard v. Bentley*,
    2015 WL 1043159 (M.D. Ala. Mar. 10, 2015)...................................................15

*Jacobson v. Fla. Sec'y of State*,
    957 F.3d 1193 (11th Cir. 2020) ............................................................. 8, 10, 13

*Jones v. City of Monroe*,
    341 F.3d 474 (6th Cir. 2003) ..............................................................................25

*Jones v. Governor of Florida*,
    950 F.3d 795 (11th Cir. 2020) ............................................................................17

*League of Women Voters of Florida, Inc. v. Detzner*,
    314 F. Supp. 3d 1205 (N.D. Fla. 2018) ..............................................................17

*League of Women Voters of Va. v. Va. State Bd. of Elections*,
    2020 WL 2158249 (W.D. Va. May 5, 2020).......................................................16

iii

*Lewis v. Governor of Ala.*,
544 F.3d 1287 (11th Cir. 2019) .................................................................5

*Lewis v. Humboldt Acquisition Corp.*,
681 F.3d 312 (6th Cir. 2012) ...................................................................25

*Libertarian Party of Ill. v. Pritzker*,
2020 WL 1951687 (N.D. Ill. Apr. 23, 2020) ..........................................16

*Lowery v. Governor of Ga.*,
508 F. App'x 885 (11th Cir. 2013) ...........................................................15

*Martinez v. Mathews*,
544 F.2d 1233 (5th Cir. 1976) ...................................................................4

*Mays v. Thurston*,
No. 4:20-cv-341 JM, 2020 WL 1531359 (E.D. Ark. Mar. 30, 2020)..................11

*Nat'l Fed. of the Blind v. Lamone*,
813 F.3d 494 (4th Cir. 2016) ...................................................................23

*Purcell v. Gonzalez*,
549 U.S. 1 (2006).....................................................................................28

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
140 S. Ct. 1205 (2020).............................................................................28

*Solomon v. Liberty Cty. Comm'rs*,
221 F.3d 1218 (11th Cir. 2000) ...............................................................30

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009)...................................................................................8

*Summit Med. Assoc., P.C. v. Pryor*,
180 F.3d 1326 (11th Cir. 1999) ...............................................................14

*Tennessee v. Lane*,
541 U.S. 509 (2004)........................................................................... 22, 26

*United States v. Jefferson County*,
720 F.2d 1511 (11th Cir. 1983) .............................................................4, 23

*United States v. Logue*,
344 F.2d 290 (5th Cir. 1965) ...................................................................27

*United States v. Richardson*,
418 U.S. 166 (1974)...................................................................................5

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981)...................................................................................4

*Winter v. Nat. Res. Def. Council*,
 555 U.S. 7 (2008) ................................................................................4

*Women's Emergency Network v. Bush*,
 323 F.3d 937 (11th Cir. 2003) ..........................................................15

## Statutes

42 U.S.C. § 12101 ..................................................................................22
42 U.S.C. § 12131 ..................................................................................22
52 U.S.C. § 10301 ..................................................................................30
52 U.S.C. § 10501 ..................................................................................26
52 U.S.C. § 10504 ..................................................................................27
ALA. CODE § 11-46-1 .............................................................................13
ALA. CODE § 17-1-2 ...............................................................................12
ALA. CODE § 17-1-3 .................................................................................4
ALA. CODE § 17-13-10 ...........................................................................21
ALA. CODE § 17-16-4 ...............................................................................4
ALA. CODE § 17-9-11 .............................................................................21
ALA. CODE § 17-9-30 ..................................................................... 2, 3, 12
ALA. CODE § 17-10-2 .............................................................................12
ALA. CODE § 17-11-9 .............................................................................12
ALA. CODE § 17-11-10 ..................................................................... passim
ALA. CODE § 17-11-11 ...........................................................................12
ALA. CODE § 35-4-20 .............................................................................20
ALA. CODE § 43-8-131 ...........................................................................20

## Regulations

28 C.F.R. § 35.130 ......................................................................... 25, 26
ALA. ADMIN. CODE r. 420-4-1-.13ER (May 21, 2020) .............................1
ALA. ADMIN. CODE r. 820-2-3-.06-.01ER (Mar. 18, 2020) ...................26
ALA. ADMIN. CODE r. 820-2-9-.12 ...........................................................2

## Other Authorities

BLACK'S LAW DICTIONARY (11th ed. 2019)...........................................27
FED. R. EVID. 201(b) ................................................................................6

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Four voters and three organizations want to change the rules for Alabama's 2020 elections (one of which has already begun), and to change them for *all* voters. Plaintiffs seek statewide relief to enjoin two established procedures and to implement a new, untested procedure, against Defendants unable to provide such relief. Plaintiffs move for a preliminary injunction. The State of Alabama, Governor Kay Ivey, and Secretary of State John H. Merrill (the State Defendants) and Alleen Barnett, Mobile County Absentee Election Manager (AEM)—oppose the motion.[1]

## I.    Factual Background

Alabama has taken extraordinary measures in response to COVID-19. Governor Ivey declared a state of emergency and the State Health Officer entered a series of health orders that encouraged and then required citizens to avoid non-essential actions. Docs. 16-1 to 16-21. Some of those restrictions were recently loosened. ALA. ADMIN. CODE r. 420-4-1-.13ER (May 21, 2020); *see* Doc. 34-15.

Alabama has also made numerous accommodations to voters to ensure a safe and fair election. In consultation with the Secretary of State and Attorney General,

---

[1] Counsel for the State Defendants represent that they have spoken to Defendants Karen Dunn Burks and Jacqueline Anderson-Smith about this response. These officials indicated to the undersigned that they agree with this response, and that while they have not yet been able to retain counsel for this action, they expect to do so next week. Defendant Roberson intends to file a separate response and declaration, which Defendants rely on in further support of their opposition.

Governor Ivey moved the runoff election from late March to July 14. Helms decl. (doc. 34-1) ¶ 20. Secretary Merrill promulgated an emergency regulation making it possible for *any* voter concerned about COVID-19 to vote absentee. *Id.* at ¶ 21. Governor Ivey issued permission for a notary to notarize a signature viewed remotely. Doc. 16-17. Moreover, persons eligible to vote absentee under the Elderly and Handicapped exception (*see* ALA. CODE § 17-9-30(d); ALA. ADMIN. CODE r. 820-2-9-.12(3)) retain that option and remain exempt from Photo ID requirements.

