# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **PEOPLE FIRST OF ALABAMA, ET AL.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civil Action Number** |
| **v.** | ) | **2:20-cv-00619-AKK** |
| | ) | |
| **JOHN MERRILL, ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

"Voting is the beating heart of democracy.  It is a fundamental political right, because it is preservative of all rights."[1]  One group that consistently exercises this right at higher rates of participation is persons 65 or older.[2]  It is also a group that is at substantially higher risk during the current COVID-19 pandemic.  The individual plaintiffs in this case are generally over 65,[3] have underlying medical conditions, and qualify as individuals with disabilities under the Americans with Disabilities Act.  The plaintiffs assert that Alabama's election laws—specifically, the requirement that a notary or two witnesses must sign absentee ballots, the requirement that absentee voters must submit a copy of their photo ID, and the state's de facto ban on curbside voting—run afoul of the

---

[1] *Dem. Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1315 (11th Cir. 2019) (citation omitted).

[2] *Voting Rates by Age*, https://www.census.gov/library/visualizations/2017/comm/voting-rates-age.html, (last visited June 15, 2020).

[3] One individual plaintiff, Eric Peebles, is under 65 and has cerebral palsy.  *See* doc. 16-45 at 7.

fundamental right to vote and violate federal law in light of the COVID-19 pandemic.  To ensure that the individual plaintiffs and those similarly situated to them can continue to exercise their fundamental political right to vote without jeopardizing their health during this pandemic, the plaintiffs filed this lawsuit on May 1 seeking relief.

COVID-19 is a novel respiratory disease that can cause severe complications, including respiratory failure and death, and it has spread rapidly around the world, resulting in more than 115,000 deaths in the United States alone and leading to numerous restrictions ordered by states to try to curb this extraordinary public health crisis.  Although COVID-19 presents risks to the entire population, people who have underlying medical conditions, such as diabetes or hypertension, or who are over 65, African-American, or disabled have substantially higher risk of developing severe cases or dying of COVID-19.  The individual plaintiffs are in those high-risk groups, and to protect their health, these plaintiffs have complied with relevant public health guidelines by self-isolating or limiting their interactions with others to reduce their exposure to COVID-19.  The plaintiffs contend that the challenged election laws force them and similarly-situated voters to choose between jeopardizing their health by leaving their homes and engaging in person-to-person contact they would not otherwise have or sacrificing their right to vote during the COVID-19 pandemic.  And, because we are in the middle of a pandemic that, at least at this juncture, has no end in sight, the plaintiffs seek a

preliminary injunction barring the defendants from enforcing these requirements so that they can exercise their right to vote by absentee ballot or by curbside voting from the safety of their cars in those jurisdictions, if any, that are willing to implement this practice.

On the other hand, the defendants contend that the challenged laws are necessary to preserve the legitimacy of upcoming elections by preventing voter fraud and safeguarding voter confidence.  But, the plaintiffs have shown that Alabama has other election law provisions that are effective at preventing fraud and safeguarding voter confidence, including laws requiring all absentee voters to identify themselves by providing a driver's license number or the last four digits of their social security number and to submit an affidavit signed under penalty of perjury verifying their identity.  And, Alabama already waives the photo ID requirement for absentee voters 65 or older who also have a physical infirmity that renders them unable to access their assigned polling place.  As to the photo ID requirement, the individual plaintiffs who are 65 or older or who suffer from a disabling condition seek only to be included in this exemption and to allow them to vote by absentee ballot without providing a copy of their photo ID with their absentee ballot applications.

The plaintiffs seek relief that the state already affords to certain individuals (waiver of the photo ID requirement), or, as the defendants acknowledge, is not prohibited by state law (barring enforcement of the de facto ban on curbside

voting), or that, in light of other provisions of state election law, will not undermine the state's interest in preventing voter fraud (waiver of the witness requirement). Therefore, because the plaintiffs have shown that the challenged laws will likely dissuade some citizens from voting and "even one disenfranchised voter . . . is too many,"[4] the court finds that the burdens imposed by the challenged election laws on voters at high risk of severe complications or death from COVID-19 are not justified by the state's interests in enforcing the laws.

As a result, and for the reasons explained below, the court will grant the plaintiffs' motion for a preliminary injunction in part, and, as to the July 14 runoff election, the court will enjoin: (1) the witness requirement for absentee ballots for voters who cannot safely obtain the signatures of two witnesses or a notary public due to the COVID-19 pandemic; (2) the photo ID requirement for absentee voters who are over the age of 65 or disabled and who cannot safely obtain a copy of their photo ID due to the COVID-19 pandemic; and (3) the state's de facto ban on curbside voting to permit jurisdictions willing to implement such a practice, if any, to do so.

This opinion is divided as follows. Part I briefly outlines the impact of COVID-19 and the plaintiffs' claims. Part II addresses the defendants' contentions related to standing, sovereign immunity, mootness, and justiciability. After determining that the issue is properly before the court, Part III turns to the

---

[4] *Lee*, 915 F.3d at 1321 (citation omitted)

plaintiffs' motion for a preliminary injunction and addresses the plaintiffs' likelihood of success on the merits of each of their claims.  In Part IV, the court addresses the remaining requirements for an injunction.  Finally, Part V concludes and describes the injunctive relief the court will grant at this juncture.

## I.

Alabama has seen over 25,000 confirmed cases, and more than 700 deaths, from COVID-19.  Doc. 16-4 at 3;  *Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html,   (last visited June 15, 2020).  "At this time, there is no known cure, no effective treatment, and no vaccine."  *S. Bay United Pentecostal Church v. Newsom*, -- S. Ct. --, 2020 WL 2813056 (May 29, 2020) (Roberts, C.J., concurring).

All persons are susceptible to contracting the virus, and people of all demographics have endured severe cases, but some groups have a substantially higher risk of developing complications and dying from COVID-19.  Doc. 16-4 at 3–4.  Older patients "are at the greatest risk" of experiencing "severe cases, long-term impairment, and death" from the virus.  *Id.* at 3.  Additionally, those with pre-existing conditions, such as hypertension, certain heart conditions, lung diseases, diabetes, and obesity, "are at high risk of a life-threatening COVID-19 illness."[5]

---

[5] These conditions are especially prevalent in Alabama.  *See Hypertension Mortality by State*, https://www.cdc.gov/nchs/pressroom/sosmap/hypertension_mortality/hypertension.htm,   (last visited   June   15,   2020);   *Heart   Disease   Mortality   by   State*,   https://www.cdc.gov /nchs/pressroom/sosmap/heart_disease_mortality/heart_disease.htm, (last visited June 15, 2020); *Chronic   Lower   Respiratory   Disease   Mortality   by   State*,   https://www.cdc.gov

*Id.* at 4.    Available evidence also shows that, if infected, "racial and ethnic minority populations, especially African-Americans, are at a substantially elevated risk of developing life-threatening COVID-19 illnesses" and dying. *Id.*

The virus spreads easily. *Id.* It spreads "through droplet transmission; that is, when an infected individual speaks, coughs, sneezes, and the like, they expel droplets which can transmit the virus to others in their proximity." *Id.* In a "closed, stagnant air environment"—*i.e.*, indoors—these droplets can linger in the air for up to 14 minutes. Doc. 46-1 at 32. The virus can also be spread through contact with a contaminated surface. *Id.* Some people who are infected with the virus do not show any symptoms, appearing to themselves and to everyone else to be perfectly healthy, rendering them particularly potent agents of transmission. *Id.* at 5. Even those infected individuals who are symptomatic can be contagious for days before developing any symptoms. *Id.*

Without a vaccine, the only ways to limit the spread of the virus are "self-isolation, social distancing, frequent handwashing, and disinfecting surfaces." *Id.* at 4–5. "Self-isolation involves not physically interacting with those outside one's household." *Id.* at 5. Social distancing means "maintaining at least six feet of distance between individuals." *Id.* The Centers for Disease Control ("CDC") also recommends that people cover their mouth and nose with a cloth mask when they

---

/nchs/pressroom/sosmap/lung_disease_mortality/lung_disease.htm, (last visited June 15, 2020); *Diabetes Mortality by State*, https://www.cdc.gov/nchs/pressroom/sosmap/diabetes_mortality/diabetes.htm, (last visited June 15, 2020); *Adult Obesity Maps*, https://www.cdc.gov/obesity/data/prevalence-maps.html, (last visited June 15, 2020).

go out in public.  *Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/
coronavirus/2019-ncov/prevent-getting-sick/prevention.html, (last visited June 15,
2020).  Given how easily the virus can spread, the CDC, public health officials,
and Alabama Governor Kay Ivey have all emphasized the importance of staying
home as much as possible and maintaining at least a six-foot distance with others
when outside of the home to minimize the risk of exposure to the virus.  Docs. 16-
4 at 5-6; 16-8 at 4; 16-9 at 2.

In light of the dangers posed by COVID-19, Governor Ivey declared a state
public health emergency on March 13, 2020.  Doc. 16-15.  Alabama's State Health
Officer subsequently issued a series of health orders encouraging Alabamians to
practice social distancing, and requiring or prohibiting certain actions to slow the
spread of the disease.  Docs. 16-16; 16-17; 16-18; 16-19; 16-20; 16-21; 34-15.  The
current "safer at home" order, which expires on July 3, 2020, encourages all
individuals in Alabama, and especially people over the age of 65 or with
underlying health conditions, to "[m]inimiz[e] travel outside the home."  Doc. 34-
15 at 3.  The order prohibits "non-work related gatherings of any size . . . that
cannot maintain a consistent six-foot distance between persons from different
households."  *Id.*  In spite of these efforts, the number of COVID-19 cases
throughout Alabama continues to increase.  *Daily Confirmed New Cases*,
https://coronavirus.jhu.edu/data/new-cases-50-states/alabama, (last visited June 15,
2020); *Daily and Cumulative Case Counts*, https://alpublichealth.maps.arcgis.com/

apps/opsdashboard/index.html#/6d2771faa9da4a2786a509d82c8cf0f7, (last visited June 15, 2020).

Alabama has also taken a number of actions in response to COVID-19 regarding the upcoming primary runoff election.  First, invoking her emergency powers, Governor Ivey moved the runoff election from March 31 to July 14, 2020. Docs. 16-31 at 2; 34-1 at 8.  Alabama's Secretary of State John Merrill also promulgated an emergency regulation providing that in light of the state of emergency caused by the COVID-19 pandemic, "any qualified voter who determines it is impossible or unreasonable to vote at their polling place for the Primary Runoff Election of 2020 . . . shall be eligible to" apply for an absentee ballot.  Doc. 34-1 at 60.  The regulation further instructs "[a]ll Absentee Election Managers and any other election officials of this state" to "accept all absentee ballot applications filed" pursuant to the new rule.  *Id.*  In effect, for the runoff election in July only, the emergency regulation allows any voter who does not wish to vote in person because of COVID-19 to vote absentee.

But Alabama still requires voters to comply with existing rules for casting absentee ballots.   For example, the emergency regulation maintains the requirement that voters must submit a copy of their photo ID with their absentee ballot application.  *See* doc. 34-1 at 60; Ala. Code § 17-9-30(b).[6]  And, for their

---

[6] There are exceptions to the photo ID requirement. Relevant here, voters eligible to vote absentee under the Voting Accessibility for the Elderly and Handicapped Act do not have to submit a copy of their photo ID to receive an absentee ballot.  *See* Ala. Code § 17-9-30(d).  This

votes to be counted, all absentee voters must return with their absentee ballot an affidavit that is signed by a notary public or two adult witnesses who witnessed the voter sign the affidavit.  Ala. Code § 17-11-7(b).  However, because "person-to-person contact increases the risk of transmitting COVID-19," Governor Ivey issued a rule permitting notaries to witness the signing of absentee affidavits through videoconferencing. Doc. 16-17 at 2-3.

The plaintiffs in this lawsuit include four individual plaintiffs—Robert Clopton, Eric Peebles, Howard Porter, and Annie Carolyn Thompson.  Doc. 1 at 9–12. All four are at higher risk of contracting a severe case of the virus due to their age, race, or underlying medical conditions, and for that reason each plaintiff has thus far exercised great lengths to self-isolate and limit his or her exposure to the virus.  *Id.* at 9–12.  Though each plaintiff is registered and intends to vote, the plaintiffs maintain that complying with Alabama's election laws would force them to increase their exposure to the virus.  *Id.*

The individual plaintiffs all say they would prefer to vote absentee.  But Clopton, Peebles, and Thompson allege that they cannot comply with the witness requirement without leaving their home or bringing in someone outside of their household.  Doc. 16-45 at 2–10, 17–21.  And Thompson tells the court that she cannot comply with the photo ID requirement without going to a business to make

---

exception applies to voters who are either disabled or 65 or older and are "unable to access his or her assigned polling place."  Ala. Admin. Code R. 820-2-9-.12(3).

a copy of her ID.  Doc. 16-45 at 12–21.  All four individual plaintiffs allege that, if they cannot vote absentee, they would prefer to utilize a curbside voting method, rather than enter a polling place.  Doc. 16-45 at 2–21.  Alabama does not officially prohibit curbside voting, but Secretary Merrill has "on at least two occasions," shut down attempts by counties to establish curbside voting operations because they were not, in his view, complying with the law.  Doc. 34-1 at 21.

