# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| PEOPLE FIRST OF ALABAMA, ROBERT CLOPTON, ERIC PEEBLES, HOWARD PORTER, JR., ANNIE CAROLYN THOMPSON, GREATER BIRMINGHAM MINISTRIES, ALABAMA STATE CONFERENCE OF THE NAACP, BLACK VOTERS MATTER CAPACITY BUILDING INSTITUTE, TERESA BETTIS, SHERYL THREADGILL-MATTHEWS, and GREGORY BENTLEY, <br><br> Plaintiffs, <br><br> v. <br><br> JOHN MERRILL, in his official capacity as the Secretary of State of Alabama, STATE OF ALABAMA, JOJO SCHWARZAUER; JACQUELINE ANDERSON-SMITH; KAREN DUNN BURKS; MARY B. ROBERSON; JAMES MAJORS; GINA JOBE ISHMAN; DEBRA KIZER; RUBY JONES THOMAS, JOHNNIE MAE KING; CAROLYN DAVIS-POSEY; SHERRI FRIDAY; JAMES NAFTEL II; DON DAVIS; BILL ENGLISH; LASHANDRA MYRICK; FRANK BARGER; J.C. LOVE, III; and BRITNEY JONES-ALEXANDER, all in their official capacities as the absentee election managers, circuit clerks, or probate judges for Jefferson, Lee, Lowndes, Madison, Mobile, Montgomery, and Wilcox Counties. <br><br> Defendants. | Case No.: 2:20-cv-00619-AKK <br><br> FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF |

## INTRODUCTION

1.      Plaintiffs People First of Alabama, Robert Clopton, Eric Peebles, Howard Porter, Jr., Annie Carolyn Thompson, Greater Birmingham Ministries, the Alabama State Conference of the NAACP, Black Voters Matter Capacity Building Institute, Teresa Bettis, Sheryl Threadgill-Matthews, and Gregory Bentley (collectively, "Plaintiffs") file this First Amended Complaint for injunctive and declaratory relief against the Defendants Secretary of State John Merrill, the State of Alabama, and JoJo Schwarzauer, Jacqueline Anderson-Smith, Karen Dunn Burks, Mary B. Roberson,[1] James Majors, Gina Jobe Ishman, Debra Kizer, Ruby Jones Thomas, Johnnie Mae King, Carolyn Davis-Posey, Sherri Friday, James Naftel II, Bill English, Don Davis, Lashandra Myrick, Frank Barger, J.C. Love III, and Britney Jones-Alexander, the Circuit Clerks, Probate Judges, and Absentee Election Managers for the counties of Jefferson, Lee, Lowndes, Madison, Mobile, Montgomery, and Wilcox, (collectively, "Defendants") for failing to take adequate steps to protect the fundamental right to vote ahead of all upcoming 2020 elections, including, but not limited to the July 14 primary runoff, August 25 municipal elections and November 3 general election (hereinafter, the "2020 elections"), amid the unprecedented national and statewide COVID-19 public health crisis, as well as failing to comply with federal civil rights and voting rights law.

2.      The United States and the State of Alabama are in a state of emergency. COVID-19 is spreading rapidly throughout the country, infecting over 2.4 million people, including in Alabama, which has over 44,375 confirmed cases of COVID-19 and 984 deaths.[2] The Director of

---

[1] Plaintiffs and Defendant Mary Roberson have reached a settlement. Doc. 72. Upon the entry of the appropriate order, Plaintiffs agree that Defendant Roberson should be dismissed from this action. Doc. 71.

[2]    Alabama's COVID-19 Data and Surveillance Dashboard, Ala. Dep't of Pub. Health, https://alpublichealth.maps.arcgis.com/apps/opsdashboard/index.html#/6d2771faa9da4a2786a509d82c8cf0f7    (last visited July 6, 2020).

the Centers for Disease Control and Prevention (CDC), Robert Redfield, now estimates based on antibody tests that the actual number of infections is 10 times as high as the confirmed cases,[3] meaning that at least 24 million Americans and upwards of 440,000 Alabamians have been infected as of July 6.

3.      As a result, in early April, Governor Kay Ivey ordered Alabama residents to stay at home absent specific reasons not to, and the Alabama Department of Public Health ("ADPH") and the CDC likewise advised people to remain in their homes and follow social distancing protocols. In a communal effort to slow the spread of the disease and save lives, the Governor also closed government offices, schools, and businesses, and strongly urged people to limit person-to-person interactions to their family and avoid large gatherings.

4.      On April 28, 2020, Governor Ivey amended Alabama's "Safer-at-Home" public health order, allowing some businesses to open subject to sanitation and social-distancing guidelines, but still encouraged individuals—especially those at higher risk of death or serious illness from COVID-19 infection—to stay home. The Safer-at-Home order was most recently renewed and amended on June 30, 2020, and, among other restrictions and recommendations, it prohibits as of May 11, 2020, all non-work related gatherings of any size where a six-foot distance could not be maintained.[4]

5.      This crisis is likely to persist for many more months or longer. Indeed, as soon as Alabama began to lift many of these restrictions in place, COVID-19 cases began rising even faster

---

[3] Lena H. Sun & Joel Achenbach, *CDC chief says coronavirus cases may be 10 times higher than reported: Agency expands list of people at risk of severe illness, including pregnant women*, Wash. Post (Jun. 25, 2020), https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/.

[4] Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of Infection by COVID-19, Amended June 30, 2020 (June 30, 2020), https://governor.alabama.gov/assets/2020/06/2020-06-30-Safer-at-Home-Order.pdf.

in Alabama than most other states in the nation. Over the past two weeks, Alabama has had the second highest number of new cases per capita in the country[5] and, as of June 25, 82% of Alabama's intensive care unit beds are now full due to COVID-19 patients.[6]

6.      Given these extraordinary circumstances, Secretary Merrill has waived the excuse requirement for absentee voters for the July 14, 2020 primary runoff election. But despite fast-rising COVID-19 cases and deaths and the reality that community transmission will continue throughout at least the remainder of 2020, he has failed to take such action for any other 2020 elections, including the August municipal elections and the November general election.

7.      Alabama's absentee voting excuse requirements and multiple other provisions of Alabama law, policy, and/or practice that establish requirements for voting in-person and by-mail will pose direct and severe obstacles to voting, namely: (1) Alabama's strict limitations on the categories of individuals who may vote by absentee mail ballot for elections other than the July primary runoff election, Ala. Code § 17-11-3; (2) the requirement that the affidavit that must be included with an absentee ballot be signed by the voter in the presence of either a notary or two adult witnesses, *id*. §§ 17-11-7 to 17-11-10; (3) the requirement that copies of photo identification accompany absentee ballot applications, *id.* § 17-9-30(b); (4) the requirement that copies of photo identification accompany certain absentee ballots, *id.* §§ 17-11-9 and 17-11-10(c); and (5) the *de facto* ban on curbside voting (collectively, the "Challenged Provisions").

8.      First, Plaintiffs' challenge Alabama's maintenance of a strict set of limitations on who can vote by absentee ballot (the "Excuse Requirement") during community transmission of

---

[5] AP, *Coronavirus cases spike in Alabama — 'We are extremely concerned about these numbers'* , CNBC (June 21, 2020),   https://www.cnbc.com/2020/06/21/coronavirus-cases-spike-in-alabama-we-are-extremely-concerned-about-these-numbers.html.

[6] Marty Johnson, *Alabama ICU beds 82 percent full as coronavirus cases soar*, The Hill (June 26, 2020), https://thehill.com/homenews/state-watch/504668-alabama-icu-beds-82-percent-full-as-coronavirus-cases-soar.

COVID-19, including for all upcoming 2020 elections. The Excuse Requirement limits the individuals who may vote absentee to seven delineated categories. None of these categories include Plaintiffs or other high-risk voters like people who are aged 65 and older or people with disabilities, like diabetes, asthma, or autoimmune deficiencies, that place them at higher risk of death or serious illness from contracting COVID-19. The Excuse Requirement demands that an otherwise eligible voter submit an absentee ballot application no less than five days before the relevant election, attesting that they have one of the seven excuses enumerated in section 17-11-3(a) of the Alabama Code.[7]

9.      Second, Plaintiffs challenge Alabama's requirement that a voter casting an absentee ballot sign it before a notary or two witnesses (the "Witness Requirement"). State law requires that, in addition to the signature of the voter, all mail-in ballots must contain a signed affidavit witnessed by either a notary public or two third-party witnesses over age 18 who are not then candidates for public office; otherwise, the ballot goes uncounted.

10.     Both the Excuse Requirement and the Witness Requirement pose an unreasonable obstacle to many thousands of vulnerable Alabamians' ability to safely vote in the 2020 elections due to the near certainty of continuing community spread of COVID-19 throughout 2020.

11.     Maintaining the Excuse Requirement threatens to disenfranchise or severely burden the right to vote of hundreds of thousands of Alabamians, like Plaintiffs and the members and constituents of organizational Plaintiffs, by requiring them to risk their health or the health of their

---

[7] Additionally, individuals who require emergency treatment by a physician within five days of the election may apply for an emergency absentee ballot and must return the ballot by noon on Election Day. Ala. Code § 17-11-3(c). And caregivers of individuals requiring emergency treatment, individuals who are unexpectedly unable to vote in person because of an action of their employer within five days of the election, and individuals who have a family member die within five days of the election may apply for an receive and absentee ballot up to the day before the election. Ala. Code § 17-11-3(d).

loved ones to vote, as well as creating significant public health risks. These burdens will fall disproportionately on Black Alabamians—who are testing positive for and dying from COVID-19 at far higher rates than white Alabamians—as well as Alabamians who face greater risk to their health due to COVID-19, including senior citizens and individuals with certain preexisting conditions. Many of the individual Plaintiffs are acutely aware of dangers of COVID-19 since they know individuals who have been hospitalized or died because of COVID-19 infections.

12.     And for Alabamians who live alone are at greater risk of serious illness or death from COVID-19, they cannot—and should not have to—risk the threat of contagion present in obtaining two witness signatures to vote. The Witness Requirement threatens to disenfranchise many thousands of voters who, like Plaintiffs, are adhering to social distancing guidelines to protect themselves and others. Indeed, about 30% of households in Alabama constitute people living alone (555,330),[8] including 165,882 Alabamians over age 18 with a disability[9] and 95,102 persons over age 65 with a disability[10]—that is, two of the groups who are most vulnerable to COVID-19.

13.     Neither the Excuse Requirement nor the Witness Requirement meaningfully advance any valid government interest. As for the former, the COVID-19 pandemic poses the same concerns for August and November that led Secretary Merrill to make clear that any state interest

---

[8] U.S. Census Bureau, 2010-2018 American Community Survey 1-Year Estimates: Selected Social Characteristics of the United States: Alabama (2018), https://data.census.gov/cedsci/table?q=single%20person%20households&g=0400000US01&hidePreview=true&tid=ACSDP1Y2018.DP02&vintage=2018&layer=VT_2018_040_00_PY_D1&cid=DP02_0001E&moe=false (last visited June 25, 2020).

[9] U.S. Census Bureau, 2010-2018 American Community Survey  1-Year Estimates: Selected Social Characteristics of the United States: Alabama (2018) Sample, https://data.census.gov/mdat/#/search?ds=ACSPUMS1Y2018&vv=AGEP(18:99)&cv=DIS&rv=ucgid&nv=HHT(4,6)&wt=PWGTP&g=0400000US01 (last visited June 25, 2020).

[10] U.S. Census Bureau, 2010-2018 American Community Survey 1-Year Estimates: Selected Social Characteristics of the United States: Alabama (2018), https://data.census.gov/mdat/#/search?ds=ACSPUMS1Y2018&vv=AGEP(65:99)&cv=DIS&rv=ucgid&nv=HHT(4,6)&wt=PWGTP&g=0400000US01 (last visited June 25, 2020).

in a restrictive interpretation of the Excuse Requirement must give way in light of the COVID-19 pandemic. As for the latter, many other provisions of Alabama law safeguard the integrity of absentee voting without putting the lives of voters at risk. Indeed, Alabama is one of only 12 states that require an individual submitting an absentee ballot to have it be witnessed by another. Of those 12, Alabama is one of only three states that require the absentee ballot to be notarized.[11]

14.     Even if the Excuse and Witness Requirements did offer some additional marginal benefit to any valid state interest, their benefits are greatly outweighed by the risk of disenfranchisement and the burden on voters to choose between their health and their vote. The Excuse and Witness Requirements violate the fundamental right to vote under the First and Fourteenth Amendments to the U.S. Constitution, Title II of the Americans with Disabilities Act ("ADA"), and Section 2 of the Voting Rights Act of 1965 ("VRA"). The Witness Requirement violates Sections 3(b) and 201 of the VRA as well.

15.     Third, the requirements that each person who applies for an absentee ballot mail-in a copy of their photo ID, Ala. Code. § 17-9-30(b), and that certain absentee voters must again submit another copy of their photo ID when casting their ballot, *id*. § 17-11-9 (collectively, the "Photo ID Requirement"), create nearly insurmountable barriers to exercising the fundamental right to vote amid the COVID-19 pandemic. Many voters who are more susceptible to complications from COVID-19, like Plaintiffs Porter and Thompson, lack a reliable means of photocopying their ID without endangering their lives. Others lack a photo ID at all. The Photo ID Requirements, as applied in the current COVID-19 crisis, violate Title II of the ADA and the

---

[11]  Mississippi, Missouri, and Oklahoma require the notarization of absentee ballots. Alaska, Louisiana, Minnesota, North Carolina, Rhode Island, South Carolina, Virginia, and Wisconsin require witness signatures. *Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options*, Nat'l Conf. of State Legislatures (June 22, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx (scroll down and select tab titled "Processing, Verifying, and Counting Absentee Ballots"; see the chart titled "Verifying Authenticity of Absentee/Mailed Ballots.").

fundamental right to vote under the First and Fourteenth Amendments to the U.S. Constitution.

16.     Fourth, Alabama does not offer—and Secretary Merrill prohibits local election officials from implementing—curbside or "drive-thru" voting, which allows voters to cast their ballots in person, but outside of a poll site, without leaving the car ("Curbside Voting Ban"). Many voters with disabilities are unable to access polling places or vote absentee. Other voters must vote in-person because they require assistance from poll workers. Curbside voting can significantly reduce the opportunities for COVID-19 to spread at in-person poll sites. This is particularly important to voters like Plaintiffs Clopton and Peebles, who usually vote in-person, but who have a higher susceptibility to death or serious health problems due to COVID-19. Alabama's Curbside Voting Ban, a reasonable accommodation provided in other states, means that significant numbers of vulnerable voters who need to vote in-person have no option for doing so because of the increased risk of infection from traditional in-person voting. In the context of the pandemic, as well as in ordinary circumstances, the Curbside Voting Ban violates the First and Fourteenth Amendments to the U.S. Constitution, Title II of the ADA, and Section 2 of the VRA.

17.     Both together and separately, the Challenged Provisions needlessly force many hundreds of thousands of Alabamians to choose between risking their lives or voting in 2020.

18.     On June 15, 2020, the Court recognized the danger to high risk voters and granted Plaintiffs' preliminary injunction motion for the July 14 primary runoff, enjoining the Witness and Photo ID Requirements in Jefferson, Lee, and Mobile Counties and the Curbside Voting Ban statewide. Doc. 58 at 4. A unanimous motions panel for the Eleventh Circuit U.S. Court of Appeals refused to stay that injunction pending appeal. *See People First of Ala. v. Sec'y of State for Ala.*, No. 20-12184, __ F. App'x __, 2020 WL 3478093, at *1 (11th Cir. June 25, 2020). On July 2, 2020, however, the Supreme Court of the United States split 5-4 in favor of staying the injunction.

*Merrill v. People First of Ala.*, No. 19A1063, __ S. Ct. __ 2020 WL 3604049 (U.S. July 2, 2020) (mem.). Thus, the Challenged Provisions remain in effect for the July 14 and other 2020 elections.

19.    The Challenged Provisions directly contradict the specific guidance from the CDC concerning safe voting practices during the COVID-19 pandemic. Among other things, the CDC recommends that state and local election officials "offer alternative voting methods that minimize direct contact and reduce crowd size at polling locations," like "drive-up voting for eligible voters," as a means of complying with social distancing rules and limiting personal contacts. The CDC also recommends that state and local election officials affirmatively offer "alternative voting options" for those voters with symptoms or those voters who have COVID-19 to "minimize exposure between poll workers and voters, such as a designated polling site or curbside voting."[12]

20.    Compliance with the Challenged Provisions poses a significant risk to the lives of Plaintiffs and many thousands of other Alabama voters who are seeking a safe method of exercising their right to vote in the upcoming 2020 elections, including the elections on August 25, and November 3, as well as any other elections that occur while this crisis continues.

21.    Without intervention from this Court, hundreds of thousands of Alabama voters are at risk of being disenfranchised. Alabama has no early in-person voting option. Consequently, Alabama voters almost unanimously vote in-person on Election Day. In 2018, for example, only 3.4% of Alabama voters (57,832 people) cast absentee ballots out of the 1,723,694 total people who voted that year. Most Alabama voters are therefore unlikely to be familiar with the absentee voting process. A significant number of Alabama's absentee ballots are often rejected because the absentee ballots do not meet the Witness Requirement. In 2018, Alabama rejected over 2.37% or

---

[12] Ctrs. for Disease Control & Prevention, *Considerations for Election Polling Locations and Voters: Interim guidance to prevent spread of coronavirus disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated June 22, 2020).

1,368 of the absentee ballots cast.[13] The Witness Requirement accounts for about a quarter of those rejected absentee ballots.

22.     Contrary to the usual limitations on absentee voting in Alabama, however, for the July 14 primary runoff election, Secretary Merrill has made it clear that any registered voter is permitted to vote absentee in light of the COVID-19 pandemic. Alabama is expecting a large increase in absentee voting during 2020 elections. Thus, if just a third of all people who voted in 2018 (or 575,000 people) switched to mail-in absentee voting in the August 25 municipal election or the November 3 general election, up to 34,000 voters could expect to have their ballots rejected because of the Witness Requirement alone.

23.     The risk of disenfranchisement from the Excuse and Witness Requirements and Curbside Voting Ban fall more heavily on Black voters in Alabama, who are more likely to live alone or with young children, more likely to have a disability than the white population, and who are afflicted by and die from COVID-19 at stunningly disproportionate rates. Black Alabamians are 39.25% of COVID-19 patients and 46% of COVID-19-related deaths despite making up just 27% of its total population.[14] Alabama's history of racial discrimination in various areas, such as voting, education, employment, and healthcare, interact with these provisions to hinder Black people's ability to participate effectively in the political process in violation of Section 2 of the VRA.

24.     The Challenged Provisions will each, separately and jointly, unduly burden the right to vote of Alabamians for the 2020 elections.

