FILED
2020 Jul-30  PM 02:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| PEOPLE FIRST OF ALABAMA, *et al.,* | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:20-cv-00619-AKK |
| | ) | |
| JOHN H. MERRILL, Secretary of State, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

### STATE DEFENDANTS' NOTICE OF RECENT AUTHORITY

Secretary of State John H. Merrill and the State of Alabama ("State Defendants") hereby give notice of a recent decision of the United States Court of Appeals for the Eleventh Circuit that may impact this Court's resolution of their pending partial motion to dismiss. Doc. 112.

In *Greater Birmingham Ministries v. Secretary of State for the State of Alabama*, __ F.3d __, 2020 WL 4185801 (11th Cir. Jul. 21, 2020), the Court affirmed in full the decision of Chief Judge Coogler granting Secretary Merrill summary judgment against constitutional and statutory challenges to Alabama's photo ID law. (Attachment). The Eleventh Circuit summarized its lengthy decision as holding:

> The burden of providing a photo ID pursuant to Ala. Code § 17-9-30 in order to vote is a minimal burden on Alabama's voters—especially when Alabama accepts so many different forms of photo ID and makes acquiring one simple and free for voters who lack a valid ID but wish

to obtain one. The Alabama voter ID law does not violate the
Fourteenth and Fifteenth Amendments of the Constitution, nor does it
violate the Voting Rights Act.

*Id.* at *28. The reference to the Voting Rights Act encompassed two claims brought

by the plaintiffs in *Greater Birmingham Ministries*: a § 2 claim and a claim that the

positively identify provision is a "test or device" pursuant to § 201. Plaintiffs in the

instant case likewise claim the witness requirement is a "test or device" under § 201.

During the course of its constitutional analysis, the Eleventh Circuit

recognized that the State's interests in passing a photo ID law have been accepted

by the Supreme Court of the United States. *Id.* at *13. The Court recognized:

Contrary to the dissent's assertions that Alabama indisputably passed
the voter ID law "to solve a problem with in-person voting that did not
exist," Alabama's interests in passing the voter ID law are not
substantively different from the neutral, nondiscriminatory reasons
espoused by Indiana and upheld by the Supreme Court in *Crawford* [*v.
Marion County Election Board*, 553 U.S. 181 (2008)].

*Id.* The Eleventh Circuit also recognized that "[l]ike the voter ID law in *Crawford*,

the Alabama voter ID law imposes minimal burdens on voters and is supported by

legitimate state interests." *Id.* n.32.

Later, in discussing the § 2 claim, the Eleventh Circuit rejected

Plaintiffs['] argu[ment] that there is no connection between Alabama's
interest in combatting voter fraud and the voter ID law at issue in this
case. This argument fails because the Supreme Court has already held
that deterring voter fraud is a legitimate policy on which to enact an
election law, even in the absence of any record evidence of voter
fraud. . . . Simply put, Secretary Merrill was not required to prove that
voter fraud exists—yet he has done so by providing evidence of proven

in-person impersonation voter fraud in Alabama.

*Id.* at *26 (citation and footnotes omitted).

The Eleventh Circuit's discussion of the appropriate analysis under § 2, *id.* at 21-26, may also be helpful in resolving the State Defendants' partial motion to dismiss, as the Court notes the importance of Plaintiffs demonstrating causation between alleged racial bias and a challenged effect as well as the inapplicability of the *Gingles*[1] factors. Similarly, the Eleventh Circuit's decision concerning the § 201 "test or device" claim may prove useful insofar as the Court notes that the positively identify provision is one option for proving identity. *Id.* at 27-28.

---

[1] *Thornburg v. Gingles*, 478 U.S. 30, 44 (1986).

Respectfully submitted,

Steve Marshall,
  *Attorney General*

A. Barrett Bowdre (ASB-2087-K29V)
  *Deputy Solicitor General*

s/ James W. Davis
James W. Davis (ASB-4063-I58J)
Winfield J. Sinclair (ASB-1750-S81W)
Misty S. Fairbanks Messick (ASB-1813-T71F)
Jeremy S. Weber (ASB-3600-X42G)
Brenton M. Smith (ASB-1656-X27Q)
A. Reid Harris (ASB-1624-D92X)
  *Assistant Attorneys General*

Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Jim.Davis@AlabamaAG.gov
Winfield.Sinclair@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Jeremy.Weber@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Reid.Harris@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov

**Counsel for State Defendants**

**Certificate of Service**

I hereby certify that on July 30, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such to all counsel of record.

/s James W. Davis
Counsel for State Defendants

# ATTACHMENT

*Greater Birmingham Ministries v. Secretary
of State for the State of Alabama*,
__ F.3d __, 2020 WL 4185801
(11th Cir. Jul. 21, 2020)

2020 WL 4185801
Only the Westlaw citation is currently available.
United States Court of Appeals, Eleventh Circuit.

GREATER BIRMINGHAM MINISTRIES,
Alabama State Conference of the National
Association for the Advancement of Colored
People, Giovana Ambrosio, Elizabeth Ware,
Shameka Harris, Plaintiffs - Appellants,

v.

SECRETARY OF STATE FOR the State
of ALABAMA, Defendant - Appellee.

No. 18-10151
|
(July 21, 2020)

**Synopsis**
**Background:** Civil rights organizations and registered voters brought action against Alabama's Secretary of State, alleging Alabama's Photo Voter Identification Law, which required voters to present a valid photo identification in order to vote, subject to some exceptions, violated the Voting Rights Act (VRA) and the Fourteenth and Fifteenth Amendments. The United States District Court for the Northern District of Alabama, No. 2:15-cv-02193-LSC, L. Scott Coogler, J., 284 F.Supp.3d 1253, entered summary judgment for Secretary of State. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Branch, Circuit Judge, held that:

organizations possessed Article III standing to bring action;

law did not discriminate on basis of race and, thus, did not violate voters' Fourteenth Amendment right to equal protection, or Fifteenth Amendment;

law was not enacted with discriminatory intent and effect so as to violate voters' Fourteenth Amendment right to equal protection or Fifteenth Amendment;

law had no discriminatory impact on voting, as would have violated VRA provision forbidding any standard, practice, or procedure that results in the denial or abridgement of the right of any citizen to vote on account of race or color;

provision of law which allowed a voter without required photo identification to cast a regular ballot if two election officials positively identified that person as an eligible voter was not a voting "test or device" prohibited by VRA.

Affirmed.

Gayles, J., issued dissenting opinion.

**Attorneys and Law Firms**

Deuel Ross, Leah Aden, Natasha Clarise Merle, Samuel Spital, NAACP Legal Defense & Educational Fund, Inc., Swati R. Prakash, Covington & Burling, LLP, New York, NY, Ryan M. Buschell, Robert D. Fram, Joshua A. Gonzalez, Sylvia Huang, Richard B. Oatis, Nathan E. Shafroth, Covington & Burling, LLP, San Francisco, CA, John Michael Geise, Perkins Coie, LLP, Joanne B. Grossman, Covington & Burling, LLP, Daniel Scott Harawa, Coty Rae Montag, NAACP Legal Defense and Educational Fund, Inc, James MaCall Smith, Covington & Burling, LLP, Nana Wilberforce, Wilmer Cutler Pickering Hale & Dorr, LLP, Washington, DC, Joseph Mitchell McGuire, McGuire & Associates, LLC, Montgomery, AL, for Plaintiffs-Appellants.

James W. Davis, Steven Marshall, Corey L. Maze, Misty Shawn Fairbanks Messick, Winfield J. Sinclair, Alabama Attorney General's Office, Montgomery, AL, for Defendant-Appellee.

Julie Ebenstein, Dale E. Ho, American Civil Liberties Union Foundation, New York, NY, Matthew J. Higgins, Hogan Lovells US, LLP, Danielle Marie Lang, Paul March Smith, Campaign Legal Center, Ezra D. Rosenberg, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Randall C. Marshall, American Civil Liberties Union, Michael W. Robinson, Alabama Department of Public Safety, Montgomery, AL, Starr Turner Drum, John Cowles Neiman, Jr., Maynard Cooper & Gale, PC, Birmingham, AL, for Amicus Curiae American Civil Liberties Union Service.

Julie Ebenstein, Dale E. Ho, American Civil Liberties Union Foundation, New York, NY, Matthew J. Higgins, Hogan Lovells US, LLP, Danielle Marie Lang, Paul March Smith, Campaign Legal Center, Washington, DC, Randall C. Marshall, American Civil Liberties Union, Montgomery, AL, for Amicus Curiae American Civil Liberties Union of Alabama.

Jonathan Edward Paikin, Wilmer Cutler Pickering Hale & Dorr, LLP, Washington, DC, for Amici Curiae Joshua A. Douglas, Ellen D. Katz, Daniel P. Tokaji, Franita Tolson.

Julie Ebenstein, Dale E. Ho, American Civil Liberties Union Foundation, New York, NY, Matthew J. Higgins, Hogan Lovells US, LLP, Danielle Marie Lang, Paul March Smith, Campaign Legal Center, Ezra D. Rosenberg, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Randall C. Marshall, American Civil Liberties Union, Montgomery, AL, for Amici Curiae Campaign Legal Center, Lawyers' Committee for Civil Rights Under Law.

Samuel Jacob Brooke, Southern Poverty Law Center, Montgomery, AL, for Amici Curiae Southern Poverty Law Center, League of Women Voters of Alabama, Adelante Alabama Worker Center, Alabama Arise, Central Alabama Fair Housing Center, Low Income Housing Coalition of Alabama, Montgomery Pride United.

Samuel Jacob Brooke, Southern Poverty Law Center, Montgomery, AL, James Uriah Blacksher, James U. Blacksher, Attorney, Birmingham, AL, for Amicus Curiae Alabama Legislative Black Caucus.

Thomas Molnar Fisher, Office of the Attorney General, Indianapolis, IN, for Amicus Curiae State of Indiana.

John J. Park, Jr., Strickland Brockington Lewis, LLP, Atlanta, GA, for Amicus Curiae American Civil Rights Union.

Paul Joseph Orfanedes, Judicial Watch, Inc., Washington, DC, for Amici Curiae Judicial Watch, Inc., Allied Educational Foundation.

Appeal from the United States District Court for the Northern District of Alabama, D.C. Docket No. 2:15-cv-02193-LSC

Before BRANCH and ED CARNES, Circuit Judges, and GAYLES, [*] District Judge.

**Opinion**

BRANCH, Circuit Judge:

 *1  At the end of 2015, advocacy groups and individual Plaintiffs filed this lawsuit against Alabama's Secretary of State, John Merrill, challenging Alabama's 2011 Photo Voter Identification Law (hereinafter, the "voter ID law"), passed by the Alabama legislature as House Bill 19 and codified at Ala. Code § 17-9-30. The voter ID law took effect in June 2014 and requires all Alabama voters to present a photo ID when casting in-person or absentee votes. Plaintiffs allege the law has a racially discriminatory purpose and effect that violates the United States Constitution and the Voting Rights Act (the "VRA"). Specifically, Plaintiffs claim the law violates the Fourteenth and Fifteenth Amendments of the Constitution; Section 2 of the VRA, 52 U.S.C. § 10301; and Section 201 of the VRA, 52 U.S.C. § 10501. Based on these allegations, Plaintiffs seek declaratory and injunctive relief to prevent the enforcement of Alabama's voter ID Law. Secretary Merrill denies that the law is discriminatory, arguing that Alabama accepts so many types of acceptable IDs that most Alabamians already possess photo ID and voters who do not have one can obtain one easily.

Secretary Merrill filed a motion for summary judgment on all counts, while Plaintiffs moved for partial summary judgment on one claim and one issue.[1] The district court granted Secretary Merrill's motion and Plaintiffs-Appellants timely appealed.

Because Plaintiffs have failed to identify any genuine disputes of material facts and because no reasonable factfinder could find, based on the evidence presented, that Alabama's voter ID law is discriminatory, we affirm the district court's order granting summary judgment in favor of the Secretary of State for the State of Alabama.

## I. BACKGROUND

This case was filed by Greater Birmingham Ministries and the Alabama State Conference of the National Association for the Advancement of Colored People, along with Giovana Ambrosio, Shameka Harris, Debra Silvers, and Elizabeth Ware (collectively, "Plaintiffs") against John Merrill, the Secretary of State for the State of Alabama. In summarizing the facts of this case, we pull directly from—and oftentimes quote verbatim—the "Undisputed Material Facts" identified by the parties in their corrected Joint Status Report filed with the district court.[2]

### A. Historical Background

Since the 1990s, there have been concerted efforts in Alabama to pass a voter ID law that addresses voter fraud. For the purposes of this case, the parties agree that cases of proven

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   2

in-person impersonation voter fraud in Alabama are rare. However, in the mid-1990s, Alabama grappled with some recent, high-profile, and well-documented cases of absentee voter fraud that captured the public attention of Alabamians. These instances of voter fraud were summarized by a July 1996 article in *The Birmingham News*. [3]

**\*2** Various citizen groups formed to spread the word about the need for a photo ID law to combat voter fraud. [4] Alabama and the federal government worked together to investigate and prosecute cases of voter fraud in absentee voting. The investigation uncovered that, for example, voters would sign absentee ballot-related paperwork without ever marking the ballot, and, in a handful of instances, the voters were not involved in the process at all and their signatures were forged. Sometimes voters would be convinced, threatened, or bribed to give up their ballot materials and sometimes voters would sign the absentee ballot affidavits without marking the ballots. One investigation also revealed there were people at the polls on election day with a list of voters whose ballots had been fraudulently cast and they would chase away these voters when they came to the polls to cast their ballots.

Between the early 1990s and 2003, several voter ID bills were proposed in the Alabama legislature and failed. In 2003, the Alabama legislature successfully enacted a voter ID law that required voters to provide "current valid photo identification" or "a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter" (otherwise referred to as "non-photo ID"). [5] The 2003 law also included a "positively identify provision" ("PIP"). This provision provides that a registered voter who lacks the photo ID required to vote in person on election day may cast a regular ballot if she or he is positively identified by two election officials as a voter on the poll list who is eligible to vote and the two election officials sign a sworn affidavit so stating. Notably, the 2003 law (which included the PIP) was precleared by the Department of Justice; the PIP was cleared as an acceptable "fail-safe" provision. [6]

**\*3** One Alabama State Senator, Larry Dixon, sponsored several unsuccessful voter ID bills during his tenure in the Alabama legislature from 1995-2010. Senator Dixon was seen as a leader on the photo ID issue by proponents of the requirement. In 1996, Senator Dixon stated that "the fact you don't have to show an ID is very beneficial to the black power structure and the rest of the Democrats." Later, in 2001,

Senator Dixon said that voting without photo IDs "benefits black elected leaders, and that's why [black legislators are] opposed to it." Years later, in 2010, in a meeting with several other legislators, State Senator Scott Beason recorded Senator Dixon saying: "Just keep in mind if [a pro-gambling] bill passes and we have a referendum in November, every black in this state will be bused to the polls. And that ain't gonna help... Every black, every illiterate [will] be bused on HUD financed buses." In a separate recorded meeting, Senator Beason referred to people who are black as "Aborigines." [7] Senator Dixon retired in 2010 and was not in the legislature when the voter ID law at issue in this case was passed in 2011. [8]

Between 2003 and the 2011 passage of the now-challenged Alabama law, a plethora of other states also passed voter ID laws. By 2000, fourteen other states required some kind of ID in order to vote. In 2005, the bipartisan Commission on Federal Election Reform—chaired by former President Jimmy Carter and former U.S. Secretary of State James Baker —recommended that states move toward implementing a voter ID requirement to deter and detect fraud and to inspire public confidence in elections. *See* Report of the Commission on Federal Election Reform, Building Confidence in U.S. Elections § 2.5 (Sept. 2005). The Report noted that twenty-four states required identification for voters, "with some systems likely to restrict registration." The report nevertheless recommended "a photo ID system for voters designed to increase registration with a more affirmative and aggressive role for states in finding new voters and providing free IDs for those without driver's licenses." *Id.* at ii (Letter from the Co-Chairs). The Commission recommended states reach out to "non-drivers by providing more offices, including mobile ones, to register voters and provide photo IDs free of charge." *Id.* at iv (Executive Summary).

In 2008, the Supreme Court decided *Crawford v. Marion County Election Board*, 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008), which upheld an Indiana voter ID law requiring the presentation of a government-issued photo ID in order to vote. The Supreme Court's decision in *Crawford* generally affirmed the facial validity of voter ID laws.

On June 25, 2013, the Supreme Court issued its opinion in *Shelby County, Alabama v. Holder*, 570 U.S. 529, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013), declaring unconstitutional Section 4(b) of the Voting Rights Act, 52 U.S.C. § 10303(b), which is the coverage provision of Section 5 of the Act. 570 U.S. at 557, 133 S.Ct. 2612. Without Section 4(b),

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Section 5 has no present effect. Thus, the *Shelby County* decision resulted in Alabama no longer being subject to the preclearance requirement. The day after *Shelby County* was decided, the Alabama Attorney General and Secretary of State announced that the result of the *Shelby County* ruling was that laws like Alabama's voter ID law could move forward without preclearance. The 2011 Alabama voter ID law went into effect in 2014, as planned.

