FILED

2020 Aug-17  PM 04:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **PEOPLE FIRST OF ALABAMA, ET AL.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Civil Action Number 2:20-cv-00619-AKK** |
| **JOHN MERRILL, ET AL.,** | ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court are several motions to dismiss.  First, the State of Alabama and Secretary of State John Merrill ("the State Defendants") move to dismiss the claims against them for lack of jurisdiction and for failure to state a claim.  Doc. 112.  Next, Lashandra Myrick, Britney Jones-Alexander, Don Davis, and J.C. Love, III, the probate judges, respectively, for Lowndes County, Wilcox County, Mobile County, and Montgomery County ("the Probate Judges"), move to dismiss the claims against them for lack of standing.  Docs. 129, 130, 136, 140.  Finally, Ruby Jones-Thomas, the circuit clerk for Lowndes County, moves to dismiss the claims against her as an improper party.  Doc. 138.  For the reasons explained below, the State Defendants' motion is due to be granted in part, the Probate Judges' motions are due to be denied, and Jones-Thomas' motion is due to be granted in part.

## I.

The court has already addressed the circumstances of this case, *see* doc. 58, and will not retread that ground here.  However, because the plaintiffs have since amended their complaint, doc. 75, the court will briefly review the claims asserted.

The plaintiffs challenge four election practices in Alabama: (1) the requirement that voters provide an excuse to vote absentee ("the excuse requirement"), Ala. Code § 17-11-3; (2) the requirement that a notary or two witnesses must sign the absentee ballots ("the witness requirement"), Ala. Code § 17-11-7(b); (3) the requirement that absentee voters must submit a copy of their photo ID ("the photo ID requirement"), Ala. Code § 17-9-30(b); and (4) the State's de facto ban on curbside voting ("the curbside voting ban").

The plaintiffs organize their claims challenging these election practices in five counts.  Each count is asserted by all plaintiffs against all defendants.[1]  In Count I, the plaintiffs allege that, as-applied during the COVID-19 pandemic, all four of the challenged practices violate the fundamental right to vote under the First and Fourteenth Amendments to the U.S. Constitution, and that the excuse requirement, the witness requirement, and the curbside voting ban are facial violations of the right to vote under the same amendments.  Doc. 75 at 66–68.  In Count II, the plaintiffs allege that, as-applied during the COVID-19 pandemic, all four of the challenged

---

[1] Except for Count III, in which Plaintiff Eric Peebles does not join.  Doc. 75 at 71.

practices violate Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.*, and that the curbside voting ban is a facial violation of the ADA. Doc. 75 at 68–71.  In Count III, the plaintiffs allege that, as-applied during the COVID-19 pandemic, the excuse requirement, the witness requirement, and the curbside voting ban violate § 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301, and that the curbside voting ban is a facial violation of § 2 of the VRA. Doc. 75 at 71–74.  In Count IV, the plaintiffs allege that the witness requirement violates § 201 of the VRA, 52 U.S.C. § 10501.[2]  Doc. 75 at 74–76.  Finally, in Count V, the plaintiffs allege that the witness requirement is an unconstitutional poll tax under the Twenty-Fourth Amendment and that it unconstitutionally conditions the right to vote on a person's wealth in violation of the Equal Protection Clause of the Fourteenth Amendment.  Doc. 75 at 76–77.

The relevant changes in the amended complaint include: adding the challenge to the excuse requirement; adding the State as a defendant to the constitutional claims in Count I; adding the facial challenges to the curbside voting ban in Counts II and III; and adding the claims under the Twenty-Fourth and Fourteenth Amendments in Count V.  *Compare* doc. 1 at 43–52 *with* doc. 75 at 66–77.  The plaintiffs also added a number of defendants in the amended complaint, all sued in

---

[2] The plaintiffs also nominally assert a claim under § 3 of the VRA, 52 U.S.C. § 10302.  Doc. 75 at 74.  Though the plaintiffs mention § 3 in the heading of Count IV, they do not explain, in the body of the count or anywhere else in the complaint, how the witness requirement violates § 3. Thus, to the extent the plaintiffs meant to assert a claim under § 3 of the VRA, the claim is due to be dismissed for failure to state a claim.

their official capacities as absentee election managers ("AEMs"), circuit clerks, or probate judges for their respective counties.  Doc. 75 at 27.

The motions before the court move to dismiss both for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6).  The court will address each contention for dismissal, beginning with the jurisdictional issues.

## II.

A Rule 12(b)(1) challenge for lack of subject-matter jurisdiction may take the form of a facial or factual attack on the complaint.  *Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990).  When deciding a facial attack, the court takes the allegations of the complaint as true.  *Id.* at 1529.  When deciding a factual attack, the court may decide the factual issues that bear on jurisdiction, and no presumption of truthfulness applies to the plaintiff's allegations.  *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003).

