FILED

2020 Sep-22  PM 02:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| PEOPLE FIRST OF ALABAMA, et al., | |
| Plaintiffs, | Case No.: 2:20-cv-00619-AKK |
| v. | |
| JOHN MERRILL, et al. | |
| Defendants. | |

## PLAINTIFFS' POST-TRIAL BRIEF

**INTRODUCTION**

COVID-19 has infected over 145,000 and resulted in the deaths of 2,500 Alabamians. Every decision about whether to leave home requires Alabamians to take calculated health risks. But these risks are especially acute for those people who, like Plaintiffs and their members, are at higher risk of a severe infection or death from the virus due to their ages, races, and/or medical conditions ("high-risk voters"). Indeed, to-date, 96% of those Alabamians who have died from COVID-19 were high-risk people.

At trial, Plaintiffs demonstrated that Alabama's Witness Requirement, Photo ID Requirement, and *de facto* Curbside Voting Ban (collectively, the "Challenged Provisions") burden every voter and place even heavier burdens on people of color and people with disabilities. The Challenged Provisions require many voters to make the impossible choice between their health and their vote. The Constitution, the Americans with Disabilities Act ("ADA"), and the Voting Rights Act ("VRA"), however, bar Defendants from forcing Alabama voters to make that awful choice.

Plaintiffs remaining claims are: (1) *Anderson-Burdick* claims against the Probate Judges and Circuit Clerks of Jefferson, Mobile, and Montgomery County attacking all Challenged Provisions;[1] (2) an ADA challenge to the Photo ID

---

[1]     Although this Court has entered consent orders resolving the claims against Jefferson and Montgomery County, those orders entitle Plaintiffs to relief against these counties only "[i]f the Court orders declaratory and/or injunctive relief against the State of Alabama, Alabama Secretary

Requirement and Curbside Voting Ban against all Defendants; (3) claims against the Witness Requirement and Curbside Voting Ban under the VRA; and (4) an Equal Protection Clause claim against the Witness Requirement as a form of illegal wealth-based discrimination.

After nine days of trial, Plaintiffs have demonstrated that Defendants have burdened the right to vote and violated their rights under federal constitutional and statutory law. Thus, Plaintiffs are entitled to relief against Defendants on all claims.

## I. The Witness Requirement Violates Both the VRA, the Fundamental Right to Vote, and the Poll Tax Ban During the COVID-19 Pandemic.

### A. Black and Latinx Alabamians face heavier burdens than white voters in meeting the Witness Requirement in violation of the VRA.

To succeed on their VRA claim, Plaintiffs must prove that the Witness Requirement and Curbside Voting Ban "result[] in the denial or abridgement of the right . . . to vote on account of race or color." 52 U.S.C. § 10303(a). In addition to proof of disparate impact, Plaintiffs must show that "racial bias in the relevant community *caused* the alleged vote-denial." *Greater Birmingham Ministries*, 2020 WL 4185801, at *22 (11th Cir. July 21, 2020). The Senate Factors may guide the Court's analysis. *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1198 (11th Cir. 1999). Ultimately, Plaintiffs must prove that the Witness Requirement and Curbside

---

of State, the probate judges, circuit clerks, and/or absentee election managers in this action . . . ." Doc. 181 ¶ 12; Doc. 182 ¶ 10. The Court also retains jurisdiction over the settlements with the election officials in Madison, Lee, Lowndes, and Wilcox Counties. *See* Docs. 216, 235, 240, 241.

Voting Ban, addressed *infra*, "interact[ ] with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters" to participate in the political process. *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

Applying this standard, Plaintiffs demonstrated that trial that it is harder for Black voters to comply with the Witness Requirement because of Alabama's pervasive legacy of discrimination. Black and Latino voters are less likely than their white counterparts to live alone or with two adult to serve as witnesses, Doc. 228 ¶¶ 27-29, 34-35, and are less likely to have computer or internet access to contact witnesses or a notary remotely, *id*. ¶ 13. Black voters who are high-risk people are even less likely than other voters to live with two witnesses or have access to the resources needed for a notary. For example, 50% of Black people age 65 and over versus only 30% of elderly white people would need to contact two witnesses outside their household. 9/14 (Burch) Tr. at 203-205; *see also* Pls. Ex. 270 (Burch Report).

The reason that Black voters are more likely to live alone and experience poverty, which makes it harder to meet the Witness Requirement, is because of racial discrimination by state and local authorities in voting, education, employment, and other areas. Agreed Facts ¶¶ 143–50; *see also* 9/11 (Elopre) at 38-43, 63-64; 9/10 (Cogburn) at 8-23; 9/14 (Bagley) Tr. at 147-49. Plaintiffs experts testified that Black Alabamians are more likely to face discrimination in healthcare and to lack access to public healthcare services, which in part explains their higher infection rates and

worse health outcomes. 9/9 (Reingold) Tr. at 20-21, 23-24; 9/9 (Elopre) Tr. at 40-43; 9/10 (Cogburn) Tr. at 8-20; 9/14 (Bagley) Tr. at 147-49. Dr. Reingold and Dr. Elopre testified that they would advise against high risk persons seeking the signature of two witnesses from persons outside the home. 9/8/20 (Reingold) Tr. at 50–51; 9/9 (Elopre) Tr. at 60-61.

At trial, Plaintiffs testified that these circumstances are their reality. For example, Ms. Thompson is a 68-year-old Black woman who suffers from diabetes and high blood pressure and who lives alone. 9/8/20 Tr. at 168–69. She does not regularly interact with two people at the same time, and to do so would put her health at risk. *Id*. at 177. She does not have a computer and is not technologically savvy. *Id*. at 171–72. Ms. Bettis likewise testified that she lives with only one other adult, and that she lacks second witness because she no longer sees family and friends who have recently contracted COVID-19 or its symptoms. 9/14 Tr. at 4-20. Ms. Threadgill-Matthews testified that many members of her predominantly Black community in Wilcox County have contracted COVID-19. 9/9/20 Tr. at 14. She also testified that many in her community would have difficulty voting absentee because they lack transportation and ready access to notaries, photocopiers, and printers, and their diminished literacy. The Organizational Plaintiff members face similar barriers to complying with the Witness Requirement in the pandemic. 9/9 Tr. at 106-112, 124-34; 9/10 Tr. at 43, 49-50, 77-82; 9/11 Tr. at 101-112.