In addition, Secretary Merrill has encouraged Probate Judges to consider alternate polling places and to recruit additional poll workers, Helms decl. ¶ 12. He also offered suggestions on maintaining safe and sanitary polling places, *id.* at ¶ 12, and has acquired federal funds  for masks, gloves, hand sanitizer, *etc* (and implemented procedures for distributing those funds). *Id.* at ¶ 34. Secretary Merrill has been actively monitoring the situation and is committed to continuing to do so and to respond as he deems it appropriate, in the exercise of his discretion and in consultation with appropriate officials. *Id.* at ¶ 40.

Absentee ballots must be notarized or signed by two witnesses in order to be opened and counted, a rule that "goes to the integrity and sanctity of the ballot and election." ALA. CODE § 17-11-10(b). In 1996, Alabama updated absentee voting procedures to make them more secure. When successfully applying for preclearance, Alabama set out the history of absentee voting fraud in Alabama and explained why

the revisions were necessary to address the fraud. *See* Docs. 34-9 to 34-15.

Absentee voters must also include a copy of any one of a number of types of Photo ID (unless exempt). ALA. CODE § 17-9-30. Alabama issues free photo IDs to voters at locations across the State. ALA. CODE § 17-9-30(a); *see also* ALA. ADMIN. CODE r. 820-2-9-.05. Even during the COVID-19 pandemic, Secretary Merrill has advised the Boards of Registrars that they must continue issuing free photo IDs. Helms decl. ¶ 26. Driver's license offices are expected to reopen soon. Doc. 34-6.

While no Alabama statute specifically prohibits "curbside voting," no statute sets out how it could be done. Though Plaintiffs complain that one county effort was stopped, doc. 20-1 at 16, the Secretary was concerned that the procedures used in that instance did not comply with election integrity laws such as "signing the poll list, ballot secrecy, and ballot placement into the tabulation machine." Helms decl. ¶ 43. There are 1,980 polling places in the State. *Id.* at ¶ 35. It is unclear how curbside voting could be implemented in so many locations or in compliance with laws designed to protect the integrity of the election, with so little time to plan, recruit poll workers, and acquire additional voting machines. Helms decl. ¶¶ 43-51.

Each Plaintiff comes into contact with persons who go outside their respective homes. Plaintiff Clopton lives with his wife and has been grocery shopping during "senior hours." Doc. 16-45, at 4. Plaintiff Peebles has four different caregivers. *Id.* at 8. Plaintiff Porter has a wife and son who shop for his groceries. *Id.* at 36-37. And

Plaintiff Thompson is visited by her daughter and granddaughter. *Id.* at 18.

The Defendants do not enforce the witness signature and Photo ID requirements for absentee ballots. ALA. CODE § 17-11-10. Nor could any Defendant require "curbside voting" at polling places—each county's governing body designates and equips polling places, ALA. CODE § 17-16-4, and the Probate Judge of each county is the chief elections official of that county, ALA. CODE § 17-1-3(b).

## II.    Preliminary Injunction Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). "The preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly carries the burden of persuasion as to the four prerequisites." *U.S. v. Jefferson Cty*, 720 F.2d 1511, 1519 (11th Cir. 1983). Moreover, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Thus, "[m]andatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

III.   **Argument**

   A.   **Plaintiffs Are Not Likely to Succeed on the Merits.**

      1.   **Plaintiffs lack standing and their claims are barred by sovereign immunity.**

Plaintiffs are not likely to succeed on the merits because they cannot demonstrate that they have standing, which requires three showings:

> First, the plaintiff must demonstrate that she has suffered an injury in fact—an invasion of a legally protected interest that is both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, the plaintiff must show a causal connection between her injury and the challenged action of the defendant—*i.e.*, the injury must be fairly traceable to the defendant's conduct, as opposed to the action of an absent third party. Finally, the plaintiff must show that it is likely, not merely speculative, that a favorable judgment will redress her injury.

*Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (internal citations and quotation marks omitted) (en banc). Plaintiffs fail on all three counts.

   a.   ***Injury in Fact***

Plaintiffs fail to establish a legally cognizable injury because their alleged harms are neither particularized nor concrete.  Plaintiffs' concerns about the risks of COVID-19 are "plainly undifferentiated and 'common to all members of the public,'" and thus fail to confer standing. *United States v. Richardson*, 418 U.S. 166, 177 (1974) (quoting *Ex parte Levitt*, 302 U.S. 633, 634 (1937)). Every Alabamian faces some degree of risk from this pandemic. While risks may vary for different groups, Plaintiffs' own allegations suggest that every person faces some risk during

this time.[2] Thus, even those who do not have conditions believed to heighten risk may nonetheless wish to avoid public places to decrease the risk of contracting and spreading the virus. Plaintiffs thus fail to allege a particularized injury.

As discussed further below in Section III(A)(2), Plaintiffs fail to show an actual injury because they fail to allege any meaningful burden on their ability to vote while practicing social distancing. Moreover, Plaintiffs' purported injuries are rooted in speculation. COVID-19 is a novel virus, and while knowledge about it is growing, much is still unknown,[3] including how it might be affecting Alabama on July 14th.[4] The Center for Disease Control's projections for the nation and Alabama do not even extend past June 15.[5] At least one model projects that by mid-July the

---

[2] *See* Doc. 16-4, at 2 ("People of every age can and have contracted COVID-19, including severe cases . . . ."); Doc 16-24, at 2-3 (showing that 46.3% of patients with COVID-19 in Mobile County are under age 50 and 72.6% of patients are under age 65, while 22.4% of deaths occurred in patients under age 65); Docs. 16-41, at 2 & 16-44, at 2 (both noting that in March 2020 studies of COVID-19 inpatients, 74.5% of patients were age 50 or under and asserting the need "to protect older adults and persons with underlying medical conditions, as well as the general public.").

[3] As Plaintiffs' first exhibit notes: "There is much to learn about the novel coronavirus (SARS-CoV02) that causes coronavirus disease 2019 (COVID-19)." Doc. 16-2, at 2. Plaintiffs' expert, Dr. Arthur Reingold, notes that COVID-19 is a "novel" coronavirus and the following has not been determined: whether the virus can be spread through the air; the extent to which the population has developed antibodies to the virus; whether previously infected persons develop an immunity to the virus; and whether the incidence and prevalence of the virus will decline over the summer months. Doc. 16-4, at 3-4, 6-7.

[4] Plaintiffs ask this Court to rely on inadmissible hearsay in newspaper articles to address key points in their analysis. Doc. 20-1, *passim*. This Court may judicially notice a fact "that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). This rule does not allow this Court to determine scientific facts about COVID-19 based on the reporting of the *Wall Street Journal* or *Los Angeles Times*. *See, e.g.*, Docs. 16-5; 16-6; 20-1, at 10-11.