The plaintiffs in this lawsuit also include three organizations: People First of Alabama, Greater Birmingham Ministries ("GBM"), and the Alabama State Conference of the National Association for the Advancement of Colored People ("Alabama NAACP").  Doc. 1 at 8, 12–14.  People First is "a group of people with developmental disabilities," and the organization "assists its members in accessing . . . full citizenship with equal rights," including "securing access to full and equal voting rights."  *Id.* at 8.  GBM, which has about 5,000 members, is "a multi-faith, multi-racial membership organization" that "actively opposes state laws, policies, and practices that result in the exclusion of vulnerable groups or individuals from the democratic process."  *Id.* at 12–13.  The Alabama NAACP "works to ensure the political, educational, social, and economic equality of African-Americans and all other Americans."  *Id.* at 14.  "Two central goals of the Alabama NAACP are to eliminate racial discrimination in the democratic process, and to enforce federal laws and constitutional provisions securing voting rights."  *Id.*

10

The organizational plaintiffs allege that they have many members who are in the same predicament as the individual plaintiffs—they are eligible to vote and would like to, but they are afraid that complying with Alabama's witness and photo ID requirements would force them to violate social-distancing protocol. *Id.* at 8, 12–14.  These members would also prefer to vote curbside, rather than inside the polling place, if they cannot vote absentee. *Id.*  The organizational plaintiffs further allege that given the heightened interest in absentee voting due to expanded eligibility and fear of viral exposure at polling places, Alabama's election laws are forcing them to divert resources away from their usual get-out-the-vote expenditures and towards educating their members about and helping them to comply with absentee voting procedures. *Id.*

Based on these allegations, the individual and organizational plaintiffs move the court to enjoin three election practices in Alabama—the witness requirement, the photo ID requirement, and the state's de facto ban on curbside voting.  Doc. 15. The plaintiffs allege that these election practices violate (1) the individual plaintiffs' and the organizational plaintiffs' members' right to vote under the First and Fourteenth Amendments, (2) Title II of the Americans with Disabilities Act ("ADA"), and (3) for the witness requirement only, § 201 of the Voting Rights Act ("VRA"). *Id.*  The plaintiffs bring these claims against the following defendants in their official capacity: Governor Kay Ivey; Secretary of State John Merrill; Alleen Barnett, the absentee ballot manager for Mobile County; Jacqueline Anderson-

11

Smith, the Circuit Clerk of Jefferson County; Karen Dunn Burks, the Deputy Circuit Clerk of the Bessemer Division of Jefferson County; and Mary B. Roberson, the Circuit Clerk of Lee County.  Doc. 1 at 15–16.  The plaintiffs also bring the ADA and VRA claims against the State of Alabama.

The plaintiffs ask the court to enjoin the challenged practices for all the coming 2020 elections: the primary runoff on July 14, the special primary election on August 4, and the general election on November 3.  Though the state has announced emergency measures for the July election—namely, permitting any voter "who determines it is impossible or unreasonable to vote" in person because of COVID-19 to vote absentee, doc. 16-32—the state has not yet said whether these measures will apply for the elections in August and November.  Whether these measures are in place could change the outcome of the analysis.  For this reason, it is premature for the court to consider a preliminary injunction for the elections in August and November.  At this time, the court considers only whether to grant the preliminary injunction for the election on July 14, but the plaintiffs are free to move for a separate preliminary injunction regarding the other elections.

## II.

The defendants run the gamut in challenging the justiciability of this case. They maintain that the plaintiffs do not have standing to pursue their claims, that the defendants are entitled to state sovereign immunity, that the claims against Defendant Roberson are moot, and that the case presents non-justiciable political

questions.  With the exception of Governor's Ivey claim to immunity, the court rejects the defendants' arguments.

## A.

To properly invoke the jurisdiction of the federal courts, the litigants must have standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Standing consists of three elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  As the party seeking the preliminary injunction, the plaintiffs bear the burden of establishing these elements, *id.*, which the court addresses in turn.

### 1.

To establish an injury in fact, a plaintiff must show "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560.  In multiple-plaintiff cases like this, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint."  *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017).  And if there is one plaintiff "who has demonstrated standing to assert these rights as his own," the court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit."

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977).

In this case, the plaintiffs seek three injunctions: (1) to suspend the enforcement of the photo ID requirement for absentee voters; (2) to suspend the enforcement of the witness requirement; and (3) to lift the ban on curbside voting. The court will thus consider whether the plaintiffs have established an injury for each form of relief sought.

a.

For the photo ID requirement, Plaintiffs Porter and Thompson, both registered voters who intend to vote in the runoff election on July 14, claim that the requirement burdens their right to vote. Docs. 16-45 at 12–20. Their injury is a given and should not be challenged. After all, it is settled law that when plaintiffs "are required to obtain photo identification before they can vote, [t]he imposition of that burden is an injury sufficient to confer standing regardless of whether [the plaintiffs] are able to obtain photo identification." *Common Cause v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009). In fact, even if Porter and Thompson already had a copy of their IDs available, they would still have standing to challenge the requirement. The Eleventh Circuit explained why:

> Even if [the plaintiffs] possessed an acceptable form of photo identification, they would still have standing to challenge the statute that required them to produce photo identification to cast an in-person ballot. . . . Requiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional

ballot is an injury sufficient for standing.  The inability of a voter to pay a poll tax, for example, is not required to challenge a statute that imposes a tax on voting, and the lack of an acceptable photo identification is not necessary to challenge a statute that requires photo identification to vote in person.

*Id.* at 1351–52 (citations omitted).  Simply put, a voter always has standing to challenge a statute that places a requirement on the exercise of his or her right to vote.

Notwithstanding this settled law, the defendants argue there is no injury adequate to confer standing, because all absentee voters must comply with the photo ID requirement (except for those voters exempted by federal law, *see* Ala. Code 17-9-30(c)), and all voters face the risk of contracting COVID-19.  The defendants misunderstand the "particularized" requirement for standing.  "For an injury to be particularized, it must affect the plaintiff in a personal and individual way."  *Spokeo*, 136 S. Ct. at 1548 (citation omitted).  "The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance."  *Id.* at 1548 n.7.  Thus, it does not matter that the injury is "widely shared," so long as the plaintiff "suffers a particularized harm."  *Id*.  Both Porter's and Thompson's injury is particularized, because each must comply with the photo ID requirement.

The defendants next argue that the injury is speculative, rather than actual or imminent, because it is unknown how serious a risk COVID-19 will present in

mid-July.[7]  This argument mischaracterizes the alleged injury.  The injury is not that Porter or Thompson will contract COVID-19, or even that they will be forced to take a serious risk of contracting COVID-19.  The injury is that they will have to comply with the state's photo ID requirement in order to vote absentee.  This injury is not speculative; it is "certainly impending," since they intend to vote in the election on July 14.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

b.

The injury analysis for the witness requirement is the same.  Plaintiffs Clopton and Thompson claim that the witness requirement burdens their right to vote.  Docs. 16-45 at 2–5, 17–20.  As registered voters who intend to vote in the runoff election on July 14, *id.*, they have standing to challenge the witness requirement.  The requirement that these plaintiffs must find two adult witnesses or a notary public in order to vote absentee is itself an injury sufficient to confer standing.  *See Common Cause*, 554 F.3d at 1351.  The defendants' arguments that the injury is too speculative and not particularized enough to confer standing are rejected for the same reasons explained above.

---

[7] The data, which continues to show an increase of cases in Alabama, belies this contention.  *See Daily Confirmed New Cases*, https://coronavirus.jhu.edu/data/new-cases-50-states/alabama, (last visited June 15, 2020);  *Daily and Cumulative Case Counts*, https://alpublichealth.maps.arcgis.com/apps/opsdashboard/index.html#/6d2771faa9da4a2786a50 9d82c8cf0f7, (last visited June 15, 2020).

c.

For the ban on curbside voting, each of the four individual plaintiffs, claims that the ban burdens his or her right to vote.  Docs. 16-45 at 1–20.  If there is a ban on curbside voting, it would likely constitute an injury sufficient to confer standing.  But the defendants deny that there is a ban on curbside voting.

As the defendants acknowledge, "no Alabama statute specifically prohibits curbside voting."  Doc. 36 at 9.  However, "on at least two occasions," when a county established a curbside voting operation, Secretary Merrill shut it down. Doc. 34-1 at 21.  He "contacted the counties in question and advised them that they were conducting an election in violation of State law."  *Id.*  Secretary Merrill did so because, in his view, the curbside voting operations did "not legally comply with Alabama laws," including "the voter personally signing the poll list, ballot secrecy, and ballot placement in tabulation machines."  *Id.*  Secretary Merrill maintains that it "would be completely unfeasible" to implement curbside voting and otherwise comply with Alabama election law.  *Id.* at 22.  Given Secretary Merrill's professed view that curbside voting does not comply with Alabama law, and his demonstrated power to shut down any county's attempt to establish a curbside voting operation, the court finds that Secretary Merrill has effectively implemented a ban on curbside voting in Alabama.

To summarize, the individual plaintiffs have suffered an injury for standing purposes for each form of relief sought.[8]  The court thus proceeds to the second element of standing: traceability.

2.

To establish traceability, the plaintiff must show "a causal connection between her injury and the challenged action of the defendant—*i.e.*, the injury must be fairly traceable to the defendant's conduct, as opposed to the action of an absent third party."  *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc) (citations omitted).

Before evaluating traceability for the claims discretely, the court first responds briefly to the defendants' general argument that the plaintiffs' injury is caused by the virus, not the state.  This argument again mischaracterizes the injury. The injury alleged is the state's decision to force the individual plaintiffs to comply with the complained-of requirements for voting.  The virus might make the injury severe—because complying with the requirements might expose the plaintiffs to serious health risks—but it does not cause the legal injury.  With that said, the

---

[8] Because the court has identified a plaintiff with standing for each form of relief sought, the court need not address the defendants' arguments about whether the organizational plaintiffs lack standing.  But the organizational plaintiffs likely do have standing under existing precedent.  *See Common Cause*, 554 F.3d at 1350–51 (finding that the NAACP had standing to challenge Georgia's photo ID requirement because it would have to divert resources to educate and assist voters with complying); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014) (finding that organizational plaintiffs had standing to sue on behalf of their members).

court will consider whether the alleged injury can be traced to a defendant for each claim, starting with the photo ID requirement.

a.

The court finds that the individual plaintiffs' injury of complying with the photo ID requirement is traceable to the defendants serving as absentee election managers ("AEMs"). Alabama law provides that AEMs "shall determine whether an applicant for an absentee ballot is obligated to produce identification." Ala. Code § 17-11-9. Furthermore, when a voter submits an application to vote by absentee ballot, the AEM "shall determine whether identification has been properly provided." Ala. Code § 17-10-2(c)(1). If identification has not been properly provided with the application, the AEM issues a provisional ballot and notifies the voter. *Id.* In other words, the AEM interprets the law and decides whether a photo ID is required, and screens the absentee ballot applications to see if the voter has provided the photo ID. These duties clearly show that AEMs are charged with enforcing the photo ID requirement for absentee voters.[9]

b.

Likewise, the injury of complying with the witness requirement is traceable to the AEMs. AEMs are charged with administering absentee voting in their respective county. *See* Ala. Code § 17-11-2 ("In each county there shall be an

---

[9] The fact that the board of registrars, in conjunction with the canvassing board, is responsible for counting the *provisional* ballots, *see* Ala. Code § 17-10-2(g)–(f), does not somehow negate the AEMs role in screening the ballots in the first instance.

'absentee election manager,' who shall fulfill the duties assigned by this chapter."). In this capacity, the AEMs "conduct or oversee the absentee ballot process." Doc. 34-1 at 2. For this reason, the affidavit that the witnesses are required to sign is addressed and delivered to the AEM. Ala. Code § 17-11-9. After the AEM receives the absentee ballots, he or she turns them over to the local election officials for tallying. Ala. Code § 17-11-10.

The defendants attempt to dodge traceability by focusing on the local officials who count the absentee ballots, contending that it is these individuals who check for witness signatures. Here is how the process works: On election day, the AEM delivers the absentee ballots to absentee election officials, who "shall examine each affidavit envelope to determine if the signature of the voter has been appropriately witnessed." Ala. Code § 17-11-10(b). For those that are appropriately witnessed, "the election officials shall . . . open [the] affidavit envelope and deposit the ballot envelope . . . into a sealed ballot box." *Id.* Absentee ballots that are not appropriately witnessed are not counted. *Id.*

The defendants' argument turns standing into a shell game. It strains credulity to suggest that the plaintiffs should have brought their claim against the local poll workers who count the ballots. There are hundreds of these officials,[10]

---

[10] *See* Ala. Code § 17-11-11(a) (specifying that absentee election officials shall consist of one inspector and at least three clerks for each absentee precinct).

and they are not even selected until 15 to 20 days before the election.[11] Furthermore, according to the state, the AEMs also count the absentee ballots "in conjunction with other local officials."   Doc. 34-1 at 2.   Based on that representation, it appears that the AEMs may also check the absentee ballots for witness signatures.

In the end, the court is satisfied that the AEMs—as the officials in charge of the absentee voting process who oversee the counting of absentee ballots—are proper defendants for a claim challenging the requirement that an absentee ballot must be witnessed to be counted.

c.

The ban on curbside voting can easily be traced to Secretary Merrill.  As the defendants acknowledge, state law does not prohibit curbside voting.  Instead, Secretary Merrill took it upon himself, "on at least two occasions," to shut down county efforts to establish curbside voting operations, because he believes such operations do not comply with other election laws.  Doc. 34-1 at 21.  To the extent a ban exists, it exists because of Secretary Merrill, and the injury can thus be fairly traced to him.

---

[11] *See* Ala. Code § 17-8-1 (providing that absentee election officials shall be appointed by the appointing board "not more than 20 nor less than 15 days before the holding of any election").

3.

Finally, to establish redressability, a decision in the plaintiffs' favor must "significantly increase the likelihood" that the plaintiffs' injury will be redressed. *Lewis*, 944 F.3d at 1296 (citation omitted).  Furthermore, "it must be the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly."  *Id.* (citation omitted). Accordingly, for each claim, the court considers whether it can supply relief that redresses the plaintiffs' injury.

a.