---

[13] U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2018 Comprehensive Report* 27-29 (2018), https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf; U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2016 Comprehensive Report* 23 (2016), https://www.eac.gov/sites/default/files/eac_assets/1/6/2016_EAVS_Comprehensive_Report.pdf.
[14] ADPH, *Alabama's COVID-19 Data and Surveillance Dashboard,* http://www.alabamapublichealth.gov/covid19/assets/cov-al-cases-042520.pdf (last updated June 25, 2020).

25.     Plaintiffs therefore ask that the Court enjoin the Challenged Provisions and declare them unconstitutional for the duration of the 2020 election cycle.

## PARTIES

26.     Plaintiff PEOPLE FIRST OF ALABAMA ("People First"), founded in 1988, is a group of people with developmental disabilities dedicated to making their dreams happen by having choices and control over their own lives, including by having opportunities to make decisions and plans for themselves instead of having others make decisions for them. With membership chapters and members affected by the Challenged Provisions in communities across Alabama—including the counties of Jefferson, Montgomery, Madison, Tuscaloosa, Shelby, Mobile, Baldwin, Marion, Fayette, Colbert, Winston, Walker, Lamar, Marengo, Talladega, Calhoun, Cleburne, Randolph, Blount, Coffee, and Clarke—People First assists its members in accessing, among other things, competitive employment, decent housing of their choosing, transportation, and full citizenship with equal rights. This work with members includes securing access to full and equal voting rights.

27.     Because of the Challenged Provisions, during the COVID-19 pandemic, many of People First's members—who are registered voters and plan to vote in all remaining 2020 elections—will be forced to choose between voting and protecting their health because of lack of options to cast their ballot. Specifically, People First members include voters with conditions that put them at higher risk of death or severe complications from COVID-19 and are thus required to self-quarantine. Voting in-person would therefore put the health of those voters at significant risk because of person-to-person contact. Yet, although these voters may qualify for an absentee ballot given Secretary Merrill's emergency order for the July 14 runoff, these voters are ineligible to vote absentee during any subsequent 2020 elections—including the November 3 general election—

because of the Excuse Requirement. Furthermore, many of People First's members live alone or with one other adult and are unable to comply with the requirement to have their absentee ballot notarized or witnessed by two adults in the 2020 elections, because those activities also require person-to-person contact.

28.     People First members also include voters who do not have access to printers, scanners, copiers, or even internet access, and thus cannot comply with the state's photo ID requirement for absentee ballots. Finally, People First members include voters who use wheelchairs and voters with physical disabilities who are less able to access the inside of their polling place. If Alabama offered curbside or drive-thru voting—especially during the COVID-19 pandemic—these voters would use such an option to safeguard their health while still voting in-person.

29.     Plaintiff ROBERT CLOPTON is 65 years old, Black, and a resident of Mobile County, Alabama. He is a U.S. citizen, and a lawfully registered Alabama voter. He is at high-risk for death or serious illness from contracting COVID-19 because of his age and underlying health conditions, including diabetes and hypertension. Mr. Clopton recently had emergency surgery. On March 3, 2020, the same day he voted in-person in Alabama's primary election, Mr. Clopton was admitted to the hospital. He had emergency surgery on March 5. He was discharged on March 10 and has been recovering at home and sheltering in place since that date. He is not expected to make a full recovery from his surgery until at least several months from now. Mr. Clopton is eligible to vote in the July 14, 2020 primary runoff election. He would like to vote absentee. He would also like to vote absentee for the November 3 general election, but he cannot satisfy the Excuse and Witness Requirements. Mr. Clopton only has one witness—his wife, with whom he resides. Given the COVID-19 pandemic and his health status, he would not feel safe voting in-person at a polling

place for either the July 14, 2020 primary runoff or November 3, 2020 general elections. If given

the option, Mr. Clopton would consider curbside voting as a way vote on Election Day in

compliance with social distancing rules and to minimize the threat to his health from a COVID-19

infection. If he is required to vote in-person without curbside voting or comply with the Witness

Requirement to cast an absentee ballot for any remaining 2020 election, he will be prevented from

voting because the risk to his life from a COVID-19 infection is too great.

      30.     Plaintiff ERIC PEEBLES is a 38-year-old accessibility advocate who lives alone at

his home in Auburn, Alabama. He is white, a U.S. citizen, has never lost his right to vote by reason

of a felony conviction or court order, and is a lawfully registered voter in Alabama. Mr. Peebles is

at high risk for severe complications from COVID-19 because of his cerebral palsy. Respiratory

illnesses, like COVID-19, can be fatal for people with his condition. Due to this elevated risk, Mr.

Peebles has been self-isolating since on or around March 12—long before Alabama's stay-at-home

order took effect. He has not left his apartment complex since early March. He has been restricting

all in-person contact except with his four caregivers who provide 60 hours of in-home care each

week. Each caregiver works separate shifts of a few hours each and their shifts do not overlap. At

Mr. Peebles' request to protect his health, all four caregivers have been tested for COVID-19 and

received negative results. Mr. Peebles typically votes in-person and did so during the March 3,

2020 primary election. Mr. Peebles cannot operate the voting machines unassisted and thus brings

an individual into the voting booth to assist him in filling out the ballot. Despite his preference for

in-person voting, Mr. Peebles needs to vote by absentee ballot in the general election in November

because of the health risks in-person voting presents during the COVID-19 pandemic. The next

election in which Mr. Peebles can vote is the November 3, 2020 general election. Mr. Peebles also

understands that to vote absentee he must meet the Witness Requirement. Because he lives alone

and only comes into contact with his caregivers—who work separate shifts—he will not be able to comply with the Witness Requirement. Finally, Mr. Peebles understands that Alabama does not allow voters—including voters with disabilities—to vote curbside. If curbside voting were available, Mr. Peebles would choose to vote curbside, as it would allow him to avoid the person-to-person contact of voting inside at the polling place that puts his health at severe risk and the Excuse and Witness Requirements for absentee voting that he is unable to satisfy.

31.     Plaintiff HOWARD PORTER, JR. is a 69-year-old Black male who resides in Mobile County, Alabama. He is a U.S. citizen and has been a lawfully registered voter in Alabama since he was 18. Mr. Porter has Parkinson's Disease and asthma, and it is hard for him to ambulate. He is at high-risk for contracting COVID-19 because of his age and underlying medical conditions. He has not left his home since the Governor issued the April 3 stay-at-home order. Because he is at high-risk, Mr. Porter plans to stay at home for the foreseeable future even after the "Safer at Home" or any other such order is lifted. Mr. Porter has always voted in-person, but he does not want to risk COVID-19 infection. He is eligible to vote in the July 14, 2020 primary runoff. He would feel the safest if he could vote absentee in the 2020 elections. But Mr. Porter will be unable to comply with the Excuse and Photo ID Requirements. For example, although he has a printer at home, Mr. Porter is retired and only receives Social Security Income. He is therefore worried that he may not be able to afford the ink or paper needed to maintain his printer through the 2020 elections. If given the option, Mr. Porter wants to use absentee or curbside voting rather than entering the polling place in the 2020 elections. If he is required to vote in-person without curbside voting or to satisfy the Excuse and Photo ID Requirements for absentee voting, Mr. Porter will be prevented from voting because the risk to his life from a COVID-19 infection is too great.

32.     Plaintiff ANNIE CAROLYN THOMPSON is a 69-year-old retiree who lives alone

14

at her home in Mobile, Alabama. She is Black, a U.S. citizen, has never lost her right to vote by reason of a felony conviction or court order, and is a lawfully registered voter in Alabama. Ms. Thompson is at higher-risk of contracting and having severe complications from COVID-19 because of her age and preexisting conditions, including diabetes and high blood pressure. After she retired as a cosmetologist, Ms. Thompson began working as a caretaker for people who required extra assistance in assisted living homes. She recently had to leave that job when her patient spiked a very high fever and was taken to the hospital to test for COVID-19 on or around April 1. Fearing for her own health, Ms. Thompson received a COVID-19 test, which came back negative at that time. Although Ms. Thompson had been taking measures to protect herself, Ms. Thompson has been quarantining herself at home since April 1, 2020, restricting all in-person contact except when her daughter or granddaughter bring her groceries. Ms. Thompson has internet access, but does not have a printer, scanner, or copy machine at her home. She voted in-person in the March 3, 2020 primary election. Due to the health risks of voting in-person, she desires to vote by absentee ballot in all future 2020 elections, but she cannot meet the Excuse Requirement. Further, because she does not have the necessary equipment to obtain a copy of her photo ID, Ms. Thompson has no way to comply with the Photo ID Requirement without endangering her health. Public libraries in Mobile are currently closed. Ms. Thompson's only option is to find a local business that is still open and will allow her to pay for a copy of her photo ID, or she will have to choose between not voting or endangering her health by voting in-person for the July 14, 2020 primary runoff election. Because she lives alone and only periodically comes into contact with her family, Ms. Thompson also will not be able to comply with the Witness Requirement without leaving home or endangering her health.

      33.    Plaintiff GREATER BIRMINGHAM MINISTRIES ("GBM") was founded in

1969 in response to the urgent human rights and justice needs of the residents of the greater Birmingham, Alabama area.  GBM is a multi-faith, multi-racial membership organization that provides emergency services for members and constituents in need. It engages in community efforts to create systemic change with the goal of building a strong, supportive, and politically active society that pursues justice for all people.

34.     A central goal of GBM is the pursuit of social justice in the governance of Alabama. GBM actively opposes state laws, policies, and practices that result in the exclusion of vulnerable groups or individuals from the democratic process.   Toward that end, GBM regularly communicates with its members and engages in efforts to register, educate, and increase turnout, particularly among Black, Latinx, disabled, and low-income registered voters.

35.     GBM has about largely low-income 5,000 members located in or near Jefferson County. Many of GBM's low-income members lack access to a computer, the internet, or other videoconferencing technology. About a third of GBM's members are senior citizens and about one fifth of all GBM members live alone. Of those members, many are Black, Latinx, disabled, or low-income registered voters who are staying home because they are at a higher risk of death or serious illness from COVID-19 due to age or preexisting medical conditions, like diabetes or hypertension. GBM members also include people who have or have had COVID-19. Because of the Excuse and Witness Requirements and Curbside Voting Ban, these GBM members are forced to choose between risking their lives (and the lives of other people) or not voting in the 2020 elections.

36.     As a result of the Excuse and Witness Requirements and the Curbside Voting Ban, GBM is now required to divert a portion of its limited financial and organizational resources away from its usual voter registration and turnout efforts to undertake such new activities as (1) assessing who among its members are unable to comply with the Excuse and Witness Requirements amid

the COVID-19 pandemic; (2) increasing efforts to educate its members and constituents about the Excuse and Witness Requirements; (3) advocating that Defendants permit no-excuse and curbside voting; and (4) investigating, responding to, mitigating, and addressing the concerns of its members and constituents impacted or who will be disenfranchised or affected by the Excuse and Witness Requirements, Curbside Voting Ban, and Defendants' inadequate efforts to protect voters from COVID-19 ahead of the 2020 elections. In absence of the Excuse and Witness Requirements and Curbside Voting Ban, GBM would not have engaged in these activities. As a result, GBM is limited, and will continue to be limited, in the organizational resources that it can devote to its other core goals and typical activities.

37.     Plaintiff THE ALABAMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ("Alabama NAACP") is a state subsidiary of the National Association for the Advancement of Colored People, Inc.  The Alabama NAACP is the oldest and one of the most significant civil rights organizations in Alabama, and it works to ensure the political, educational, social, and economic equality of African Americans and all other Americans.

38.     Two central goals of the Alabama NAACP are to eliminate racial discrimination in the democratic process, and to enforce federal laws and constitutional provisions securing voting rights. Toward those ends, the Alabama NAACP regularly engages in efforts to register and educate Black voters and encourages them to engage in the political process by turning out to vote on Election Day.

39.     The Alabama NAACP has many thousands of members across the state, including members affected by the Challenged Provisions in Hale, Jefferson, Lee, Lowndes, Madison, Mobile, Montgomery, and Wilcox Counties. Many Alabama NAACP members are senior citizens,

Black, and/or have medical conditions, like diabetes or hypertension, that put them at higher risk for death or serious illness from COVID-19. Many members also live alone or with only one other adult person. These members and others are staying at home to avoid contracting COVID-19. They will be unable to meet the Excuse and Witness Requirement. The difficulties already faced by the Alabama NAACP's most vulnerable members in complying with the Excuse and Witness Requirements are magnified substantially by the COVID-19 crisis. For example, one active member is in her 80s, lives alone, and has breast cancer and heart disease. She is extremely vulnerable to COVID-19. She does not have ready access to videoconferencing technology. She, and other members like her, cannot vote in-person or meet the Witness Requirement without risking her life by coming into contact with others. Members of the Alabama NAACP have or have had COVID-19. Because of the Excuse and Witness Requirements and Curbside Voting Ban, these members are forced to choose between risking their lives (and the lives of others) or not voting in the 2020 elections.

40.     As a result of the State's social distancing guidelines and expanded absentee voting options, the Excuse and Witness Requirement and Curbside Voting Ban are requiring the Alabama NAACP to divert resources from its traditional voter registration and education efforts to undertake such new activities as (1) assessing who, among its constituency will be unable to comply with the Excuse and Witness Requirements, while taking protective measures against COVID-19 infection, like staying home; (2) increasing efforts to educate Black and disabled voters, as well as the general public, about the Excuse and Witness Requirements; and (3) advocating for the adoption of measures like no-excuse absentee voting and curbside voting that would ease the burdens on voters during the pandemic. In absence of the Excuse and Witness Requirements and Curbside Voting Ban, the Alabama NAACP would not have had to engage in these activities.

41.     Thus, the Excuse and Witness Requirements and Curbside Voting Ban are causing, and will continue to cause, the Alabama NAACP to divert a portion of its limited financial and other organizational resources to investigating, responding to, mitigating, and addressing the concerns of its members and constituents impacted or who will be disenfranchised by the Excuse and Witness Requirements, the Curbside Voting Ban, and Defendants' inadequate efforts to protect voters from COVID-19 ahead of the 2020 elections. As a result, the Alabama NAACP is limited, and will continue to be limited, in the organizational resources that it can devote to its other core goals.

42.     Plaintiff BLACK VOTERS MATTER CAPACITY BUILDING INSTITUTE ("BVM") is a nonprofit organization organized under Section 501(c)(3) of the Internal Revenue Code. BVM's goal is to empower voters and improve voting efficacy in marginalized communities of color. BVM mainly works in Black communities and other communities of color who often face barriers to voting that other communities do not. BVM focuses on removing those barriers with several principle beliefs as guidance. These principles include understanding, respecting, and supporting local infrastructure in pursuing civic engagement and community empowerment, supporting individuals and organizations that strive for social justice throughout the year and not just on Election Day, and ensuring that Black voters and communities of color in rural counties and smaller cities and towns — who are often ignored — have their voices heard. BVM works to increase voter registration and turnout and advocates for policies to expand voting rights and access.

43.     While BVM seeks to empower voters and improve the voting efficacy of Black communities nationally, it focuses most of its work on a handful of states, including Alabama. BVM is particularly active in the communities comprising the Black Belt of Alabama. BVM

19

focuses on those communities because they tend to be the most neglected and have higher rates of poverty than other areas or communities.

44.     BVM has a significant community of constituent individuals and organizations in Alabama's Black communities who are the primary beneficiaries of BVM's activities including constituents in Jefferson, Mobile, Lee, Montgomery, Madison, Lowndes, and Wilcox counties, among many others. These individuals and organizations help inform the needs BVM must address and local organizational strategy, participate in BVM-organized efforts like text-message voter mobilization, and volunteer at these events. BVM also partners with over three dozen local organizational partners and individuals in Alabama in an umbrella-organization-like role. Many of these local organizational partners are membership organizations comprised of individuals who are directly affected by Alabama's restrictive vote by mail laws. BVM works on behalf of its constituents and partners.

45.     One of BVM's key priorities in advancing its mission is leading and supporting voter registration, education, and mobilization efforts, as well as advocating for policies to expand voting rights and access. BVM engages with its communities in multiple ways when it comes to voting. First, BVM focuses on voter education and encourages voter turnout by providing voting guidance and exciting Black voters about their participation. BVM does so through multimedia campaigns, including social media and radio ads, text messaging, and phone banking, among other strategies. Second, BVM also supports voter education and mobilization by providing assistance and financial grants to partner organizations, who themselves engage in voter education and on-the-ground efforts to increase voter participation.

46.     Before the issuance of the Governor's social distancing rules after the onset of the COVID-19 pandemic, BVM's focus was on in-person voter education. The education component

included informing voters about election dates, how to find their polling place, how to get to a polling place if the voter has no realistic transportation options, instructions on how to vote in person (such as having photo identification, using the machine, etc.), and other instructions. Since the onset of COVID-19 and due to the Safer-at-Home order and Defendants' failure to eliminate the Excuse, Witness, and Photo ID Requirements, BVM has had to expend more time and resources explaining Alabama's absentee ballot laws. Many voters who are at high risk for COVID-19 because they have underlying conditions such as asthma, diabetes, and hypertension, have needed guidance about Alabama's absentee voter laws.

47.     BVM provides grants to its partners, who themselves engage in voter education and on-the-ground efforts to increase voter participation. Local partner organizations not only conduct voter education, but also provide services like arranging rides to the polls, door-to-door canvassing, and Election Day canvassing in an effort to help encourage people to vote on Election Day, among other things. Much of BVM's work happens through and in coordination with community partners because it is more effective and efficient to have groups on the ground, which are more familiar to local voters and can engage in voter education and turnout. Further, providing grants to partner organizations helps increase partner organizations' long-term capacity to serve in the region.

48.     In addition to providing grants, BVM regularly communicates with its community partners, including through regular monthly calls, to coordinate with and train their leadership and members. For example, BVM held a statewide convening in Alabama for local partners and other interested parties and holds monthly coordination calls with its local partners. BVM also provides technical and other support to community partners on an as-need basis.

49.     BVM's constituents and its community partners, and their members, include registered voters in the State of Alabama who plan to vote in future elections, including the August 25 and November 3, 2020 elections.

50.     Many of these constituents, and community partners, and their members, are staying at home and practicing social distancing to avoid contracting COVID-19. Additionally, many of these individuals have conditions that put them at higher risk of death or severe complications if they contract COVID-19.  Thus, public health professionals and experts strongly recommend that these individuals self-quarantine. Voting in-person would, therefore, put the health of those voters at significant risk because of person-to-person contact. Additionally, some of these individuals lack access to computers, the internet, or other reliable videoconferencing technology. Many of these individuals also live alone or with only one other adult person. Due to Defendants' failure to eliminate the Challenged Provisions, many of BVM's constituents and its community partners' members will be forced to risk their health to vote or have their ballot rejected due to the Challenged Provisions, causing many of them irreparable harm.