### B. The Passage of House Bill 19

The 2011 voter ID law began as House Bill 19 and was pre-filed with the Alabama legislature on February 25, 2011. HB19 was sponsored by Representative Kerry Rich.[9] Senator Beason was a co-sponsor of Senate Bill 86, the Senate's identical companion bill to HB19 during the 2011 legislative session.

**\*4** During the legislative session, HB19 was considered by the House Standing Committee on Constitution, Campaigns, and Elections. The committee acted favorably on the bill, recommending a substitute and an amendment. On March 22, 2011, the House considered whether to approve the substitute and the amendment. In the end, the House adopted the substitute and rejected the amendment. The parties dispute details about the ultimate passage of HB19, but it is undisputed that: (1) the Senate invoked cloture,[10] (2) not a single black senator who was present voted in favor of HB19, (3) the House passed it by a largely party-line vote of 64-31, and (4) the Senate passed the bill by a straight party-line vote. Likewise, the parties differ in their portrayal of how cloture was used regarding HB19, but it is clear that cloture was common during the 2011 session.[11] The record shows that there were 36 cloture votes in 2011, which broke the record for the number of cloture votes during an Alabama legislative session.

The Alabama House of Representatives passed HB19, with black legislators raising concerns about the bill being a "step back to the days of poll taxes and literacy tests."[12] HB19 then moved to the Alabama Senate for consideration and passage. HB19 was passed on June 9, 2011, the last day of the legislative session. Governor Robert Bentley signed HB19 into law on June 15, 2011.

### C. Provisions and Operations of Alabama's Current (2011) Voter ID Law

Alabama's current (2011) voter ID law requires voters to present a photo ID in order to vote. Seven categories of photo IDs may be used: (1) a valid Alabama driver's license or nondriver ID card;[13] (2) a valid Alabama photo voter ID; (3) a valid U.S. passport; (4) a valid employee ID card containing a photograph of the voter and issued by any branch, department, agency, or entity of the federal, state, or local government; (5) a valid student or employee ID card containing a photograph of the voter and issued by a public or private college, university, or postgraduate technical or professional school in Alabama; (6) a valid U.S. military ID card containing a photograph of the voter; or (7) a valid tribal identification card containing a photograph of the voter. Ala. Code § 17-9-30 (a)(1)-(7).[14] Alabama's photo ID requirement applies to in-person and absentee voters. Ala. Code § 17-9-30(b).[15] Voters who vote absentee are required to include a photocopy of their photo IDs, in a separate envelope, when they mail in their absentee ballots. *See* Ala. Code § 17-11-9.

**\*5** The voter ID law also provides for the Alabama Secretary of State to issue photo voter ID cards specifically for the purposes of voting. Ala. Code § 17-9-30(a)(2) & (f). The photo voter ID card is meant only for registered voters who do not have one of the other forms of photo ID accepted under the statute. There are several options for an Alabama would-be voter to obtain a photo voter ID: the Secretary of State's office, a board of registrars' office, or the Secretary of State's "mobile unit," which will travel to an individual's home if he or she lacks transportation. Secretary Merrill issued press releases informing voters about the photo ID requirement and announcing the mobile unit's upcoming locations. To obtain a photo voter ID card, voters must sign a form, under penalty of perjury, that they do not currently possess any form of valid photo ID.[16]

There is no existing list of all forms of documents that can be used to get a photo voter ID card. Examples of non-photo ID documents that can be used to obtain a photo voter ID card include: a birth certificate, social security document, hospital or nursing home record, marriage record, census record, military record, Medicare or Medicaid document, certificate of citizenship, official school record, or official school transcript. A selective service card

or documentation is also acceptable for issuance of a photo voter ID. This information has been conveyed to Alabamians through educational programming (i.e., billboards, radio advertisements, television advertisements, mailers) developed by the Secretary of State's office. Information is also available on the Secretary of State's website, alabamavoterid.com. [17]

There may be fees to obtain copies of documents that may be used to obtain a photo voter ID card. The documents of broadest applicability that serve to confirm a voter's name and date of birth are a birth certificate and/or marriage license. A copy of a birth certificate or marriage license costs $15.00 each. Accordingly, although the law did not require him to do so, the Secretary of State entered into a Memorandum of Understanding ("MOU") with the Alabama Department of Public Health ("ADPH") providing that an official issuing a photo voter ID card can request a copy of a voter's Alabama birth or marriage certificate, for purposes of issuing the ID, at no cost to the voter. Another MOU was reached among the Secretary's office, ADPH, and ALEA that allowed ADPH to perform searches for birth and marriage certificates and to bill the Secretary for the search. Pursuant to the MOUs, ADPH processed 164 requests for free birth or marriage certificates between March 2014 and September 2014, 87 in Fiscal Year 2015 (October 2014 through September 2015), 89 in FY2016, and 78 for October 2016 through July 2017.

Likewise, the Secretary of State entered into an MOU with ALEA and its predecessor, whereby if a person seeks an ALEA nondriver ID for the purposes of voting, the fee for the nondriver ID will be paid by the Secretary. ALEA has invoiced the Secretary for 33 voters who requested a nondriver ID for voting purposes. In sum, a voter who lacks an appropriate form of ID may acquire the documents needed to obtain a voter ID for no fee.

Furthermore, an Alabama voter may use an application to register to vote or a request to update a voter registration record to prove the voter's identity and receive a voter ID card. Persons already registered to vote may submit a voter registration update form, [18] even if nothing needs updating, and prove their identity with that update form.

**\*6** The Secretary contracted with Police & Sheriff's Press, Inc. ("PASP") to produce the voter ID cards. When a voter applies for a voter ID card, a temporary voter ID card is issued on the spot. The permanent card is mailed to the voter, normally within 10 business days. PASP began printing

Alabama photo voter ID cards in February 2014 and continues to do so today. PASP printed 5,294 Alabama photo voter ID cards in 2014, another 2,316 cards in 2015, another 4,429 in 2016, and 1,403 in 2017 (through June 30). As of June 30, 2017, Alabama had issued 13,442 photo voter ID cards to voters. The Secretary of State pays PASP $8.00 per card to print photo voter IDs. As of June 2017, the Secretary of State had paid more than $280,000 to PASP for card printing, other services, and equipment related to the photo voter ID program.

Voter registration cuts off on the fifteenth day before each election, but the Boards of Registrars' offices are required to stay open during the 14-day period leading to each election and on election days. Ala. Code § 17-3-50 ("The boards of registrars in the several counties of the state shall not register any person as a qualified elector within 14 days prior to any election; provided, that the boards shall maintain open offices during business days in such 14-day period and on election day during the hours of voting."). Photo voter IDs are available to the voter at the Boards of Registrars' offices on election days.

If, on election day, an Alabama voter arrives at a polling place *without* a photo ID, he or she can (1) vote a provisional ballot that can be cured by bringing a photo ID to the registrars' office by the Friday following the election, or (2) utilize the law's "positive identify provision" or "PIP" to cast a vote via regular ballot. [19] HB19's "positively identify provision" states:

> In addition, an individual who does not have valid photo identification in his or her possession at the polls shall be permitted to vote if the individual is positively identified by two election officials as a voter on the poll list who is eligible to vote and the election officials sign a sworn affidavit so stating.

Ala. Code § 17-9-30(e).

Since June of 2014, the voter ID law has been enforced in every election. [20] Alabama has advertised the voter photo ID requirement and the availability of free voter IDs. During

the implementation of the law, Alabama "spent substantial time and resources" on an education program that included billboards and radio and television advertisements. [21] After taking office, Secretary Merrill budgeted roughly $350,000 for advertising per election (approximately one third of the previous administration's expenditures). Despite decreased funding, the Secretary's office continues to promote the law. In January 2017, Secretary Merrill mailed a postcard to the address on file for every registered voter. In part, the post card said: "Remember, you need a valid photo ID to vote, unless exempt by law. If you do not have one, you may obtain a free photo voter ID at any Board of Registrars' office. To learn more, please visit our website at alabamavoterid.com, or contact your registrars." Overall, between October 2013 and January 2017, the Secretary of State's office has spent more than $2.6 million advertising Alabama's voter ID law.

**\*7** Secretary Merrill's predecessor, Jim Bennett, was largely responsible for the issuance of administrative rules governing the law's PIP and for the implementation of Alabama's voter ID law in 2014. He is also the creator of the mobile unit program, which was implemented in 2014. The schedule for the mobile unit was developed after contacting every mayor's office in the State of Alabama. The mobile unit went to every county in the State, and it went to some counties more than once. It was stationed at a variety of locations, including churches, libraries, and malls. In fact, the Secretary of State's office took suggestions on times and places from Plaintiff Greater Birmingham Ministries. Voters may request, through the Secretary of State's website, that the mobile unit come to their home or group to issue photo voter ID cards.

Secretary of State Merrill continued the mobile unit program. He solicited input on the mobile unit's schedule from the judges of probate, [22] as well as from members of the Alabama House and the Alabama Senate. The mobile unit goes to a location in the county that has been recommended and is expected to be a high-traffic area. [23] The office tries not to send the mobile unit to the same places every year.

The mobile unit has made more than 350 visits across the state since 2014, and has issued more than 850 photo voter IDs. As of April 12, 2017, 7% of mobile unit locations were within a quarter mile of a registrars' office, 11% were within a half-mile of a registrars' office, and 15% were within a mile of a registrars' office. Ninety-three percent of mobile unit locations were more than a quarter mile from a registrars' office, 89% were more than a half-mile from a registrars' office, and 85% were more than a mile from a registrars'

office. As of April 12, 2017, on average, the mobile unit locations were open for 3.6 hours a day—in 20.4% of visits, the mobile unit was open for 2 hours or less, and in 82.6% of visits they were open for four hours or less.

As of April 12, 2017, the number of home visits made by the mobile unit was fewer than ten. One of the mobile unit home visits happened after a member of the legislature contacted Secretary Merrill to assist a constituent, while another visit occurred for a plaintiff in this litigation. The Secretary has implemented a protocol whereby the voter is asked questions about his or her transportation options before a home visit is scheduled. Nonetheless, in his deposition, Secretary Merrill has made clear that if the voter says he has no one to give him a ride, the voter is taken at his word: "Now, if they choose not to be honest, then we'll accept it." He emphasized that "we're not going to—nobody is ever going to be denied a voter ID." As a result, the law accommodates voters who lack transportation to obtain an ID.

Lastly, the parties presented differing expert evidence that indicates somewhere between 32,704 and 118,152 Alabamian voters lack a form of photo ID required by the voter ID law [24] or lack a "useable ID" (meaning their ID is, for example, expired and not valid). [25] Regardless of which number is used, this number accounts for less than 2% of Alabamians who are eligible to vote. Plaintiffs' expert expressed an opinion that, overall, an estimated 1.67% of registered voters in Alabama have no valid photo ID that is accepted under the voter ID law. Broken down by race, Plaintiffs' expert concluded that 1.37% of white voters, 2.44% of black voters, and 2.29% of Latino voters [26] do not possess a photo ID. Secretary Merrill's expert found that 1.03% of registered Alabama voters, overall, lack a photo ID: 0.87% of white voters, 1.44% of black voters, and 1.26% of Latino voters. Put differently, Plaintiffs' expert concluded that an estimated 98.33% of registered Alabama voter possess a valid photo ID, while Secretary Merrill's expert estimated that 98.97% of registered Alabama voters possess a valid photo ID.

### D. The Parties [27]

#### 1. Greater Birmingham Ministries

**\*8** Plaintiff Greater Birmingham Ministries ("GBM") was founded in 1969 in response to the human rights and justice needs of the residents of the greater Birmingham,

Alabama, area. GBM has participated in lawsuits intended to accomplish its social justice objectives.

### 2. Alabama State Conference of the National Association for the Advancement of Colored People

Plaintiff Alabama State Conference of the National Association for the Advancement of Colored People ("the Alabama NAACP") is a state subsidiary of the National Association for the Advancement of Colored People, Inc. The Alabama NAACP is the oldest and one of the most significant civil rights organizations in Alabama, and it works to ensure the political, educational, social, and economic equality of black and all other Americans. Toward those ends, the Alabama NAACP has participated in numerous lawsuits intended to protect the right to vote, regularly engages in efforts to register and educate black voters, and encourages black voters to engage in the political process by turning out to vote on election day.

### 3. Giovana Ambrosio

Plaintiff Giovana Ambrosio is a lawfully registered Latino voter, U.S. citizen, and lifelong resident of Franklin County, Alabama. Ms. Ambrosio was a high school senior when she became a plaintiff. She rode the bus to school and stayed after school for extracurricular activities two to five days a week. Ms. Ambrosio was registered to vote prior to the March 1, 2016 primary, but the Secretary maintains that she was not registered in time to vote in that election. Ms. Ambrosio went to the polls for the March 1, 2016 primary, but was not personally acquainted with the election officials at her polling place that day. Ms. Ambrosio did not have an ALEA-issued driver's license, or any of the photo IDs required to vote pursuant to the voter ID law.

For the entirety of 2016, the closest driver's license-issuing ALEA office to Ms. Ambrosio's home was only open one day per month, during the hours that Ms. Ambrosio typically spent in classes or in school-sponsored and school-supervised extracurricular activities. The next closest ALEA office to Ms. Ambrosio was in Sheffield, which is an approximately 45-mile roundtrip drive. The Sheffield office is open from 8:00 am to 4:30 pm on weekdays. Ms. Ambrosio does not own a car and, although her parents have access to vehicles, both parents work full time and were unable to drive her to Sheffield during the ALEA office's normal hours.[28] To

the best of Ms. Ambrosio's knowledge, there is no public transportation from Franklin County to Sheffield, which is in adjoining Colbert County.

However, the board of registrars' office at the Franklin County courthouse is approximately one mile from Ms. Ambrosio's home. Ms. Ambrosio also knew about the mobile ID unit.

Ms. Ambrosio started classes at Northwest Shoals Community College in fall of 2016. Before classes begin, students register and pay for classes at the cashier's office. They are told then to go across the hall to the Student Success Center to get their picture taken for their student ID. The college sends new student information to the vendor to print and mail the student ID. If the picture has been taken, it should appear on the student ID. Otherwise, the card will come without a picture on it and a message that reads "needs photo see ID office." In late August 2016, Ms. Ambrosio had her picture taken for her student ID, but the ID was delayed in arriving, and eventually it arrived without a photo.

**\*9** Shortly before the November 2016 general election, Ms. Ambrosio's sister drove her to the courthouse to get a voter ID card from the board of registrars' office; she left with a temporary paper ID, and she received a permanent ID in the mail a few weeks later. Ms. Ambrosio used the temporary ID to vote in the November 2016 general election. Ms. Ambrosio also followed up with Northwest Shoals Community College and obtained a student ID with photo. That ID is an accepted voter ID under Ala. Code § 17-9-30.

### 4. Shameka Harris

Plaintiff Shameka Harris is a thirty-three year-old lawfully registered black voter, U.S. citizen, and resident of Sumter County, Alabama. Although Ms. Harris has previously voted in-person using a photo or non-photo ID under the 2003 voter ID law, her unexpired ALEA nondriver photo ID was stolen, along with her wallet, in 2014.

In 2016, Ms. Harris possessed an expired nondriver photo ID, which she could not use to vote. Ms. Harris did not attempt to vote in November 2016 because she knew that voters needed to have a valid photo ID and she did not have one at the time.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Ms. Harris does not own a car. She pays private individuals to drive her anywhere that is not within the immediate walking distance of her home.

Ms. Harris has a copy of her birth certificate. Ms. Harris's birth certificate was lost in a fire, but she later replaced it. She paid $15 (borrowed from her boyfriend) to replace her birth certificate, and she had to pay for the ride to Livingston. Before her March 2017 deposition, and after the November 2016 election, Ms. Harris also went to Livingston to update her voter registration. Ms. Harris took the updated voter registration to the ALEA office and got a new nondriver photo ID.

### 5. Elizabeth Ware

Plaintiff Elizabeth Ware is a sixty year-old, lawfully registered black voter, U.S. citizen, and resident of Mobile County, Alabama.

Ms. Ware's nondriver photo ID was stolen in 2014. Ms. Ware lives in Prichard, in Mobile County. The license commission in Mobile County issues renewals and duplicates of driver's licenses and nondriver IDs at five locations in Mobile County, including one in Prichard. The Prichard office is open 7:00 am to 5:00 pm Mondays, Tuesdays, Thursdays, and Fridays. Ms. Ware has a Medicaid card and a Social Security card.

Ms. Ware testified that she tried to get a photo voter ID from the Mobile County board of registrars' office but was turned away because she had previously held a nondriver ID. Ms. Ware did not have a photo ID at the time of the March 1, 2016 primary election or the November 2016 general election, and did not vote in either election.