## A.

The State Defendants argue that the plaintiffs' challenge to the excuse requirement is moot.  Doc. 112 at 11–12.  A "case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Troiano v. Supervisor of Elections in Palm Beach Cty.*, 382 F.3d 1276, 1282 (11th Cir. 2004).  The plaintiffs seek an injunction prohibiting the defendants from enforcing the excuse requirement "during, at least, all Alabama primary, municipal,

and general elections in 2020 or as long as the pandemic continues to present a danger to Plaintiffs and other voters." Doc. 75 at 78. After the plaintiffs filed their amended complaint, however, Secretary Merrill issued a series of rules pursuant to his emergency powers, *see* Ala. Code § 17-11-3(e), waiving the excuse requirement for all remaining 2020 elections.[3] Because Secretary Merrill has already waived the excuse requirement through 2020—and even into 2021[4]—the State Defendants say the plaintiffs have obtained the relief they seek.

The plaintiffs respond that they seek a suspension of the excuse requirement for the duration of the pandemic, *see* doc. 75 at 78, which they say may extend to March 2021, when the state would hold elections for which Secretary Merrill has not yet waived the excuse requirement. The plaintiffs allege that the pandemic is likely to be ongoing until there is a treatment or a vaccine available, and they allege that an effective treatment or vaccine is unlikely to be available in 2020. *Id.* at 31–32. But the reports on this point are conflicting and include statements by the nation's top infectious disease doctor, Dr. Anthony Fauci, that we may indeed have a vaccine by the end of the year. *Id.* at 31. And the plaintiffs do not allege (and rightly so, since no one knows) that the pandemic will be ongoing in March 2021.

---

[3] Ala. Admin. Code r. 820-2-3-.06-.02ER (June 25, 2020) (waiving excuse requirement for all remaining municipal elections in 2020); *id.* 820-2-3-.06-.03ER (July 17, 2020) (waiving excuse requirement for special election for House District 49); *id.* 820-2-3-.06-.04ER (July 17, 2020) (waiving excuse requirement for general election on November 3, 2020).

[4] *See* Ala. Admin. Code r. 820-2-3-.06-.05ER (July 24, 2020) (waiving the excuse requirement for a special election scheduled in January 2021).

Ultimately, it is simply too speculative to press the challenge to the excuse requirement based on the possibility that the pandemic will be ongoing seven months from now, and that the State will decline to extend the waiver, as it has done for each election up to this point during the pandemic. *See, e.g.*, *Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985) (affirming the dismissal of a claim for injunctive relief as moot when the risk of future injury was too speculative). Accordingly, the court finds that the plaintiffs' challenge to the excuse requirement is as moot.[5]

## B.

The State argues next that it is entitled to sovereign immunity on all claims against it. Doc. 112 at 10–11. The court disagrees in part. Congress validly abrogated states' sovereign immunity for claims under the ADA and the VRA. *Nat'l Ass'n of the Deaf v. Florida*, 945 F.3d 1339, 1351 (11th Cir. 2020) (finding that the ADA abrogated states' sovereign immunity); *Ala. State Conference of the NAACP v. Alabama*, 949 F.3d 647, 655 (11th Cir. 2020) (finding that the VRA abrogated

---

[5] The plaintiffs suggest the issue falls under the "capable of repetition, yet evading review" exception to mootness. Doc. 134 at 8. The plaintiffs do not expand on what, exactly, is capable of repetition. If they mean the pandemic, such unpleasant conjecture is far too speculative and remote to constitute a case or controversy under Article III. *See Hall v. Sec'y, Ala.*, 902 F.3d 1294, 1297 (11th Cir. 2018) (To qualify as capable of repetition, there must be "a reasonable expectation that the same complaining party will be subjected to the same action again. The remote possibility that an event might recur is not enough to overcome mootness . . . .") (citation omitted).

If, instead, the plaintiffs' concern is that Secretary Merrill might withdraw the emergency rules waiving the excuse requirement, their argument fits better under the "voluntary cessation" exception to mootness. Unlike private parties, however, courts may credit official actions by the state that voluntarily cease allegedly unconstitutional conduct. *See Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267–68 (11th Cir. 2020).

states' sovereign immunity).  Therefore, as the court has previously said, doc. 58 at 30, the State is not entitled to immunity for the claims brought under the ADA and the VRA.