Court have found similar burdens on the right to vote to be significant. *See, e.g.*, *Common Cause*, 970 F.3d at 14 (finding that "[t]he burden imposed by [the absentee ballot] requirements in the midst of a pandemic is significant"); *Middleton v. Andino*, 2020 WL 5591590, at *28-30 (D.S.C. Sept. 18, 2020) (suspending a witness requirement due to the "significant burden" of complying with it in the pandemic, particularly for Black voters); *Harding*, 2020 WL 5543769, at *13 & n.155 (finding Louisiana's absentee ballot regime "unduly" burdens voters in light of COVID-19 and noting that the burden falls harder on Black voters).

### B. The Witness Requirement Unduly Burdens the Fundamental Right to Vote of Many Alabamians During the Pandemic.

Under *Anderson-Burdick*, the Court must weigh the Challenged Provisions' severe burdens on Alabamian voters' fundamental rights against the provisions' purported rationales. *See Dem. Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019). Because the Challenged Provisions require voters to risk their health to vote, these provisions are subject to strict scrutiny and must fall because the burdens are not narrowly drawn to serve a compelling state interest. *Id*. at 1318. But even under a less demanding level of scrutiny, these provisions should not survive because their burden outweighs any benefit to the State. The Challenged Provisions need not be "insurmountable" barriers. *New Alliance Party of Ala. v. Hand*, 933 F.2d 1568, 1575-76 (11th Cir. 1991). Plaintiffs need only show that "'burdened voters have few alternate means of access to the ballot.'" *Obama for Am.*

*v. Husted*, 697 F.3d 423, 431 (6th Cir. 2012) (citations omitted). Courts must balance the character and magnitude of the injury to Plaintiffs' fundamental right to vote against the State's rationale for infringing upon it. *See Lee*, 915 F.3d at 1327.

At trial, Defendants argued that people who do not cut off all human contact should be forced to bear the health risk required by the Challenged Provisions. "Such risks may be necessary to obtain food and other necessities, but the burden one might be forced to accept to feed oneself differs in kind from the burden that the First and Fourteenth Amendments tolerate on the right to vote." *League of Women Voters of Va. v. Va. State Bd. of Elecs.*, 2020 WL 4927524, at *9 (W.D. Va. Aug. 21, 2020) ("*LWVV*"). While people can try to mitigate the risk of infection, the Challenged Provisions will still dissuade many people from voting because these significant "burdens are much more unusual and substantial than those that voters are generally expected to bear. Taking an unusual and in fact unnecessary chance with your life is a heavy burden to bear simply to vote." *Common Cause RI. v. Gorbea*, 970 F.3d 11, 14-15 (1st Cir. 2020), *aff'd* No. 20A28, 2020 WL 4680151 (U.S. Aug. 13, 2020) ; *see also Ocasio v Comision Estatal de Elecciones*, 2020 WL 5530274, at *5 (D.P.R. Sept. 14, 2020) (finding in light of COVID-19, to make it easier for at risk populations to vote by mail, the "balance of hardships and public interest support injunctive relief"); *Memphis A. Philip Randolph Inst. v. Hargett*, 2020 WL 5412126, at *33 (M.D. Tenn. Sept. 9, 2020) (enjoining the requirement that first time voters

6

must vote in-person, in light of COVID-19).

The Court should enjoin the Secretary and Defendants from enforcing the Witness Requirement under the First and Fourteenth Amendments to the U.S. Constitution. *See* Pls.' Motion for Reconsideration, Doc. 229; *see also* 9/17 (Barnett) Tr. at 107, 132 (describing the Secretary's role in enforcing absentee voting rules).

At trial, Plaintiffs proved that the Witness Requirement burdens their right to vote and that the burden on voters is not justified by any State interest. Dr. Reingold testified that "the best way to avoid contact with the virus is to not be in contact with other people." 9/8/20 Tr. at 31. Yet, Plaintiffs Peebles, Thompson, Bettis, and many of Organizational Plaintiffs' members will face substantial challenges to voting due to the Witness Requirement because they lack access to witnesses. Plaintiff Thompson is high risk and does not live with two other adults. 9/8/20 Tr. at 168–69. Ms. Bettis is also high risk and has limited her interaction with non-household members to reduce her risk of contractive the virus, 9/14 Tr. at 12–13. PFA, BVM, GBM and NAACP also testified that many of high-risk members who face obstacles to identifying with two witnesses. *See* 9/9/20 Tr. at 106-26, 176-89; 9/10/20 Tr. at 78; 9/11 Tr. at 101-112, 161-70. Remote notarization is burdensome because of associated costs and because it does not eliminate the risk of interaction. A voter and notary must still sign the same actual absentee ballot, meaning that they must still find a way to physically interact with one another. *See* 9/15 (Helms) Tr. at 178.

7

Nonetheless, Defendants assert numerous state interests, including election integrity and avoiding voter confusion. "The problem is that the state has plucked these interests from other cases without attempting to explain how they justify the discriminatory classification here at issue." *Fulani v. Krivanek*, 973 F.2d 1539, 1546 (11th Cir. 1992). Alabama offers only these "boiler plate" interests, *id*. at 1547, which do not justify the real burdens identified here.

The Witness Requirement has no impact election integrity. Secretary Merrill and Mr. Helms confirmed that absentee ballot applications collect personal identifying information that local election officials use to verify the voter's identity. And Ms. Barnett, Mobile County AEM, testified that she uses this information to verify that the absentee ballot was sent to the right person. 9/17 Tr. at 119, 124–25. The Witness Requirement is not a voter ID safeguard: both Secretary Merrill and Mr. Helms testified that the witnesses do not have to know the voter, and that officials do not verify the identifies of the witnesses or that the witnesses watched the voter sign the ballot. *See* 9/11/20 Tr. at 11; 9/15/20 Tr. at 178.