[5] *COVID-19 Forecasts*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/forecasting-us.html (last updated May 21, 2020).

virus's daily infection rate will drastically fall off and be a fraction of what it is today.[6] The primary runoff election is scheduled 50 days from now—a long time in the course of a novel pandemic—and Plaintiffs have not demonstrated that they face a concrete risk of injury as a result of the State's voting laws.[7]

None of this discussion is intended to dismiss Plaintiffs' fears about the virus. Concerns about COVID-19 have already led the State to take significant precautionary measures regarding elections, including delaying the primary runoff election for as long as possible, providing for remote notarization, and allowing liberal use of absentee ballots. But there is an important difference between Plaintiffs' generalized fears about living with risk factors during a pandemic and the type of particularized and concrete fear that would allow them to invoke this Court's constitutionally limited jurisdiction. A plaintiff seeking injunctive relief must demonstrate that the future injury which forms the basis for the relief sought is "certainly impending"; a mere reasonable likelihood of injury will not suffice. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Plaintiffs' alleged injuries are not "certainly impending," and to the extent Plaintiffs seek an injunction that

---

[6] *COVID-19 Projections*, IHME, https://covid19.healthdata.org/united-states-of-america/alabama (last updated May 20, 2020).

[7] In addition, even assuming that this novel coronavirus continues to present an appreciable health risk in mid-July, this does not mean that the State's voting laws increase any risk to Plaintiffs. Plaintiffs assume that actions such as merely having an absentee ballot notarized or witnessed, or physically entering a polling place to vote, present an appreciable risk to their health. These are tremendous assumptions, given everything that is not known about the transmission of this virus and when we do not know the precautionary measures polling places might employ.

applies to November elections, their claims are even more speculative.

The organizational Plaintiffs have likewise failed to demonstrate an injury in fact. Each must first allege (and later prove) that "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). An organization that seeks associational standing must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (holding that a statistical probability that a member would suffer injury failed to give the organization standing). For the same reasons that the individual Plaintiffs fail to demonstrate an injury in fact because their claims are generalized and conjectural, the organizational Plaintiffs have failed to demonstrate that at least one of their identified members has suffered or will suffer harm by any of the challenged provisions of State law.

The organizational Plaintiffs' diversion-of-resources allegations likewise fail to establish standing. "[A]n organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." *Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1205 (11th Cir. 2020). Here, any additional resources

the organizations are spending are the result of the *pandemic*, not any "[D]efendant's illegal acts." *Id.* Presumably, the organizational Plaintiffs would expend these resources regardless of whether the State loosened the witness or photo ID requirements. And each would undoubtedly use resources to help their members with voting regardless of whether the rules change.

Moreover, Plaintiffs' complaint makes clear that the organizations are not "diverting" any resources at all. People First makes no allegation about diverting resources. Doc. 1 ¶¶ 21-23.[8] And the most GBM and the Alabama NAACP allege is that that "the Witness Requirement and the Prohibition on Curbside Voting" will force them to continue to do what they were already doing. *Id.* ¶¶ 31, 35. GBM, for example, alleges that Defendants have forced it to "divert" resources from "voter registration and turnout efforts" to "new activities" like "(1) assessing who among its members are unable to comply with the Witness Requirement amid the COVID-19 pandemic; (2) increasing efforts to educate its members and constituents about the Witness Requirement; (3) advocating that Defendants permit curbside voting; and (4)" addressing concerns of those affected by normal voting requirements during the pandemic. *Id.* ¶ 31. But these "new activities" are nothing new. They are simply

---

[8] While People First attaches a declaration to its motion for preliminary injunction alleging that the organization must divert resources from its voter education training programs to "train its members on navigating the election system during the pandemic," Doc. 16-45, at 26 ¶ 14, the complaint contains no such allegation. And, in any event, People First's allegation is simply that it is spending voter education resources on educating voters. There is no diversion.

part of ongoing "voter registration and turnout efforts." *Id.* In short, GBM has alleged that it would normally spend its resources on voter registration and turnout efforts, and GBM continues to spend its resources on voter registration and turnout efforts. There is no diversion of "resources away *from*" these activities because the resources are being used *for* those activities. *Jacobson*, 957 F.3d at 1206.

The Alabama NAACP's allegations are thinner still, merely asserting that they will have to spend resources on the same activities GBM is undertaking, *see* doc. 1 ¶¶ 35-36, without alleging "what activities [the Alabama NAACP] would divert resources away *from*" to respond. *Jacobson*, 957 F.3d at 1206. Moreover, the activities the Alabama NAACP complains about having to undertake sound a lot like its "efforts to register and educate Black voters and encourage[] them to engage in the political process by turning out to vote on Election Day"—activities the organization "regularly engages in." Doc. 1 ¶ 33.[9]

**b.**   *Traceability*

Plaintiffs also lack standing because they cannot satisfy the causation requirement. Plaintiffs' concerns are caused by a novel virus, not by the State. While the State is attempting to make voting as safe as practicable, the underlying cause of

---

[9] If Plaintiffs' diversion-of-resources allegations are sufficient to establish standing under Eleventh Circuit or Supreme Court precedent, Defendants reserve the right to argue that those cases should be overturned. No organization has "a legally protected interest in *not* spending money to advance its core mission." *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1224 (9th Cir. 2012) (Ikuta, J., concurring and dissenting).

any injury to the Plaintiffs is well beyond the State's control. Neither the State nor her officers "caused" the Plaintiffs' fears of injury—a pandemic did. *See e.g.*, *Bennett v. Spear*, 520 U.S. 154, 167 (1997) ("[T]he injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court . . . ."); *Mays v. Thurston*, No. 4:20-cv-341 JM, 2020 WL 1531359, at *2 (E.D. Ark. Mar. 30, 2020) ("Any injury caused by Plaintiffs' failing to take advantage of these available avenues to exercise their rights to vote are not caused by or fairly traceable to the actions of the State, but rather are caused by the global pandemic."). Plaintiffs' alleged injuries are traceable to a virus and individual choices made in response; costs incurred to avoid subjective fears do not create standing to sue the government. *See Clapper*, 568 U.S. at 417-18.