For the photo ID requirement, the question is whether an injunction ordering the defendants not to enforce the requirement for absentee voters would successfully allow the plaintiffs to vote absentee without presenting photo ID.  The court finds that, at the very least, an injunction directed to the defendant AEMs would provide redress.  The AEMs determine whether a photo ID is required for each absentee ballot received.  Ala. Code § 17-11-9.  If the court ordered the AEMs not to enforce the photo ID requirement, the AEMs would simply note for each absentee ballot that a photo ID was not required, and the ballot could be counted without issue.  Thus, because an injunction directed to the defendant

22

AEMs would likely redress their injury, the plaintiffs have established standing to pursue the photo ID claim.[12]

b.

Regarding the witness requirement, the plaintiffs first argue that the court could redress their injury by ordering Secretary Merrill not to enforce the witness requirement for absentee voters.  It is tempting to agree that an injunction directed to Secretary Merrill would significantly increase the likelihood of relief for the plaintiffs.  Secretary Merrill is "the chief elections official in the state."  Ala. Code § 17-1-3(a).  As such, he has the authority, and indeed the obligation, to tell election officials how to implement election laws.[13]  This authority empowers Secretary Merrill to instruct election officials to ignore the witness requirement, so that ordering Secretary Merrill not to enforce the witness requirement would redress the plaintiffs' injury.[14]

---

[12] To be sure, an injunction directed to the AEMs would provide relief only in the counties where the defendant AEMs serve—*i.e.*, Jefferson County, Baldwin County, and Lee County.  To provide statewide relief, an injunction against Secretary Merrill would have to be effective.  Based on the Eleventh Circuit's precedent in *Jacobson v. Florida Secretary of State*, 957 F.3d 1193 (11th Cir. 2020), the court does not believe it can rely on an injunction directed to Secretary Merrill to establish standing.

[13] *See* Ala. Code 17-1-3(a) ("The Secretary of State . . . shall provide uniform guidance for election activities."); Ala. Code § 17-2-4(f) ("The Secretary of State . . . shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the state.").

[14] *See Lewis*, 944 F.3d at 1301 (noting that it is sufficient for a judgment to redress a plaintiff's injury "indirectly").

In fact, the Fifth Circuit, in almost precisely the same context, adopted this theory of redressability.[15]   However, the Eleventh Circuit—which this court is of course bound to follow—recently rejected a similar theory.   *See Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1207–12 (11th Cir. 2020).   In *Jacobson*, the plaintiffs challenged "the order in which candidates appear on the ballot in Florida's general elections."   *Id.* at 1197.   The court determined that the plaintiffs alleged injury "is neither fairly traceable to [Florida's Secretary of State] nor redressable by a judgment against her because she does not enforce the challenged law."   *Id.* at 1198.   Instead, "Florida law tasks" the local Supervisor of Elections for each of Florida's 67 counties "with placing candidates on the ballot in the correct order."   *Id.* at 1199.   These supervisors are independent of the Secretary. *Id.* at 1207.   Thus, "[a]n injunction ordering the Secretary not to follow the ballot statute's instructions for ordering candidates cannot provide redress, for neither she nor her agents control the order in which candidates appear on the ballot."   *Id.* at 1208.   And any judgment the court issued would not be binding against the supervisors who actually enforced the provision, since they were not parties to the suit.   *Id.*

---

[15] *Texas Democratic Party v. Abbott*, -- F.3d --, 2020 WL 2982937 (5th Cir. 2020) (holding that because "the Secretary of State has the duty to obtain and maintain uniformity in the application, operation, and interpretation of Texas's election laws," claims seeking to expand access to absentee voting in Texas were traceable to and redressable by the Secretary of State) (citation omitted); *see also OCA-Greater Houston v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017) (holding that the "invalidity of a Texas election statute is, without question, fairly traceable to and redressable by . . . its Secretary of State, who serves as the chief election officer of the state") (citation omitted).

The Eleventh Circuit rejected the idea that "the Secretary's position as the chief election officer of the state" established standing, because nothing connected the Secretary specifically to the order of candidates on the ballot.  *Id.* (citation omitted).  The court also rejected the argument "that the Secretary's authority to prescribe rules about ballot layout, and to provide written direction to the Supervisors," establishes standing.  *Id.* at 1211.  The Secretary's "power to prescribe rules and issue directives about ballot order, which the Supervisors might well be obliged to follow, says nothing about whether she possesses authority to *enforce* the complained-of provision."  *Id.* at 1211 (citations omitted) (emphasis in original).  And the court indicated that "an injunction ordering the Secretary to promulgate a rule requiring the Supervisors to place candidates on the ballot in an order contrary to the ballot statute . . . would have raised serious federalism concerns, and it is doubtful that a federal court would have authority to order it." *Id.* at 1211–12.

Based on this precedent, the court is compelled to find that an injunction against Secretary Merrill would not redress the plaintiffs' injury.  In *Jacobson*, the court found that the plaintiffs "should have sued the Supervisors of Elections instead of the Secretary of State."  *Id.* at 1212.  Here, unlike in *Jacobson*, the plaintiffs did what the Eleventh Circuit suggested—they sued the local officials in charge of the absentee voting process: the AEMs.

25

Consistent with *Jacobson*, the court finds that an injunction ordering the defendant AEMs not to enforce the witness requirement would likely redress the plaintiffs' injury.  The AEMs receive the absentee ballots, Ala. Code § 17-11-9, deliver them to the absentee election officials, § 17-11-10, and count the ballots "in conjunction with [these] other local officials," doc. 34-1 at 2.  Given the AEMs role in overseeing the absentee ballot process, if the court ordered the AEMs not to enforce the witness requirement, it is likely that unwitnessed absentee ballots would be counted.

c.

For redressability of the curbside voting claim, the question is whether a judgment would redress the plaintiffs' injury by lifting the ban on curbside voting.  To be clear, the plaintiffs are not asking the court to implement curbside voting across Alabama.[16]  Instead, the plaintiffs' request is merely to enjoin Secretary Merrill from prohibiting counties from establishing curbside voting operations.  *See* docs. 20-1 at 9–10; doc. 46 at 2.  As the defendants acknowledge, "no Alabama statute specifically prohibits curbside voting."  Doc. 36 at 9.  The practice is only prohibited because Secretary Merrill has acted to shut down curbside voting operations when counties have attempted to provide them.  Doc. 34-1 at 21.  Thus,

---

[16] Nor would such an order supply standing, since (1) county commissions are responsible for "designat[ing] the places of holding elections," Ala. Code § 17-6-4(a); (2) the county commissions are not defendants in this case; and (3) "it must be the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury," *Lewis*, 944 F.3d at 1296 (citation omitted).

if the court enjoined Secretary Merrill from banning otherwise lawful curbside voting operations, counties would be free to provide them, if they are so inclined, and the ban would be lifted.

*          *          *

In conclusion, the plaintiffs have demonstrated that they likely have standing to pursue each of their claims.  The court thus proceeds to the defendants' other arguments regarding the case's justiciability.

**B.**

The defendants assert that they are each entitled to sovereign immunity.  The doctrine of state sovereign immunity "prohibits suits against state officials where the state is, in fact, the real party in interest."  *Summit Med. Assocs. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999).  However, there is an exception for "suits against state officers seeking prospective equitable relief to end continuing violations of federal law."  *Id.* (citing *Ex parte Young*, 209 U.S. 123 (1908)).  The *Young* doctrine thus permits "the exercise of the judicial power of the United States where a plaintiff seeks to compel a state officer to comply with federal law."  *Id.* But the *Young* doctrine does not apply "unless the state officer has some responsibility to enforce the statute or provision at issue."  *Id.* at 1341; *Ex parte Young*, 209 U.S. at 157 ("[I]t is plain that such officer must have some connection with the enforcement of the act.").

The analysis for whether a state official has "some connection" to the

27

challenged statute is similar to the analysis for whether a state official is a proper defendant for the purposes of traceability and redressability.  *See Cressman v. Thompson*, 719 F.3d 1139, 1146 n.8 (10th Cir. 2013).  But they are still "separate issues."  *Jacobson*, 957 F.3d at 1210.  The Eleventh Circuit suggested that the standard for qualifying as a proper defendant under *Ex parte Young* is less exacting:

> To be a proper defendant under *Ex parte Young*—and so avoid an Eleventh Amendment bar to suit—a state official need only have 'some connection' with the enforcement of the challenged law.  In contrast, Article III standing requires that the plaintiff's injury be 'fairly traceable' to the defendant's actions and redressable by relief against *that* defendant.

*Id.* (citations omitted).  Thus, a state official could be a proper defendant under *Ex parte Young*, but not a proper defendant for the purposes of standing.  *See id.* (observing that just because "the Florida Secretary of State was a proper defendant under *Ex parte Young*," did not mean the Secretary was a proper defendant under Article III).

With that said, the court finds that the defendant AEMs—assuming that they are state officials—are not entitled to sovereign immunity.  For the reasons explained above, the AEMs are closely connected to the enforcement of the witness and photo ID requirements for absentee voting.  If the AEMs are sufficiently connected to the challenged provisions to establish traceability and redressability, they are necessarily sufficiently connected to satisfy the *Young*

28

doctrine.

For the same reason, Secretary Merrill is sufficiently connected to the ban on curbside voting to satisfy the *Young* doctrine.  The court also finds that Secretary Merrill is sufficiently connected to the witness and photo ID requirements.  As noted previously, Secretary Merrill is tasked with "provid[ing] uniform guidance" on the administration of election law.  Ala. Code § 17-1-3(a).  He is also charged with adopting standards "that define what constitutes a vote and what will be counted as a vote."  Ala. Code § 17-2-4(f).  With regard to the photo ID requirement specifically, Secretary Merrill is required to inform the public about the requirement, Ala. Code § 17-9-30(n), and to adopt rules indicating to AEMs whether a photo ID is required, Ala. Code § 17-11-5.  In the court's view, these and other provisions establish "some connection" between Secretary Merrill and the enforcement of the challenged provisions.  Accordingly, he is not entitled to sovereign immunity.

However, the court finds that Governor Kay Ivey is entitled to sovereign immunity.  To establish the requisite connection, the plaintiffs rely on the Governor's general executive power to enforce the laws, as well as her emergency powers, with which she could suspend the challenged provisions.  A governor's "general executive power is not a basis for jurisdiction in most circumstances.  If a governor's general executive power provided a sufficient connection to a state law to permit jurisdiction over [her], any state statute could be challenged simply by

naming the governor as a defendant." *Women's Emergency Network v. Bush*, 323 F.3d 937, 949 (11th Cir. 2003).[17]   Similarly, the Governor's emergency powers do not supply the requisite connection.  Otherwise, the Governor would be a proper defendant in virtually every suit challenging a state statute.  Accordingly, Governor Ivey is due to be dismissed from the case.

The plaintiffs also named the state as a defendant.  The only claims the plaintiffs bring against the state are under the VRA and the ADA.  Because Congress validly abrogated states' sovereign immunity for claims brought under the VRA and the ADA, the state is not entitled to sovereign immunity.  *Ala. State Conference of the NAACP v. Alabama*, 949 F.3d 647, 655 (11th Cir. 2020) (finding that the VRA abrogated state's sovereign immunity); *Nat'l Ass'n of the Deaf v. Florida*, 945 F.3d 1339, 1351 (11th Cir. 2020) (finding that the ADA abrogated state's sovereign immunity).

## C.

Defendant Roberson, the Circuit Clerk for Lee County, argues that the claims against her are moot because she no longer serves as the AEM for Lee County.  In a nutshell, the circuit clerk of each county serves as the AEM unless he or she declines, in which case the appointing board selects a replacement.  Ala. Code § 17-11-2.  Here, after learning of this suit, Roberson opted to decline to serve as AEM, doc. 41 at 1–2, and promptly argued that the claims against her are

---

[17] The Supreme Court long-ago reached the same conclusion.  *See Fitts v. McGhee*, 172 U.S. 516, 529–30 (1899).

moot as a result.  But the plaintiffs sued Roberson in her official capacity as circuit clerk through which she was presumptively serving as the AEM of Lee County. And, when a party sued in her official capacity resigns, the official's "successor is automatically substituted as a party."  Fed. R. Civ. P. 25(d).  Accordingly, when the appointing board selects a replacement AEM, the successor AEM for Lee County will automatically be substituted.  The claim is not moot.

## D.

Finally, in a footnote, the defendants urge the court to dismiss the claims as non-justiciable political questions.  Doc. 36 at 21 n.16.  Doing so would result in the court abdicating from its role to address disputes that arise under the Constitution or federal statutes.  This is precisely what the plaintiffs seek in this case—*i.e.*, they ask the court to decide whether the challenged provisions run afoul of the Constitution, the VRA, or the ADA.  The court agrees with the Fifth Circuit, which easily dismissed the contention that a similar claim was a non-justiciable political question by noting that the "standards for resolving such claims are familiar and manageable, and federal courts routinely entertain suits to vindicate voting rights."  *Texas Democratic Party*, -- F.3d --, 2020 WL 2982937 (5th Cir. 2020).  The plaintiff's claims are justiciable, and the court can thus proceed to consider the merits of the motion for a preliminary injunction.

## III.

A preliminary injunction is an "extraordinary remedy" designed to prevent

irreparable harm to the parties during the pendency of a lawsuit. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008).  The court may issue a preliminary injunction only if the plaintiffs establish: (1) a substantial likelihood of success on the merits, (2) a likelihood of suffering irreparable harm in the absence of relief, (3) that the balance of equities weigh in their favor, and (4) that the injunction serves the public interest.  *Id.* at 20; *Jones v. Governor of Fla.*, 950 F.3d 795, 806 (11th Cir. 2020).  The determination of whether the plaintiffs have satisfied their burden "is within the sound discretion of the district court and will not be disturbed absent a clear abuse of discretion."  *Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1246 (11th Cir. 2002) (citation omitted).  The first two factors of the preliminary injunction standard are "the most critical."  *Lee*, 915 F.3d at 1317.  The court thus begins with whether the plaintiffs have shown a substantial likelihood of success on the merits of each of their claims.  In doing so, because the plaintiffs bring claims under the First and Fourteenth Amendments of the U.S. Constitution, the ADA, and the VRA, the court will address separately whether the plaintiffs have established a substantial likelihood of success for each of these categories of claims, beginning with the constitutional claims.