51.     Due to Defendants' failure to eliminate the Challenged Provisions, BVM must divert scarce resources away from voter education and other efforts, including voter registration and other community assistance projects, to inform and educate voters about the vote by mail requirements. In the absence of the Challenged Provisions, BVM would not have had to engage in these activities.

52.     Thus, the Challenged Provisions are causing and will continue to cause BVM to divert organizational resources to investigating, responding to, mitigating, and addressing the concerns of its constituents, community partners, and partners' members impacted by the Challenged Provisions and Defendants' inadequate efforts to protect voters from COVID-19 ahead

22

of the 2020 elections. As a result, BVM is limited and will continue to be limited, in the organizational resources that it can devote to its other core goals.

53.     Plaintiff TERESA BETTIS is a 51-year-old Alabama citizen who lives at her home in Prichard, Alabama with her husband and two minor children. Her home is located in Mobile County. She is Black, a U.S. citizen, has never lost her right to vote by reason of a felony conviction or court order, and is a lawfully registered voter at her current address in Alabama. She is also the executive director of the Center for Fair Housing and in that role frequently works as an organizational partner with Plaintiff BVM on their voter registration and voter education efforts. Ms. Bettis faces a higher risk of contracting and having severe complications from COVID-19 because of two preexisting conditions: diabetes and hypertension. Ms. Bettis is even more concerned about avoiding exposure because her mentee's son has tested positive for COVID-19 and her mentee's son's grandmother is in the hospital with a coma as a result of the disease. Since the start of the COVID-19 pandemic, Ms. Bettis has been practicing social distancing, including limiting her visits outside of the house, wearing a mask when she does leave her home, and keeping a distance from other individuals when outside of the home. She has converted her work to remote work to avoid leaving her home. Ms. Bettis also has not engaged in the same level of voter education efforts for the upcoming July election as she has for previous elections because of the difficulties of social distancing.

54.     Ms. Bettis is a dedicated voter and frequently votes in federal, state, and local elections. She voted in-person in the March 3, 2020 primary election. She is eligible to vote absentee in the July 14 primary runoff because of Secretary Merrill's broader interpretation of the absentee statute for that election, but likely does not meet any of the Excuse Requirements for future 2020 elections. But due to the health risks of voting in-person, Ms. Bettis would like to vote

by absentee ballot in all future 2020 elections. Because only one other adult lives in her home, Ms. Bettis would also have to venture outside of the house to have her absentee ballot notarized or to find another adult to witness her ballot, thus, endangering her health.

55.    Plaintiff SHERYL THREADGILL-MATTHEWS is a 67-year-old Alabama citizen living in Camden, Alabama. Her home is in Wilcox County. She is Black, a U.S. citizen, has never lost her right to vote by reason of a felony conviction or court order, and is lawfully registered voter at her current address in Alabama. She currently is the director of a youth program, BAMA Kids. In that role she has partnered with BVM on their voter registration and education efforts. BAMA Kids runs a summer program for the youth, which in previous years has been conducted in person, but this summer is being conducted remotely because of the COVID-19 pandemic. Ms. Threadgill-Matthews is a retired social worker and poll worker at the absentee box. Ms. Threadgill-Matthews faces a higher risk of contracting and having severe complications from COVID-19 because of her age and hypertension. COVID-19's devastating path through Alabama has directly affected Ms. Threadgill-Matthews and rightfully made her concerned about contracting it: she knows 15 to 20 people who have had COVID-19, eight of whom have been hospitalized, including her neighbor who was in intensive care for two weeks. She knows two individuals who have passed from COVID-19. Ms. Threadgill-Matthews has been practicing social distancing since the start of the COVID-19 pandemic by limiting her time outside of the home, wearing a mask when she leaves the home, and keeping distance from others.

56.    Ms. Threadgill-Matthews is a dedicated voter. She votes in federal, state, and local elections. Ms. Threadgill-Matthews voted in person on March 3, 2020. She plans to vote absentee in the July 2020 elections and would like to vote absentee in future 2020 elections because of the threat of contracting COVID-19. While she will likely be able to vote absentee in the July 2020

elections because of Secretary Merrill's broader interpretation of the absentee statute for that election, she likely does not meet any of the Excuse Requirements for future elections.

57.     Plaintiff GREGORY BENTLEY is a 50-year-old Alabama citizen who lives at his home in Huntsville, Alabama with his wife and minor daughter. His home is in Madison County. He is Black, a U.S. citizen, has never lost his right to vote by reason of a felony conviction or court order, and is a lawfully registered voter at his current address in Alabama. He is Presbyterian Minister at Fellowship Presbyterian in Huntsville, Alabama and President of the Huntsville Southern Christian Leadership Conference, which partners with BVM on registering voters and getting voters to the polls. Mr. Bentley has been practicing social distancing since the start of the COVID-19 pandemic because his daughter has a pre-existing condition—she contracted necrotizing enterocolitis as an infant, which may place her at higher risk for severe complications from COVID-19. He knows at least ten people who have had COVID-19 and five people who have passed from COVID-19 and does not want to risk exposure since he well knows how easily it can be transmitted. He is currently practicing social distancing by wearing a mask whenever he goes out and he has stopped attending social functions. For example, his church now conducts virtual services rather than in-person services.

58.     Mr. Bentley is a dedicated voter. He votes in federal, state, and local elections.  Mr. Bentley voted in person or March 3, 2020. Even at that early date, he wore a mask to the polls. He would like to vote absentee in the July 2020, August 25 municipal elections, and other future 2020 elections including the November general election because of the threat of contracting COVID-19 and passing it on to his daughter. While he will likely be able to vote absentee in the July 2020 elections because of Secretary Merrill's broader interpretation of the absentee statute for that election, he likely does not meet any of the Excuse Requirements for future elections.

59.     Defendant JOHN MERRILL is the Secretary of State of the State of Alabama. He is sued in his official capacity. As a constitutional officer and a member of the State's executive department, he is Alabama's chief election official. Ala. Const., art. V, § 112. He is charged with administering elections and enforcing the Challenged Provisions, including instructing probate judges, absentee election managers, and other officials on the proper interpretation and implementation of the Challenged Provisions, issuing related administrative rules, and canvassing and certifying election results in a manner that is consistent with the Challenged Provisions. The Secretary of State is also responsible for prescribing and designing the absentee ballot application form that "shall be used throughout the state," Ala. Code § 17-11-4, which include instructions to election officials and voters regarding the Excuse and Photo ID Requirements. The Secretary of State, and no other defendant, election official, or state officer, is statutorily required to "inform the public" about the Photo ID Requirement, *id*. § 17-9-30(n), issue voter photo ID cards, *id*. § 17-9-30(f), (j), and charged with "rule making authority for the implementation" of the Photo ID Requirement. *Id*. § 17-9-30(o). In the event Alabama, the federal government or another state declares a state of emergency that "renders substantial compliance with" the absentee ballot provisions of Alabama law "impossible or unreasonable for a group of qualified voters who respond to the emergency," the Secretary of State "may adopt an emergency rule to allow those qualified voters to vote by absentee ballot." Ala. Code § 17-11-3(e).

60.     Defendant STATE OF ALABAMA ("State") is a State of the United States, and is being sued pursuant to Sections 2, 3 and 201 of the VRA and Title II of the ADA. Pursuant to the Fourteenth and Fifteenth Amendments of the U.S. Constitution, Congress has validly abrogated the State of Alabama's sovereign immunity in actions brought to enforce the VRA and the ADA. The State receives federal funding under the Help America Vote Act of 2002 ("HAVA"). The

State has indicated to the Eleventh Circuit U.S. Court of Appeals and the Supreme Court of the United States that it intends to subject itself to federal jurisdiction to defend the constitutionality of the Challenged Provisions as a defendant-intervenor as to the 42 U.S.C. § 1983 claims in this action. The State has therefore waived or is estopped from raising a sovereign immunity defense.

61.     Defendants JOJO SCHWARZAUER; JACQUELINE ANDERSON-SMITH; KAREN DUNN BURKS; MARY B. ROBERSON; JAMES MAJORS; GINA JOBE ISHMAN; DEBRA KIZER; RUBY JONES THOMAS; JOHNNIE MAE KING; and CAROLYN DAVIS-POSEY, in their official capacities as the circuit clerks and/or the absentee ballot managers for federal, state, and county elections in Jefferson, Lee, Lowndes, Madison, Mobile, Montgomery, and Wilcox counties. As the circuit clerks and/or the absentee ballot managers, they are charged with enforcing the Excuse, Witness and Photo ID Requirements, processing and distributing absentee ballot applications, appointing and training poll workers, and issuing, validating and canvassing absentee ballots.

62.     SHERRI FRIDAY, JAMES NAFTEL, DON DAVIS, BILL ENGLISH, LASHANDRA MYRICK, FRANK BARGER, J.C. LOVE, III, and BRITNEY JONES-ALEXANDER, in their official capacities as the probate judges for federal, state, and county elections in Jefferson, Lee, Limestone, Lowndes, Madison, Mobile, Montgomery, and Wilcox counties. As the probate judges of their respective counties, they are charged with enforcing the Challenged Provisions, including, but not limited to serving as the chief election officials of their counties, appointing and training poll workers, and validating and canvassing election returns and ballots.

**JURISDICTION AND VENUE**

63.     This action arises under the First, Fourteenth and Twenty-Fourth Amendments to

27

the U.S. Constitution, the ADA, and the VRA, and is brought under 42 U.S.C. §§ 1983 and 1988, 42 U.S.C. §§ 12131, *et seq*., and 52 U.S.C. §§ 10301, 10302(b) and 10501 to seek injunctive and declaratory relief for violations of federal law. This Court therefore has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

64.    This Court has personal jurisdiction over Defendants, who are sued in their official capacities as government officials. The violations complained of concern their conduct in such capacities.

65.    Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

66.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to Plaintiffs' claims occurred there.

## STATEMENT OF FACTS

## I.    Transmission of COVID-19 and Public Health Guidelines

67.    Our nation is in the midst of a public health emergency due to the exponential spread of COVID-19, the respiratory disease caused by the novel coronavirus SARS-CoV-2. According to the CDC, this coronavirus spreads aggressively, including by asymptomatic people.[15] Persons in all age groups have contracted the disease.[16]

68.    Since April, the United States has led the world in the total number of COVID-19 cases.[17] As of June 25, 2020, the United States has confirmed over 2.4 million cases of COVID-

---

[15] Ctrs. for Disease Control & Prevention (hereinafter "CDC"), *How Coronavirus Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited June 25, 2020).
[16] Robert Verity, et al., Estimates of the Severity of Coronavirus Disease 2019: A Model-Based Analysis, The Lancet 6Infec Dis (Mar. 30, 2020), https://www.thelancet.com/action/showPdf?pii=S1473-3099%2820%2930243-76.
[17] Lisa Lockerd Maragakis, *Coronavirus Disease 2019 vs. the Flu,* Johns Hopkins Univ. Health, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-disease-2019-vs-the-flu

19 and reported 122,370 deaths due to COVID-19 and counting.[18] As of June 25, CDC Director Robert Redfield has explained that antibody tests now indicate the total number of infections is likely 10 times higher than reported cases: 24 million Americans have likely been infected to date.[19]

69.     Even mild cases of COVID-19 generally involve about two weeks of fevers and dry coughs and are more severe than the flu.[20]

70.     The CDC estimates that approximately 20% of those who are infected by SARS-CoV-2 require hospitalization.[21] COVID-19 can severely damage lung tissue, cause a permanent loss of respiratory capacity, and it also damage tissues in the kidney.[22] The surge of COVID-19 cases also causes mounting strains on healthcare systems, including critical shortages of doctors, nurses, hospital beds, medical equipment, and personal protective equipment.[23]

71.     In serious cases, individuals' lungs "become filled with inflammatory material

---

(last visited Apr. 30, 2020); *see also* COVID-19 Dashboard, Johns Hopkins Ctr. for Sys. Sci. & Eng'g, https://www.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6 (last visited Apr. 26, 2020) (GIS map of global COVID-19 cases developed by the Johns Hopkins Ctr. for Sys. & Engineering).

[18] CDC, Cases in the U.S., https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited June 25, 2020).

[19] Lena H. Sun & Joel Achenbach, *CDC Chief Says Coronavirus Cases May Be 10 Times Higher Than Reported*, Wash. Post (June 25, 2020 7:41 p.m.), https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/.

[20] Holly Secon & Aria Bendix, *There Is a Wide Misconception of What a 'Mild' Case of COVID-19 Looks Like. It Can Be Ugly and Brutal.*, Business Insider (Apr. 16, 2020), https://www.businessinsider.com/mild-coronavirus-cases-high-fever-dry-cough-2020-3.

[21] Ctrs. for Disease Control & Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited June 25, 2020).

[22] Ctrs. for Disease Control & Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited June 25, 2020).

[23] Megan L. Ranney et al., *Critical Supply Shortages — The Need for Ventilators and Personal Protective Equipment during the Covid-19 Pandemic*, New Eng. J. Medicine, Apr. 30, 2020, https://www.nejm.org/doi/full/10.1056/NEJMp2006141; World Health Org., *Shortage of Personal Protective Equipment Endangering Health Workers Worldwide* (Mar. 3, 2020), https://www.who.int/news-room/detail/03-03-2020-shortage-of-personal-protective-equipment-endangering-health-workers-worldwide.

[and] are unable to get enough oxygen to the bloodstream . . . ."[24] Severe cases of COVID-19 cause acute respiratory distress syndrome ("ARDS") in which fluid displaces air in the lungs. COVID-19 patients with ARDS "are essentially drowning in their own blood and fluids because their lungs are so full."[25] The virus frequently causes extreme symptoms, including fever and chills that can last for weeks, excruciating pain, debilitating fatigue, an unremitting cough, uncontrollable diarrhea, and an inability to keep down food and water.[26]

72.    People of all ages have contracted COVID-19 and died from it. The illness poses special risks for older people and those with certain preexisting medical conditions. Preliminary reports based on WHO data show a 3.6% mortality rate for individuals between 60-69 years old, and an 8% mortality rate for those 70-79 years old.[27] According to the CDC's analysis, 80% of all COVID-19 related deaths in the U.S. are people aged 65 and older.[28] The CDC has now explained that the risk of COVID-19 increases steadily with age.[29] COVID-19 also poses greater risks for people with preexisting heart and respiratory conditions, individuals with compromised immune systems, and those with many other conditions, including sickle cell disease, which

---

[24] Graham Readfearn, *What Happens to People's Lungs When They Get Coronavirus?*, The Guardian (Apr. 14, 2020), https://www.theguardian.com/world/2020/apr/15/what-happens-to-your-lungs-with-coronavirus-covid-19.
[25] Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19 — Even in His Young Patients*, ProPublica (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.
[26] *See, e.g.*, *id.*; Leah Groth, *Is Diarrhea a Symptom of COVID-19? New Study Says Digestive Issues May Be Common With Coronavirus*, Health (Mar. 20, 2020), https://www.health.com/condition/infectious-diseases/coronavirus/is-diarrhea-a-symptom-of-covid-19.
[27] *Sarah Boseley, People in Their 60s at Higher Coronavirus Risk Too, Say Scientists, The Guardian (Apr. 22, 2020), https://www.theguardian.com/society/2020/apr/22/people-in-their-60s-at-higher-coronavirus-risk-too-say-scientists*.
[28] *Id.*
[29] Lena H. Sun & Joel Achenbach, *CDC Chief Says Coronavirus Cases May Be 10 Times Higher Than Reported*, WASH. POST (June 25, 2020 7:41 p.m.), https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/.

disproportionately affects Black Americans.[30]

73.     The effects of the pandemic on social life will last well into the summer and fall of 2020, if not far longer. Experts have indicated that seasonal changes are "unlikely to stop transmission."[31] Dr. Anthony Fauci, head of the National Institute of Allergy and Infectious Diseases and member of the White House's coronavirus taskforce, recently called the a second round of COVID-19 in the fall "inevitable" and explained that the severity of the next wave will depend on factors like continuation of current precautionary measures.[32] As Dr. Fauci has stated, "[w]e will have coronavirus in the fall . . . . I am convinced of that because of the degree of transmissibility that it has, the global nature."[33]

74.     Dr. Fauci also confirmed that he "can't guarantee" in-person voting will be safe in November, because of a potential resurgence of COVID-19 in the fall.[34] As Dr. Fauci testified before the Senate, "the idea of having treatments available, or a vaccine" by this this fall "would be something that would be a bit of a bridge too far."[35] And even if a vaccine could be developed by the fall, Dr. Fauci has explained that "there's no guarantee that the vaccine is actually going to

---

[30] *Id.*; *See also* Ctrs. for Disease Control & Prevention, *People of Any Age with Underlying Medical Conditions,* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk html (last visited June 25, 2020).

[31] Marc Lipsitch, Harvard T.H. Chan School of Public Health, Ctr. for Communicable Disease Dynamics, *Seasonality of SARS-CoV-2: Will COVID-19 go away on its own in warmer weather?*, https://ccdd hsph.harvard.edu/will-covid-19-go-away-on-its-own-in-warmer-weather/ (last visited Apr. 30, 2020).

[32] Christina Maxouris, *US Could Be in For 'a Bad Fall and a Bad Winter' if It's Unprepared for a Second Wave of Coronavirus, Fauci Warns,* CNN, (Apr. 29, 2020), https://www.cnn.com/2020/04/29/health/us-coronavirus-wednesday/index.html.

[33] Savannah Behrmann, *'Convinced': Fauci Says There Will Be Coronavirus in the Fall After Trump Says 'It May Not Come Back'*, USA Today (Apr. 23, 2020), https://www.usatoday.com/story/news/politics/2020/04/22/coronavirus-dr-anthony-fauci-says-i-am-convinced-second-wave/3009131001/.

[34] Jason Silverstein, *Fauci Says he "Can't Guarantee" In-Person Voting in November Will Be Safe,* CBS News, Apr. 13, 2020, https://www.cbsnews.com/news/coronavirus-fauci-says-he-cant-guarantee-in-person-voting-in-november-will-be-safe/?ftag=CNM-00-10aac3a.