Ms. Ware lives on a fixed income. She does not have reliable access to transportation, and does not own a vehicle. Her health limits her ability to walk to the nearest bus stop, though she has walked to a polling place near her home. Although members of Ms. Ware's family can sometimes provide her with rides, their work schedules often prevent her family members from giving her rides during the day.

Ms. Ware was unaware of the mobile ID unit home visit until her deposition. At her deposition, Ms. Ware expressed interest in arranging for the mobile unit to come to her home. On March 10, 2017, two employees of the Secretary of State's office traveled more than 150 miles (one way) to Ware's residence to issue her a photo ID.

### 6. Defendant-Appellee John Merrill

Defendant John H. Merrill is being sued in his official capacity as the Secretary of State of Alabama. The Secretary of State is Alabama's chief election official. He is charged with issuing photo voter ID cards and informing the public about the voter ID law's requirements. *See* Ala. Code §§ 17-9-30(f), (l), (n). Secretary Merrill also has authority to promulgate administrative rules to implement the voter ID law. *Id.* § 17-9-30(o).

### E. Procedural History

**\*10**  Plaintiffs filed this lawsuit, claiming the 2011 voter ID law violates the Fourteenth and Fifteenth Amendments of the Constitution, as well as Section 2 of the VRA, arguing the passage of the law was motivated by racial discrimination and that the law has a discriminatory effect. They also claim the "Positively Identify Provision" ("PIP") constitutes an illegal "test or device" in violation of Section 201 of the VRA. Secretary Merrill denies these claims and argues that the law is constitutional, nondiscriminatory, and valid. He also argues that the PIP is valid and does not violate Section 201 of the VRA.

Merrill filed a motion for summary judgment, while Plaintiffs filed a motion for partial summary judgment. The court considered both motions at the same time and granted Merrill's motion for summary judgment, dismissing all claims and denying Plaintiffs' motion for partial summary judgment. The district court found that Plaintiffs failed to show that the voter ID law in fact discriminates against Alabamians on the basis of race. Although it was undisputed that minority registered voters are statistically more likely than white voters to lack the required ID, the district court determined that "a person who does not have a photo ID today is not prevented from voting if he or she can easily get one, and it is so easy to get a photo ID in AL, *no one* is prevented from voting." The district court concluded that no discriminatory impact existed because free IDs are issued in every county, or at an individual's home, under conditions that any registered voter can meet.

Plaintiffs-Appellants timely filed this appeal.

## II. JURISDICTION

The judicial power of the federal courts is limited by Article III of the U.S. Constitution. We may exercise jurisdiction only over "Cases" and "Controversies." U.S. Const. art. III, § 2; *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "To satisfy the 'case' or 'controversy' requirement of Article III, which is the 'irreducible constitutional minimum' of standing, a plaintiff must, generally speaking, demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Glassroth v. Moore*, 335 F.3d 1282, 1292 (11th Cir. 2003) (quoting *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)).

Although the parties did not address this issue in their briefing or at oral argument, the Court is obligated, as a jurisdictional matter, to confirm the Plaintiffs' standing to bring this case. "Indeed, it is well settled that a federal court is obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking." *Univ. of S. Alabama v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999). Plaintiffs in this case can be sorted into two groups: advocacy organizations (GBM and the Alabama NAACP) and individuals (Ambrosio, Harris, and Ware). We address the standing of the organizational Plaintiffs first.

Based on the Supreme Court's standing doctrine, GBM and the Alabama NAACP have standing to bring this suit. "[W]e have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). First, both organizations have members (minority voters in Alabama) who would otherwise have standing to sue. Second, this lawsuit is germane to both organizations, whose purposes focus on voter rights and equal opportunity for minority voters. Finally, we cannot say that the constitutional and voting rights claims asserted, or the declaratory or injunctive relief requested, require the participation of the individual members in this lawsuit. *See Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229,

1244 (11th Cir. 2003) (holding that the third prong of the associational standing test was satisfied where organizational plaintiffs' individual members did not need to be made parties to the suit "in order to advance the [organizational plaintiffs'] equal protection claim or to fashion the sort of prospective injunctive relief [the organizational plaintiffs] sought"); *see also Sierra Club v. Tennessee Valley Auth.*, 430 F.3d 1337, 1345 (11th Cir. 2005) (same). [29] Accordingly, we conclude that the organizational Plaintiffs in this case have met the prerequisites to associational standing.

**\*11** Our conclusion that the two advocacy organizations have associational standing makes it unnecessary for us to engage in a full standing analysis of the claims made by individual Plaintiffs Ambrosio, Harris, and Ware. *Glassroth v. Moore*, 335 F.3d 1282, 1293 (11th Cir. 2003) ("Having concluded that those two plaintiffs have standing, we are not required to decide whether the other plaintiff[s] ... ha[ve] standing."); *see also Am. Civil Liberties Union of Georgia v. Rabun Cty. Chamber of Commerce, Inc.*, 698 F.2d 1098, 1109 (11th Cir. 1983) ("Because we have determined that at least these two individuals have met the requirements of Article III, it is unnecessary for us to consider the standing of the other plaintiffs in this action.").

## III. DISCUSSION

### A. Standard of Review

The Court of Appeals reviews *de novo* "a district court's rulings on cross-motions for summary judgment, and the facts are viewed in the light most favorable to the non-moving party on each motion." *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012) (citations omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable factfinder 'could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.' " *Cynergy, LLC v. First Am. Title Ins. Co.*, 706 F.3d 1321, 1326 (11th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)). This Court will affirm the grant of summary judgment if we conclude that there is no genuine issue of material fact.

### B. Discussion

"We approach this case with caution, bearing in mind that these circumstances involve 'one of the most fundamental rights of our citizens: the right to vote.' " *Georgia State Conference of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015) (quoting *Bartlett v. Strickland*, 556 U.S. 1, 10, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009)). However, "[g]iven the fact that petitioners have advanced a broad attack on the constitutionality" of Alabama's voter ID law, and because Plaintiffs seek "relief that would invalidate the statute in all its applications, they bear a heavy burden of persuasion." *Crawford*, 553 U.S. at 200, 128 S.Ct. 1610.

Plaintiffs are correct that summary judgment is not often granted in voter denial lawsuits. They are incorrect, however, in implying that a case such as this should never be decided on summary judgment. It is irrefutable that a motion for summary judgment can—and should—be granted when the conditions of Rule 56 are met. Fed. R. Civ. P. 56 (a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."), *see also Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983) ("Faced with cross motions for summary judgment the district court made extensive findings of fact and entered judgment for the government. ... [T]he only required finding is that there is no genuine issue as to any material fact."). We firmly resist any inducement to establish a category of claims (e.g., vote denial claims or constitutional challenges to laws affecting voting) that can never succeed on a Rule 56 motion for summary judgment. *Cf. Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000) ("[W]e have reiterated that trial courts should not treat discrimination differently from other ultimate questions of fact.") (internal quotations omitted); *Chapman v. AI Transp.*, 229 F.3d 1012, 1026 (11th Cir. 2000) (en banc) ("The long and short of it is that the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale.").

**\*12** We do acknowledge that, even as the parties set forth 100-plus pages of jointly filed "Undisputed Material Facts," they continued to dispute the materiality and relevance of various facts. But such disputes do not doom a motion for summary judgment; only genuine disputes about material facts do. *See Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1213 (11th Cir. 1995) In this case, there are no such disputes of material facts.

### 1. Violation of the Fourteenth & Fifteenth Amendments

We turn now to the substantive arguments raised by Plaintiffs. Plaintiffs filed suit under 42 U.S.C. § 1983,[30] which provides them with a federal "cause of action for constitutional violations committed under color of state law. To prevail, plaintiffs must demonstrate both that the defendants deprived them of a right secured under the Constitution or federal law and that the deprivation occurred under color of state law." *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187–88 (11th Cir. 1999) (citing *Arrington v. Cobb County*, 139 F.3d 865, 872 (11th Cir. 1998)). Because the Alabama voter ID law and its enforcement fall squarely under color of state law, we need only address the constitutionality of the law. *Id.* at 1188.

Plaintiffs allege that the Alabama voter ID law "was purposefully enacted or operates to deny or abridge the right to vote on account of race or color," in violation of the Fourteenth Amendment to the United States Constitution. Plaintiffs also allege the voter ID law violates the Fifteenth Amendment to the United States Constitution because Alabama "intentionally enacted or operates [HB19] to deny or abridge the right to vote on account of race or color." The Fourteenth Amendment provides in relevant part that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV.

At the outset, we are compelled to mention that Plaintiffs have failed to distinguish meaningfully their grievances from those raised more than a decade ago by the plaintiffs in *Crawford v. Marion County Election Board*, 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008).[31] In *Crawford*, a variety of nonprofit organizations and public officials brought a facial challenge to an Indiana state law that required Indiana residents to present government-issued photo identification to vote. The Supreme Court upheld the Indiana photo voter ID law. We readily acknowledge that the challengers in *Crawford* did not allege intentional race discrimination; rather, they mounted a facial attack against Indiana's photo ID requirements and made no mention of discriminatory intent on the part of the Indiana legislature when passing the photo ID law. In contrast, Plaintiffs' claims in this case rest heavily on the alleged motives of the Alabama legislature and so we must determine whether Alabama's voter ID law

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

was passed with an intent to discriminate against Alabama's minority voters. We also recognize that Plaintiffs in this case have provided evidence of the various voter ID issues facing individual Plaintiffs in an attempt to address the *Crawford* Court's concerns about an incomplete record. Despite these differences, *Crawford* is not completely distinguishable. In two key respects, this case is the same: (1) the alleged voter burdens facing Alabamians are essentially the same as the burdens imposed on Indiana voters in 2008 that the Supreme Court upheld as constitutionally valid, and (2) Alabama's stated interests in passing a photo ID law echo the state interests espoused by Indiana that were held to be sufficient in *Crawford*. Thus, *Crawford*'s principles are relevant to this case and deserve our consideration.

 **\*13**  In *Crawford*, the Supreme Court analyzed an Indiana law that required voters to present a photo ID when voting in person. Indiana offered four state interests in passing a voter ID law: (1) deterring and detecting voter fraud, (2) participating in a nationwide effort to improve and modernize election procedures, (3) addressing the state's own mismanagement of voter rolls, and (4) safeguarding voter confidence. *Id.* at 191, 128 S.Ct. 1610. Individuals without a photo ID were allowed to cast provisional ballots that could be cured by an affidavit. *Id.* at 199, 128 S.Ct. 1610. The Court acknowledged that, due to the ID requirement, "a somewhat heavier burden may be placed on a limited number of persons," but determined that the severity of that burden was mitigated through the provisional ballot option. Further, the Court noted that the Indiana plaintiffs failed to develop, in the record, evidence sufficient to convince the Court that the voter ID requirement imposed "excessively burdensome requirements on any class of voters." *Id.* at 202, 128 S.Ct. 1610 (internal quotations omitted). In considering "only the statute's broad application to all Indiana voters," the Court concluded that it imposed "only a limited burden on voters' rights" so the "precise interests advanced by the State" were sufficient to defeat the facial challenge to the Indiana law. *Id.* at 202–03, 128 S.Ct. 1610 (internal quotations and citations omitted). Simply put, the Court weighed the burdens imposed on voters with the state interests underlying the Indiana law and found the law to be a neutral, nondiscriminatory regulation of voting procedure. *Id.* at 203, 128 S.Ct. 1610. Notably, the Supreme Court recognized that "just as other States provide free voter registration cards, the photo identification cards issued by [the State] are also free. For most voters who need them, the inconvenience of making a trip to the BMV [or a registrars' office], gathering the required documents, and posing for a photograph surely

does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." 553 U.S. at 198, 128 S.Ct. 1610.

Here, as in *Crawford*, the burden analysis is similar. Alabama provides free photo voter ID cards to any Alabamian who wants one. In fact, Alabama makes it even easier to obtain a photo ID than Indiana did: Alabamians can utilize the mobile unit option to obtain a photo ID, virtually eliminating the need to take a "trip to the BMV" or registrars' office. *Id.* It is undisputed that free photo IDs are available from every registrars' office in Alabama; that the Secretary of State's mobile unit travels throughout the state to offer alternative locations; and that, if a voter cannot get to a registrars' office, he or she can request and receive a home visit by the mobile unit.

Furthermore, the Court determined that the state interests espoused by Indiana in defending its voter ID law in *Crawford* are legitimate and valid reasons to adopt such a law. *See id.* at 192–97, 128 S.Ct. 1610. The Supreme Court explained that the Indiana's interests in modernizing election procedures, combating voter fraud, and protecting public confidence in the integrity of the electoral process are legitimate and justify the minimal burdens imposed by a voter ID law. *Id.* These interests are the same ones advanced as justification for the Alabama photo voter ID law at issue here; in their motion for summary judgment, Alabama articulated the state's interests in passing the "photo ID law to combat voter fraud, to increase confidence in elections, and to modernize its elections procedures." Contrary to the dissent's assertions that Alabama indisputably passed the voter ID law "to solve a problem with in-person voting that did not exist," Alabama's interests in passing the voter ID law are not substantively different from the neutral, nondiscriminatory reasons espoused by Indiana and upheld by the Supreme Court in *Crawford*. Just as "Congress believes that photo identification is one effective method of establishing a voter's qualification to vote," *Id.* at 193, 128 S.Ct. 1610, so too did the Alabama legislature. It follows that the burden of presenting a photo ID in order to vote is "justified by relevant and legitimate state interests 'sufficiently weighty to justify' " the burden on Alabama voters. *Id.* at 191, 128 S.Ct. 1610 (quoting *Norman v. Reed*, 502 U.S. 279, 288–289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992)). [32]

Nevertheless, despite the analysis and result in *Crawford*, we proceed with a full review of Plaintiffs' claims. As an initial matter, we are mindful that the Supreme Court has <u>not</u>

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

held that "a law that imposes any burden upon the right to vote must be subject to strict scrutiny." *Burdick v. Takushi*, 504 U.S. 428, 432, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). Acknowledging that "[e]lection laws will invariably impose some burden upon individual voters," the Court instead has applied "a more flexible standard." *Id.* at 433-34, 112 S.Ct. 2059.

**\*14** In considering a state's election law, we

> must weigh the character and magnitude of the asserted injury to the rights ... that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.

*Id.* at 434, 112 S.Ct. 2059 (internal citations omitted).

Accordingly, "the rigorousness of [the] inquiry into the propriety of a state election law depends on the extent to which a challenged regulation burdens ... Fourteenth Amendment rights." *Id.* at 434, 112 S.Ct. 2059. If the challenged law involves "severe restrictions" to the right to vote, "the regulation must be narrowly drawn to advance a state interest of compelling importance." *Id.* (internal quotations omitted). Conversely, when the state law at issue "imposes only 'reasonable, nondiscriminatory restrictions' upon the ... Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983)).

With *Burdick* in mind, we turn to our analysis of Plaintiffs' equal protection claims. A successful equal protection claim under the Fourteenth Amendment requires proof of *both* an intent to discriminate and actual discriminatory effect. *Davis v. Bandemer*, 478 U.S. 109, 127, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) ("[P]laintiffs were required to prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group."); *see also Burton*, 178 F.3d at 1188–89. Similarly, the Supreme

Court has long recognized that evidence of a racially discriminatory motivation is required for Plaintiffs to prevail on a Fifteenth Amendment claim. Put simply, "racially discriminatory motivation is a necessary ingredient of a Fifteenth Amendment violation." *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 62, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), *superseded by statute on other grounds as stated in Thornburg v. Gingles*, 478 U.S. 30, 35, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). *See also Gomillion v. Lightfoot*, 364 U.S. 339, 347, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *Wright v. Rockefeller*, 376 U.S. 52, 56, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964).

There are two prongs to an equal protection analysis under the Fourteenth Amendment and a denial or abridgment analysis under the Fifteenth Amendment. *See Hunter v. Underwood*, 471 U.S. 222, 227–28, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985); *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1222–23 (11th Cir. 2005) (applying the *Hunter* test to a Fourteenth Amendment equal protection claim); *Burton*, 178 F.3d 1175, 1188–89 (applying the *Hunter* test to a Fifteenth Amendment abridgment claim). Plaintiffs must first show that the State's "decision or act had a discriminatory purpose and effect." *Burton*, 178 F.3d at 1188–89. If Plaintiffs are unable to establish both intent *and* effect, their constitutional claims fail. *Burton*, 178 F.3d at 1195. Once discriminatory intent and effect are established, the second prong provides that "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this [racial discrimination] factor." *Hunter*, 471 U.S. at 228, 105 S.Ct. 1916; *Johnson*, 405 F.3d at 1223.