However, the State is entitled to immunity for the constitutional claims pleaded in Counts I and V.  The plaintiffs seek to get around this finding by contending that the State waived its immunity.  Citing to *Lapides v. Board of Regents of University System of Georgia*, 535 U.S. 613, 619–20 (2002), where the Supreme Court reasoned that a state waives its sovereign immunity when it invokes a federal court's jurisdiction by voluntarily removing a case to federal court, the plaintiffs argue that the State waived its immunity when it participated in the appeal from the preliminary injunction.  Doc. 134 at 7.  On appeal, the plaintiffs argued that the State was not a proper party, because the preliminary injunction enjoined county officials, rather than the State.  In response, the State, though a named defendant, compared itself to an intervenor, contending that it had an interest in defending the constitutionality of its laws and that it was harmed by the injunction.  Emergency Application for Stay at 14–15, *Merrill v. People First of Ala.*, -- S. Ct. --, 2020 WL 3604049 (July 2, 2020) (No. 19A1063).  The State proceeded to argue that the challenged provisions did not violate the right to vote under the First and Fourteenth Amendments.  *Id.* at 32–38.

The plaintiffs maintain that by participating in the appeal as a quasi-intervenor and defending the constitutionality of its laws, the State waived its sovereign

immunity.  Without addressing whether participating in the appeal would otherwise amount to a waiver, the court declines to find that the State waived its immunity to the claims in Counts I and V for a simple reason: the plaintiffs did not assert the claims in Count V, or name the State as a defendant to the claims in Count I, until they filed their amended complaint after the appeals had concluded.  *See Merrill v. People First of Ala.*, -- S. Ct. --, 2020 WL 3604049 (July 2, 2020).  Because the State could not waive a defense to claims that had not yet been asserted against it, the constitutional claims in Counts I and V are due to be dismissed against the State.

## C.

Secretary Merrill moves to dismiss the claims against him challenging the witness and photo ID requirements for lack of standing, arguing that those claims are not traceable to nor redressable by him because he does not enforce the witness or photo ID requirements.  Doc. 112 at 9–10.  Bound by the Eleventh Circuit's precedent in *Jacobson v. Florida Secretary of State*, 957 F.3d 1193, 1207–12 (11th Cir. 2020), the court previously ruled that the witness and photo ID requirements were not redressable by Secretary Merrill for standing purposes.  Doc. 58 at 22–25.

The plaintiffs urge the court to reconsider.  Doc. 134 at 5–6.  The plaintiffs point to a number of provisions that they say connect Secretary Merrill to the enforcement of the witness and photo ID requirements.  *Id*.  At bottom, the plaintiffs' theory rests on Secretary Merrill's authority to issue rules and guidance regarding the witness and photo ID requirements; the same authority that enabled Secretary

Merrill to waive the excuse requirement.  Were the slate blank, the court would agree that this authority suffices to establish standing.  But the Eleventh Circuit rejected the same theory of traceability and redressability in *Jacobson*.  957 F.3d at 1211 (finding that the Secretary of State's "power to prescribe rules and issue directives about [the challenged requirement], which [local officials] might well be obliged to follow, says nothing about whether [the Secretary] possesses authority to *enforce* the complained-of provision") (citations omitted).  The Eleventh Circuit's reasoning applies equally here, and the court is bound to follow it.[6]  Accordingly, the challenges to the witness and photo ID requirements are due to be dismissed against Secretary Merrill.

## D.

Similarly, the Probate Judges challenge the plaintiffs' claims on standing grounds, arguing that the witness requirement, the photo ID requirement, and the

---

[6] Notably, in a more recent decision, the Eleventh Circuit reached the merits in a case challenging the photo ID requirement as racially discriminatory in violation of the VRA and the Fourteenth and Fifteenth Amendments.  *Greater Birmingham Ministries v. Sec'y of State for Ala.*, -- F.3d --, 2020 WL 4185801 (11th Cir. July 21, 2020).  Secretary Merrill was the sole defendant.  The parties did not object to standing, but the court nonetheless found that the plaintiffs had suffered a legal injury.  *Id.* at *10–11.  However, the Eleventh Circuit did not address whether the injury was traceable to or redressable by Secretary Merrill, *see id.*, and this court therefore can "infer no view on the issue" from that precedent, *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1207 n.52 (11th Cir. 1991).  Even if it could be cited as evidence of standing, when two circuit precedents conflict, the older precedent controls.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).  That said, the court would welcome further guidance from the Eleventh Circuit on this important question of standing in voting rights cases, which other circuits have answered differently.  *See Tex. Democratic Party v. Abbott*, 961 F.3d 389, 399 (5th Cir. 2020); *Calzone v. Hawley*, 866 F.3d 866, 870 (8th Cir. 2017).

curbside voting ban are not traceable to nor redressable by probate judges. *See* docs. 129, 130, 136, 140.