Nor do election officials or investigators use the Witness Requirement to conduct absentee voter fraud prosecutions. Houston County Circuit Clerk Ms. Woodall testified that the Witness Requirement has not helped her detect alleged voter fraud, 9/16/20 Tr. at 71–72, 89. Similarly, Greg Biggs testified that voter fraud could happen despite the Witness Requirement, *id*. at 36–39, and that prior instances

8

of voter fraud were unrelated to the Witness Requirement and specifically concerned

instances of people in power abusing said power, *id*. at 20–21.

## C.  The Witness Requirement Requires Payment of a Direct Fee to Vote in Violation of the Prohibition on Poll Taxes and Other Fees.

"The basic right to participate in political processes as voters and candidates

cannot be limited to those who can pay for a license." *M.L.B. v. S.L.J.*, 519 U.S. 102,

568 (1996)*.* It is a "*per se* violation of the Equal Protection Clause for a State to

'make[ ] the affluence of the voter or payment of any fee an electoral standard.'"

*Jones v. Governor*, 2020 WL 5493770, at *5 (11th Cir. Sept. 11, 2020) (en banc)

(quoting *Harper v. Bd. of Elections*, 383 U.S. 663, 666 (1966)). This is true "whether

the citizen, otherwise qualified to vote, has [money] in his pocket or nothing at all,

pays the fee or fails to pay it." *Harper*, 383 U.S. at 668.

The Constitution bars a range of wealth-based discrimination in voting. *See,*

*e.g., Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198 (2008); *Morse v.*

*Republican Party of Va.*, 517 U.S. 186 (1996); *Quinn v. Millsap*, 491 U.S. 95 (1989);

*Boustani v. Blackwell*, 460 F. Supp. 2d 822 (N.D. Ohio 2006); *Common Cause/Ga.*

*v. Billups*, 406 F. Supp. 2d 1326, 1368 (N.D. Ga. 2005). In the pandemic, courts

have noted that some costs may be illegal poll taxes. *See, e.g.*, *Harding v. Edwards*,

2020 WL 5543769, at *14 & n.165 (M.D. La. Sept. 16, 2020) (doctor certification);

*Lewis v. Hughes*, 2020 WL 4344432, at *16 (W.D. Tex. July 28, 2020) (postage fees).

Here, Alabama cannot both require voters to cast notarized absentee ballots,

Ala. Code § 17-11-9, and authorize notaries to charge a fee for that service, *id*. § 36-20-74. Most notaries do charge. Dr. Burch found that 89% of the surveyed notaries charge to notarize absentee ballots. 9/14 Tr. at 206; *see also* Pls. Ex. 265. Even those who do not charge for notarization may bill for travel. 9/14 Tr. 206-07. And most notaries (84%) lack videoconferencing technology. *Id*. Plaintiffs Bettis, Peebles, and Thompson and Ms. Lux testified that the notary aspect of the Witness Requirement is burdensome. 9/8 Tr. at at 127-28, 154-59; 9/11 Tr. at 181; 9/14 Tr. at 20-21. The two-witness option also imposes a "material requirement" on them in the pandemic. Doc. 161 at 24 (quoting *Harman v. Forssenius*, 380 U.S. 528, 541 (1965)).

At trial, Defendants offered no justification for the State authorizing a fee for notarizing absentee ballots. Defendants did offer some evidence that the Mobile County library is offering a free notary service. But the actions of third parties to mitigate the burden of the Witness Requirement is irrelevant to Plaintiffs' challenge to a state authorized fee. Even if it were relevant, Ms. Calhoun testified that "not many people" had used or were "aware" of the free notary services. 9/16 Tr. at 133.

## II.   The Photo ID Requirement Violates Both the ADA and the Fundamental Right to Vote During the COVID-19 Pandemic.

### A.   Many Alabamians with Disabilities are Discriminated Against in their Right to Vote by the Photo ID Requirement.

The ADA "prohibits all discrimination" on the basis of disability "by a public entity, regardless of the context." *Bircoll v. Miami-Dade Cty*., 480 F.3d 1072, 1084–

85 (11th Cir. 2007). Ms. Thompson and Organizational Plaintiff members are qualified individuals with disabilities who face discrimination because of the Photo ID Requirement. Defendants have not offered a reasonable accommodation though they could easily do so. *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001).

Individuals have a disability under the ADA where physical and mental impairments substantially limit major life activities, including substantial limits to functions of the immune, respiratory, and circulatory systems. 28 C.F.R. § 35.108(c)(1). "'Substantially limits' is not a demanding standard," and must "be construed broadly in favor of expansive coverage." 28 C.F.R. § 35.108(d)(1).

At trial, Ms. Thompson testified that she has diabetes and hypertension and is 68 years old. 9/8 Tr. at 168–69. Ms. Ellis testified that all People First members are people with developmental disabilities, many of whom are also high-risk. 9/11 Tr. at 100–03, 106–07. Many GBM members are also high-risk people, including people with neurological and ambulatory disabilities. 9/9 Tr. at 107, 128-30, 135. These are all disabilities under the ADA. *See* 28 C.F.R. § 36.105(b)(2). Dr. Burch provided uncontested evidence that at least a million Alabamians are "considered high risk based on CDC guidance of severe illness from COVID-19," and many of these Alabamians have diabetes or other conditions that are disabilities. 9/14 Tr. at 191.

Because of her underlying disabilities, which makes her a high-risk person, Ms. Thompson has severely curtailed her normal life activities, as have many People

First and GBM members. 9/8 Tr. at 169–70; 9/9 Tr. at 111-12; 9/11 Tr. at 158. And

Dr. Burch testified that over 74% of Alabamians at high risk due to their age or

underlying conditions are avoiding crowds and public places. 9/14 Tr. at 208. Thus,

their high-risk health statuses have severely limited their ability to leave home or

"interact with others" amid the pandemic, 28 C.F.R. §§ 36.105(c)(1)(i), which

qualifies them as people with disabilities. *See Silver v. City of Alexandria*, 2020 WL

3639696, at *4 (W.D. La. July 6, 2020) (holding that the plaintiff "has a qualifying

disability" due to "the existence of the COVID-19 pandemic in our nation, and the

existence of his obvious co-morbidities"). That people may not colloquially refer to

themselves "disabled" has no bearing on the ADA's protections. *See, e.g., Haley v.