Additionally, Plaintiffs fail to demonstrate a causal connection between the so-called "prohibition" on curbside voting and any action by any Defendant. Plaintiffs concede that "no provision of Alabama law known to Plaintiffs expressly prohibits curbside or drive-thru voting." Doc. 16, at 21. Plaintiffs then allege that "Secretary Merrill prohibits election officials from offering curbside voting," *id.*, but their evidence on this point consists of a single incident in which Secretary Merrill told a county that its curbside voting as it was then being conducted failed to comply with important legal requirements, such as voters personally signing poll books. Helms decl. ¶ 43. Moreover, Alabama law states that non-party Probate Judges and

11

County Commissions are responsible for designating the places of holding elections and the number of voting machines at each voting place. ALA. CODE § 17-6-4(a). The Defendants could not require a county to offer curbside voting and could not prohibit it  from doing so, and therefore no Defendant before the Court has caused any injury to Plaintiffs with respect to curbside voting.

Nor have Plaintiffs shown a causal connection between Defendants and the witness signature or Photo ID requirements. AEMs determine whether an applicant for an absentee ballot is obligated to produce identification, ALA. CODE §17-11-9, but separate "poll worker[s] or other election official[s]" determine whether the notarization or witnessing requirements are met and count the ballots. ALA. CODE §§ 17-11-10(b), 17-11-11. Thus, it is not clear how the Defendant AEMs could have caused an alleged injury.[10] The State Defendants likewise have no role in enforcing

---

[10] As Ms. Roberson points out in an expected separate filing, AEMs enter all absentee ballots received into the records system as "accepted" for purposes of record keeping, regardless of signature or witness requirements. Roberson decl. at ¶ 7. Entering a ballot into the voter registration system as "accepted" is no indication of whether it conforms to the law and will actually be counted; it merely shows that it was received by the AEM and will be turned over to the election officials. *Id.* Therefore, AEMs do not enforce the signature requirement. Second, an AEM's determination of whether an applicant for an absentee ballot is required to submit proper photo ID is based solely on the reason checked on the application. Roberson decl. at ¶ 6. If the applicant did not designate a reason to vote absentee that is photo-ID exempt and has not provided proper photo ID, the AEM must contact the voter and inform him or her of the requirement to submit proper photo ID. ALA. CODE § 17-10-2(c). On the eighth day prior to the election, if proper photo ID is not provided with the absentee application, the AEM will issue a provisional absentee ballot. *Id.* at §§ 17-9-30(c), 17-10-2(c). However, the board of registrars determines whether the provisional ballot should be certified and counted. *See id.* at §§ 17-10-2(f); 17-10-2(g). The canvassing board, on which the circuit clerk serves for general elections, counts the provisional ballots, but in a primary election, which Plaintiffs seek to enjoin, executives for the *political parties* are the canvassing board. *Id.* at §§ 17-1-2(6), 17-10-2(f).

these provisions and could not have caused any alleged injury.[11]

### c.   *Redressability*

Finally, Plaintiffs have not demonstrated that it is likely, not merely speculative, that a favorable judgment will redress their purported injuries. Because the State Defendants do not enforce any of the challenged provisions, an injunction against them will not redress any injury. An injunction against the Governor or Secretary requiring them to provide curbside voting or to count absentee ballots without witness signatures will accomplish nothing because they do not count absentee ballots and lack the authority to establish polling places.[12] An injunction against the four named AEMs likewise would not redress injuries, but even if it could, it could do so only in their respective counties. The defendant AEMs could not provide relief in other counties whose AEMs are not joined.

Plaintiffs fail to meet the redressability prong for a second reason: Plaintiffs' action ultimately seeks to compel the State to provide a risk-free voting experience for her citizens in the middle of a pandemic involving a novel coronavirus about which the world is still learning. This Court could rule entirely in Plaintiffs' favor

---

[11] To the extent Plaintiffs seek a preliminary injunction with respect to municipal elections, no Defendant before the Court caused any alleged injury (or could redress it). Municipal elections are their own entity, governed by separate statutes and conducted by different officials. *See* ALA. CODE §§ 11-46-1, *et seq.* The Defendants play no role in municipal elections.

[12] *See Jacobson*, 957 F.3d at 1207-12 (holding that plaintiffs lacked standing to sue Secretary of State because, although Secretary served as Florida's chief election official, plaintiffs' alleged injuries were only traceable to and redressable by a decision against the non-party Supervisors of Elections of Florida's 67 counties).

and the election still may take place during a pandemic, and not all voters will agree with Plaintiffs' preferred remedies. Some might not be comfortable with curbside voting that involves being handed materials directly from an election official. Others who might prefer to stand in a socially distanced line instead of having a poll worker hand something directly to them through an automobile window might be frustrated at the longer lines caused by the diversion of poll workers to curbside voting. Some voters might not feel comfortable handling an absentee ballot that has been processed through the U.S. mail. No voting system can eliminate all risk.

### d.    *Sovereign Immunity*

For many of the same reasons Plaintiffs lack standing, the State Defendants are protected by sovereign immunity.[13] "[T]he Eleventh Amendment prohibits suits against [S]tate officials where the [S]tate is, in fact, the real party in interest." *Summit Med. Assoc., P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999). *Ex parte Young*, 209 U.S. 123 (1908), allows litigation against State officials for prospective injunctive relief to end violations of federal law. However, *Ex parte Young* does not allow a suit against a State official who "has no authority to enforce the challenged statute." *Summit Med. Assoc., P.C.*, 180 F.3d at 1342.[14]

---

[13] The State of Alabama preserves the defense that its sovereign immunity has not been abrogated with respect to any claim. To the extent that an AEM is considered a state official, the AEMs claim the benefits of sovereign immunity.

[14] The inquiry into whether a defendant has a sufficient connection to the enforcement of the challenged law is largely the same as the one that governs standing. *Greater Birmingham Ministries v. Alabama*, 2017 WL 782776, at *13 (N.D. Ala. 2017).

Plaintiffs' claims present special standing and immunity problems as related to Governor Ivey. Plaintiffs rely on the Governor's supreme executive power as a basis for their action. But a Governor's general executive power does not provide a sufficient connection to the enforcement of a challenged law.[15] In addition, the Governor's emergency authority is a wholly inadequate basis on which to sue. Ordering a Governor to exercise her discretion to suspend laws through an emergency proclamation would be as inappropriate as ordering a Governor to veto a bill or pardon a prisoner. "There is no doubt that the court cannot control the exercise of the discretion of an officer." *Ex parte Young*, 209 U.S. at 158.[16]

### 2. The challenged provisions do not violate Plaintiffs' constitutional rights.

Voting is a protected right, but "States have the power to impose voter qualifications, and to regulate access to the franchise in other ways." *Dunn v.*

---

[15] *See Women's Emergency Network v. Bush*, 323 F.3d 937, 949-50 (11th Cir. 2003) (holding that a governor's "general executive power" is not a basis for jurisdiction when other officials enforce the law); *Hard v. Bentley*, 2015 WL 1043159, at *5 (M.D. Ala. Mar. 10, 2015) (finding Governor's general authority as Alabama's chief executive official insufficient to establish standing or overcome sovereign immunity in challenge to marriage laws); *cf. Lowery v. Governor of Ga.*, 506 F. App'x 885, 886 (11th Cir. 2013) (holding that Governor could not provide relief for alleged violations of the VRA and the Equal Protection Clause, and thus is not a proper defendant).