### A.

States have an interest in the orderly administration of elections and retain the power to regulate elections.  *See* U.S. Const. Art. 1, § 4, cl.1; *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008).  Still, an individual's right to

vote is sacrosanct, and "any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).

When deciding a constitutional challenge to state election laws, district courts apply a flexible standard outlined by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). Under the *Anderson-Burdick* balancing test, the court must "weigh the character and magnitude of the burden the State's rule imposes on [First and Fourteenth Amendment] rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (citation omitted). "[T]he rigorousness of [the court's] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. If the challenged law severely restricts the right to vote, then strict scrutiny applies, meaning the law must be narrowly drawn to serve a compelling state interest. *Id.* (citation omitted). If the challenged law "imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (citation omitted). But, "even when a law imposes only a

slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Lee*, 915 F.3d at 1318–19 (citation omitted).

1.

The first election requirement that the plaintiffs' challenge is the requirement under Alabama law that all absentee ballots include an affidavit signed by the voter and witnessed by a notary public or two adult witnesses. Ala. Code §§ 17-11-7; 17-11-9; 17-11-10. According to the plaintiffs, this requirement, as applied during the COVID-19 pandemic, imposes a severe burden on their individual right or the right of their members to vote, thereby triggering strict scrutiny. Docs. 1 at 44; 20-1 at 22–23. Allegedly, voters who live alone or with only one other adult and who wish to cast an absentee ballot must choose between adhering to health guidelines regarding social distancing and voting in upcoming elections.[18] *Id.* And, the plaintiffs contend that the witness requirement is not narrowly tailored to serve a compelling state interest. *See* doc. 20-1 at 25–28.

---

[18] The plaintiffs also contend that strict scrutiny applies because the burden imposed by the witness requirement falls more heavily on black voters, the elderly, and voters with disabilities. Doc. 20-1 at 22. But, the case the plaintiffs cite involved an equal protection challenge to a Florida law that restored voting rights to ex-felons who had completed all terms of their sentence, including the payment of all fines, fees, and restitution. *Jones*, 950 F.3d at 800. Here, the plaintiffs do not explicitly assert an equal protection claim, *see* doc. 1, or argue that the challenged provisions violate the Equal Protection Clause, *see* doc. 20-1. And, the plaintiffs do not cite any binding authority applying strict scrutiny in the context of a claim that a state election law violates First and Fourteenth Amendment associational rights because an otherwise non-discriminatory law imposes a heavier burden on a protected class of voters. *See id.*

34

Thus, the plaintiffs ask the court to enjoin this requirement for all voters.  Doc. 1 at 44; 20-1 at 9.

a.

To evaluate the plaintiffs' likelihood of success on this claim, the court must first decide whether the witness requirement imposes a burden on the right to vote that is severe enough to trigger strict scrutiny.  *See Lee*, 915 F.3d at 1319.  First of all, there is no doubt that the witness requirement imposes some burden on the right to vote.  After all, when Governor Ivey issued the emergency rule allowing notaries to witness affidavits by videoconference, she explained that the rule was necessary because "person-to-person contact increases the risk of transmitting COVID-19," effectively acknowledging that the witness requirement increases absentee voters' exposure to the virus.  Doc. 16-17 at 2–3.  Exposure to a deadly virus is a burden.

To show that the witness requirement severely burdens the right to vote, the plaintiffs point to evidence that approximately 1.3 million adults in Alabama live with only one other person, and more than 555,000 Alabamians live alone, including approximately 215,000 who are 65 or older and 186,000 black Alabamians, who are at higher risk of COVID-19 complications.  Docs. 20-1 at 22–23; 16-37 at 4–5.  The court accepts that the COVID-19 pandemic and resulting social-distancing recommendations will undoubtedly make it more difficult for many of these individuals to satisfy the witness requirement to vote

absentee.   But, the demographic evidence does not establish that the witness requirement imposes a severe burden on the right to vote sufficient to trigger strict scrutiny.   The demographic statistics do not indicate whether voters living alone or with only one other person regularly interact with individuals outside of their household who could serve as witnesses.   Moreover, it is possible for a voter to obtain the required witness signatures without violating the CDC's social-distancing guidelines.   For example, the voter and witnesses could wear masks and gloves and remain more than six feet apart outdoors, or be physically separated from one another by a window or open doorway.   To be sure, observing social-distancing guidelines does not eliminate the risk of contracting COVID-19, but it does substantially mitigate the risk.   The ability of many voters to comply with social-distancing protocol and to satisfy the witness requirement lessens the severity of the burden on voters' right to vote.

Even so, satisfying the witness requirement could impose a more significant burden on some voters who live alone and who are at heightened risk of severe COVID-19 complications due to age, disability, pre-existing conditions, and race. *See* doc. 16-4 at 8.   For example, Peebles lives alone and has been self-isolating since mid-March because he is at high risk of complications from COVID-19 due to spastic cerebral palsy.   *See* doc. 16-45 at 7–9.   Peeble's only contact has been with his four caregivers, but obtaining the signatures from them is not an option

36

because their shifts do not overlap, and he only interacts with one caregiver at a time. *Id*.[19]

Another plaintiff, Clopton, lives with only his wife. *Id.* at 4. Since mid-March, Clopton has left his home only for a medical appointment and to shop for groceries during "senior hours" because he is at high risk from COVID-19 due to his age, underlying conditions, medical history, and race. *Id.* at 3-4. The Cloptons have not allowed visitors into their home since mid-March, with the exception of Mrs. Clopton's sister who has been in their home's entryway on two occasions. *Id.* at 4. And, Clopton is not comfortable with the risk of inviting a second witness to his home even if the witness remains outside. *Id.* at 4-5.

Finally, People First, GBM, and the Alabama NAACP have members who live alone, are at high risk from COVID-19 complications, and prefer to vote by absentee ballot to minimize their risk from exposure to the virus. *Id.* at 24-25, 31, 36. These plaintiffs maintain that their affected members will not be able to comply with the witness requirement without risking their health by engaging in person-to-person contact in contravention of current health guidelines. *Id.* at 24–26, 31.

---

[19] Similarly, Thompson lives alone and is at high risk for complications from COVID-19 due to underlying medical conditions, age, and race. Doc. 16-45 at 17–18. Thompson began self-isolating at home on April 1, and since that time, she has only had contact with her daughter and granddaughter who bring her groceries and check on her. *Id.* at 18. The plaintiffs contend that the witness requirement is a significant barrier to Thompson's right to vote, doc. 20-1 at 24, but they do not provide any evidence suggesting that Thompson's daughter and granddaughter, who Thompson has regular contact with, could not witness her affidavit.

Based on the record, it is clear that the plaintiffs are rightly concerned about the risk of COVID-19 and minimizing their potential exposure to the virus. However, even if the witness requirement imposes a significant burden on some individual plaintiffs and members of the organizational plaintiffs, that is not sufficient at this juncture to establish that strict scrutiny applies. *See Crawford*, 553 U.S. at 206 (J. Scalia, concurring) (nothing that when determining whether strict scrutiny applies, the Court has looked at the burden on voters "categorically and di not consider the peculiar circumstances of individual voters or candidates") (citations omitted).

This finding does not end the analysis, however. The plaintiffs have shown that satisfying the witness requirement presents some risk of COVID-19 exposure to voters who do not regularly come into contact with at least two adults simultaneously, even if these voters follow social-distancing guidelines. *See* doc. 16-4 at 4–5, 8. And, this burden is not "exceedingly light" as the defendants suggest. *See* doc. 36 at 22.[20] Moreover, even if the requirement imposes only a

---

[20] The defendants also assert that the witness requirement does not impose a severe burden because "[m]any voters will be able to take advantage of the ability to have documents notarized over videoconferencing." Doc. 36 at 26. But videoconferencing is not free. It requires internet access at a minimum, which is a service that may be an unaffordable luxury for many. Moreover, a notary is entitled to a $5.00 fee for notarizing a document. Ala. Code § 36-20-74. The right to vote "cannot be made to depend on an individual's financial resources," *Johnson v. Governor of State of Fla*, 405 F.3d 1214, 1216 n.1 (11th Cir. 2005), and "'a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the . . . payment of any fee an electoral standard,'" *Jones v. Governor of Fla.*, 950 F.3d 795, 821 (11th Cir. 2020) (quoting *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 667-68 (1966)). Therefore, the defendants cannot rely upon the option to have an affidavit notarized by videoconferencing, even

slight burden on the right to vote, this burden "must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (citation omitted).  Thus, the court turns to the "precise interests put forward by the State as justifications for the burden imposed by its rule . . . ." *Burdick*, 504 U.S. at 434 (citation omitted).

b.

According to Alabama law, the witness requirement "goes to the integrity and sanctity of the ballot and election."  Ala. Code § 17-11-10(c).  The defendants contend that requiring witnesses helps prevent voter fraud by ensuring that the voter completing the ballot is the person identified on the ballot.  Doc. 36 at 26.  Although voter fraud, including absentee voter fraud, is not common,[21] Alabama has a legitimate and strong interest in preventing such fraud.  *Lee*, 915 F.3d at 1322 (citing *Common Cause*, 554 F.3d at 1353-54); *see also Crawford*, 553 U.S. at 196.  But, while the state's determination that the witness requirement helps deter fraud may be reasonable, the *Anderson-Burdick* balancing test still requires the court to "'determine the legitimacy and strength of [] [the State's] interests,' while also considering 'the extent to which those interests make it necessary to burden the

---

for persons who can afford internet service, to establish that the witness requirement does not burden the right to vote.

[21] *See* doc. 16-46 at 4–7; *Crawford*, 553 U.S. at 194 ("There is no evidence of extensive fraud in U.S. elections or of multiple voting, but both occur, and it could affect the outcome of a close election.") (citation omitted).

Plaintiff[s'] rights.'"  *Stein v. Ala. Sec'y of State*, 774 F.3d 689, 694 (11th Cir. 2014) (quoting *Anderson*, 460 U.S. at 789).

As to those issues, the plaintiffs contend that the witness requirement is not necessary because it does not protect the integrity of an absentee ballot in a meaningful way.  The plaintiffs have a point.  First of all, the substance of the witnesses' role in helping to prevent voter fraud is underwhelming.  The witness certifies only that they watched the individual sign the affidavit envelope.  *See* Ala. Code 17-11-7(b).  The witness does not even attest that the voter is who she says she is.  For this reason, as the defendants point out, doc. 34-1 at 20, the witness could be a total stranger, such as a mail or grocery delivery person.  Nor do the witnesses have to watch the voter complete the ballot, presumably to preserve the voter's right to a secret ballot.  Thus, all that the witnesses certify is that they watched this person—who may or may not be known to them, and who may or may not be the same person who completed the ballot—sign the affidavit.  This is hardly a foolproof fraud prevention measure.

The plaintiffs also assert that the requirement is not effective because witnesses do not have to identify themselves by legibly printing their names, and election officials do not confirm the identity or age of the witnesses.  Doc. 20-1 at 26 (citing Ala. Code §§ 17-11-7; 17-11-9; 17-11-10).  But, while Alabama does not expressly require witnesses to print legibly, the state requires witnesses to print their names and address after signing an absentee voter affidavit.  *See* Ala. Code

§ 17-11-7(b). In theory, the state can use this information to confirm the identify or age of the witnesses if necessary in a potential election contest or investigation of voter fraud. Additionally, whatever the requirement's practical value, it could help to increase the perception of the absentee ballot's legitimacy.[22] In the end, the effectiveness of the witness requirement in preventing fraud may be limited, but it is not meaningless.

Next, the plaintiffs argue that the witness requirement is not necessary to help prevent voter fraud because other laws sufficiently protect election integrity. Doc. 20-1 at 26–27. Indeed, under relevant Alabama law, a voter casting an absentee ballot must complete an application containing "sufficient information to identify the applicant," including either the applicant's driver's license number or the last four digits of the applicant's social security number. Ala. Code § 17-11-4; doc. 16-46 at 19. Furthermore, with certain limited exceptions, a voter must submit a copy of his or her photo ID with an absentee ballot application.[23] Doc. 16-46 at 19. Finally, the affidavit submitted with absentee ballots requires absentee voters to swear that the information in the affidavit is true, and, as printed

---

[22] *See Crawford*, 553 U.S. at 197 (finding that a state has an interest in safeguarding voter confidence and noting that the "electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters") (citation omitted).

[23] To be sure, the plaintiffs seek to enjoin the photo ID requirement. But the plaintiffs would enjoin the requirement only for those voters who are 65 or older or disabled, who are not already entitled to a waiver of the requirement under the state's existing exemption, and who feel it is impossible or unreasonable to comply with the requirement because of COVID-19. *See* docs. 15 at 3; 20-1 at 34. For everyone else, the photo ID requirement would still apply and would still serve as a fraud deterrent.

on the absentee ballot applications, falsifying absentee ballot applications or verification documents is a felony.  Ala. Code §§ 17-11-7; 17-17-24(a); doc. 16-46 at 19.