[35] *Dr. Anthony Fauci & CDC Director Senate Testimony Transcript May 12* at 32, Rev (May 12, 2020), https://www.rev.com/blog/transcripts/dr-anthony-fauci-cdc-director-senate-testimony-transcript-may-12.

be effective . . . .”[36] Yet public health experts warn that the virus will continue to pose a serious threat to public health and safety until that point.[37]

75.     With no known effective treatment and vaccines months (or more) away, public health officials have been left to urge the public to practice “social distancing,” i.e., avoidance of close contact with others.[38] For purposes of social distancing, the CDC recommends that individuals stay at least six feet away from others and “avoid crowded places.”[39]

76.     Even maintaining six feet of separation from others is not sufficient to avoid the risk of infection. Researchers have demonstrated that particles from a cough may spread as far as 16 feet, while a sneeze may spread particles as far as 26 feet.[40] When multiple people share a space the concentration of infectious droplets in the air “build[s] up.”[41]

77.     Health officials recommend that all individuals practice social distancing as much as possible not just for their own health but for the health of the community. Recent studies indicate that people who are infected but do not have symptoms likely also play a role in the spread of COVID-19.[42] The CDC has said that “[e]veryone has a role to play in slowing the spread and

---

[36] *Id.* at 19, 92.

[37] Devan Cole, *Fauci Admits Earlier Covid-19 Mitigation Efforts Would Have Saved More American Lives*, CNN (Apr. 12, 2020), https://www.cnn.com/2020/04/12/politics/anthony-fauci-pushback-coronavirus-measures-cnntv/index.html.

[38] Johns Hopkins Univ., *Coronavirus, Social Distancing and Self-Quarantine*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine (last visited June 25, 2020).

[39] CDC, *Social Distancing*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last updated July 6, 2020).

[40] Yuliya Parshina-Kottas et al, *This 3-D Simulation Shows Why Social Distancing Is So Important*, N.Y. Times, (Apr. 14 2020), https://www.nytimes.com/interactive/2020/04/14/science/coronavirus-transmission-cough-6-feet-ar-ul.html.

[41] *Id.*

[42] Dr. Robert Redfield, the director of the CDD noted in April that “[o]ne of the [pieces of] information that we have confirmed now is that a significant number of individuals that are infected actually remain asymptomatic. That may be as many as 25 percent.” Roz Plater, *As Many as 80 Percent of People with COVID-19 Aren't Aware They Have the Virus*, Healthline News, (May 28, 2020), https://www.healthline.com/health-news/50-percent-of-people-with-covid19-not-aware-have-virus

protecting themselves, their family, and their community.[43]

78.     The CDC has issued specific guidelines concerning voting during the COVID-19 pandemic. Among other things, it recommends that states "offer alternative voting methods that minimize direct contact and reduce crowd size at polling locations" including "mail-in methods of voting if allowed in the jurisdiction" and asked jurisdictions to encourage "drive-up voting for eligible voters" as a means of complying with social distancing rules and limiting personal contact during in-person voting.[44]

79.     Compliance with these recommendations is essential to ensuring that voters can safely participate in our democracy. There is no evidence that SARS-CoV-2 can be spread through the mail, and the U.S. Postal Service has further changed their policies to "eliminate the requirement that customers sign our Mobile Delivery Devices for delivery" and now require the customer "to step back a safe distance or close the screen door/door so that they may leave the item in the mail receptacle or appropriate location by the customer door."[45]

80.     In contrast, the risks of interpersonal interaction while voting are already evident. During Florida's April primary, two Broward County poll workers tested positive for COVID-19, one of whom was handling driver's licenses as part of the identification verification process.[46] Elections held on April 7 in Wisconsin saw multi-hour waits and lines stretching blocks upon blocks in places like Milwaukee and Green Bay, in part, because officials faced a huge backlog of

---

[43] Ctrs. for Disease Control & Prevention, *Social Distancing*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing html (last updated May 6, 2020).

[44] Ctrs. for Disease Control & Prevention, *Considerations for Election Polling Locations and Voters: Interim guidance to prevent spread of coronavirus disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated June 22, 2020).

[45] United States Postal Service, *USPS Statement on Coronavirus* (April 30, 2020), https://about.usps.com/newsroom/statements/usps-statement-on-coronavirus htm (citing guidance from the CDC).

[46] Anthony Man, *Two Broward poll workers, including one who handled voters' driver licenses, test positive for coronavirus*, S. Fla. Sun Sentinel, Mar. 26, 2020, https://www.sun-sentinel.com/coronavirus/fl-ne-broward-elections-poll-workers-coronavirus-20200326-wmgy775dvjc5jis2oagxlpmule-story.html.

requests for absentee ballots and questions about voting absentee, including how to properly request an absentee ballot and how to return it in time to be considered. Election officials also dealt with a reduced number of poll workers due to age, fears of illness, or actual illness. The Wisconsin Department of Health Services has directly traced and linked 71 confirmed cases of COVID-19 to in-person voting in April 7 primary.[47] More recently, a team of economists found "a statistically and economically significant association between in-person voting and the spread of COVID-19 two to three weeks after the election" in Wisconsin.[48]

## II.   COVID-19 in Alabama

81.    The COVID-19 pandemic has deeply affected Alabama. As of July 6, 2020, the State had confirmed over 44,375 cases.[49] At least 984 Alabamians have died from the disease.[50]

82.    Models used by health officials project a sustained outbreak in Alabama through the fall, and project that about 2,000 Alabamians will die of COVID-19 by October 1, even with continued social distancing.[51] On April 26, Dr. Deborah Birx, the White House coronavirus task force coordinator, stated that social distancing would be required at least through the summer.[52]

---

[47] Dee J. Hall, *Study: Poll closings, COVID-19 fears, kept many Milwaukee voters away*, SUN PRAIRIE STAR (June 26, 2020), https://www.wisconsinwatch.org/2020/06/study-poll-closings-covid-19-fearskept-many-milwaukee-voters-away/.

[48] Chad D. Cotti et al., *The Relationship Between In-Person Voting and Covid-19: Evidence from the Wisconsin Primary*, Working Paper 27187, NAT'L BUREAU ECON. RES. (May 2020, revised June 2020), https://www.nber.org/papers/w27187; *see also,* Phillip Alvelda, *COVID-19 Cases and Deaths Surge: The Impact of Wisconsin's In-person Primary Vote*, Inst. For New Econ. Thinking (May 27, 2020), https://www.ineteconomics.org/perspectives/blog/covid-19-cases-and-deaths-surge-the-impact-of-wisconsins-in-person-primary-vote (documenting "a measurable resurgence of the virus within six days of the in-person April 7, 2020 primary election vote").

[49] Ala. Dep't of Public Health, Div. of Infectious Diseases & Outbreaks, *COVID-19 in Alabama*, https://dph1.adph.state.al.us/covid-19/ (last visited July 6, 2020).

[50] *Id.*

[51] *See* Institute for Health Metrics and Evaluation, *COVID-19 Projections: Alabama*, https://covid19.healthdata.org/united-states-of-america/alabama (last visited July 6, 2020).

[52] Ben Kamisar, Birx: *U.S. Needs a 'Breakthrough' on Antigen Testing to Aid in Reopening*, NBC News (Apr. 26, 10:25 a m.), https://www.nbcnews.com/politics/meet-the-press/birx-u-s-needs-breakthrough-antigen-testing-aid-re-opening-n1192901.

83.     As has been the case nationally, Alabamians of all ages have tested positive for COVID-19. At least one confirmed case in Alabama is a patient who is less than one year old; another is 97.[53]

84.     As has been the case throughout the country, Alabamians with underlying health conditions have been especially vulnerable to COVID-19: 841 of the 880 Alabamians who have died from COVID-19 had underlying conditions.[54]

85.     As Alabama State Health Officer Dr. Scott Harris has said, "[c]hronic diseases factors are a real risk for dying from this disease, and chronic diseases are found in about a third of our citizens."[55] Alabamians suffer from the underlying health conditions that health officials have identified pose the greatest risk for COVID-19 complications at disproportionately higher rates: 38% of Alabamians have high cholesterol, more than 14% have diabetes, and about 400,000, or 1 in 11 Alabamians, have kidney disease.[56]

86.     Furthermore, Black Alabamians suffer from these underlying conditions at disproportionately high rates compared to white Alabamians. For example, according to the ADPH, Black Alabamians are significantly more likely to have diabetes, and Black Alabamians die of diabetes-related complications at two times the rate of white Alabamians with diabetes.[57]

---

[53] Jessica Barnett, *Ivey: Students to work from home for remainder of year*, The News Courier, Mar. 26, 2020, (Mar. 26, 2020), https://www.enewscourier.com/covid-19/ivey-students-to-work-from-home-for-remainder-of-year/article_edd3d2d0-6fad-11ea-aa1a-0bb1baa48e68.html.

[54] Ala. Pub. Health Dept., *Characteristics of Laboratory Confirmed Cases of COVID-19*, https://www.alabamapublichealth.gov/covid19/assets/cov-al-cases-062520.pdf (last updated June 25. 2020).

[55] Leada Gore, *Alabama's Coronavirus Peak: 'Clearly the State Can't Stay Shut Down', ADPH's Dr. Scott Harris Says*, AL (Apr. 20, 2020), https://www.al.com/news/2020/04/alabamas-coronavirus-peak-clearly-the-state-cant-stay-shut-down-adphs-dr-scott-harris-says.html.

[56] Safiya Charles, *These 5 underlying conditions are the most frequent in Alabamians who died of COVID-19*, Montgomery Advisor (Apr. 22, 2020 11:30 a.m.), https://www.montgomeryadvertiser.com/story/news/2020/04/22/most-common-underlying-health-conditions-coronavirus-deaths-alabama-covid-19-fatalities/2999600001/.

[57] *Id.*

87.     In response to the outbreak of COVID-19 in Alabama, Governor Ivey and the ADPH have urged social distancing. Governor Ivey has stated: "Maintaining a 6-foot distance between one another is paramount."[58] Further, the ADPH has instructed the public "to spend as much time as possible at home to prevent an increase in new infections."[59]

88.     To combat viral spread, Governor Ivey and the ADPH have taken a series of steps and issued a series of orders since early March. Through these orders, the Governor has closed many "non-essential" businesses and schools and recommended rigorous social distancing under a "Safer at Home" Order that has been renewed through July 31, 2020.[60]

89.     On March 13, Governor Ivey declared a State of Emergency for Alabama.[61] On the same day, President Donald Trump proclaimed a National Emergency concerning COVID-19.[62]

90.     On March 19, Governor Ivey and the ADPH issued a statewide health order implementing the following mandatory measures: (a) prohibiting "[a]ll gatherings of 25 persons or more, or gatherings of any size that cannot maintain a consistent six-foot distance between persons"; (b) closing all beaches; (c) closing all Senior Citizen Center gatherings; (d) closing all public and private schools, colleges, and universities; (e) closing most preschools and childcare centers, with an exception for "childcare centers operated for the exclusive benefit of essential

---

[58] Off. of the Gov. of Ala., *Governor Ivey Announces New Primary Runoff Election Date* (Mar. 18, 2020), https://governor.alabama.gov/newsroom/2020/03/governor-ivey-announces-new-primary-runoff-election-date/.
[59] Ala. Dep't of Pub. Health, *It's safer at home; protect yourself and your community from COVID-19* (Mar. 27, 2020), https://www.alabamapublichealth.gov/news/2020/03/27 html; *see also* Ala. Dep't of Pub. Health, *ADPH Reinforces Safer at Home Recommendations as More Than 800 COVID-19 Cases Reported in a Single Day* (June 12, 2020), https://www.alabamapublichealth.gov/news/2020/06/12.html.
[60] *See* Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of Infection by COVID-19 (Apr. 3, 2020), https://governor.alabama.gov/assets/2020/04/Final-Statewide-Order-4.3.2020.pdf (summarizing and extending measures); *see also* Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of Infection by COVID-19, Amended May 21, 2020 (May 21, 2020), https://governor.alabama.gov/assets/2020/05/Safer-at-Home-Order-FINAL-5.21.2020.pdf.
[61] Proclamation by the Governor of the State of Alabama, State of Emergency: Coronavirus (COVID-19), Mar. 13, 2020, https://governor.alabama.gov/newsroom/2020/03/state-of-emergency-coronavirus-covid-19/.
[62] Proclamation No. 9994, 85 Fed. Reg. 15337 (2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

employees" of enumerated categories of employers; (f) requiring hospitals and nursing homes to prohibit visitation except for certain compassionate care situations; (g) delaying all elective medical and dental procedures; and (h) prohibiting restaurants, bars, breweries, and similar establishments from permitting "on-premise consumption of food or drink."[63]

91.    The following day, March 20, Governor Ivey authorized the Alabama National Guard to activate up to 100 guardsmen as needed to combat COVID-19.[64]

92.    On March 26, Governor Ivey issued a proclamation ordering "all public K-12 schools" to "implement a plan to complete the 2019-2020 school year using alternative methods of instruction"; extending the licensure period for emergency medical services personnel; authorizing some notaries to notarize signatures through videoconferencing; authorizing state agencies to create, retain, and accept electronic records and signatures; and enabling municipalities to authorize law enforcement officers to issue a summons and complaint in lieu of arrest for most misdemeanors and violations.[65]

93.    On March 30, President Trump approved a major disaster declaration for Alabama, which made federal emergency aid available for pandemic related recovery efforts.[66]

94.    On April 2, Governor Ivey issued a proclamation modifying regulations applicable to health care providers and ordering licensing boards to adopt emergency rules to "expand the

---

[63] *See* Order of the State Public Health Officer Suspending Certain Public Gatherings Due to Risk of Infection by COVID-19 (Mar. 19, 2020), https://www.alsde.edu/COVID19%20Updates/Alabama%20State%20Health%20Officer%20Statewide%20Social%20Distancing%20Order%20%20%283.19.20%29.pdf.

[64] Off. of the Gov. of Ala., *Governor Ivey Issues Statement on Authorization of Alabama National Guard on As Needed Basis* (Mar. 20, 2020), https://governor.alabama.gov/newsroom/2020/03/governor-ivey-issues-statement-on-authorization-of-alabama-national-guard-on-as-needed-basis/.

[65] Gov. Kay Ivey, Proclamation by the Governor (Mar. 26, 2020), https://www.alabamapublichealth.gov/legal/assets/soe-covid19-instruction-032620.pdf.

[66] *See* FEMA, *President Donald J. Trump Approves Major Disaster Declaration for Alabama* (Mar. 30, 2020), https://www.fema.gov/news-release/2020/03/30/president-donald-j-trump-approves-major-disaster-declaration-alabama.

capacity of the health care workforce"; modifying or suspending some regulations and laws affecting healthcare facilities; expanding the Governor's March 26 authorization of remote notarizations and witnessing; authorizing governmental entities to postpone or cancel public meetings; enabling corporations to hold remote shareholder meetings; and authorizing measures "to reduce the number of local inmates being held in county jails in a way that does not jeopardize public safety."[67]

95.     On April 3, Governor Ivey and State Health Officer Scott Harris issued a mandatory statewide order requiring "every person . . . to stay at his or her place of residence except as necessary to perform" an enumerated list of "essential activities."[68]

96.     In addition, the April 3 order mandated the closure of entertainment venues, athletic facilities, and close-contact service providers, such as barber shops.[69] In order to remain open, "essential retailers" were required by the order to implement a reduced "emergency maximum occupancy rate," enforce social distancing, and take reasonable steps to comply with CDC and ADPH sanitation guidelines.[70]

97.     Further, the April 3 order required any non-institutionalized person who has tested positive for COVID-19 to "be quarantined to their place of residence for a period of 14 days after receiving positive test results."[71] The order prohibited persons in quarantine from "leav[ing] their place of residence for any reason other than to seek necessary medical treatment."[72]

98.     In issuing the April 3 order, Governor Ivey's issued a statement describing it as "a

---

[67] Gov. Kay Ivey, Proclamation by the Governor (Apr. 2, 2020), https://www.alabamapublichealth.gov/legal/assets/soe-covid19-040220.pdf.
[68] Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of Infection by COVID-19, at 1 (Apr. 3, 2020), https://governor.alabama.gov/assets/2020/04/Final-Statewide-Order-4.3.2020.pdf.
[69] *Id.* at 7-8.
[70] *Id.* at 8.
[71] *Id.* at 8-9.
[72] *Id.* at 8.

Stay at Home order to be applied statewide."[73]

99.    On April 14, during a press conference, Governor Ivey stressed the importance of continuing to practice social distancing and continuing to abide by the State's "Stay at Home" order, stating: "It is imperative that we keep doing what we are doing . . . . Now is not the time to let our guard down and pretend that things are back to normal."[74]

100.    On April 28, Governor Ivey announced a "Safer at Home" order effective from April 30 through May 15.[75] On May 21, Governor Ivey extended the "Safer at Home" order through July 3, 2020.[76] Under the "Safer at Home" order, all non-work related gatherings are prohibited, except between groups of fewer than ten people or those that can maintain six-feet of distance between people from different households.[77] Some businesses may open, but are subject to rigorous sanitation and social distancing guidelines.[78] Individuals—especially vulnerable persons—are encouraged to stay home, wear face coverings when necessary to leave the home, and follow good sanitation practices.[79]

101.    On June 30, 2020, Governor Ivey extended the Safer-at-Home order through July 31, 2020, including the State's recommendations that high risk and vulnerable persons remain at

---

[73] Off. of the Gov. of Ala., *Governor Ivey Issues Stay at Home Order* (Apr. 3, 2020), https://governor.alabama.gov/newsroom/2020/04/governor-ivey-issues-stay-at-home-order/.

[74] *See* Chip Brownlee, *Gov. Kay Ivey: Now is not the time to "pretend things are back to normal"*, Ala. Political Reporter (Apr. 14, 2020), https://www.alreporter.com/2020/04/14/gov-kay-ivey-now-is-not-the-time-to-pretend-things-are-back-to-normal/.

[75] Press Release, The Office of Alabama Governor Kay Ivey, Governor Ivey Issues Safer at Home Order (Apr. 28, 2020), https://governor.alabama.gov/newsroom/2020/04/governor-ivey-issues-safer-at-home-order/. *See also* Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of Infections by COVID-19 at 2 (Amended Apr. 28, 2020), https://governor.alabama.gov/assets/2020/04/Safer-At-Home-Order-Signed-4.28.20.pdf.

[76] Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of Infection by COVID-19, Amended May 21, 2020 (May 21, 2020), https://governor.alabama.gov/assets/2020/05/Safer-at-Home-Order-FINAL-5.21.2020.pdf.

[77] *Id.*

[78] *Id.*

[79] *Id.*

home and requiring that restaurants and senior centers offer curbside pickup services.[80]

102.    Yet, the number of COVID-19 cases are continuing to rise in both the rural and urban counties of Alabama.[81] As of June 17, the average number of new cases reached its all-time high in 26 of the state's 67 counties, and hospitalizations due to COVID-19 have also reached their highest levels yet in the state.[82]

103.    Indeed, perhaps because of relaxed social distancing restrictions in Alabama, the State is experiencing one of the nation's largest spikes of COVID-19. As of June 23, Alabama is second in the nation in terms of rising COVID-19 cases per capita.[83] The three highest single days of new cases in Alabama have each occurred in June, occurring on June 12, June 13, and June 23.[84] On July 3, 2020, Alabama set a new high of 1,758 new cases in one day, a seven-day average of 1,092, and 843 hospitalizations.[85] Because of the high incidence of COVID-19 infections in Alabama, multiple states now require mandatory quarantining for anyone traveling from Alabama.