**\*15** As we turn to the first prong of the equal protection analysis to determine whether the Alabama photo ID law has both a discriminatory intent and effect, we are further guided by the multiple factor approach articulated by the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The *Arlington Heights* analysis, which applies to both Fourteenth Amendment and Fifteenth Amendment claims, *see Burton*, 178 F.3d at 1189, requires us to start by determining whether the challenged law has a discriminatory impact and "whether it bears more heavily on one race than another." *Id.* at 266, 97 S.Ct. 555. From there, the Supreme Court suggested that the relevant evidentiary factors for determining whether racially discriminatory intent existed include:"[t]he historical background of the decision," "[t]he specific sequence of events leading up [to] the challenged decision," "[d]epartures from the normal

procedural sequence," and "contemporary statements by members of the [Legislature], minutes of its meetings, or reports." *Arlington Heights*, 429 U.S. at 267–68, 97 S.Ct. 555. We thus summarize the *Arlington Heights* factors as follows: (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators. And, because these factors are not exhaustive, the list has been supplemented: (6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives. *Jean*, 711 F.2d at 1486.[33] For the reasons articulated below, we find that the Plaintiffs have not met the requirements of the first prong and so their equal protection challenge fails.

### i. Impact of the Challenged Law

As we turn to the first *Arlington Heights* factor – whether the Alabama law has a discriminatory impact—we note that the Supreme Court cautioned that it would be rare to find a case involving "a clear pattern, unexplainable on grounds other than race" and that, "[a]bsent a pattern as stark as that, ... [discriminatory] impact alone is not determinative, and the Court must look to other evidence." *Arlington Heights*, 429 U.S. at 266, 97 S.Ct. 555.

Here, there is no clear pattern that would be determinative. While we acknowledge Plaintiffs' assertions that minority voters in Alabama possess photo IDs at a slightly lower rate than white Alabama voters, the small disparities in ID possession rates do not, standing alone, establish a "pattern, unexplainable on grounds other than race."[34] *Id.* Accordingly, we turn to the other *Arlington Heights* factors and Plaintiffs' proffered "other evidence" to determine whether the Alabama legislature intended to discriminate when it passed its 2011 voter ID law.

### ii. Contemporary Statements and Actions of Key Legislators and Historical Background

Plaintiffs argue that the discriminatory intentions of individual legislators—as evidenced by their statements made "contemporaneously"[35] to the bill's passage— and the concurrent passage of other allegedly "racially discriminatory" laws like HB56[36] create a triable issue of

fact regarding whether the Alabama legislature intended to discriminate when passing the voter ID law. *See Arlington Heights*, 429 U.S. at 268, 97 S.Ct. 555 ("The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body."). In doing so, Plaintiffs attempt to tie the more modern statements made by Alabama legislators to Alabama's racist history as well as statements made by former Alabama legislators. Because Plaintiffs' analysis integrates both arguments, we consider these *Arlington Heights* factors together.

**\*16** We begin with the modern statements made by several Alabama legislators. Plaintiffs cite the statements of legislators Dixon, Rich, and Beason and argue that "[t]hese overt statements of racial bias against voters of color powerfully support the inference that HB19 had a discriminatory purpose." To support their argument, Plaintiffs cite *Carrollton Branch of NAACP v. Stallings*, 829 F.2d 1547, 1552 (11th Cir. 1987), for the proposition that "discriminatory intent could be inferred from the fact that the sponsor of the challenged law had in the past made a racist speech about a different voting bill."

In *Stallings*, however, this Court found evidence of discriminatory intent based on prior speech because the sponsor of the 1951 bill had made the speech when he introduced the same bill in 1947. 829 F.2d at 1552. The racist speech in 1947 "was evidence of an intent to discriminate against black voters in any voting legislation before the General Assembly during that [1947] session." *Id.* Because the bill was re-introduced "under the same sponsorship" in 1951, we considered the circumstances to be the same as in 1947. *Id.*

In this case, Plaintiffs primarily cite various statements made by former Alabama State Senator Larry Dixon in 1996 and 2010. Although in *Stallings* we found that earlier statements can sometimes provide evidence of discriminatory intent, that case involved the same bill and the same sponsor. Senator Dixon was not a sponsor of this legislation and, in fact, was not a member of the Alabama legislature in 2011 when the voter ID law was passed. Similarly, Plaintiffs provide no evidence that Senator Beason's comment was made at the same time, or even during the same session, as the passage of HB19. In fact, there is no evidence as to when he made his comment or what bill he was discussing when he did. Likewise, Representative Rich's allegedly "prejudiced comments about Latino citizens" do not provide

*Stallings*-level evidence of discriminatory intent. Although Representative Rich, who was the primary sponsor of HB19, did make these statements during the 2011 legislative session, he made them during the debate on a different bill (HB56) about an entirely different subject (immigration). It does not stand to reason that those comments support a wholesale intent by Representative Rich, or by the Alabama legislature, to discriminate against minority voters. To be clear: this Court does not condone, under any circumstances, racist statements. But we are confined to an analysis of discriminatory intent as it relates to HB19, and the statements Plaintiffs identify were not made about the law at issue in this case and thus do not evidence discriminatory intent behind it.

Secretary Merrill's arguments stand in stark contrast to Plaintiffs' claims. Secretary Merrill contends that the Alabama voter ID law was passed to combat voter fraud, increase voter confidence, and to modernize elections. As this Court has recognized, "a strong state policy in favor of [the challenged practice], for reasons other than race, is evidence that the [practice] does not have a discriminatory intent." *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1571 (11th Cir. 1984). Secretary Merrill notes that, at the time of HB19's passage, Alabama already had an existing —precleared—voter ID law that required Alabamians to present a photo ID. Alabama merely joined a growing national trend in passing voter identification laws. The passage of HB19—and, in fact, the prior 2003 law—was driven by the need to address well-documented and public cases of voter fraud that occurred in Alabama. The law's passage was championed both by public officials and by grass-roots, citizen-led movements.

**\*17** During oral argument, we expressed our skepticism that the discriminatory intent could be ascertained from the statements of one legislator speaking about another bill. [37] As a general matter, determining the intent of the legislature is a problematic and near-impossible challenge. *Hunter*, 471 U.S. at 228, 105 S.Ct. 1916 ("Proving the motivation behind official action is often a problematic undertaking."); *see also Edwards v. Aguillard*, 482 U.S. 578, 636–37, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (Scalia, J., dissenting) ("[D]iscerning the subjective motivation of those enacting the statute is, to be honest, almost always an impossible task. The number of possible motivations, to begin with, is not binary, or indeed even finite. ... To look for *the sole purpose* of even a single legislator is probably to look for something that does not exist.").

The Plaintiffs' position is weakened significantly by the fact that the evidence presented in this case is largely unconnected to the passage of the actual law in question. Unlike *North Carolina State Conference of NAACP v. McCrory*, the record and the specific sequence of events leading up to the passage of the law does not lead to "the obvious inference ... of ... discriminatory intent." 831 F.3d 204, 227 (4th Cir. 2016), cert. denied sub nom. *North Carolina v. N. Carolina State Conference of NAACP*, ––– U.S. ––––, 137 S. Ct. 1399, 198 L.Ed.2d 220 (2017). In *McCrory*, the North Carolina legislature, immediately after *Shelby County*, vastly expanded an earlier photo ID bill and changed the accepted photo ID provision: "the new ID provision retained only those types of photo ID disproportionately held by whites and excluded those disproportionately held by African Americans." *Id.* But the opposite has happened in Alabama, where the Alabama legislature specifically included the types of photo ID— government employee IDs—that North Carolina failed to accept in *McCrory*, as acceptable IDs. Furthermore, the Alabama legislature also decided to allow student IDs, in contrast to the Texas election law that the Fifth Circuit criticized in *Veasey v. Abbott*, 830 F.3d 216, 262 (5th Cir. 2016), cert. denied, ––– U.S. ––––, 137 S. Ct. 612, 197 L.Ed.2d 78 (2017) (Texas legislature rejected amendments to expand the forms of acceptable ID to include student IDs, federal IDs, state-government employee IDs despite testimony about likely disparate impact if such IDs were excluded). Alabama specifically included a wide variety of photo IDs and offers free photo IDs to Alabama citizens who wish to obtain one, which raises the question: "Indeed, why would a racially biased legislature have provided for a cost-free election ID card to assist poor registered voters—of all races—who might not have drivers' licenses?" *Id.* at 281 (Jones, J., dissenting).

It is also questionable whether the sponsor speaks for all legislators. The vote of a sponsor is only one vote of the 105 votes in the Alabama House of Representatives. And the record does not show that the primary sponsor, Representative Rich, spoke *at all* about the intentions motivating the passage of HB19. It stretches logic to deem a sponsor's "intent"— ascertainable only from contemporaneous statements made by HB19 sponsor Representative Rich about a different bill on a different topic unrelated to the voter ID law—as *the* legally dispositive intent of the entire body of the Alabama legislature on that law. No reasonable fact-finder could find a discriminatory intent or purpose underlying Alabama's voter ID law from the statements identified by Plaintiffs.

**\*18** When we focus on the circumstances surrounding the passage of HB19, it is undisputed that *none* of the comments in question were made about that legislation. The statements made by current and former Alabama legislators at issue in this case are not "smoking gun" evidence of discriminatory intent in the context of the voter ID law. The fact remains that Plaintiffs cannot point to evidence—not a single comment made by any sitting Alabama legislator in reference to HB19 —to support their argument that the voter ID law was intended to discriminate against black and Latino voters.

We are mindful of the danger of allowing the old, outdated intentions of previous generations to taint Alabama's legislative action forevermore on certain topics. Plaintiffs point to the racist history of Alabama as a significant barrier for Secretary Merrill to overcome in defending this law. But it cannot be that Alabama's history bans its legislature from ever enacting otherwise constitutional laws about voting. Surely, "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Bolden*, 446 U.S. at 74, 100 S.Ct. 1490; *see also Abbott v. Perez*, —— U.S. ——, 138 S. Ct. 2305, 2324, 201 L.Ed.2d 714 (2018) (explaining that "the presumption of legislative good faith [is] not changed by a finding of past discrimination"); *Arlington Heights*, 429 U.S. at 267, 97 S.Ct. 555 (focusing the Court's "historical background" analysis on the "specific sequence of events leading up to the challenged decision" and not providing an unlimited look-back to past discrimination). In fact, during oral argument, Plaintiffs' counsel admitted that, if *today's* Alabama legislature passed the same law, without any discriminatory intent and relying on *Crawford*'s legitimate state interests in preventing voter fraud and increasing voter confidence in elections, a current version of HB19 would pass constitutional muster. [38]

The dissent does not dispute that another state, say Illinois, could enact the identical statute, but instead argues partly that Alabama cannot enact this statute because of its history. But the Supreme Court foresaw this line of argument in *Shelby County*, emphasizing "the fundamental principle of equal sovereignty," which requires that we recognize that ours "is a union of States, equal in power, dignity and authority." *Shelby County*, 570 U.S. at 544, 133 S.Ct. 2612; *id.* ("[T]he constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized."). Notwithstanding the *Shelby County* Court's admonition, the dissent argues our decision allows Alabama to "start with a clean slate" and that we should penalize the current legislature for Alabama's racist past, because a

racist past is evidence of current intent. But applying the principles of equal sovereignty counsels against the dissent's disparate treatment of Alabama and guides us to look at the precise circumstances surrounding the passing of the voter ID law. *See Shelby County*, 570 U.S. at 553, 133 S.Ct. 2612 (stating that the Fifteenth Amendment "is not designed to punish for the past; its purpose is to ensure a better future"); *Cf. Ramos v. Louisiana*, 590 U.S. ——, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020) (Alito, J., dissenting) ("Too much public discourse today is sullied by *ad hominem* rhetoric, that is, attempts to discredit an argument not by proving that it is unsound but by attacking the character or motives of the argument's proponents."). Perhaps most significant is the fact that Plaintiffs provide no evidence that the Alabama legislators who supported the law intended the law to have a discriminatory impact or believed that the law would have such an effect. Ultimately, the requirement that Alabama voters present photo ID "is amply justified by the [state's] valid interest in protecting 'the integrity and reliability of the electoral process.' " *Crawford*, 553 U.S. at 204, 128 S.Ct. 1610. HB19 was passed with provisions that permit voters to present many acceptable forms of photo ID. The statements made by individual members of the Alabama legislature at one time about other bills do not change the fact that the legislative body passed a nondiscriminatory voter ID law, supported by valid neutral justifications, and that the law permits many different forms of ID and provides for free IDs for anyone in need.

### iii. The Specific Sequence of Events Leading Up to HB19's Passage and Procedural and Substantive Departures

**\*19** Plaintiffs also present evidence of the legislature's passage of HB19 and the alleged procedural departures that occurred when passing the 2011 voter ID law. *Arlington Heights*, 429 U.S. at 267, 97 S.Ct. 555 ("The specific sequence of events leading up the challenged decision also may shed some light on the decisionmaker's purposes. ... Substantive departures too may be relevant."). [39] Plaintiffs take issue with the use of cloture and truncated debate that precipitated the quick passage of the voter ID legislation at the end of the 2011 legislative session to support their position.

To contradict Plaintiffs' arguments about the procedural maneuverings by the Alabama legislature in passing HB19, Secretary Merrill insists that there was nothing uncommon about the way that the voter ID law was passed. Indeed, it is

undisputed that the use of cloture was exceedingly common during the 2011 legislative session. Plaintiffs counter that no black legislators voted for HB19, and the vote was a strictly party-line vote. Pursuant to *Crawford*, while it might be suspicious if partisan reasons were the only consideration or justification for the law, [40] Secretary Merrill has provided valid neutral justifications (combatting voter fraud, increasing confidence in elections, and modernizing Alabama's elections procedures) for the law's passage.

### iv. Foreseeability and Knowledge of Disparate Impact

Plaintiffs combine "foreseeability of disparate impact" and "knowledge of that impact," titling their argument "Foreknowledge." Plaintiffs assert that the Alabama legislature had foreknowledge of the disparate impact HB19 would have on minority voters in Alabama, as evidenced by the inclusion of a three-year enforcement delay in the bill. As noted above, the evidence establishes that the delay in implementation occurred because the legislature anticipated challenges to the law and needed time to obtain preclearance. The mere fact of an implementation delay, without more, does not suggest that the Alabama legislature foresaw or knew that the law would have a disparate impact on minority voters. Finding a legitimate reason for the enactment delay, we decline to infer "foreknowledge" of disparate impact on the part of the Alabama legislature.

### v. Availability of Less Discriminatory Alternatives

**\*20** The final *Arlington Heights* factor we must consider is the "availability of less discriminatory alternatives." *Jean, 711 F.2d at 1486*. Plaintiffs argue that HB19's proponents "failed to include [alternative] options, such as a reasonable impediment provision, [41] which would have reduced the law's" allegedly discriminatory impact.

We find this argument unpersuasive because, although the Alabama legislature did not include the alternative option that Plaintiffs would have preferred, we cannot say that the legislature failed to consider voter ID alternatives that would lessen any potentially discriminatory impact. Rather, the legislature passed a voter ID law that allows the use of not only driver's licenses, but also many other forms of photo ID, and ensured that any Alabamian who wants one could obtain a free photo ID from the state. The record does not

support Plaintiffs' claim that the Alabama legislature intended to discriminate by failing to include alternative options that were less discriminatory.

Overall, the *Arlington Heights* are meant to assist this Court in determining whether racially discriminatory intent existed when the Alabama legislature passed the 2011 voter ID law. After examining all of the *Arlington Heights* factors, it is clear that Plaintiffs have failed to prove that the law was enacted with discriminatory intent. In this case, Justice Scalia's concurrence in *Crawford*, joined by Justices Thomas and Alito, rings particularly true: "[W]ithout proof of discriminatory intent, a generally applicable law with disparate impact is not unconstitutional. The Fourteenth Amendment does not regard neutral laws as invidious ones, *even when their burdens purportedly fall disproportionately on a protected class*." *Crawford, 553 U.S. at 207, 128 S.Ct. 1610* (Scalia, J., concurring) (internal citation omitted).

Lastly, we need not reach *Hunter*'s second prong because the Plaintiffs "cannot first prove that race was a motivating factor." *Burton, 178 F.3d at 1195* (citations omitted). Thus, "there is no basis for shifting the burden to the [State] to determine whether, by a preponderance of the evidence, it would have made the same decision notwithstanding its racial motivation." *Id.*

In sum, when we weigh the burden on a voter to obtain and present a photo ID against Alabama's interests underlying the voter ID law, we find the law to be a neutral, nondiscriminatory regulation of voting procedure. We reiterate that, in order "to establish a violation of either the Equal Protection Clause of the Fourteenth Amendment or the Fifteenth Amendment, Appellants must show that [Alabama's] decision or act had a discriminatory purpose and effect." *Id. at 1188–89*; *see also Bolden, 446 U.S. at 65, 100 S.Ct. 1490* ("[The Fifteenth] Amendment prohibits only purposefully discriminatory denial or abridgment by government of the freedom to vote ..."). Because Plaintiffs-Appellants have failed to show that the Alabama voter ID law was passed with a racially discriminatory intent or purpose, the district court appropriately granted Secretary Merrill's motion for summary judgment on Plaintiffs' Fourteenth and Fifteenth Amendment claims. We affirm.