The plaintiffs identify a number of provisions that establish the Probate Judges' connection to the witness and photo ID requirements. Doc. 141 at 5–6. Probate judges are the "chief elections official" of their counties, Ala. Code § 17-1-3(b), which includes serving as the chair of the three-member board that appoints poll workers who count the absentee ballots, *id.* §§ 17-1-3(b), 17-1-2(1), 17-8-1, 17-11-11(a), serving on the canvassing board that tabulates absentee ballots, *id.* § 17-1-2(6), 17-10-2(f), and ensuring the training of poll workers, *id.* § 17-8-9(a). Additionally, because probate judges appoint and train the poll workers who count the absentee ballots, these workers likely qualify as agents of probate judges, in which case their responsibilities—including checking the absentee ballots to ensure the witness and photo ID requirements are satisfied—may be imputed to probate judges. *Cf. Jacobson*, 957 F.3d at 1208 ("Because the Supervisors are independent officials not subject to the Secretary's control, their actions to implement the ballot statute may not be imputed to the Secretary for purposes of establishing traceability."). Given the Probate Judges' role in the absentee ballot process, and their control over the poll workers, the court finds that the enforcement of the witness and photo ID requirements are traceable to and redressable by the Probate Judges.[7]

---

[7] In reply, the Probate Judges argue that the court's reliance on *Jacobson* is "seriously misplaced," and contend that the witness and photo ID requirements are traceable to and redressable by Secretary Merrill, rather than to local officials. Doc. 154. Standing is not an either-or proposition:

The court also finds that the curbside voting ban is traceable to and redressable by the Probate Judges.  Of course, the plaintiffs allege that the de facto ban on curbside voting exists because Secretary Merrill has taken it upon himself to shut down any attempts to establish curbside voting operations.  Doc. 75 at 63–64.  But the plaintiffs also allege that when Secretary Merrill has intervened to shut down curbside voting operations, he did so by ordering probate judges to stop the practice. *Id.*  They may have merely been following orders, but the curbside voting ban is thus traceable to and redressable by the probate judges nonetheless.

## E.

Ruby Jones-Thomas, the circuit clerk for Lowndes County, moves to dismiss the claims against her because she no longer serves as the AEM for Lowndes County. Doc. 138.  The plaintiffs respond that they bring their claims against Jones-Thomas in her official capacity as the circuit clerk, not as the AEM.  Doc. 152 at 2; *see also* doc. 75 at 27.

The witness and photo ID requirements are traceable to and redressable by circuit clerks.  Ordinarily, the circuit clerk serves as the AEM.  Ala. Code § 17-11-2.  However, if the circuit clerk declines to serve as AEM, the appointing board names a replacement.  *Id.*  As it happens, the circuit clerk is one of the three members

---

the injury can be traceable to and redressable by more than one defendant.  In any case, the court does not rely on *Jacobson* to find standing against the Probate Judges; the court relies on the Probate Judges' role in Alabama's absentee ballot process.

of the appointing board.  Ala. Code § 17-1-2(1).  As a member of the appointing board, the circuit clerk is responsible for selecting the poll workers who count the absentee ballots.  Ala. Code §§ 17-8-1, 17-11-11(a).  The circuit clerk also serves on the canvassing board, which tabulates the absentee ballots.  Ala. Code §§ 17-1-2(6), 17-10-2(f).  As with the probate judges, because the circuit clerks appoint the poll workers, the poll workers' responsibility for checking the absentee ballots to ensure the witness and photo ID requirements are satisfied may fairly be imputed to the circuit clerks.  For these reasons, the witness and photo ID requirements are traceable to and redressable by Jones-Thomas in her official capacity as circuit clerk for Lowndes County.

In contrast, the plaintiffs fail to allege that the curbside voting ban is traceable to circuit clerks.  Thus, the claims challenging the curbside voting ban are due to be dismissed against Jones-Thomas and against any other defendants named solely in their official capacity as circuit clerks.

### III.

The court now turns to the motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  When reviewing a Rule 12(b)(6) motion, the court must accept the factual allegations in the complaint as true and determine whether the complaint "state[s] a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

**A.**

The State Defendants move to dismiss the claims in Count I that the witness requirement and the curbside voting ban are facial violations of the First and Fourteenth Amendment.  Doc. 112 at 12.  The State Defendants argue that the plaintiffs failed to allege sufficient facts to adequately state a facial challenge.  The court agrees.  All of the plaintiffs' allegations in Count I hinge on the burden on their right to vote during the pandemic.  As such, these claims are clearly as-applied and fail to state a facial challenge.  The plaintiffs' facial challenges to the witness requirement and the curbside voting ban under the First and Fourteenth Amendment in Count I are due to be dismissed.[8]