Cmty. Mercy Health Partners*, 2013 WL 322493, at *11 (S.D. Ohio Jan. 28, 2013).

Plaintiffs have also shown that they and similarly situated Alabamians have

been discriminated against in absentee voting by virtue of the Photo ID Requirement.

Of course, "[p]laintiffs need not … prove that they have been disenfranchised or

otherwise 'completely prevented from enjoying a service, program, or activity.'"

*Disabled in Action v. Bd. of Elec. in City of N.Y.*, 752 F.3d 189, 198 (2d Cir. 2014);

*see also Shotz*, 256 F.3d at 1080–81 (same). Because Plaintiffs are challenging the

"accessibility of a widely-available absentee voting program, the 'relevant public

service or program at issue' is not the 'voting program in its entirety' but rather the

'absentee voting program.'" *Hernandez v. N.Y. State Bd. of Elections*, 2020 WL

4731422, at *8 (S.D.N.Y. Aug. 14, 2020) (quoting *Nat'l Fed'n of the Blind v. Lamone,* 813 F.3d 494, 503 (4th Cir. 2016)).

Ms. Thompson and many of the Organizational Plaintiffs' members will face substantial challenges to voting by absentee ballot due to the Photo ID Requirement. Ms. Thompson does not have a copy of her photo ID, nor does she own a printer, copier, or scanner. 9/8 Tr. at 176. Similarly, People First members generally do not have access to copiers or scanners. 9/11 Tr. at 128–29. People First also lacks the infrastructure to help members fulfill the Photo ID Requirement. *Id.* at 144. GBM also has many high-risk members who lack photo IDs and computer access. 9/9 Tr. at 110. On a statewide level, Plaintiffs' expert Dr. Burch testified that about 30% of white and about 50% of Black Alabamians who are in the high risk group do not have computers or internet access. 9/14 Tr. at 198, 201, 207. Given this, it is unlikely they will have ready access to print or copy their IDs without risking their health.

While the Mobile County Defendants noted that some locations of their libraries will offer free copying services, there is no similar evidence in other counties. Regardless, this service only helps those who reside in Mobile County, or who know about the service or who have the transportation and the ability to get to the library, a barrier for many People First members and Alabamians in rural areas. 9/11 Tr. (Ellis) at 114–15 (most People First members are not drivers); 9/8 (Thompson) at 183; 9/9 Tr. (Threadgill-Matthews) at 17, 24, 29–30.

13

Defendants also presented no evidence to counter Dr. Reingold's testimony about the risks of in-person voting, 9/9 Tr. at 46–47, and his opinions that— particularly for high-risk individuals such as these Plaintiffs and Organizational Plaintiff members—persons who do not have the ability to make photocopies of their photo IDs at home avoid travelling outside the home to do so, *id.* at 49–51; *see also Common Cause*, 970 F.3d at 15.

Finally, Plaintiffs proved that extending the photo ID exemption for absentee voting to individuals with disabilities during the COVID-19 pandemic—particularly those with conditions designating them as high risk by the CDC and those who are 65 and older—is a reasonable modification that would not cause "undue hardship." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401–03 (2002). The burden of showing that a modification is reasonable is "not a heavy one" and it "is enough for the plaintiff to suggest the existence of a plausible accommodation." *Nat'l Fed. of the Blind*, 813 F.3d at 507–08. Alabama law already exempts certain groups of people from the Photo ID Requirement, *see* Ala. Code § 17-9-30(d) and (f), including those eligible to vote under the Voting Accessibility for the Elderly and Handicapped Act ("VAEHA"), proving both the reasonableness of the accommodation, and that the Photo ID Requirement is not an essential eligibility requirement. *See* Doc. 161 at 15.

Moreover, the VAEHA protects *both* people over age 65, regardless of disability, and people with a "temporary or permanent physical disability." 52 U.S.C.

§ 20107. Yet rather than properly construe this exemption to protect all high-risk voters, the Secretary exempts only a narrower group: voters who are 65 and older *or* disabled, *and* who are unable to access the polls due to a physical infirmity. Ala. Admin. Code R. 820-2-9-.12(2); *see also* 9/15 Tr. at 173 (Mr. Helms testifying that the photo ID exemption does not apply to voters with COVID-19, nor all high-risk voters). The Court could construe the VAEHA exemption to include all high-risk voters and allow such voters to mark the applications' third excuse. Pls. Ex. 22.

Because the narrow construction of the Photo ID Requirement's exemption tends to screen out voters with disabilities by diminishing their chance of voting absentee, or from voting at all, it violates the ADA. *See, e.g.*, *Doe v. Jud. Nominating Commn. for Fifteenth Jud. Cir. of Fla.*, 906 F. Supp. 1534, 1540 (S.D. Fla. 1995).

### B. The Photo ID Requirement Unduly Burdens the Fundamental Right to Vote of Many Alabamians During the Pandemic.

Plaintiffs proved that their right to vote has been significantly burdened by the Photo ID Requirement, and that the requirement does not sufficiently advance the State's interests to justify the burden. When assessing the severity of the burden on plaintiffs' right to vote, courts look at the effect on plaintiffs and the groups they represent because the right to vote is "individual and personal in nature." *Reynolds*, 377 U.S. at 561; *see also Veasey v. Abbott*, 830 F.3d 216, 249, n. 40 (5th Cir. 2016) (en banc) ("The right to vote is personal and is not defeated by the fact that 99% of other people can secure the necessary credentials easily.") (citations omitted). Courts

15

must also consider the severity and reach of the burden on all affected groups and individuals, however. *See Crawford*, 553 U.S. at 198–99. To satisfy the Photo ID Requirement, Plaintiffs without home printers and copiers must interact with persons outside of their household, which necessarily involves a heightened risk in the pandemic. *See LWWV*, 2020 WL 4927524, at *9.

As discussed, *supra*, Plaintiffs established at trial that Ms. Thompson and many Organizational Plaintiff members will face substantial challenges to voting by absentee ballot due to the Photo ID requirement. The Photo ID Requirement present Plaintiffs with the impossible "option" of either "braving exposure to an illness from which they are at high risk of severe complications or dying, or foregoing their right to vote." Doc. 58 at 64.