[16] This Court should also decline to take up this issue as a non-reviewable political question. *Baker v. Carr*, 369 U.S. 186, 217 (1962) (laying out six indicia of a political question, including "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion"); *Aketepe v. United States*, 105 F.3d 1400, 1402 (11th Cir. 1997) ("Restrictions derived from the separation of powers doctrine prevent the judicial branch from deciding 'political questions,' controversies that revolve around policy choices and value determinations constitutionally committed for resolution to the legislative or executive branches.") (citations omitted).

*Blumstein*, 405 U.S. 330, 336 (1972). Elections must be regulated to preserve their order and integrity. Thus, "[t]he Supreme Court has rejected a 'litmus-paper test' for '[c]onstitutional challenges to specific provisions of a State's election laws' and instead has applied a 'flexible standard.'" *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). This *Anderson-Burdick* test requires a court to balance the burden of a regulation upon voters against the State's interests served by the regulation. "Reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters are generally justified by "the State's important regulatory interests." *Burdick*, 504 U.S. at 434.

Here, the only burdens Plaintiffs complain of are exceedingly light, whether looked at generally as to all Alabama voters or even specifically as to Plaintiffs. Plaintiffs argue that this Court should apply "strict scrutiny" to the challenged provisions because allegedly they "severely" burden voting rights and disparately impact some groups. As discussed below, the burden in this case is not severe at all, and the cases Plaintiffs cite for imposing strict scrutiny are easily distinguishable.[17]

---

[17] Plaintiffs rely on four recent district court cases to assert that the burdens in this case are severe and warrant strict scrutiny. Doc. 20-1, at 13-14. One involved a consent decree, whereas the issues in this case are very much contested. *See League of Women Voters of Va. v. Va. State Bd. of Elections*, 2020 WL 2158249 (W.D. Va. May 5, 2020). The other three cases involved ballot access provisions requiring thousands of signatures. *Libertarian Party of Ill. v. Pritzker*, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020); *Garbett v. Herbert*, 2020 WL 2064101 (D. Utah Apr. 29, 2020); *Esshaki v. Whitmer*, 2020 WL 1910154 (E.D. Mich. Apr. 20, 2020). The requirement to have two

And no authority requires the Court to apply strict scrutiny to a non-severe burden if the impact is different for different groups. Plaintiffs cite to *Jones v. Governor of Florida*, 950 F.3d 795 (11th Cir. 2020), but that case involved an equal protection claim where disparate treatment was obviously relevant. Plaintiffs also cite *Georgia Coalition for the People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1263-64 (N.D. Ga. 2018), which held that "disparate impact 'matters' when evaluating the severity of the burden on individuals' constitutional right to vote." That decision was poorly reasoned and should not be followed.[18] "[S]trict scrutiny is appropriate only if the burden is severe." *Clingman v. Beaver*, 544 U.S. 581, 592 (2005).

The claim that the challenged provisions violate Plaintiffs' First and Fourteenth Amendment rights is therefore assessed under the *Anderson-Burdick* balancing test, and Alabama's photo ID law passes the test. Binding precedent establishes that Alabama has a weighty and legitimate interest in detecting and deterring voter fraud and safeguarding voter confidence. *Crawford*, 553 U.S. at 192-197 (plurality opinion); *Common Cause/Ga.*, 554 F.3d at 1353. The State is not

---

witnesses sign a ballot is hardly as burdensome as canvassing the public for thousands of signatures during a pandemic.

[18] The *Kemp* court cited to *League of Women Voters of Florida, Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018), which cited in turn to the poorly reasoned (and now-vacated) decision in *Common Cause Indiana v. Marion County Election Board*, 311 F. Supp. 3d 949 (S.D. Ind. 2018), *vacated on other grounds*, 925 F.3d 928 (7th Cir. 2019). Space does not permit a full treatment of the problems with *Common Cause Indiana*, but in short, *Common Cause Indiana* cites in part to a <u>dissent</u> in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), for the proposition that the *Burdick* analysis permits consideration of whether voting laws fall disproportionately on the poor, the elderly, and the immobile.

required to produce *evidence* of these interests, *Common Cause/Ga.*, 554 F.3d at 1353, although it has done so already in another case in this Court.[19] Alabama's anti-fraud interests in requiring photo ID apply even (if not especially) when required for absentee voting. *See* Doc. 34-5, explaining how requiring absentee voters to submit a copy of their Photo ID deters absentee fraud.

On the burden side of the scale, Plaintiffs have produced no evidence of any person who lacks a photo ID,[20] but instead claim that a heavy burden exists on voters who may have difficulty making a copy of their ID to include with their ballot. Their evidence from three individuals does not support this claim.[21] Plaintiff Porter says that he has a copier at home but is "worried that [he] may not be able to afford the ink, paper, and toner needed to maintain my printer for the July 14 election." Doc.

---

[19] In *Greater Birmingham Ministries v. Merrill*, 284 F. Supp. 3d 1253 (N.D. Ala. 2018), Judge Coogler granted summary judgment for the Defendants in a challenge to Alabama's photo ID law and held as follows: "Secretary Merrill is not required to prove that voter fraud exists (although he has done so), that the Photo ID Law helps deter voter fraud, or that the law increases confidence in elections. Supreme Court precedent mandates that Alabama's justifications for the law are valid." *Id.* at 1277-78. That decision is on appeal.

[20] Plaintiffs make the conclusory assertion that "there are tens of thousands of Alabama voters who lack photo ID, and now cannot get one," doc. 20-1, at 7, but they cite to no evidence of this and do not claim that they should get injunctive relief because of any person's alleged lack of ID.