The defendants do not dispute that these laws and requirements provide an effective deterrent to voter fraud.  *See* doc. 36.  In fact, Secretary Merrill has acknowledged that a bill proposing to eliminate the witness requirement for absentee ballots and add a photo ID requirement would strengthen absentee voting laws in Alabama.  *See* doc. 16-46 at 23–24.[24]  In light of the state's current photo ID requirement for absentee voter applications—which will remain in place for most absentee voters, *see* note 25, *supra*—Secretary Merrill's statement undermines the legitimacy of the State's interest in maintaining the witness requirement to prevent fraud.  In addition, the defendants' acknowledgement that persons who are essentially unknown to a voter, such as a "mail delivery person, grocery or food delivery person, police officer or sheriff's deputy," can serve as witnesses, doc. 34-1 at 20, also undermines the legitimacy of the witness requirement as an effective means of deterring fraud.  Moreover, as the Western District of Virginia recently observed, "[f]or the fraudster who would dare to sign

---

[24] The bill, introduced by state Senator Rodger Smitherman, would have eliminated the requirement that voters give a reason to vote absentee and the witness requirement for absentee voters, and would have added a requirement that absentee voters include a copy of a photo ID with their application for an absentee ballot.  Doc. 16-46 at 23.  According to an article about the bill, Secretary Merrill's office suggested that Sen. Smitherman propose the changes in the absentee ballot law, and Secretary Merrill "said he believed it would strengthen the absentee voting law."  *Id.* at 23–24.

the name of another qualified voter at the risk of being charged with [a] felon[y] [], writing out an illegible scrawl on an envelope to satisfy the witness requirement would seem to present little to no additional obstacle—at least on the record before the [c]ourt." *League of Women Voters of Va. v. Va. State Bd. of Elections*, 2020 WL 2158249, at *9 (W.D. Va. May 5, 2020). While the state has a legitimate interest in preventing voter fraud, based on the record before the court, as it relates to the witness signature requirement, that interest does not necessitate the burdens imposed by the witness requirement during the COVID-19 pandemic, especially in light of other laws designed to prevent voter fraud in Alabama.

As a result, because some voters at risk of severe complications from COVID-19 who do not regularly come into contact with at least two adults simultaneously will likely be dissuaded from voting due to the health risks associated with complying with the witness requirement and the steps necessary to mitigate those risks, the plaintiffs are likely to show that the burdens imposed on those voters outweigh the state's interest in enforcing the witness requirement. Thus, on the record before the court, the plaintiffs have shown a likelihood of success on the merits of their claim that the witness requirement is unconstitutional as to vulnerable voters who cannot safely satisfy the requirement in light of the COVID-19 pandemic.

2.

With exceptions for voters entitled to vote absentee under federal law, including the Voting Accessibility for the Elderly and Handicapped Act, Alabama requires absentee voters to provide a copy of their photo identification with their absentee ballot application and certain absentee ballots.[25]  Ala. Code §§ 17-9-30(b), (d); 17-11-9.  The plaintiffs assert that the photo ID requirement is unconstitutional as applied to People First's members, Porter, Thompson, and similarly-situated elderly or disabled voters in the COVID-19 pandemic.  Doc. 1 at 44.  The plaintiffs seek an order enjoining enforcement of the photo ID requirement, as to those voters.  Docs. 15 at 3; 20-1 at 9.

a.

First, the court must determine whether the photo ID requirement imposes a burden on the right to vote that is severe enough to warrant strict scrutiny. According to the plaintiffs, Alabama's photo ID requirement presents a severe burden on elderly and disabled voters who are most vulnerable to COVID-19 because complying with the requirement could require those voters to leave their

---

[25] Alabama interprets the Voting Accessibility for the Elderly and Handicapped Act to exempt from the photo ID requirement any voter who is over the age of 65 or has a disability and who is "unable to access his or her assigned polling place due to a neurological, musculoskeletal, respiratory (including speech organs), cardiovascular, or other life-altering disorder that affects the voter's ability to perform manual tasks, stand for any length of time, walk unassisted, see, hear, or speak . . . ."  *See* Ala. Admin. Code R. 820-2-9-.12(3); doc. 16-46 at 19.  The court notes that any voter over the age of 65 or with a disability who has a symptomatic case of COVID-19, *i.e.*, a respiratory disorder, would almost certainly qualify for this exception to the photo ID requirement.

homes and risk exposure to the virus.[26]   Doc. 20-1 at 32.   The plaintiffs point to

Thompson and some members of People First as examples of vulnerable voters

who cannot make copies of their IDs at home, and therefore must risk exposure to

the virus to obtain a copy of their ID.   Docs. 20-1 at 18–19; 32.[27]   Indeed, Secretary

Merrill has indicated that voters without a printer at home may need to go to

"Walmart or Kinko's" to make a copy of their IDs in order to apply for an absentee

ballot.  *See* doc. 16-33 at 3.

The defendants contend that the photo ID requirement does not present a

severe burden to Thompson and People First's members because there is no

evidence that any of these plaintiffs lack access to a person who could help them

obtain a copy of their ID.[28]   Doc. 36 at 25.   True enough.   Yet, there is no

guarantee that each of those plaintiffs will be able to find a person to help make a

copy for them, and requiring a vulnerable voter to find a person willing to help at

---

[26] The plaintiffs do not cite any evidence regarding the number of voters, or any specific voters, who lack a photo ID, *see* doc. 20-1, and they base their challenge to the photo ID requirement primarily on the burden certain voters may face to obtain a copy of their photo IDs, *see id.* at 32-34; doc. 46.   As evidence of that burden, plaintiffs state that 200,000 households in Alabama lack computers needed to copy a photo ID.   Doc. 20-1 at 33.   However, this fact does not show how many of those households include elderly and disabled voters who wish to vote absentee.

[27] The plaintiffs also contend that complying with the photo ID requirement severely burdens Porter's right to vote.   Doc. 20-1 at 32.   But the record before the court reveals that Porter currently has the capability to copy his ID at home, and he is concerned only about his ability to afford the ink and paper needed to print a copy of his ID for the July 14 and November elections. Doc. 16-45 at 14–15.   Because the record contains no indication that Porter could not print copies of his ID now in anticipation of the elections, the plaintiffs have not shown that the photo ID requirement imposes a severe burden on Porter's right to vote.

[28] The defendants also contend that the photo ID requirement is not a severe burden because 87% of Alabama households have a computer in the home.   Doc. 36 at 25.   This statistic gives no meaningful information about the burden imposed by the requirement because making a copy of a photo ID requires a printer or copier in addition to a computer.

the risk of potential exposure to COVID-19 is itself a burden.  This burden is not sufficient, however, to establish that strict scrutiny applies.  *See Crawford*, 553 U.S. at 206 (J. Scalia, concurring).[29]   Still, even if the burden is not severe, "relevant and legitimate interests of sufficient weight" must justify the burden imposed on vulnerable voters by the photo ID law.  *Lee*, 915 F.3d at 1318–19 (citation omitted).

b.

As with the witness requirement, the defendants assert that the photo ID requirement serves the State's interests in deterring voter fraud and safeguarding voter confidence.  Doc. 36 at 23; *see also* doc. 34-5 at 3.  It is settled law that he state has a legitimate interest in preventing voter fraud, and that a photo ID requirement advances that interest. *Crawford*, 553 U.S. at 196–97; *Common Cause*, 554 F.3d at 1353–54; *see also Greater Birmingham Ministries v. Merrill*, 284 F. Supp. 3d 1253, 1277 (N.D. Ala. 2018).  That said, the plaintiffs do not ask the court to enjoin the photo ID requirement for all absentee voters.  Instead, they ask the court to enjoin the photo ID requirement only for those voters who are 65

---

[29] The plaintiffs contend that Judge Eleanor Ross's well-reasoned decision in *Georgia Coalition for the People's Agenda v. Kemp*, 347 F. Supp. 3d 1251 (N.D. Ga. 2018), supports a finding that strict scrutiny applies when the effects of a facially non-discriminatory election provision have a disparate impact on a protected class of voters.  *See* doc. 20-1 at 22.  The court is not persuaded because the defendants in that case did not respond to the plaintiffs' arguments on disparate impact, and *Kemp* does not cite any authority applying strict scrutiny review because a facially non-discriminatory election law has a disparate impact on a protected class of voters.  *See* 347 F. Supp. 3d at 1264.

46

or older or disabled, and who feel it is impossible or unreasonable to comply with the photo ID requirement because of COVID-19.

The weightiness of the state's interest in preserving the photo ID requirement for this limited subset of voters is less clear. As previously noted, the state already provides an exception to the photo ID requirement for voters who are 65 or older or disabled, and who are unable to access the polls due to a physical infirmity. Ala. Admin. Code R. 820-2-9-.12(3). Effectively, the plaintiffs merely ask the state to construe the last part of the existing exception to apply to those who are afraid to go to the polls because of COVID-19. Doc. 20-1 at 32–34. The state has not explained why, consistent with its interest in preventing voter fraud, it can exempt voters who are 65 or older or disabled and cannot access the polls, but it cannot exempt voters who are 65 or older or disabled and cannot safely obtain a copy of their photo ID because of the pandemic. *See* doc. 36.

Furthermore, there are other measures to prevent voter fraud. The state can establish the identity of an absentee voter through the existing requirement that a voter provide his driver's license number or the last four digits of his social security number with an absentee ballot application. *See* Ala. Code § 17-11-4; doc. 16-46 at 19. This is information that is generally available only to the individual himself, and it is information the state already requires and could verify. To the extent that a fraudster could get her hands on this information to submit a fraudulent absentee ballot, it is doubtful that insisting on the submission of a copy

47

of a photo ID would deter that individual.  In sum, based on the record before the court, the state's interest in requiring this limited class of voters to comply with the photo ID requirement is fairly minimal.

Weighed against this interest, the burden on that group of voters is significant.  The defendants do not dispute the plaintiffs' evidence that some members of People First cannot make copies at home and cannot safely leave their homes during the COVID-19 pandemic because of their heightened risk of complications from this virus.  *See* docs. 16-45 at 25; 26.  The defendants instead suggest that those members and other voters in the same predicament could find others to make a copy for them.  Even assuming that is a viable option for all of these voters, finding a willing individual to assume the risk of exposure to COVID-19 is itself a burden, and does not completely eliminate the risk of exposure to the voter.  Thus, the photo ID requirement could present some elderly and disabled voters who wish to vote absentee with the burden of choosing between exercising their right to vote and protecting themselves from the virus, which could dissuade them from voting.

"[E]ven one disenfranchised voter . . . is too many."  *Lee*, 915 F.3d at 1321 (citation omitted).  At this juncture, the plaintiffs have shown that the state's interest in enforcing the photo ID requirement does not justify the burden on voters who are 65 or older or disabled and who cannot safely obtain a copy of their photo

ID.   Thus, the plaintiffs have shown a substantial likelihood of success on this claim.[30]

3.

The CDC recommends that election officials encourage curbside voting for eligible voters if allowed in a jurisdiction to minimize the risk of COVID-19 exposure.   Doc. 16-2 at 2.   The plaintiffs assert that the individual plaintiffs and People First's members would utilize curbside voting if that option was available to them.   Docs. 1 at 9–11; 16-45 at 5, 9, 14, 19.   Although Alabama law does not expressly prohibit curbside voting, *see* docs. 20-1 at 16; 36 at 26, Secretary Merrill bars local elections officials from utilizing curbside voting to assist voters with disabilities, *see* doc. 16-41 at 15–16.

According to the plaintiffs, some voters with disabilities, including some members of People First, must vote in person, rather than by absentee ballot, in order to receive assistance at the polls, and curbside voting would minimize the risk of exposure to COVID-19 for those voters.   Doc. 20-1 at 35–36.   The plaintiffs contend that Secretary Merrill's prohibition on curbside voting may deprive those voters of their right to vote by forcing them to choose between foregoing their right to vote and risking their health by going inside a polling place.   Doc. 1 at 44–45.

---

[30] Even if the defendants are correct that the plaintiffs have not shown a likelihood of success on their constitutional challenge to the photo ID requirement as applied to voters who are 65 or older or disabled and who cannot comply with the requirement during the COVID-19 pandemic, the individual plaintiffs and similarly-situated disabled voters are still entitled to relief from the requirement under the ADA claim.   *See* part III.B, *infra*.

The defendants do not directly dispute that contention, but instead state that "every voter in Alabama can vote absentee." *See* doc. 36 at 27. And, the defendants contend that "mandating curbside voting raises a host of practical concerns," including how the state could find enough poll workers to cover inside and curbside voting at almost 2,000 polling places, control lines of traffic at the polls, and preserve the privacy of ballots. *Id.* at 36 at 9, 26–27. But, this contention misunderstands the plaintiffs' claim, and the defendants' concerns do not address the issue at hand.

The plaintiffs seek an order preventing the state from prohibiting local election officials from providing curbside voting—not an order requiring the state to provide curbside voting. Docs. 1; 20-1 at 35–37. The defendants identify no fraud-prevention interest that justifies prohibiting local election officials from providing curbside voting that complies with all relevant election laws. *See* doc. 36. And, the defendants do not dispute that other states permit curbside voting, or present evidence indicating that curbside voting that complies with state election law is prone to fraud. *See* docs. 16-42 at 24; 16-43 at 5, 9; 36. The defendants suggest that curbside voting would conflict with laws requiring voters to sign a poll list and ballots to be kept secret. *See* docs. 36 at 27; 34-1 at 21. But, contrary to the defendants suggestion otherwise, *see* doc. 34-1 at 21, Alabama law expressly allows an election official to write a voter's name on a poll list if the voter "because of a physical disability, is unable to write his or her own name," Ala.

Code § 17-9-11, and provides that voters who wish to have assistance voting may receive it from poll workers, Ala. Code § 17-9-13.  Because the defendants have not proffered any legitimate justification for the burden imposed by Secretary Merrill's prohibition on curbside voting, the plaintiffs have shown a substantial likelihood of success on their claim that the prohibition violates the Constitution.

## B.

Next, the court determines whether the plaintiffs have shown a substantial likelihood of success on their claims under the ADA.  Congress enacted the ADA to address the "pervasive unequal treatment" of people living with disabilities. *Nat'l Ass'n of the Deaf v. Fla.*, 945 F.3d 1339, 1347 (11th Cir. 2020) (citing *Tennessee v. Lane*, 541 U.S. 509, 517 (2004)).  The ADA serves as a safeguard to ensure the dignity of these people in many areas of public life, including voting. 42 U.S.C. § 12101(a)(1)–(3).  *See also Am. Ass'n of People with Disabilities v. Harris*, 647 F.3d 1093, 1107 (11th Cir. 2011) ("[D]isabled citizens must be able to participate in the [State]'s voting program.").  Because of this lofty purpose, the ADA "must be broadly construed." *Kornblau v. Dade County*, 86 F.3d 193, 194 (1996).