104.    In response to this rapid increase in case numbers, Alabama State Health Officer Dr. Scott Harris declared that he was "extremely concerned about these numbers."[86] As Dr. Harris

---

[80] *See* Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of Infection by COVID-19, Amended May 21, 2020 (May 21, 2020), https://governor.alabama.gov/assets/2020/05/Safer-at-Home-Order-FINAL-5.21.2020.pdf.

[81] Nicholas Reimann, *Alabama's Coronavirus Cases Are Skyrocketing, Breaking Records for 4 Straight Days*, FORBES (June 14, 2020), https://www.forbes.com/sites/nicholasreimann/2020/06/14/alabamas-coronavirus-cases-are-skyrocketing-breaking-records-for-4-straight-days/#3278a9664824.

[82] Ramsey Archibald, *Top 10 Counties in Alabama for Rising Coronavirus Cases*, Alabama Media Group (June 17, 2020), https://www.al.com/news/2020/06/top-10-counties-in-alabama-for-rising-coronavirus-cases.html.

[83] Cassie Fambro, *Alabama Second in Nation in Rising COVID-19 Cases*, WBRC (June 23, 2020 9:03 p.m.), https://www.wbrc.com/2020/06/23/alabama-second-nation-rising-covid-cases/.

[84] *Alabama Reports its Third-Highest Day of COVID-19 Cases*, WSFA (June 24, 2020 at 1:52 p.m.), https://www.wsfa.com/2020/06/24/alabama-reports-its-third-highest-day-covid-cases/.

[85] Leada Gorve, *Alabama adds staggering 1,758 coronavirus cases since yesterday*, Alabama Media Group, July 3, 2020, https://www.al.com/news/2020/07/alabama-adds-staggering-1758-coronavirus-cases-since-yesterday.html.

[86] *Coronavirus Cases Spike in Alabama — 'We Are Extremely Concerned About These Numbers'*, CNBC (June 21, 2020 11:39 a.m.), https://www.cnbc.com/2020/06/21/coronavirus-cases-spike-in-alabama-we-are-extremely-concerned-about-these-numbers.html.

acknowledged in May, COVID-19 has created "a true state of emergency and one whose end is not yet in sight."[87]

### III.   COVID-19's Impact on Black Alabamians Given Ongoing and Past Discrimination

105.    The COVID-19 pandemic has had a particularly devastating effect on Black communities. A CDC report published April 8, 2020, which included data from 1,482 patients hospitalized across 14 states, found that Black COVID-19 patients made up 33% of those for whom race or ethnicity information was available, despite representing only 18% of the states' populations.[88]

106.    The higher risk of COVID-19 infection for African Americans is tied to pre-existing and evolving inequities in structural systems and social conditions. For example, according to the CDC, "[m]any members of racial and ethnic minorities may be more likely to live in densely populated areas because of institutional racism in the form of residential housing segregation. . . . People living in densely populated areas and homes may find it harder to practice social distancing." The CDC identifies racial discrimination and disparities in living conditions, work circumstances, and health circumstances to the racial disparities in infection and outcomes for African Americans, including "[r]acial housing segregation" and "[r]acism, stigma, and systemic inequities," which serve to "undermine prevention efforts, increase levels of chronic and toxic stress, and ultimately sustain health and healthcare inequities" among Black Americans.[89] The structural factors and systematic racism that contribute most significantly to elevated risk

---

[87] Dr. Scot Harris, *Safeguard Your Overall Health in the COVID-19 Pandemic*, Ala. Public Health, May 2020, https://www.alabamapublichealth.gov/news/archived-messages html#may2020 (last visited June 13, 2020).

[88] Shika Garg, MD, et. al., *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019—COVID-NET, 14 States, March 1-30, 2020*, CDC MORBIDITY AND MORTALITY WEEKLY REPORT (Apr. 17, 2020), at 459.

[89] CDC, *Coronavirus Disease 2019: COVID-19 in Racial and Ethnic Minority Groups*, (Last Updated June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities html.

nationally are also evident in Alabama, including a history of anti-Black racism and discrimination.

107.    As Dr. Selwyn M. Vickers, Senior Vice President of Medicine and Dean of the University of Alabama at Birmingham School of Medicine, has explained, across the nation, the "alarming outcomes [for Black COVID-19 patients] are in large part the result of longstanding inequities in an array of health determinants, including limited access to health care (especially primary care)[.]"[90] In many parts of the country, COVID-19 "testing facilities have been concentrated in predominantly white areas" or have been  "drive-through-only or not on public transportation routes, making them less accessible for people who do not own an automobile."[91]

108.    Alabama has likewise reported alarming racially disparate patterns of serious illness and mortality due to COVID-19.[92] As of July 6, the ADPH has reported that Black people in Alabama represented over 34.5% of reported COVID-19 cases and 44.9% of related deaths[93] despite making up just 27% of the state's population.[94] In Mobile County, as of July 6, Black people accounted for 48.6% of COVID-19 deaths, 60.7% of hospitalizations, and 46.9% of infections, [95] despite representing only 36% of the population.[96]

109.    These racial disparities reflect Alabama's long and ongoing history of discrimination against Black people in health, education, housing, employment, and other areas of

---

[90] Dr. Selwyn M. Vickers, *Health Disparities and COVID-19: A Crisis Within a Crisis*, UAB News, Apr. 10, 2020, https://www.uab.edu/news/campus/item/11232-health-disparities-and-covid-19-a-crisis-within-a-crisis.
[91] *Id.*; *see also* Blake Farmer, *The Coronavirus Doesn't Discriminate, But U.S. Health Care Showing Familiar Biases*, NPR, Apr. 2, 2020, https://www.npr.org/sections/health-shots/2020/04/02/825730141/the-coronavirus-doesnt-discriminate-but-u-s-health-care-showing-familiar-biases.
[92] *See* Kim Chandler, *Alabama numbers show race disparity in COVID-19 deaths*, Associated Press, Apr. 7, 2020, https://apnews.com/ca48e15ae178c14036ed795ccac857c3.
[93] ADPH, *Alabama Public Health Daily Case Characteristics: 7/6/20*, https://www.alabamapublichealth.gov/covid19/assets/cov-al-cases-062520.pdf.
[94] U.S. Census Bureau, *QuickFacts Alabama*, https://www.census.gov/quickfacts/AL (last visited June 25, 2020).
[95] Mobile County Health Dep't, *Characteristics of COVID-19 Patients–Mobile County, Alabama, 2020* (July 6, 2020), http://mchd.org/Documents/BulkDocuments/News_762020100925am_MCHD_Daily_07_06_2020.pdf.pdf
[96] U.S. Census Bureau, *QuickFacts: Mobile County, Alabama*, https://www.census.gov/quickfacts/mobilecountyalabama (last visited June 25, 2020).

socioeconomic life. Due to persistent structural inequities, Black Alabamians have less access to healthcare and health insurance.[97] Black voters in the Black Belt counties in particular "have fewer primary care physicians, dentists and mental health providers per resident than other counties."[98]

110.   Disparities in access to transportation further exacerbate Black people's disproportionate lack of access to healthcare. Of those persons who can reach healthcare providers, Black patients showing symptoms like cough and fever are less likely than other patients to be given one of the scarce COVID-19 tests,[99] because of longstanding racial biases in medical care.[100]

111.   Underlying health disparities further render Black Alabamians particularly vulnerable to COVID-19. The CDC has added sickle cell disease—a blood disorder that disproportionately affects Black Americans—to the list of pre-existing conditions that exacerbate the effects of COVID-19.[101] In Alabama, Black people are more than twice as likely as whites to die from diabetes and nearly three times as likely to die from hypertension or asthma.[102] Black Americans also suffer from kidney failure at three times the rate of white people and represent

---

[97] Heeju Sohn, *Racial and Ethnic Disparities in Health Insurance Coverage: Dynamics of Gaining and Losing Coverage over the Life-Course*, 36 Popul Res Policy Rev. 181 (Apr. 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5370590/ ("African Americans . . . are more likely to be uninsured throughout adulthood than non-Hispanic [white] individuals. Without insurance, people face considerable barriers in receiving health services. Many health care providers require insurance coverage from their patients or charge a prohibitively high fee.").

[98] Anna Maria Barry-Jester, *The Healthcare System is Leaving the Southern Black Belt Behind*, FiveThirtyEight Jun. 28, 2017, https://fivethirtyeight.com/features/the-health-care-system-is-leaving-the-southern-black-belt-behind/; *see also* The Office of Primary Care and Rural Health Alabama Department of Public Health and The Alabama Rural Health Association, *Selected Health Status Indicators* (Oct. 2007), http://www.adph.org/ruralhealth/assets/BBACData.pdf.

[99] *See* Rubix Life Sciences, *Health Data in the COVID-19 Crisis: How Racial Equity is Widening for Patients to Gain Access to Treatment* 3 (Mar. 20, 2020), https://rubixls.com/wp-content/uploads/2020/04/COVID-19-Minority-Health-Access-7-1.pdf; *see also* Farmer, *supra*.

[100] *See, e.g.*, Michael O. Schroeder, *Racial Bias in Medicine Leads to Worse Care for Minorities*, U.S. News (Feb. 11, 2016), https://health.usnews.com/health-news/patient-advice/articles/2016-02-11/racial-bias-in-medicine-leads-to-worse-care-for-minorities.

[101] Lena H. Sun & Joel Achenbach, *CDC Chief Says Coronavirus Cases May Be 10 Times Higher Than Reported*, Wash. Post (June 25, 2020 7:41 p.m.), https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/.

[102] ADPH, *Selected Health Status Indicators: Alabama's Caucasian and African American Populations* 4-5 (July 2013), http://www.adph.org/minorityhealth/assets/MinorityHealthStatus2013.pdf.

35% of all patients receiving dialysis due to the condition.[103] Many of these underlying conditions result from past and present policies that both relegate Black people to particular neighborhoods and disproportionately allocate landfills, factories, and other environmental risks to Black neighborhoods.[104] On April 10, in light of the racial disparities in infection and death for Black Alabamians, Dr. Karen Landers, an officer at the ADPH, urged Black people in particular to "stay at home" and stringently practice social distancing.[105]

112.    Racial discrimination in Alabama has also resulted in socioeconomic inequalities that disadvantage Black people, like higher rates of unemployment, disability, poverty, and inadequate health insurance than white people. These factors also make it more likely that Black voters in Alabama are forced to work outside the home even during the current pandemic and are therefore more exposed to COVID-19.

113.    Black Americans are, for example, more likely to be part of the "blue collar" essential workforce than white people.[106] In Alabama, the U.S. Census Bureau's 2018 American Community Survey 1-Year Estimates ("ACS") shows that 20.7% of Black people and just 13.7% of white people over age 16 work in service occupations. Similarly, 25.8% of Black people and just 14.6% of white people work in production, transportation, or material moving occupations.

---

[103] Safiya Charles, *These 5 underlying conditions are the most frequent in Alabamians who died of COVID-19* Montgomery Advisor (April 22, 2020 11:30 a.m.), https://www.montgomeryadvertiser.com/story/news/2020/04/22/most-common-underlying-health-conditions-coronavirus-deaths-alabama-covid-19-fatalities/2999600001/.

[104] *See, e.g.*, Ihab Mikati et al., *Disparities in Distribution of Particulate Matter Emission Sources by Race and Poverty Status*, 108 Am J. Pub. Health 480-83 (2018), https://www ncbi.nlm.nih.gov/pmc/articles/PMC5844406/; Diane Alexander & Janet Currie, *Is it who you are or where you live? Residential segregation and racial gaps in childhood asthma*, 55 J. Health Econ. 186 (2017), https://www.ncbi nlm nih.gov/pmc/articles/PMC6112984/.

[105] *Dr. Karen Landers Says Large Number of COVID-19 Deaths Are African American*, WHNT-TV Huntsville (Apr. 10, 2020), https://www.msn.com/en-us/foodanddrink/foodnews/dr-karen-landers-says-large-number-of-covid-19-deaths-are-african-american/vp-BB12rYB6.

[106] Devan Hawkins, *The Coronavirus Burden Is Falling Heavily on Black Americans. Why?*, The Guardian (Apr. 16, 2020), https://www.theguardian.com/commentisfree/2020/apr/16/black-workers-coronavirus-covid-19.

By contrast, 39.1% of white people versus only 26.2% of Black people in Alabama hold management or professional occupations—*i.e.*, "white collar" jobs that are much more likely to allow employees to continue to work safely at home.

## IV.   The COVID-19 Crisis and 2020 Elections in Alabama

114.    Numerous elections are still scheduled to take place in Alabama before the end of the calendar year, including major statewide elections on July 14 and November 3.[107]

115.    Upon information and belief, as of March 10, 2020, Defendant John Merrill had no plan for safely conducting the then-scheduled March 31 runoff election amid the pandemic.

116.    On March 10, for instance, a local columnist asked Defendant John Merrill his plan for safely running the then-scheduled March 31, 2020 primary runoff election during the pandemic. Among other options, the columnist asked Secretary Merrill about encouraging more citizens to vote early and allowing curbside drop-off for absentee ballots.[108]

117.    Secretary Merrill responded that "we're not going to talk about that," asserting that "we don't need for people to be concerned about something that may not ever happen. The story that you're thinking about writing is not even important."[109] Secretary Merrill said that he would "follow the lead" of Governor Ivey and the ADPH. He refused to discuss any plan for the then-scheduled March 31 election until they told him there was "a concern." When asked if he had a "secret plan." Secretary Merrill answered, "We'll respond accordingly based on what information we have," adding: "We don't have any [coronavirus cases] yet. . . . So we don't need to have our people have an increased level of anxiety."[110]

---

[107] *See* Ala. Sec'y of State, Upcoming Elections, 2020 Election Calendar, https://www.sos.alabama.gov/alabama-votes/voter/upcoming-elections (last visited June 25, 2020).
[108] Kyle Whitmire, *Election Day Epidemic? Alabama Has No Plan*, Alabama Media Group (Mar. 10, 2020), https://www.al.com/news/2020/03/election-day-epidemic-alabama-has-no-plan.html.
[109] *Id.*
[110] *Id.*

118.    Three days later, on March 13, there were six confirmed cases of Alabamians with COVID-19.[111]

119.    Also, on March 13, Governor Ivey declared a state of emergency in Alabama. That same day, Secretary Merrill stated that there were no plans to postpone the March 31 primary runoff and that he had no authority under state law to do so.[112]

120.    Two days later, on March 15, Secretary Merrill asked for an emergency opinion from the Alabama Attorney General on whether the Governor had the authority pursuant to her emergency powers to move the March 31 runoff election date. "I don't have the authority and the governor does not have the authority, explicit authority, to postpone the election," Secretary Merrill said. "So, with the new information that was introduced today by the governor about the outbreak and the steps that she's taking with state employees, I felt it was important we get a better interpretation about what the potential might be in order to have that exercised for that reason."[113] By then, there were 22 confirmed COVID-19 cases in Alabama.[114]

121.    Secretary Merrill sought the opinion out of a concern that, because of the increasingly strict federal and state guidelines discouraging large gatherings and urging people to practice social distancing, he would be unable to safely conduct the primary runoff.[115]

122.    Local election officials had also urged a postponement of the primary runoff election to reduce the risk of spreading COVID-19 among voters and poll workers, who tend to

---

[111] Chip Brownlee, *Tracking COVID-19 Cases in Alabama*, Ala. Political Reporter https://www.alreporter.com/mapping-coronavirus-in-alabama/ (last visited Apr. 30, 2020).

[112] Mike Cason, *John Merrill Says Law Doesn't Allow Postponement of Alabama Runoff*, Alabama Media Group (Mar. 13, 2020), https://www.al.com/news/2020/03/john-merrill-says-law-doesnt-allow-postponement-of-alabama-runoff.html.

[113] Mike Cason, *John Merrill Says Alabama Runoff Should Be Postponed; Seeks AG Opinion*, Alabama Media Group (Mar. 15, 2020), https://www.al.com/news/2020/03/john-merrill-says-alabama-runoff-should-be-postponed-seeks-ag-opinion.html.

[114] *Brownlee, supra.*

[115] Mike Cason, *AG Steve Marshall Says Governor Can Postpone March 31 Runoff*, Alabama Media Group (Mar. 17, 2020), https://www.al.com/news/2020/03/ag-steve-marshall-says-governor-can-postpone-march-31-runoff.html.

be older than the general public, putting them at higher risk of death or severe illness from the virus.[116]

123.    On March 17, the Alabama Attorney General issued an opinion finding that Governor Ivey had the authority under the state's emergency management law to postpone the primary runoff until July 14, at the latest. Secretary Merrill agreed that the primary runoff cannot be postponed later than July 14 because further delay will interfere with the November 3 general election.[117] That day, there were 39 confirmed COVID-19 cases in Alabama.[118]

124.    On March 18, Governor Ivey rescheduled the March 31 primary runoff to July 14, 2020.[119] The same day, there were 51 confirmed COVID-19 cases in Alabama.[120]

125.    That same day, Secretary Merrill promulgated an emergency rule pursuant to Section 17-11-3(e) of the Alabama Code titled "Absentee Voting During State of Emergency."[121] Section (1) of the emergency rule provided as follows:

> [A]ny qualified voter who determines it is impossible or unreasonable to vote at their voting place for the Primary Runoff Election of 2020 due to the declared states of emergency, shall be eligible to check the box on the absentee ballot application which reads as follows: "I have a physical illness or infirmity which prevents my attendance at the polls. [ID REQUIRED]."[122]

The emergency rule makes clear that any Alabama registered voter "shall be eligible to vote an absentee ballot for the Primary Runoff Election of 2020" and that "[a]ll Absentee Election Managers and any other election officials of this state are hereby directed and instructed to follow

---

[116] *Id.*
[117] *Id.*
[118] *Brownlee*, *supra*.
[119] Gov. Kay Ivey, Proclamation by the Governor (Mar. 18, 2020), available at https://governor.alabama.gov/assets/2020/03/2020-03-18-1st-Supplemental-COVID-19-SOE.pdf.
[120] *Brownlee*, *supra*.
[121] Ala. Sec. of State, *Certification of Emergency Rules Filed with Legislative Services Agency, 820-2-3-.06-.01ER*, Absentee Voting During State of Emergency (Mar. 18, 2020), https://www.alabamapublichealth.gov/legal/assets/order-secretarystate-031820.pdf.
[122] *Id.*

this Emergency Administrative Rule and accept all absentee ballot applications filed hereunder immediately."[123]  In effect, this emergency rule means that any voter who wishes to vote absentee because they are concerned about exposure to a deadly virus may. The emergency rule expires after 120 days, *see* Ala. Code § 41-22-5(b), which occurs before both the August municipal elections and the November general election.