### 2. Violation of Section 2 of the Voting Rights Act

**\*21** Plaintiffs allege that the Alabama voter ID law and its implementation violate Section 2 of the VRA because it results in minority voters "having less opportunity than white voters to participate effectively in the political process and to elect candidates of their choice" and "having less opportunity to participate effectively in the political process in Alabama on account of race, color, or language minority status." The district court, however, noted that a black voter and a white voter "of equal means who each lack ID and a birth certificate, and who each live an equal distance away from the registrar's office, are in the exact same position." Finding that there was no discriminatory impact, the district court granted Secretary Merrill's motion for summary judgment on Plaintiffs' Section 2 claim. For the reasons set forth below, we affirm.

Our analysis begins with the statute. Section 2 of the VRA states:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner *which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color*, or in contravention of the guarantees set forth in section 10303(f)(2) [42] of this title, as provided in subsection (b).
>
> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. ...

52 U.S.C. § 10301(a)-(b) (emphasis added).

Unlike discrimination claims brought pursuant to the Fourteenth and Fifteenth Amendments, which require proof of both discriminatory intent and actual discriminatory effect, the language of Section 2(a) of the VRA requires only proof of discriminatory "results," not of discriminatory intent. *Chisom v. Roemer*, 501 U.S. 380, 403–04, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) (voter dilution case discussing the 1982 amendments to Section 2 of the VRA which removed the proof of intent requirement); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1227 (11th Cir. 2005) ("Congress amended Section 2 of the Voting Rights Act so that a plaintiff could establish a violation without providing discriminatory intent."). However, "[d]espite its broad language, Section

2 does not prohibit all voting restrictions that may have a racially disproportionate effect." *Id.* at 1228. Rather, Section 2(b) "make[s] clear that an application of the results test requires an inquiry into the totality of the circumstances." *Chisom*, 501 U.S. at 394, 111 S.Ct. 2354. And, in looking into the totality of the circumstances, if "members of a protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," a violation is shown. *Id.* at 388, 111 S.Ct. 2354 (internal quotations omitted).

Thus, under the analysis set forth by the statutory text and embraced by the Supreme Court in *Chisom* and this Court in *Johnson*, we must consider whether the challenged law results in a denial or abridgment of the right to vote on account of race or color. This analysis turns on whether, based on the totality of the circumstances, the challenged law violates Section 2(a) because it deprives minority voters of an equal opportunity to participate in the electoral process *and* to elect representatives of their choice.

**\*22** In support of their Section 2 claim, Plaintiffs point to disparate voter ID possession rates and disparate burdens placed on minority voters—travel disparities, socioeconomic disparities, and lack of Spanish-language materials—as evidence that HB19 violates Section 2 by resulting in a discriminatory effect. Plaintiffs' expert identified a total of 118,000 Alabamians who lack proper IDs: 50,000 Alabama voters who do not possess any photo ID that would permit them to vote and another approximately 68,000 voters who possess IDs that potentially could not be used to vote (*i.e.*, IDs with a discrepancy between the information on a voter roll and the ID). Plaintiffs also argue that black voters are twice as likely as white voters to lack a photo ID.

In contrast to Plaintiffs' 118,000 estimate, however, Merrill's expert estimated that only approximately 32,000 registered voters lack a photo ID that passes muster under the law and that there is only a 1% difference between white and minority voters in that regard. Secretary Merrill also argues that no voter will be denied an equal opportunity to vote because the Alabama law allows a large variety of IDs to be utilized and Alabama makes it very easy to obtain a necessary voter photo ID if one is lacking.

As an initial matter, Plaintiffs just barely clear the hurdle of demonstrating that minority voters are less likely than white voters to possess photo ID. Even if Plaintiffs' estimate of the number of minority voters without a plainly compliant photo

ID is correct, the number of Alabama voters who lack photo ID is miniscule compared to the overall state population of eligible voters. It is undisputed that approximately 99% of white voters and 98% of black voters possess a photo ID. Plaintiffs, however, continue to argue that black and Latino voters are about twice as likely as white voters to lack a valid voter photo ID. Plaintiffs arrive at their "twice as likely" statement by comparing the 1% of white voters who lack valid photo ID to the 2% of minority voters who lack valid photo ID. But, as the Secretary noted in his brief, when Plaintiffs represent percentages in this way, it "is a misuse of data" that "mask[s] the fact that the populations were effectively identical." *Frank v. Walker*, 768 F.3d 744, 753 n.3 (7th Cir. 2014). There is only a 1% difference between the ID possession rates of white and minority Alabama voters.

Even though minority voters in Alabama are slightly more likely than white voters not to have compliant IDs, the plain language of Section 2(a) requires more. First, the challenged law has to "result in" the denial or abridgement of the right to vote. Second, the denial or abridgement of the right to vote must be "on account of race or color." In other words, the challenged law must have *caused* the denial or abridgement of the right to vote on account of race. As Judge Tjoflat noted in his concurrence to our holding in *Johnson*, the words "on account of" contained in section 2(a) "suggest a causation requirement." *Johnson*, 405 F.3d at 1238 (Tjoflat, J., specially concurring) (stating that the "minimum content of such a case" requires a "showing that racial bias in the relevant community *caused* the alleged vote-denial or abridgment.") A number of our sister circuits have either expressly or in essence agreed. The Fourth Circuit, presented with a challenge to a photo ID law, refused to make the "unjustified leap from *the disparate inconveniences* that voters face when voting to *the denial or abridgement of the right to vote*." *Lee v. Virginia State Board of Elections*, 843 F.3d 592, 600–01 (4th Cir. 2016) (emphases in original). The Sixth Circuit, in evaluating a challenge to a change in Ohio's early voting laws, noted that beyond some statistical disparities, "the record does not establish that [the state law] ... *actually makes voting harder* for African Americans." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 631 (6th Cir. 2016) (emphasis in original). The Seventh Circuit, in analyzing Wisconsin's photo ID law, noted that "[a]lthough these findings [of statistical disparities in ID possession rates] document a disparate outcome, they do not show a 'denial' of anything by Wisconsin, as § 2(a) requires; unless Wisconsin makes it *needlessly* hard to get photo ID, it has not denied anything to any voter." *Frank v. Walker*, 768 F.3d 744, 753

(7th Cir. 2014) (emphasis in original). The Ninth Circuit, in analyzing an Arizona law which required proof of citizenship to register to vote and the presentation of ID at the polls, stated that "proof of 'causal connection between the challenged voting practice and a prohibited discriminatory result' is crucial." *Gonzalez v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012) (quoting *Smith v. Salt River Project Agric. Improvement & Power Dist.*, 109 F.3d 586, 595 (9th Cir. 1997)). And, as Judge Jones so clearly stated in her dissent from the Fifth Circuit's holding in *Veasey v. Abbott*, "[u]sing the textualist approach to Section 2, a vote abridgement claim ... requires a causal connection between the challenged regulation and the disparate impact." 830 F.3d at 311 (Jones, J., dissenting); *see also id.* at 312 ("A tailored causation analysis is imperative under Section 2 case law.").

**\*23** In this case, there is no evidence that the challenged law either "resulted in" the denial or abridgement of the right to vote or that any such denial or abridgement of the right to vote was "on account of race or color" under Section 2(a). 52 U.S.C. § 10301(a). Lacking a showing of evidence necessary to demonstrate the "sort of causal connection between racial bias and disparate effect necessary to make a vote-denial claim" dooms Plaintiff's claims. *Johnson*, 405 F.3d at 1239 (Tjoflat, J., specially concurring). Nonetheless, Plaintiffs have also submitted evidence that relates to the factors set forth by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30, 44, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).[43] Plaintiffs argue that the district court, in failing to analyze these *Gingles* factors, erred.

The *Gingles* factors provide a way to examine, in certain circumstances, the totality of the circumstances provided for in Section 2(b) of the Voting Rights Act. *Id.* In *Gingles*, the Court stated that "[i]n order to answer this question [posed by 2(b) ], a court must assess the impact of the contested structure or practice on minority electoral opportunities on the basis of objective factors." *Id.* (internal quotations omitted). As an initial (and critically important) matter, *Gingles* involved a state's redistricting plan that was challenged as impermissible vote dilution. This case, however, involves claims of vote denial—a very different type of claim, as we discuss below.

Under *Gingles*, plaintiffs alleging vote dilution must first show the existence of three preconditions for multimember districts to impair minority voting: (1) "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district," (2) "the minority group must be

able to show that it is politically cohesive," and (3) "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it ... to defeat the minority's preferred candidate." *Id.* at 50–51, 106 S.Ct. 2752. If these preconditions are met, plaintiffs can proceed under the *Gingles* factors:

> the history of voting-related discrimination in the State ...; the extent to which voting in the elections of the State ... is racially polarized; the extent to which the State ... has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Id.* 478 U.S. 30 at 44–45, 106 S.Ct. 2752 (citing S.Rep., at 28–29, U.S. Code Cong. & Admin. News 1982, pp. 206-207) (internal quotations omitted). The *Gingles* Court also identified additional factors that have had probative value: "evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group" and evidence "that the policy underlying the State's ... use of the contested practice or structure is tenuous may have probative value." *Id.* at 45, 106 S.Ct. 2752 (citing S.Rep., at 29, U.S. Code Cong. & Admin. News 1982, p. 206).

**\*24**  As a threshold matter, we question the applicability of *Gingles* to this case. Gingles was a vote dilution case and this case involves vote denial, a fundamentally different claim.

And the *Gingles* factors themselves bear no resemblance to the facts of this case. For example, Plaintiffs are not pointing to unusually large election districts, majority vote requirements, prohibitions against bullet voting, candidate slating processes, racial appeals in political campaigns, or minorities being elected to public office. How, then, can we apply the factors in this case? The obvious answer is that we cannot. We will attempt to do so, however, in order to demonstrate the futility of the exercise.

As a starting point, and as additional evidence that the *Gingles* factors are inapplicable, we note that Plaintiffs have failed to show the existence of the three *Gingles* preconditions. Their arguments make no mention of the three "necessary preconditions" and they make no attempt to articulate the existence of the "compactness/numerousness, minority cohesion or bloc voting, and majority bloc voting" we consider "generally necessary to prove a § 2 claim." *Johnson v. De Grandy*, 512 U.S. 997, 1011, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) (citing *Gingles*, 478 U.S. at 50, 106 S.Ct. 2752). While this failure clearly dooms Plaintiffs' *Gingles* argument, we nonetheless turn to the specific factors.

Regarding the first two *Gingles* factors, Plaintiffs claim that "it is undisputed that Alabama has a history of voting-related discrimination [Factor 1] ... [and there] is also no dispute that Alabama elections are racially polarized (Factor 2), which provided the Legislature an incentive to discriminate against voters of color." While we credit Plaintiffs' argument about Alabama's history of voting-related discrimination, we also reiterate our caution against allowing the old, outdated intentions of previous generations to taint Alabama's ability to enact voting legislation. Likewise, Plaintiffs provide no concrete evidence of current racially polarized voting, choosing instead to rely on the contemporaneous statements and discriminatory intent arguments we have already found wanting.

Plaintiffs' evidence of the third *Gingles* factor—"the extent to which the State ... has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group"—relates primarily to the "Positively Identify Provision" of the Alabama voter ID law. Plaintiffs argue that the PIP and Secretary Merrill's administrative decisions regarding the implementation of the PIP "enhance the opportunity for discrimination against" Alabama's minority voters. But Plaintiffs' argument that the Secretary "instructs election officials not to rely on objective criteria (such as non-photo ID) in deciding whether to allow a voter to use the

PIP, resulting in a subjective process" misstates the PIP's role in Alabama elections.[44] As we discuss at length in Section 3 of this opinion, the PIP is a failsafe provision meant to provide voters who do not have photo identification in their possession, or who opt not to cast a provisional ballot, with another opportunity to vote. It does not replace the objective, neutral requirement that a voter present a valid photo ID. And Plaintiffs' expert testimony that fewer black voters know their poll workers is largely irrelevant because there is no indication that the state of Alabama has "used voting practices or procedures" to prevent minority voters from getting to know their poll workers. Absent evidence of state action that "enhance[s] the opportunity for discrimination," we cannot say that Factor 3 supports Plaintiffs.

**\*25** In support of the fifth *Gingles* factor[45] ("the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process"), Plaintiffs argue that it is not seriously disputed that minority voters in Alabama bear the effects of discrimination. Plaintiffs again reiterate the poverty and increased barriers to acquiring ID faced by minority voters. As we have already discussed, however, the photo ID law itself and its implementation undercut these arguments. First, the law permits voters to utilize a wide range of photo IDs. Second, the State's willingness to cover the cost of obtaining a birth certificate or other required documentation significantly mitigates, if not eliminates, the external costs of proving one's identity. Third, the availability of mobile unit locations and home visits largely dispense with the need for transportation.

Plaintiffs argue that the mobile unit does not ensure that all Alabamians have access to a voter ID and that the Secretary's statement to the contrary goes to the Secretary's credibility. In short, Plaintiffs view the question of the adequacy of the mobile unit as a question of material fact that must be decided at trial. We disagree. As a threshold matter, despite the dissent's protests to the contrary, Plaintiffs have provided no evidence countering the Secretary's statements showing that the mobile unit is sufficient.[46] Absent evidence to the contrary, there is no real dispute on this point.

Appellants also argue that the "penalty of perjury" threat tied to obtaining a voter ID card chills interest among minority voters. To support this argument, Plaintiffs point to the personal opinion of Merrill's former Chief Legal Advisor and Counsel for Elections and Administration, who believes it is possible that "penalty of perjury" may have a chilling effect on photo voter ID applications. But they can point to no named Plaintiff—or any citizen of Alabama—that has refrained from applying due to the penalty of perjury. This argument is speculative, at best.

Accordingly, the evidence provided by Plaintiffs related to the fifth *Gingles* factor is unpersuasive.

In addressing the sixth *Gingles* factor, Plaintiffs again point to the racial statements made during HB19's passage as "the use of overt or subtle racial appeals in political campaigns." But the evidence provided by Plaintiffs is as unsuccessful in proving the sixth *Gingles* factor as it was in proving discriminatory intent. We are not persuaded that the statements made by Alabama legislators constitute "overt or subtle racial appeals in political campaigns."

Furthermore, in examining the seventh *Gingles* factor, "the extent to which members of the minority group have been elected to public office" in Alabama, Plaintiffs argue that voters of color are underrepresented in the Alabama legislature. Plaintiffs argue that such underrepresentation "limited their influence in the legislative process that led to HB19's passage" and pursuant to the eighth *Gingles* factor, insist that the legislature was unresponsive to the needs of minority voters by failing to consider amendments to HB19. But, in reviewing these arguments, we return to the language in Section 2(b). *Gingles* explicitly highlights the text of the statute, which "cautions that 'nothing in [§ 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.'" *Gingles*, 478 U.S. at 43, 106 S.Ct. 2752 (citing 52 U.S.C. § 10301(b)). The inability of Alabama legislators to prevent HB19's passage and, relatedly, the ability of the Legislature's majority party to block amendments is a result of the legislative process.

**\*26** Plaintiffs address the ninth and final *Gingles* factor—"that the policy underlying the State's ... use of the contested practice or structure is tenuous"—by attacking Alabama's voter fraud justification as "tenuous and pretextual." In short, Plaintiffs argue that there is no connection between Alabama's interest in combatting voter fraud and the voter ID law at issue in this case. This argument fails because the Supreme Court has already held that deterring voter fraud is a legitimate policy on which to enact an election law, even in the absence of any record evidence of voter fraud.[47] *See Crawford*, 553 U.S. at 192-97, 128 S.Ct. 1610 ("The only kind of voter fraud that [the law] addresses is in-person voter impersonation at polling places.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   20

The record contains no evidence of any such fraud actually occurring in Indiana at any time in its history... It remains true, however, that flagrant examples of such fraud in other parts of the country have been documented ... While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear."). Simply put, Secretary Merrill was not required to prove that voter fraud exists—yet he has done so by providing evidence of proven in-person impersonation voter fraud in Alabama. Because the Supreme Court's precedent in *Crawford* mandates the validity of Alabama's policy justifications and because Secretary Merrill has provided evidence of previous voter fraud, the final *Gingles* factor weighs heavily in favor of Secretary Merrill.

In summary, even if the *Gingles* factors did apply to this vote denial case, Plaintiffs have not provided sufficient evidence that would permit a reasonable factfinder to conclude that minority voters, pursuant to Section 2(b), had "less opportunity than other members of the electorate to participate in the political process." 52 U.S.C. § 10301(b). Ultimately, however, this case highlights the fundamental misalignment between the *Gingles* factors and this case. Thus, the district court's failure to analyze them is not error.