**B.**

The State Defendants also move to dismiss the plaintiffs' challenges to the witness and photo ID requirements under the ADA.  Doc. 112 at 13–16.  The State Defendants maintain that the plaintiffs failed to allege a prima facie case under the ADA, because both the witness and photo ID requirements are essential eligibility requirements.  *Id.*  For the reasons explained in the court's earlier opinion, doc. 58 at 59–60, the court finds that the witness requirement is an essential eligibility

---

[8] Instead of defending their facial challenges in Count I, the plaintiffs argue that they adequately stated a facial challenge to the curbside voting ban under the ADA and VRA.  Doc. 134 at 8–10. As best the court can tell, the State Defendants did not move to dismiss those claims.  *See generally* doc. 112.  To the extent that the State Defendants meant to move to dismiss those claims through its arguments in section III.B of its brief, the court agrees with the plaintiffs' that they adequately state a facial challenge to the curbside voting ban under the ADA and VRA.

requirement. The plaintiffs' challenge to the witness requirement under the ADA is thus due to be dismissed.

In its earlier opinion, the court found that the photo ID requirement was *not* an essential eligibility requirement. *See* doc. 58 at 66–67. The court gave three reasons: (1) unlike the witness requirement, the Alabama legislature did not describe the photo ID requirement as essential[9]; (2) Alabama created multiple exceptions to the photo ID requirement[10]; and (3) other Alabama laws effectively serve the photo ID requirement's purpose of protecting against voter fraud.[11] The State Defendants urge the court to reconsider its decision.

The State Defendants argue that, subject to limited exceptions, Alabama law is clear that absentee ballots will not be counted without photo ID. Ala. Code § 17-9-30(b) ("[A]n absentee ballot shall not be issued unless the required identification is submitted with the absentee ballot application."). The Alabama Supreme Court has also held that absentee voters' failure to "include proper identification" is a "fatal" defect. *Townson v. Stonicher*, 933 So. 2d 1062, 1065–67 (Ala. 2005). These

---

[9] *Cf.* Ala. Code § 17-11-10(b) (explicitly stating that the witness requirement "goes to the integrity and sanctity of the ballot and election").

[10] Ala. Code § 17-9-30(d) (exempting from the photo ID requirement voters who are eligible to vote absentee pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, the Voting Accessibility for the Elderly and Handicapped Act, or any other federal law); Ala. Code § 17-9-30(f) (permitting an individual to vote without a photo ID if two election officials identify her as an eligible voter).

[11] *See, e.g.*, Ala. Code §§ 17-11-4, 17-11-7, 17-17-24(a).

points prove only that providing photo ID is a requirement; they do not show that the requirement is essential.

The State Defendants also contend that it would not be fair to use the exceptions Alabama carved out to comply with federal law to show that the photo ID requirement is not essential. After all, Alabama did not have much of a choice. To use Alabama's compliance against it would force states to "choose between 'compromising their essential eligibility criteria for public programs' and openly defying federal voting laws." Doc. 112 at 15 (quoting *Tennessee v. Lane*, 541 U.S. 509, 532 (2004)). The State Defendants' point is valid. But not all of the exceptions to the photo ID requirement that Alabama created were made to comply with federal law. Alabama also permits voters to vote without photo ID if two election officials identify them as eligible. Ala. Code § 17-9-30(f). Moreover, the State Defendants do not contest the court's finding that other laws effectively protect against voter fraud.

In the end, the State Defendants have not persuaded the court to depart from its prior holding. Their motion to dismiss the challenge to the photo ID requirement under the ADA is thus due to be denied.

## C.

Next, the State Defendants move to dismiss the claims under § 2 of the VRA. Doc. 112 at 16–17. The plaintiffs did not move for a preliminary injunction on these claims, so the court addresses them now for the first time. In Count III, the plaintiffs

assert that the witness requirement, the photo ID requirement, and the curbside voting ban abridge their right to vote on account of race in violation of § 2 of the VRA.  Doc. 75 at 71–74.  In short, the plaintiffs' theory is that the challenged practices force them to violate social distancing protocol and increase their risk of exposure to a deadly virus; that complying with the challenged practices is harder for African Americans than for white voters; that African Americans are more at risk from COVID-19; and thus that the challenged practices present a significant obstacle to the exercise of the franchise for African Americans.  *Id.*

The State Defendants move to dismiss this claim for two reasons.  First, they argue that the denial or abridgement of the right to vote is not "on account of race or color," as required by the statute.  Doc. 112 at 16–17.  Second, they argue that the denial or abridgement of the right to vote is because of the virus, not the challenged practices, and thus there is no state action.  *Id.* at 17.  The court begins with the second contention.