Defendants assert an interest in preventing voter fraud and the "integrity and sanctity of the ballot and election." Ala. Code § 17-11-10(b). Yet other provisions of Alabama election law sufficiently protect the integrity of absentee ballots.[2]

Voters are already required to enter identifying information, like their driver's license number or last four digits of their Social Security number, on the absentee application and ballot. Ms. Barnett testified that she verifies this information when reviewing absentee ballot application to ensure the ballot is sent to the right person. 9/17 Tr. at 119, 124–25. Ms. Woodall testified that she was able to detect voter fraud

---

[2] *See* Ala. Code §§ 17-11-4, 5, 7; §§ 17-17-14, 24, 26.

without using the Photo ID Requirement. 9/16 Tr. at 86–89. For the few instances of voter fraud that Defendants documented in their case, these would have occurred with or without the Photo ID Requirement. *See* 9/16 Tr. (Biggs) at 24, 36-39 (testifying that the Photo ID requirement likely does not help where voters are being manipulated as in the instances of voter fraud that he investigated); 09/16 (Woodall) at 90–91 (testifying that fraudsters were able to comply with Photo ID Requirement); 9/17 Tr. (Murdock) at 84 (the kind of voter fraud he documented could still occur regardless of the Photo ID requirement). Further, certain disabled and elderly voters are already exempted from the Photo ID Requirement, demonstrating it is unnecessary to prevent fraud. 9/17 Tr. (Barnett) at 117–18. Courts have found similar tenuous connections to voter fraud and election integrity insufficient for absentee ballot restrictions in light of COVID. *See e.g.*, *Middleton*, 2020 WL 5591590, at *31 (holding that, while "the state has a significant interest in investigating voter fraud" the benefits of a witness requirement to promoting that interest was "marginal"); *Harding*, 2020 WL 5543769, at *12 (restrictions on absentee voting not sufficiently tailored to voter fraud); *LWVV*, 2020 WL 4927524, at *9.

Defendants are also likely to cite to *Greater Birmingham Ministries v. Merrill*, 966 F.3d 1202 (11th Cir. 2020), but that decision carries little weight on the instant Photo ID claims for several reasons. First, Plaintiffs' claims in this case are as-

applied to the context of the COVID-19 pandemic and relate to absentee voting, as opposed to the challenge to in-person and absentee voting brought before this pandemic. Plaintiffs have provided evidence of even more significant burdens in the current context. Second, the claims in the two cases are entirely distinct, with the *GBM* Plaintiffs raising claims intentional racial discrimination and VRA claims, and Plaintiffs here raising ADA and undue burden on the right vote claims.

The record here, in the context of COVID-19, strongly supports relief under both claims. As Plaintiff Porter aptly stated, "while I don't mind dying to vote, I think . . . we're past that time." 9/14 Tr. at 80.

## III. The Curbside Voting Ban Violates the ADA, VRA and the Fundamental Right to Vote During and Outside of the COVID-19 Pandemic.

Plaintiffs ask this Court to end Secretary Merrill's ban on curbside voting, which unilaterally prohibits all counties from providing a CDC-recommended accommodation, even when the county is willing and able to do so. *See* Doc. Nos. 181 ¶¶ 14-16; 182 ¶¶ 10-14. Nothing in Alabama law bars curbside voting. Agreed Facts ¶ 110. Rather, state law makes curbside voting possible: any voter may request assistance from nearly anyone, including poll workers, Ala. Code § 17-9-13(a), poll workers may sign a poll book for voters with disabilities, *id*. § 17-9-11, each poll site includes poll workers assigned as "ballot clerks" who, "upon the request of a voter, shall assist the voter as necessary to deposit the ballot in the precinct ballot counter" or boxes, Ala. Code § 17-8-1(b)(4); Ala. Admin. Code r. 307-X-1-.10, and

all poll workers take an oath to protect the secrecy of the ballot. Ala. Code §§ 17-6-34; 17-8-8. Moreover, federal law requires voters to have access to broad assistance "throughout the voting process." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017) (citing 52 U.S.C. § 10508; 52 U.S.C. § 10310(c)(1)).

Probate Judges have already implemented curbside voting in Alabama. The Secretary contends that he shut down curbside voting at least three times because it did not comply with Alabama law. Yet, neither he nor Mr. Helms could identify those provisions of Alabama law with which these three instances of curbside voting did not comply. Curbside voting is particularly necessary now. Voters cannot be temperature-checked or required to wear a mask to vote. 9/11 Tr. at 26; 9/16 Tr. at 110. Even a *known* COVID-19-positive voter who refuses to wear a mask cannot be turned away from the polls. 9/16 Tr. at 126. This puts high-risk voters in enormous danger. Counties that plan to use curbside voting to comply with their obligations under federal law, protect high-risk voters, and make it possible for COVID-19-positive voters to vote without entering polling places should be allowed to do so.

A.   **The Curbside Voting Ban violates the VRA, the ADA, and the Fourteenth Amendment during the pandemic.**

In violation of the VRA, the Curbside Voting Ban disproportionately burdens Black voters who are more likely to have disabilities, Doc. 228 at ¶¶ 39-40, are at greater risk of contracting, 9/9 (Elopre) Tr. at 47-48, and dying from COVID-19, Agreed Facts ¶¶ 64–73, 99, and therefore have a greater need for curbside voting,

19

9/10 Tr. at 8–9, 23. Hale and Perry County, where the Secretary intervened to stop curbside voting, are majority-Black. 9/11 (Merrill) Tr. at 37-39, 42. Mobile County Probate Judge Don Davis testified that he determined many polling places were unable to accommodate more than a "handful of voters" inside at a time while complying with CDC-guidelines. 9/15 Tr. at 103–04. Mobile County's chief clerk concluded that "many of the polling locations that create the biggest issues with the CDC guidelines serve predominantly minority communities." *Id.* And, as discussed *supra*, because voters of color face higher obstacles to voting absentee, curbside voting is more important for them. 9/14 (Burch) Tr. at 204–05. A majority of voters are new to absentee voting and are not confident about navigating absentee voting. *Id.* at 194-95; *see also* Pls. Ex. 423 at 14. Plaintiff Porter, for example, tried to vote absentee in the July 14 election, but was unable to do so and therefore wishes to vote curbside to ensure that his vote counts. 9/15 Tr. at 77-81. Alabama's history of discrimination has led to a "tradition" of Black people voting in person to confirm the acceptance of their ballots. 9/9 (Douglas) Tr. at 113-14.