[21] The State Defendants do not agree that it is appropriate to look at unique burdens borne by certain individuals. Burdens should be assessed "categorically," not based on "the peculiar circumstances of individual voters or candidates." *Crawford*, 553 U.S. at 206 (Scalia, J., concurring in the judgment). While it may appear that the three-Justice opinion authored by Justice Stevens differs in this respect from the three-Justice opinion authored by Justice Scalia, Justice Stevens never said that examining unique burdens by certain groups was the right approach, only that the record did not allow the Court to do so because the burden was not quantifiable when there was insufficient evidence of how many people lacked a photo ID. Nor is it possible in this case to quantify individual burdens; Plaintiffs offer statistics of how many people live alone or lack a computer, but there is no way to know how many of those people do not want to go to a polling place or are unwilling to have two family members come to their home to witness a signature.

16-45, at 14 ¶ 14. Lacking ink—much less *fear* of a *possible* future ink shortage—is not a severe burden that justifies rewriting State election law, and Mr. Porter does not explain why he cannot make a copy now. Plaintiff Thompson says she has no copier and does not wish to leave home to make a copy. Doc. 16-45, at 19 ¶¶ 18-19. But her daughter and granddaughter visit her regularly, *id.* at 18 ¶ 13, and they could assist her with a copy. Finally, People First's Executive Director claims that member "Kelly" has no printer or copier and "is unable to obtain a copy elsewhere without significant risks to her health." Doc. 16-45, at 24-25 ¶11. She does not, however, testify that "Kelly" lacks access to anyone who could help her make a copy.

Making a copy of a photo ID is simply not a severe burden, even in the COVID-19 world. According to Plaintiffs' own evidence, over 87% of Alabama households have a computer in the home, doc. 20-1 at 15, and many will be able to make a copy without interacting with anyone else. None of Plaintiffs' declarants even have to compromise their isolation practices to comply with the photo ID requirement. Someone is at least bringing groceries, and having that person or another caregiver make a copy is not a severe burden. COVID-19 complicates things for *everyone*, but making a copy is not a problem for the vast majority of voters even now. Those for whom it is less convenient still have two months to have someone copy their ID at a library, drug store, shipping store, or other business. [22]

---

[22] Some libraries may be closed at the moment, but that does mean they will be closed in July.

The witness signature requirement also passes the *Anderson-Burdick* test. Many voters will be able to take advantage of the ability to have documents notarized over videoconferencing. Others need only do a little planning to get two witness signatures without sacrificing social distancing. No law says that a witness has to be within six feet of the signer. A witness could even watch the signing through a window, then come in and sign after the voter has left the room.

On the other hand, the State interest is weighty: "The provision for witnessing of the voter's affidavit signature . . . goes to the integrity and sanctity of the ballot and election." ALA. CODE § 17-11-10(b). The witness requirement helps prevent voter fraud by adding an additional layer of protection, ensuring that the person filling out the absentee ballot is the actual voter listed on the ballot. A witness could provide important evidence in an election contest or an investigation of voter fraud. No anti-fraud provision is perfect, but witnesses are required for signatures of many legal documents,[23] and the State's policy determination that a witness signature helps protect the integrity of an election is reasonable.

Finally, Plaintiffs challenge the "curbside voting ban." We are not aware of an express "ban" on curbside voting in Alabama (though no law expressly authorizes it). But no Defendant in this case can give the Plaintiffs this relief, and mandating curbside voting raises a host of practical concerns. How will elderly poll workers

---

[23] *E.g.*, ALA. CODE § 35-4-20 (conveyances of real property); ALA. CODE § 43-8-131 (wills).

work outside all day in an Alabama summer? How can the State find enough poll workers to cover the outside and inside operations at nearly 2,000 polling places? How will traffic control of lines of cars be enforced? It also raises many legal issues. How can poll workers handle ballots and preserve privacy? *See* ALA. CODE § 17-13-10. How will voters in their cars and voters inside the polling place each be able to sign the voting roll? *See* ALA. CODE § 17-9-11.[24]

In *Anderson-Burdick* terms, declining to offer curbside voting presents no burden on the right to vote because in the upcoming election, every voter in Alabama can vote absentee. No voter is *required* to go inside a polling place at all. And the State has important interests that weigh against an injunction. Such a change, even if possible, would cause chaos, requiring non-party Probate Judges to hire many more poll workers (when they already face shortages). Last-minute training will be required. The State also has an interest in election integrity, which would be compromised if drive-up voters are not signing the poll books and if poll workers are carrying a voter's private ballot to and from the voting machines.

### 3. Plaintiffs' ADA claim fails because they have not stated a prima facie case and the relief requested would unreasonably modify or fundamentally alter Alabama elections.

To state a *prima facie* claim under Title II of the Americans with Disabilities

---

[24] It is also difficult to see how driving to the polling place and interacting with "at least two poll workers and/or a poll observer," *see* Doc. 1 ¶ 140, is any better, in terms of social distancing, than having a witness sign a ballot, or even entering the polling place.

Act (ADA), a plaintiff must show:

> (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.

*Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1083 (11th Cir. 2007). The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements" for the public action in question. 42 U.S.C. § 12131(2). Plaintiffs fail to make a prima facie case because: (1) they do not meet the essential eligibility requirements for having their absentee ballots counted; (2) they have not been excluded from voting;[25] and (3) whatever difficulties they face are not "by reason of" their disabilities.[26]

First, Plaintiffs would not be qualified individuals because the Witness Requirement is an essential eligibility requirement of having an absentee ballot counted. "Title II does not require States to employ any and all means to make [public] services accessible to persons with disabilities, and it does not require States to compromise their essential eligibility criteria for public programs." *Tennessee v. Lane*, 541 U.S. 509, 531-32 (2004). Here, election officials may not even *open* an

---

[25] In the interest of efficiency, Defendants refer to the second element simply as "exclusion," recognizing that it includes a denial of benefits and any other discrimination by public entities.

[26] Defendants assume, without conceding, that the individual Plaintiffs' allegations each meet the ADA's definition of disability, *see* 42 U.S.C. § 12101, at this stage of the proceedings.

unwitnessed envelope because the witness requirement "goes to the integrity and sanctity of the ballot and the election." ALA. CODE § 17-11-10(b).[27] The plain language of State law establishes the witness requirement as an essential requirement of having an absentee ballot counted and therefore Plaintiffs' ADA claim fails.[28]

Second, Plaintiffs are not excluded from voting. Plaintiffs cite no case where a court held that anything other than a *concrete* barrier constituted exclusion under the ADA.[29] Further, no exclusion occurs when an individual's own decisions lead to the alleged exclusion. *See Greer v. Richardson Indep. Sch. Dist.*, 472 F. App'x 287, 295 (5th Cir. 2012) (holding plaintiff did not make prima facie case because her exclusion "appear[ed] to be, at least in part, a product of her own choices"). Here, no concrete barrier prevents Plaintiffs from complying with the witness requirement. Rather, they allege that complying with the witness requirement *might* expose them

---

[27] *See also Eubanks v. Hale*, 752 So. 2d 1113, 1157-58, 1158 n.28 (Ala. 1999) (holding that unwitnessed absentee ballots did not "substantial[ly] compl[y] with the *essential* requirements of the absentee ballot law" (emphasis added)).