To state a claim under Title II, a plaintiff must demonstrate: "(1) that [s]he is a 'qualified individual with a disability;' (2) that [s]he was 'excluded from participation in or . . . denied the benefits of the services, programs, or activities of a public entity' or otherwise 'discriminated [against] by such entity;' (3) 'by reason

51

of such disability.'"  *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001) (quoting 42 U.S.C. § 12132).  A "public entity" is "any State or local government [or] any department, agency . . . or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1).  The final clause of § 12132 "is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context."  *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1084–85 (11th Cir. 2007).

A plaintiff is a qualified individual if she "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity . . . with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services."  *United States v. Georgia*, 546 U.S. 151, 153–54 (2006) (quoting 42 U.S.C. § 12131(2)).  While "rules, policies, [and] practices" may be subject to reasonable modification, "essential eligibility requirements" are not.  *Mary Jo C. v. New York State & Local Ret. Sys.*, 707 F.3d 144, 159 (2d Cir. 2013) (citing 42 U.S.C. § 12131(2)).[31]  When

---

[31] The court finds the analysis in *Mary Jo C.* instructive.  There, the Second Circuit construed the "essential eligibility requirement" language found in 42 U.S.C. § 12131(2) "distinguish[ed] between two categories of requirement: (1) rules, policies, or practices . . . and (2) essential eligibility requirements."  *Mary Jo C.*, 707 F.3d at 157.  The Circuit acknowledged the interplay between the essential eligibility requirement inquiry at the prima facie stage and the later assessment of whether a proposed modification fundamentally alters the challenged provision: "[t]he regulations indicate that 'essential eligibility requirements' are those requirements without which the 'nature' of the program would be 'fundamentally alter[ed].'"  *Id.* at 158 (quoting 28 C.F.R. § 35.130(b)(7)).  *See also Washington v. Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 850 (7th Cir. 1999) (finding the essentialness inquiry should be "whether waiver of the rule . . . would be so at odds with the purposes behind the rule that it would be a fundamental and unreasonable change).  Drawing from the Supreme Court's analysis in *PGA Tour, Inc. v. Martin*,

an individual cannot meet an essential eligibility requirement, "the only possible accommodation is to waive the essential requirement itself . . . [but] [w]aiving an essential eligibility standard would constitute a fundamental alteration in the nature of the . . . program [at issue]." *Pottgen v. Missouri State High School Activities Ass'n*, 40 F.3d 926, 930 (8th Cir.1994).[32] Therefore, a plaintiff who does not meet an essential eligibility requirement is not qualified to state a claim under the ADA. The question then becomes: is the requirement essential for eligibility in the program?   "[W]hether an eligibility requirement is essential is determined by consulting the importance of the requirement to the program in question." *Mary Jo C.*, 707 F.3d at 159.[33]   A public entity cannot merely state that the discriminatory

---

532 U.S. 661 (2001), the Circuit read the ADA to require analysis of "the importance of an eligibility requirement for a public program or benefit, rather than to defer automatically to whatever "formal legal eligibility requirements" may exist, no matter how unimportant for the program in question they may be." *Id.* at 159.

[32] The Eighth Circuit in *Pottgen* considered Title III of the ADA.   Courts have read the requirements of Title II and Title III as being consistent with each other:

> The House Committee on Education and Labor indicated that Title II's prohibitions are to be "identical to those set out in the applicable provisions of titles I and III of this legislation."   H.R.Rep. No. 101–485(II), at 84 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 367.   More specifically, the House Report on the ADA states that the prohibitions of discrimination on the basis of association from Titles I and III should be incorporated in the regulations implementing Title II.   *Id.*; H.R.Rep. No. 485(III), at 51 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 474; *see also Kinney v. Yerusalim*, 9 F.3d 1067, 1073 n.6 (3d Cir. 1993) (legislative history indicates that Titles II and III are to be read consistently).

*Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997*), recognized as superseded on other grounds by Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001).   *See Mary Jo C.*, 707 F.3d at 159 (finding cases interpreting Title III to be instructive in Title II analysis).   "Congress clearly did not intend to give public entities more latitude than private parties to discriminate against the disabled." *Theriault v. Flynn*, 162 F.3d 46, 53 n.10 (1st Cir. 1998).

[33] *See also Pottgen*, 40 F.3d at 930 ("[T]o determine whether [the plaintiff] is a 'qualified individual' under [Title II of] the ADA, we must first determine whether the [challenged

requirement is essential to the fundamental nature of the activity at issue—it must provide evidence that the procedural requirement is necessary to the substantive purpose undergirding the requirement. *See Schaw v. Habitat for Humanity*, 938 F.3d 1259, 1266–67 (11th Cir. 2019) ("Whether a particular aspect of an activity is 'essential' will turn on the facts of the case.").[34]

Moving beyond the qualification stage, exclusions under Title II need not be absolute: a public entity violates Title II not just when "a disabled person is completely prevented from enjoying a service, program, or activity," but rather when such an offering is not "readily accessible." *Shotz*, 256 F.3d at 1080 (citing 28 C.F.R. § 35.150).[35]  However, mere difficulty in accessing a benefit is not, by

---

provision] is an essential eligibility requirement by reviewing the importance of the requirement to the . . . program [at issue].")

[34] Though *Schaw* addressed the Fair Housing Amendments Act, the Eleventh Circuit acknowledged that it drew its reasonable accommodation analysis from precedent concerning the ADA. *See* 938 F.3d at 1265 n.2 ("Congress imported the reasonable-accommodation concept from case law interpreting the Americans with Disabilities Act and the Rehabilitation Act . . . Because we have applied these reasonable-accommodation requirements on numerous occasions, we can look to case law under the ADA and RA for guidance on what is reasonable under the Fair Housing Amendments Act.") (citations omitted).

[35] *See* H.R. REP. 101-485, 105, 1990 U.S.C.C.A.N. 303, 388 ("It would also be a violation of this title to adopt policies which impose additional requirements or burdens upon people with disabilities that are not applied to other persons . . In addition, this subsection prohibits the imposition of criteria that "tend to" screen out an individual with a disability. This concept . . . makes it discriminatory to impose policies or criteria that, while not creating a direct bar to individuals with disabilities, diminish such individuals' chances of participation."); *see also Bircoll*, 480 F.3d at 1082 n.13 (11th Cir. 2007) ("Because [the defendant] has not challenged the validity of the DOJ's regulations for Title II, we likewise interpret and apply the regulations but with the caveat that we do not here determine their validity."); *Wisconsin Community Services, Inc. v. City of Milwaukee*, 465 F.3d 737, 751 n.10 (7th Cir. 2006) ("The Supreme Court never has decided whether these regulations are entitled to the degree of deference described in *Chevron, U.S.A. Inc. v. National Resource Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed. 2d 694 (1984).  Nevertheless, the Court has said that, '[b]ecause the Department of Justice is the agency directed by Congress to issue regulations

itself, a violation of the ADA.  *See Bircoll*, 480 F.3d at 1088.  Instead, a plaintiff must show that the failure to accommodate created an injury.  *Id.*

If a plaintiff makes a prima facie case of discrimination, she must then propose a reasonable modification to the challenged requirement or provision. This remedy should be a "proportionate and reasonable modification of a service that is already provided, and it [should] not change the nature of the service." *Nat'l Ass'n of the Deaf v. Fla.*, 945 F.3d 1339, 1351 (11th Cir. 2020).  Certain public offerings cannot be made meaningfully accessible, while others would demand prohibitively high cost and effort.  Accordingly, a successful ADA claim requires plaintiffs to "propose a reasonable modification to the challenged public program that will allow them the meaningful access they seek."  *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016).  To show the accommodation sought is reasonable, "a plaintiff need only demonstrate a facially reasonable request—or one that seems reasonable in 'the run of cases.'"  *Schaw*, 938 F.3d at 1267.  This burden is "not a heavy one . . . [i]t is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits."  *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003).  If the plaintiffs can make this showing, the burden of non-persuasion shifts to the defendants.  *Schaw*, 938 F.3d at 1267.

---

implementing Title II ... its views warrant respect.' *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597–98 (1999) (internal citations omitted).").

A public entity need not "employ any and all means to make judicial services accessible to persons with disabilities." *Lane*, 541 U.S. at 531–32. Rather, the entity must make "reasonable modifications that would not fundamentally alter the nature of the service provided . . . [or] impose an undue financial or administrative burden." *Id*. (citations omitted). A "public entity has the burden of proving that compliance with this subpart would result in a 'fundamental' alteration." *Hindel v. Husted*, 875 F.3d 344, 348 (6th Cir. 2017) (citing 28 C.F.R. § 35.164); *see also Schaw*, 938 F.3d at 1267. Without evidence that the proposed modification is "unreasonable or incompatible" with the state's program, a defendant cannot succeed in the affirmative defense. *Hindel*, 875 F.3d at 348. The reasonable-modification inquiry in Title II–ADA cases is "a highly fact-specific inquiry [and] terms like reasonable are relative to the particular circumstances of the case." *Bircoll*, 480 F.3d at 1085. This inquiry entails assessing whether the proposed modification "would eliminate an essential aspect of the . . . program or simply inconvenience it, keeping in mind the basic purpose of the . . . program . . . , and weighing the benefits to the plaintiff against the burdens on the defendant." *Schaw*, 938 F.3d at 1267. "A modification that provides an exception to a peripheral . . . rule without impairing its purpose cannot be said to 'fundamentally alter' the [activity]." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 690 (2001).

The plaintiffs contend that each of the challenged provisions violate the ADA and submit recommendations for purportedly reasonable modifications. Docs. 1; 20-1.  The defendants dispute the plaintiffs' prima facie case and assert that the challenged provisions are essential eligibility requirements for participation in Alabama elections.  Doc. 36.  The court addresses the parties' respective contentions regarding each of these provisions in turn.

1.

As stated previously, Alabama law requires that all absentee ballots include an affidavit signed by the voter and witnessed by a notary public or two adult witnesses.  Ala. Code §§ 17-11-7; 17-11-9; 17-11-10.  The plaintiffs claim that this provision forces voters who live alone or with only one other adult and who wish to cast an absentee ballot to choose between adhering to health guidelines regarding social distancing and voting in upcoming elections.  Docs. 1 at 44; 20-1 at 22–23.  They propose modifying the witness requirement to allow voters to submit self-executed affidavits affirming their identity.  Doc. 20-1 at 28, 31.

The first part of the analysis is to determine whether the plaintiffs make out a prima facie case that the witness requirement violates the ADA.  To support their burden, the individual plaintiffs assert that they are "eligible to vote and would do so with reasonable accommodation[, but] [a]bsent a modification" to the witness requirement, they will be "prevented from voting and completely denied their

'right to participate in the democratic process.'"   Doc. 20-1 at 31 (citing *Nat'l Ass'n of the Deaf*, 945 F.3d at 1349).

The individual plaintiffs' eligibility is not in contention.   All four are registered voters in Alabama and plan to vote in the 2020 elections.   Doc. 16-45 at 2–20.   And, all four have ADA-eligible disabilities that render them highly vulnerable to COVID-19, and Clopton, Porter, and Thompson are eligible to vote in the runoff election on July 14, 2020.   *Id.*

Each of the individual plaintiffs usually votes in person, but each intends to vote absentee in 2020 to avoid exposure to COVID-19.   *Id.*   All four contend that the witness requirement serves to exclude them from voting absentee based on their disabilities because they live alone or with only one other person and do not generally interact with at least two adults simultaneously.   In addition, the organizational plaintiffs contend they have members who live alone and will not be able to comply with the witness requirement without risking their health because doing so would require person-to-person contact in contravention of current health guidelines.   Doc. 16-45 at 24–26, 31.

At this stage, the defendants do not dispute "that the individual Plaintiffs' allegations each meet the ADA's definition of disability."   Doc. 36 at 22 n.26. Their quarrels with the plaintiffs' prima facie case are three-fold: (1) that the plaintiffs are not "qualified individuals because the witness requirement is an essential eligibility requirement of having an absentee ballot," doc. 36 at 28, (2)

that the plaintiffs are not excluded because the witness requirement does not present a "concrete barrier," *id*. at 29, and (3) that any exclusion the plaintiffs face is not a result of their disabilities, but rather "stem[s] from [their] own choices," *id*. The court respectfully disagrees with the defendants' second and third contentions.[36]  However, the court agrees that at this stage, the plaintiffs have not shown a likelihood of success that they can meet the essential eligibility requirements of the Alabama voting regime.

The defendants assert that the witness requirement is an essential eligibility requirement because it "goes to the integrity and sanctity of the ballot and election." *Id*. (citing Ala. Code § 17-11-10(b)).[37]  The plaintiffs counter that the witness requirement "does not meaningfully protect the integrity of the absentee ballot," noting that (1) the current regulations do little to ensure the integrity of the requirement, and (2) several other provisions of Alabama law sufficiently protect

---

[36] *See* part III.B.a.2, *supra*.

[37] The relevant section reads:

> No poll worker or other election official shall open an affidavit envelope if the voter's affidavit signature or mark is not witnessed by the signatures of two witnesses or a notary public, or other officer, including a military commissioned officer, authorized to acknowledge oaths, and no ballot envelope or ballot therein may be removed or counted.  The provision for witnessing of the voter's affidavit signature or mark in Section 17-11-7 goes to the integrity and sanctity of the ballot and election.  No court or other election tribunal shall allow the counting of an absentee ballot with respect to which the voter's affidavit signature or mark is not witnessed by the signatures of two witnesses 18 years of age or older or a notary public, or other officer, including a military commissioned officer, authorized to acknowledge oaths, prior to being delivered or mailed to the absentee election manager.