126.    On March 19, Plaintiffs Greater Birmingham Ministries, the Alabama NAACP, and other civil rights organizations requested that Secretary Merrill take a number of steps to ensure voters could safely participate in all of the upcoming 2020 elections, including to extend emergency rule 820-2-3-.06-.01ER to all 2020 elections; ease the Photo ID Requirements for voters with the highest susceptibility to COVID-19; extend the deadline for requesting and postmarking absentee ballots to Election Day; and allow curbside voting.

127.    Secretary Merrill did not respond to this letter.

128.    On April 17, Plaintiffs GBM and the Alabama NAACP sent a follow up letter to Secretary Merrill. Secretary Merrill also failed to respond to their second letter.

129.    Upon information and belief, Secretary Merrill has corresponded with individual voters and other civic groups who have offered recommendations similar to Plaintiffs.

130.    To date, however, Secretary Merrill has neither adopted nor implemented Plaintiffs' recommendation or any other reasonable accommodations to address their concerns.

131.    On April 8, Secretary Merrill wrote a letter to the Acting Executive Director of the U.S. Election Assistance Commission requesting over $6 million in federal funds to pay for increased absentee voting costs because of the expanded absentee voting options in the runoff,



[123] *Id.*

increased rates of absentee voting in the November 3 general election, additional pay for poll workers, and supplies to sanitize in-person polling locations.[124] Secretary Merrill's letter states that he anticipates substantial increases in absentee voting throughout 2020.

132.    Upon information and belief, Secretary Merrill did not request funding for and does not intend to permit local, city, and county election officials to conduct curbside or drive-thru voting in the 2020 elections.[125]

## V.    The Challenged Provisions Unreasonably Burden the Voting Rights of Alabamians

### A.    The Excuse Requirement's substantial and unreasonable burden on Alabamians during COVID-19 transmission outweighs any State interest in maintaining it.

133.    In the past, most Alabama voters have voted in person on Election Day.[126] For most voters, that means physically appearing at a designated polling place where they may be in close contact with other voters and poll workers. This also means repeatedly touching shared equipment and material such as voting machines, paper ballots, and writing instruments. At present, public health officials consider all of these activities as risking exposure to and/or transmission of COVID-19.

134.    Meaningful opportunities to vote in person are still necessary for many Alabama voters, including those who lack access to reliable mail service or who need accommodations

---

[124] Letter from John H. Merrill, Ala. Sec'y of State, to Mona Harrington, Acting Exec. Director, U.S. Election Assistance Comm'n (Apr. 8, 2020), https://www.eac.gov/sites/default/files/paymentgrants/cares/AL_CARES_Disbursement_RequestLetter.pdf.

[125] See Brian Lyman, *Coronavirus in Alabama: Election Money Will Go Toward Reimbursing Polling Station Prep*, Montgomery Advertiser (Mar. 30, 2020), https://www.montgomeryadvertiser.com/story/news/2020/03/30/coronavirus-alabama-election-money-go-toward-reimbursing-polling-station-prep-covid-19/5086632002/.

[126] See, e.g., U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2018 Comprehensive Report* 29 (2018) (63,379 absentee ballots of over 1.72 million ballots cast in Alabama in 2018 midterm elections), https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf; U.S. Election Assistance Comm'n, *The Election Admin. and Voting Survey 2016 Comprehensive Report* 23 (2016) (88,601 absentee ballots of over 2.13 million total ballots cast in Alabama in 2016 general election), https://www.eac.gov/sites/default/files/eac_assets/1/6/2016_EAVS_Comprehensive_Report.pdf.

related to disabilities or personal assistance due to limited English literacy, including members and

constituents of Plaintiffs People First and Alabama NAACP, that are only available at in-person

voting sites. But to reduce the possibility of virus transmission at needed in-person sites, the CDC

instructs states to encourage as many voters as possible to use "voting methods that minimize

direct contact and reduce crowd size at polling locations."[127]

135.    Unlike the vast majority of other states, Alabama offers no opportunities for in-

person early voting.[128] As a result, polling places are more likely to be crowded on Election Day

in November 2020 because, under current state law, most voters will only have one option for how

to vote: in person on Election Day.

136.    Continuing COVID-19 community transmission is inevitable in November. All

Alabamians will be forced to risk violating social distancing protocols and risk their health and the

health of their communities by going to the polls to vote in-person because they do not meet any

of the Excuse Requirements, or else not vote. Having to make such a choice during a pandemic is

plainly unreasonable and represents a severe burden on the right to vote. Even if the ongoing

COVID-19 outbreak lessens by November in Alabama, members of vulnerable or "high-risk"

populations and those who risk grave medical complications from COVID-19 will reasonably

decide to self-quarantine until a vaccine for the illness is the developed or a cure is identified.

137.    While Alabama's Excuse Requirement allows individuals with "any physical

illness or infirmity which prevents his or her attendance at the polls" to vote absentee, it is far from

clear that this covers many individuals at high risk for severe consequences from COVID-19,

---

[127] Ctrs. for Disease Control & Prevention, *Considerations for Election Polling Locations, supra.*

[128] *See* Nat'l Conf. of State Legislatures, *State Laws Governing Early Voting* (Aug. 2, 2019), https://www.ncsl.org/research/elections-and-campaigns/early-voting-in-state-elections.aspx.

including those with certain preexisting conditions and senior citizens. And even beyond these categories, people of any age or health condition can face severe complications from COVID-19 including death.

138.    Therefore, the Excuse Requirement severely burdens the fundamental right of all eligible voters practicing self-quarantining and social distancing to participate in elections in Alabama in August and November. All eligible voters should be able to practice social distancing regardless of their own health condition and should not have to choose between voting and their decision to practice social distancing for the benefit of the health of their community.

139.    The Excuse Requirement also egregiously burdens the fundamental right to vote of persons with disabilities, like Plaintiffs Peebles and Porter, who have medical conditions that place them at higher risk of death or serious illness from COVID-19 infection, but who are not considered "physically disabled" under the Excuse Requirement. For Plaintiffs and Plaintiffs' members and other voters with disabilities, the Excuse Requirement places them at "high-risk" of exposure to severe illness from COVID-19 (*e.g.*, by being immunocompromised). Older individuals also already face higher rates of infection and death from COVID-19, further magnifying its impact.

140.    The Excuse Requirement will therefore severely burden and/or disenfranchise tens if not hundreds of thousands of Alabama voters who might otherwise vote in scheduled elections from participating in those contests, as anyone not covered by an enumerated absentee "excuse" will have to choose between (1) exposing themselves and others to the risk of illness from COVID-19 by voting in person or (2) foregoing their right to vote.

141.    The Excuse Requirement is also particularly burdensome for Black voters in Alabama, who continue to bear the effects of discrimination in areas such as voting, education,

employment, and health, which hinder their ability to participate effectively in the political

process. It is precisely because of these patterns that Black Alabamians face particularly severe

health risks from COVID-19 exposure arising from being forced to vote in-person rather than by

mail.

142.    Moreover, Black voters are disproportionately burdened by long lines at the polls.

A recent study based on data from millions of smartphone users during the 2016 presidential

election found that residents of mostly Black neighborhoods waited 29% longer to vote and were

74% more likely to spend more than 30 minutes at their polling place than residents of all-white

neighborhoods.[129] This disproportionate wait-time problem means that the risks of voting in-

person during community transmission of COVID-19 will fall more heavily on Black voters.[130]

143.    The Excuse Requirement will result in longer lines for everyone. These longer lines

will make it harder to practice adequate social distancing, and likely decreases in polling places

and poll workers will cause even longer lines and compound the health risks voters waiting in them

will face. For example, in a May 4, 2020 letter to Secretary Merrill, Mobile County Probate Judge

Don Davis wrote that he was "at a loss" on how the county could run the elections. In his letter,

Judge Davis anticipated that the pandemic will result in significant problems for the July 14

election, including the consolidation or closure of polling places because of the unavailability of

---

[129] M. Keith Chen et al., *Racial Disparities in Voting Wait Times: Evidence from Smartphone Data* (Nov. 14, 2019), https://www.kareemhaggag.com/f/Racial_Disparities_in_Voting_Wait_Times.pdf.

[130] Moreover, Black voters can least afford unnecessarily long wait times as the price to pay for voting, because Black people are "more likely to be working in jobs without flexibility or paid sick leave," which means any delays at the polls disproportionately threaten their job security. Laura Williamson, *How to Build a Racially Inclusive Democracy During COVID-19 and Beyond*, Demos (Apr. 28, 2020), https://www.demos.org/policy-briefs/how-build-racially-inclusive-democracy-during-covid-19-and-beyond; Lonnie Golden, *Limited Access: Disparities in Flexible Work Schedules and Work-at-Home*, 29 J. Family & Econ. Issues 86 (2008).

poll workers and the need to follow social distancing rules, which can lead to longer lines.[131] Additionally, the fact that Alabama is one of only a few states without early in-person voting before Election Day means that there will be no opportunities to spread out the impact of in-person voting.

144.    The Excuse Requirement is plainly unreasonable in the context of COVID-19 community transmission, which, by current expert predictions, will still be occurring during the absentee voting period for the November 3, 2020 general election at rates that make in-person voting risky both for individuals and from a public health perspective.

145.    Moreover, the State's refusal to allow all Alabama voters to vote safely from home in response to the pandemic cannot be justified by any legitimate state interest. The COVID-19 pandemic poses the same concerns for November that led Secretary Merrill to issue the emergency order allowing "any qualified voter who determines it is impossible or unreasonable to vote at their voting place" to vote absentee in light of COVID-19. Because the significant weight of the scientific and epidemiological evidence indicates that COVID-19 will pose a threat to the health of Alabamians for the remainder of 2020, if not longer, it is unreasonable not to waive the Excuse Requirement for the August and November elections as well.

146.    Nor does the State's interest in election integrity outweigh the Excuse Requirement's burden on Alabama voters. For one, this is belied by Secretary Merrill's decision to relax the requirement to allow any Alabama voter who believes it is unreasonable to vote in person due to COVID-19 to vote absentee in July, effectively waiving the requirement. If the requirement were necessary to ensure election integrity, the Secretary surely would not have taken

---

[131]    John Sharp, *Sneeze guards and sanitizer: Alabama election officials prepare for July 14 runoff*, Alabama Media Group, May 12, 2020, https://www.al.com/news/2020/05/sneeze-guards-and-sanitizer-alabama-election-officials-prepare-for-july-14-runoff.html

such an action. In 2018, Secretary Merrill called the Excuse Requirement "long-outdated" and inconvenient to people.[132]

147.    Beyond this, Alabama has a number of different laws and procedures that ensure integrity of the absentee voting process separate and apart from the Excuse Requirement and other Challenged Provisions. When absentee election managers receive absentee ballot applications, they must check to determine that applicants appear "on the list of qualified voters produced from the state voter registration list in the election to be held." Ala. Code § 17-11-5(a). If the individual does not appear on the voter registration list for that jurisdiction but does appear on the voter registration list for another jurisdiction in Alabama, the absentee ballot manager shall transmit a provisional absentee ballot, which is will be counted subject to the individual meeting the required re-identification procedures. *Id.*; Ala. Code § 17-11-9.

148.    Additionally, when submitting an absentee ballot, the voter must swear or affirm under penalty of perjury that the voter: (a) has "not voted nor will [] vote in person in the election to which this ballot pertains"; (b) "marked the enclosed absentee ballot voluntarily" and understands the instructions and complied with them; and (c)  "that all of the information given above is true and correct to the best of my knowledge and that I understand that by knowingly giving false information so as to vote illegally by absentee ballot that I shall be guilty of a misdemeanor which is punishable by a fine not to exceed one thousand dollars ($1,000) or confinement in the county jail for not more than six months, or both." Ala. Code § 17-11-7.

149.    And as noted with the attestation, Alabama has several provisions of law that threaten criminal penalties for individuals who misuse the absentee voting process. In addition to

---

[132] John Sharp, *After Midterms, will Alabama reform the way you vote?*, Alabama Media Group, Nov. 18, 2018, https://www.al.com/election/2018/11/after-midterms-will-alabama-reform-the-way-you-vote.html.

the penalty for false statements noted above, *see* Ala. Code § 17-17-8, Alabama law also criminalizes: voting when not registered in the jurisdiction, Ala. Code § 17-17-14; changing a voter's ballot contrary to the voter's intent, voting "more than once by absentee ballot in the same election," falsifying "absentee ballot applications or verification documents so as to vote absentee," soliciting or encouraging "illegal absentee voting," and voting "both an absentee and a regular ballot at any election," Ala. Code § 17-17-24; and preparing or assisting the voting of an absentee ballot of a comatose person or other individual who cannot communicate their preference, Ala. Code § 17-17-26, among others.

150.    Therefore, whatever interests may be served by the Excuse Requirement are adequately protected by other means and, regardless, are substantially outweighed by the burden the Excuse Requirement places on voters during community transmission of COVID-19.

### B.    Alabama's Witness Requirement will deny large numbers of eligible voters the right to vote without meaningfully advancing any valid State interest.

151.    In the current pandemic, many voters have no means to safely satisfy Alabama's Witness Requirement. Individuals living alone, or with only one other individual over age 18, will not be able to sign their absentee ballot in the presence of a notary or two adult witnesses without defying federal and state social distancing guidelines. Getting a notary working under the direction of a lawyer to notarize a ballot via videoconferencing is not an option for those voters who cannot afford the potential notary fee, or who lack computer or internet access, or who simply cannot identify a notary who is working under the direction of an attorney amid the extensive business shutdowns. Additionally, even assuming a voter could navigate the process, it is unclear whether an absentee ballot envelope notarized via videoconference would comply with Alabama election law.

152.    Faced with either participating in the political process or potentially facing serious

illness or death, the Witness Requirement will likely disenfranchise thousands of eligible voters in Alabama. And for voters forced to take the risk of voting in-person, they are putting themselves and their communities in serious danger.

153.    At present, Alabama has over 3.59 million registered voters.[133] Over 1.1 million Alabamians voted in the April 2020 Democratic and Republican primaries.[134] And in the November 2016 general election, over 2.1 million Alabamians cast ballots.[135]

154.    According to the ACS, 14.6% of Alabamians live alone. Of those Alabamians who live alone, 39% are Alabamians over age 65. Assuming similar voter turnout in the 2020 November general election, over 300,000 Alabamians (i.e., 14.6% of 2.1 million voters) will face the false choice of either risking their safety by voting in-person, leaving their homes to find witnesses for their absentee ballots, or not voting at all. Like Plaintiffs, many of them will be forced not to vote to protect their health and their community.

155.    This burden on the right to vote will fall more heavily upon certain groups—older people, persons with disabilities, and Black Alabamians, among others. For instance, per the ACS, of the 3.8 million individual Alabamians of voting age, 14.6% (555,330) live alone. Of those 555,330 individuals who live alone, 38.9% (215,966) are age 65 and older. Around 30% of Alabamians 18 and older who live alone have a disability, and 44% of Alabamians 65 and older who live alone have a disability. For the 980,850 Black Alabamians of voting age, 186,497 (19.0%) live alone.

156.    According to the ACS, in Alabama, for those Black people who live alone, 29.7%

---

[133] Ala. Sec'y of State, *Elections Data Downloads* https://www.sos.alabama.gov/alabama-votes/voter/election-data (last visited June 25, 2020)(click on link for "Voter Registration Statistics – 2020").
[134] Ala. Sec'y of State, *Unofficial Election Night Results* (Mar. 9, 2020), https://www2.alabamavotes.gov/electionnight/statewideresultsbycontest.aspx?ecode=1001060.
[135] *Primary/Primary Run-Off/General Election Statistics-State of Alabama* 8, https://www.sos.alabama.gov/sites/default/files/voter-pdfs/turnout.pdf (last updated June 25, 2018).

(55,388) are disabled.  For the subset of Black people who are over age 65 and living alone, 45.9% (22,782) are disabled. For white voting age population living alone, 30.2% (107,647) are disabled. For the subset of whites over 65 and living alone, 44.0% (70,816) are disabled.

157.    Of all Black households (*i.e.*, homes with all of their occupants, regardless of number, treated as one unit), 37.1% contain people who live alone, per the ACS.  Of all white households, 27.5% contain people who live alone. And 14.1% of all Black households in Alabama are headed by women who live alone with their children under 18 (*i.e.*, people who are not legally competent witnesses) versus just 3.8% of similar white households.

158.    COVID-19 has a disproportionately harmful effect on Black people because they are more likely to have pre-existing conditions that exacerbate the symptoms of the disease due to environmental and economic factors and because of inequalities in the health care system.[136]

159.    The Witness Requirement will therefore likely prevent thousands of Alabamians who might otherwise cast absentee ballots from doing so this year, with a disproportionate impact falling on older voters, voters with a disability, and Black voters.

160.    The notary public alternative is not a viable option for most voters, especially during the current pandemic. First, notaries are entitled to a payment of $5.00 for notarizing an absentee ballot affidavit.[137] Second, notarization may still require personal interaction with a third-party witness in violation of social distancing protocols. In acknowledgment of the current barriers to notarizations, Governor Ivey issued an executive order on March 26, which permits attorneys who are also notaries and notaries who work under the supervision of an attorney to notarize documents

---

[136] *Characteristics of COVID-19 Patients–Mobile County, Alabama, supra*; Colleen Walsh, *COVID-19 Targets Communities of Color*, HARVARD GAZETTE (Apr. 14, 2020), https://news.harvard.edu/gazette/story/2020/04/health-care-disparities-in-the-age-of-coronavirus/.
[137] Ala. Code § 36-20-74.

using videoconferencing in lieu of personal appearance.[138] Videoconferencing is not an option for every notary in Alabama. Notaries who are not attorneys or are not supervised by attorneys must still personally interact with a voter to notarize a ballot. But, even for the videoconferencing option, a voter must have access to videoconferencing technology. Further, it is more burdensome for Black Alabamians who are less likely to be able to afford the potential fees of notarization, the costs of videoconferencing, or sending the affidavit to the notary. Black Alabamians are also less likely to have access to the technology needed for videoconferencing, like broadband internet, a computer, tablet or "smart phone." Some notaries also lack access to the computer, internet, or technology necessary for notarizations via videoconferencing. Further, because Alabama law requires the absentee ballot envelope itself to be notarized, remote notarization may not be a viable option for absentee ballots.

161.    The Witness Requirement does not meaningfully advance the State's interest in election integrity. Alabama election officials are not required to follow up with witnesses to confirm their identity or that they indeed witnessed the signing of the voter's affidavit. *See* Ala. Code § 17-11-10. Instead, officials merely examine the affidavit for the witness signatures. If the information in the affidavit is correct and it contains the witness signatures, then officials "shall certify the findings, open each affidavit envelope, and deposit the plain envelope containing the absentee ballot into a sealed ballot box." *Id*. § 17-11-10(b).