### 3. Violation of Section 201 of the Voting Rights Act

Plaintiffs also attack the law's option for voters to be "positively identified" by election officials, arguing that the PIP is a voting "test or device" and "violates the prohibition on those tests or devices enumerated in Section 201 of the Voting Rights Act, 52 U.S.C.A. § 10501, by requiring, as a prerequisite to voting, that otherwise eligible registered voters who lack the required photo ID prove their qualifications by the voucher of two election officials." [48] Secretary Merrill argues that the PIP does not violate Section 201 because it is not a requirement to vote, nor does it require a voter to prove his or her qualifications.

Section 201 of the VRA prohibits voting tests or devices as follows:

(a) No citizen shall be denied, because of his failure to comply with any test or device, the right to vote in any Federal, State, or local election conducted in any State or political subdivision of a State.

(b) As used in this section, the term "test or device" means any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class.

52 U.S.C. § 10501(a)-(b). The key statutory language governing our review of the PIP is Section 201(b)'s definition of a "test or device": "the term 'test or device' means any *requirement* that a person as a *prerequisite* for voting or registration for voting ... prove his qualifications by the *voucher* of registered voters or members of any other class." *Id.*

**\*27** The Alabama 2011 voter ID law defines the PIP as follows:

> In addition, an individual *who does not have valid photo identification* in his or her possession at the polls shall be permitted to vote if the individual is positively identified by two election officials as a voter on the poll list who is eligible to vote and the election officials sign a sworn affidavit so stating.

Ala. Code § 17-9-30(e) (emphasis added). The district court concluded that the PIP is not a prohibited device or test because the PIP is not actually a voucher requirement or prerequisite to vote.

As an initial matter, we note that the PIP at issue in this case contains the same PIP language that was pre-cleared by the Department of Justice as a "failsafe" provision in 2003. To the extent the PIP did not violate section 201 of the VRA then, it does not do so now.

Further, the clear language of the PIP demonstrates it does not contain an impermissible voting test or device but rather provides an alternate voting path in the event the voter does not have a photo ID. The PIP is simply one more option for proving one's identity; it is a "failsafe" so that "voters who

do not have identification in their possession at the polls may vote" provision. Thus, contrary to Plaintiffs' assertions, the PIP actually increases the opportunities for minority voters to be able to cast a ballot. On this point, the district court's analysis is instructive:

> This argument [that the PIP is an impermissible test or device] fails to take into account that obtaining a photo ID provides an objective, guaranteed option of proving one's identity that pre-VRA voter laws with tests and devices lacked. Alabama voters can always present a photo ID and avoid reliance on the positively identify provision. In other words, no voter is required, as a prerequisite to vote or register, to be positively identified by an election official. _In fact, the positively identify provision gives more voters, including minority voters, the opportunity to vote._ Even if a voter does not have a photo ID, he can still vote if he is positively identified by election officials. Accordingly, because the positively identify provision is not a requirement or prerequisite to voting, it is not a voucher within the meaning of the VRA's ban on tests and devices.

_Greater Birmingham Ministries v. State_, 161 F. Supp. 3d 1104, 1116 (N.D. Ala. 2016) (denying Plaintiffs-Appellants' request for a preliminary injunction to enjoin application of the positively identify provision) (emphasis added).

Additionally, even in situations where an individual lacks a photo ID, the PIP is only one of the options available to voters. There are actually _two_ options available to a voter lacking a valid ID: (1) use the PIP as a means of identification, or (2) cast a provisional ballot and "cure" that ballot by later presenting a photo ID at the registrars' office by the Friday of election week. Thus, Plaintiffs are incorrect in arguing that would-be voters without valid ID "may vote only if" the election official identify them because, as Secretary Merrill points out, these voters can instead "vote a provisional ballot that may be cured by bringing a photo ID to the

registrars' office by the Friday following Election Day." And an individual voter lacking a photo ID can obtain one from the Secretary or from the registrars' office. The district court correctly found that "[t]he facts...related to the ease of obtaining a photo ID show that no one in Alabama is 'required' to rely on the positively identify provision because they have the option of acquiring a photo ID with little to no effort and no cost." _Greater Birmingham Ministries_, 284 F. Supp. 3d at 1282.

**\*28** The PIP in this case is distinctly different from the inherently discriminatory voucher in _United States v. Logue_, 344 F.2d 290 (5th Cir. 1965), because positive identification by another individual is not a requirement to vote in Alabama. In _Logue_, the Fifth Circuit reversed the denial of an injunction prohibiting Alabama from enforcing a requirement that any person registering to vote had to produce a qualified voter (a "supporting witness") to vouch for such voter. _Id._ at 291. Because it was more difficult for black Alabamians to find registered voters to vouch for them, the requirement effectively denied their right to register and vote and thus was impermissible. _Id._ Here, however, if an Alabama voter possesses a photo ID, or opts to cast a provisional ballot, that voter does not need to be separately identified by another individual in order to cast his or her vote. The PIP only applies when a voter arrives at the polls without a valid photo ID and it is only one option available to that voter to be able to cast a vote.

Lastly, Plaintiffs argue that the district court erred "by suggesting that, even if the voucher test were a voting requirement, it would only be invalid if it were used in an 'improper manner.' " But Plaintiffs mischaracterize the district court's finding, which specifically states that the court "need not determine whether [the PIP] is being used in an improper manner," before noting that "evidence on this record shows that it is not." _Greater Birmingham Ministries_, 284 F.Supp.3d at 1282–83. The court merely underscored the point that Plaintiffs have not presented any evidence that the PIP was used in an improper manner.

For all of these reasons, we hold that the PIP is valid.

## IV. CONCLUSION

The burden of providing a photo ID pursuant to Ala. Code § 17-9-30 in order to vote is a minimal burden on Alabama's voters—especially when Alabama accepts so many different

forms of photo ID and makes acquiring one simple and free for voters who lack a valid ID but wish to obtain one. The Alabama voter ID law does not violate the Fourteenth and Fifteenth Amendments of the Constitution, nor does it violate the Voting Rights Act.

Because Plaintiffs have failed to identify any genuine disputes of material facts and because no reasonable factfinder could find that Alabama's voter ID law is unconstitutionally discriminatory based on the evidence presented, we **AFFIRM** the decision of the district court.

GAYLES, District Judge, dissenting:

Courts in this Circuit have long recognized "Alabama's deep and troubled history of racial discrimination" and voter suppression. *I.L. v. Alabama*, 739 F.3d 1273, 1288 (11th Cir. 2014).

> To some extent, [t]hings have changed in the South. Certain things, however, remain stubbornly the same. In an era when the degree of racially polarized voting in the South is increasing, not decreasing, Alabama remains vulnerable to politicians setting an agenda that exploits racial differences. The Beason and Lewis recordings represent compelling evidence that political exclusion through racism remains a real and enduring problem in [Alabama]. Today, while racist sentiments may have been relegated to private discourse rather than on the floor of the state legislature, it is still clear that such sentiments remain regrettably entrenched in the high echelons of state government.

*United States v. McGregor*, 824 F. Supp. 2d 1339, 1347 (M.D. Ala. 2011) (first alteration in original) (internal quotation marks and citations omitted).

\* \* \* \*

Congress enacted the Voting Rights Act of 1965 ("VRA") after recognizing that early efforts to combat racial discrimination in states like Alabama were ineffective. "The Voting Rights Act ... is widely considered to be among the most effective civil rights statutes ever passed by Congress." *Ala. State Conference of Nat'l Ass'n for Advancement of Colored People v. Alabama*, 949 F.3d 647, 649 (11th Cir. 2020). When enacted, the VRA contained several provisions. Section 2 "prohibits states from imposing election practices that result in racial discrimination." *Id.* In particular, "Section 2 ... prohibits 'any State or political subdivision' from imposing any 'voting qualification or prerequisite to voting or standard, practice, or procedure' that 'results in a denial or abridgement of the right of any citizen of the United States to vote on account of race [or color].' " *Id.* at 651 (citing 52 U.S.C. § 10301(a)).

**\*29** The VRA also included special provisions targeted to specific "[s]tates and localities where opposition to the Constitution's commands were most virulent ...." *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 562, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013) (Ginsburg, J., dissenting). "Section 5 govern[ed] changes in voting procedures, with the purpose of preventing jurisdictions covered by its requirements from enacting or seeking to administer voting changes that have a discriminatory purpose or effect." *Lopez v. Monterey Cnty.*, 519 U.S. 9, 12, 117 S.Ct. 340, 136 L.Ed.2d 273 (1996). Section 5's preclearance requirement prohibited certain jurisdictions from implementing any change in their voting procedures without first submitting the changes to the Department of Justice or to a panel of three judges.

Section 4(b) set forth a coverage formula to determine which jurisdictions were subject to Section 5's preclearance requirement. Under the formula, "covered" jurisdictions included states or political subdivisions "that had maintained a test or device as a prerequisite to voting as of November 1, 1964, and had less than 50 percent voter registration or turnout in the 1964 Presidential election." *Shelby Cnty.*, 570 U.S. at 537, 133 S.Ct. 2612 (citing § 4(b), 79 Stat. 438). Tests or devices included literacy tests, educational or knowledge requirements, proof of good moral character, and/or vouchers from registered voters. *Id.* (citing § 4(c), 79 Stat. 438-39). In 1965, Alabama, Georgia, Louisiana, Mississippi, South Carolina, and Virginia were covered jurisdictions and could only obtain preclearance for changes in their voting laws by proving that the proposed change in law "had neither 'the purpose [nor] the effect of denying or abridging the right to

vote on account of race or color.' " *Id.* (quoting § 5, 79 Stat. 439) (alteration in original).

Sections 4 and 5 were to expire after five years but, in 1970, Congress reauthorized them and extended Section 4(b)'s coverage to include "jurisdictions that had a voting test and less than 50 percent voter registration or turnout as of 1968." *Id.* at 538, 133 S.Ct. 2612 (citing VRA Amendments of 1970, §§ 3–4, 84 Stat. 315). Congress reauthorized the VRA again in 1975, 1982, and 2006. *Id.* at 538–39, 133 S.Ct. 2612. By 2006, Section 5 forbade "voting changes with 'any discriminatory purpose' as well as voting changes that diminish[ed] the ability of citizens, on account of race, color or language minority status, 'to elect their preferred candidates of choice.' " *Id.* at 539, 133 S.Ct. 2612 (quoting 42 U.S.C. § 1973c(b)–(d)). Through each reauthorization, Alabama remained a covered jurisdiction under the VRA and faced challenges to its voting procedures under Section 2. *Id.* at 582, 133 S.Ct. 2612 (Ginsburg, J., dissenting) ("Between 1982 and 2005, Alabama had one of the highest rates of successful § 2 suits, second only to its VRA-covered neighbor Mississippi." (citation omitted)).

In 2013, the Supreme Court issued its opinion in *Shelby County*, holding Section 4(b)'s coverage formula unconstitutional. *Id.* at 557, 133 S.Ct. 2612. As a result, Alabama was no longer required to seek preclearance to change its voting laws. It was against this historical backdrop that the Alabama Legislature implemented the Photo ID Law [1] at issue here.

## I. Passage of Alabama's Photo ID Law [2]

Voter fraud in Alabama is rare. While there have been some limited cases of absentee voter fraud, in-person voter fraud is virtually non-existent. *See Greater Birmingham Ministries v. Merrill,* 284 F. Supp. 3d 1253, 1257 (N.D. Ala. 2018) ("While cases of proven in-person voter fraud in Alabama are extremely rare, there are some documented cases of absentee voter fraud in Alabama in recent history."). [3] Indeed, Defendant presented evidence of only two cases of in-person voter fraud in Alabama's history. Despite the lack of in-person voter fraud, Secretary Merrill claims Alabama enacted the Photo ID Law to combat voter fraud and to restore confidence in elections—a dubious position in light of the facts. A close look at the history and the timing of the legislation and its actual impact on Black and Latino [4] voters gives us a window

into why Alabama likely designed a law to cure a problem that did not exist.

### A. History and Timing of the Photo ID Law

**\*30** From 2000 to 2002, the Alabama House attempted to pass various voter identification bills. White legislators overwhelmingly favored these bills while Black legislators opposed them because of the potential impact on Black voters. At the same time, the Alabama Black Caucus pushed for a bill to re-enfranchise felon voters who were disproportionately Black. The competing measures resulted in a two-year standoff. Finally, on the last day of the 2003 Legislative Session, both a voter identification bill and a re-enfranchisement bill passed after both sides agreed not to filibuster. Governor Bob Riley signed the voter identification bill into law but vetoed the re-enfranchisement bill. After facing opposition from Black legislators to a tax referendum and a threatened NAACP boycott, Governor Riley relented and backed a modified re-enfranchisement bill. The modified bill was passed over a Republican filibuster in the House and opposition in the Senate led by Senator Larry Dixon. [5]

The 2003 voter identification law required each voter to provide valid photo identification or a copy of a utility bill, bank statement, government check, paycheck, or other government document that showed the name and address of the voter. From 2003 to 2010, repeated attempts to restrict the 2003 law to only permit photo identification failed because of opposition from Black legislators who were concerned about the potential disparate impact of a photo identification requirement on Black voters.

The 2010 elections produced a historic Republican landslide in Alabama with Republicans holding supermajorities in both the House and Senate. In 2011, one of the priorities of the newly-elected Alabama Legislature was to enact legislation requiring photo identification to vote. House Representative Kerry Rich sponsored HB 19 and Senators Scott Beason, Ben Brooks, Rusty Glover, Paul Sanford, Jabo Waggoner, and others co-sponsored an identical bill in the Senate. The House passed HB 19 by a largely party-line vote of 64-31. Senator Beason, the Senate's Rules Committee Chairman, then added HB 19 to the "special order" calendar for June 9, 2011, the last day of the 2011 Legislative Session. The Senate invoked cloture and passed HB 19 on a straight party-line vote. [6] All

present Black senators voted against the bill. Governor Robert Bentley signed HB 19 into law on June 15, 2011. [7]

This Photo ID Law, by its terms, did not go into effect immediately; and Alabama never sought preclearance under Section 5 of the VRA. Then, on June 25, 2013, the Supreme Court issued its opinion in *Shelby County* striking down Section 4(b) of the VRA. Twenty-four hours later, Alabama's Attorney General and Secretary of State announced that the Photo ID Law could then move forward without preclearance. On June 29, 2013, the Secretary of State issued proposed administrative rules for the Photo ID Law. On October 22, 2013, the Secretary of State issued final administrative rules.

### B. Evidence that Discrimination was a Motivating Factor

**\*31** Statements made by some Alabama legislators about the need for a photo ID law are probative evidence of the Photo ID Law's purpose—to suppress the minority vote. I start with Senator Larry Dixon. From the 1990s until his retirement in 2010, Senator Dixon sponsored photo identification bills like HB 19. During this time, Senator Dixon made repeated comments linking photo identification legislation to race, including "the fact you don't have to show an ID is very beneficial to the Black power structure and the rest of the Democrats" and that voting without photo identification "benefits Black elected leaders, and that's why they're opposed to it." While Senator Dixon retired in 2010, his influence can be seen in his recorded conversations with Senator Beason.

In 2010, Senator Beason recorded himself in a meeting with Senators Dixon, Brooks, Glover, Sanford, and Waggoner, Representative Lewis, and legislative staffer Monica Cooper. In the recordings, Senator Dixon stated: "[j]ust keep in mind if [a pro-gambling] bill passes and we have a referendum in November, every black in this state will be bused to the polls. And that ain't gonna help" ... "[e]very black, every illiterate" would be "bused on HUD financed buses." Senator Brooks added: "They won't be bused as much as they will be up to the gambling." Senator Beason chimed in: "That's right. That's right. This will be busing extra." Senator Dixon went on to state that coach buses "will meet at the gambling casino to get free certificates for black[s]," with Senator Brooks adding: "Free buffet." Not a single legislator present during this conversation objected to this racist language. In a separate recorded meeting, Representative Lewis asked whether the

predominantly Black residents of Greene County were "y'all's Indians?" Senator Beason responded by referring to Black people as "Aborigines." [8]

In a February 2011 speech, Senator Beason encouraged Republicans to "empty the clip, and do what has to be done" on immigration and stated that "Democrats do not want to solve the illegal immigration problem because they know, this is a fact, that when more illegal immigrants move into an area, when their children grow up and get the chance to vote, they vote for Democrats." Senator Beason also referred to the children of immigrants as "anchor babies."

Representative Rich sponsored HB 19. In a statement posted on his personal website, Representative Rich expressed a concern that "[i]t is impossible for an area to assimilate the number of people that we have had forced on us." Representative Rich was "primarily" concerned about "Hispanic" immigrants and their alleged inability "to speak English." In his opening statement to the Legislature on HB 56, Representative Rich repeatedly conflated "illegal immigrants" and "Hispanics" when discussing the "kinds of social and economic problems" that HB 56 purportedly sought to address. Representative Rich stated that "[t]he major problem with illegals in [his] area is with Hispanics" and that he considered Latino U.S. citizens whose parents are undocumented to be a "drain on the taxpayers."