The State Defendants observe that, according to the plaintiffs' as-applied claims, the challenged practices did not pose a problem under § 2 until the virus emerged.  Thus, the virus converted the challenged practices into violations of the statute without any state action.  The court previously addressed this argument:

> The injury alleged is the state's decision to force the individual plaintiffs to comply with the complained-of requirements for voting. The virus might make the injury severe—because complying with the requirements might expose the plaintiffs to serious health risks—but it does not cause the legal injury.

Doc. 58 at 18.  While the State did not cause the virus, by continuing to enforce its preexisting law, which the plaintiffs allege it is now extremely burdensome to comply with, the State may well have denied those voters the use of the franchise.

The State Defendants' other argument is that the plaintiffs fail to adequately allege that any denial or abridgement of their right to vote is "on account of race or color."  Starting with the text, § 2 of the VRA states:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . as provided in subsection (b).
>
> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice . . . .

52 U.S.C. § 10303.  Interpreting these provisions, the Supreme Court explained that "Section (a) adopts a results test, thus providing that proof of discriminatory intent is no longer necessary to establish any violation of the section.  Section (b) provides guidance about how the results test is to be applied."  *Chisom v. Roemer*, 501 U.S. 380, 395 (1991) (emphasis omitted).  The Eleventh Circuit has cautioned, though, that "[d]espite its broad language, Section 2 does not prohibit all voting restrictions

that may have a racially disproportionate effect." *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1228 (11th Cir. 2005) (en banc).

Section 2 includes two types of claims: vote-dilution claims, related to redistricting, and vote-denial claims. *Ohio Democratic Party v. Husted*, 834 F.3d 620, 636 (6th Cir. 2016). This case presents a vote-denial claim. As numerous courts have noted, a "clear standard" for applying the "results test" to vote-denial claims "has not been conclusively established." *Id.* at 636–37 (collecting cases).

The critical text is that the challenged law must "result[] in the denial or abridgement of the right . . . to vote on account of race or color." § 10303(a). A denial or abridgement of the right to vote is shown if members of the protected class "have less opportunity than other members of the electorate to participate in the political process"—in other words, a disparate impact in access to the franchise. § 10303(b). But proof of disparate impact alone is not enough. The "denial or abridgement of the right to vote must be 'on account of race or color.'" *Greater Birmingham Ministries*, 2020 WL 4185801, at *22.

Expanding on the on-account-of-race element, the Eleventh Circuit said the plaintiff must show that "racial bias in the relevant community *caused* the alleged vote-denial or abridgement." *Id.* (citation omitted). Of course, "racial bias" does not require the plaintiffs to show discriminatory intent; that would disregard the plain statutory language and Supreme Court precedent. *See Chisom*, 501 U.S. at 395 (holding that "proof of discriminatory intent is no longer necessary"). Instead, the

18

plaintiff must show that the challenged law "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters" to participate in the political process. *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986); *see also Husted*, 834 F.3d at 638 (directing courts to ask "whether the challenged [law] causes the discriminatory impact as it interacts with social and historical conditions").

Applying this standard, the court is satisfied that the plaintiffs have alleged sufficient facts to survive a Rule 12(b)(6) motion. The plaintiffs allege that because of the pervasive legacy of discrimination, it is harder for African Americans to comply with the challenged practices. For example, due to disparities in poverty rates tied to historical discrimination, doc. 75 at 42–43, African Americans are more likely to live alone, less likely to own a computer, tablet, or smartphone, and less likely to have internet access, *id.* at 73, making it harder to comply with the witness requirement. African Americans are also more likely to be disabled and to require assistance at the polls, *id.* at 72–73, amplifying the burden of the curbside voting ban.

The plaintiffs further allege that African Americans are at greater risk from COVID-19. *Id.* at 42–43. African Americans are substantially overrepresented in COVID-19 cases and deaths. *Id.* at 42. Part of the reason for this, the plaintiffs say, is because African Americans have increased rates of underlying conditions that increase the risk from COVID-19, such as diabetes, sickle cell disease, hypertension,

asthma, and kidney failure.  *Id.* at 43.  The plaintiffs assert that the increased rates of these conditions is partly caused by discrimination in access to health care, and partly by the effects of housing and employment discrimination that concentrated African Americans in areas with higher environmental risks.  *Id.* at 42–44.  But the greater risk from COVID-19 is about more than underlying conditions.   The plaintiffs allege that it is also tied to African Americans' dense living situations—a consequence of historic housing segregation—and to the fact that African Americans are more likely to work in jobs that increase their exposure to COVID-19.  *Id.* at 41.