As discussed *supra*, voters of color's higher rates of disability and infection and death from COVID-19 is tied to the State's history of racial discrimination in voting, education, employment, healthcare, and other areas. The Secretary's ban violates the letter and the spirit of state law, which requires broad assistance to voters and was enacted to comply with the VRA. 9/14 Tr. (Bagley) at 124-26; *see Harris*

*v. Siegelman*, 700 F. Supp. 1083, 1087 (M.D. Ala. 1988). The Secretary's statements also show his opposition to voting mechanisms—like curbside voting—that may be employed by those voters whom he views as "lazy." 9/14 (Bagley) Tr. at 143.

The Curbside Voting Ban also violates the ADA. Indoor areas, like polling places, are prime locations for airborne transmission of COVID-19, and Alabama does not require masks or temperature checks to vote. Due to their disabilities, Plaintiffs and many other high-risk voters cannot enter a polling place without endangering their own health, the health of others, or both. In fact, people with disabilities may require assistance voting, which prolongs the process, and disproportionally increases their risk of exposure. 9/11 (Lux) Tr. at 175. Defendants could greatly reduce this risk by simply permitting curbside voting—an alternative the CDC advocates in light of the serious threat posed by the COVID-19 pandemic.

Similarly, the Curbside Voting Ban violates the Fourteenth Amendment. Severe restrictions on the right to vote, like the Curbside Voting Ban, are subject to strict scrutiny and must be narrowly drawn to serve a compelling state interest. *See Lee*, 915 F.3d at 1318. Given the pandemic, the Curbside Voting Ban contravenes the fundamental right to vote by forcing voters to choose between voting or their health (and the health of others). Defendants failed to introduce at trial any credible evidence to establish the Curbside Voting Ban serves any compelling state interest.

Defendants' vague suggestion that Curbside Voting Ban is necessary to

safeguard ballot secrecy and integrity fails on its face. State and federal law already allows voters to receive assistance from poll workers in completing their ballot or placing the ballot in the tabulation machine. For some voters, like Ms. Lux, curbside voting would help them to better maintain ballot secrecy. 9/11 Tr. at 178-79. And, in any event, numerous other provisions of Alabama election law protect ballot secrecy and integrity.[3] Defendants identified at trial no evidence whatsoever that curbside voting had resulted in or would result in voter fraud or compromised ballot secrecy. *See, e.g.*, 9/11 (Merrill) Tr. at 37-39, 42; 9/15 (Helms) Tr. at 194-95. That state law does not specifically mention curbside voting is no barrier to allowing it. State and county election officials provide other accommodations that are not specifically contemplated by state law. *See, e.g.*, 9/11 (Merrill) Tr. at 19-20 (mailing photocopies of photo IDs to voters); 9/15 (Davis) Tr. at 113 (outdoor tents to vote).

In fact, at trial, Defendants focused on whether some individual counties would find it *feasible* to implement curbside voting—but that inquiry is irrelevant. First, Plaintiffs have not sought to require all 67 counties to provide curbside voting. Plaintiffs merely seek to bar Secretary Merrill and state officials from stopping those counties who *do* find it feasible to provide this accommodation to voters. Second,

---

[3] *See, e.g.*, Ala. Code §§ 17-11-7 (absentee voters must sign affidavit under threat of perjury), 17-17-8 (crime to willfully make a false statement identifying oneself as a qualified elector), 17-17-14 (crime to vote when not registered in the jurisdiction), 17-17-24 (felony to change another voter's ballot, vote on behalf of another person, or falsify a ballot or verification document), 17-17-26 (crime to prepare or assist in voting an absentee ballot for a person who is unable to communicate their preference).

where curbside voting has occurred, it did not harm ballot secrecy, nor lead to logistical or traffic issues. 9/11 (Merrill) Tr. at 37-42; 9/15 (Helms) Tr. at 194-95.

## B.    The Curbside Voting Ban burdens voters outside of the pandemic.

Outside of COVID-19, Plaintiffs Peebles and Porter, as well as the PFA members like Ms. Lux, testified that their polling places are not accessible and sought the accommodation of curbside voting. Dr. Peebles testified that his polling place is inaccessible in part because he must use an elevator to get inside, which he cannot operate alone. 9/8 Tr. at 131. Mr. Porter testified that his polling place is difficult for him to navigate because of his Parkinson's disease. 9/14 Tr. at 68, 79, 80-83. Ms. Lux testified that her mobility and vision issues make her polling place hard to navigate. 9/11 Tr. at 176-78. Even before the pandemic, the lack of curbside voting compromised her ballot secrecy. *Id.* at 175-76. This testimony proves that there are polling places that are not ADA compliant.[4] *See, e.g.,* 28 C.F.R. § 35.133 (features of facilities, e.g., elevators, must be "useable" by people with disabilities); 28 C.F.R. § 35.150 (facilities must be "accessible [ ] and useable"); *see also Disabled in Action,* 752 F.3d at 199 (noting that inaccessibility includes "inadequate signage directing voters with disabilities to accessible entrances or voting areas, blocked entryways or pathways, and inaccessible interior spaces inside voting areas.").

---

[4] At least as recently as July 2019, Montgomery County's polling stations were not all ADA compliant and presented accessibility issues. 9/9 Tr. at 67–70; Pls. Ex. 460; Pls. Ex. 462.

While the Mobile and Lee County probate judges claimed that every polling place in their county is ADA-compliant, neither knew what the ADA required for polling places. *See* 9/15 Tr. at 122-23; 9/17 Tr. at 188-89, 200-01. Curbside voting would address inaccessible polling places. As-applied to these Plaintiffs, the Curbside Voting Ban violates the VRA and ADA regardless of COVID-19.