[28] Plaintiffs' one-sentence assertion that the Photo ID Requirement violates the ADA is insufficient to meet their burden to show that they are likely to prevail on the merits. *Compare* Doc. 20-1 at 27 ("Further, as Plaintiffs are protected by the ADA, Defendants must interpret the Photo ID Requirement in a manner that protects their right to vote." (internal citation omitted)), *with Jefferson Cty.*, 720 F.2d at 1519 (holding that the movant clearly carries the burden of persuasion as to the four prerequisites for a preliminary injunction). Even if Plaintiffs had argued this point, the Photo ID Requirement still does not violate the ADA. Additionally, the Photo ID Requirement serves as an essential eligibility requirement for voting, whether in-person or absentee. *See* ALA. CODE § 17-9-30.

[29] *See* Doc. 20-1 at 21-23 (citing *Nat'l Fed. of the Blind v. Lamone*, 813 F.3d 494 (4th Cir. 2016) (considering blind individuals' access to Maryland's no-excuse absentee voting system); *Disabled in Action v. Bd. of Elections in N.Y.C.*, 752 F.3d 189 (2d Cir. 2014) (considering the physical accessibility of individuals with "mobility or vision disabilities" to polling places))

to COVID-19, which *might* result in health consequences due to their disabilities.[30]
But all of the individual Plaintiffs challenging the witness requirement[31] already
compromise the strict isolation they claim prevents them from complying. Clopton
has gone to the grocery store four times in the last two months. *See* Doc. 16-45, at 4
¶¶ 8-10. Peebles has four in-home care workers. *See* Doc. 16-45, at 8 ¶ 9. And
Thompson is visited by her daughter and granddaughter. *See* Doc. 16-45, at 18 ¶ 13.

Third, even to the extent Plaintiffs face difficulties in complying with the
witness requirement, those difficulties stem from Plaintiffs' own choices and not
from the requirements imposed by Defendants. None of the individual Plaintiffs
challenging the witness requirement face exclusion because of their disabilities.
Rather, it is their subjective fear of contracting COVID-19—not their disabilities or
the witness requirement—that causes their alleged exclusion. *See Clapper*, 568 U.S.
at 417-18 (holding costs incurred by subjective fears of government surveillance not
"certainly impending" were "self-inflicted injuries").[32] As such, Plaintiffs are not
excluded from absentee voting "by reason of" their disabilities.[33]

Plaintiffs' ADA claim also fails because the requested relief is unreasonable

---

[30] For the same reasons, Plaintiffs state no exclusion as to the Photo ID Requirement.

[31] Plaintiff Porter makes no allegations about the witness requirement. He lives with two individuals over age 18 who could witness his absentee ballot. *See* Doc. 16-45, at 12 ¶ 2.

[32] Each of these Plaintiffs also endorses curbside voting, despite requiring "at least two poll workers and/or a poll observer [to] meet a voter at their vehicles." Doc. 1 at ¶ 140.

[33] Additionally, Plaintiffs' assertion that their exclusion is by reason of some unquantifiable risk stemming from their disability does not present a manageable standard for future ADA cases.

and would fundamentally alter Alabama elections. Title II of the ADA requires States to make "reasonable modifications" to avoid discrimination unless those modifications "fundamentally alter" the nature of the service at issue. 28 C.F.R. § 35.130(b)(7)(i).[34] When analyzing modifications to statutory requirements, "the overall focus should be on whether waiver of the rule . . . would be so at odds with the purposes behind the rule that it would be a fundamental and unreasonable change." *Jones v. City of Monroe*, 341 F.3d 474, 480 (6th Cir. 2003) (citations and internal quotations omitted), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir. 2012) (en banc).

Enjoining the witness requirement would unreasonably and fundamentally alter Alabama elections.[35] In *Jones*, the Sixth Circuit rejected a requested modification to waive a one-hour parking ordinance because it would be at odds with the fundamental purpose of the ordinance: to encourage downtown shopping. 341 F.3d at 475-76, 480. Here, the witness requirement "goes to the integrity and sanctity of the ballot and election." ALA. CODE § 17-11-10(c); *see also Eubanks*, 752 So. 2d at 1158 n.28. Because waiving the witness requirement is at odds with its purpose to preserve the sanctity and integrity of the ballot and election, Plaintiffs' request would

---

[34] Plaintiffs declined to acknowledge this limitation on modifications in either their complaint or briefing.

[35] Additionally, a change to an essential eligibility requirement—like the Witness Requirement and Photo ID Requirement here—necessarily results in a fundamental alteration. *See Lane*, 541 U.S. at 532. ("Title II . . . does not require States to compromise their essential eligibility criteria for public programs.").

be a fundamental alteration to Alabama elections.[36]

Lastly, Plaintiffs' request for curbside voting would be an unreasonable modification of existing election procedures.[37] Title II's regulations require public entities to "make reasonable modifications," 28 C.F.R. § 35.130(b)(7)(i), to remedy disability discrimination, but not to use "any and all means." *Lane*, 541 U.S. at 531. Implementing curbside voting at 1,980 voting sites in fewer than 50 days is an unreasonable modification because it would impose an undue burden both financially and logistically on county election officials.[38] *See* Helms decl. ¶¶ 43-51.

### 4.    The witness requirement is not a prohibited voucher.

Plaintiffs erroneously contend that the witness requirement is a voucher prohibited under § 201 of the Voting Rights Act. Doc. 20-1, at 28-29. Section 201 provides: "No citizen shall be denied, because of his failure to comply with any *test or device*, the right to vote . . . ." 52 U.S.C. § 10501(a) (emphasis added). A "test or device" includes "any requirement that a person as a prerequisite for voting or registration for voting . . . (4) *prove his qualifications by the voucher of registered voters or members of any other class*." 52 U.S.C. § 10501(b) (emphasis added).

Alabama's witness requirement does not involve a "qualification," and its

---

[36] Waiving the Photo ID Requirement is a fundamental alteration for the same reasons.

[37] Having never been lawfully implemented before in Alabama, *see* Helms decl. ¶¶ 43-51, mandated curbside voting would likely also be a fundamental alteration to Alabama elections.