Ala. Code § 17-11-10.

election integrity.  Doc. 20-1 at 26–28.  But even if the witness requirement is functionally useless in securing the "integrity and sanctity of the ballot and election," Ala. Code § 17-11-10(b), and other extant measures may be sufficient to confirm absentee voter identity, *see* Ala. Code §§ 17-11-4; 17-11-7; 17-17-24(a); doc. 16-46 at 18–20, the court cannot find the waiver requirement nonessential at this stage.  The plaintiffs are generally correct that the defendants' bald assertion of the requirement's essential nature is insufficient to block the plaintiffs' claim. Doc. 46 at 8.  The defendants are not alone in asserting this point, however; both the Alabama legislature and the Alabama Supreme Court have clearly indicated that the requirement is essential under Alabama law.[38]  *See Eubanks v. Hale*, 752 So. 2d 1113, 1157–58 (Ala. 1999) (citing Ala. Code § 17-11-10); *Compare Mary Jo C.*, 707 F.3d at 160 (finding the challenged provision non-essential where the state regularly granted waivers and extensions of the provision).  Because the witness requirement is deemed a condition precedent to eligibility under state law, and essential eligibility requirements are not subject to reasonable modifications, the plaintiffs cannot state an ADA claim against the witness requirement based on the current record.

---

[38] While the Alabama Supreme Court has recognized that "substantial compliance with the essential requirements of the absentee voting law is sufficient . . . so long [the] irregularities in the voting process do not adversely affect the sanctity of the ballot and the integrity of the election," it has also held that the state intended the witness requirement to be an essential eligibility requirement. *Eubanks v. Hale*, 752 So. 2d 1113, 1157–58 (Ala. 1999) ("An irregularity with regard to that requirement, therefore, would require that the ballot be excluded.").

2.

Alabama requires citizens voting absentee to submit a paper copy of their photo ID along with their absentee ballot application and certain mail-in ballots. Ala. Code §§ 17-9-30(b), (d); 17-11-9.[39]   By Secretary Merrill's own admission, voters who lack the means to photocopy their IDs at home will be forced to leave their homes to secure a copy from an outside printing vendor.  Doc. 16-33 at 3. The plaintiffs propose that the defendants expand their interpretation of the photo ID exemption to include those who are at heightened risk from COVID-19.  Doc. 20-1 at 15.  As the individual plaintiffs put it, because they are protected by the ADA, the defendants "must interpret the photo ID requirement in a manner that protects their right to vote."  Doc. 20-1 at 35.[40]

Based on the current record, the plaintiffs state a prima facie case of disability discrimination relating to the photo ID requirement as applied in the COVID-19 pandemic.  The defendants do not dispute that the individual plaintiffs are disabled, doc. 36 at 22 n.26, nor do they make a serious effort to demonstrate

---

[39] As previously noted, Alabama provides exceptions for voters entitled to vote absentee under federal law, including the Voting Accessibility for the Elderly and Handicapped Act.  Ala. Code §§ 17-9-30(b), (d); 17-11-9.

[40] The defendants assert that because the plaintiffs employ only one sentence to specifically assert their ADA claim at to the photo ID requirement, *see* doc. 20-1 at 35, the plaintiffs fail to meet their burden of demonstrating that they are likely to succeed on the merits of this claim. Doc. 36 at 29 n.28.  The court disagrees.  It is true that the plaintiffs must "clearly carr[y] the burden of persuasion" that they are likely to succeed on the merits of their photo ID claim. *United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir. 1983).  But while the plaintiffs do not devote a separate section of their brief to this claim, they make the requisite prima facie case and propose a reasonable modification through their broader discussion of the requirement.

that the photo ID requirement is an essential eligibility requirement,[41] *id.* at 31 n.35.  More importantly, Alabama does not designate the photo ID requirement as essential, allowing the individual plaintiffs a clearer path to establishing their qualifications.  *See generally* Ala. Code § 17-9-30.

Turning next to the "excluded . . . by reason of . . . disability" elements of the prima facie case, *see* 42 U.S.C. § 12132, the court finds the plaintiffs succeed here as well.  The defendants again claim that the individual plaintiffs are not excluded because the photo ID requirement does not present a "concrete barrier," doc. 36 at 29, and that any exclusion they face is the result of their "own decisions," *id*.  The court sees no persuasive value in this point.  The Eleventh Circuit has recognized that plaintiffs are excluded when an offering is not "readily accessible."  *Shotz*, 256 F.3d at 1080 (citing 28 C.F.R. § 35.150).  Physical barriers are not the only means by which to impede accessibility.  The plaintiffs have provided evidence that Thompson and some members of People First who are at risk of severe complications from COVID-19 do not have the capability to copy their IDs in their homes.  Docs. 20-1 at 18–19, 32.  As Secretary Merrill has indicated, voters may need to go to "Walmart or Kinko's" to make a copy of their IDs in order to apply for an absentee ballot.  *See* doc. 16-33 at 3.  Alternatively,

---

[41] As explained previously, the prima facie essential eligibility inquiry and the later fundamental alteration analysis overlap.  *See Mary Jo. C.*, 707 F.3d at 158 ("The regulations indicate that 'essential eligibility requirements' are those requirements without which the 'nature' of the program would be 'fundamentally alter[ed].'") (quoting 28 C.F.R. § 35.130(b)(7).  For this reason, the court considers whether the photo ID can reasonably be deemed essential in its discussion of the plaintiffs' proposed modification.

the defendants suggest that the individual plaintiffs could find a person who could help them obtain a copy of their ID. *See* doc. 36 at 25. But this would entail requiring a vulnerable voter to find a person willing to help at the risk of potential exposure to COVID-19. As discussed above, a public entity violates Title II not just when "a disabled person is completely prevented from enjoying a service, program, or activity," but also when such an offering is not "readily accessible." *Shotz*, 256 F.3d at 1080 (citing 28 C.F.R. § 35.150). Although the interplay between the COVID-19 public health emergency and voting requirements is novel, district courts who have considered the issue have found that requiring a voter to risk her health by foregoing social distancing guidelines presents a "nearly insurmountable hurdle." *Libertarian Party of Illinois v. Pritzker*, 2020 WL 1951687, at *4 (N.D. Ill. April 23, 2020). Requiring a voter to ask another person to clear this hurdle on their behalf, even if this request proves successful, could easily dissuade them from voting. Because the photo ID requirement is not readily accessible to the plaintiffs, they meet their burden of demonstrating their exclusion.

The defendants' third contention that the plaintiffs' "difficulties stem from [their] own choices and not from the requirements imposed by Defendants," doc. 36 at 30,[42] is similarly problematic. The defendants assert that "it is [the plaintiffs'] subjective fear of contracting COVID-19—not their disabilities . . . that

---

[42] The defendants expand on this argument in their counterargument to the plaintiffs' witness requirement case. *See* doc. 36 at 30. To the extent that they intended to include these contentions for the photo ID requirement, the court considers them as well.

causes their alleged exclusion." Doc. 36 at 30. To support this contention, the defendants first cite an unpublished Fifth Circuit case finding a Title II claimant was not excluded in the meaning of the ADA because her exclusion "appear[ed] to be, at least in part, a product of [their] own choices." *Id.* (citing *Greer v. Richardson Independent School Dist.*, 472 F. App'x 287, 295 (5th Cir. 2012). In *Greer*, the court dismissed the plaintiff's complaint that her seating location at an entertainment venue was subpar because the plaintiff did not ask to be reseated. *Greer*, 472 F. App'x at 295. In this case, the plaintiffs are presented with the option of braving exposure to an illness from which they are at high risk of severe complications or dying, or foregoing their right to vote. To the extent that the plaintiffs' trepidation to risk their health is a choice, it is not a meaningful one. And, in any event, unlike the *Greer* plaintiff, these plaintiffs are asking to be reseated, *i.e.*, that the defendants waive the requirement.

The defendants next cite to *Clapper v. Amnesty Intern. USA*, 568 U.S. 398 (2013), for the proposition that any injury the plaintiffs suffer due to their subjective fears of COVID-19 are self-inflicted. In that case, the Supreme Court contemplated justiciability questions regarding plaintiffs asserting that the Foreign Intelligence Surveillance Act violated their constitutional rights. *Clapper*, 568 U.S. at 398. As explained in part II, *supra*, the claims presented in this case are

justiciable.  Moreover, the individual plaintiffs' fear of serious complications of contracting COVID-19 are hardly subjective.[43]

Finally, the defendants' implication that the plaintiffs are barred from making a claim against the state because they have already "compromise[ed] the strict isolation they claim prevents them from complying" with the photo ID requirement, *see* doc. 36 at 30, is unavailing.  It is not clear from the record that the plaintiffs have in fact compromised their strict isolation, *see* doc. 16-45 at 8, 18, but even assuming that they had, this purportedly imperfect compliance does not absolve the defendants of ADA violations.  The ADA does not require the plaintiffs to prove that they are completely unable to "enjoy[] a service, program, or activity," but rather that such participation is not "readily accessible."  *Shotz*, 256 F.3d at 1080 (citing 28 C.F.R. § 35.150).  Demanding that the plaintiffs expose themselves to COVID-19 when they otherwise would not impedes their ability to readily access the state's voting program.  That the plaintiffs have some ability to interface with others for medical appointments, grocery runs, and sporadic interactions with their children and grandchildren or in-home care workers, *see*

---

[43] The currently available information from the scientific community establishes an objective basis for the plaintiffs' fear of contracting COVID-19.  Based on their respective ages and disabilities, *see generally* doc. 16-45, each of the individual plaintiffs is highly vulnerable to the virus, doc. 16-4 at 3–4.  Moreover, COVID-19 is "readily spread through respiratory transmission," and touching contaminated surfaces.  *Id.* at 4.  Infected individuals may transmit the disease without showing any symptoms, *id.* at 5, and "the only ways to limit its spread is self-isolation, social distancing, frequent handwashing, and disinfecting surfaces," *id.* at 3–4.  Were the plaintiffs to contract COVID-19, they would be at high risk of dying from the disease.  Their fear is not subjective.

doc. 16-45 at 8, 18, does not permit the defendants to condition the plaintiffs' exercise of their voting rights on violating self-isolation guidelines.

Turning now to the reasonable modification inquiry, the court finds the plaintiffs' proposed modification is facially reasonable. *See Schaw*, 938 F.3d at 1267. The plaintiffs' request is merely to extend an existing exemption to the photo ID requirement to a limited group of voters. *See* doc. 20-1 at 15. The defendants assert that the proposed expansion is "at odds with its purpose to preserve the sanctity and integrity of the ballot and election" and therefore "would be a fundamental alteration to Alabama elections," doc. 36 at 31–32, but they provide no evidence to establish this claim, *see generally id*. This statement alone is insufficient to show that the photo ID requirement is essential and would therefore fundamentally alter Alabama's voting program. *See Schaw*, 938 F.3d at 1267. Having performed a "highly fact-specific" inquiry into the proposed modification, *Bircoll*, 480 F.3d at 1085, the court find that the facts here belie the defendants' assertion. Unlike the witness requirement, the Alabama legislature provides no language indicating the photo ID requirement is essential. *See* Ala. Code § 17-9-30. In fact, the law provides multiple exemptions to the photo ID requirement.[44] Moreover, insofar as the purpose of the photo ID requirement is to

---

[44] *See* Ala. Code § 17-9-30(d) (exempting from the photo ID requirement voters who are eligible to vote absentee pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, the Voting Accessibility for the Elderly and Handicapped Act; or any other federal law); *id*. at § 17-9-30(f) (permitting an individual to vote without a photo ID if two election officials identify her as an eligible voter on the poll list and sign a sworn affidavit to that effect).

"preserve the sanctity and integrity of the ballot and election," doc. 36 at 31–32, other Alabama laws serve this purpose by protecting against voter fraud. For example, as discussed previously, a voter casting an absentee ballot must provide her driver's license number or the last four digits of her social security number in her absentee ballot application. Ala. Code § 17-11-4; doc. 16-46 at 19. Absentee voters also must submit an affidavit identifying themselves and swearing that the information in their affidavit is true. Ala. Code §§ 17-11-7; 17-17-24(a); doc. 16-46 at 19. The defendants do not dispute that these laws provide effective deterrents to voter fraud. *See* doc. 36. Based on these facts, the court finds the plaintiffs' modification does not fundamentally alter the Alabama voting program.[45] Accordingly, the plaintiffs have shown a likelihood of success on the merits of their ADA claim challenging the photo ID requirement.