162.    In fact, in 2017, Secretary Merrill supported a bill that would have eliminated the Witness Requirement but added the now-existent ID Application Requirement. Rather than

---

[138] Off. of the Ala. Governor, *Fourth Supplemental State of Emergency (Coronavirus: COVID-19)* (Mar. 26, 2020), https://governor.alabama.gov/assets/2020/03/4th-Supplemental-State-of-Emergency-COVID-19.pdf.

increasing absentee voter fraud, Secretary Merrill thought the bill made it "easier to vote."[139] That is, in light of the Photo ID Requirements, Secretary Merrill does not believe that there is a separate need to enforce the Witness Requirement. Indeed, the District of Columbia and 38 states that have no witness requirement operate absentee balloting systems that are not undermined by fraud.[140]

163.     Alabama has several other vehicles to both confirm the legitimacy of the absentee ballot cast and protect election integrity. First, the affidavit requires an absentee voter to swear or affirm that the information is true and correct. The affidavit warns that it is a criminal offense to knowingly give false information to illegally vote absentee. This offense is punishable by a fine up to thousand dollars ($1,000) and/or confinement in the county jail for up to six months. Ala. Code § 17-11-7.

164.     Separately, it is also a criminal offense for any person to willfully falsify an absentee ballot application or verification documents. Ala. Code § 17-17-24.

165.     Finally, the absentee ballot application is required to "contain sufficient information to identify the applicant and shall include the applicant's name, residence address, or such other information necessary to verify that the applicant is a registered voter." Ala. Code § 17-11-4. The current absentee ballot application requires a voter to submit either their driver's license number or the last four digits of their social security number, which allows election officials to verify the voter's identity even before the distribution of the absentee ballot.[141]

166.     Given these criminal penalties and the alternative identification methods, the additional step of requiring a voter to sign their absentee ballot before a notary or two witnesses

---

[139] Mike Cason, *Bill Would Eliminate Requirement to Give Reason for Voting Absentee*, Alabama Media Group (Jan. 13, 2019), https://www.al.com/news/birmingham/2017/04/bill_would_eliminate_requireme.html.
[140] *Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options*, *supra*.
[141] Ala. Form AV-R1, *Application for Absentee Ballot*, https://www.sos.alabama.gov/sites/default/files/voter-pdfs/absentee/RegularAbsenteeAppFillable.pdf (revised Sept. 3, 2019).

offers no meaningful protection against fraud. Indeed, while instances of fraud are rare, a person determined to falsely submit an absentee ballot and risk imprisonment could just as easily forge the two witnesses' signatures as they could falsely attest to their identity when signing the absentee ballot affidavit.

167.    The Witness Requirement places an unnecessary and dangerous burden on the voting rights of the many thousands of people in Alabama, particularly elderly, disabled, and Black voters, who will have to choose between casting their ballots safely or disenfranchisement.

**C.    The Photo ID Requirements will endanger the lives of large numbers of voters who lack access to printers and scanners or lack photo ID acceptable for voting.**

168.    The Photo ID Requirements require a person who is submitting an application for an absentee ballot to include a copy of their photo ID and, separately, once the ballot is received, to also return a second copy of the photo ID when mailing in the actual absentee ballot if the absentee election manager determines the voter is required to do so. A voter who fails to provide photo ID with the application cannot receive an absentee ballot. A returned absentee ballot that requires a photo ID will not be counted if it does not include a copy of the voter's photo ID.

169.    Yet, given the federal social distancing guidelines, Governor Ivey's "Safer at Home" order, and the closures of many offices, libraries, schools, and businesses (e.g., FedEx and UPS stores), many voters have no means of meeting the Photo ID Requirements. For example, 12.8% (over 200,000) of all households in Alabama lack a computer, smartphone or tablet. Without access to the computers, scanners and printers needed to generate copies of the photo ID required to cast absentee ballots, tens of thousands of voters will not be able to vote. And, even if these voters could find a way to travel (6.3% of all Alabama residents lack vehicles) and find a business open to copy their IDs, they would have to break social distancing protocols to do so, at great risk to their safety and that of others. As a result, many Alabama citizens will be unable to

60

obtain the copies of the photo IDs that they need to either return with their absentee ballot or even complete their absentee ballot application.

170.    In particular, elderly voters and voters with disabilities and preexisting conditions, like Plaintiffs Porter and Thompson, cannot obtain copies of their photo IDs to vote absentee in the 2020 elections without putting their lives in serious risk.

171.    On April 21, a voter based in Montgomery directed a question about the Photo ID Requirements to Secretary Merrill via Twitter. "So to exercise my right to vote I need to have a computer, with Internet, a printer, with toner and paper, and a smart phone with a camera or a scanner or a copy machine?" the Montgomery-based voter asked.[142] In response, the official account of the Secretary of State's office asked him to contact them or local officials.

172.    Secretary Merrill, however, mocked the voter via his personal account.



173.    When a local reporter simply retweeted Secretary Merrill's response, Secretary Merrill again proved unhelpful. He confirmed that voters, like Plaintiffs Porter and Thompson, must violate social distancing protocols, which endangers their safety, to comply with the Photo ID Requirements.

---

[142] Stephen Stetson (@StetsonStephen), Twitter (Apr. 21, 2020, 10:53 AM), https://twitter.com/StetsonStephen/status/1252611322128273408.



174.    Moreover, there are tens of thousands of Alabama voters who lack photo ID, and now cannot get one. Since March 23, 2020, nearly every photo ID-issuing office in Alabama, including the Alabama Law Enforcement Agency ("ALEA") offices and county boards of registrars, has been closed.[143] To the extent ALEA continues to operate any photo ID-issuing offices, it "[d]iscourages anyone with a weakened or compromised immune system from visiting any Driver License locations" and has "begun curbside check-in and screening" to "reduce potential exposure" to COVID-19.[144]

175.    Upon information and belief, Secretary Merrill did not deploy his office staff to issue photo IDs at people's homes or public events for at least the duration of the Stay-at-Home Order.

176.    Secretary Merrill has instructed probate judges and absentee managers to continue to require individuals, like Plaintiff Thomson, who have medical conditions and who cannot

---

[143] Press Release, *ALEA Continues to Modify its Driver License Division Operations in Response to COVID-19*, Ala. Law Enforcement Agency, (Mar. 23, 2020), https://www.alea.gov/news/alea-continues-modify-its-driver-license-division-operations-response-covid-19.

[144] *Id.*

comply with the Photo ID Requirements without putting their lives at risk—to submit copies of their photo IDs with the absentee ballot application.[145] Defendants do not consider voters with preexisting medical conditions that put them at a higher risk of death or serious illness from COVID-19 infection to be exempt from the Photo ID Requirements under Alabama Code § 17-9-30(d).

**D.     The Curbside Voting Ban Needlessly Increases the Risks of COVID-19 Infection via Personal Interactions at In-Person Poll Sites in the 2020 Elections.**

177.    No provision of Alabama law expressly prohibits curbside or drive-thru voting. *See generally* Ala. Code § 17-9-1 to § 17-9-15.

178.    Nonetheless, Alabama does not offer curbside voting to voters whose disabilities, age, or physical condition prevent them from going into an in-person voting location. Although no state law prohibits curbside voting, Secretary Merrill bars local, city, and county election officials from using curbside or drive-thru voting. Secretary Merrill has a policy and practice of intervening to prevent local election officials from employing curbside voting to assist people with disabilities.

179.    On at multiple occasions, Secretary Merrill has intervened to stop curbside voting. In an interview from 2018, Secretary Merrill described one such instance of interference: "If you came up to the polls and you were not able to get out of the car, or you said you were disabled, [election officials] were allowing people to take the ballots out. Now when that was introduced to me, I made a call to the probate judge and we stopped it dead-cold right when it was introduced to us. I asked [the probate judge], 'Under what authority and what jurisdiction do you have to be able to provide that?' And [the probate judge] said, 'Well, it's just a courtesy.'" Secretary Merrill

---

[145] Ala. Sec. of State, *Certification of Emergency Rules Filed with Legislative Services Agency, 820-2-3-.06-.01ER*, Absentee Voting During State of Emergency (Mar. 18, 2020), http://www.alabamapublichealth.gov/legal/assets/order-secretarystate-031820.pdf

reported that he then told the probate judge, "'Well, let me tell you something: If you don't like the law, change the law. Don't make the law on the spot. That's not acceptable.'"[146] No Alabama law prohibits curbside voting, but federal law, including 52 U.S.C.A. § 20102, at times requires it.

180.    Secretary Merrill also intervened on November 8, 2016 to stop Hale County, which has a majority Black voting age population, from offering curbside voting. Secretary Merrill was contacted about this practice and he instructed his office to begin an investigation. In response to the investigation, the county probate judge told Secretary Merrill that curbside voting was being offered to assist voters with disabilities by bringing ballots to voters in their cars. Secretary Merrill's office informed the county that the practice was illegal. Secretary Merrill ordered Hale County to immediately cease and desist curbside voting. The county complied.[147]

181.    Even outside of the pandemic, Alabama election officials and probate judges have used or have sought to use curbside voting as a means of permitting people with ambulatory disabilities to vote without the need to leave their vehicle to attempt to enter inaccessible polling locations where reasonable permanent or temporary architectural modifications are not possible, or where accessible parking, and a path to the voting location cannot be permanently or temporarily modified to comply with the ADA. Most states employ curbside voting to assist elderly voters or voters with disabilities. Substantial numbers of Alabama polling places are inaccessible because reasonable permanent or temporary architectural modifications are not possible, or because accessible parking, and a path to the voting location cannot be permanently or temporarily

---

[146]    Jeff Poor, *Alabama SoS John Merrill: 'I've had instances in 2016 and again this year where we had people that were allowing drive-by voting'*, YELLOWHAMMER NEWS (Nov. 23, 2018), https://yellowhammernews.com/alabama-sos-john-merrill-ive-had-instances-in-2016-and-again-this-year-where-we-had-people-that-were-allowing-drive-by-voting/.

[147] Ainsley Allison, *Secretary of State's office shuts down curbside voting in Hale County*, ABC News 3040 (Nov. 8, 2016), https://abc3340.com/news/election/secretary-of-states-office-shuts-down-curbside-voting-in-hale-county.

modified to comply with the ADA.

182.   To protect the lives of voters amid the COVID-19 crisis, however, the CDC has recommended that jurisdictions encourage "drive-up voting for eligible voters" as a means of complying with social distancing rules and to limit personal contact during in-person voting.[148]

183.   On information and belief, other states have already employed curbside voting as a safety accommodation to voters during the pandemic. In elections held during the COVID-19 crisis, Arkansas,[149] Ohio,[150] Wisconsin,[151] and Wyoming[152] permitted everyone to vote without leaving their car in adherence to the necessary social distancing protocols. Upon information and belief, none of these states usually permit blanket curbside voting.

184.   Indeed, Governor Ivey's April 3 stay-at-home order and her series of "Safer at Home" orders permit "drive-in" gatherings to protect individuals—particularly vulnerable individuals—from in-person contact that could put them at risk from COVID-19. The June 30 Safer-at-Home order likewise requires restaurants and senior centers to offer curbside services to protect the health and safety of high-risk people.

185.   Amid the pandemic and because of the Excuse, Witness, and Photo ID

---

[148] Ctrs. for Disease Control & Prevention, *Considerations for Election Polling Locations and Voters: Interim guidance to prevent spread of coronavirus disease 2019*, *supra*.
[149] Rick Klein & MaryAlice Parks, *The Note: Voting in Age of Coronavirus Gets Uncertain Test Runs*, ABC NEWS (Mar. 31, 2020), https://abcnews.go.com/Politics/note-voting-age-coronavirus-uncertain-test-runs/story?id=69877935.
[150] Rick Rouan, *Ohio Offering Curbside Voting, Extending Absentee Deadline for Those in Hospital in Wake of Coronavirus*, USA TODAY (Mar. 16, 2020), https://www.usatoday.com/story/news/politics/elections/2020/03/16/coronavirus-ohio-offering-curbside-voting-states-head-polls-tuesday/5058230002/.
[151] *Early Voting: Where You Can Still Cast a Ballot In-Person Before the April 7 Election in the Milwaukee Area*, MILWAUKEE JOURNAL SENTINEL (Mar. 31, 2020), https://www.jsonline.com/story/news/politics/elections/2020/03/31/coronavirus-wisconsin-where-you-can-still-vote-early/2883706001/.
[152] Quinn Scanlan, *States Focus on Alternatives to In-Person Voting as They Move Forward with Primaries Amid Coronavirus Pandemic*, ABC News (Mar. 20, 2020), https://abcnews.go.com/Politics/states-focus-alternatives-person-voting-move-forward-primaries/story?id=69688445.

Requirements, many voters with disabilities, including preexisting conditions that make them more susceptible to COVID-19, are completely deprived of any alternative method of voting.

186.    Under these circumstances, Defendants' failure to accommodate voters who are particularly vulnerable to COVID-19 by offering the reasonable accommodation of curbside voting constitutes a severe and undue burden on the right to vote.

187.    Even outside of the COVID-19 pandemic, the Curbside Voting Ban has acted and will continue to act to hinder the rights of those 450,000 adults in Alabama with ambulatory disabilities, particularly, those voters who are assigned to polling places that are inaccessible because reasonable permanent or temporary architectural modifications are not possible.

## CLAIMS FOR RELIEF

### COUNT ONE
### Violations of the Fundamental Right to Vote
### under the First and Fourteenth Amendments (42 U.S.C. § 1983)
### (All Plaintiffs against All Defendants)

188.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

189.    Eligible individuals have a fundamental right to vote under the First and Fourteenth Amendments of the U.S. Constitution. Under the First and Fourteenth Amendments, a court considering a challenge to a state election law must carefully balance the character and magnitude of the injury to the rights that the plaintiff seeks to vindicate against the justifications put forward by the State. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

190.    As-applied in the COVID-19 pandemic and on their face, the Excuse Requirement, Witness Requirement, the Curbside Voting Ban, and their enforcement—both individually and together—severely and unreasonably burden the fundamental right to vote of all Plaintiffs, their

members, constituents and other similarly situated Alabama voters. These three provisions will likely prevent thousands of voters from casting effective ballots, with particularly heavy burdens on older Alabamians, voters with disabilities, and Black voters. And they will significantly burden many thousands of other voters who decide they must risk their health and the health of their community by voting in person at the polls to ensure their vote is counted.

191.    As-applied in the COVID-19 pandemic, the Photo ID Requirements and their enforcement severely and unreasonably burden the fundamental right to vote for Plaintiffs Porter, Thompson, and the members of People First of Alabama, as well as other similarly situated Alabama voters. The Photo ID Requirements will likely prevent thousands of voters from casting effective ballots, with particularly heavy burdens on older Alabamians and voters with disabilities.

192.    No valid state interest justifies those burdens. Alabama's Excuse, Witness, and Photo ID Requirements do not advance the State's interest in election integrity. By contrast, the State already has in place numerous other measures that prevent fraud without endangering the safety of voters in the current pandemic. And for the Excuse Requirement, Secretary Merrill's emergency order that effectively eliminates the Requirement for the July 14 primary demonstrates that the interest in safely voting far outweighs the minimal-to-nonexistent interests in maintaining that Requirement.

193.    With respect to the Curbside Voting Ban, Secretary Merrill has publicly equated curbside voting with purported "voting irregularities." To the extent that Defendants assert that his policy and practice of prohibiting curbside voting is an election security measure, Defendants can address those concerns through other means. For example, Clay Helms, the Deputy Chief of Staff and Director of Elections for the Alabama Secretary of State, testified that a polling place with curbside voting would be feasible and permissible under Alabama law if the curbside voting site:

1) used e-poll books; 2) placed a tabulation booth at the site; and 3) assigned poll workers to work there. Doc. 34-1 ¶ 46. Over half of Alabama's 67 counties already use e-poll books. *Id.*

194.    Therefore, Defendants, acting under color of state law, by enforcing the Challenged Provisions have and will continue to deprive Plaintiffs of the fundamental right to vote secured to them by the First and Fourteenth Amendments in violation of 42 U.S.C. § 1983.

**COUNT TWO**
**Failure to Provide Reasonable Accommodations in Violation of**
**Title II of the Americans with Disabilities Act (42 U.S.C. §§ 12131, *et seq.*)**
**(All Plaintiffs Against All Defendants)**

195.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count below as though fully set forth herein.

196.    Voting is one of our nation's most fundamental rights and a hallmark of our democracy. Yet for too long, people with disabilities have been excluded from this core aspect of citizenship. People with intellectual or mental health disabilities have been prevented from voting because of prejudicial assumptions about their capabilities. People who use wheelchairs or other mobility aids, such as walkers, have been unable to enter the polling place to cast their ballot because there was no ramp. People who are blind or have low vision could not cast their vote because the ballot was completely inaccessible to them.[153]

197.    Invaluable federal civil rights laws have been enacted to combat such forms of discrimination against those with disabilities and to protect the fundamental right to vote for all Americans. These laws include: the ADA; The Rehabilitation Act of 1973 (the "Rehabilitation Act"); the VRA; the Voting Accessibility for the Elderly and Handicapped Act of 1984 (the "VAEHA"); the National Voter Registration Act of 1993 ("NVRA"); and the Help America Vote

---

[153] See U.S. Dep't. of Justice, *The Americans With Disabilities Act and Other Federal Laws Protecting the Rights of Voters With Disabilities* 1, Sept. 2014, https://www.justice.gov/file/69411/download (last visited July 6, 2020).

Act of 2002 (the "HAVA").

198.    Under Title II of the ADA, state and local governments must not impose requirements on participation in public services, programs, or activities, including voting, that screen out individuals with disabilities from fully and equally enjoying those programs and must make reasonable modifications in policies, practices, or procedures, including voting and election procedures, when the modifications are necessary to avoid discrimination on the basis of disability.

199.    One of the fundamental underpinnings and policy behind the above laws is ensuring policies and procedures do not discriminate against people with disabilities.

200.    Congress has documented a pattern of unequal treatment in the administration of a wide range of public services, programs, and activities, including the penal system, public education, and voting. The U.S. Court of Appeals for the Eleventh Circuit has held that prior U.S. Supreme Court precedent considered the record supporting Title II of the ADA as a whole, and has conclusively held that Congress had documented a sufficient historical predicate of unconstitutional disability discrimination in the provision of public services to justify enactment of a prophylactic remedy under Section 5 of the Fourteenth Amendment to the U.S. Constitution. *See Nat'l Assoc. of the Deaf v. Florida*, 945 F. 3d 1339, 1351 (11th Cir. 2020).