### II. The District Court's Order

In modern-day America, it is unusual to have such clear evidence that legislative leaders and sponsors of legislation are motivated by racial discrimination. And although the District Court recognized that "[i]n other election law cases, it has been appropriate for the trier of fact to engage in the delicate and highly fact-sensitive consideration of the kinds of testimony and historical facts that are summarized [in this case,]" *Greater Birmingham Ministries*, 284 F. Supp. 3d at 1273, the District Court did not find it necessary here. Rather, on cross motions for summary judgment, the District Court found that Alabama's Photo ID Law "does not in fact discriminate on the basis of race[,]" and, as a result, it did not need to address the purpose of the law. *Id.* at 1274 (emphasis omitted). While it is undisputed "that registered voters of color in Alabama are statistically more likely than white voters to lack the required photo ID[,]" the District Court granted summary judgment to Secretary Merrill, finding "*no one* is prevented from voting." *Id.* (emphasis in original).

**\*32**  On appeal, Plaintiffs argue the District Court erred in finding no disputed issues of material fact as to whether (1) the Photo ID Law violates Section 2 of the VRA; (2) the Photo ID Law has a discriminatory result/impact in violation of Section 2 of the VRA; (3) the Photo ID Law was adopted, at least in part, for a racially discriminatory purpose in violation of the Constitution; and (4) the Secretary's interpretation of the Positively Identify Provision in the Photo ID Law is a prohibited "test or device" in violation of Section 201 of the VRA. I find that there are genuine issues of material fact as to both the discriminatory purpose and impact of Alabama's Photo ID Law such that summary judgment should not have been granted on Plaintiffs' constitutional or Section 2 VRA claims.

### III. Summary Judgment Standard

Summary judgment, pursuant to Federal Rule of Civil Procedure 56(a), "is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.' " *Tolan v. Cotton*, 572 U.S. 650, 656–57, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (per curiam) (quoting Fed. R. Civ. P. 56(a)). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). An issue is "genuine" when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the nonmoving party in light of his burden of proof. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). And a fact is " 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004).

Courts must not "weigh conflicting evidence or make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016). Summary judgment is generally inappropriate in intentional discrimination cases because the "legislature's motivation is itself a factual question." *Hunt v. Cromartie*, 526 U.S. 541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999). And summary judgment is generally not appropriate in Section 2 cases "due to the fact-driven nature of the legal tests required by the Supreme Court and our precedent." *Ga. State Conference of NAACP*

*v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1348 (11th Cir. 2015).

### IV. Plaintiffs' Constitutional Claims

To prevail on their Fourteenth and Fifteenth Amendment claims, Plaintiffs must show (1) that the Alabama Legislature intended to discriminate on the basis of race and (2) that the Photo ID Law had an actual discriminatory effect. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (holding that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact. ... Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). To make this determination, we are guided by the non-exhaustive list of factors enumerated by the Supreme Court in *Arlington Heights*, 429 U.S. at 266–68, 97 S.Ct. 555, and as supplemented in later cases, *see Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983). These factors include the racial impact of the decision, the historical background of the decision, the specific sequence of events, the departure from the normal procedural sequence, substantive departures, the legislative history, the foreseeability of the disparate impact, knowledge of the impact, and the availability of less discriminatory alternatives. *Jean*, 711 F.2d at 1486.

**\*33**  While acknowledging the necessity of analyzing Plaintiffs' racial discrimination claims under *Arlington Heights*, the majority opinion goes to great lengths to discuss how this action is no different than *Crawford v. Marion County Election Board*, 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008). I respectfully disagree. In *Crawford*, there were no allegations that Indiana legislators passed Indiana's photo identification law to discriminate on the basis of race. Here, Plaintiffs expressly allege that the Alabama Legislature enacted the Photo ID Law with the intent to suppress the votes of Black and Latino voters. In addition, the petitioners in *Crawford* did not present evidence of any individual plaintiff "who claimed that the law would deter them from voting[.]" *Id.* at 188, 128 S.Ct. 1610. Here, Plaintiffs include Black and Latino individuals who claim Alabama's Photo ID Law impacts their ability to vote. Finally, unlike Alabama, Indiana was never required under the VRA to obtain preclearance to change its voting laws. With this in mind, I address the *Arlington Heights* factors.

## A. Impact [9]

The District Court found that "[i]t would serve no purpose" to consider the *Arlington Heights* factors other than racial impact because "a ruling in Plaintiff's favor would do no more than hold that the Alabama Legislature intended to discriminate in enacting the Photo ID Law, but failed." *Greater Birmingham Ministries*, 284 F. Supp. 3d at 1277. Relying on *Palmer v. Thompson*, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), the District Court essentially concluded that, without impact, Alabama's intent in passing the Photo ID Law is irrelevant. In *Palmer*, a municipality enacted a facially neutral law to close all public pools with the discriminatory intent to maintain segregation. A deeply divided Supreme Court upheld the municipality's decision and held that discriminatory motive does not invalidate a facially neutral law. The Supreme Court has not expressly overturned *Palmer*, but it has all but done so in subsequent opinions. Over the past four decades, the Supreme Court has held that facially neutral laws may run afoul of the Equal Protection Clause if they are enacted or enforced with a discriminatory intent. *See, e.g., Washington v. Davis*, 426 U.S. 229, 244 n.11, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) ("To the extent that *Palmer* suggests a generally applicable proposition that legislative purpose is irrelevant in constitutional adjudication, our prior cases ... are to the contrary[.]"); *Hunter v. Underwood*, 471 U.S. 222, 227–28, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985) (holding that where "a neutral state law ... produces disproportionate effects along racial lines ... '[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause' " (quoting *Arlington Heights*, 429 U.S. at 264–65, 97 S.Ct. 555)).

Although impact is one of the *Arlington Heights* factors, I do not agree that a limited impact protects otherwise discriminatory legislation. Indeed, under the District Court's logic, Alabama could pass a law that expressly states that its purpose is to discriminate on the basis of race and, as long as that law is facially neutral or its disparate impact is minimal, it would withstand Fourteenth and Fifteenth Amendment challenges. This absurd result cannot be what the Constitution requires or the Supreme Court intends. But, even if I accept that the impact factor alone is dispositive, there are genuine issues of material fact as to the impact of the Photo ID Law on Alabama's Black and Latino voters.

The record clearly reflects factual disputes as to the true impact of the legislation on Black and Latino voters. Plaintiffs' expert opined that there were around 50,000 registered voters in Alabama (or 1.67% of the registered voter population) who may not have any forms of photo ID that may be used for voting, and that approximately 68,046 additional voters have photo IDs that may be contested at the polls. Plaintiffs' expert also opined that 1.37% of White registered voters, 2.44% of Black registered voters, and 2.29% of Latino registered voters may not currently have an acceptable photo ID. [10] Therefore, Black and Latino voters without acceptable photo IDs are nearly twice as likely to be affected by the Photo ID Law as White voters in the same predicament. The District Court, weighing the significance of that evidence, called the disparity "miniscule." This was improper at summary judgment.

**\*34** Small percentages are hard to quantify—especially without an analysis of the percentages in actual numbers. According to 2018 Alabama Voter Registration Statistics, there were 844,995 Black registered voters and 31,080 Hispanic registered voters in the state. [11] Accepting at this stage Plaintiffs' percentages of registered voters who may not have acceptable photo IDs, 20,618 Black registered voters and 712 Hispanic/Latino registered voters did not have acceptable photo IDs to vote in Alabama's elections at the time summary judgment was granted. In a time where elections are closely decided, any impact on voter turnout may be significant and probative. Indeed, in 2017, United States Senator Doug Jones won his election over Roy Moore in Alabama by less than 1% point (21,924 votes). [12] Therefore, a judge or jury at trial should decide whether the Photo ID Law's potential impact on approximately 21,330 Black and Latino voters is meaningful. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when] ruling on a motion for summary judgment ....").

The record also reflects disputed issues of material fact regarding the ease with which Black and Latino voters are able to procure a photo ID that would enable them to vote under the Photo ID Law. It is a question of fact whether voters like Plaintiff Shameka Harris or former Plaintiff Debra Silvers can realistically get a photo ID. [13] It is a question of fact whether the mobile ID unit is *actually* available to *any* registered voter. The record reflects that during the time leading up to District Court's order, the mobile ID

unit made less than ten home visits, one of which only occurred because a state legislator personally requested it. Even Secretary Merrill's own protocol requires voters seeking an accommodation to detail their access to transportation before being granted a visit from the mobile unit. Despite these record facts, the District Court relied almost exclusively on Secretary Merrill's self-serving statements to find that "it is so easy to get a photo ID in Alabama, *no one* is prevented from voting." This credibility determination is error. *See id.*

### B. Purpose

The Supreme Court has made it clear that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights,* 429 U.S. at 266, 97 S.Ct. 555; *see also Hunt,* 526 U.S. at 549, 119 S.Ct. 1545 ("The legislature's motivation is itself a factual question."). Unlike the District Court, the majority opinion does address the purpose factor. However, I must respectfully dissent as the majority opinion also appears to weigh conflicting evidence and make credibility determinations. For example, the majority opinion accepts as true Secretary Merrill's assertions to find that the Alabama Legislature did not intend to discriminate against Black and Latino voters despite overtly racist comments by the very sponsors and advocates of the Photo ID Law.

While the District Court found no need to analyze the history and purpose of the Photo ID Law, the majority opinion essentially ignores impact. In determining purpose, impact "may provide an important starting point." *Arlington Heights,* 429 U.S. at 266, 97 S.Ct. 555. Indeed, the impact of the legislation can inform purpose. It is undisputed that (1) Alabama's Photo ID Law has a disparate impact according to race and that thousands of minority voters may be affected, (2) some Alabama legislative leaders and sponsors of the Photo ID Law had the intent to suppress minority voters, and (3) Alabama passed the Photo ID Law to solve a problem with in-person voting that did not exist. Based on this record, there is sufficient evidence to find that Alabama's Photo ID Law is unlawful.

**\*35** Even so, there are disputed issues of material fact regarding the Photo ID Law's purpose which prevent entry of summary judgment. The timing and sequence of events leading to the passage of the Photo ID Law contradict Secretary Merrill's statements about the law's purpose. *See id.*

at 267, 97 S.Ct. 555 ("The specific sequence of events leading up to the challenged decision ... may shed some light on the decisionmaker's purposes."). The Senate Rules Committee added HB 19 to the special order calendar on the last day of the 2011 Legislative Session. The Senate then invoked cloture and stymied any debate. Despite the rush to pass this important legislation, the State took no action to seek pre-clearance pursuant to the VRA as it was then required to do. But within days of the Supreme Court's decision in *Shelby County* two years later, then-Secretary of State Bennet issued proposed administrative rules to implement the Photo ID Law. If the timing and sequence used by Alabama to pass and implement the Photo ID Law departed from the normal procedural sequence, this "might afford evidence that improper purposes ... play[ed] a role." *Id.* Within the record before us, there are material factual disputes regarding that issue. Therefore, it is improper for the majority to simply credit Secretary Merrill's word that nothing was uncommon about the way the law was passed.

The legislative history of the Photo ID Law also provides an abundance of evidence of discriminatory intent such that a judge or jury at trial should consider the Alabama Legislature's motivation. "The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body ...." *Id.* at 268, 97 S.Ct. 555. Senator Dixon, Senator Beason, Representative Rich, and other legislators' overtly racist statements at and around the time the Photo ID Law was drafted, discussed, and enacted provide a window into the Legislature's purpose. Plaintiffs should be able to present these statements at trial to ascertain whether Alabama intended to discriminate when it enacted the Photo ID Law. Instead, the majority opinion minimizes the weight of this evidence even though the lawmakers' racist statements were made in the context of minority voting in Alabama.

In addressing foreseeability and whether the Alabama Legislature knew of the Photo ID Law's likely disparate impact, the majority opinion disregards the fact that legislators for and against the law openly discussed the law's likely impact on Black voters. The majority also weighed the evidence to find that the Legislature's delay in seeking preclearance occurred because the Legislature anticipated challenges to the law and needed time to obtain preclearance. Such credibility determinations are for judges and juries at trial, not courts at summary judgment.

Alabama's history of enacting laws designed to suppress people of color is well-documented. *See Lynch v. Alabama, No. 08-S-450-NE, 2011 WL 13186739, at \*12–18 (N.D. Ala. Nov. 7, 2011)* (detailing Alabama's extensive history of legislation designed to disenfranchise and limit the power and influence of its Black citizens), *aff'd in part, vacated in part, remanded sub nom., I.L.*, 739 F.3d 1273. The majority opinion essentially argues that we should not penalize Alabama's legislators for Alabama's past; rather, we should start with a clean slate when reviewing the Photo ID Law. But this is

not what the law commands us to do. Alabama's history of voter suppression is relevant here and provides a wealth of direct and circumstantial evidence that should be considered at trial.[14]

For these reasons, I respectfully dissent.

### All Citations

--- F.3d ----, 2020 WL 4185801

### Footnotes

\*   Honorable Darrin P. Gayles, United States District Judge for the Southern District of Florida, sitting by designation.

1   Plaintiffs requested summary judgment on their Section 201 claim. Plaintiffs also argued that the "facts show that there is a statistically significant racial disparity" between the ID possession rates for voters of color and white voters in Alabama, and requested "partial summary judgment on this issue, which is a discrete element of Plaintiffs' claims."

2   Although "the parties dispute the relevance and materiality of some of the facts contained herein," the parties have agreed that these facts are undisputed. *Greater Birmingham Ministries v. Merrill*, 284 F. Supp. 3d 1253, 1257 n.2 (N.D. Ala. 2018).

3   At least some newspapers were supportive of efforts to pass a voter ID requirement in the late 1990s.

4   The Honest Election Coalition was formed and "produced a 10-minute video entitled '*Something is Wrong in Alabama*.' Through the video, ... the Coalition described some of the voter fraud allegedly occurring in Alabama and argued for legislative reforms." The Coalition pushed for legislative reforms and, "[i]n 1996, the Alabama Legislature passed half of the Honest Election Coalition's proposed election reform package by altering rules concerning absentee ballots; the Legislature failed to pass a voter ID law. The Honest Elections Coalition continued to support a voter ID law." Another grassroots citizen group, Citizens for a Better Greene County, also focused on fighting voter fraud.

5   The 2003 law provided "[t]he term 'other government document' may include, but is not limited to, any of the following: a. A valid identification card issued by a branch, department, agency, or entity of the State of Alabama, any other state, or the United States authorized by law to issue personal identification. b. A valid United States passport. c. A valid Alabama hunting or fishing license. d. A valid Alabama permit to carry a pistol or revolver. e. A valid pilot's license issued by the Federal Aviation Administration or other authorized agency of the United States. f. A valid United States military identification card. g. A certified copy of the elector's birth certificate. h. A valid Social Security card. i. Certified naturalization documentation. j. A certified copy of court records showing adoption or name change. k. A valid Medicaid card, Medicare card, or an Electronic Benefits Transfer card (formerly referred to as a 'food stamp card')."

6   At that time, Section 5 the Voting Rights Act required Alabama to seek preclearance for any change in voting requirements from either the U.S. Attorney General or a three-judge court in the United States District Court for the District of Columbia. *See Shelby Cty. v. Holder*, 570 U.S. 529, 544, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013). The U.S. Attorney General precleared Alabama's 2003 voter ID law, including the positively identify provision, and that law remained in effect until 2014 when the 2011 law went into effect. *See infra* note 20.

7   The Statement of Undisputed Facts submitted by the parties does not identify when these comments were made, nor do we know what bill Senator Beason may have been discussing.

8   Because Senator Dixon was not a member of the Alabama legislature at the time of HB19's passage, we generally agree with Secretary Merrill that the facts about Senator Dixon are irrelevant and immaterial. We include them here, however, because they are a linchpin of Plaintiffs' discriminatory intent argument.

9   During the 2011 legislative session, Representative Rich also sponsored an immigration bill, HB56. HB56 contained a proof of citizenship requirement for voter registration, although anyone already registered was not required to provide proof of citizenship. During his opening statement, Representative Rich referenced "illegal immigrants" and "Hispanics" when discussing the "kinds of social and economic problems" that HB 56 purportedly sought to address. HB56 was passed on June 2, 2011, one week prior to the passage of HB19. Several provisions of House Bill 56 were preempted by federal law, while one section was found to violate the equal protection clause. *See, e.g., United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012); *see also Hispanic Interest Coal. of Alabama v. Governor of Alabama*, 691 F.3d 1236, 1249 (11th Cir. 2012). The validity of HB56 is not at issue in this case.

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    29

10  Cloture is "[t]he procedure of ending debate in a legislative body and calling for an immediate vote." Black's Law Dictionary (10th ed. 2014). In Alabama, when cloture is invoked, the Senate has to wait (typically, for 20 minutes) before voting.