In sum, the plaintiffs allege that there is a disparate impact, and that the disparate impact is caused by the challenged practices interacting with social and historical inequalities.  As such, the motion to dismiss the § 2 claim under the VRA is due to be denied.

### D.

Turning to the other claim under the VRA, the State Defendants move to dismiss the challenge to the witness requirement under § 201 of the statute.  Doc. 112 at 17–18.  Section 201 prohibits the use of "any test or device," such as a "requirement" that a voter "prove his qualifications by the voucher of registered voters or members of any other class," to deny a citizen the right to vote.  52 U.S.C. § 10501.

The court previously determined that the witness requirement was not a prohibited "test or device" under § 201.  Doc. 58 at 72.  However, the court

suggested that the option of using a notary may qualify as a prohibited "test or device," because the notary "certif[ies] that the affiant is known (or made known) to me to be the identical party he or she claims to be," Ala. Code § 17-11-7(b), and vouching for a voter's identity seems like a qualification. *See* doc. 58 at 72–74. Recent precedent from the Eleventh Circuit forecloses the plaintiffs' claims under § 201 of the VRA.

In *Greater Birmingham Ministries v. Secretary of State for Alabama*, -- F.3d --, 2020 WL 4185801, at *26–28 (11th Cir. July 21, 2020), the Eleventh Circuit considered whether the option for an individual without a photo ID to nevertheless cast a ballot "if the individual is positively identified by two election officials as a voter on the poll list who is eligible to vote" was a prohibited test or device under § 201 of the VRA. Ala. Code § 17-9-30(f). The Eleventh Circuit held that because the positively identify provision was an option or a "failsafe," rather than a requirement, it was not an impermissible test or device under § 201. *Greater Birmingham Ministries*, 2020 WL 4185801, at *27. Consistent with this precedent, because voters may use witnesses instead of a notary, the notary option is not a requirement, and thus does not violate § 201 of the VRA. The plaintiffs' claims under § 201 of the VRA are thus due to be dismissed.

### E.

Finally, the State Defendants move to dismiss the claims in Count V. Doc. 112 at 18–19. In Count V, the plaintiffs allege that the notary option is an

unconstitutional poll tax in violation of the Twenty Fourth Amendment, and that it unconstitutionally conditions the right to vote on a person's wealth in violation of the Equal Protection Clause of the Fourteenth Amendment.  Doc. 75 at 76–77.  The problem with the notary option is that Alabama law entitles notaries to a five-dollar fee.  Ala. Code § 36-20-74.  Additionally, in order to facilitate social distancing, Governor Ivey issued a rule permitting notaries to witness the signing of absentee affidavits through videoconferencing.  Doc. 16-17 at 2–3.  But, as the court has noted, "videoconferencing is not free.  It requires internet access at a minimum, which is a service that is an unaffordable luxury for many."  Doc. 58 at 38 n.20.  As a result, the plaintiffs say the notary option is unconstitutional, and that the witness requirement must be enjoined in its entirety.

The court will address the claim under the Twenty-Fourth Amendment first. The Twenty-Fourth Amendment states that "[t]he right of citizens" to vote in a federal election "shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax."  U.S. Const. amend. XXIV, § 1. By its plain terms, the amendment applies to "any poll tax or other tax."  The notary fee and the costs associated with videoconferencing are not a tax.  An "essential feature of any tax" is that "[i]t produces at least some revenue for the Government." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564 (2012); *see also Jones v. DeSantis*, -- F. Supp. 3d --, 2020 WL 3618062, at *27 (N.D. Fla. 2020) (finding that the standard definition of tax applies to the Twenty-Fourth Amendment).  The

plaintiffs do not allege that the notary fee or the costs of videoconferencing produce revenue for the government. Accordingly, the challenge to the witness requirement under the Twenty-Fourth Amendment is due to be dismissed.

The protection under the Equal Protection Clause against conditioning the right to vote on wealth has a broader reach. A "State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966).[12] Normally, because wealth is not a suspect classification, discriminating on the basis of wealth is reviewed only for a rational basis. *See Jones v. Governor of Fla.*, 950 F.3d 795, 808 (11th Cir. 2020). However, wealth classifications are subject to heightened scrutiny when they are used to limit access to the right to vote. *M.L.B. v. S.L.J.*, 519 U.S. 102, 124 (1996); *Harper*, 383 U.S. at 670; *Jones*, 950 F.3d at 808–09.