### C. Defendants' Objections to Curbside Voting Are Irrelevant.

> 1. Ballot clerks are authorized to assist voters without breaking a purported "chain of custody."

Although several Defense witnesses asserted that curbside voting would break the "chain of custody" at the polls, that requirement simply does not exist. The concept of "chain of custody" appears nowhere in Alabama's voting laws or the Election Handbook published by Secretary Merrill's office.[5] Rather, Alabama law and the Handbook contemplate: (i) there are circumstances under which individuals will not deposit their votes directly into the ballot counter; (ii) ballot clerks are responsible for assisting voters; and (iii) ballot clerks have a responsibility to maintain the secrecy of ballots.

Alabama law provides that ballot clerks shall, upon a voter's request, "assist the voter as necessary to deposit the ballot in the precinct ballot counter"[6] or ballot

---

[5] *See* Exhibit L/L/W-1 (Alabama Election Handbook, 19th Ed.).
[6] Ala. Code § 17-8-1(b).

box.[7] The Election Handbook restates this obligation and requires each polling place to have a ballot clerk to "assist[] the voter in depositing ballots in the precinct ballot counter."[8] Alabama law and the Handbook neither specify that that assistance must be given inside the polling place, nor require that the ballot clerk must place the ballot into the ballot counter within view of the voter.

Even if Defendants' insistence that poll workers must maintain a "chain of custody" were correct, ballot clerks are clearly an authorized link in that chain. Ballot clerks take an oath to uphold the law in performing their duties.[9] That oath includes keeping ballots secret and inviolate.[10] Ballot clerks attend training before each election to stay apprised of their duties and responsibilities.[11] Where ballot boxes are used as a conduit until votes are transferred to a central ballot counter,[12] ballot clerks are specifically entrusted with "preserv[ing] the secrecy of the ballot

---

[7] Exhibit L/L/W-1, PDF page 448-49, numbered pages 416-17 (Ala. Election Handbook, 19th Ed., § 307-X-1-.01(3)); *see also* Sept. 11, 2020 Rough Trial Tr. at 37, 69 (Secretary Merrill agrees that voters are allowed to receive assistance from poll workers).

[8] Exhibit L/L/Q-1, at PDF page 144, numbered page 112.

[9] Exhibit L/L/W-1, at PDF page 148, numbered page 116 (Ala. Election Handbook, 9th Ed. § 8.4.4).

[10] Ala. Code. § 17-6-34.

[11] Sept. 15, 2020 Rough Trial Tr. at 46; Sept. 16, 2020 Rough Trial Tr. at 77.

[12] The Election Handbook provides for the use of "central ballot counters," defined as "marksense ballot counter[s] that read[] and tabulate[] marksense ballots at a central location to which ballots are transported after the polls close." Exhibit L/L/W-1, PDF page 443, numbered page 411 (Ala. Election Handbook, 19th Ed., § 307-X-1-.01(3)). Marksense ballots are "machine-readable" ballots that allow voters to mark their "choices in designated voting response locations" to be read in a central ballot counter. *Id.*

box."[13] This role holds ballot clerks responsible for protecting ballots after they leave the possession of the voter and before they reach the ballot counter, just as would occur in curbside voting.

Secretary Merrill even admitted the hypothetical chain of custody would not necessarily be broken where voters receive assistance to place their ballots in the ballot counter.[14] As "trusted authorit[ies]," Secretary Merrill testified that Absentee Election Managers can carry out curbside voting without breaking the chain of custody."[15] The same is true for ballot clerks at the polls, who are responsible under Alabama law for assisting voters in placing their votes in the ballot counter and preserving the secrecy of ballots once they leave the presence of the voter.

2.   *Feasibility is irrelevant.*

Defendants' argument that it is not feasible for all counties in Alabama to implement curbside voting is irrelevant. Plaintiffs seek to lift Secretary Merrill's unilateral ban for counties that wish to provide curbside voting—not force every county to provide curbside voting whether they find it feasible or not.

Defendants' argument, however, is also just plain wrong: curbside voting is feasible. Indeed, approximately half of states permit curbside voting on a regular

---

[13] Exhibit L/L/W-1, PDF page 448–49, numbered pages 416–17 (Ala. Election Handbook, 19th Ed., § 307-X-1-.01(3)).
[14] Sept. 11, 2020 Rough Trial Tr. at 69.
[15] *Id.* at 50, 82, 93.

basis, with or without the COVID-19 pandemic.[16] Further, the CDC has recommended curbside voting to mitigate the health risks associated with voting in person during the pandemic.[17] Some probate judges and elected officials in Alabama would like to offer curbside voting,[18] and Jefferson and Montgomery Counties are willing to offer curbside voting in November.[19] In fact, curbside voting has previously been provided by county officials in at least Perry, Hale, Chilton, and Wilcox County.[20] Moreover, Secretary Merrill and Mr. Helms testified that curbside voting would be feasible and permissible provided certain steps were taken,[21] while evidence from poll workers indicate that it would be a straightforward process.[22] Over 60 counties recently purchased electronic poll books for use in the November election and many of those books have a curbside voting function.[23]

Feasibility is particularly moot, however, for any polling places that are not ADA compliant. States are required under the ADA to accommodate voters who cannot access polling places to prevent excluding people with certain disabilities

---

[16] Pls.' Ex. 16.
[17] Ex. P450, at 11–12.
[18] Sept. 15, 2020 Rough Trial Tr. at 124–25.
[19] Doc. 181; Doc. 182.
[20] 9/11 (Merrill) Tr. at 37; 9/15 (Helms) Tr. at 189; 9/9 (Threadgill-Matthews) Tr. at 9-10.
[21] Doc. 181 ¶ 15; Doc. 182 ¶ 13.
[22] 9/10 (Simelton) Tr. at 60–-61.
[23] 9/15 Tr. at 53, 117–18; Ex. P180.

27

from voting[24]— and many states meet that obligation by offering curbside voting.[25] Counties that have designated non-ADA-compliant polling places—or polling places that become non-ADA-compliant by the time of the election, for example, as a result of construction—***must*** accommodate their disabled voters. Secretary Merrill, who is similarly bound to comply with the ADA and the requirement to ensure polling place accessibility statewide under the VAEHA, 52 U.S.C. § 20102(b), offers no reason that counties should not be allowed to meet their federal obligations by offering curbside voting.

## IV.   *Purcell* **Does Not Foreclose Relief.**

Defendants will likely argue that because absentee voting is underway, any injunction in this case would come too close to the election. But this case does not present a problem under *Purcell v. Gonzalez*, 549 U.S. 1 (2006). *Purcell* does not preclude this Court from ordering relief for several reasons.

*First*, an injunction from this Court would not issue too close to Election Day. But the election is more than a month away, and local election officials would have more than enough time to implement a court order before then. Indeed, the Eleventh Circuit has denied stays of orders changing absentee voting rules even where the injunctions were issued just before or after Election Day. *See Lee*, 915 F.3d at 1315

---

[24] 42 U.S.C. § 12132; *see also* Plaintiffs' Proposed Conclusions of Law ¶¶ 66–68.
[25] United States General Accounting Office, "Voters with Disabilities: Access to Polling Places and Alternative Voting Methods" (Oct. 2001), at 8, https://www.gao.gov/new.items/d02107.pdf.

(denying a stay when an injunction related to absentee voting was issued Election Day); *Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262 (11th Cir. 2019) (mem.) (denying a stay related to absentee rules where the injunction was issued a few days before Election Day). The Supreme Court has likewise left in place injunctions in the pandemic. *See Common Cause*, 2020 WL 4680151, at *1 (declining to stay an injunction of a witness requirement); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1206 (2020) (leaving in place an order extending the absentee ballot receipt deadline). And numerous other courts have entered orders in recent weeks. *See, e.g.*, *Middleton*, 2020 WL 5591590; *Harding*, 2020 WL 5543769; *Ocasio*, 2020 WL 5530274; *Hargett*, 2020 WL 5412126.

*Second*, an order enjoining the Challenged Provisions will not cause confusion for local election officials or be difficult for them to implement. With respect to the Witness and Photo ID Requirements, the absence of a burden on local election officials is evident from the ease with which they implemented this Court's June 15 preliminary injunction order. During trial, Mobile Absentee Election Manager Alleen Barnett testified that she was easily able to implement the order by (1) sending voters who requested an absentee ballot application a short letter explaining this Court's modification of the Photo ID Requirement, 9/17 (Barnett) Tr. at 150–52, and simply reviewing absentee ballot applications for either a copy of a photo ID or the written statement required by the Court's order, *id.* at 146–48. And she

started implementing the order the day after it issued, notwithstanding that the absentee voting process being underway since March 2020. *Id.* at 152. There is no record-based reason why election officials could not implement a prospective injunction with similar ease. To the contrary, Probate Judge Don Davis testified that he would get the message out to voters as quickly as he could and did not indicate he would experience any difficulty in doing so. 9/15 (Davis) Tr. at 129.

The same is true regarding the Curbside Voting Ban. If this Court enters an order enjoining Secretary Merrill from banning curbside voting, the injunction will not *require* anything of any Defendants. Counties that do not wish to implement curbside voting would not be required to do so, and those that do want to do so, including Jefferson and Montgomery Counties, could do so without interference from the Secretary, such as has happened in Perry, Hale, and Chilton Counties.

*Third*, the only demonstrated voter confusion arising from the preliminary injunction concerned alleged questions from voters about whether the injunction applied statewide or only in certain counties. See 9/16 (Woodall) Tr. at 82-83. This confusion can be avoided, however, if the Court issues a statewide injunction on Plaintiffs' claims against the State or Secretary Merrill. See Doc. 226 at 12-13.

Further, there is evidence that the Challenged Provisions *as they exist now* are causing confusion. Ms. Barnett testified that confusion over the existing photo ID exemption led some exempt voters to still mail in copies of their photo IDs. 9/17 Tr.

at 117–18. Mr. Helms has repeatedly received questions over whether voters are eligible to select the photo ID exemption. *See* 9/15 (Helms) Tr. at 162; PX 231 (email from voter to Secretary's office). The State has already created confusion, and an injunction from this Court would offer clarity to voters ahead of the election.

## **CONCLUSION**

For the forgoing reasons and based on the facts adduced at trial, the Court should grant complete relief to Plaintiffs on their remaining claims.

DATED September 22, 2020.

Respectfully submitted,

/s/Deuel Ross
Deuel Ross*
Natasha C. Merle*
Liliana Zaragoza*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
P: (212) 965-2200
dross@naacpldf.org

Mahogane Reed*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
700 14th Street, NW, Suite 600
Washington, DC 20005
P: (202) 682-1300
mreed@naacpldf.org

Sarah Brannon*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street, NW
Washington, DC 20005-2313
P: (202) 675-2337
sbrannon@aclu.org

Randall C. Marshall [ASB-3023-A56M]
ACLU FOUNDATION
OF ALABAMA, INC.
P.O. Box 6179
Montgomery, AL  36106-0179
P: (334) 420-1741
rmarshall@aclualabama.org

/s/ Caren E. Short
Caren E. Short (ASB-0646-P48N)
Nancy G. Abudu*
SOUTHERN POVERTY LAW
CENTER
PO Box 1287
Decatur, GA 30031
P: (404) 521-6700
caren.short@splcenter.org

T. Alora Thomas-Lundborg*
Davin M. Rosborough*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.
New York, NY 10004
P: (212) 549-2693
athomas@aclu.org

William Van Der Pol [ASB-211214F]
Jenny Ryan [ASB–5455-Y84J]
Maia Fleischman
ALABAMA DISABILITIES
  ADVOCACY PROGRAM
Box 870395
Tuscaloosa, AL 35487
P: (205)348-4928
wvanderpoljr@adap.ua.edu

Katrina Robson*
O'MELVENY & MYERS LLP
1625 Eye Street NW, Suite 1000
Washington, DC 20006
P: (202) 383-5300
krobson@omm.com

*Admitted *pro hac vice*
**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2020 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to counsel of record.


 */s/ Deuel Ross*

Deuel Ross

*Attorney for Plaintiffs*