[38] Further, Defendants already made a significant modification by making absentee voting widely available to "any qualified voter who determines it is impossible or unreasonable" to vote in-person. ALA. ADMIN. CODE r. 820-2-3-.06-.01ER (Mar. 18, 2020).

purpose is very different from past discriminatory practices that required voter registration applicants to produce "supporting witnesses" to vouch for their "good character." *See United States v. Logue*, 344 F.2d 290, 291 (5th Cir. 1965) (per curiam). The signature requirement confirms the identity of a person voting outside the presence of election officials at the polls. The witnesses merely certify that the voter listed on the absentee ballot affidavit is the person who signed it. This is a far cry from "personally assuring"[39] the "possession of qualities or properties (such as fitness or capacity) inherently or legally necessary to make one eligible . . . to perform a public duty or function,"[40] like voting.[41] The witness requirement thus does not relate to a qualification and bears no similarity to the voucher requirements that were enacted for a discriminatory purpose in the 1950s and 1960s.

In any event, Plaintiffs have no right to bring a § 201 claim. The provision for enforcing § 201 provides only that "the Attorney General" may institute an action, and that action must be before a three-judge panel. 52 U.S.C. § 10504. This "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others," *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001), including the private right of action Plaintiffs attempt to bring here.

---

[39]*Vouch*, BLACK'S LAW DICTIONARY (11th ed. 2019)

[40] *Qualification*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[41] Plaintiffs also argue that the witness requirement is prohibited for all voters "[o]r, at least, as-applied to those vulnerable persons who must vote absentee in this crisis." Doc. 20-1 at 29. They offer no analysis of how the witness requirement could conceivably fall within Section 201 for some voters but not others, or just during a pandemic.

### B.  The Equities Do Not Favor the Grant of a Preliminary Injunction.

The remaining elements do not support a preliminary injunction. As discussed above, Plaintiffs have not shown that they will suffer any injury at all, and thus have not shown that they will suffer irreparable harm without an injunction. The balance of the equities likewise weighs against an injunction.

A preliminary injunction would harm the public interest, first, because of the confusion and chaos inherent in changing the rules of an election that has already begun. The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). Court orders implementing new rules "can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). While Plaintiffs have plenty of time to satisfy the existing requirements, the State cannot implement new rules throughout the State in less than 50 days, and voter confusion would result from shifting standards.[42]

Moreover, "[a] State indisputably has a compelling interest in preserving the integrity of its election process." *Purcell*, 549 U.S. at 4 (citation and quotation marks omitted).  An injunction would undermine this interest by eliminating State

---

[42] Some voters are already complying with the current rules Plaintiffs ask this court to change, which could then change again on appeal.

provisions designed to deter and detect voter fraud and safeguard public confidence in elections. Governor Ivey and Secretary Merrill have already made accommodations by rescheduling the primary runoff election and expanding the availability of absentee voting, and they are better positioned to make any other adjustments they deem appropriate, making use of public health and voting expertise that Plaintiffs and the courts do not have.

Finally, an injunction would usurp the Constitutional role of the States in conducting elections. "Simply put, federal courts have no authority to dictate to the States precisely how they should conduct their elections." *Esshaki v. Whitmer*, ___ F. App'x ___, 2020 WL 2185553, at *2 (6th Cir. May 5, 2020) (citing *Clingman*, 544 U.S. at 586). Make no mistake: Plaintiffs are not merely seeking to prohibit a an alleged violation of federal law; they ask this Court to micromanage the details of how State officials balance the various interests at play to best conduct a fair, safe, and honest election in the midst of a pandemic. State and local election officials are in a better position than the courts to balance these interests.

Finally, Plaintiffs seek State-wide relief based on the situations of four individual voters, while having joined only some local officials from just three of Alabama's 67 counties. This broad requested relief, based on so little evidence,

magnifies the harm to the public interest that an injunction would wreak.[43]

## IV.   Conclusion.

Accordingly, Plaintiffs' motion for preliminary injunction should be denied.

Respectfully submitted,

Steve Marshall,
  *Attorney General*

<u>s/</u> James W. Davis
James W. Davis (ASB-4063-I58J)
Winfield J. Sinclair (ASB-1750-S81W)
Jeremy S. Weber (ASB-3600-X42G)
Brenton M. Smith (ASB-1656-X27Q)
  *Assistant Attorneys General*

Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Jim.Davis@AlabamaAG.gov
Winfield.Sinclair@AlabamaAG.gov
Jeremy.Weber@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov

***Counsel for State Defendants***

---

[43] Plaintiffs apparently do not argue that their Section 2 claim entitles them to a preliminary injunction. *See generally* doc. 20-1. But if they are, the claim entitles them to no relief because it fails on the merits. To state a claim under Section 2, Plaintiffs must show that any denial or abridgement of their right to vote is "on account of race or color," as required by the statute. 52 U.S.C. § 10301(a); *see also Solomon v. Liberty Cty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000). Here, any denial or abridgement is not on account of race, but on account of a pandemic, a health condition, age, or a voter's decisions about whether and how she will exercise caution. Moreover, Defendants preserve the argument that Section 2's "results test" is unconstitutional because Congress lacks the power under the Fourteenth or Fifteenth Amendments to invalidate nondiscriminatory state and local laws.

Jay M. Ross (ASB-6378-069J)
A. Patrick Dungan (ASB-0951-Y84D)*
ADAMS AND REESE LLP
11 North Water Street, Suite 23200
Mobile, AL 36602
(251) 433-3234
jay.ross@arlaw.com
patrick.dungan@arlaw.com

Todd D. Engelhardt (ASB-8939-T67D)
Robert F. Dyar (ASB-1876-G12Q)
ADAMS AND REESE LLP
1901 6th Avenue North, Suite 3000
Birmingham, AL 35203
(205) 250-5000
todd.engelhardt@arlaw.com
Robert.dyar@arlaw.com

*Application for admission to the N.D.
of Alabama forthcoming

***Counsel for Defendant Alleen Barnett***

**Certificate of Service**

I hereby certify that on May 25, 2020 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to counsel of record. I further certify that I have on this date mailed a copy of the forgoing to the following parties:

Jacqueline Anderson-Smith
Circuit Clerk of Jefferson County, Alabama
Jefferson County Courthouse
716 Richard Arrington, Jr. Blvd. N.
Birmingham, AL 35203

Karen Dunn Burks
Deputy Circuit Clerk
Bessemer Division of Jefferson County, Alabama
1801 3rd Ave N
Bessemer, AL 35020

/s James W. Davis
Counsel for State Defendants