### 3.

Finally, the plaintiffs contend that Secretary Merrill's prohibition on curbside voting violates the ADA by denying "delivery of services at alternate

---

[45] *See Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1225 (11th Cir. 2008) (allowing short-term recovery homes to operate in multi-family zones was not the "fundamental alteration" that it would in single-family zones). *Compare Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 410 (1979) (requiring a nursing school to waive all clinical requirements for a deaf applicant would fundamentally alter the nature of the nursing program), *with Anderson v. City of Blue Ash*, 798 F.3d 338, 363 (6th Cir. 2015) (allowing a miniature therapy horse to reside in disabled girl's backyard would not necessarily fundamentally alter the nature of single-family neighborhoods). *See also Mary Jo C.*, 707 F.3d 144, 160 (2d Cir. 2013) ("The fact that the State itself waives the deadline in the enumerated circumstances strongly suggests that the filing deadline is not 'essential.'"); *Martin*, 532 U.S. at 685 ("[T]he walking rule is not an indispensable feature of tournament golf either. [The PGA] permits golf carts to be used [by non-disabled golfers] in [several of its tournaments other than the one in question].").

accessible sites."  Doc. 20-1 at 37 (citing 28 C.F.R. § 35.150(b)).  The plaintiffs

state a prima facie case[46] and have proposed a reasonable modification.  As stated

previously, the defendants seem to misunderstand the plaintiffs' case.  *See* doc. 36

at 32.  The plaintiffs are not requesting that the defendants "implement[] curbside

voting at 1,980 voting sites in fewer than 50 days," *id*., but rather they are asking

that the defendants refrain from blocking counties that choose to offer the

accommodation, *see* docs. 1; 20-1 at 35–37.  Beyond this misunderstanding, the

only argument the defendants present against the modification is their contention

that "mandated curbside voting would likely also be a fundamental alteration to

Alabama elections."  Doc. 36 at 32.  But there is no evidence that curbside

voting—mandated or otherwise—would fundamentally alter Alabama law.  In fact,

the defendants' witness identified methods for making the offering feasible.[47]  The

---

[46] The defendants do not contest the plaintiffs' prima facie case for their curbside voting claim. *See* doc. 36.  Alabama law does not prohibit curbside voting, *see* docs. 20-1 at 16; 36 at 26, and the plaintiffs merely request that the state not prohibit counties from implementing it, *see* docs. 1; 20-1 at 35–37.  No evidence suggests that the prohibition is essential nor that an allowance of curbside voting would fundamentally alter Alabama law.  Moreover, the plaintiffs have provided evidence that while they would vote in person if curbside voting were available, the state's prohibition prevents them from doing so, doc. 16-45.  The ADA is not so narrow that the plaintiffs' rights only extend to voting "at some time and in some way."  *Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 199 (2d Cir. 2014).  The plaintiffs have the right to "fully participate in [Alabama's] voting program[,]" *id.*, including by casting a vote in person.  The plaintiffs demonstrate that by prohibiting curbside voting, the state excludes them from voting in person based on their disability, thereby "fail[ing] to 'provide[] [them] with meaningful access to the benefit that [it] offers.'"  *Id.* (citing *Alexander v. Choate*, 469 U.S. 287, 29 (1985)).

[47] The defendants submitted with their response the declaration of Clay Helms, the Deputy Chief of Staff and Director of Elections for the Alabama Secretary of State's office.  Doc. 34-1.  Helms explained that curbside voting would require the use of e-poll books or alternatively the transport of polling lists from inside the polling place to the curb, additional tabulation machines to preserve ballot secrecy, and additional poll workers to staff the curbside voting stations.  *Id.* at

defendants' contention that such a disruption is "likely," *id*., is insufficient to rebut the plaintiffs' proposed modification. Here again, the plaintiffs have demonstrated their likelihood of success on the merits of their ADA claim regarding curbside voting.

## C.

Finally, the court evaluates whether the plaintiffs have shown a substantial likelihood of success on their claim that the witness requirement violates § 201 of the Voting Rights Act, codified at 52 U.S.C. § 10501.[48] The plaintiffs maintain that the witness requirement is an impermissible "test or device" under the statute. The court notes that, unlike the plaintiffs' other claims, the VRA claim contends that the witness requirement is a facial violation of § 201, rather than as applied in the context of the COVID-19 pandemic. At this juncture, the plaintiffs have not demonstrated that they are likely to prevail on this claim.

As an initial matter, the defendants contend that this claim is not properly before the court. In their view, claims under § 201 may be brought only by the Attorney General of the United States, and they must be before a three-judge

---

22–23. Helms expressed concerns that these procedures would compromise the privacy of the curbside voters, inconvenience candidates wishing to campaign 30 feet from the polling site, and create parking and traffic flow problems around the site. *Id.* at 23–24. Presumably, those jurisdictions that opt to implement curbside voting will utilize procedures that address these concerns.

[48] The plaintiffs plead that the witness requirement also violates §§ 2 and 3 of the VRA, codified at 52 U.S.C. §§ 10301, 10302. And they claim that the ban on curbside voting violates §§ 3 and 201 of the VRA, codified at 52 U.S.C §§ 10302, 10501. However, the plaintiffs did not move for a preliminary injunction on these claims.

district court panel.  The defendants are correct that the statute allows the Attorney General to initiate a civil action "[w]henever the Attorney General has reason to believe that a State or political subdivision . . . has enacted or is seeking to administer any test or device as a prerequisite to voting in violation of" § 201, and that when the Attorney General brings such an action, it "shall be heard and determined by a court of three judges" in federal district court.  52 U.S.C. § 10504.  However, the statute also contemplates that private plaintiffs may bring an action challenging a state practice as an impermissible test or device.  *See* 52 U.S.C. § 10302(b) ("If in a proceeding instituted by the Attorney General *or an aggrieved person* . . . the court finds that a test or device has been used . . . it shall suspend the use of tests and devices in such State or political subdivisions as the court shall determine is appropriate[.]") (emphasis added).  And the requirement for a three-judge panel only applies when the Attorney General initiates the suit.  *See* 52 U.S.C. § 10504.  Consequently, this court may consider the plaintiffs' claim under § 201.

Section 201 provides that "[n]o citizen shall be denied, because of his failure to comply with any test or device, the right to vote in any Federal, State, or local election conducted in any State or political subdivision of a State."  52 U.S.C. § 10501(a).  The term "test or device" includes:

> any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational

achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class.

52 U.S.C. § 10501(b).  Alabama's witness requirement does not qualify as a "test or device" under the statute's first three provisions, as it is not a literary test, it is not an educational test, and it is not a moral character requirement.  The issue is whether the witness requirement forces an absentee voter to "prove his qualifications by the voucher of registered voters or members of any other class . . . as a prerequisite for voting."  *Id.*

Congress included the voucher requirement as a "test or device" in response to election practices used to discriminate against African-Americans.  For example, in at least one county in Alabama, in order to register to vote, an applicant had to produce a "supporting witness" who "must affirm that he is acquainted with the applicant, knows that the applicant is a bona fide resident of the county, and is aware of no reason why the applicant would be disqualified from registering." *United States v. Logue*, 344 F.2d 290, 291 (5th Cir. 1965); *see also* S. Rep. No. 89-162, 1965 U.S.C.C.A.N. 2508, 2549–50 (1965) (citing the *Logue* case as justification for the inclusion of the "voucher requirement" in the Voting Rights Act of 1965).[49]

---

[49] Originally, the "test or device" ban applied only to jurisdictions subject to preclearance, *see* 52 U.S.C. § 10303(b), but Congress extended the ban to apply nationwide in 1970, *see* Voting Rights Act Amendments of 1970, Pub. L. No. 91-285, § 6, 84 Stat. 314, 315 (1970), and it made the ban permanent in 1975, *see* Voting Rights Act Amendments of 1975, Pub. L. No. 94-73, § 102, 89 Stat. 400, 400 (1975).

Alabama's current witness requirement is less onerous.  It requires only that an absentee voter "have a notary public (or other officer authorized to acknowledge oaths) or two witnesses witness his or her signature to the [absentee voting] affidavit."  Ala. Code § 17-11-9.  The notary or witnesses must then sign the affidavit and list their address.  *See* Ala. Code § 17-11-7(b).  The notary also "certif[ies] that the affiant is known (or made known) to me to be the identical party he or she claims to be."  *Id.*

The plaintiffs argue that Alabama's witness requirement qualifies as a prohibited voucher requirement, because it mandates that "[w]itnesses must vouch for a voter's identity."  Doc. 20-1 at 28.  But that is not the case.  As a copy of the affidavit form makes clear, only the notary must vouch for the voter's identity by "certify[ing] that the affiant is known (or made known) to me to be the identical party he or she claims to be."  *Compare* Ala. Code § 17-11-7(b), *with* doc. 39-1.  The witnesses do not vouch that the voter is over 18, that she is a citizen, that she is a resident of the state, or that she is not disqualified from voting as a convicted felon or for any other reason.  *Cf.* Ala. Const. art. VIII, § 177 (noting qualifications for voting).  The witnesses' signature indicates only that they observed the voter sign the affidavit.  *See* Ala. Code § 17-11-9.  As such, the witnesses do not vouch for the voter's "qualifications."  52 U.S.C. § 10501(b).

Arguably, because the notary certifies that the voter is who she says she is, the notary does vouch for the voter's qualifications in violation of § 201.  This

argument turns on whether the voter's identify is a "qualification" for the purposes of the statute.  52 U.S.C. § 10501(b).  A qualification is defined as the "possession of qualities or properties (such as fitness or capacity) inherently or legally necessary to make one eligible . . . to perform a public duty or function." Qualification, Black's Law Dictionary (11th ed. 2019); *see also* Qualification, Oxford English Dictionary (2d ed. 1989) ("A necessary condition, imposed by law or custom, which must be fulfilled or complied with before a certain right can be acquired or exercised, an office held, or the like.").  It seems to the court that it is "inherently or legally necessary" to vote that a voter be who she says she is.[50]

Anticipating this argument, the United States contends, in a statement of interest, that the notary's certification of the voter's identity is not a voucher "requirement," because absentee voters have the option of using witnesses instead. Doc. 39 at 9 n.3.  Another judge on this court recently accepted a similar argument that the option for an in-person voter to prove her identity by being "positively identified" by two election officials was not a "requirement" but rather a "failsafe" for those who forgot or did not have a photo ID.  *Greater Birmingham Ministries*, 284 F. Supp. 3d at 1281–83.  That case is currently pending on appeal.  *Greater Birmingham Ministries v. Sec'y of State of Ala.*, No. 18-10151 (11th Cir. argued

---

[50] The VRA prohibits a test or device that requires a voter to "prove his qualifications by the voucher of registered voters *or members of any other class*."  52 U.S.C. § 10501(b) (emphasis added).  The United States argues that adults do not qualify as a class.  *See* Ala. Code § 17-11-10(b) (requiring that witnesses be "18 years of age or older").  The court need not address this issue.  But surely "notar[ies] public (or other officer[s] authorized to acknowledge oaths)" qualify as a class under the statute.  Ala. Code § 17-11-9.

July 28, 2018).  For its part, this court is concerned about the consequences of a rule that so long as the state offers one method of voting that passes statutory muster, the state is free to offer another method that violates the statute.

In this case, however, the plaintiffs do not make any arguments about whether the notary-specific certification, as opposed to the witness requirement generally, is a prohibited voucher requirement under § 201.  For this reason, the plaintiffs have not established that they are likely to succeed on the merits of their VRA claim at this time.

## IV.

In addition to showing a likelihood of success on the merits, the plaintiffs must also show a likelihood of irreparable harm in the absence of relief, that the balance of equities weigh in their favor, and that an injunction serves the public interest.  *See Winter*, 555 U.S. at 20.  In this case, if the challenged election laws are not enjoined, the individual plaintiffs and similarly-situated voters could likely face a painful and difficult choice between exercising their fundamental right to vote and safeguarding their health, which could prevent them from casting a vote in upcoming elections.  "The denial of the opportunity to cast a vote that a person may otherwise be entitled to cast—even once—is an irreparable harm."  *Jones*, 950 F.3d at 828.  Thus, the plaintiffs have shown a likelihood of irreparable harm in the absence of relief.  *See Id.* (citations omitted); *Obama for Am. v. Husted*, 697 F.3d

423, 435 (6th Cir. 2012); *Christian Legal Soc'y v. Walker*, 453 F.3d 852, 859 (7th Cir. 2006).

The balance of equities and the public interest also tip in the plaintiffs' favor. While an order enjoining the witness and photo ID requirements results in some burden to the defendants, who will have to quickly communicate the changed rules to local election officials and voters, those burdens do not outweigh the irreparable injury the individual plaintiffs and similarly-situated voters could incur by foregoing their right to vote. The court appreciates the defendants' concern that changes to election rules could cause confusion, *see* doc. 36 at 34, and that "federal courts should ordinarily not alter the election rules on the eve of an election," *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). But, the singular circumstances presented by the COVID-19 pandemic are far from ordinary, and, while the burden of communicating election rule changes is not minimal, the defendants have time to clearly and succinctly communicate the changes prior to the July 14 run-off election without causing chaos and confusion. In addition, prohibiting the state from interfering with local election officials, if any, who choose to provide curbside voting that complies with state election laws imposes no burden on the defendants, while the prohibition could burden vulnerable voters who need to minimize their risk of exposure to COVID-19 and who need assistance at the polls. Thus, the burdens imposed on voters in high-risk

groups who wish to vote absentee or by curbside voting during the COVID-19 pandemic outweighs the competing burden on the defendants.

Next, all voters have a "strong interest in exercising the 'fundamental political right' to vote.'" *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (citation omitted). "The public interest therefore favors permitting as many qualified voters to vote as possible." *Obama for Am.*, 697 F.3d at 437. As a result, the court finds that granting injunctive relief in this case is in the public interest, and that the plaintiffs have established they are entitled to a preliminary injunction.

## V.

"Crafting a preliminary injunction is an exercise of discretion and judgment." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (citation omitted). "In executing its duties, the court must pay particular attention to the public consequences of any preliminary relief it orders." *Lee* at 1327 (citing *Winter*, 555 U.S. at 24). In addition, "a court 'need not grant the total relief sought by [the plaintiffs] but may mold its decree to meet the exigencies of the particular case.'" *Trump*, 137 S. Ct. at 2087 (citation omitted).

Thus, for the foregoing reasons and after careful consideration of the record, the court will grant in part the plaintiffs' motion for a preliminary injunction, doc. 15, and will order defendants: (1) not to enforce the witness requirement for the July 14 runoff election for absentee voters who determine it is impossible or unreasonable to safely satisfy that requirement in light of the COVID-19

pandemic, and who provide a written statement signed by the voter under penalty of perjury that he or she suffers from an underlying medical condition that the Centers for Disease Control has determined places individuals at a substantially higher risk of developing severe cases or dying of COVID-19; (2) not to enforce the photo ID requirement for the July 14 runoff election for absentee voters who are over the age of 65 or disabled who determine it is impossible or unreasonable to safely satisfy that requirement in light of the COVID-19 pandemic, and who provide a written statement signed by the voter under penalty of perjury that he or she is 65 or older or has a disability; and (3) not to enforce the state's de facto prohibition on curbside voting.  A separate order will be issued.

**DONE** the 15th day of June, 2020.

ABDUL K. KALLON
UNITED STATES DISTRICT JUDGE