201.    Individuals who suffer a significant medical vulnerability that places them at extremely high risk of serious bodily injury or death should they leave the confines of their homes—including Plaintiffs Clopton, Peebles, Porter, Thompson, Bettis, Threadgill-Matthews, and the members and constituents of the organizational Plaintiffs whose health conditions put them at significant risk of severe illness or death should they contract COVID-19 but not all of whom can absentee under the current Excuse Requirement regime—have a disability within the meaning of the ADA.

202.    Defendants' failure and refusal to provide reasonable accommodations with respect to the Challenged Provisions for those voters, such as Plaintiffs Clopton, Peebles, Porter, and Thompson and the members and constituents of Plaintiffs People First, GBM, BVM and the Alabama NAACP, whose health statuses severely limit their ability to leave home or have any personal contacts with others amid the COVID-19 pandemic, violates the ADA.

203.    Defendants have no valid justification for their failure or refusal to offer the reasonable accommodation of eliminating the Excuse and Witness Requirements for at least those voters, like Plaintiffs Clopton, Peebles, Thompson, Bettis, and Threadgill-Matthews, whose health statuses severely limit their ability to leave home or have personal contact with others amid the COVID-19 pandemic. For the Excuse Requirement, Secretary Merrill's emergency order that effectively eliminates the Excuse Requirement for the July 14 primary demonstrates that this requirement is not an essential requirement and does not fundamentally alter Alabama law.

204.    Defendants have no valid justification for their refusal to offer the reasonable accommodation of interpreting the existing exemptions to the Photo ID Requirements for certain elderly and/or disabled voters as also applicable to Plaintiffs Porter, Thompson and the members and constituents of People First and BVM, and those similarly situated voters, whose health statuses severely limit their ability to leave home or have personal contact with others amid the COVID-19 crisis.

205.    Defendants also have no valid justification for their refusal to permit curbside voting as a reasonable accommodation for the significant challenges disabled voters, like Plaintiffs Clopton and Peebles and the members and constituents of People First, GBM, BVM and the Alabama NAACP, face as a result of the COVID-19 crisis.

206.    As applied in the COVID-19 pandemic, the failure to accommodate these voters

constitutes a condition on access to the ballot box that has the effect of screening out such individuals from participating in the July 14, August 25, and November 3, 2020 elections, as well as all other 2020 elections, in violation of Title II of the ADA.

207.    Even outside of the COVID-19 pandemic, the Curbside Voting Ban has acted, and continues to act, to violate the rights under Title II of the ADA of the over 450,000 adults in Alabama with ambulatory disabilities, like Plaintiffs Peebles and Porter and the members and constituents of People First, GBM, BVM and the Alabama NAACP, who would benefit from the availability of curbside voting at otherwise inaccessible polling places.

208.    Unless the requested relief is granted, Plaintiffs, Plaintiffs' members, and those similarly situated will suffer irreparable harm in that they will be discriminated against and denied equal access to absentee voting and in-person curbside voting, or forced to risk their health, and possibly their lives, to vote in-person within a polling place—a program, service, or activity that impacts their ability to participate in one the most fundamental democratic institutions: voting.

209.    The ADA authorizes injunctive relief as appropriate to remedy acts of discrimination against persons with disabilities. 42 U.S.C. §§ 12188(a)(1)-(2).

### COUNT THREE
**The Excuse and Witness Requirements and Curbside Voting Ban**
**Violate Section 2 of the Voting Rights Act (52 U.S.C. § 10301)**
**(All Plaintiffs, except Mr. Peebles, Against All Defendants)**

210.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

211.    Section 2 of the VRA provides in part that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a).

212.   The "essence of a [Section] 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). Section 2 prohibits both vote denial and vote dilution. *See id.* at 45 n.10.

213.   Vote denial occurs when a state erects "formal barriers to access such as literacy or residency tests" that result in the denial or abridgment of the right to vote on account of race. *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1556 (11th Cir. 1984). To succeed here, Plaintiffs must prove that (1) Black people "have less opportunity than other members of the electorate to participate in the political process" and (2) that the "impact of the contested structure" is linked to historical conditions based on the Senate Factors. *Gingles*, 478 U.S. at 44.

214.   The Excuse and Witness Requirements, if not enjoined, will materially burden the right to vote, and will have an adverse and disparate impact on Black voters in Alabama. Black voters in Alabama are more likely to work in jobs that expose them to COVID-19, less likely to have insurance or financial resources, more likely to live alone or with young children, more likely to lack computer or internet access, and more likely to suffer from severe health complications and/or to die from COVID-19 than white voters. Black voters are therefore significantly more burdened by the effects of the Excuse and Witness Requirements.

215.   Likewise, the Curbside Voting Ban, if not enjoined, will materially burden the right to vote, and will have an adverse and disparate impact on Black voters in Alabama. Black voters in Alabama are less likely to have insurance or financial resources. Black voters are more likely to be disabled, to be undereducated and in need of in-person assistance to vote (which can be provided even if voters do not leave their car), and to suffer from severe complications or to die from COVID-19 than white voters. Black voters are therefore significantly more burdened by the effects

of the Curbside Voting Ban.

216.   The discriminatory results of the Excuse and Witness Requirements and Curbside Voting Ban are directly linked to social and historical conditions. Alabama has a long history of voting-related discrimination, including recent uses of discriminatory voter purges, racial gerrymanders, selective annexations, and at-large election systems. From 1965 to 2013, Alabama was covered by the preclearance provisions of the VRA. During that time, the U.S. Department of Justice objected to dozens of proposed voting changes because their potentially discriminatory purpose or effect.

217.   Black people in Alabama continue to suffer from discrimination in other areas such as education, employment, and health, which hinders their ability to participate effectively in the political process. According to the ACS, in Alabama, 11.5% of Black people and 8.1% of white people lack health insurance; 42.7% of Black people and 38.1% of white people over age 65 have a disability; Black adults are overrepresented among people with ambulatory disabilities; 15.8% of Black people and 14.1% of white people age 18 to 64 have a disability; 16.6% of Black people and only 11.4% of white people lack a high school degree; 9.4% of Black people and 4.2% of white people over age 16 are unemployed; 23.4% of Black households and 7.6% of white households in general lived below the poverty line; 18.3% of Black people over 65 versus 8.0% of white people over 65 also live in poverty; 12.7% of Black households and only 3.9% of white households lack a vehicle; 18.9% of Black households and 10.7% of white households lack a computer, tablet, or "smart phone"; even among those people with computers, 29.6% of Black households and just 17.2% of white households lack broadband internet; 26.3% of Black households and 8.0% of white households use SNAP/food stamps; and Black median family income ($43,287) is nearly half that of white families ($73,109).

218.    As-applied in the COVID-19 pandemic and as discussed above at ¶¶ 106-111, these discriminatory patterns make Black voters more vulnerable to COVID-19, such that the Excuse and Witness Requirements and Curbside Voting Ban, are particularly burdensome and dangerous for them as a group relative to other voters. In addition, voting is racially polarized in Alabama and Black voters do not hold elected office in proportion to their population, resulting in state elected officials who are less responsive to the health, voting, and other concerns of Black voters amid the COVID-19 crisis.

219.    Even outside of the COVID-19 pandemic, as described above at ¶¶ 178-182, the Curbside Voting Ban has acted and continues to act to discriminate against Black voters, including Plaintiffs and Plaintiffs' members, in violation of Section 2 of the VRA. In Alabama, as compared to white voters, Black voters are more likely to have ambulatory disabilities, Black people aged 65 and over are more likely to have ambulatory disabilities, Black voters are disproportionately assigned to inaccessible polling locations, and Black voters disproportionately reside in Hale County where Secretary Merrill has intervened to stop or prohibit curbside voting.

220.    Under the totality of the circumstances, the Excuse and Witness Requirements and Curbside Voting Ban interact with these social and historical conditions to abridge and deny Black people in Alabama the right to vote. As a result of these provisions, Black Alabamians will have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

## COUNT FOUR
### The Witness Requirement Violates Sections 3 and 201 of the Voting Rights Act, 52 U.S.C. §§ 10302, 10501 (All Plaintiffs Against All Defendants)

221.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

222.    Section 201 of the VRA categorically prohibits the use of "any test or device" as a "prerequisite for voting or registration for voting," stating that "[n]o citizen shall be denied, because of his failure to comply with any test or device, the right to vote in any Federal, State, or local election conducted in any State or political subdivision of a State." 52 U.S.C. §§ 10501(a)-(b).  Section 201 defines the phrase "test or device" as including "any requirement that a person as a prerequisite for voting . . . prove his qualifications by the voucher of registered voters or members of any other class." 52 U.S.C. § 10501(b)(4).

223.    Section 201 is a "potent weapon" and it applies to "any official with control over any aspect of an election . . . ." *United States v. Bd. of Comm'rs of Sheffield*, 435 U.S. 110, 120-21 (1978).  For that reason, the U.S. Department of Justice has employed the VRA to block discriminatory literacy and witness requirements in the absentee voting process.[154]

224.    "All literacy tests and similar voting qualifications were abolished" by the VRA because, "[a]lthough such tests may have been facially neutral, they were easily manipulated to keep blacks from voting." *N.W. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 198 (2009). This *per se* ban on tests and devices "bars certain types of voting tests and devices altogether" and removes the burden of demonstrating the discriminatory application of a test or device. *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 338 n.6 (2000).

225.    The notary certification aspect of the Witness Requirement is a prohibited "test or device" insofar as it is a "requirement that a person as a prerequisite for voting . . . prove his qualifications by the voucher of registered voters or members of any other class." 52 U.S.C. §

---

[154] Letter from Bill Lann Lee, Acting Assist. Att'y Gen., U.S. Dep't of Just., Civ. Rights Div., to Hon. Robert A. Butterworth, Att'y Gen., State of Florida (Aug. 14, 1998), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/FL-1030.pdf; Letter from Jerris Leonard, Assist. Att'y Gen., U.S. Dep't of Just., Civ. Rights Div., to Hon. MacDonald Gallion, Att'y Gen., State of Alabama (Mar. 13, 1970), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1100.pdf.

10501(b). An absentee ballot that is not witnessed by a "notary public or other officer authorized to acknowledge oaths . . . will not be counted." Ala. Code § 17-11-7. The notary or officer is required to "certify that the affiant is known (or made known) to me to be the identical party he or she claims to be." *Id*. Because it is "inherently or legally necessary" that a voter be who she says she is, proof of identity is a qualification under Alabama law. Doc. 58 at 73 (citations omitted). Accordingly, under the plain text of the VRA, this is *per se* prohibited as an illegal test or device.

226.    In addition, as-applied to Alabama citizens, like Plaintiffs Clopton, Peebles and Thompson, who must strictly adhere to social distancing guidelines for the foreseeable future because they are highly susceptible to death or serious illness from COVID-19, the absentee voting system subject to the Witness Requirement is the only reasonable avenue for them to even attempt to vote.

227.    No governmental justification can overcome the plain text of the VRA. For instance, before the VRA, the purported interest in the identification and authentication of a voter was insufficient to justify other "supporting witness" requirements. *See, e.g.*, *United States v. Ward*, 349 F.2d 795, 799 (5th Cir. 1965); *United States v. Logue*, 344 F.2d 290, 291 (5th Cir. 1965). Even without the Witness Requirement, Alabama law already includes additional means of authenticating a voter, as described above at ¶¶ 147-50.

228.    As-applied in the COVID-19 pandemic or on its face, the Witness Requirement demands that thousands of voters, including Plaintiffs Clopton, Peebles, and Thompson, either comply with a *per se* illegal "test or device" or have their vote discarded in violation of the VRA.

## COUNT FIVE
### The Witness Requirement is a Poll Tax
### (42 U.S.C. § 1983)
### (All Plaintiffs Against All Defendants)

229.    Plaintiffs re-allege and incorporate by reference each allegation contained in the

76

preceding paragraphs as though fully set forth herein.

230.    The Witness Requirement violates the prohibition against poll taxes enshrined in the Fourteenth and Twenty-Fourth Amendments to the U.S. Constitution. The Equal Protection Clause of the Fourteenth Amendment is violated whenever a state "makes the affluence of the voter or payment of any fee an electoral standard." *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 666 (1966). The Twenty-Fourth Amendment guarantees that the right to vote in federal elections "shall not be denied or abridged . . . by reason of failure to pay any poll tax or other tax." U.S. Const. Am. XXIV.

231.    The Witness Requirement demands that voters pay a fee or have access to financial resources to vote absentee in federal, state, or local elections. A notary is always entitled to a $5.00 fee to satisfy the notarization aspect of the Witness Requirement. Ala. Code § 36-20-74. Amid the pandemic, one means of satisfying the Witness Requirement is for voters to use videoconferencing to have a notary witness the absentee ballot. "But videoconferencing is not free. It requires internet access at a minimum, which is a service that is an unaffordable luxury for many." Doc. 58 n.20.

232.    Regardless of the COVID-19 crisis, the Witness Requirement makes the payment of a fee, tax, and/or the financial resources of Plaintiffs and the members of organizational Plaintiffs a prerequisite for voting in violation of the Fourteenth and Twenty-Fourth Amendments.

233.    In the COVID-19 crisis, where absentee ballots and the notarization aspect of the Witness Requirement may help to limit person-to-person contact, the fact that the Witness Requirement makes the payment of a fee, tax, and/or the financial resources of Plaintiffs and Plaintiffs' members a condition to vote violates the Fourteenth and Twenty-Fourth Amendments.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that Alabama's enforcement of the Excuse and Witness Requirements (as stated in Ala. Code. §§ 17-11-3, 17-11-7, 17-11-8, and 17-11-10), at least while the risk of COVID-19 transmission in Alabama remains, violates the rights of voters and the guarantees of the First, Fourteenth, and Twenty-Fourth Amendments to the U.S. Constitution, the ADA, and the VRA.

B.    Issue a preliminary and permanent injunction that orders relief including:

    1.    Prohibiting Defendants from enforcing the Excuse Requirement (as stated in Ala. Code §§ 17-11-3 and 17-11-7) for all voters during, at least, all Alabama primary, municipal, and general elections in 2020 or as long as the pandemic continues to present a danger to Plaintiffs and other voters;

    2.    Permanently enjoining Defendants from enforcing the Witness Requirement (as stated in Ala. Code §§ 17-11-7, 17-11-8, and 17-11-10) for all voters or, at least, enjoining Defendants from doing so during all Alabama primary, municipal, and general elections in 2020 or as long as the pandemic continues to present a danger to Plaintiffs and other voters;

    3.    Prohibiting Defendants from enforcing the Photo ID Requirements (as stated in Ala. Code §§ 17-9-30(b) and 17-11-9) for all voters during, at least, all Alabama primary, municipal, and general elections in 2020 or as long as the pandemic continues to present a danger to Plaintiffs and other voters;

    4.    Permanently enjoining Defendants from enforcing the Curbside Voting Ban or, at least, enjoining Defendants from enforcing the Curbside Voting Ban for all Alabama primary, municipal, and general elections in 2020 or as long as the pandemic continues to present a danger to Plaintiffs and other voters;

    5.    Ordering Defendants to issue guidance instructing all local, city, and county

election officials to count otherwise validly cast absentee ballots regardless of whether the voter meets one of the parameters of the Excuse Requirement set out in Ala. Code §§ 17-11-3 for all Alabama primary, municipal, and general elections in 2020 or as long as the pandemic continues to present a danger to Plaintiffs and other voters;

6.   Ordering Defendants to count and/or to issue guidance instructing all local, city, and county election officials to count otherwise validly cast absentee ballots that are missing the signature(s) of a notary or two witnesses for all Alabama primary, municipal, and general elections in 2020 or as long as the pandemic continues to present a danger to Plaintiffs and other voters;

7.   Ordering Defendants to accept and/or to issue guidance instructing all local, city, and county election officials to accept otherwise validly submitted applications for absentee ballots and to count all otherwise validly cast absentee ballots that are missing the copies of photo IDs for all Alabama primary, municipal, and general elections in 2020 or as long as the pandemic continues to present a danger to Plaintiffs and other voters;

8.   Ordering Defendants to instruct and/or issue guidance instructing all local, city, and county election officials that curbside, drive-thru, and/or drive-up voting at in-person polling sites is permitted for all Alabama primary, municipal, and general elections in 2020 or as long as the pandemic continues to present a danger to Plaintiffs and other voters;

9.   Ordering Defendants to modify election materials, including absentee ballot applications and absentee ballots, to reflect the elimination of the Challenged

Provisions, and conduct a public information campaign, in coordination with local, city, and county officials, informing Alabama voters about both the elimination of the Excuse, Witness, and Photo ID Requirements before and during the absentee balloting period and the availability of curbside voting and ordering Defendants to issue guidance instructing local, city, and county election officials to issue absentee ballots to all eligible voters and to count otherwise validly cast absentee ballots that are missing a specific excuse for voting absentee, witness signatures, and copies of photo ID;

C.      Award Plaintiffs attorneys' fees in this action;

D.      Award Plaintiffs their costs of suit; and

E.      Grant such other and further relief as Plaintiffs request or as this Court deems just and proper in the circumstances.

DATED this 6th day of July 2020.

Respectfully submitted,

 /s/ Deuel Ross
Deuel Ross*
Natasha C. Merle*
Liliana Zaragoza*
NAACP LEGAL DEFENSE &
     EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
Tel.: (212) 965-2200
dross@naacpldf.org
nmerle@naacpldf.org
lzaragoza@naacpldf.org


 /s/ William Van Der Pol
William Van Der Pol [ASB-211214F]
Jenny Ryan [ASB–5455-Y84J]
ALABAMA DISABILITIES
  ADVOCACY PROGRAM
Box 870395
Tuscaloosa, AL 35487
P: (205)348-4928
wvanderpoljr@adap.ua.edu
jrryan2@adap.ua.edu


Sarah Brannon^
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street, NW
Washington, DC 20005-2313
202-675-2337
sbrannon@aclu.org

 /s/ Caren E. Short
Caren E. Short (ASB-0646-P48N)
Nancy G. Abudu*
SOUTHERN POVERTY LAW CENTER
PO Box 1287
Decatur, GA 30031
P: (404) 521-6700
F: (404) 221-5857
caren.short@splcenter.org
nancy.abudu@splcenter.org


T. Alora Thomas-Lundborg^
Davin M. Rosborough^
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2693
athomas@aclu.org
drosborough@aclu.org

/s/ Randall C. Marshall
Randall C. Marshall (ASB-3023-A56M)
ACLU FOUNDATION OF ALABAMA, INC.
P.O. Box 6179
Montgomery, AL  36106-0179
(334) 420-1741
rmarshall@aclualabama.org

*Admitted *pro hac vice*
^*Pro hac vice* motions forthcoming

***Attorneys for Plaintiffs***