11  The parties agree that cloture was frequently used by the Alabama Senate during the 2011 session and that cloture is "invoked for controversial and noncontroversial bills." But Plaintiffs allege the Black Caucus was prevented from speaking against HB19 or proposing amendments. After the Senate invoked cloture, Plaintiffs contend that the Republicans held the microphone and blocked all opponents from speaking, refusing to let the seven black and two white photo ID opponents speak out against the bill.

12  The concerns raised by black legislators throughout the 1990s and 2000s—that the voter ID bill would be discriminatory —echo those raised by Plaintiffs today.

13  With respect to the issuance of Alabama driver's licenses and nondriver IDs, the Alabama Law Enforcement Agency ("ALEA"), formerly the Alabama Department of Public Safety, handles initial issuances of driver's licenses and nondriver IDs for all Alabamians. Renewals and duplicates are also available in every county in Alabama from a judge of probate, a license commissioner, or a revenue commissioner. Renewals and duplicates are also available from self–service kiosks or the Alabama Online Driver License Issuance System. A grace period of 60 days after expiration of a driver's license exists for the purpose of driver's license renewal and the driver's license remains valid during that time. Under certain conditions, a driver's license that has been expired for three years or less can be renewed without going to an ALEA office. Persons 62 and older may obtain a "lifetime" nondriver ID that does not expire. There is a fee to obtain a driver's license. In addition to paying a fee for the driver's license, a person must present various forms of documentation to receive a driver's license, and some of those documents have fees associated with obtaining copies of them.

14  The text of the law states:

   (a) Each elector shall provide valid photo identification to an appropriate election official prior to voting. A voter required to show valid photo identification when voting in person shall present to the appropriate election official one of the following forms of valid photo identification:

   (1) A valid Alabama driver's license or nondriver identification card which was properly issued by the appropriate state or county department or agency.

   (2) A valid Alabama photo voter identification card issued under subsection (f) or other valid identification card issued by a branch, department, agency, or entity of the State of Alabama, any other state, or the United States authorized by law to issue personal identification, provided that such identification card contains a photograph of the elector.

   (3) A valid United States passport.

   (4) A valid employee identification card containing the photograph of the elector and issued by any branch, department, agency, or entity of the United States government, this state, or any county, municipality, board, authority, or other entity of this state.

   (5) A valid student or employee identification card issued by a public or private college, university, or postgraduate technical or professional school located within the state, provided that such identification card contains a photograph of the elector.

   (6) A valid United States military identification card, provided that such identification card contains a photograph of the elector.

   (7) A valid tribal identification card containing a photograph of the elector.

   Ala. Code § 17-9-30 (a)(1)-(7).

15  We note that Section 17-9-30 was amended in 2019 to require absentee voters to present a photo ID at the time of applying for an absentee ballot rather than at the time of submitting the absentee ballot. Ala. Code § 17-9-30(b). In addition, a new subsection (c) provides for making an absentee ballot provisional if the voter has failed to provide the photo ID with the absentee ballot application "after the eight day prior to the election." Ala. Code § 17-9-30(c). These amendments have no effect on our analysis.

16  This requirement was part of the implementing rules promulgated by former Secretary of State Jim Bennett in 2013. See ALA. ADMIN. CODE 820-2-9-.03 (2013).

17  This web ID automatically redirects the user to https://www.sos.alabama.gov/alabama-votes/photo-voter-id.

18  Voters in Alabama are currently required to update their registration when they move.

19  HB19 contains the same pre-cleared PIP included in the 2003 law. Preclearance is no longer required, however. See infra note 20.

20  The 2011 voter ID law was always scheduled to go into effect in June 2014. The gap in passage and implementation occurred because the legislature anticipated challenges to the law and needed time to obtain preclearance. At the time of HB19's passage, Alabama was still a "covered" State under Section 5 of the Voting Rights Act and thus could not

enforce the law without first obtaining preclearance from the U.S. Department of Justice or a federal three-judge court. However, on June 25, 2013, the Supreme Court issued its opinion in *Shelby County*, declaring unconstitutional Section 4(b) of the Voting Rights Act, which is the coverage provision of Section 5 of the Act. 570 U.S. at 540-51, 133 S.Ct. 2612. As a result of the *Shelby County* decision, Alabama is no longer subject to preclearance before implementing a change in laws that impact voting rights. Although preclearance is no longer required, HB19 was written to accommodate this past requirement and was not slated to become operative until the first statewide primary in June 2014.

21    Former Alabama Deputy Secretary of State, Emily T. Marsal (who served under former Alabama Secretary of State Jim Bennett) testified about the steps taken by Bennett's office to implement the law and educate Alabamians about its requirements.

22    Secretary Merrill sought their input because judges of probate are the chief elections officials of the county.

23    The mobile unit has been to a plethora of Alabama events throughout the state: the Chilton County Peach Festival in Clanton; the Peanut Butter Festival in Brundidge in Pike County; the Peanut Festival in Dothan in Houston County; the Magic City Classic in Birmingham (where Alabama State University and Alabama A & M University play football); the Tomato Festival in Slocomb in Geneva County; and the Rattlesnake Rodeo in Opp in Covington County.

24    Plaintiffs' expert expressed an opinion that an estimated 50,106 (1.67%) registered voters in Alabama have no valid photo ID that is accepted under the voter ID law. Secretary Merrill's expert disagrees, finding instead that an estimated 32,704 registered Alabama voters lack an acceptable photo ID.

25    Plaintiffs' expert estimated that an additional 68,046 voters have what he called "contestable" photo IDs, or IDs that have material discrepancies between the name or other identifying information on the voter roll such that they may be contested at the polls. When added to the initial 50,106 estimate, Plaintiffs cite an estimated 118,152 registered voters who have either no photo ID *or* have a "contestable" photo ID. Defendants unequivocally dispute this estimate, arguing that "[n]othing in the record shows that a single Alabama voter has ever been unable to vote because information on the ID does not match the name in the voter registration database."

26    Because Plaintiffs have used the term "Latino" to refer to Hispanic voters in Alabama, for clarity, this Court will also do so.

27    Former Plaintiff Debra M. Silvers passed away in January 2017. In March 2017, Plaintiffs filed a Notice of Death with the district court. At the time of her passing, she was a Plaintiff in this lawsuit, but is no longer. Accordingly, we do not include her in our summary of the individual Plaintiffs.

28    At the time of her August 2016 deposition, Ms. Ambrosio did not know how to drive a car.

29    The Court in *Hunt* considered "the type[s] of relief that an association could properly pursue on behalf of its members," and found that prospective relief weighed in favor of finding that associational standing exists. *See Hunt*, 432 U.S. at 343, 97 S.Ct. 2434 (quoting *Warth*, 422 U.S. at 515, 95 S.Ct. 2197 ("If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind.")).

30    Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute, ... of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ..." *Id.*

31    We are cognizant of the fact that we are required to impose the narrowest ground of the Supreme Court's plurality decision in *Crawford. See Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (quotation marks omitted). We join our sister circuits in recognizing Justice Stevens' plurality opinion as controlling. *See Obama for Am. v. Husted*, 697 F.3d 423, 441 n.7 (6th Cir. 2012) ("Justice Stevens' opinion in *Crawford* (the narrowest opinion, thus the controlling one for our purposes) ... Justice Stevens' opinion does not reveal any disinclination to evaluate evidence of an excessive burden; rather, the purely anecdotal evidence did not support that the voter-ID statute at issue imposed such a burden."). *See also The Am. Civil Liberties Union of New Mexico v. Santillanes*, 546 F.3d 1313, 1321 (10th Cir. 2008) ("Following *Crawford*, it appears that Justice Stevens's plurality opinion controls, a position advocated by the Plaintiffs in the present case because it is the narrowest majority position. Few commentators have analyzed the decision; however, some district court opinions analyzing similar laws have followed Justice Stevens's approach.").

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.  31

32   The dissent attempts to distinguish this case from *Crawford* because "unlike Alabama, Indiana was never required under the VRA to obtain preclearance to change its voting laws." While that is true, it is irrelevant. Like the voter ID law in *Crawford*, the Alabama voter ID law imposes minimal burdens on voters and is supported by legitimate state interests.

33   The *Arlington Heights* factors require a fact intensive examination of the record and, even so, do not lend themselves to a clean analysis in this case. While Plaintiffs attempt to provide "a convincing mosaic of circumstantial evidence" in support of their claims, *Lewis v. City of Union City*, 877 F.3d 1000, 1018 (11th Cir. 2017), this approach results in a presentation of evidence that supports several factors at once to support their overarching "discriminatory intent" argument. We attempt to parse these arguments as neatly as possible within the *Arlington Heights* and *Jean* framework, focusing on issues in the order and manner presented in Plaintiffs' briefing.

34   Our analysis in Section 3.B.2 further guides our findings that the small disparities in ID possession rates—and its negligible impact—do not establish a pattern based on race and do not rise to a genuine dispute of material fact.

35   Plaintiffs use the term "contemporaneously" loosely, citing some statements made in 2010 and some made as far back as 1996.

36   *See supra* note 9.

37   This skepticism echoed our past reluctance to speculate about a state legislature's intent. *See Autauga Quality Cotton Ass'n v. Crosby*, 893 F.3d 1276, 1285–86 (11th Cir. 2018) ("It's certainly not our place—particularly as a federal court ...— to speculate whether the Alabama Legislature might have secretly intended (or might even today prefer) a different rule.").

38   *See* oral argument at 15:40-18:58: (Counsel for Plaintiffs acknowledged that, if "this law was enacted anew, I think we would concede that there may not be a constitutional violation." Chief Judge Ed Carnes then queried, "Your case rises and falls on the racially discriminatory intent of the legislature, does it not?" to which Counsel answered, "Yes.").

39   Notably, Plaintiffs attack only the alleged "[p]rocedural [d]epartures" of the Alabama legislature. They provide no evidence of any substantive departures for this Court to consider.

40   In *Crawford*, the Court also addressed the partisan politics surrounding Indiana's voter ID law, acknowledging that "all of the Republicans in the General Assembly voted in favor of [the voter ID law] and the Democrats were unanimous in opposing it." 553 U.S. at 203, 128 S.Ct. 1610. But, because "partisan considerations" were not the only justification for enacting the voter ID law, the Court went on to uphold the Indiana law:

> [I]f a nondiscriminatory law is supported by valid neutral justifications, those justifications should not be disregarded simply because partisan interests may have provided one motivation for the votes of individual legislators. The state interests identified as justifications for [the voter ID law] are both neutral and sufficiently strong to require us to reject petitioners' facial attack on the statute. *The application of the statute to the vast majority of [ ] voters is amply justified by the valid interest in protecting "the integrity and reliability of the electoral process."*
>
> *Id.* at 204, 128 S.Ct. 1610 (quoting *Anderson,* 460 U.S. at 788 n.9, 103 S.Ct. 1564) (emphasis added).

41   This type of provision would allow voters who face some "reasonable impediment" in obtaining photo ID to submit affidavits or non-photo ID and cast a ballot.

42   Section 10303(f)(2) prohibits any voting qualification or practice that results in the denial or abridgement of the right to vote protections for members of a language minority group. Voting Rights Act Amendments of 1975, Pub. L. No. 94-73; 52 U.S.C. § 10303(f)(2) ("No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote because he is a member of a language minority group").

43   These factors are also called the "Senate factors" because they were "detailed in a Senate Report accompanying the 1982 amendments." *Johnson*, 405 F.3d at 1227 n.26.

44   Plaintiffs also note that "the Governor's decision to partially close the driver's license issuing offices in eight of the eleven majority-Black counties in Alabama for the entire of the 2016 election season was a policy that enhanced HB19's discriminatory effect." But the Governor is not a party in this case and his actions are not at issue here. Moreover, Plaintiffs provide no evidence that the Governor's decision was in any way related to the Alabama voter ID law. Even if we assume this evidence may support Plaintiffs' argument, this one factor alone would not, based on the totality of the circumstances, persuade us that a violation of Section 2 has occurred.

45   Plaintiffs do not address the fourth factor, "the exclusion of members of the minority group from candidate slating processes."

46   At oral argument, Plaintiffs' counsel acknowledged that, although the mobile unit had made home visits five times, there is no evidence that any individuals who wished to obtain a voter ID were unable to get one.

47   We focus on the voter fraud justification because it is the only justification directly attacked by Plaintiffs. We note that Alabama's additional justifications of increasing confidence in elections and modernizing Alabama's elections procedures

are also valid under the Supreme Court's holding in *Crawford*. These justifications further support our determination that the final *Gingles* factor supports Secretary Merrill's argument.

48    Plaintiffs have interpreted the PIP as an impermissible "voucher," due to the Secretary's interpretation that individuals may "vouch" for voters. Appellants summarize the Secretary's position thusly: "The Secretary interprets the PIP to mean that a person without HB19 ID may vote only if election officials, at their discretion, vouch for that person's identity based solely upon personal acquaintance."

1    The District Court referred to the law as the "Photo ID Law," and the majority opinion refers to it as the "voter ID law." For purposes of this dissent, I refer to the law at issue as the Photo ID Law.

2    Like the majority opinion, I rely on the undisputed facts set forth in the parties' Corrected Joint Status Report filed with the District Court.

3    To the extent voter fraud exists in Alabama, the record reflects the following abuses as cited in a 1996 article in the Birmingham News: (1) *absentee ballots* cast in the names of dead people and people who have moved; (2) *absentee ballots* mailed to unregistered voters; (3) *absentee ballots* being removed from mailboxes; (4) intimidation of poor and elderly voters who are made to turn over their *absentee ballots*; (5) pressuring and soliciting nursing home patients; (6) vote buying; and (7) bulk mailing of *absentee ballots* by just a few individuals. *See Greater Birmingham Ministries*, 284 F. Supp. 3d at 1257 (emphasis added).

4    Like the majority opinion, I use the term "Latino" because that is the term Plaintiffs/Appellants used in their briefing. Though Hispanic and Latino are often used interchangeably, I recognize that the terms do not necessarily mean the same thing.

5    Senator Dixon described the re-enfranchisement bill as "a very big Black Caucus issue, primarily because so many of the Black voters in the state would be benefited."

6    When cloture is invoked, the Senate must wait (typically, for 20 minutes) before voting. At least one senator recalls Republican leadership holding the microphone for those twenty minutes with respect to HB 19.

7    In addition to passing HB 19, the same Alabama Legislature passed HB 56, an extensive immigration bill that required, among other things, proof of citizenship for voter registration. The legislators who sponsored HB 56 were largely the same as those who sponsored the Photo ID Law. This Court later held that federal law preempted several sections of HB 56, *see United States v. Alabama*, 691 F.3d 1269, 1280 (11th Cir. 2012), and that the section requiring verification of citizenship and immigration status of enrolling students violated the Equal Protection Clause, *see Hispanic Interest Coalition of Alabama v. Governor of Alabama*, 691 F.3d 1236, 1249 (11th Cir. 2012). The same Legislature also passed a state legislative redistricting plan that was later deemed to, in part, violate federal law because race predominated over traditional districting criteria in several districts. *Alabama Leg. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1033 (M.D. Ala. 2017) (on remand from *Alabama Leg. Black Caucus v. Alabama*, 575 U.S. 254, 135 S.Ct. 1257, 191 L.Ed.2d 314 (2015)).

8    On June 17, 2011, just days after the conclusion of 2011 Legislative Session and the passage of the Photo ID Law, Senator Beason's recorded conversations became publicly known through the trial testimony in *McGregor*, 824 F. Supp. 2d at 1344–48. On November 15, 2011, Alabama Senate leadership stripped Senator Beason of his powerful position as Chair of the Senate Rules Committee. He remained, however, in the Alabama Senate until 2014.

9    For the same reasons I find there are genuine issues of material fact as to impact, I find there are genuine issues of material fact as to Plaintiffs' VRA claims, which require proof of discriminatory results. *See Chisom v. Roemer*, 501 U.S. 380, 403–04, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991).

10    Secretary Merrill's expert also noted a racial disparity among potential Alabama voters, though the disparity was not as significant as Plaintiffs' expert's numbers.

11    "Voter Registration Statistics – 2018," https://www.sos.alabama.gov/alabama-votes/voter/election-data (last visited July 17, 2020).

12    "Special Election Official Results," https://www.sos.alabama.gov/alabama-votes/voter/election-night-official-results (last visited July 17, 2020).

13    Ms. Harris is a Black woman. She has no car, is on a fixed income, and must pay private individuals to drive her. Similarly, Ms. Silvers was a Black woman who lost all her valid forms of identification in a house fire. She did not live anywhere near the various locations she would have needed to visit to obtain a new social security card or new birth certificate.

14    I note that in finding Section 4(b) of the VRA unconstitutional, the Supreme Court did not hold that Alabama's Legislature is incapable of passing racially discriminatory laws. Indeed, Chief Justice Roberts clearly stated that "voting discrimination still exists; no one doubts that." *Shelby Cnty.*, 570 U.S. at 536, 133 S.Ct. 2612.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.