Under this heightened scrutiny, the court considers: "(1) the nature of the individual interest affected; (2) the extent to which it is affected; (3) the rationality of the connection between legislative means and purpose; and (4) the existence of alternative means for effectuating the purpose." *Jones*, 950 F.3d at 825. Here, the

---

[12] The Equal Protection Clause is also broader because it applies to state and federal elections, whereas the Twenty-Fourth Amendment applies only to federal elections. *See Harper*, 383 U.S. at 680 (Harlan, J., dissenting); *see also Swisher Intern., Inc. v. Schafer*, 550 F.3d 1046, 1059 n.13 (11th Cir. 2008) ("The Equal Protection Clause of the Fourteenth Amendment does not apply directly to the federal government; however, the principles of equal protection are applied to the federal government through the Due Process Clause of the Fifth Amendment.").

parties did not address these factors, and the court declines to undertake this analysis in the first instance.

Instead, the State Defendants argue only that the notary option does not violate the Equal Protection Clause because voters have a free alternative: using two witnesses. Doc. 112 at 19. The court rejects this argument. The Supreme Court's decision in *Harman v. Forssenius*, 380 U.S. 528 (1965), is instructive. In that case, not only did a free alternative not cure the unconstitutionality of a poll tax, the Supreme Court held that the alternative itself violated the Twenty-Fourth Amendment because it was a "material requirement" imposed "solely upon those who refuse to surrender their constitutional right to vote in federal elections without paying a poll tax." *Id.* at 541. The court emphatically rejected the logic of alternatives as a panacea:

> The requirement imposed upon those who reject the poll tax method of qualifying would not be saved even if it could be said that it is no more onerous, or even somewhat less onerous, than the poll tax. For federal elections, the poll tax is abolished absolutely as a prerequisite to voting, and no equivalent or milder substitute may be imposed.

*Id.* at 542.

In a case concerning the Equal Protection Clause, the Eleventh Circuit also cast doubt on the State Defendants' theory. Hearing a challenge to Florida's requirement that former felons must repay all outstanding fees and fines before they can vote, the Eleventh Circuit reasoned that free alternatives may make the requirement less burdensome, but the court did not suggest that a free alternative

automatically cured the wealth classification altogether. *See Jones*, 950 F.3d at 826.

After all, a rule establishing that a state could cure even the most egregious

conditions on the franchise merely by identifying another method of voting would

"subvert[] the effectiveness" of the Equal Protection Clause. *Harman*, 380 U.S. at

542. At the very least, the court believes the other method must be viable. Here, the

plaintiffs contend that the alternatives are available to them only at the expense of

increasing their exposure to a deadly virus. They are entitled to be heard and to try

to prove their case.

For these reasons, the court holds that offering a free alternative does not

automatically cure conditioning the right to vote on wealth or the payment of a fee.[13]

Accordingly, the motion to dismiss the challenge to the witness requirement under

the Equal Protection Clause is due to be denied.[14]

---

[13] The Eleventh Circuit's decision in *Greater Birmingham Ministries* does not require a different result. There, the court held that a voting method did not violate § 201 of the VRA because the method was merely a "failsafe," and voters could utilize other methods. *Greater Birmingham Ministries*, 2020 WL 4185801, at *27. Section 201 of the VRA prohibits "any requirement" that qualifies as a test or device under the statute. The Eleventh Circuit simply found that a voting method is not a "requirement" when the voter has other options. Needless to say, the text of the Equal Protection Clause is not limited to requirements.

[14] That said, the court is skeptical of the plaintiffs' argument that, consistent with *Harman*, the witness requirement must be enjoined in its entirety, as opposed to enjoining only the notary option. That result does not seem consistent with standard severability analysis. *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010) ("Generally speaking, when confronting a constitutional flaw in a statute, [courts] try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact.") (citation omitted). The court will address this issue if and when it arises.

## IV.

In conclusion, the Probate Judges' motions, docs. 129, 130, 136, 140, are **DENIED**.

Jones-Thomas' motion, doc. 138, is **GRANTED IN PART**.  The plaintiffs' challenge to the curbside voting ban is dismissed for want of standing against Jones-Thomas and any other defendants named solely in their official capacities as circuit clerks.

The State Defendants' motion, doc. 112, is **GRANTED IN PART**.  The plaintiffs' challenge to the excuse requirement is dismissed as moot.  The constitutional claims in Counts I and V are dismissed against the State due to sovereign immunity.  The challenges to the witness and photo ID requirement are dismissed against Secretary Merrill for want of standing.  The following claims are dismissed for failure to state a claim: the facial challenges to the witness requirement and the curbside voting ban in Count I; the challenge to the witness requirement under the ADA; the claim under § 201 of the VRA; and the claim under the Twenty-Fourth Amendment.  All other claims remain in the case.

The motion to stay discovery, doc. 148, pending resolution of the State Defendants' motion to dismiss is **DENIED AS MOOT**.

**DONE** the 17th day of August, 2020.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE