FILED

2020 Sep-30  PM 12:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **PEOPLE FIRST OF ALABAMA, et al.,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civil Action Number** |
| **v.** | ) | **2:20-cv-00619-AKK** |
| | ) | |
| **JOHN MERRILL, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Voting is an inviolable right, occupying a sacred place in the lives of those who fought to secure the right and in our democracy, because it is "preservative of all rights."[1]  The parties do not dispute those fundamental truths.  The parties' dispute centers instead on whether three provisions of Alabama's election laws—the requirement that a notary or two witnesses sign absentee ballot affidavits, the requirement that absentee voters submit a copy of their photo ID with an absentee ballot application, and the de facto ban on curbside voting[2]—violate the right to vote in light of the COVID-19 pandemic.

The plaintiffs assert that the defendants' enforcement of the Challenged Provisions during the pandemic compels voters to risk exposure to COVID-19 in

---

[1] *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

[2] The court refers to these three provisions as the "Challenged Provisions."

order to exercise their right to vote, leading to potentially deadly consequences for vulnerable voters whose age, race, disabilities, or health conditions place them at heightened risk from the virus.  The plaintiffs contend that forcing voters to bear that risk runs afoul of their fundamental right to vote and violates federal law, and they seek an order barring the defendants from enforcing the Challenged Provisions for the general election in November.  Without this relief, the plaintiffs believe voters will face an impossible choice between jeopardizing their health by engaging in person-to-person contact they would not otherwise have or sacrificing their right to vote during the COVID-19 pandemic.

These issues are important to all people, but the plaintiffs find them particularly significant.  Their testimony speaks for itself.  Plaintiff Eric Peebles, an Alabama voter who uses a wheelchair and suffers from spastic cerebral palsy, described what voting means for people with disabilities:  "Voting is important to me because as a person with a disability and for people with disabilities, voting is the one way that we can participate . . . . Voting is blind.  Everybody's ballot looks the same when you're counting them."[3]  Susan Ellis, the executive director of plaintiff People First, echoed that sentiment:  "[Voting is] a way to have a visible participation in policy making, and decision making, and law making.  . . .  [O]ur

---

[3] 9/8/20 at 132.  This citation reflects the date of the testimony and the page of that day's transcript. Due to the time-sensitive nature of this case, the court cites to the Court Reporter's uncertified rough transcript of the trial.

members are proud to . . . be examples to our community that people with intellectual and developmental disabilities are valued citizens and want to express and be seen expressing the right to vote."[4] Many Black Alabamians, another group with a historically fraught relationship with the franchise, feel the same.  As plaintiff Howard Porter, Jr., a Black man in his seventies, earnestly expressed:  "[S]o many of my [ancestors] even died to vote.  And while I don't mind dying to vote, I think we're past that – we're past that time."[5]  Mr. Porter believes that voting should be as easy and secure as possible because Election Day "is the only day that rich, the poor, sick, the healthy, all should be counted as one and just as easy."[6]  Similarly, plaintiff Annie Carolyn Thompson, a sixty-eight-year-old Black woman, explained that the importance of voting "has been instilled in [her] from a young person because of . . . how hard it was for us to get the right to vote, the things that some of my ancestors had to go through in order to get the right to vote . . . ."[7]  Thus, she concluded, "[T]he right to vote is very important to me, and I do not take it lightly."[8]

Neither do the defendants.  Alabama Secretary of State John Merrill, for example, testified that he wants every eligible voter who wishes to vote in November

---

[4] 9/11/20 at 115-16.

[5] 9/14/20 at 80.

[6] *Id.*

[7] 9/8/20 at 180.

[8] *Id.*

to do so "[w]ithout any obstacle being placed in their way."[9]   However, he and the other defendants maintain that the Challenged Provisions are necessary to preserve the legitimacy of the general election by preventing voter fraud and safeguarding voter confidence.  The defendants also contend that the Challenged Provisions do not impose any undue burdens on the plaintiffs, especially when balanced against the State's interests, and that enjoining the Challenged Provisions so close to the election will result in voter confusion and unduly burden the defendants.

Based on the evidence presented during the trial the court held from September 8 to 18, the plaintiffs have proved that their fears are justified.  As applied during the COVID-19 pandemic, the Challenged Provisions unduly burden the fundamental Constitutional rights of Alabama's most vulnerable voters and violate federal laws designed to protect America's most marginalized citizens.  That is for three reasons.  First, because the Challenged Provisions only marginally advance the State's interests in maintaining them while significantly burdening the right to vote, all three provisions violate the First and Fourteenth Amendments during the pandemic.  Second, because the photo ID requirement and the de facto curbside voting ban make voting inaccessible for voters with disabilities, both those provisions violate the Americans with Disabilities Act during the pandemic.  Finally, because the witness requirement interacts with Alabama's history of discriminating

---

[9] 9/11/20 at 64.

against Black citizens to deny Black voters' their right to vote, that provision violates the Voting Rights Act during the pandemic.

Thus, the plaintiffs have met their burden and are entitled to declaratory and injunctive relief.  Consistent with the findings and conclusions detailed below, for the November 3, 2020 general election, the court will enjoin:  (1) the witness requirement for absentee ballots for voters who provide a statement that they have an underlying medical condition that puts them at a heightened risk from COVID-19 and, thus, they cannot safely obtain the signatures of two witnesses or a notary public; (2) the photo ID requirement for absentee voters over 65 or those under 65 who cannot safely obtain a copy of their photo ID during the COVID-19 pandemic due to an underlying medical condition, and, as required by the application, who provide other identifiers such as their driver's license number and last four digits of their social security number; and (3) the de facto ban on curbside voting.  To be clear, lifting the ban on curbside voting permits counties willing to implement the practice, if any, to do so, but this order does not mandate that counties must provide curbside voting in Alabama.  Moreover, the court emphasizes that its decision does not undermine the validity of the Challenged Provisions outside of the COVID-19 pandemic or beyond the November 3 election.  Rather, the court grants only narrowly tailored relief to address the additional burdens facing a limited class of voters who are particularly susceptible to complications from contracting COVID-19.

# I. FINDINGS OF FACT

## A.    The COVID-19 Pandemic

1.    Our nation is now in the midst of a public health emergency due to the spread of COVID-19, the respiratory disease caused by the novel coronavirus SARS-CoV-2.  Since April, the United States has led the world in the total number of COVID-19 cases.  Agreed Facts at ¶ 24.[10]  As of September 29, 2020, the United States has confirmed 7,129,383 cases of COVID-19 and reported 204,598 deaths and counting due to COVID-19.[11]  *See id.* at ¶ 25 (citing CDC data).  The COVID-19 pandemic has deeply affected Alabama, and as of September 29, Alabama reported 137,564 confirmed COVID-19 cases and 2,399 confirmed COVID-19 deaths,[12] including family members and a friend of some of the individual plaintiffs.  *See* Agreed Facts at ¶ 59 (citing ADPH data); 9/14/20 at 9-11, 69-71.

2.    The most common symptoms of COVID-19 are fever, cough, and shortness of breath, and other symptoms include chest pain, muscle pain, vomiting,

---

[10] In accordance with the court's scheduling order, doc. 93 at 7-9, the parties submitted proposed findings of fact and conclusions of law to the court by email on September 4, 2020, *see* doc. 178. The submission includes agreed facts that the parties do not dispute in 176 separately numbered paragraphs, numbered sequentially from 1-15 in section one, and from 1-161 in the remaining sections.  The court cites to the page and paragraph number for the agreed facts identified in the first section of proposed facts and to only the paragraph number for the agreed facts identified in the remaining sections.

[11] CDC, Cases in the U.S., https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Sept. 30, 2020).

[12] Ala. Dep't of Pub. Health, Alabama's COVID-19 Data and Surveillance Dashboard, https://alpublichealth.maps.arcgis.com/apps/opsdashboard/index.html#/6d2771faa9da4a2786a50 9d82c8cf0f7 (last visited Sept. 30, 2020).

anorexia, confusion, and lack of senses of taste and smell.  *See* Pl. Ex. 269 at ¶ 8.

Even mild cases of COVID-19 can be more severe than the flu and involve about

two weeks of fevers and dry coughs.  Agreed Facts at ¶ 27.  Severe cases of COVID-

19 cause acute respiratory distress syndrome ("ARDS") in which fluid displaces air

in the lungs, leaving patients to "essentially drown[] in their own blood and fluids

because their lungs are so full."[13]  *See id.*; Pl. Ex. 269 at ¶ 8.  Due to the respiratory

impacts of the disease, individuals with severe cases may need supplemental oxygen

or to be intubated and put on a ventilator, or suffer a permanent loss of respiratory

capacity.  Pl. Ex. 269 at ¶ 8; Agreed Facts at ¶ 29.  Along with damaging lung tissue,

severe cases of COVID-19 can damage the kidneys, or lead to strokes and heart

attacks.  9/8/20 at 13; Agreed Facts at ¶ 29.

3.      In Alabama, as of September 3, approximately 11.5 percent of those

infected by COVID-19 have been hospitalized.  Pl. Ex. 294 at 1.  Thus, surges of

COVID-19 cases can strain healthcare systems, leading to critical shortages of

doctors, nurses, hospital beds, medical equipment, and personal protective

equipment.  *See* Agreed Facts at ¶ 29.  For that reason and others, health officials

recommend that all individuals take steps to prevent the spread of the disease, not

just for their own health but for the health of the community.  *Id.* at ¶ 35.  As the

---

[13] Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19 — Even in His Young Patients*, ProPublica (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.

CDC put it, "[e]veryone has a role to play in slowing the spread and protecting themselves, their family, and their community."[14]  *Id.*

4.    COVID-19 is highly infectious and spreads through respiratory droplets from infected individuals.  *See* Pl. Ex. 269 at ¶¶ 10, 20; Pl. Ex. 271 at ¶ 13.  Strong evidence now suggests that SARS-CoV-2 is aerosolized, such that tiny droplets containing the virus remain in the air for a period of time, and the virus can be transmitted to others who inhale that air.  Pl. Ex. 269 at ¶¶ 10, 20; 9/8/20 at 15. Further evidence indicates that aerosolized droplets with SARS-CoV-2 can linger in closed, stagnant air environments for up to fourteen minutes.  Pl. Ex. 269 at ¶ 10. Consequently, transmission of the virus is more likely to occur indoors when people share space in a room for an extended period of time.  9/8/20 at 17-18; *see also* Pl. Ex. 269 at ¶ 20.  COVID-19 may also spread through contaminated surfaces, i.e., "when an infected individual touches a surface with a hand they have coughed into and then another person touches that same surface before it has been disinfected and then touches their face."  Pl. Ex. 269 at ¶ 10.  Finally, COVID-19 is particularly dangerous because it can be spread by individuals who are a- or pre-symptomatic, and who may not know they have the disease and can spread it to others.  Pl. Ex. 269 at ¶ 13; Pl. Ex. 271 at ¶ 13.

---

[14]    CDC, *Social Distancing*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last visited Sept. 17, 2020).

5.      No vaccine for COVID-19 currently exists, and it is unlikely a vaccine will become widely available until well into 2021.  *See* Pl. Ex. 269 at ¶¶ 12, 15; 9/8/20 at 26, 29.  Accordingly, to slow the spread of COVID-19, public health officials have been left to urge the public to practice "social distancing," i.e., avoidance of close contact with others.  Pl. Ex. 269 at ¶ 12; Pl. Ex. 352 at 3-8; *see also* 9/8/20 at 31.  For purposes of social distancing, the CDC recommends that individuals stay at least six feet away from others who do not live in their households and avoid crowded places.  Agreed Facts at ¶ 33.  Following that recommendation, Governor Kay Ivey recognizes that "[m]aintaining a 6-foot distance between one another is paramount,"[15] and the Alabama Department of Public Health ("ADPH") has instructed the public to "spend as much time as possible at home to prevent an increase in new infections."[16]  *Id.* at ¶ 34; State Ex. 15.  The CDC and ADPH also recommend that all individuals wear masks or face coverings, which decrease the spread of COVID-19 by helping to prevent an infected individual from spreading droplets containing the virus that can infect others.[17]  9/9/20 at 53; Pl. Ex. 269 at ¶ 12; State Ex. 85.

---

[15] Press Release, *Governor Ivey Announces New Primary Runoff Election Date*, March 18, 2020, https://governor.alabama.gov/newsroom/2020/03/governor-ivey-announces-new-primary-runoff-election-date/ (last visited Sept. 23, 2020).

[16] ADPH, *It's safer at home; protect yourself and your community from COVID-19* (Mar. 27, 2020), https://alabamapublichealth.gov/news/2020/03/27.html (last visited Sept. 21, 2020).

[17] CDC, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Sept. 21, 2020).

6.     Though people of all ages have contracted COVID-19 and suffered severe manifestations of the disease, the illness poses special risks for older people, and the risk of COVID-19 increases steadily with age.  9/8/20 at 64; 9/9/20 at 44; Pl. Ex. 269 at ¶ 8; Agreed Facts at ¶ 30.  As of September 1, 77.3 percent of COVID-19 related deaths in Alabama have been people 65 or older,[18] and 80 percent of deaths in the United States have been people over 65.[19]  Agreed Facts at ¶ 30; Pl. Ex. 270 at 8.  Thus, the CDC warns that older people should avoid interacting with people outside of their households and people who have been exposed to the virus.[20] Pl. Ex. 270 at 8.

7.     COVID-19 also presents special risks for people with disabilities.  "The CDC [] warns that people with disabilities may be at increased risk of becoming infected with COVID-19 to the extent that they "(1) 'have limited mobility or cannot avoid coming into close contact with others who may be infected;' (2) 'have trouble understanding information or practicing preventative measures;' or (3) are 'not able to communicate symptoms of illness.'"  Pl. Ex. 270 at 10.  As Susan Ellis, the Executive Director of People First of Alabama, explained, people with intellectual disabilities are not able to identify risky behavior in the same way as other people

---

[18]  *See* ADPH, Characteristics of Laboratory Confirmed Cases of COVID-19 https://www.alabamapublichealth.gov/covid19/assets/cov-al-cases-090120.pdf.

[19]  CDC, Older Adults, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Sept. 21, 2020).

[20] *Id.*

can.  9/11/20 at 130.  For example, they may pick up and throw away a tissue on the floor without wearing gloves in an effort to be helpful to others without thinking of the germs on the tissue.  *Id.*  In addition, adults with disabilities are three times more likely than adults without disabilities to have underlying chronic medical conditions that put them at higher risk from COVID-19.[21]  Pl. Ex. 270 at 10.

8.    People with certain preexisting medical conditions, including immunological conditions, hypertension, certain heart conditions, lung diseases (asthma and chronic obstructive pulmonary disease), diabetes mellitus, obesity, chronic kidney disease, and sickle cell anemia also have an elevated risk of severe complications or death from COVID-19.  9/9/20 at 44; Pl. Ex. 269 at ¶ 8; Pl. Ex. 270 at 8; Pl. Ex. 352 at 1-2, 12.   In fact, statistics from the ADPH reveal that approximately 96.2 percent of Alabamians who have died from COVID-19 had underlying health conditions.[22]  Agreed Facts at ¶¶ 30, 62.  Due to their heightened risk from COVID-19, the CDC advises people with underlying conditions to limit interactions with people outside of their households as much as possible and to avoid others who are not wearing masks.[23]  *See* Agreed Facts at ¶ 62; Pl. Ex. 270 at 8.

---

[21]  *See* CDC, People with Disabilities, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities.html (last visited Sept. 22, 2020).

[22]  *See* ADPH, Characteristics of Laboratory Confirmed Cases of COVID-19 https://www.alabamapublichealth.gov/covid19/assets/cov-al-cases-090120.pdf.

[23]  CDC, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Sept. 21, 2020).

9.     Alabamians suffer from high rates of the underlying health conditions that increase their risk for COVID-19 complications:  more than 14 percent have diabetes, 41.9 percent have high blood pressure, 10.4 percent have asthma, approximately 33 percent are obese, and about 1 in 11 have kidney disease.  Agreed Facts at ¶ 43; Pl. Ex. 270 at 25; 9/14/20 at 198.  As Alabama State Health Officer Dr. Scott Harris stated, "[c]hronic disease factors are a real risk for dying from this disease, and chronic diseases are found in about a third of our citizens."[24]  *Id.*  The prevalence of underlying diseases is even more profound for older Alabamians, who are already at a higher risk from COVID-19.  For example, the COVID-impact survey revealed that in the Birmingham metro region, 76.1 percent of White people and 80.3 percent of Black people over the age of 60 had at least one underlying condition that put them at an increased risk from COVID-19.  Pl. Ex. 270 at 30; 9/14/20 at 201.

10.     Racial minorities, particularly Black people, are more likely to suffer from underlying conditions that increase the risks from COVID-19, such as diabetes, heart disease, and lung disease.  *See* Pl. Exs. 268 at ¶ 6; 269 at ¶ 9; 271 at ¶ 12; 9/8/20 at 66-67; 9/9/20 at 42-43.  That trend is reflected in Mobile, Alabama, where areas of the city with the highest percentage of Black residents have markedly higher

---

[24] Leada Gore, *Alabama's Coronavirus Peak: 'Clearly the State Can't Stay Shut Down', ADPH's Dr. Scott Harris Says*, https://www.al.com/news/2020/04/alabamas-coronavirus-peak-clearly-the-state-cant-stay-shut-down-adphs-dr-scott-harris-says.html (last visited Sept. 16, 2020).

prevalence of asthma, high blood pressure, kidney disease, COPD, and diabetes, than predominately White areas of the city. *Compare* doc. 228-5 at 8, 10, 12-14, *with* doc. 228-6. Moreover, about 42.2 percent of Black people over the age of 65 have a disability, compared to 38.1 percent of their White cohorts. Doc. 228 at ¶ 36.

11.   People who are Black, Latinx, or Native American suffer higher rates of COVID-19 infections than non-Hispanic White individuals, and they are more likely to suffer severe outcomes and be hospitalized or die if they are infected with COVID-19. 9/8/20 at 20-21, 66-67; 9/9/20 at 47-49; Pl. Exs. 268 at ¶ 11; 269 at ¶ 9; 271 at ¶¶ 13-14. Indeed, a CDC report published April 8, 2020, which included data from patients hospitalized across 14 states, found that Black COVID-19 patients made up 33 percent of those for whom race or ethnicity information was available, despite representing only 18 percent of the states' populations.[25] Agreed Facts at ¶ 64. This disparity has continued. As of September 21, the CDC reports that Black people represent 18.5 percent of COVID-19 cases and 21 percent of COVID-19 deaths in individuals for whom race or ethnicity is known, despite representing only 12.5 percent of the U.S. population.[26] *See* Agreed Facts at ¶¶ 25, 68 (citing CDC

---

[25] Shikha Garg, MD, et. al., Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019—COVID-NET, 14 States, March 1-30, 2020, CDC Morbidity and Mortality Weekly Report (Apr. 17, 2020), at 459, https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6915e3-H.pdf.

[26] Demographic Trends of COVID-19 cases and deaths in the US reported to the CDC, https://covid.cdc.gov/covid-data-tracker/?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcases-updates%2Fcases-in-us.html#demographics (last visited Sept. 22, 2020); The U.S.

and U.S. Census Bureau Data).   And, Latinx people represent 29.5 percent of COVID-19 cases, though they represent only 18.4 percent of the population.[27]  *Id.*

12.    Like the rest of the country, Alabama has reported alarming racial disparities in serious illness and mortality due to COVID-19.  Agreed Facts at ¶ 68; Pl. Ex. 268 at ¶ 13; 9/14/20 at 197.  As of August 13, the ADPH reported that Black people in Alabama account for 41.1 percent of COVID-19 related deaths, despite making up just 27 percent of the population.  Agreed Facts at ¶ 68; *see also* Pl. Ex. 271 at ¶ 16; 9/9/20 at 49.  And, in Mobile County, as of August 13, Black people accounted for 51.1 percent of COVID-19 deaths, despite representing only 36 percent of the population.  Agreed Facts at ¶ 68.  In addition, counties in the Black Belt[28] in Alabama that are predominately African American, including Lowndes and Wilcox, have higher COVID-19 related death rates compared to predominantly White counties, and Lowndes County has the State's highest case fatality rate.  Pl. Ex. 271 ¶ 14; 9/9/20 at 50-51, 82, 99.  Dr. Latesha Elopre, the plaintiffs' expert on internal medicine, infectious diseases, and disparities in access to health care and health outcomes in Alabama, explained, "there is strong data that supports . . .

---

Census Bureau, https://data.census.gov/cedsci/profile?q=United%20States&g=0100000US (last visited Sept. 22, 2020).

[27] *Id.*

[28] The Black Belt is named for the region's fertile black soil.  *See, e.g.*, Pl. Ex. 271 at ¶ 8.

looking [across] age groups, that Black people, regardless of health conditions, have higher rates of death compared to Whites." 9/9/20 at 91-92.

13.    The higher risk of COVID-19 infection for African Americans is tied to pre-existing and evolving inequities in structural systems and social conditions. *See* Pl. Exs. 268 at ¶¶ 6-10; 271 at ¶ 14; 9/9/20 at 38; 9/10/20 at 12; Agreed Facts at ¶ 66.  To begin, people who are Black, Latinx, or Native American are more likely to hold jobs that do not provide paid leave, cannot be performed remotely, and require more exposure to the public and, therefore, to COVID-19.  Pl. Exs. 268 at ¶ 14; 269 at ¶ 9; 271 at ¶ 14; 9/8/20 at 20, 66-67; 9/10/20 at 17.  Also, due to patterns resulting from a history of housing discrimination, Black and Latinx individuals are more likely to live in areas impacted by environmental pollutants, or in densely populated areas, making it harder for those individuals to practice social distancing. *See* Agreed Facts at ¶ 66; Pl. Exs. 268 at ¶¶ 8-9, 14; 271 at ¶ 14; 9/8/20 at 21; 9/10/20 at 13-14, 16.  In addition, evidence reveals that testing resources for COVID-19 are scarcer in Black communities and that Black people are less likely to be referred for testing than White people when presenting comparable signs of infection.  Pl. Ex. 268 at ¶ 15.  Indeed, for these and other reasons, the CDC identified discrimination in housing, education, finance, and health care as a factor that puts racial and ethnic

minorities at increased risk of getting sick and dying from COVID-19.[29]  *See* Agreed Facts at ¶ 66; 9/10/20 at 9; Pl. Ex. 270 at 9.

14.     The discrimination and systemic racism that contribute to elevated COVID-19 risk for Black people and other minorities nationally are evident in Alabama.  Agreed Facts at ¶ 66.  For example, in Alabama's Black Belt counties, residents face multiple stressors that lead to a relatively poor quality of life:  high levels of poverty and unemployment, inadequate education, high rates of illiteracy, lack of jobs, many single-parent households, and food insecurity.  9/9/20 at 41; Pl. Ex. 271 at ¶¶ 8-9.  On top of that, Black Belt counties have fewer primary care physicians per resident than other counties, and, despite the high rates of infection, people living in these counties receive fewer COVID-19 tests than elsewhere in Alabama.  Agreed Facts at ¶¶ 67, 69; Pl. Ex. 271 at ¶ 16.  Disparities in access to transportation exacerbate those obstacles and make COVID-19 testing and health care even less accessible for Black people in those counties, which in turn makes it even more difficult for communities in the Black Belt to manage and slow the spread of the disease.  *See* Pl. Ex. 271 at ¶¶ 10, 14; Agreed Facts at ¶ 70.

---

[29]  CDC, *Health Equity Considerations & Racial & Ethnic Minority Groups*, https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html   (last visited Sept. 22, 2020).

B.     **Alabama's Response to the Pandemic**

15.     Governor Ivey and the ADPH have taken steps to combat the spread of COVID-19 in Alabama, including by issuing a series of orders since March 13, when Governor Ivey declared a State of Emergency.  *See* Pl. Exs. 299-303; State. Ex. 7. First, on March 19, Dr. Harris issued a statewide health order implementing several mandatory measures, including:  prohibiting "[a]ll gatherings of 25 persons or more, or gatherings of any size that cannot maintain a consistent six-foot distance between persons[;]" closing all public and private schools, colleges, and universities and Senior Citizen Center gatherings; requiring hospitals and nursing homes to prohibit visitation except for certain compassionate care situations; and prohibiting restaurants, bars, and breweries, from permitting "on-premise consumption of food or drink."  Pl. Ex. 301.

16.     On March 26, Governor Ivey issued a proclamation ordering "all public K-12 schools" to "implement a plan to complete the 2019-2020 school year using alternative methods of instruction," and, because "person-to-person contact increases the risk of transmitting COVID-19," authorizing notaries who work under the supervision of an attorney to notarize signatures through videoconferencing to "reduce the necessity of in-person meetings."  State Ex. 21 at 1-2.  Governor Ivey issued another proclamation on April 2 expanding the remote notary authorization to all notaries in the State.  State Ex. 25 at 4.  Governor Ivey's April 2 proclamation also authorized governmental entities to postpone or cancel public meetings and

17

enabled corporations to hold remote shareholder meetings to further reduce the need for in-person meetings in light of COVID-19.  *See id.* at 4-5.

17.     Then, on April 3, Governor Ivey and Dr. Harris issued a mandatory statewide order requiring "every person . . . to stay at his or her place of residence except as necessary to perform" an enumerated list of "essential activities."  Pl. Ex. 300 at 2.  The order also mandated the closure of entertainment venues, athletic facilities, and close-contact service providers, such as barber shops. *Id.* at 8-9.  And, the order required "essential retailers" to implement a reduced "emergency maximum occupancy rate," enforce social distancing, and take reasonable steps to comply with CDC and ADPH sanitation guidelines to remain open.  *Id.* at 9. In addition, the "Stay at Home" order required any non-institutionalized person who has tested positive for COVID-19 to "be quarantined to their place of residence for a period of 14 days after receiving positive test results," and prohibited persons in quarantine from "leav[ing] their place of residence for any reason other than to seek necessary medical treatment."  *Id.* at 9-10.

18.     On April 28, Governor Ivey announced a "Safer at Home" order, effective from April 30 through May 15, which lifted some of the restrictions in the "Stay at Home" order.  Pl. Ex. 303.  Since then, she has extended the order several times, *see* Pl. Exs. 299; 302, and on August 27, Governor Ivey extended the "Safer

at Home" order through October 2, 2020, Agreed Facts at ¶ 58.[30]  Under this most

recent order, all individuals—especially vulnerable persons—are encouraged to stay

home and follow good sanitation practices, and all non-work related gatherings of

any size that cannot maintain a consistent six-foot distance between persons from

different households are prohibited.  *Id.* at ¶¶ 57-58  The order requires that "any

person who has tested positive for COVID-19—other than institutionalized

persons—shall be quarantined to their place of residence for a period of 14 days"

and mandates that "[a]ny person quarantined . . . shall not leave their place of

residence for any reason other than to seek necessary medical treatment." *Id.* at ¶ 57.

Finally, effective July 16, the "Safer at Home" order requires people over the age of

six to wear facial coverings or masks in public to prevent the spread of COVID-19.

*Id.*  The mask requirement does not apply to certain people or in certain situations,

including to "[a]ny person who is voting, though wearing a face covering is strongly

encouraged . . . ." *Id.*  Alabama has seen a downward trend in the number of COVID-

19 cases and hospitalizations since Governor Ivey implemented the mask order in

mid-July.  9/9/20 at 46, 52, 58, 76-77.

19.    Evidence indicates that many people in Alabama, including the

individual plaintiffs, have been adhering to the Safer at Home order and following

---

[30] *See* Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of
Infections by COVID-19 (Aug. 27, 2020), https://governor.alabama.gov/assets/2020/08/Safer-at-
Home-Order-Final-8.27.20.pdf.

CDC guidelines.  *See* 9/8/20 at 116-22, 133-34, 169-70; 9/9/20 at 11-12; 9/14/20 at 10-11, 35-36, 71-72, 75, 193; Pl. Ex. 270 at 30-33.  Almost two-thirds of Alabamians report following CDC guidance closely, and just over half report following CDC guidance very closely.  9/14/20 at 212.  And, the COVID-Impact Survey, which asked questions about precautions respondents are taking to avoid exposure to COVID-19, indicates that the vast majority of adults under the age of 60 in the Birmingham area who have at least one underlying medical condition are avoiding crowded or public places, maintaining six-feet of distance with others, and wearing masks outside of their homes.  9/14/20 at 201-02; Pl. Ex. 270 at 30-31.  Specifically, for those adults that are high risk due to a medical condition, 74.4 percent report avoiding crowded or public places, 86 percent stay six feet from others, and 88.8 percent report wearing masks outside their home.  Pl. Ex. 270 at 30.  A statewide Auburn University at Montgomery poll showed that people who are not high risk are following COVID-19 safety precautions as well.  "78.1 percent of Alabama registered voters said that they were 'very' or 'somewhat likely . . . to voluntarily wear a mask or face covering in public if the COVID-19 pandemic continues through the end of the year.'"  *Id.* at 31 n.82.  For Black voters under 60 who are at high risk due to a medical condition, 74.8 percent report avoiding public or crowded places that are not job-related, and even higher percentages of Black voters in that category maintain six feet of distance and wear a mask when they go in public.  *Id.* at 30-31.

C.      **Voting and Alabama's Elections in the Pandemic**

20.     Despite all efforts to control the pandemic, the number of COVID-19 cases continues to increase in the United States and Alabama, and there have been up-ticks in case numbers since schools and colleges reopened this fall.  9/9/20 at 46, 53.  Dr. Robert R. Redfield, Director of the CDC, indicated that he believes "the fall and winter of 2020 and 2021 are going to be probably one of the most difficult times that we've experienced in American public health."[31]  Agreed Facts at ¶ 32.  The plaintiffs' expert on epidemiology, Dr. Arthur Reingold, M.D., echoed that sentiment, testifying that we will continue to have COVID-19 in Alabama and throughout the United States for the foreseeable future, though he cannot predict if the number of new cases will increase, decrease, or stay the same through the end of the year.  9/8/20 at 37, 54; *see also* Pl. Ex. 269 at ¶¶ 17-18.  Thus, the COVID-19 pandemic will likely have a profound impact on voting in the November 3, 2020 general election.  *See* Pl. Ex. Ex. 271 at ¶ 18; 9/9/20 at 38.

21.     With respect to voting in the pandemic, Dr. Anthony Fauci, head of the National Institute of Allergy and Infectious Diseases and a member of the White House's coronavirus taskforce, stated:

---

[31] Aria Bendix, CDC director predicts this fall and winter will be 'one of the most difficult times we've experienced in American public health', Business Insider (July 14, 2020), https://www.businessinsider.com/cdc-director-robert-redfield-deadly-coronavirus-surge-fall-winter-2020-7.

> I don't see any reason why, if people maintain [six-foot] distancing, wearing a mask and washing hands—why you cannot, at least where I vote, go to a place and vote. [32]

> And you can do that, if you go and wear a mask, if you observe the physical distancing, and don't have a crowded situation, there's no reason why you shouldn't be able to do that.  I mean, obviously if you're a person who is compromised physically or otherwise, you don't want to take the chance.  There's the situation of mail-in voting that has been done for years in many places.  So there's no reason why we shouldn't be able to vote in person or otherwise. [33]

Agreed Facts at ¶ 31.  Still, according to Dr. Reingold, traditional in-person voting exposes voters to a risk of contracting COVID-19 due to the proximity of a large number of individuals in a limited space and the large number of common surfaces that many people may touch.  9/8/20 at 46-47; Pl Ex. 269 at ¶ 19.  And, the risk of infections increases for people who have to use public transportation or ride in a car with people outside of their household to get to the polls.  9/8/20 at 46-47; Pl Ex. 269 at ¶ 19.  Moreover, Dr. Reingold indicated that, in Alabama, the risk of in-person voting is compounded because the State's mask order does not apply to "[a]ny person who is voting,"[34] which means that not everyone voting will wear a mask in

---

[32] Jacqueline Alemany, Power Up: Anthony Fauci Cautiously Supports Sending Kids Back to School, Aug., 7, 2020, https://www.washingtonpost.com/politics/2020/08/07/power-up-anthony-fauci-cautiously-supports-sending-kids-back-school/.

[33] Nsikan Akpan, What Fauci Says the U.S. Really Needs to Repoen Safely, Aug. 13, 2020, https://www.nationalgeographic.com/science/2020/08/what-anthony-fauci-says-united-states-really-needs-to-reopen-safely-cvd/.

[34] While the State's order does not require voters to wear masks, it states that "wearing a face covering is strongly encouraged" for voters.  Pl. Ex. 299 at 3.

polling places, leading to greater risk of COVID-19 transmission.  *See* 9/8/20 at 49;

Pl. Ex. 299 at 3; *see also* 9/11/20 at 26-27, 30.  Similarly, in part because of the

chance that people at polling sites will not be wearing masks, Dr. Elopre

recommends that people at-risk from COVID-19 vote absentee rather than in-person.

9/9/20 at 56-57.

     22.     Evidence exists of transmission of COVID-19 from in-person voting.

Indeed, after the April 7 primary election in Wisconsin, that state's contact tracing

efforts identified 71 individuals who had COVID-19 cases linked to working at the

polls or voting in person at the polls.  9/10/20 at 163; Pl. Ex. 267 at 2.  The plaintiffs'

expert, Dr. Chad Cotti, a health economist at the University of Wisconsin-Oshkosh,

concluded that counties that had higher numbers of in-person votes per polling

location in the Wisconsin primary had a higher rate of COVID-19 spread at a

community level after the election than counties with relatively fewer in-person

votes.  9/10/20 at 156, 174; Pl. Ex. 267 at 3.  In particular, he found that a 10 percent

increase in in-person voter density, i.e., in-person votes per polling location,

corresponds to about a 17 – 18 percent increase in the positive test rate.  9/10/20 at

158; Pl. Ex. 267 at 3, 15.  Ultimately, Dr. Cotti concluded from his analysis that

approximately 700 cases of COVID-19 in the five-week period after the April 7

Wisconsin primary were associated with in-person voting.  9/10/20 at 149, 158; Pl.

Ex. 267 at 3.  Based on his conclusion, Dr. Cotti opined that to reduce COVID-19

risk, "it would be prudent for election officials and state leaders to engage in as many

practices to 'de-densify'[] polling locations as possible," including by offering more hours at the polls, early voting, and curbside voting, and by encouraging absentee voting.  9/10/20 at 151, 174.

23.     In contrast to Dr. Cotti, the State defendants' expert, Dr. Quentin Kidd, a political scientist at Christopher Newport University, found that there was no increase in COVID-19 infection rates in the 14-day period following elections in Wisconsin, Virginia, West Virginia, Georgia, and Kentucky, based on his review of data from Johns Hopkins University.  9/16/20 at 150, 154-59, 214.  Dr. Kidd's review, however, analyzed only the 7-day moving average for COVID-19 cases reported in databases for the 14 days after the elections.  *See id.*; State Ex. 133 at 8-13.  Noticeably, he admitted he did not account for the acknowledged lag times between exposure, the onset of symptoms, testing, and results.  9/16/20 at 150-51, 165-66, 177-78, 177-182.  And, on cross examination, Dr. Kidd admitted that during the time-period between 15 and 30 days after the elections, which accounted for the lag time, a noticeable increase in COVID-19 cases could be seen in all of those jurisdictions, except Virginia.  *Id.* at 185-95.  Virginia, however, allows curbside voting for individuals over 65 and for individuals with a disability, and only 57,500 people voted in person.  *Id.* at 195.  Thus, Dr. Kidd's analysis, even if the court were to accept it,[35] does not refute Dr. Cotti's testimony that there is a link between higher

---

[35] The court sustained the plaintiffs' objections to Dr. Kidd's opinions as to the first fourteen pages of Dr. Kidd's expert report, *see* State Ex. 133, pursuant to Rule 702 of the Federal Rules of Evidence.  *See* 9/16/20 at 211-12, 221-22.  As the court explained, Dr. Kidd's field of expertise

numbers of in-person votes per polling location and increased COVID-19 spread in communities.

24.     The CDC has issued specific guidelines to address concerns about voting during the COVID-19 pandemic.  Pl. Ex. 451.  Among other things, the CDC recommends that states "offer alternative voting methods that minimize direct contact and reduce crowd size at polling locations," including early voting, and it asked states to consider "drive-up voting for eligible voters if allowed in the jurisdiction" as a means of complying with social distancing rules and limiting personal contact during in-person voting.  *Id.*  The plaintiffs' experts, Dr. Reingold and Dr. Elopre, agree with the CDC's recommendations, including the recommendation for curbside or drive-up voting, though Dr. Reingold admits that curbside voting is not necessarily safer than absentee voting.  9/8/20 at 45, 52, 76-77; 9/9/20 at 56-57, 62; *see also* Pl. Ex. 269 at ¶¶ 23-24.

25.     Alabama does not offer early, traditional in-person voting[36] or curbside voting.  Agreed Facts at ¶ 36.  Still, Alabama has taken specific steps to make voting

---

does not qualify him to reach the areas he offers opinions on, and Dr. Kidd admits that he has no expertise in the area of public health and has not done any research on the topic that would help the court increase its understanding of the areas he is opining on. *Id.* at 221-22. In addition, unlike Dr. Cotti, Dr. Kidd did not undertake any regression analysis or control for any public health factors, such as the lag times discussed above, in his analysis. *Id.* Put simply, Dr. Kidd's analysis is no different than what a lay person could report on through a simplistic and straightforward look at the relevant John Hopkins data, and offers no real benefit from an expertise point of view to aid the court in its understanding of the underlying data. *Id.* at 221.

[36] As discussed below, the State does offer early in-person absentee voting.

safer during the COVID-19 pandemic.  To begin, on March 13, Secretary Merrill

sent a letter to probate judges to suggest that they should sanitize polling machines

and equipment frequently during voting, provide hand sanitizer to voters, and

provide gloves to poll workers.  State Ex. 5.  Then, on March 18, Governor Ivey

rescheduled the March 31 primary runoff election to July 14.  State Exs. 15, 16;

Agreed Facts at ¶ 80.  That same day, Secretary Merrill promulgated an emergency

rule titled "Absentee Voting During State of Emergency," providing in part as

follows:

> [A]ny qualified voter who determines it is impossible or unreasonable
> to vote at their voting place for the Primary Runoff Election of 2020
> due to the declared states of emergency, shall be eligible to check the
> box on the absentee ballot application which reads as follows: "I have
> a physical illness or infirmity which prevents my attendance at the
> polls. [ID REQUIRED]."

State Ex. 17; Agreed Facts at ¶ 81.  In effect, this rule meant that any voter concerned

about potential exposure to COVID-19 at a polling place could vote absentee in the

July 14 primary runoff election.  *See* 9/11/20 at 3.  Secretary Merrill issued a press

release in March informing voters about the emergency absentee voting rule for the

July election.  State Ex. 18.

26.     In April, Congress appropriated funds for Alabama to prepare for

voting during the pandemic in the July and November elections, and the Secretary

of State's office also dedicated increased funding to this effort.  9/15/20 at 149; State

Ex. 35.  The Secretary of State will use some of those funds to reimburse counties

for masks, gloves, and cleaning supplies for polling places.  *Id.*  And, Secretary Merrill testified that his office will provide a mask to any voter at a polling place who would like one.  9/11/20 at 61.  Still, Secretary Merrill's office received letters from some probate judges expressing concern about their ability to comply with CDC recommendations and State and Federal election laws during the July runoff election.  State Exs. 36; 38.  And, the Secretary received a report that in Mobile County, the polling sites that would have the biggest issues complying with CDC guidelines serve predominately minority communities.  *See* 9/11/20 at 35.

27.     Alabama saw a record turnout of voters for a runoff election on July 14, with 17.6 percent of eligible voters voting.  9/11/20 at 45.  During and after the July 14 election, Secretary Merrill received complaints that poll workers and voters did not wear masks at polling sites.  *Id.* at 26-27, 30.  When he learned that voters in certain precincts were not wearing masks, Secretary Merrill took steps to ensure those voters were still allowed to vote in the runoff.  *Id.* at 30.  According to Secretary Merrill, "[n]o voter can be turned away [from a polling site] for any reason if they are a qualified elector[,]" even if they are visibly ill or have a known case of COVID-19.  *Id.*; *see also* 9/15/20 at 202; 9/17/20 at 193.

28.     Secretary Merrill extended the emergency absentee voting rule to apply to the November 3, 2020 general election.  9/11/20 at 3; 9/15/20 at 152.  Thus, any voter in Alabama who wishes to vote absentee in the November election due to concerns about COVID-19 may do so, subject to the witness and photo ID

requirements.  Secretary Merrill expects voter turnout in November to exceed the 2016 presidential election, and although most Alabama voters have traditionally voted in person on Election Day, he expects voters to cast a record number of absentee ballots in the November election.  9/11/20 at 47, 80; Agreed Facts at ¶ 89. On at least 14 occasions, Secretary Merrill's office issued a press release encouraging voters concerned about exposure to COVID-19 to vote absentee and providing information on how to apply for an absentee ballot and the applicable deadlines.  State Exs. 21; 30; 33; 34; 37; 44; 46; 39; 59; 61; 62; 66; 69; 71.

29.     Absentee voting for the general election began on September 9, and as of September 11, more than 30,000 people had applied for absentee ballots across the State.  9/11/20 at 47, 58; 9/15/20 at 142.  In addition, several hundred people have completed absentee ballots in person in their county AEM's office.  9/11/20 at 47, 58; *see also* 9/15/20 at 92; 9/16/20 at 55-56; 9/17/20 at 137, 195.  To cast an absentee ballot, a voter must complete an absentee ballot application, and return the application to the AEM by mail or in person with a copy of her photo ID at least five days before the election.  9/15/20 at 139, 151.  Then, after the voter receives the absentee ballot packet, she must seal the completed ballot inside an affidavit envelope, and sign the affidavit in the presence of two witnesses or a notary.  9/15/20 at 139-40.  Finally, the voter must return the completed ballot and affidavit to the AEM in person up until the day before Election Day, or by mail in time to be received by noon on Election Day.  9/15/20 at 151.

30.     Voters may go in person to an AEM's office to vote before the election, and they can complete the absentee voting process in a single trip.  9/11/20 at 47-48; 9/17/20 at 130-31.  Alleen Barnett, the Absentee Election Coordinator for Mobile County, estimates that her office has been serving between 40-50 voters a day since absentee voting began on September 9, and she anticipates that the number will increase.  9/17/20 at 102-03, 130.  In addition to serving voters at the AEM's office, Secretary Merrill encourages AEMs and Circuit Clerks to hold events outside of their offices, such as outdoors on college campuses, in parking lots, or in nursing homes, to allow voters additional opportunities to cast absentee ballots in person before the election.  9/11/20 at 48-50.

31.     In the Mobile County AEM's office, Ms. Barnett and her staff wear masks, have hand sanitizer and rubber gloves available, and wipe their work areas and the voter areas with disinfectant spray.  9/17/20 at 134.  They also practice social distancing in the office and have spaced chairs for voters at least six-feet apart.  *Id.* But, Ms. Barnett's office cannot turn away a voter who does not wear a mask.  *Id.* at 153.  At least in part for that reason, Mr. Howard Porter, Jr., one of the individual plaintiffs from Mobile County, testified that he would not consider voting in person in the AEM's office.  9/14/20 at 88.  Mr. Porter explained his decision for not voting in person:  "I don't want any vote that I cast to be my last vote.  And in Alabama, a person can vote even if they don't have on a face mask.  And that's just too much for me.  []  [A]s important as the right to vote is, I just can't endure that."  *Id.* at 78-

29

79.  Mr. Porter, a Black man in his seventies, further explained:  "[S]o many of my [ancestors] even died to vote.  And while I don't mind dying to vote, I think we're past that – we're past that time.  And that should not be a requirement . . . . Because voting is the only day that rich, the poor, sick, the healthy, all should be counted as one and just as easy.  And any obstacle placed in the way of the opportunity to vote places an effect on the process itself."  *Id.* at 80.

## D.   <u>Alabama's History of Disenfranchisement of Black Voters</u>

32.     For the individual plaintiffs who are Black and the organizations who advocate for the voting rights of Blacks, voting is fundamental and sacred in light of the many thousands who died to secure the right.  They view any restrictions to voting as part of the centuries-old effort to deprive Blacks from accessing the ballot.  As the plaintiffs testified, Black Alabamians have consistently overcome barriers to exercising their fundamental right to vote, only to later have that right curtailed.  *See* 9/14/20 at 118.  The relevant historical facts are largely undisputed.  Briefly, after the bloodshed of the Civil War, the nation finally deemed African Americans worthy of the franchise.  *See* Pl. Ex. 264 at 6.  The "radical" northern Republicans, emerging triumphant from the War, sought to cement their hard-fought victory with three Constitutional amendments.  *Id.*  The Thirteenth Amendment, the first of this trio, granted millions of formerly enslaved persons their freedom, abolishing a system that deprived them of their humanity.  Const. Amend. XIII.  Second, the Fourteenth Amendment transformed these freed men and women into citizens, guaranteeing

30

them due process and equal protection of the laws.  Const. Amend. XIV.  Finally, the Fifteenth Amendment granted the franchise to the men among our nation's newest citizens.  Const. Amendment XV.  Backed by the federal government, the formerly enslaved exercised their newfound rights to elect Black candidates to statewide office in Alabama and across the South.  Pl. Ex. 264 at 6.

33.    But their political power proved fleeting.  Pl. Ex. 264 at 6.  Favoring unity with the former Confederacy over equality for Black Americans, the Republican Congress withdrew federal troops from the South.  *Id.*  Terrorists and southern Democrats replaced them.  *Id.*  These groups, known as "Redeemers," used racial violence to erase the advances Black people made during Reconstruction.  *Id.* Notwithstanding the Fourteenth and Fifteenth Amendments, Redeemers in Alabama "burned houses, churches, and schools; raided party meetings; and lynched" those Black citizens who dared to vote.  *Id.*  In Mobile, Alabama, Democrats once murdered prospective Black voters and fired a cannon near their polling place, scattering hundreds of other Black voters.  *Id.*

34.    By 1874, Redeemers had recaptured the Alabama legislature and governorship.  Agreed Facts at ¶ 144.  Once in power, these officials paired violence with policy, imposing legislative barriers to further undermine the Black vote.  *Id.* They redrew voting districts to exclude Black voters, implemented at-large elections across the state to dilute Black voting blocs and maintain all-White local

31

governments, and, in Alabama's Black Belt, they eliminated elections altogether so that the Governor could appoint White leaders. *Id.*

35.     Their later efforts included enacting new laws nominally geared toward curbing voter fraud. Agreed Facts at ¶ 145. The Alabama legislature passed the Sayre Law in 1893, which entrenched "a more respectable and cunning way of controlling or disenfranchising black voters." *Harris v. Siegelman*, 695 F. Supp. 517, 522 (M.D. Ala. 1988). This "reform" measure followed reports of rampant voter fraud among Democrats seeking to disrupt a fledgling alliance between poor populists and poorer Black voters. 9/14/20 at 115. Under the Sayre Law, Democrats no longer needed to engage in fraud to weaken this biracial coalition. The law strategically set voter registration deadlines in the busiest months for farmers, instituted time limits for voting, and adopted a "secret ballot" designed to make it difficult for illiterate voters to vote along party lines. Agreed Facts at ¶ 145. As a result, Black voter turnout plummeted twenty-two percent. *Id.*

36.     Not even the Alabama Constitution was safe from White supremacy. In 1901, Redeemers revised the state constitution to more explicitly disenfranchise Black voters. Agreed Facts at ¶ 146. These revisions sought to address the "grave problem" of "Negro domination" and to "establish white supremacy." Pl. Ex. 264 at 7. Redeemers constitutionalized a poll tax, conditioned voting rights on property ownership and employment status, imposed a literacy test, and prohibited from voting anyone convicted of certain crimes "thought to be more commonly

committed by [Black residents]."   Agreed Facts at ¶ 146 (quoting *Hunter v. Underwood*, 471 U.S. 222, 232 (1985)).  The number of registered Black voters in Alabama dropped from 180,000 to 3,000 under the 1901 Constitution.  *Id.*

37.   As the federal courts awakened to southern efforts to disenfranchise Black citizens, Alabama innovated.  When the Supreme Court invalidated the all-White primary in 1944, the state legislature responded by enacting the "Boswell Amendment" to its 1901 Constitution.   Agreed Facts at ¶ 147.   The Boswell Amendment required that citizens prove their ability to "understand and explain" articles of the U.S. Constitution to a local registrar before registering to vote.  *Id.* Registrars wielded significant discretion under this system, making it nearly "impossible for a [Black voter] to qualify."  *Id.*  That was by design.  An author of the Amendment declared this discretion integral to excluding from registration "those elements in our community which have not yet fitted themselves for self-government."  Pl. Ex. 264 at 8.  And when a federal court in 1949 invalidated the Boswell Amendment as racially discriminatory, the legislature replaced it with a more elaborate scheme to prevent Black voter registration.  Agreed Facts at ¶ 147. This new scheme imposed a literacy test on potential registrants, disqualified registrants charged with a crime of "moral turpitude," and required registrants to produce a supporting witness willing to confirm the registrant's good standing.  *Id.* Because the legacy of slavery made Black citizens disproportionately illiterate and

made most White citizens unwilling to vouch for Black registrants, these provisions disparately impacted Black would-be registrants.  *Id.*

38.     At midcentury, Black attorneys in Alabama began using newly enacted federal civil rights legislation to challenge voter discrimination in federal courts. Agreed Facts at ¶ 148.  They scored key victories while working with the Department of Justice's Civil Rights Division.  *See* Pl. Ex. 264 at 10.  The Civil Rights Division in turn began filing lawsuits against local registrars across Alabama, challenging the discriminatory use of the State's voter questionnaire, witness requirement, and other registration requirements.  Agreed Facts at ¶ 148.

39.     In 1965, Congress passed the Voting Rights Act ("VRA"), which outlawed lingering devices for disenfranchising African Americans including literacy tests, witness requirements, and Alabama's poll tax.  Agreed Facts at ¶ 149. Sections 4 and 5 of the VRA also required that changes affecting voting in Alabama receive preclearance from the federal government before enactment.  *Id.*; *see also* Pl. Ex. 264 at 23.

40.     Although Black voter registration in Alabama soared from 25 percent to 56 percent in the three years following enactment of the VRA, the state legislature used racial gerrymandering to subsequently dilute Black voting power.  Agreed Facts at ¶ 150.  Throughout the 1960s and 1970s, Alabama politicians proposed several districting plans that would have fragmented predominantly Black

communities.  *Id.*; *see also* 9/14/20 at 122.  Federal courts consistently blocked their implementation.  *See* Pl. Ex. 264 at 15.

41.    In the 1990s, the Alabama legislature again enacted so-called reform measures that disproportionately impacted Black voters in the name of rooting out voter fraud.  9/14/20 at 126.  These laws formally mandated that citizens interested in voting absentee include with their ballots either two witness signatures or the signature of a notary public.  *Id.* at 127; *see also* Pl. Ex. 264 at 20-21.  This legislation had a "laser focus on Black political activists" who had used Alabama's absentee ballot process to increase Black voter turnout.  9/14/20 at 126.  At the time, only four state senators opposed these new restrictions; all were Black.  *Id.* at 128; Pl. Ex. 264 at 21.  Some White senators, in contrast, insisted that only Black voters engaged in voter fraud.  Pl. Ex. 264 at 21.

42.    To be sure, other reformers in the 1990s had nonracial motivations.  For example, former Justice Glenn Murdock of the Alabama Supreme Court, then a litigator, championed reform to the state legislature after investigating irregularities in Alabama's 1994 Supreme Court election.  9/17/20 at 8.  Justice Murdock agrees, however, that voter fraud was not instrumental to that election.  *Id.* at 16.  Instead, purported fraud was "conflated with" the real issue in that debacle—"technical" questions "about changing the rules of the election" after the fact.  *Id.*; *see also* Pl. Ex. 264 at 20–22.  Meanwhile, Pamela Montgomery, a private citizen, advocated election reform only after she became "convinced" that fraud existed in Greene

35

County, Alabama, based, in part on an unofficial audit of absentee ballot returns she helped conduct.  9/18/20 at 18.  Ms. Montgomery formed a local citizens' group, which she testified was not designed to suppress the Black vote but was instead a biracial effort to improve the lives of the Black citizens of Greene County.  *Id.* at 30–32, 42–43.  But, in a county she said was 90 percent Black, White residents were overrepresented by 500 percent among the leadership of Ms. Montgomery's citizens' group, *id.* at 46–47, and the court has other reasons to discount her testimony.[37]

43.    Evidence at trial produced by the defendants showed instances of voter fraud, mostly occurring two decades ago.  Gregory Biggs prosecuted a handful of fraud cases in the 1990s while working in the state Attorney General's office. 9/16/20 at 7.  In Winston County, for example, Mr. Biggs helped convict several elected officials who conspired with local bootleggers to bribe voters into exchanging absentee ballots for beer.  *Id.* at 13.  The other convictions Mr. Biggs secured also involved local officials abusing their power to facilitate fraud.  Mr. Biggs admitted on cross-examination, however, that the Challenged Provisions would not prevent the fraud he prosecuted from occurring today.  *Id.* at 21–22.  The

---

[37] On cross-examination, Ms. Montgomery acknowledged that she has previously complained that Black officials routinely play the "race card" to maintain power, but she denied having ever observed a White politician use race to divide people.  9/18/20 at 48–49.  There were other admissions Ms. Montgomery made related to her social media postings, *id.* at 57-58, which the court will not include here to protect her privacy.  The court will add only that as the trier of fact, these postings undermine her credibility and cause the court to give little weight to her testimony.

record shows that voter fraud rarely occurs today, and the defendants point to only two instances of voter fraud convictions secured in Alabama since the 1990s. *See* 9/16/20 at 67–70.

44.     Regardless of whether they were designed to address fraud or to suppress the Black vote, the absentee ballot reforms enacted in the 1990s disproportionately disadvantaged the rural Black citizens who historically relied on absentee voting. 9/14/20 at 129; *see also* Pl. Ex. 264 at 21–22. Because these citizens regularly worked long hours outside their counties and often lacked access to vehicles, they struggled to reach "far-flung polling places" on Election Day. 9/14/20 at 129. Alabama's rural Black Belt, which is predominately Black, thus saw sharp declines in the number of absentee ballots cast. *Id.* Some state officials heralded this as a success. *Id.*; *see also* Pl. Ex. 264 at 21–22.

45.     Alabama's history of voter discrimination interacts with systemic disparities that currently affect Black residents' education, employment, and healthcare outcomes to negatively impact Black political participation. Pl. Ex. 264 at 24.

46.     For example, in addition to voting discrimination, racial discrimination in Alabama's public schools is also well-documented. Pl. Ex. 264 at 24–25. State and local officials fought to maintain segregation in Alabama schools long after the Supreme Court ruled the practice unconstitutional in *Brown v. Board of Education*, 347 U.S. 483 (1954). Pl. Ex. 264 at 24–25. Efforts to desegregate school systems

37

in Alabama have continued, with dozens remaining under desegregation orders today.  9/14/20 at 137.

47.    To no surprise, consistent with CitiBank's study released last week that found that the U.S. Economy has lost $16 trillion since 2000 because of discrimination against Blacks,[38] educational discrimination has had a lasting effect in Alabama.  *See* 9/14/20 at 139.  Of adults aged 25 years and over, 16.6 percent of Black Alabamians have not completed high school compared to 11.4 percent of their White counterparts.  Doc. 228 at ¶ 3.  For the same age range, only 17.3 percent of African Americans in the State earned a bachelor's degree or higher compared to 28.3 percent of White adults.  *Id*. at ¶ 4.

48.    Complementing Alabama's historical racial disparities in education are entrenched disparities in employment and economic opportunities.  Pl. Ex. 264 at 30–31.  Over the past half-century, litigation has uncovered many examples of state entities adopting racially discriminatory employment practices.  9/14/20 at 140; Pl. Ex. 264 at 31.  And private employers too have faced countless allegations of racial discrimination.  In 2019, for example Alabama had a higher percentage of racially-based employment discrimination claims than any other state.  Pl. Ex. 264 at 31.

---

[38]  *See* NPR, *Cost of Racism,* https://www.npr.org/sections/live-updates-protests-for-racial-justice/2020/09/23/916022472/cost-of-racism-u-s-economy-lost-16-trillion-because-of-discrimination-bank-says (last visited Sept. 25, 2020).

Alabama was also overrepresented nationally in racially-based employment discrimination claims based on its population. *Id.*

49.    Relatedly, Black communities in Alabama suffer from higher concentrations of unemployment and under-employment. *See* Doc. 228 at ¶¶ 5–6. The unemployment rate among Black Alabamians over age 16 is more than double the rate among White residents of the same age. *Id.* at ¶ 5. Those Black Alabamians who are employed are more likely to work lower paying jobs than White workers. Of employed Black adults in the State, 20.7 percent work in service occupations compared to just 14.8 percent of Whites. *Id.* at ¶ 7; *see also* Pl. Ex. 268 at ¶ 14. Only 26.2 percent of employed Black Alabamians hold management or professional roles; 39.1 percent of White Alabamians hold such positions. Doc. 228 at ¶ 6.

50.    In Alabama, Black households also have fewer economic resources. The median household income for Black Alabamians is $33,503 compared to $58,257 for White households. Doc. 228 at ¶ 9. More than one quarter of Black Alabamians live in poverty compared to only 11.3 percent of White Alabamians. *Id.* at ¶ 10. This economic inequality has consequences. Roughly 13 percent of Black families in Alabama lack access to a vehicle compared to only 3.9 percent of White families. *Id.* at ¶ 14. Black households are eight percent less likely than White households to own a computer, smartphone, or tablet. *Id.* at ¶ 13. Black households are also less likely to have broadband internet access—29.6 percent compared to 17.2 percent of White households. *Id.* at ¶ 12.

51.     These economic conditions intersect with other legacies of racial discrimination in Alabama to make the State's Black residents more likely to suffer negative health outcomes.  Pl. Ex. 268 at ¶ 6.  Historic racial residential segregation is a principal driver.  9/10/20 at 13–14.  State and federal laws and practices "produced and maintained" racial residential segregation in Alabama by incentivizing discriminatory zoning, redlining, and predatory lending.  Pl. Ex. 268 at ¶ 8.  Racial residential segregation has devalued neighborhoods, reduced access to quality and affordable food, and produced disproportionately high concentrations of poverty in Black communities.  9/10/20 at 15–16; Pl. Ex. 268 at ¶ 8.  It is "one of the strongest indicators of chronic illness patterns in the Black community."  9/10/20 at 13.  Because of racial residential segregation, Black individuals are more likely than White individuals to suffer from chronic conditions such as obesity, cancer, and asthma.  *See id.* at 16; Pl. Ex. 268 at ¶ 8.

52.     This is particularly true in Alabama's Black Belt counties, where "a shortage of infrastructure to support economic stability and growth compounds the inability of [residents] to move upward economically, contributing to generational poverty, especially among rural Black people who are less likely to be able to mobilize out of rural areas."  Pl. Ex. 271 at ¶ 8.  Health outcomes for Black Alabamians in rural counties are much worse than for White Alabamians in those counties.  9/9/20 at 43; Pl. Ex. 271 at ¶ 9.  Although impoverished people of all races face structural obstacles that adversely impact their health, a Black person living in

40

poverty "typically [] would have a worse outcome compared to their counterparts." 9/9/20 at 69, 72.

53.    These health disparities reflect, in part, callousness among elected officials in Alabama to the needs of Black residents.  For example, Alabama's legislature has rejected requests to expand Medicaid under the Affordable Care Act notwithstanding the urging of Black leaders and a racial gap in insurance coverage. 9/14/20 at 147–48.  Expanding Medicaid would have insured an additional 220,000 Alabamians, particularly benefiting Black residents.  9/10/20 at 23; Pl. Ex. 268 at ¶ 13.  This healthcare and insurance inequality helped to make Black Alabamians especially vulnerable when a novel coronavirus surfaced in early 2020.  *See* Pl. Ex. 264 at 39

### E.    The Parties in this Lawsuit

#### (1)    Individual Plaintiffs

##### (a)    *Howard Porter, Jr.*

54.    Mr. Porter is a Black man in his seventies, and a registered voter in Mobile County, Alabama who lives with his wife and adult son.  9/14/20 at 65-67, 76.  Mr. Porter has asthma and Parkinson's Disease, which causes him to have difficulty walking, and he uses a cane to walk.  *Id.* at 64-68.  Mr. Porter is at higher risk for complications or death from COVID-19 because of his age and underlying medical conditions.  Agreed Facts at 3, ¶ 3.  He takes the COVID-19 pandemic seriously and follows the CDC's guidance closely.  *See id.*  Sadly, his sister and

uncle both died from COVID-19, and Mr. Porter is very fearful about becoming infected.  9/14/20 at 69-72.

55.     Since Governor Ivey's Stay at Home order on March 13th, Mr. Porter has left his home to attend his doctor's appointments.  *Id.* at 71-72; Agreed Facts at 3, ¶ 3.  He also attended one of his wife's medical appointments to provide support for her while she was receiving treatment for a serious medical condition.  9/14/20 at 71-72.  Every time Mr. Porter leaves his home, he wears a mask, and he practices social distancing.  *Id.* at 75.  In addition, the medical providers he saw also wore masks.  *Id.*  Upon arriving home, Mr. Porter washes his clothes and showers.  *Id.*

56.     Mr. Porter's wife and son leave the house to obtain groceries, and they wear a mask and follow social distancing protocols while out.  *Id.* at 75.  Upon their return home, they also wash their clothes and take a shower.  *Id.*  Since the pandemic hit, Mr. Porter's daughter and grandchildren have visited him once in his home.  *Id.* at 76.  His daughter and grandchildren had also adhered to social distancing protocols before their visit.  *Id.*

57.     Mr. Porter has always voted in-person, but now he does not want to risk a COVID-19 infection.  Agreed Facts at 3, ¶ 3.  Mr. Porter chose not to vote in the July 14 primary runoff election when he did not receive his absentee ballot.  9/14/20 at 78.  He did not vote in-person in the election because he did not want to risk being infected with COVID-19.  *Id.*  When Mr. Porter votes in person at his polling place, he is required to walk 100 to 150 feet from his disabled parking space to the

entrance. *Id.* at 77. Walking this distance is challenging for Mr. Porter due to his Parkinson's. *Id.* Mr. Porter would prefer to vote curbside as opposed to voting absentee or in-person. 9/14/20 at 79-81. He believes it would be "less strenuous" given his disability, provide less contact than going inside the polling place, and reduce the time he spends now to vote. *Id.*

        (b)   *Dr. Eric Peebles*

58.    Dr. Peebles is 39-years-old, White, and lives alone in Auburn, Alabama. 9/8/20 at 114; Agreed Facts at 1, ¶ 1. He is a lawfully registered voter who has never lost his right to vote by reason of a felony conviction or court order. *Id.* Dr. Peebles has cerebral palsy, which puts him at heightened risk from COVID-19 because respiratory illnesses carry high risks of severe complications and can be fatal for people with his condition. 9/8/20 at 114, 116. Dr. Peebles uses a wheelchair and requires "full assistance with activities of daily living . . . ." *Id.* at 115.

59.    He has not left his apartment complex since early March, except to attend medically necessary appointments and to travel to Birmingham in June for retrieval of data from his phone for discovery in an unrelated legal case. 9/8/20 at 120-22. Although Dr. Peebles attempted to have the retrieval of the data conducted remotely, counsel for the opposing party required that their own expert obtain the data directly from Dr. Peebles's phone. *Id.* at 123. Because Dr. Peebles relies on his phone to not only communicate, but also to activate the automatic door opener at his home, he would not be able to leave his home in the event of an emergency if

he did not have his phone. *Id.* at 123. Therefore, he reasonably did not believe he could safely remain in his home without his phone, and he determined that he needed to be present when the expert examined his phone. *See id.* at 123-24, 150. At least six other people, all of whom wore a mask, attended the discovery meeting, and they all remained more than six feet apart during the meeting. *Id.* at 126-37. Dr. Peebles did not wear a mask because it was a high-stress situation, and he wanted access to water. *Id.* at 149.

60.     Except for those appointments, Dr. Peebles has restricted all in-person contact since March 13, with the exception of his five caregivers who provide 60 hours of in-home care each week, and nurses who visit him three days a week to treat a persistent wound. 9/8/20 at 116-22,133-34. Each caregiver works separate shifts of a few hours each, and Medicaid billing practices require that their shifts are separated by at least two hours. *See id.* at 118. Although the nurses come on the same days each week and will continue to do so through September and October, the timing of their visits varies, and Dr. Peebles cannot predict when their visit may coincide with one of his caregiver's shifts. *Id.* at 119, 134, 148.

61.     Because Dr. Peebles's caregivers necessarily come into close contact with him, he must be sure that they strictly follow the CDC's social distancing guidelines at all times. *See id.* at 116-17, 120. As a precaution, each of Dr. Peebles's caregivers has been tested for COVID-19, and all of his caregivers wear masks in his home. *Id.* at 120-21.

62.     Dr. Peebles typically votes in person and did so during the March 3, 2020 primary election.  *Id.* at 124, 129.  Dr. Peebles cannot operate the voting machines unassisted and thus brings an individual into the voting booth to assist him in filling out the ballot.  *See id.* at 124-25.  He has had trouble navigating the physical space in his polling place, which is located inside a hotel, and requires help with operating the elevator.  *Id.* at 130-31.  Dr. Peebles explained that "[t]here are some issues [] with whether this is enough room for me to activate the button on the elevator and then, turn, back out or pull out of the elevator without risking being hit by the door . . . ."  *Id.* at 131.  Nevertheless, he reports that he has "always [been] able to vote" at his polling site with assistance.  *Id.* at 153.

(c)     *Annie Carolyn Thompson*

63.     Ms. Thompson is a 68-year-old retiree who lives alone at her home in Mobile, Alabama.  9/8/20 at 168.  She is Black, a U.S. citizen, has never lost her right to vote by reason of a felony conviction or court order, and is a lawfully registered voter in Alabama.  *Id.*; Agreed Facts at 3, ¶ 4.  Ms. Thompson is at higher risk of contracting and having severe complications from COVID-19 because of her age and preexisting conditions, including diabetes and high blood pressure.  *See* 9/8/20 at 168-69.  Ms. Thompson takes medication for both conditions.  *Id.* at 169.

64.     Ms. Thompson's vulnerability to COVID-19 has caused her to severely limit her social contact, and she has basically "self-quarantine[d]" since the beginning of April.  9/8/20 at 169-70.  After she retired as a cosmetologist, Ms.

45

Thompson began working as a caretaker, but she left that job at the beginning of the pandemic to protect her health. *Id.* at 170; Agreed Facts at 4, ¶ 4. Since the start of the pandemic, the only person Ms. Thompson allows regularly in her home is her daughter, who delivers groceries and other necessities approximately once or twice a week. 9/8/20 at 169-70. One of Ms. Thompson's granddaughters tested positive for COVID-19, and both she and Ms. Thompson's daughter had to quarantine at home. *Id.* at 228-29. Accordingly, Ms. Thompson recently has had to do her own grocery shopping instead of relying on her daughter.

65.    Ms. Thompson only leaves her home for necessary errands, such as going to the bank, grocery store, pharmacy, medical appointments, and to take her dog to the veterinarian and groomer to treat his skin condition. *See* 9/8/20 at 169, 171, 173, 199. When Ms. Thompson leaves her home, she protects herself "to the fullest extent" possible. *Id.* at 193. This means she always wears a mask and practices social distancing, and she also wears gloves and uses sanitizers, wipes, and sprays. *See id.* at 170, 172. When Ms. Thompson has to go to the grocery store, she limits her shopping to senior hours. *Id.* at 228, 231. In addition, Ms. Thompson uses the bank's drive-thru window, and someone at the vet's office and groomer retrieves Ms. Thompson's dog from her car and brings him back, so Ms. Thompson does not leave her car for either type of appointment. *Id.* at 172-73, 217.

66.    Ms. Thompson testified that she would have difficulty meeting the photo ID requirement to vote absentee because she does not have the necessary

technology or equipment to make a copy of her photo ID at home and would, therefore, have to venture out of her home to obtain the copy.  *Id.* at 176-77.  She also indicated that she would have difficulty meeting the witness requirement because she does not regularly interact with two people at the same time.  *Id.* at 177.  She further testified, however, that, having learned about the Mobile Public Library's curbside notary services in this litigation, she would use them to notarize her absentee ballot for the November election.  *Id.* at 196-97, 203-04.

67.     Ms. Thompson requested an absentee ballot for the July runoff election because of COVID-19, but her ballot did not arrive until the day of the election.  9/8/20 at 174-75.  Accordingly, because Ms. Thompson could not vote absentee, she called a friend who works at her polling site to find out a time when few people would be at the site.  *Id.* at 174-75.  She felt safe voting in person on that occasion because all of the poll workers wore masks and gloves, there were sanitizing stations all over, they had sneeze guards, and people practiced social distancing.  *Id.* at 197.  Ms. Thompson testified that she would not feel safe voting in person in November because her polling site, which is not a large facility, will be very crowded since it is a major election that will have a larger turnout.  *See id.* at 197-98, 201, 218.  Ms. Thompson also would not be comfortable voting in person in November because people are not required to wear masks when voting.  *See id.* at 219, 226.

(d)   *Teresa Bettis*

68.     Ms. Bettis is a 51-year-old U.S. citizen who is Black, lives at her home in Mobile County, Alabama with her husband and two minor children.  9/14/20 at 4; Agreed Facts at 6, ¶ 10.  She is registered to vote in Alabama and has never lost her right to vote by reason of a felony conviction or court order.  Agreed Facts at 6, ¶ 10. Ms. Bettis is also the executive director of the Center for Fair Housing and in that role frequently works as an organizational partner with plaintiff Black Voters Matter ("BVM") on their voter registration and voter education efforts.  9/14/20 at 4-5.  Ms. Bettis also serves as the housing chair for Mobile chapter of the NAACP.  *Id.* at 5.

69.     Ms. Bettis faces a higher risk of contracting and having severe complications from COVID-19 because of two preexisting conditions, diabetes and hypertension, which she treats with over-the-counter supplements from local health stores.  9/14/20 at 6-7.  She has not taken prescription medications for either condition in approximately eight years and is currently looking for a doctor who is open to utilizing alternative medicine to help her manage the conditions.  *Id.* at 8, 26. Ms. Bettis does not regularly check her blood sugar levels or her blood pressure, but she can feel when she has a problem with them.  *Id.* at 25-26.

70.     As Ms. Bettis is an at-risk individual, she has avoided crowds and limited visitors in her home and trips outside of her home.  *See* 9/14/20 at 10-11. During the pandemic, Ms. Bettis has left her home to go to her dentist, the pharmacy, the bank's drive-thru window, the grocery store, and to pick up to-go meals at local

restaurants and fast food drive-thru windows. *Id.* at 17, 33-34. Ms. Bettis shops at the grocery store once or twice a week, and she has also been to Lowe's, Marshall's, and the Shoe Station. *Id.* at 35. When Ms. Bettis ventures out for such errands, she wears a mask and practices social distancing, and she keeps gloves, hand sanitizer, and disinfectant in her car. *Id.* at 10-11, 35-36.

71.  Since mid-March, Ms. Bettis has had visitors at her home on limited occasions. *See id.* at 11-12. First, in early or mid-March, her sister-in-law visited to obtain help setting up a laptop to work remotely. *Id.* at 12. Then, Ms. Bettis allowed her husband's siblings to visit for Father's Day, but required them to stay outside in the yard where they could remain socially distant. *See id.* Ms. Bettis also had her nephew enter her home on one occasion to witness her absentee ballot for the July election. *Id.* at 12, 39-40, 56. Ms. Bettis has not had anyone over to her home since her nephew's visit, and she does not plan to have any visitors at her home, either inside or outside, because each visitor increases the risk "of bringing the COVID into your home, and [she's] just not comfortable with that." *Id.* at 12-13, 20, 57. And, this includes her nephew because he now has a relative living with him who has an illness that the nephew and other relatives refuse to disclose. *Id.* at 19-20.

72.  Ms. Bettis has worked primarily from home since March 19, but she goes to the office to meet her bookkeeper every two weeks. *See* 9/14/20 at 14, 18, 27, 29. And, on a few occasions, Ms. Bettis has met with two people at a time at work, including her administrative assistant, an IT employee, and board members.

*Id.* at 14, 30-31, 52, 61.   On those occasions, everyone wore masks and stayed socially distant in a large conference room.  *Id.* at 31.  In addition to those meetings, Ms. Bettis met the board president in a parking lot in order for him to sign documents required to open a new bank account.  *Id.* at 28-29, 53.  Ms. Bettis testified that her office will remain closed for the foreseeable future to minimize the risk of exposure to COVID-19.  *See id.* at 16.

73.    Ms. Bettis is especially concerned about avoiding exposure to COVID-19 because she has known several people who have had the disease, including a close friend who became very sick and two women in their 80s who are like second mothers to her.  9/14/20 at 9, 58.  One of the older women had to be hospitalized, and one of the women's son also contracted COVID-19 and died from the disease. *Id.* at 9-11.  Although Ms. Bettis normally would have attended the funeral to support her friend, she did not go to avoid potentially exposing herself to COVID-19.  *See id.* at 11.  In addition, her bookkeeper's daughter recently tested positive for COVID-19, and as a result, she is requiring her bookkeeper to work solely from home for thirty days, or until mid-October.  *Id.* at 9-10, 14, 32-33.

74.    Due to her concern about COVID-19, Ms. Bettis intended to vote absentee in the July runoff election.  9/14/20 at 18, 46.  But, she sealed the envelopes for the absentee ballot incorrectly and did not have time to request another absentee ballot.  *Id.* at 18, 40-41.  Accordingly, she voted in person at her polling site in a large auditorium.  *Id.*  When Ms. Betis arrived at the site mid-morning, only one or

two people were inside the site voting and they were wearing masks along with the poll workers. *Id.* at 21, 41. However, not all of the poll workers wore gloves, and Ms. Bettis did not observe any cleaning or disinfecting at the site. *Id.* at 21-22, 41.

75.     Ms. Bettis does not believe she can vote in person in November because her polling site is typically extremely crowded for a presidential election. *Id.* at 22. Since she is at high-risk from COVID-19, she is not willing to expose herself to the risk of being around so many people at one time. *Id.* at 22-23. If she cannot vote absentee, she probably will not vote, and that would be the first time since turning 18 that she did not vote in a presidential election. *Id.* at 23. Not voting would be devastating for Ms. Bettis, but exposing herself to COVID-19 is not an option for her. *See id.* at 24. When informed about the Mobile Public Library's curbside notary services at trial, Ms. Bettis agreed that utilizing the services to notarize her absentee ballot would be an option for her. *Id.* at 45.

(e)     *Sheryl Threadgill-Matthews*

76.     Ms. Threadgill-Matthews is a Black, 67-year-old U.S. citizen who lives in Wilcox County, Alabama with her husband. 9/9/20 at 4, 10; Agreed Facts at 7, ¶ 13. She is a registered voter at her current address in Alabama, and has never lost her right to vote by reason of a felony conviction or court order. Agreed Facts at 7, ¶ 13. Ms. Threadgill-Matthews is a retired social worker and is currently the executive director of a youth program, BAMA Kids. 9/9/20 at 5. In that role she has partnered with BVM on their voter registration and education efforts. *Id.* at 6.

51

Ms. Threadgill-Matthews also served as an absentee election official in Wilcox County for over 20 years, and in that role she reported to the county's probate judge, circuit clerk, and AEM. *Id.* at 6-7. Ms. Threadgill-Matthews testified that the absentee election officials check the absentee ballot envelopes for compliance with the witness requirement and that the probate judge provided some training for the polling officials. *Id.* at 7-10. During her years as an absentee polling official, Ms. Threadgill-Matthews never personally noted anything suspicious that she felt should be flagged as fraudulent. *Id.* at 9.

77.     Ms. Threadgill-Matthews faces a higher risk of contracting and having severe complications from COVID-19 because of her age and hypertension, which she treats with prescription medication. *Id.* at 10. She knows several people in Wilcox County who have had COVID-19, including two neighbors who were hospitalized. *Id.* at 11. For that reason and because she is at-risk, Ms. Threadgill-Matthews has been very diligent about social distancing and wearing a mask, and she has stopped traveling to visit her family. *See id.* at 11-12.

78.     Ms. Threadgill-Matthews has also limited her trips outside her home. *See id.* She goes to the grocery store during senior hours, the pharmacy, and her bank's drive-thru window, or to the BAMA Kids office to pick up files she needs for work. *Id.* at 11-12, 26-27. Ms. Threadgill-Matthews has also helped with food bank distribution outside and an outdoor back-to-school rally for BAMA Kids where everyone wore masks and practiced social distancing, and she has attended two

drive-up church services in a parking lot. *Id.* at 12-13.  Ms. Threadgill-Matthews has also stopped having visitors to her home, with the exception of a niece who visits occasionally, an exterminator, and a person who delivered a new washer and dryer after the original washer stopped working. *See id.* at 11-12.

79.    Ms. Threadgill-Matthews is a dedicated voter, who votes in every election, and she voted in person on March 3, 2020.  9/9/20 at 14.  She plans on voting absentee in November and in any future elections when COVID-19 remains a risk in order to avoid exposure to other people at the polling site, but testified that "curbside voting would be a very attractive option for me because it would take away some of the – steps of having to secure an absentee ballot." *Id.* at 14-15.  Ms. Threadgill-Matthews has helped others exercise their right to vote since she moved to Wilcox County in 1978. *Id.* at 16.  For example, Ms. Threadgill-Matthews helped an elderly gentleman with ambulatory difficulties by contacting Carolyn Davis-Posey, the circuit clerk in Wilcox County, to arrange for the man to vote absentee. *See* 9/9/20 at 9, 27.  Ms. Threadgill-Matthews then drove the gentleman to the courthouse, and Ms. Davis-Posey met him at the car so he could cast an absentee ballot. *Id.*  Ms. Threadgill-Matthews has observed that people, especially Black people, have had difficulty exercising their right to vote due to lack of transportation and living far from the polling site, and because some people do not understand the process or are unable to read the ballot. *Id.* at 17-18, 23-24.  Since the pandemic began, more people than usual have reached out to Ms. Threadgill-Matthews for

advice as to how to satisfy the requirements for absentee voting.  Agreed Facts at 8 ¶ 15.

    (2)   <u>Organizational Plaintiffs</u>

       (a)   *People First of Alabama*

80.    People First is a state-wide nonprofit dedicated to elevating the living experience of people with intellectual and developmental disabilities, such that they can be valued members of their community.  Agreed Facts ¶ 1; 9/11/20 at 100-101.  People First is funded by a single grant of $97,000.  9/11/20 at 118.  It employs one full-time executive director, a part-time outreach coordinator, a part-time financial director, and a part-time grant writer.  *Id.* at 119.  People First is made up of 150 to 200 members with developmental disabilities located throughout the State.  9/11/20 at 100-101, 108, 110.  It has 25 chapters across the State, including in Jefferson, Madison, and Mobile Counties.  *Id.* at 110-11, 126.  People First members include people from all racial and ethnic backgrounds, and roughly 25 percent of its members are Black.  9/11/20 at 130-131.

81.    People First educates its members on voting during election years.  *Id.* at 141.  But, in the past, it has not spent time educating members about voting absentee. *Id.* at 120.  After the pandemic hit, People First developed training on how to correctly apply and cast an absentee ballot.  *Id.* at 116-117.  The organization dedicated 18 hours of the executive director's time to developing this training and 35 hours of the outreach coordinator's time.  *Id.* at 122, 125.  People First held an

absentee voter training on August 7, 2020 with 20 members from the statewide leadership board in attendance.  *Id.* at 123-124.  It also held another training in Jefferson County a week later with 18 people in attendance.  *Id.* at 125-146.  The organization also held trainings in Shelby County and Huntsville and plans to hold sessions in Tuscaloosa and Mobile.  *Id.* at 126.  Additionally, a committee of People First members in Madison County donated volunteer time to create a public service announcement which included information about absentee voting.  *Id.* at 122-123.

82.    People First members' disabilities have impacted how they vote, and, at times, resulted in the members facing additional challenges when voting.  For example, based on her interactions with them, Ms. Ellis testified that some of the members have vision impairments that would preclude them from casting their ballot without assistance.   9/11/20 at 137-138.   Such assistance would involve them verbally telling their helper what candidate they would like to vote for so that the helper can fill out the ballot for them.  *Id.*  Another example is Jenny Lux, a member who has a disability requiring her to use an Automark machine to vote.  *Id.* at 172. Using the Automark machine takes longer than the typical voting process, and would require Ms. Lux to spend more time at the polling place than other voters if she were to vote in person.  *Id.* at 174.  This would in turn increase her exposure to SARS-CoV-2.  *See id.*  Another challenge that results from Ms. Lux's disability is an issue with balance that makes standing in line for long periods dangerous.  *Id.* at 175.  Ms. Lux uses a cane while walking and waiting in line, and, if needed, she will ask a poll

worker to provide a chair for her.  *Id.* at 174.  However, on at least one occasion previously, no chair was available for her to use at her polling place.  *See id.*

83.     People First members have conditions placing them at higher risk for COVID-19 complications or death.  9/11/20 at 106-107.  They have cardiovascular issues, breathing issues, obesity, and diabetes.  *Id.*  Further, People First's members with intellectual disabilities are not able to identify risks of infection in the same way as other people can.  *Id.* at 130.  One member of People First has severe asthma and difficulty breathing, placing her at elevated risk of complications and death from COVID-19.  Agreed Facts at ¶ 1.  Another member, Ms. Lux, suffers from Adult Respiratory Distress Syndrome and has permanent scarring on her lungs as a result of her previous battle with the swine flu.  9/11/20 at 164.  These conditions put her at higher risk of complications or death according to the CDC.  *Id.*  Ms. Lux fears that she "would probably wind up on a ventilator" if she contracted COVID-19.  *Id.* at 167.

84.     Some People First members have been following the CDC's guidance on social distancing and other COVID-19 prevention measures.  Ms. Lux testified that she lives alone and generally stays at home unless she is obtaining coins from the bank to use in her apartment complex's laundry facilities or picking up groceries from a Walmart with curbside pickup services.  9/11/20 at 161, 167.  Ms. Lux's father drives her to get groceries, but they both wear masks and maintain social distance.  *Id.* at 168.  She distances herself from her masked father not only for her

56

own protection, but also because he is 66 and at higher risk for COVID-19 complications or death.  *Id.* at 167.  Ms. Lux also left her home to film a video with other members of People First that discussed the importance of voting.  *Id.*  at 170. During this excursion, all individuals wore masks and maintained social distance. *Id.*  Further, Ms. Lux interacts with relatively few people, and she does not interact with her neighbors.   *Id.* at 168-169.  She sees her minor son, a church friend, her stepdaughter, and her stepdaughter's children and husband.  *Id.* at 161, 168-169. However, during these interactions, everyone, aside from the children, wears a mask and adheres to social distancing guidelines.  *Id.*

85.     Some members of People First cannot fulfill the witness absentee voting requirement without increasing their risk for COVID-19 complications or death.  Ms. Lux cannot comply with the witness requirement because she cannot easily get two adults together at the same time to witness her complete the ballot. 9/11/20 at 180.  The people who Ms. Lux interacts with do not typically come to her house at the same time.  *Id.* at 180, 184-85.  Ms. Lux is also unwilling to go to the bank to have her absentee ballot notarized as it would involve waiting in line for the notary.  *Id.* at 181.  Ms. Lux, who contracted swine flu in 2009 and spent 28 days in a medically-induced coma, expressed her concern of engaging in activities, such as waiting in line, that would increase her exposure to SARS-CoV-2 this way:  "But is it worth it?  Is it worth that risk?  That's something that you really have to weigh."

*Id.* at 164, 181.  Because of these reasons, and her concerns about her vote being lost in the mail, Ms. Lux is not sure if she would vote absentee.  *Id.* at 180.

86.    Some members of People First do not have access to the necessary technology to comply with the Witness and Photo ID absentee voting requirements without leaving their homes.  Many members have disabilities that make it difficult for them to maintain employment, and they rely on social security and disability benefits.  Agreed Facts ¶ 1; 9/11/20 at 104-105.  In general, members of People First do not have access to copiers, scanners, computers, and internet in their homes, and most members do not drive.  9/11/20 at 115, 128-129, 157.  Further, based on her interactions with them and their disabilities, Ms. Ellis testified that some members would likely have difficulty navigating and solving the technological issues that come with using video conference technology.  *Id.* at 129-30.  And, the parties agree that at least one People First member has a developmental disability that makes it difficult for her to use technology.  Agreed Facts at ¶ 1.

87.    Curbside voting better reflects People First's members' prior experiences with voting in person.  9/11/20 at 136.  Curbside voting would be easier for People First's members because they would not have to problem solve how to get a copy made, how to find two witness signatures, and how to complete the application for voting absentee.  *Id.*  Further, for those who require assistance in casting their ballot, allowing their oral communication about who they want to vote

58

for to take place in a vehicle would help ensure the secrecy of their ballot. *Id.* at 138.

88.     Though Ms. Lux does not drive herself, she would like to vote curbside this year. 9/11/20 at 167, 171. If available, she would arrange for her father to drive her to the polling place, and she is willing to call ahead to her polling place or schedule a time to vote curbside. *Id*. at 176. She is also willing to allow a poll worker to take her ballot and ID out of her sight to facilitate the curbside voting. *Id.* at 177. She believes this would be no more intrusive than her current in-person voting option of using the Automark machine, which gives poll workers an opportunity to supervise her voting. *Id.* at 179. For example, in 2008, a poll worker watched her vote for future President Obama using the Automark machine, and expressed disapproval by saying, "Oh, I can't believe you made that choice." *Id.*

(b)     *Greater Birmingham Ministries ("GBM")*

89.     GBM is a multi-faith, multi-racial membership organization that provides emergency services for members and constituents in need. Agreed Facts at ¶ 2. It engages in community efforts to create systemic change with the goal of building a strong, supportive, and politically active society that pursues justice for all people. *Id.* A central goal of GBM is the pursuit of social justice in the governance of Alabama. *See id.* at ¶ 3. Toward that end, GBM regularly communicates with its members and engages in efforts to register, educate, and

increase voter turnout, particularly among Black, Latinx, disabled, and low-income registered voters. *See id.*

90.     GBM has about 5,000 largely low-income members who are primarily, but not exclusively, located in or near Jefferson and Shelby counties. *See id.* at ¶ 4; 9/9/20 at 104.   It also has donor members across Alabama including in Mobile, Tuscaloosa, Madison, and Montgomery counties.   9/9/20 at 105.   GBM has sponsoring members that are state-wide organizations. *Id.* at 103-104.   Eighty-five percent of GBM's individual members are registered voters. *Id.*

91.     When the pandemic confronted Alabama, GBM began several efforts to make voting safer for its members.   GBM drafted a petition advocating that the State allow for curbside voting and remove the absentee ballot photo ID and witness requirements. *Id.* at 135-146.   The petition was written in Spanish and English. *Id.*; Plaintiff Ex. 377.   The petition cost GBM staff time, the volunteer services of a graphic designer, and volunteer time.   9/9/20 at 138.   GBM circulated the petition statewide, received 4,000 signatories, and sent the petition to Secretary Merrill. 9/9/20 at 135-136.

92.     GBM also sent two letters to Secretary Merrill advocating for him to allow curbside voting and remove the absentee voting witness and photo ID requirements. *Id.* at 141-142; Pl. Exs. 392 and 393.   GBM diverted staff time to draft these letters.   9/9/20 at 141-142.

93.     GBM developed educational materials on absentee voting, *see* 9/9/20 at 132 and Pl. Ex. 373, and organized absentee voter clinics, *see* 9/9/20 at 125.  The clinics were outdoors, and GBM required social distancing.  9/9/20 at 125.  "[P]eople could come and get absentee voter assistance in which [GBM] would provide onsite witnesses as well as notaries."  *Id.*  GBM also provided free photocopies of participants' identification.  *Id.*  Thus far, GBM has held six absentee voter clinics and plans to do more before the election.  *Id.*  GBM expended various resources to develop and hold the clinics.  It devoted advertising resources by sending an email newsletter and phone banking, and purchased tents to use for the clinics.  *Id.* at 131-32.  The clinic materials cost about $2,000.  *Id.*  GBM also used resources like folding tables, a photocopier, tablets, laptops, and Wi-Fi.  *Id.*  Further, two GBM staff members and up to twelve volunteers spent time working at each clinic.  *Id.*

94.     If the absentee voting witness and photo ID requirements were not in place, GBM would have devoted these resources to census outreach.  *Id.* at 131, 138.  The Executive Director of GBM explained, "[i]f there were no witness or photo ID requirements, we would not have to do those clinics because we could do the voter education work over the phone."  *Id.* at 132.  GBM has not helped people with absentee voting "much previously."  *Id.* at 113.  While it is true that GBM distributed a census flier at the clinics, GBM would not have needed as many volunteers to serve as witnesses, printers, paper, and ink if it was only doing census work.  *Id.* at 153, 163-164.  And, without the need to educate voters on absentee and photo ID

requirements, GBM would have instead focused its funding and staff and volunteer time on the census. *Id.* at 131, 138.

95.    GBM has members who are at higher risk for COVID-19 complications or death due to their race or age.  Of GBM's individual members, roughly 85 percent are Black, approximately 15 percent are White, and about 5 percent are Latinx. *Id.* at 107-110.   Forty percent  of GBM's members are over 60 or 65 years old.  9/9/20 at 107-110.  Ninety percent of GBM's members are low income annually, and 10 percent of its members are low income based on a recent loss of a job. *Id.* at 107-110.  Some of GBM's members have mobility issues. *Id.* at 134-135.

96.    Some of GBM's members are following social distancing rules.  9/9/20 at 111-112, 126.  Members of GBM are staying home due to their elevated risk of death or serious illness from COVID-19.   Agreed Fact ¶ 6.  GBM had members decline to leave their home to pick up free groceries even though GBM offered the groceries curbside.  9/9/20 at 111-112, 126.  There were also members who declined to attend absentee voter clinics in order to protect themselves from COVID-19. *Id.* at 126.

97.    Some of GBM's members cannot fulfill the witness absentee voting requirement without increasing their risk for COVID-19 complications or death. Forty percent of GBM members live alone, with nearly all of those individuals being over 60.  9/9/20 at 107-110.  There is overlap between members who live alone, are over 60, are low-income, and are a minority race. *Id.*  One GBM member, James

Sokol, reported during a board meeting that he was unable to meet the witness requirement without exposing himself to an additional individual outside of his household. *Id.* at 129-130, 166-167. Mr. Sokol has a neurological disease and informed GBM that he had COVID-19 when he voted in July. *Id.* Mr. Sokol expressed to the Executive Director of GBM that he would prefer curbside voting over absentee voting. *Id.* at 167-178.

98.     Some members of GBM do not have access to the necessary technology to adhere to the witness and photo ID requirements without leaving their homes. Around 60-65 percent of GBM members polled lack internet and computer access. 9/9/20 at 107-110. These members overlap with those who live alone. *Id.*

99.     Some members of GBM cannot adhere to the photo ID requirement without increasing their exposure to COVID-19. Some of GBM's members do not have a photo ID. 9/9/20 at 107-110. There is overlap between members who are a minority race and who have no photo ID. *Id.* There is also overlap between members who have no photo ID and who are low income. *Id.* Further, there is overlap between those who have no photo ID and who are over the age of 65.

100.    GBM is seeking a remedy for their claims that continues after November 3, 2020. 9/9/20 at 133. There are elections in Tuscaloosa and Alabaster in late November, and GBM has members in those areas. *Id.* GBM plans to continue

to educate its members and the public about absentee voting after the November general election during the pandemic. *Id.* at 133-134.[39]

       (c)   *Alabama NAACP*

101.   The Alabama NAACP is a state subsidiary of the National Association for the Advancement of Colored People, Inc. Agreed Facts at ¶ 7. The Alabama NAACP is the oldest and one of the most significant civil rights organizations in Alabama. *Id.* It is comprised of more than forty local units with active branches and chapters across the state including in Jefferson, Madison, Mobile, and Montgomery counties. 9/10/20 at 37–38; Pl. Ex. 329.

102.   Two central goals of the Alabama NAACP are to eliminate racial discrimination in the democratic process, and to enforce federal laws and constitutional provisions securing voting rights. Agreed Facts at ¶ 8. The Alabama NAACP believes that "all people should have the right to express their political desires" and that this is done most effectively through voting. 9/10/20 at 52. Voting is thus "fundamental to the NAACP." *Id.* Toward those ends, the Alabama NAACP regularly engages in efforts to register and educate Black voters and encourages them to engage in the political process by turning out to vote on Election Day. Agreed Facts at ¶ 8; *see also* 9/10/20 at 52, 55, 57–58.

---

[39] At trial, the plaintiffs did not present additional evidence regarding the Tuscaloosa and Alabaster elections, including whether any members of GBM actually plan to vote in those elections. Thus, the plaintiffs have not shown they are entitled to any relief related to the Tuscaloosa and Alabaster elections, and the court confines its analysis to the November 3 general election.

103.   Since the pandemic began, the Alabama NAACP has diverted resources to helping voters comply with the Challenged Provisions.  9/10/20 at 53–54.  It has hosted outdoor clinics during which it offered photocopying services to help voters satisfy the photo ID requirement.  *Id.*  The Alabama NAACP held these clinics in Limestone, Lawrence, Jefferson, Shelby, and Montgomery counties, and it plans to host another in Montgomery County and one in Baldwin County.  *Id.* at 55–57. Future clinics will offer witness and notary services, but the Alabama NAACP cannot reach everyone who needs these services because of the high demand, and some voters are unaware of the clinics.  *Id.* at 56–57.  For past clinics, the Alabama NAACP purchased ink and paper to photocopy IDs, and hand sanitizer and masks to protect its members and prospective voters.  *Id.* at 56.  Additionally, the Alabama NAACP is increasing its efforts to educate vulnerable Alabamians about the absentee balloting process.  *Id.* at 58, 76.  The organization has also increased its advocacy for the adoption of less restrictive voting methods.  *Id.* at 72; *see also* Pl. Ex. 392; Pl. Ex. 393.  If the Alabama NAACP was not engaged in this work, it would be "strictly" working on "registering people to vote and educating people about the issues that are at hand."  9/10/20 at 57.

104.   Many Alabama NAACP members are particularly vulnerable during this public health crisis.  *See* Agreed Facts at ¶ 9.  Although the NAACP is a diverse organization, most of its members are Black.  9/10/20 at 43; Agreed Facts at ¶ 9. Most members are also senior citizens, many of whom have chronic medical

conditions, like diabetes or hypertension, that make them more likely to suffer serious complications from contracting COVID-19. Agreed Facts at ¶ 9. Many members also live alone or with only one other adult. *Id.* Some members of the Alabama NAACP have or have had COVID-19. *Id.*

105. Some of the Alabama NAACP's most vulnerable members cannot comply with the Challenged Provisions without exposing themselves to a potentially deadly case of COVID-19. *See* 9/10/20 at 77–78, 80–81. Lillian Jefferson, the Alabama NAACP's former president, lives alone, which could make it more difficult for her to satisfy the witness requirement.[40] *Id.* at 80-81. The president of the Alabama NAACP's Montgomery County branch, Della Bryant, is older than 65, lives alone, and has difficulty walking. *Id.* at 81, 111. Because Ms. Bryant does not own a copier, obtaining a copy of her ID requires her to interact with another person who may have the coronavirus. *Id.* at 81. Ms. Bryant, however, may be exempt from the photo ID requirement due a physical disorder that affects her ability to walk. *Id.* at 111-12. Keisha Hendricks is a medically retired veteran who currently serves as the Alabama NAACP's economic chair. *Id.* at 81. She cannot walk due to her health conditions. *Id.* Ms. Hendricks also lives alone, making it more difficult for her to satisfy the witness requirement. *Id.* But, Ms. Hendricks has a woman over

---

[40] Mr. Benard Simelton, the current president of the Alabama NAACP, admitted on cross-exam that he does not know if Ms. Jefferson has close family members, friends, or neighbors she could ask for help. 9/10/20 at 110.

the age of 18 who visits her home to help care for her, and Ms. Hendricks' caregiver was present when Mr. Simelton visited Ms. Hendricks in her home.  *Id.* at 114-15.

106.   The Alabama NAACP favors curbside voting because some of its members, like Ms. Hendricks, have ambulatory issues.  *Id.* at 59.  Without curbside voting as an option, some of those members would struggle to navigate steps at some polling places.  *Id.* Curbside voting would also benefit the organization's members who face higher risks associated with COVID-19 due to their age.  *Id.*  For these members, curbside voting is preferred because it would allow them to "remain in their car without exposing themselves" to the coronavirus.  *Id*

        (d)    *Black Voters Matter*

107.   BVM is a nonprofit organization that works primarily with community-based groups to increase voter turnout and involvement in civic life among members of the Black community.  9/9/20 at 174.  BVM supports those groups, which it calls "partners," by providing financial resources and access to tools such as texting and phone banking technology.  *Id.* at 175.  It also advocates for policies to expand voting rights and access.  Agreed Facts at ¶ 13.

108.   BVM had an active presence in Alabama before the pandemic.  It has partners in Alabama at the state and local levels.  9/9/20 at 175.  The organization is particularly active in Alabama's Black Belt counties, including Wilcox and Lowndes counties, because those counties have generally been deprived of resources and have higher rates of poverty and unemployment than other areas.  *Id.* at 176–77.  BVM

has an Alabama state coordinator, who manages its relationships with its partners and travels throughout the State to support them. *Id.* at 179–84. Since 2018, BVM has sponsored "bus tours" in Alabama to further promote its partners and generate excitement among voters. *Id.* at 183. BVM has also held an annual conference in the State. *Id.* at 179–80.

109. During the pandemic, BVM has had to divert resources from its traditional Alabama initiatives to educate voters about the Challenged Provisions. BVM has sponsored several text campaigns targeting Black voters who may need assistance navigating Alabama's absentee voting scheme. *Id.* at 190–91. In its July text campaign, BVM sent text messages inviting roughly 190,000 Black Alabamians to attend a virtual townhall discussing several topics, including voting in Alabama. *Id.* at 192; Pl. Ex. 340. BVM estimates that such campaigns cost around five cents per text, 9/9/20 at 193, and it plans to sponsor several future waves of texts because "the current requirements [for absentee voting in Alabama] are so complicated." *Id.* at 194. But for the Challenged Provisions, BVM would be focused on its "core function" of educating voters about turnout and substantive issues. *Id.* at 195.

110. BVM has also provided additional grants for its partners to educate community members about complying with the Challenged Provisions during the COVID-19 pandemic. *See, e.g., id.* at 200–03. In some cases, these grants have been for as much as $10,000 "because of the extra challenges" associated with satisfying Alabama's absentee voting requirements. *Id.* at 204. If the Challenged

Provisions did not exist, BVM would not need to provide these additional and increased grants. *See id.* at 205.

111.    BVM and its partner organizations favor allowing curbside voting in Alabama. *Id.* at 189.  Many of BVM's constituents and the members of its partner organizations have health conditions that increase their risk of death or severe complications from contracting COVID-19.  Agreed Facts at ¶ 18.  Some of these individuals lack access to computers, the internet, or other reliable videoconferencing technology, and many live alone or with only one other adult. *Id.* BVM believes that curbside voting would be a safer option than voting in person for these at-risk individuals.  9/9/20 at 189.

       (3)    <u>Defendants</u>

            (a)    *Secretary of State John Merrill and the State of Alabama*

112.    Secretary Merrill is the Secretary of State of the State of Alabama, which is itself a defendant in this action, and he has served in this position since 2015. 9/11/20 at 2.  As the Secretary of State, he is Alabama's chief election official, and is charged with:  providing uniform guidance with respect to elections, issuing related administrative rules, canvassing and certifying election results, and prescribing and designing the absentee ballot application form that "shall be used throughout the state."  Agreed Facts at 15, ¶ 20.  In addition, Secretary Merrill is statutorily required to "inform the public" about the photo ID requirement, Ala. Code § 17-9-30(n), and is granted "rule making authority for the implementation" of the

photo ID requirement, *id.* § 17-9-30(o).  Agreed Facts at 15, ¶ 20.  In the event

Alabama, the federal government, or another state declares a state of emergency that

"renders substantial compliance with" the absentee ballot provisions of Alabama law

"impossible or unreasonable for a group of qualified voters who respond to the

emergency," the Secretary of State "may promulgate an emergency rule to allow

those qualified voters to vote by absentee ballot."  Ala. Code § 17-11-3(e); Agreed

Facts at 15, ¶ 20.

        (b)    *County Circuit Clerks and Absentee Election Managers*

113.  The Circuit Clerks and AEMs are charged with processing and

distributing absentee ballot applications; appointing poll workers; training absentee

office workers; issuing, tracking, and safeguarding absentee ballots; and canvassing

provisional absentee ballots.  Agreed Fact ¶ 22; 9/16/20 at 48-49, 51.  In Alabama,

the county circuit clerk serves as the AEM, though a circuit clerk can decline that

role.  9/15/20 at 41.  Circuit clerks and AEMs defer to the Secretary of State's office

on what the law is with regard to voting in Alabama.  9/15/20 at 168.

114.  Plaintiffs filed this suit against many circuit clerks and AEMs

throughout Alabama.  Doc. 75.  Many of these defendants have settled and are no

longer in the case.  Those remaining are: Jacqueline Anderson-Smith, the Circuit

Clerk and AEM for the Birmingham Division of Jefferson County; Karen Dunn

Burks, the Deputy Circuit Clerk and AEM of the Bessemer Division of Jefferson

County; Gina Jobe Ishman, the Circuit Clerk and AEM of Montgomery County; and

JoJo Schwarzauer, the Circuit Clerk of Mobile.  Ms. Anderson-Smith, Ms. Burks, and Ms. Ishman have all "agree[d] to abide by any injunctions or orders of the Court" with regard to this case, docs. 181 and 182, and, consequently, did not present any evidence at trial.

(c)    *County Probate Judges*

115.   Probate judges are the chief election officials in their county.  9/15/20 at 166-67.  Probate judges defer to the Secretary of State's office on what the law is with regard to voting in Alabama.  *Id.* at 168.  Generally, probate judges determine the number of poll workers assigned to a polling place.  *Id.* at 136.  They are charged with appointing and training poll workers.  Agreed Fact ¶ 23.  They also ensure there are tabulation machines at the polling places.  9/15/20 at 137.  They work with the county commissions to determine polling places.  *Id.* at 167.  They are also in charge of validating and canvassing election returns and ballots.  Agreed Fact ¶ 23.

116.   As with the circuit clerk and AEM defendants, the plaintiffs named many probate judges across Alabama as defendants in this lawsuit.  Doc. 75.  Many of these defendants have settled and are no longer in the case.  Those remaining are: Judges Sherri Friday and James Naftel of Jefferson County, Judge J.C. Love III of Montgomery County, and Judge Don Davis of Mobile.  Judge Friday, Judge Naftel, and Judge Love have "agree[d] to abide by any injunctions or orders of the Court" with regard to this case, docs. 181 and 182, and as such, did not present any evidence at trial.

71

117.   Judge Davis has served as Probate Judge for Mobile County for twenty years.  9/15/20 at 37.  Many of his election administration duties are shared with the Mobile County Commission, which is responsible for creating election precincts, determining poll locations, securing election machines, and providing adequate funding for elections.  *Id.* at 41.  Judge Davis helps nominate poll workers, although the ultimate appointment is done by the County Commission.  *Id.* at 44-46.  He also helps train poll workers using a printed guide and video presentations.  *Id.* at 47.

118.   Although Judge Davis is the chief election official for Mobile County, he does not have control over all aspects of the election.  9/15 20 at 40.  According to Judge Davis, Ms. Schwarzauer (the Circuit Clerk) and Ms. Barnett (the Absentee Election Coordinator) are responsible for all aspects of absentee voting, including processing absentee ballot applications.  *Id.* at 41-43.  Ms. Barnett's testimony backs this up.  She reported that she and the employees in her office enforce the photo ID requirement by checking that returned absentee ballot applications are complete and include a copy of a photo ID for all voters who are not exempt from the photo ID requirement.  *See* 9/17/20 at 112, 116, 137.

## F.   The Challenged Provisions of Alabama Law

119.   The plaintiffs in this case challenge three provisions of Alabama election law:  (1)  the requirement that a notary or two witnesses sign absentee ballot affidavits ("the witness requirement"); (2) the requirement that voters submit a copy

of their photo ID with absentee ballot application ("the photo ID requirement"); and

(3) the state's de facto ban on curbside voting.[41]  Doc. 75.

120.   Dr. Tracy Burch, the plaintiffs' expert on political science and political

participation, testified that "Black Alabama adults at high-risk for severe illness from

COVID-19 are far less able to satisfy these requirements for absentee voting than

high-risk White Alabama adults while following CDC guidance to avoid contact

with people from outside their household."  Ex. 270 at 7; 9/14/20 at 191-192.  Dr.

Burch explained that this is because high risk Black voters are more likely to live

alone or with just one other adult. Pl. Ex. 270 at 34 ("22.0 percent of Black adults

age 18 to 64 who report being in fair or poor health live in a household with no other

adults, meaning that they would need to contact two additional witnesses from

outside their household.  This rate is five times higher than that for White adults with

health issues; only 3.9 percent of White adults with health issues do not live with

any adults."); *see also* 9/14/20 at 203-04.   For Black individuals over 65, this

disparity is more dramatic, "nearly 90 percent of Black people age 65 and older

would need to risk contacting at least one other person outside their household to

meet the witness requirement" compared with "77.2 percent of White people and

47.1 percent of Latino people." Pl. Ex. 270 at 37.

---

[41] The plaintiffs previously challenged the requirement that voters provide an excuse to vote absentee in Alabama elections, doc. 75, but the court dismissed that claim as moot after Secretary Merrill extended the emergency rule allowing all voters to vote absentee in the November election, doc. 161 at 26.

121.    In Alabama, high-risk Black voters are also less likely to have resources allowing them to safely vote absentee.  Only 3.9 percent of White households do not have a vehicle compared to 12.7 percent of Black households.  Doc. 228 at ¶ 13; 9/9/20 at 89-90.  Fifty percent of elderly Black adults in Alabama do not have internet access compared to thirty percent of elderly White adults.  9/14/20 at 207; *see also* Doc. 270 at 40.  High risk Black voters are also more likely to be experiencing poverty than their White counterparts.  9/14/20 at 204-205.  For adults who are high risk due to a medical condition, 35.6 percent of Black individuals have an income below $25,000, compared to 6.6 percent of White individuals.  Pl. Ex. 270 at 39; 9/14/20 at 204-05.  For that same group, 53.3 percent of Black adults are food insecure compared to only 20.5 percent of White adults.  *Id.*  Black Alabamians who are high risk due their age are also more likely to be poor than their White counterparts.  *Id.*  39.8 percent of Black adults at high risk due to age have an income below $25,000, whereas, only 14.9 percent of White adults in that category have an income below $25,000.  *Id.*  Similarly, 59 percent of elderly Black adults are food insecure compared to only 27.1 percent of elderly White adults.  *Id*

(1)    The Witness Requirement

122.    Voters are required to sign an absentee ballot affidavit in the presence of two witnesses or a notary.  9/15/20 at 139-40, 178; Ala. Code § 17-11-10(b).  Alabama is one of only two states that has this requirement.  9/11/20 at 10.  Notaries may use video conference to watch the voter sign the affidavit, but they must still

sign the same ballot affidavit as the voter. 9/15/20 at 178. That means that the voter must still arrange to meet the notary in person. *See* 9/8/20 at 165. As for the two witnesses, they are not required to know the voter or identify the voter. 9/15/20 at 178. Employees at a county AEM's offices will witness a voter's absentee ballot affidavit for voters who complete the ballot in-person at the AEM's office. 9/17/20 at 130-31. However, there is no guarantee other voters in the office will be wearing masks because they are not required to do so. 9/15/20 at 201-202

123. Witnesses and parties at trial presented conflicting testimony about which local election official checks to ensure that a ballot affidavit that complies with the witness requirement. Secretary Merrill testified that the AEM or her staff examine the ballot affidavit envelope to ascertain whether it meets the witness requirement at the time the AEM receives the ballot. *See* 9/11/20 at 88. But, the Absentee Election Coordinator for Mobile County, Ms. Barnett, testified she and her staff do not check the ballot affidavit for witness signatures or a notary stamp when they receive the ballots, and they do not notify the voter if the required signatures are missing. 9/17/20 at 127. Instead, her office files the affidavit envelopes containing the ballots in locked cabinets until Election Day. *Id.* at 127-28. Ms. Barnett then delivers the ballots to Probate Judge Davis's designee on Election Day. *Id.* at 141. Judge Davis, in turn, testified that before opening an absentee ballot, poll workers first verify that the ballot is either notarized or witnessed. 9/15/20 at 59. If

75

the ballot affidavits do not have the signatures or notary seal, they are not counted. *Id.* Houston County, Alabama utilizes a similar process. 9/16/20 at 48-50.

124.   The facts do not show that the witness requirement prevents voter fraud. While Secretary Merrill testified that "there are experts who believe that the security standards that are in place, which include the signature provisions, are beneficial to the security and integrity of the election process," *see* 9/11/20 at 62, his office wrote SB 77, which, if enacted, would have removed the witness requirement for absentee voting, *see id.* at 7-8, 10-11. Secretary Merrill also testified that witnesses do not have to know the voter, and no one confirms the identity of the witnesses or that they saw the voter execute the affidavit. *Id.* at 11. Similarly, Justice Murdock testified that the witness requirement would not prevent the types of fraud he investigated as a private lawyer and advocate for election reform, or other antifraud measures unrelated to the witness requirement have minimized those types of fraud. 9/17/20 at 81-88. Also, Mr. Biggs, a former prosecutor of voter fraud in the mid-1990s, testified that the witness requirement would not have prevented any of the four cases of voter fraud he prosecuted. 9/16/20 at 28, 31-32, 38-39.

125.   The parties and witnesses offered conflicting evidence about whether the witness requirement assists the State in investigating voter fraud. Secretary Merrill testified that none of the voter fraud convictions in the State "have been the result of investigations that have utilized the signature requirement when they have completed their investigation or during the investigative process." 9/11/20 at 62.

But, Mr. Biggs testified that the witness signatures provided a lead for identifying ballots that may have been fraudulent in the voter fraud convictions he obtained in the 1990s.  9/16/20 at 11-12.  However, his full testimony suggested that he may have conflated the issue with the requirement for the voter to sign their voting documents.  *See* 9/16/20 at 10.  And, he indicated that the witness signature requirement's main benefit was to flag multiple ballots, if any, signed by the same witnesses.  *Id.*  However, Alabama law does not prohibit a witness from signing multiple absentee ballots.  9/15/20 at 181.

126.  The defendants presented evidence of voter fraud convictions in Houston County in 2014.  9/16/20 at 67.  The witness signatures on the absentee ballots helped the circuit clerk of Houston County, Carla Woodall, flag potentially fraudulent ballots. 9/16/20 at 67; *see also id.* at 72.  But, she was also able to identify potential fraud from the similar handwriting and pen color the fraudsters used and the consecutive street addresses they listed on the absentee ballot applications. 9/16/20 at 66.  And, like Mr. Biggs, Ms. Woodall's testimony also appeared to sometimes conflate the witness signature requirement with the separate requirement that voters sign the absentee ballot affidavit.  *See* 9/16/20 at 71-72.

127.  The plaintiffs presented evidence that the witness requirement is burdensome for Alabama voters during the pandemic.  Dr. Elopre, a plaintiffs' expert on internal medicine, infectious diseases, and disparities in access to health care and health outcomes in Alabama, opined based on her direct experience

researching social determinants of health in the Black Belt that, "witness signatures and other requirements for absentee ballots may be unattainable for those who historically fought for the right to vote in [Black Belt] counties." Pl. Ex. 271 at ¶ 18. Many voters do not have two other adults living in their home to serve as witnesses. 9/9/20 at 61; Pl. Ex. 270 at 34-37. This means they need to find individuals outside of their home to serve as witnesses or a notary. 9/9/20 at 61; 9/9/20 at 115; Pl. Ex. 270 at 39. And interacting with witnesses outside of their home, increases their potential exposure to COVID-19. 9/9/20 at 115; 9/9/20 at 61.

128. Alabama's Safer at Home order mandates that anyone with COVID-19 must quarantine at home for fourteen days and can only leave home for medical reasons. State Ex. 85. This means, obviously, that a voter who has COVID-19 is prohibited from having contact with others outside their home to obtain the required witness signatures for their ballot. 9/9/20 at 61. And yet, because of the witness requirement, Mr. James Sokol, a board member of GBM, alleged at a board meeting that he had to find one witness outside of his household in order to vote absentee in the July primary run-off even though he had COVID-19 at the time. 9/9/20 at 129-130. Whether Mr. Sokol's report is true is irrelevant to the court's findings and analysis. It is undisputed, however, that a COVID-19 diagnosis alone does not exempt a voter from the witness requirement.

129. Resources that aid voters in safely adhering to the witness requirement are not available to all voters. For example, while it is possible for a vulnerable voter

to have a ballot witnessed through a car window, a voter who is highly impoverished may not have the resources to do so.  9/9/20 at 89-90.  The Director of Elections and Deputy Chief of Staff to the Secretary of State, Clay Helms, testified that his staff would go to a voter's home to witness the voter's absentee ballot.  9/15/20 at 163. But, the defendants did not present evidence that this service has been advertised to voters, provided to any voter, or that voters are aware of this service

130.   As stated previously, in lieu of the two witnesses, Alabama also allows voters the option of having their absentee ballot affidavit notarized.  Similar to the two witnesses, using a notary risks exposure to COVID-19 if the interaction is in-person.  *See* 9/9/20 at 116; 9/11/20 at 181, Agreed Facts at ¶ 62, and Pl. Ex. 270 at 8.  And while the State now allows the videoconferencing option, voters may not have access to technological devices or the internet to use the remote notary services, and if they do, they still need to meet the notary in person or find some other way to obtain her signature or seal on the absentee ballot affidavit.  Pl. Ex. 270 at 39; 9/16/20 at 178; 9/8/20 at 165.  Lastly, the voters may not have the funds to pay for the notary's services.  Pl. Ex. 270 at 39; 9/9/20 at 116.

131.   The only evidence regarding the cost of notary services in Alabama involved a study of forty-two notaries presented by the plaintiffs.  The study showed that only five offered their services for free to notarize a ballot, eighteen charged $5, six charged $10, and thirteen charged more than $10.  9/14/20 at 206.  In addition, "[s]ome also charged if they were required to travel to meet people in order to

notarize signatures." *Id.* Finally, "only six notaries said that they had any virtual kind of capabilities." *Id*.

132.   Dr. Elopre believes that curbside notary services and copying services would be a reasonably safe way for voters to comply with those requirements if they are in a car by themselves.  9/9/20 at 94.  The Mobile County Public Library offers free curbside notary services at five of its branches.  9/16/20 at 118-119.  The normal procedure requires patrons to exit their vehicles to utilize the curbside services, but the head of the library system testified that she is "pretty sure" her staff would go to a vehicle to retrieve documents if a patron "could not get out of their car."  9/16/20 at 129.  The Library's notary services work best when patrons call ahead because there is no guarantee that a notary will be present otherwise at one of the five locations.  9/16/20 at 128.  The Library has advertised this curbside service on its website, its Facebook page, flyers, and in the local, free, and widely available newspaper, *The Lagniappe.*  9/16/20 at 120-122, 135.  The head of the library system testified that the use of this service has been sparse because citizens may not know about it.  9/16/20 at 133.  The defendants have no control over the curbside services offered by the Library.  9/16/20 at 123-124.

(2)   The Photo ID Requirement

133.   Alabama requires voters to include a photo ID with their absentee ballot application depending on the reason that they are voting absentee.  Pl. Ex. 22.  If a voter is found to have "falsifie[d] [an] absentee ballot application or verification[,]"

the State can convict them of a Class C felony.  *Id.*  Those voting absentee due to a fear of increased exposure to COVID-19 must use the excuse, "I have a physical illness or infirmity which prevents my attendance at the polls," and comply with the photo ID requirement.  State Ex. 17; Pl. Ex. 22.

134.   Alabama does not require voters to submit a copy of their photo ID when they are voting absentee either (1) under the Uniformed and Overseas Citizens Absentee Voting Act, or (2) because they have "a physical illness or infirmity which prevents [their] attendance at the polls. . . .  due to a neurological, musculoskeletal, respiratory (including speech organs), cardiovascular, or other life-altering disorder that affects [their] ability to perform manual tasks, stand for any length of time, walk unassisted, see, hear, or speak . . . ."  Pl. Ex. 22.  Voters qualify for the second exception to the photo ID requirement only if they are "(a) an elderly voter aged 65 or older; or b) [] a voter with a disability."  *Id.*

135.   AEMs may also require a voter to provide a copy of their identification with their absentee ballot.  Agreed Facts at ¶ 118.  Some absentee voters, therefore, may need to furnish photo ID twice; once with the absentee ballot application and again with the actual absentee ballot.  *Id.*

136.   Circuit clerks and AEMs are charged with enforcing the photo ID requirement.  9/11/20 at 16 and 9/17/20 at 116, 139.  When the circuit clerk or AEM receives an absentee ballot application, they check to see if the voter is required to submit a copy of their photo ID.  9/17/20 at 116.  If a photo ID is required, the AEM

or circuit clerk checks whether the voter included the ID with the application. 9/17/20 at 116.  The AEM or circuit clerk will not send the voter a ballot if they fail to include a required photo ID.  9/17/20 at 116.

137.   Ms. Barnett, Absentee Election Coordinator for Mobile County, testified that if a voter who is not exempt from the photo ID requirement sends an absentee ballot application without a copy of her ID, her office will send a letter to the voter to let the voter know they cannot process the application and to request a copy of the photo ID.  9/17/20 at 116.  Ms. Barnett testified that her staff returns "a good many" applications to voters due to missing information.  *Id.* at 120.  There was no evidence presented that other AEMs follow Ms. Barnett's lead and notify the voters when their absentee ballot applications are rejected.

138.   The photo ID requirement is available, if necessary, as a tool to investigate allegations of voter fraud, *see* 9/11/20 at 45 and 9/16/20 at 72, but it is not clear the photo ID prevents voter fraud.  Based on the evidence at trial, the photo ID is not necessary to verifying the identity of the absentee voter.  Ms. Barnett testified that with a voter's name, address, and date of birth, she feels she has "a good amount of data to be able to identify the voter."  9/17/20 at 113.  Her office also verifies the voter's driver's license number or the last four digits of their social security number that the voter is required to provide on her application.  *Id.* at 114. While Ms. Barnett testified that she compares the voter's signature on the absentee ballot application with the signature on the photo ID, she also testified that she uses

the signature on the voter's registration document when available in her office's computer system to verify an applicant's identity. 9/17/20 at 118. Further, no evidence was presented that other AEMs also use the photo ID to verify signatures. And there is evidence that the photo ID requirement would not prevent the type of fraud the defendants identified at trial. For example, Justice Murdock testified that as to the absentee ballot challenge in the 1994 Chief Justice race he worked on as a lawyer, which launched his anti-corruption advocacy, the dispute centered on the counting of absentee ballots with no witness signatures rather than the photo ID provision. 9/17/20 at 83-88. Mr. Gregory Biggs, a former prosecutor who worked on four voter fraud cases in the mid-1990s, also testified that the photo ID requirement would not have prevented the cases he prosecuted. 9/16/20 at 28, 31-32, 36, 39.

139.   Secretary Merrill's office has received calls from voters who need help obtaining a copy of their IDs. 9/11/20 at 16-17. And, Secretary Merrill has offered to mail some voters a copy of their photo ID if they text or email a picture of the ID to him. 9/11/20 at 17. He has also encouraged county officials to offer the same service. *Id.* After receiving the text or email request, Secretary Merrill's office confirms that the information on the photo ID sent to them matches the information on a voter registration record before making the copy for the voter. *Id.* at 17-19. Still, he acknowledged that his office does not know if it is sending the copy of the

ID to the corresponding voter.  *Id.* at 18-19.  The Secretary of State's website does not advertise this service.  *Id.* at 20.

140.   The Secretary of State's office also has a mobile unit that travels around the State to provide voters with a free photo ID.  9/15/20 at 154; State Ex. 73.  This mobile unit was in Birmingham on July 7 and July 11, and the Secretary's office advertised the events on their webpage and with a printable flier.  State Ex. 73.  The mobile unit has held at least 40 events during the pandemic.  9/15/20 at 165.

141.   The plaintiffs presented evidence that the photo ID requirement is a barrier to voting for some voters during the pandemic.  To begin, the varying photo ID requirements on the absentee ballot application can confuse voters causing them to believe they do not need to send a photo ID with their application.  The Executive Director of GBM, Scott Douglas, believes the language of the absentee ballot application is confusing due to its lengthy paragraphs, the terms used, and the penalty of felony charges.  9/9/20 at 124.  That confusion has generated questions from GBM members.  *Id.* at 125.  Ms. Barnett's testimony supports the conclusion about voter confusion as she testified that there are times when people should have included a photo ID in their application and did not, or included a photo ID when they were exempt from the requirement.  9/17/20 at 117, 120.  Further, the Secretary of State's office has received questions regarding when voters are required to send an ID with an absentee ballot application. 9/15/20 at 162-63.

142.   Obtaining a photo ID itself can be a barrier to those who do not have one.  9/11/20 at 14-15.  As Secretary Merrill acknowledges, *see* 9/11/20 at 16-17, some eligible voters do not have access to the necessary equipment to make a copy of their photo ID at home.  9/9/20 at 60, 9/9/20 at 22.

143.   Voters who do not own photocopying equipment may not have access to transportation to obtain a copy of their ID.  9/9/20 at 60, 9/9/20 at 22.   Many people who are more vulnerable to COVID-19 complications or death do not have access to personal transportation and must rely on riding with a friend or taking public transportation.  9/9/20 at 60.  This increases the risk such individuals will become infected.  *Id.*; *see also* 9/8/20 at 46-47.

144.   Due to the pandemic, a voter may have more difficulty gaining access to places where they normally could make copies like their church or library.  As Ms. Threadgill-Matthews testified, churches, for example, have been closed making it difficult for some to obtain a free copy of their photo ID.  9/9/20 at 23.  Even when voters have access to a photocopier outside their homes or can go to the AEM's office to vote in person and thereby bypass copying their ID, utilizing the outside copier or the AEM's office increases their potential exposure to COVID-19.  For example, going in person to the AEM's office to vote absentee (and in that case only having to show an ID in person, *see* 9/16/20 at 51) can result in that voter potentially exposing herself to COVID-19 by interacting with the other voters or county

employees.   The fact that voters are not required to wear masks while voting exacerbates this risk.  State Ex. 85; 9/17/20 at 153.

145.   If a voter has tested positive for COVID-19, then they are required by the State Health Officer's emergency order to quarantine themselves.  State Ex. 58. During this 14-day period, the voter is prohibited from leaving her home to obtain a copy of her photo ID.  *Id.*  Further, even in the absence of the emergency order, an infected voter should not leave her home to obtain a copy of her photo ID for public health reasons.  9/9/20 at 60.

### (3)    The Curbside Voting Ban

146.   No provision of Alabama law expressly prohibits curbside or drive-thru voting.  9/11/20 at 43; 9/15/20 at 184; Agreed Facts at ¶ 110; *see generally* Ala. Code §§ 17-9-1 – 17-9-15.   Likewise, no provision of Alabama law expressly provides for the practice.  9/11/20 at 38, 41, 43; *see generally* Ala. Code §§ 17-9-1 – 17-9-15.  Therefore, according to Secretary Merrill, curbside voting violates state law.  9/11/20 at 38, 41.

147.   Secretary Merrill is aware of instances of curbside voting in Perry, Hale, and Houston counties.  9/11/20 at 37, 65.  When Secretary Merrill or his staff learned of those instances, they intervened to stop them.  *Id.* at 37-38, 40-41.  For example, after receiving a report of curbside voting in Hale County in 2016, Secretary Merrill immediately called the Hale County probate judge, who told him that he offered the service as a convenience to voters.  *Id.* at 40.  Secretary Merrill

told the probate judge to cease and desist and informed the judge that, if necessary, he would call the county sheriff to end the practice. *Id.* at 40-41. Then, in 2018, two employees from the Secretary's office learned that poll workers permitted curbside voting at a polling site in Perry County, and they informed the poll workers that curbside voting is not allowed in Alabama. *Id.* at 37-38. Secretary Merrill does not know the details regarding the curbside voting that occurred in Hale and Perry counties, such as whether the voters permitted to vote curbside had a disability, whether the polling sites were accessible, or whether the secrecy of the ballots was compromised. *Id.* at 38-39, 40-42. Secretary Merrill testified that it did not matter whether the voters were disabled because curbside voting is against the law. *Id.* at 41. Because he believes the practices violates the law, Secretary Merrill would seek a court order or call law enforcement to enforce the ban on curbside voting. *See id.* at 52.

148.    Secretary Merrill's deputy chief of staff and director of elections, Clay Helms, testified that, in addition to not being allowed by Alabama law, curbside voting is also not practical in Alabama. 9/15/20 at 134, 157-59. In particular, Mr. Helms testified that providing curbside voting would require additional poll workers at a time when poll worker recruitment is already an issue, along with additional electronic poll books and voting machines that would be difficult to procure. *Id.* at 157-58. Mr. Helms also expressed concerns about issues that could arise if poll workers have to remove a completed ballot from a voter's sight to feed it into a

tabulation machine during the curbside voting process. *Id.* at 158-59. Secretary Merrill expressed the same concern when testifying that he understood that when officials in Perry and Hale counties provided curbside voting, poll workers carried ballots out to the voters and then returned the ballots back inside the polling place after the voters completed them, which broke the chain of custody for the ballot in violation of Alabama law. 9/11/20 at 51, 68. He explained that under Alabama law, unlike AEMs, poll workers are not authorized to receive a completed ballot, and he is not aware if an AEM has authority to receive ballots that are not absentee ballots. *See id.* at 81-82, 84, 86. But, Alabama law expressly allows voters to receive assistance from poll officials while casting a ballot. *See* Ala. Code § 17-9-13(b).

149.   In spite of the challenges that curbside voting may present, several states offer the service, and the CDC recommends that states consider curbside voting as a means of complying with social distancing rules and limiting personal contact during in-person voting. Pl. Ex. 451. In addition, Drs. Elopre and Reingold, the plaintiffs' experts in infectious diseases and epidemiology, respectively, both testified that curbside voting would be a safer alternative to in-person voting because it presents a decreased risk of exposure to COVID-19. 9/8/20 at 45, 52; 9/9/20 at 62-63. Because it is a safer alternative, the individual plaintiffs testified that they would utilize curbside voting in the November election, especially if they cannot vote absentee. 9/8/20 at 125, 129, 175, 179; 9/9/20 at 15; 9/14/20 at 23, 59, 79-81. And, Dr. Peebles testified that he would like to use curbside voting even after the

88

COVID-19 pandemic in case of potential issues with accessing his polling site. 9/8/20 at 161-62.

150.   Montgomery and Jefferson counties agreed to "exercise good faith and undertake reasonable efforts to provide curbside voting in a manner that complies with state and federal law and the CDC guidelines for voting" if the ban is lifted. Docs. 181 at ¶ 16 and 182 at ¶ 14.  There are already variances in voting logistics by county.  Each county's probate judge decides "how to handle voting logistics," and not all counties have electronic pollbooks.  9/15/20 at 167, 186.  Further, counties use different types of handicap accessible voting machines.  *Id.* at 137.

151.   The organizational plaintiffs also believe that curbside voting would benefit their members.  First, Ms. Ellis testified that curbside voting would be more similar to People First members' prior experiences with voting than absentee voting would be, making it easier for them to vote because it would not require as much problem solving.  9/11/20 at 137-138.  And, some members of People First may need to vote in person rather than absentee because they require assistance with voting due to vision impairments.  *See id.* at 137-38.  Second, curbside voting is very important to the Alabama NAACP because many of its members are older, vulnerable to COVID-19, and want to minimize their exposure to the virus, and because some members also have ambulatory issues. 9/10/20 at 59.  Third, GBM also has a member who reported he would prefer curbside voting, and it has members with ambulatory issues who would benefit from the service.  9/9/20 at 134-35, 139-

40, 167-68.  Finally, many members of BVM partner organizations are at high risk from COVID-19 and would benefit from curbside voting to minimize exposure to the virus.  *See* 9/9/20 at 189.

152.   Plaintiffs also contend the ban on curbside voting disproportionately burdens Black voters as they are more likely to have a disability.  Doc. 247 at 19-24.  In Alabama, Black adults over 65 are 4.1 percent more likely to have a disability than White adults over 65.  Doc. 228 at ¶¶ 36, 40.   Elderly Black adults are also 5.6 percent more likely to have an ambulatory difficulty.  *Id.*

**G.   Procedural History of this Litigation**

153.   On May 1, 2020, the plaintiffs filed their initial complaint in this case alleging the photo ID requirement, the witness requirement, and the curbside voting ban infringe on their voting rights as provided by the Constitution, the Americans with Disabilities Act, and the Voting Rights Act.  Doc. 1

154.   The plaintiffs moved for a preliminary injunction, docs. 15, 46, which the defendants opposed, docs. 36, 38, 39, 41, and 45.  The court granted the motion in part on June 15, 2020, ordering the defendants "(1) not to enforce the witness requirement for the July 14 runoff election for absentee voters who determine it is impossible or unreasonable to safely satisfy that requirement in light of the COVID-19 pandemic, and who provide a written statement signed by the voter under penalty of perjury that he or she suffers from an underlying medical condition that the Centers for Disease Control has determined places individuals at a substantially

higher risk of developing severe cases or dying of COVID-19; (2) not to enforce the photo ID requirement for the July 14 runoff election for absentee voters who are over the age of 65 or disabled who determine it is impossible or unreasonable to safely satisfy that requirement in light of the COVID-19 pandemic, and who provide a written statement signed by the voter under penalty of perjury that he or she is 65 or older or has a disability; and (3) not to enforce the State's de facto prohibition on curbside voting."   Doc. 58 at 76-77; Doc. 59.

155.   That same day, the court ordered the parties to provide a plan for expedited discovery with a trial setting in September.  Doc. 59

156.   The next day, the defendants appealed to the Eleventh Circuit, doc. 60, and also filed an Emergency Motion for Stay Pending Appeal.  *People First of Ala. v. Secretary of State for the State of Alabama*, Case 20-12184, at *1 (11th Cir. June 25, 2020). The Eleventh Circuit denied the defendants' Emergency Motion for Stay Pending Appeal.  *Id.*  The defendants appealed this denial of their emergency motion to the Supreme Court, and the Supreme Court granted the defendants' application for stay of the preliminary injunction.  *Merrill v. People First of Ala.*, --S.Ct. ---, 2020 WL 3604049 (July 2, 2020).

157.   Trial testimony showed that while the court's injunction was in effect from June 15, 2020 to July 1, 2020, Judge English, the probate judge for Lee County, trained absentee poll workers to handle the different standards that applied before

the preliminary injunction, during the injunction, and after the stay.  9/17/20 at 178-80.

158.   Ms. Barnett, Mobile County's Absentee Election Coordinator,  testified that she was able to comply with the June injunction while it was in place without reprinting ballot applications or ballot affidavit envelopes.  9/16/20 at 146-52.  She simply included a letter noting the change to the absentee application requirements with the absentee ballot application and a letter noting the change to the witness requirement with the absentee ballot.  *Id.*

159.   On July 7, 2020, the plaintiffs amended their complaint and asserted five separate legal theories related to the photo ID requirement, the witness requirement, and the curbside voting ban.  Doc. 75.

## II. CONCLUSIONS OF LAW

After orders related to motions to dismiss, motions for summary judgment, and several settlements, the following claims remain and proceeded to a bench trial from September 8 – 18, 2020:

(1)   Count I—Violations of the fundamental right to vote under the First and Fourteenth Amendments:  Dr. Peebles, Ms. Bettis, Ms. Thompson, and the organizational plaintiffs assert claims against Judge Davis and Ms. Schwarzauer challenging the witness requirement as applied in the pandemic;  Ms. Thompson and the organizational plaintiffs assert claims against Judge Davis and Ms. Schwarzauer challenging the photo ID requirement as applied in the pandemic; and all of the plaintiffs bring a claim against Secretary Merrill and Judge Davis challenging the curbside voting ban as applied in the pandemic;

(2)   <u>Count II—Violations of the Americans with Disabilities Act</u>: Ms. Thompson and the organizational plaintiffs assert claims against the State, Judge Davis, and Ms. Schwarzauer challenging the photo ID requirement as applied; all of the plaintiffs assert a claim against Secretary Merrill and Judge Davis challenging the curbside voting ban both during and outside the pandemic;

(3)   <u>Count III—Violations of Section 2 of the Voting Rights Act</u>: Ms. Bettis, Ms. Thompson, and the organizational plaintiffs assert claims against the State, Judge Davis, and Ms. Schwarzauer for enforcing the witness requirement during the pandemic; all of the plaintiffs except Dr. Peebles assert claims against Secretary Merrill and Judge Davis for enforcing the curbside voting ban both during and outside of the pandemic; and

(4)   <u>Count V—Violations of the Fourteenth Amendments Equal Protection Clause</u>: Dr. Peebles, Ms. Bettis, Ms. Thompson, and the organizational plaintiffs assert claims against Judge Davis and Ms. Schwarzauer challenging the witness requirement's notary option.

The court addresses the merits of each of the plaintiffs' claims after first analyzing the defendants' defenses and contentions related to standing, the *Purcell* principle, and due process.

## A.

"[S]tanding 'is a threshold question in every federal case, determining the power of the court to entertain the suit.'" *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1265 (11th Cir. 2015) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  The plaintiffs bear the burden of establishing standing as the parties invoking this court's jurisdiction.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citation omitted).  To do so, "[t]he plaintiff[s] must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the

defendant[s], and (3) that is likely to be redressed by a favorable judicial decision."
*Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Friends of the Earth v. Laidlaw Env. Serv. (TOC), Inc.*, 528 US. 167, 180-81 (2000)).   The defendants continue to challenge each of these elements.[42]  *See* docs. 189 at 2-6; 246 at 2-3; 231; 244 at 14-15.

1.

An injury in fact requires "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560.  The plaintiffs have made this showing.

a.

"[W]hen plaintiffs 'are required to obtain photo identification before they can vote, [t]he imposition of that burden is an injury sufficient to confer standing regardless of whether [the plaintiffs] are able to obtain photo identification.'"  Doc. 58 at 14 (quoting *Common Cause v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009)).  Thus, Ms. Thompson, the only individual plaintiff challenging the photo ID requirement, has shown an injury in fact with respect to that requirement because she must obtain a copy of her ID before she can vote absentee.  *See* 9/8/20 at 176-77; *see also* doc. 58 at 14-16.  Likewise, the individual plaintiffs challenging the

---

[42] The court addressed many of the defendants' contentions regarding standing in its memorandum opinions on the plaintiffs' motion for a preliminary injunction and the defendants' motions to dismiss or for summary judgment.  *See* docs. 58 at 13-27; 161 at 8-12; 226 at 3-10.

witness requirement—Dr. Peebles, Ms. Bettis, and Ms. Thompson—have shown an injury in fact with respect to that requirement because they must satisfy the requirement to vote absentee. *See* 9/8/20 at 126, 177; 9/14/20 at 39-40; *see also* doc. 58 at 16. That the plaintiffs' injuries are purportedly too slight, as the defendants contend, *see* docs. 189 at 3-6; 246 at 3-6, is irrelevant. As the Eleventh Circuit explained: "The slightness of [the plaintiffs'] burden is [] not dispositive . . . ; a small injury, 'an identifiable trifle,' is sufficient to confer standing." *Common Cause*, 554 F.3d at 1351 (citing *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973)).

Next, the curbside voting ban impacts the individual plaintiffs' ability to safely vote in person during the COVID-19 pandemic. *See* Pl. Ex. 269 at ¶¶ 23-24; 9/8/20 at 45, 52, 76-77; 9/9/20 at 56-57, 62; *see also* 9/14/20 at 79-81; 9/11/20 at 171. With the ban in place, a voter's only option for casting a ballot in person on Election Day is to wait in line with others to vote inside a polling site, risking exposure to COVID-19 through exposure to poll workers and other voters, who may or may not be wearing masks, and who may or may not be sick and showing signs of COVID-19. *See id.*; 9/15/20 at 202; 9/17/20 at 193; Pl. Ex. 237. Forcing a voter to endure the risk and fear of exposure in order to vote in person is the injury regardless of whether the plaintiff catches or is actually exposed to COVID-19. Thus, based on *Common Cause*, the court finds this injury is sufficient to confer

standing to challenge the ban as applied during the COVID-19 pandemic.  *See* doc. 58 at 17; *Common Cause*, 554 F.3d at 1351.

Outside of the COVID-19 pandemic, due to the curbside voting ban, all voters—including those with ambulatory disabilities—must go inside their polling places to cast a vote.  And, the ban prevents county officials from accommodating voters' disabilities by allowing them to vote from their cars.  In other words, the ban operates to require voters with disabilities to walk, or otherwise ambulate, to their polling site to vote in person.  For Dr. Peebles and Mr. Porter, who have ambulatory difficulties that impair their ability to readily access their polling sites, 9/8/20 at 115-130-31; 9/14/20 at 64-68, 77, 79-80, the imposition of that requirement is sufficient to confer standing to challenge the curbside voting ban outside of the COVID-19 pandemic.

## b.

The organizational plaintiffs also have standing either associationally or organizationally through a diversion of resources theory.  First, as to associational standing, an organization may "'bring suit on behalf of its members when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit.'"  *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 966 F.3d 1202, 1219-20 (11th Cir. 2020) (quoting *Hunt v. Washington State Apple*

*Advertising Comm'n*, 432 U.S. 33, 343 (1977)).  Except for BVM, the organizational plaintiffs satisfy these requirements.

To begin, this lawsuit is germane to all of the organizations, whose purposes focus at least in part on equal opportunities for Black voters or voters with disabilities.  *See* 9/9/20 at 107-10, 174; 9/10/20 at 52, 55, 57-58; 9/22/20 at 100; Agreed Facts at ¶¶ 1-3, 8; *see also Greater Birmingham Ministries* 966 F.3d at 1219-20 (recognizing that the Alabama NAACP and GBM have associational standing to challenge Alabama's photo ID requirement).  Next, the injunctive relief the plaintiffs seek does not require the individual members to participate in the suit.  Finally, at trial, representatives of People First, GBM, and the Alabama NAACP identified members of their respective organizations who must comply with the Challenged Provisions in order to vote and, therefore, are impacted by the provisions.  *See* 9/9/20 at 106-10, 125-30, 145-47, 166-67; 9/10/20 at 80-11, 111; 9/11/20 at 104-05, 128-29, 180, 184-85.[43]  Even if the impact is slight, as the defendants contend, it is still an injury sufficient to confer standing to those individuals.  *Common Cause*, 554 F.3d at 1351.  Accordingly, People First, GBM, and the Alabama NAACP have associational standing to challenge the election laws at issue.

---

[43] These members include People First member, Ms. Lux; GBM member, Mr. Sokol, and Alabama NAACP members, Ms. Jefferson and Ms. Bryant.  *See* 9/9/20 at 107-10, 129-30, 166-67; 9/10/20 at 80-11, 111; 9/11/20 at 128-29, 180, 184-85.

The same is not true of BVM. At trial, Mr. Albright, BVM's executive director, testified that BVM works primarily through partnerships with community groups. 9/9/20 at 174. And, while Mr. Albright identified several groups that BVM partners with and people associated with those groups, such as Plaintiffs Threadgill-Matthews and Bettis, he did not identify any individual members of BVM who have been harmed by the challenged provisions. *See id.* at 177-79, 185-87. Moreover, the plaintiffs have not presented any evidence that members of BVM's partner groups, or "partner network," are also members of BVM. As a result, the plaintiffs have not shown that BVM has associational standing to assert claims on behalf of its members. *See Jacobson v. Fla. Sec'y of State*, -- F.3d --, 2020 WL 5289377, at * 7 (11th Cir. Sept. 3, 2020) (finding that an organization's failure to prove that it has any members is fatal to its associational standing).

But, this does not end the court's inquiry for BVM. An organization also has standing to sue on its own behalf "to challenge election laws by showing that [it] will have to divert personnel and time to educating potential voters on compliance with the laws and assisting voters who might be [affected by the laws] on Election Day." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1343 (11th Cir. 2014) (citation omitted).[44] Mr. Albright testified that BVM generally provides financial resources

---

[44] *See also Common Cause*, 554 F.3d at 1350 (noting that the NAACP's "'reasonabl[e] anticipat[ion] that they would have to divert personnel and time to educating volunteers and voters on compliance' with the new voting requirements . . . was a 'concrete injury' sufficient to confer standing") (citations and alteration in original omitted).

to its partner organizations with the goal of increasing voter turnout and involvement in civic life among members of the Black community.  9/9/20 at 174, 195.  This year, however, BVM has had to divert resources from its traditional Alabama initiatives. BVM has sponsored several text campaigns targeting Black voters who may need assistance navigating Alabama's absentee voting scheme.  *Id.* at 190–91.  In its July text campaign, BVM sent text messages inviting roughly 190,000 Black Alabamians to attend a virtual townhall discussing several topics, including voting in Alabama. *Id.* at 192; Pl. Ex. 340.  BVM estimates that such campaigns cost around five cents per text, and it plans to sponsor up to six future waves of texts, spending up to $60,000 in text messaging, because "the current requirements [for absentee voting in Alabama] are so complicated."  9/9/20 at 193-94, 223.  But for the need to educate voters on how to comply with requirements for absentee voting during the pandemic, BVM would be focused on its "core function" of educating voters about turnout and substantive issues.  *Id.* at 195.  Thus, because BVM will divert resources from its regular activities, it has shown an injury sufficient to confer standing to challenge the election laws at issue on its own behalf.[45]

---

[45] The other organizations presented similar evidence regarding the diversion of resources to educate their members on the photo ID and witness requirements. *See* 9/9/20 at 125, 131-32, 135-46; 9/10/20 at 53-57, 72; 9/11/20 at 116-17, 120; 122-46.  Thus, they also have organizational standing.

2.

The next part of the standing inquiry is traceability.  To establish traceability, a plaintiff must show "a causal connection between her injury and the challenged action of the defendant—*i.e.*, the injury must be fairly traceable to the defendant's conduct, as opposed to the action of an absent third party."  *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc) (citations omitted).

a.

The plaintiffs assert claims against Judge Davis challenging the photo ID and witness requirements and the curbside voting ban in Mobile County.  *See* doc. 75.  As to the photo ID requirement, Judge Davis testified that, although he is the chief election official for Mobile County, he does not have control over all aspects of the election.  9/15/20 at 40.  Instead, the County Circuit Clerk (Ms. Schwarzauer) and the Absentee Election Coordinator (Ms. Barnett) are responsible for all aspects of absentee voting, including processing absentee ballot applications.  *Id.* at 41-43.  And, he testified that he has no role in training Ms. Barnett's employees.  *Id.* at 56.

Indeed, Ms. Barnett testified that she and her staff in the AEM's office enforce the photo ID requirement by confirming that an absentee ballot application is complete before mailing or personally giving a voter an absentee ballot.  *See* 9/17/20 at 112, 116, 137.  Among the requirements they check for is that the application must include a copy of a photo ID for all voters who are not exempt from the photo ID

requirement.  *See* 9/17/20 at 112, 116, 137.  If an application does not include a copy of the voter's ID and the voter is not exempt, Ms. Barnett or her staff send a letter to the voter informing him or her that her office cannot process the application without a copy of the ID.  *Id.* at 116.  Ms. Barnett did not indicate that Judge Davis plays any role in processing absentee ballot applications, enforcing the photo ID requirement, or directly supervising the relevant staff.  *See id.*  Moreover, the plaintiffs did not adduce any evidence at trial showing that Ms. Barnett's or her staff's actions to enforce the photo ID requirement should be imputed to Judge Davis.

Based on *Jacobson*, Judge Davis's position as the chief election official in the county is not sufficient to show that any injury from enforcement of the photo ID requirement is traceable to him, *see* 2020 WL 5289377, at *12,[46] and Judge Davis does not play any role in enforcing the photo ID requirement.  Thus, any injury to the plaintiffs from the photo ID requirement is not traceable to Judge Davis.  *See Lewis*, 944 F.3d at 1299 ("'[T]he causation element of standing requires the named defendants to possess authority to enforce the complained-of provision.'") (quoting *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015)).

As to the witness requirement, Ms. Barnett testified that neither she nor her staff confirms compliance with the witness requirement when they receive an absentee ballot, and they do not notify the voter when the required signatures are

---

[46] *See* docs. 58 at 25; 161 at 8-9.

missing.  9/17/20 at 127.  Instead, they store the absentee ballots in locked cabinets until Election Day when they deliver them to Judge Davis's designee.  *Id.* at 141. Judge Davis testified that before opening an absentee ballot on Election Day, poll workers first verify that the ballot is either notarized or witnessed, and they do not count ballots that do not have the signatures or notary seal.  9/15/20 at 59.  Moreover, under Alabama's election laws, probate judges serve as the chair of the three-member board that appoints the poll workers who count absentee ballots and on the canvassing board that tabulates absentee ballots.  Ala. Code. §§ 17-1-2(6), 17-1-3(b), 17-2-2(1), 17-8-1, 17-10-2(f); 17-11-11(a).  Based on this evidence and a probate judge's roll in the absentee ballot process, poll workers under Judge Davis's authority and control enforce the witness requirement.  Thus, the plaintiffs' injuries from the witness requirement, if any, are traceable to Judge Davis.[47]

b.

The plaintiffs assert claims against Ms. Schwarzauer, the Mobile County Circuit Clerk, challenging the witness and photo ID requirements.  Docs. 75; 161. Under Alabama law, the circuit clerk is one of the three members of the appointing board responsible for selecting poll workers who count absentee ballots, and she serves on the canvassing board that tabulates absentee ballots.  Ala. Code. §§ 17-1-

---

[47] The court does not address whether the plaintiffs' injuries, if any, from the curbside voting ban are traceable to Judge Davis because the court finds that the injuries would not be redressed by an order enjoining Judge Davis from enforcing the ban.  *See* section II(A)(3)(b), *infra*.

2(6); 17-8-1, 17-10-2(f); 17-11-11(a).   Moreover, Ms. Barnett testified that she performs the AEM's duties at Ms. Schwarzauer's option and that the canvassing board, which includes Ms. Schwarzauer, enforces the witness requirement.   *See* 9/17/20 at 139, 145.   In addition, Secretary Merrill testified that the circuit clerks are charged with enforcing the photo ID requirement.   9/11/20 at 16.   Because Ms. Schwarzauer enforces the witness and photo ID requirement, or is responsible for the relevant poll workers, the plaintiffs' injuries from those requirements, if any, are traceable to Ms. Schwarzauer.

c.

Next, the plaintiffs assert claims against the State challenging the witness and photo ID requirements.   Doc. 75.   Because these requirements are express provisions of state law, any injuries the requirements inflict on the plaintiffs are clearly traceable to the State.   *See OCA-Great Houston v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017) ("The facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the State . . . .").

d.

Last, the plaintiffs assert claims against Secretary Merrill challenging the ban on curbside voting.   Doc. 37.   Secretary Merrill testified that curbside voting does not comply with Alabama law because no provision in the State's code or constitution expressly provides for it, and he or his staff has put a stop to curbside voting when counties have offered it as a service to voters.   9/11/20 at 38, 41, 65.

103

Thus, because he enforces the ban on curbside voting or is responsible for those who do, any injuries from the ban are traceable to Secretary Merrill.[48]

### 3.

The final requirement for standing is redressability.  To establish redressability, the plaintiffs must show that a decision in their favor "would 'significantly increase the likelihood' that [they] 'would obtain relief that directly redresses the injury' that [they] claim[] to have suffered."  *Lewis*, 944 F.3d at 1301 (quoting *Harrell v. Fla. Bar*, 608 F.3d 1241, 1260 n.7 (11th Cir. 2010)).  In addition, for a decision to redress the injury, "'it must be the effect of the court's judgment on the defendant'—not an absent third party—'that redresses the plaintiff's injury, whether directly or indirectly.'"  *Id.* (quoting *Dig. Recognition*, 803 F.3d at 958).

---

[48] The plaintiffs ask the court to reconsider its order dismissing their ADA and VRA claims against the State challenging the curbside voting ban, arguing that the Secretary Merrill's testimony establishes the ban is traceable to the State.  Doc. 229 at 1-2.  But, as discussed below, Alabama law does not prohibit curbside voting, *see* section II(E)(2)(d), *infra*, and, therefore, the court declines to reconsider its prior order that any injury from the ban is not traceable to the State, *see* doc. 226 at 5-6.  The plaintiffs also ask the court to reconsider its holding finding that any injury from the photo ID and witness requirements are not traceable to Secretary Merrill based on *Jacobson*.  Doc. 229 at 3-4.  According to the plaintiffs, Secretary Merrill's testimony at trial that he could compel action from probate judges, and presumably AEMs, by seeking a court order or calling a county sheriff reveals that any injuries from the probate judge's and AEM's enforcement of the witness and photo ID requirements are traceable to Secretary Merrill.  *Id.* at 4.  But, in *Jacobson*, the Eleventh Circuit rejected a similar argument, finding:  "That the Secretary must resort to judicial process if the [county] Supervisors [of elections] fail to perform their duties underscores her lack of authority over them.  Because the Supervisors are independent officials not subject to the Secretary's control, their actions to implement the ballot statute may not be imputed to the Secretary for purposes of establishing traceability."  2020 WL 5289377 at *11.  Thus, Secretary Merrill's testimony does not show that injuries from the witness and photo ID requirements are traceable to him, and the plaintiffs' motion to reconsider, doc. 229, is due to be denied.

a.

The plaintiffs seek an order enjoining the county defendants and State from enforcing the witness and photo ID requirements for the general election in November.  *See* doc. 75 at 78.  An order enjoining the State and relevant Mobile County defendants from enforcing those requirements would redress any injuries the plaintiffs suffer from the need to comply with the requirements.

b.

The analysis is different for the curbside voting ban.  The curbside voting ban imposes no requirements the plaintiffs must satisfy in order to vote, and the injury imposed by the ban is the need to face the risk and fear of exposure to COVID-19 to vote in person on Election Day.  The plaintiffs seek an order enjoining Secretary Merrill and Judge Davis (as to Mobile County only) from enforcing the curbside voting ban in the November general election.  Doc. 75.  Such an order, however, would not require the defendants to take any affirmative action, such as actually providing curbside voting.  Thus, a decision in the plaintiffs' favor would not redress their injuries if the county officials who administer the election would not provide curbside voting even in the absence of a ban.  *See Lewis*, 944 F.3d at 1301.

Here, Judge Davis testified that he cannot offer curbside voting in Mobile County for both legal and practical reasons.  9/15/20 at 93-96.  And, Judge Davis expressly stated that if the court issues an order allowing for curbside voting by lifting the ban, he still cannot and would not provide curbside voting at poll locations

105

in Mobile County.  *See id.* at 96.  Thus, an order enjoining Judge Davis from enforcing the curbside voting ban would not provide any redress for the plaintiffs' injuries.  Consequently, the plaintiffs do not have standing to assert the curbside voting ban claims against Judge Davis.  And, because Judge Davis made clear that he will not provide curbside voting in Mobile County even if the court enjoins enforcement of the ban, the individual plaintiffs living in Mobile County (Ms. Bettis, Ms. Thompson, and Mr. Porter) do not have standing to challenge the ban because an order in their favor will not redress their injuries.

The redressability analysis is different for the claims against Secretary Merrill. Although Judge Davis and Judge Bill English, the probate judge of Lee County, testified that they could not and would not offer curbside voting in their counties,[49] *see* 9/15/20 at 96; 9/17/20 at 166-71, Judge Naftel, Judge Friday, and Judge Love, the probate judges in Jefferson and Montgomery Counties, have indicated a willingness to provide curbside voting in the upcoming election, *see* docs. 181 at 8-9; 182.  In particular, those judges entered into consent orders with the plaintiffs agreeing to "exercise good faith and undertake reasonable efforts to provide curbside voting in a manner that complies with state and federal law and the CDC guidelines

---

[49] Because Judge English testified that he could not provide curbside voting in Lee County even if the court lifts the curbside voting ban, *see* 9/17/20 at 166-71, an order lifting the ban would not significantly increase the likelihood that Dr. Peebles would receive relief from any injuries inflicted by the ban.  Thus, Dr. Peebles does not have standing to challenge the curbside voting ban.

for voting in the COVID-19 pandemic in . . . the November 3, 2020 election" if the court issues an order that would permit curbside voting. *Id.* Thus, an order enjoining Secretary Merrill from enforcing the ban would "'significantly increase the likelihood'"[50] that curbside voting would be available in Jefferson and Montgomery counties, and in any other county where officials are willing to offer it. Consequently, Ms. Threadgill-Matthews's and the organizational plaintiffs' injuries from the ban are redressable by an order in the plaintiffs' favor on their claims against Secretary Merrill.

*   *   *

In summary, based on the discussion above and the findings in this case, the court makes the following conclusions of law with respect to standing:

1.      The plaintiffs have suffered injuries sufficient to confer standing to challenge the photo ID requirement, witness requirement, and curbside voting ban.

2.      The plaintiffs' injuries from the photo ID requirement are not traceable to Judge Davis. Therefore, the plaintiffs do not have standing to assert claims against Judge Davis challenging the photo ID requirement.

3.      The plaintiffs' injuries from the witness requirement are traceable to Judge Davis. And, the plaintiffs' injuries could be redressed by an order enjoining Judge Davis from enforcing the requirement. Therefore, the plaintiffs in Mobile

---

[50] *Lewis*, 944 F.3d at 1301.

County challenging the witness requirement have standing to assert their witness requirement claims against Judge Davis.

4.    The plaintiffs' injuries from the photo ID and witness requirement are traceable to Ms. Schwarzauer and the State of Alabama, and would be redressed by an order enjoining these defendants from enforcing the requirements.  Thus, the plaintiffs have standing to assert their claims challenging the photo ID and witness requirements against Ms. Schwarzauer (as to Mobile County only) and the State of Alabama.

5.    The plaintiffs' injuries from the curbside voting ban would not be redressed by an order enjoining Judge Davis from enforcing the ban in Mobile County.  Thus, the plaintiffs do not have standing to assert claims against Judge Davis challenging the curbside voting ban.

6.    The plaintiffs' injuries from the curbside voting ban are traceable to Secretary Merrill.  However, Dr. Peebles's, Mr. Porter's, Ms. Thompson's, and Ms. Bettis's injuries from the curbside voting ban would not be redressed by an order enjoining Secretary Merrill from enforcing the ban because the probate judges from their respective counties have made clear they would not provide curbside voting even if the court enjoins Secretary Merrill from enforcing the ban.  Thus, these plaintiffs do not have standing to assert claims challenging the curbside voting ban.

7.    An order enjoining Secretary Merrill from enforcing the ban would significantly increase the likelihood that the plaintiffs would obtain relief redressing

108

their injuries in counties where officials are willing to provide the service.  Thus, the organizational plaintiffs and Ms. Threadgill-Matthews have standing to assert claims challenging the curbside voting ban against Secretary Merrill.

## B.

Based on their contention "that lower federal courts should ordinarily not alter the election rules on the eve of an election," *see* Defendants' Proposed Conclusions of Law, at ¶ 86 (quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020)), the defendants argue that it is too late for the court to provide relief to the plaintiffs.  Docs. 186 at 1; 188; 199 at 2.  The *Purcell* principle the defendants cite is grounded in the idea that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls.  As an election draws closer, that risk will increase."  *Purcell v. Gonzalez*, 127 S. Ct. 1, 4-5 (2006).

But, contrary to the defendants' contentions, the Supreme Court has not provided a bright line rule regarding when a federal court must abstain from interceding in an election.  And its actions in this area do not support the defendants' contention that it is too late for the court to act.  For example, the Court has stopped a lower court from intervening 33 days before an election, *see Purcell*, 127 S. Ct. at 6, but also allowed a lower court's injunction issued 26 days before an election to stand, *see Frank v. Walker*, 574 U.S. 929 (2014).  Also, a recent decision by the Court partially leaving in place a district court's order related to absentee ballots

109

makes the defendants' argument against hearing this case even weaker.   In *Republican National Committee v. Democratic National Committee*, the Supreme Court did not stay the lower court's injunction extending the date for the receipt of absentee ballots—even though absentee voting had already begun and the lower court issued its order six days before the election.   140 S. Ct. at 1206-07; *Democratic Nat'l Comm. v. Bostelmann*, 451 F. Supp. 3d 952, 976-977 (W.D. Wisc. 2020).

The Eleventh Circuit has also declined in two recent cases to stay injunctions issued immediately before and even after Election Day.   *See Democratic Executive Comm. of Fla. v. Lee*, 915 F.3d 1312, 1315 (11th Cir. 2019) (denying stay of injunction issued *after* Election Day that provided absentee voters time to verify their flagged signature and have their vote counted); *Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262 (11th Cir. 2019) (denying stay of injunction related to absentee voting rules issued several days before Election Day) (mem.) (Pryor, Jill, J., concurring). These decisions further undermine the defendants' position that the court is past the demarcation line for it to address this dispute.   And it makes sense not to have a bright-line cutoff date.   After all, the doors of the courthouses are open to all who believe their rights have been infringed.   To hold that an aggrieved voter cannot challenge the purported abridgement of her franchise right after a set date before an election invite some officials to engage in shenanigans knowing that courts will not hear a challenge to their illegal conduct.

Brightline rule or not, the *Purcell* principle does not prevent the court from issuing relief in this case.  First, the plaintiffs timely raised this dispute.  Second, the court's order today will not cause voter confusion or create an incentive for voters to remain away from the polls.  Third, the defendants can adhere to the court's order without hardship.  Finally, the State defendants are judicially estopped from raising this issue.

1.

Unlike the *Little v. Reclaim Idaho* case the defendants cite, the plaintiffs here have not delayed in seeking relief.[51]  The plaintiffs filed this case soon after it became clear the novel coronavirus had reached the level of a global pandemic that would drastically impact everyone's life.  Doc. 1.  More precisely, the plaintiffs initiated this lawsuit on May 1, 2020, doc. 1, about a month and a half after Governor Ivey first declared a state of emergency in Alabama.  *See* State Ex. 7.  The pandemic is an unprecedented event in United States and Alabama history, and it would defy logic to expect lay plaintiffs to predict its impact on citizens well before health experts and government leaders raised alarm bells.  Further, contrary to the defendants' contention that the plaintiffs "amplified" the timing problems, *see* doc.

---

[51] In *Little*, the Court noted that its stay of the lower court's injunction may result in the exclusion of the plaintiffs' initiative from the ballot, but that the exclusion was due to the fact the plaintiffs had waited "more than a month after the deadline for submitting signatures" to bring their claim challenging the deadline.  _ S. Ct. _, 2020 WL 4360897, at *1-2 (Jul. 30, 2020) (mem.) (Roberts, J., concurring).

186 at 4-5, the plaintiffs undertook efforts to accelerate this case to a timely resolution, including seeking expedited relief by asking for an August trial and moving for partial summary judgment. Docs. 77; 169.

The court has also treated this case with the urgency it deserves, while recognizing that the parties should have an opportunity to conduct discovery. Throughout this case, the court has been cognizant of the upcoming November election and has sought to dispose of the case as fairly and quickly as possible. With input from the parties, *see* docs. 59, 68, 69, the court set the case for trial at the beginning of September, doc. 93. The court overruled several of the defendants' objections to the expedited schedule, explaining "the accelerated timeline is necessary given that the asserted claims concern the election scheduled for November 3, 2020." Doc. 126 at 1. Further, the court self-imposed a deadline to issue a final ruling within a week of the trial's conclusion, and while the court missed the deadline by three business days, it is issuing this opinion thirty-four days before the November election.[52] Frankly, the court does not know what else it could have done to bring the matter to trial without seriously impacting the parties' ability to prosecute and/or defend their respective contentions.

---

[52] The release date of this opinion further distinguishes it from some of the cases defendants cite in support of withholding review. The courts in those cases issued orders shortly before or even after the election. *See* Defendants' Proposed Conclusions of Law at p. 263-64, ¶ 92; *Clarno v. People Not Politicians*, No. 20A21, 2020 WL 4589742 (U.S. Aug. 11, 2020), *staying* 2020 WL 3960440 (D. Or. July 13, 2020) and *Little v. Reclaim Idaho*, _ S. Ct. _, 2020 WL 4360897, at *1-2 (Jul. 30, 2020).

2.

The court's ruling in this case will not result in "voter confusion and consequent incentive to remain away from the polls." *Purcell*, 127 S. Ct. at 7. The evidence from trial shows that Alabama's absentee voting laws are causing voters confusion as they stand. 9/17/20 at 117, 120; 9/15/20 at 162-63; 9/9/20 at 124-25; Pl. Ex. 231. This court's order may not eliminate all the confusing aspects of the absentee voter application, but it is unlikely it will make the process more confusing. Today's decision simply precludes the defendants from enforcing the Challenged Provisions against certain individuals. It does not require any additional action of voters, but, instead, relieves certain voters of the necessity of finding witnesses or a notary, obtaining a copy of their photo ID, or going inside a polling place on Election Day. Because the order is taking away requirements placed on Alabama voters, as opposed to imposing them, it is unlikely to cause voters confusion. But, even if a voter were to be confused, this confusion would, at most, result in the voter taking additional unnecessary steps to apply for or complete their absentee ballot.

Further, the order will not *cause* any voters to forgo voting altogether. The defendants theorize that a voter may plan to rely on curbside voting, then be disenfranchised when it is not offered in their county "for one reason or another on Election Day . . . ." Doc. 244 at 3. The court doubts that the counties, if any, who opt to provide curbside voting will fail to publicize and inform their citizens that they are doing so. Likewise, because this order is not ordering counties to provide

113

curbside voting, the court seriously doubts county officials who decide not to offer the service will fail to make that point if they receive inquiries from their citizens. Thus, to the extent that curbside voting is not offered in a voter's county making the hypothetical voter misinformed about local voting rules, the onus of such misinformation is on the individual counties and the Secretary of State, who is tasked with educating the public about how to vote.  Agreed Facts at 15, ¶ 20; 9/15/20 at 166-67.  Alternatively, if the defendants' point is intended to suggest that a reviewing court will stay this order and create confusion, no court should withhold relief it finds the facts and law warrant because of a concern that a higher court will reverse its decision, especially where, as here, this court has found multiple violations of the plaintiffs' and their members' right to vote.  Further, under Alabama law, a voter may file an absentee ballot up to five days before an election,  9/15/20 at 139, 151, a point which the parties will likely highlight on appeal to urge the Circuit to issue its ruling before the five-day cutoff.

3.

The defendants also argue the relief requested by the plaintiffs will place a "tremendous hardship upon all Defendants."  Doc. 186 at 3-4.  The evidence presented at trial does not support this contention.  Alleen Barnett, the Absentee Election Coordinator for Mobile County, testified that after the court issued the preliminary injunction, she simply sent a letter about the changes implemented by the injunction with a voter's absentee application.  9/16/20 at 146-52.  Ms. Barnett

114

did not have to make any changes to the absentee ballot application or print new versions of the application.  *Id.*  Similarly, Ms. Barnett mailed a letter explaining who no longer needed to meet the witness requirement when she mailed voters their absentee ballots.  *Id.*  The injunction did not require her or the State to reprint any absentee ballot affidavit envelopes, and other than sending these two letters, she made no other changes to her absentee ballot review process.  *Id.*  Similarly, Judge English, the Probate Judge of Lee County, testified that he was able to train absentee poll workers to handle the varying standards that applied with the change in absentee voter rules under the injunction.  9/17/20 at 178-80.  The testimony of Judge English and Ms. Barnett belie the defendants' contentions of a "tremendous hardship."

The defendants also argue that it would be impossible for them to educate voters and poll workers if relief varies by counties.  Doc. 186 at 3-4.  This order does not provide relief that varies by county.  However, to the extent that some counties will choose to implement curbside voting while others do not, variance in voting options may result.  This possibility does not foreclose the court's ability to grant relief related to the curbside voting claims.  There is precedent in this Circuit for providing relief in some, but not all counties.  *See Jones v. DeSantis*, 410 F. Supp. 3d 1284, 1310-11 (N.D. Fla. 2017), *aff'd* 950 F.3d 795, 833 (11th Cir. 2020). Further, counties in Alabama already employ different procedures and resources for conducting elections.  For example, Clay Helms, the Director of Elections and the Deputy Chief of Staff to the Secretary of State, testified that not all counties have

115

electronic pollbooks, that counties use different types of handicap accessible voting machines, and that each county's probate judge decides "how to handle voting logistics . . . ." 9/15/ 20 at 137, 167, 186.

4.

Finally, the State defendants are judicially estopped from raising this objection.  When the plaintiffs moved for a preliminary injunction for the July runoff election, the State defendants argued "to the extent plaintiffs [sought] an injunction that applies to November elections, their claims [were too] speculative."  Doc. 36 at 13-14.  They further asserted that the plaintiffs could not establish a concrete injury "50 days" before the primary runoff election.  *Id.* at 13.  This court agreed with the defendants' speculation argument related to November and limited the preliminary injunction solely to the July runoff.  Doc. 58 at 12.  The State defendants cannot have it both ways by now contending, essentially, that the plaintiffs should have also moved for a preliminary injunction for the November election in June, at a time when the pandemic's impact on November was "speculative."  *See New Hampshire v. Maine*, 532 U.S. 742, 750-55 (2001) (party estopped from asserting inconsistent position in direct conflict with previous position accepted by the court because the party "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped").

To close, while "lower federal courts should ordinarily not alter the election rules on the eve of an election[,]"  *Republican Nat'l Comm.*, 140 S. Ct. at 1207, the

court is also bound to uphold the laws of the United States.  U.S. Const. art. III.  This includes hearing a dispute centered on an unforeseeable global crisis, which the plaintiffs maintain interacts with State law to purportedly violate Constitutional and federal rights.  Therefore, because there is nothing the plaintiffs or the court could have done differently to resolve the case sooner and there is not likely to be much, if any, confusion, the court finds that the *Purcell* principle does not preclude the court from providing a remedy here.

Based on the findings in this case and the discussion above, the court makes the following conclusion of law:

1.     The *Purcell* principle does not preclude the court from providing a remedy to the plaintiffs in this case.

## C.

Although the *Purcell* objection arguably supports an expedited resolution of this case, the defendants object also to the accelerated schedule set in this case, contending that the schedule violated their due process rights by impairing their ability to prepare an adequate defense and retain experts.  Docs. 74; 244 at 14-15; 246 at 1-2; 9/16 20 at 220.  Needless to say, this case proceeded to trial just over four months after filing, and it has proceeded on an expedited and challenging schedule.  The court appreciates that the pace has not been ideal for the parties or the court.  But, to state the obvious, this is not a typical case.  Rather, as the court previously explained, "this case has an unusual urgency because the claims concern

the November 3, 2020 election and a State of Emergency Governor Ivey declared [approximately] six months ago due to the risks presented by COVID-19." Doc. 211 at 1; *see also* doc. 126; 9/16/20 at 223-25. Thus, given the important issues this case presents regarding voting in an upcoming election, the court exercised its "broad discretion over the management of pre-trial activities, including discovery and scheduling," *Johnson v. Board of Regents of Univ. of Ga.*, 263 F.3d 1234, 1269 (11th Cir. 2001), to enter an accelerated discovery schedule. In particular, the court provided the parties with approximately seven weeks for discovery, in part to give the parties adequate opportunity for discovery while allowing them as much time as possible to respond to any relief the court orders, including filing an appeal, before the election. *See* doc. 93.

Based on the urgent nature of this case and the court's broad discretion to manage discovery and its docket, the court makes the following conclusion of law:

1. The court's expedited discovery schedule, which applied to all parties, did not violate the defendants' due process rights.

## D.

The court turns now to the plaintiffs' claims. In Count I, the plaintiffs plead an alleged violation of the fundamental right to vote. States cannot unreasonably burden citizens' fundamental right to vote consistently with the First and Fourteenth Amendments. *See Anderson v. Celebrezze*, 460 U.S. 780, 789–90 (1983). When determining whether an election law passes constitutional muster, courts apply the

balancing test that the Supreme Court first adopted in *Anderson* and further developed in *Burdick v. Takushi*, 504 U.S. 428 (1992).  This involves weighing the "character and magnitude of the asserted injury to" the voters' constitutional rights against the "precise interests" the state has offered to justify its rule.  *Anderson*, 460 U.S. at 789.  Courts must also evaluate the "legitimacy and strength" of the state's interests and the extent to which those interests "make it necessary to burden the [plaintiffs'] rights."  *Id.*

Under this flexible *Anderson-Burdick* test, the "rigorousness" of the court's review "depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights."  *Burdick*, 504 U.S. at 434.  A law that severely burdens the right to vote triggers strict scrutiny, meaning the law must be "narrowly drawn to serve a compelling state interest."  *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (2019) (citing *Burdick*, 504 U.S. at 434).  In contrast, "the state's important regulatory interests" are generally enough to justify an election law that imposes only "reasonable, nondiscriminatory restrictions."  *Anderson*, 460 U.S. at 788.  But, "even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden."  *Lee*, 915 F.3d at 1318–19 (citation omitted).

1.

Alabama law requires that voters include with their absentee ballots an affidavit signed by the voter and witnessed by a notary public or two adult witnesses.

Ala. Code §§ 17-11-7; 17-11-9; 17-11-10.  Plaintiffs challenge this requirement as unduly burdensome, as applied during the COVID-19 pandemic.  Doc. 75 at 66–77 ¶ 190.  They contend that the requirement's burdens on either their individual right to vote or their members' rights are severe enough to trigger strict scrutiny.  Doc. 247 at 6.  Allegedly, voters who live alone or with only one other adult and who wish to cast an absentee ballot must choose between increasing their exposure to COVID-19 and voting.  *Id.*  And, the plaintiffs contend that the witness requirement is not narrowly tailored to serve a compelling state interest.  *Id.*  Thus, the plaintiffs ask the court to enjoin this requirement for all voters.  Doc. 75 at 78.

a.

The court must first decide whether the witness requirement imposes a burden on the right to vote that is severe enough to trigger strict scrutiny.  *See Lee*, 915 F.3d at 1319.  The court has already determined that for most voters, it does not.  Doc. 58 at 36.  Although the court recognized in its earlier order enjoining the Challenged Provisions that "[e]xposure to a deadly virus is a burden," it also acknowledged that observing public health guidelines "substantially mitigate[s]" one's risk of contracting COVID-19.  *Id.*  That fact continues to lessen the severity of the burden that most voters face to comply with the requirement.[53]

---

[53] The defendants cite Justice Scalia's concurrence in *Crawford v. Marion County Election Board* for the proposition that "[a] burden that is 'merely inconvenient' as opposed to 'virtually impossible' is not a severe burden."  Docs. 189 at 7; 245 at 6 (quoting *Crawford*, 553 U.S. at 206 (Scalia, J., concurring)).  Because the Challenged Provisions do not impose a severe burden on the right to vote in this case, the court finds no reason to opine on what constitutes a severe burden.

Still, satisfying the witness requirement imposes a more significant burden on some voters who live alone and who are at heightened risk of severe COVID-19 complications due to their age, disability, pre-existing conditions, and race.  *See* 9/14/20 at 191–192.  For example, Dr. Peebles lives alone and has been minimizing his exposure to other people, and therefore the virus, since early March.  9/8/20 at 114, 116, 120.  He is at high risk of complications from COVID-19 due to his spastic cerebral palsy.  *Id*.  Dr. Peebles interacts regularly with his four caregivers, but obtaining signatures from them is not an option because their shifts do not overlap, and he only sees one caregiver at a time.  *Id.* at 118.  Although Dr. Peebles has encountered two adults simultaneously during previous necessary appointments with his doctors and lawyers, he has since remained isolated at home.

Similarly, Ms. Thompson lives alone and is at high risk for complications from COVID-19 due to her underlying medical conditions, age, and race.  9/8/20 at 168–69.  Ms. Thompson began self-isolating at home on April 1.  *Id*. at 169–70.  However, she recently began leaving her home to purchase groceries and other necessaries while her daughter, who was exposed to COVID-19 and had previously delivered Ms. Thompson's groceries, is quarantining.  *Id*. at 169–70, 228–29.

---

The court notes, however, that Justice Scalia's *Crawford* concurrence does not control.  Justice Scalia's concurrence construed the flexible *Anderson-Burdick* balancing standard into a "two-track approach" in which only laws imposing a severe burden are invalid; all others would be upheld. *Crawford*, 553 U.S. at 205.  Notably, Justice Scalia spoke for only three Justices.  The six other Justices, in both the plurality and the dissent, did not question the *Anderson-Burdick* framework. They simply disagreed over the outcome of that framework as applied to Indiana's photo ID law.

Although Ms. Thompson was in frequent contact with her daughter and granddaughter over the summer, the granddaughter has since moved away for school. *Id.* at 178–79. Ms. Thompson thus does not regularly encounter two adults who can witness her absentee ballot application. *Id.*

Organizational plaintiffs People First, GBM, and the Alabama NAACP all have members who live alone, are at high risk from COVID-19 complications, and prefer to vote by absentee ballot rather than in person to minimize their risk from exposure to the virus. *See, e.g.*, 9/11/20 at 161, 180–81; 9/9/20 at 107–110, 115; 9/1020 at 77–78, 80–81. These plaintiffs maintain that their affected members cannot satisfy the witness requirement without risking their health by engaging in person-to-person contact in contravention of health guidelines. Doc. 247 at 6.

To be sure, these plaintiffs have good reason to be concerned about the risk of COVID-19 infection, and to minimize their potential exposure to the virus. And expert trial testimony established that "the best way to avoid contact with the virus is to not be in contact with other people." 9/8/20 at 31. However, even if the witness requirement significantly burdens some individual plaintiffs and members of the organizational plaintiffs, that does not necessarily establish that strict scrutiny applies. *See Crawford*, 553 U.S. at 206 (Scalia, J., concurring) (noting that when determining whether strict scrutiny applies, the Court has looked at the burden on voters "categorically and did not consider the peculiar circumstances of individual voters or candidates") (citations omitted).

122

But there is more to consider. The plaintiffs showed at trial that satisfying the witness requirement presents some risk of COVID-19 exposure to voters who do not regularly encounter at least two adults simultaneously, even if these voters follow social-distancing guidelines. The defendants' contention that the "Plaintiffs failed to show that they are burdened at all" by the witness requirement, doc. 244 at 9, is simply untrue. Their argument to this effect is essentially that the individual plaintiffs have not shown enough "creativity and initiative" to get their absentee ballots witnesses or notarized. Docs. 186 at 5; 160 at 17. They contend that each plaintiff has had "opportunities to safely obtain signatures," including while meeting others outdoors or perhaps while visiting a doctor. Doc. 244 at 9. Alternatively, they maintain that the plaintiffs could arrange for someone to witness their ballots "from a distance or through a car window." *Id.* True enough. A "determined and resourceful voter intent on voting" could certainly "manage to work around" the witness requirement. *Common Cause R.I. v. Gorbea*, 970 F.3d 11, 14 (1st Cir. 2020). "But it is also certain that the burdens are much more unusual and substantial than those that voters are generally expected to bear. Taking an unusual and in fact unnecessary chance with your life is a heavy burden to bear simply to vote." *Id.* at 14–15.

The availability of free witness or notary services does not diminish the burden that at-risk individuals face when attempting to comply with the witness requirement. For example, the defendants point out that the Mobile County Public

Library offers those services to county residents at no charge.  Doc. 245 at 7; *see also* doc. 244 at 10.  Library patrons in Mobile County can travel to any one of five library branches to have their absentee ballots notarized without going indoors.  9/16/20 at 118–119.  Both Ms. Bettis and Ms. Thompson, who live in Mobile County, testified that they would consider using this program to satisfy the witness requirement.  9/9/20 at 196–97; 9/14/20 at 44–45.  The defendants thus contend that both those plaintiffs can satisfy the witness requirement with minimal risk.  Doc. 245 at 6–7.  But the burden on these plaintiffs is not simply having to get their ballot applications notarized.  Rather, it is having to expose themselves to a potentially deadly virus.  Whether they can obtain notarization for free from a county library is therefore of no moment, particularly when doing so generally requires interacting with library staff face-to-face outside.  *See* 9/16/20 at 129.

For the same reason, it matters not that some individual plaintiffs have ventured outside of their homes to run necessary errands.  The defendants describe Ms. Thompson's safety concerns as "disingenuous" because she has made "regular away-from-home trips to get her Shih Tzu shampooed."  Doc. 245 at 7.  But Ms. Thompson's dog has a skin condition that requires recurrent trips to both the groomer and veterinarian.  9/8/20 at 173.  And she dutifully follows public health guidelines whenever she goes to either service.  *Id.*  True, Ms. Thompson also leaves home to visit her bank, pharmacy, doctor's office, and grocery store.  *Id.* at 171.  Those trips necessarily entail a level of risk for someone with Ms. Thompson's

124

health conditions, despite her rigorous safety precautions. *See id.* at 170.  However, "[s]uch risks may be necessary to obtain food and other necessities, but the burden one might be forced to accept to feed oneself differs in kind from the burden that the First and Fourteenth Amendment tolerate on the right to vote." *League of Women Voters of Va. v. Va. State Bd. of Elections*, No. 6:20-CV-00024, 2020 WL 4927524, at *9 (W.D. Va. Aug. 21, 2020).

Ultimately, the burden imposed by the witness requirement might not be severe, but it doubtlessly exists.  Other courts have recognized that the burden such a law imposes is at least significant.  *See, e.g.*, *Common Cause R.I*, 970 F.3d at 14 (concluding that a two-witness or notary requirement imposed a "significant" burden as applied "in the midst of a pandemic").  Moreover, even if the requirement only slightly burdened the right to vote, this burden "must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (citation omitted).  Thus, the court turns to the "precise interests put forward by the State as justifications for the burden imposed by its rule . . . ." *Burdick*, 504 U.S. at 434 (citation omitted).

b.

According to state law, the witness requirement "goes to the integrity and sanctity of the ballot and election."  Ala. Code § 17-11-10(c).  The defendants contend that requiring witnesses curbs voter fraud by ensuring that the voter completing the ballot is the person identified on the ballot.  Doc. 244 at 10.  Although

there was no evidence of extensive voter fraud offered at trial, the defendants established that voter fraud has occurred on occasion.  The State has a legitimate and strong interest in preventing such fraud.  *Lee*, 915 F.3d at 1322 (citing *Common Cause*, 554 F.3d at 1353–54); *see also Crawford*, 553 U.S. at 196.  But, while the State's determination that the witness requirement deters fraud may be reasonable, the *Anderson-Burdick* balancing test nonetheless requires the court to "'determine the legitimacy and strength of [] [the State's] interests,' while also considering 'the extent to which those interests make it necessary to burden the Plaintiff[s'] rights.'" *Stein v. Ala. Sec'y of State*, 774 F.3d 689, 694 (11th Cir. 2014) (quoting *Anderson*, 460 U.S. at 789).[54]

Based on the evidence at trial, the necessity of the witness requirement in combating voter fraud is not as clear as the defendants maintain.  The plaintiffs contend that the requirement is unnecessary because it has no impact on the integrity of an absentee ballot.  Doc. 247 at 9.  To start, the witnesses play only a minor role in helping to prevent voter fraud.  Witnesses certify only that they watched the individual sign the affidavit envelope.  *See* Ala. Code 17-11-7(b).  As Secretary

---

[54] For this reason, defendant Judge Davis's contention that the State is "only required to articulate, not to prove," a governmental interest, doc. 246 at 12, is unavailing.  It is true that "*Anderson* does not require any evidentiary showing or burden of proof to be satisfied by the state government." *Common Cause*, 554 F.3d at 1353 (citing *Anderson*, 460 U.S. at 796).  But the State's legitimate interests in fraud prevention still "must be weighed against the burden" the Challenged Provision imposes "to determine whether the interest is 'sufficiently weighty to justify the limitation.'" *Id.* (quoting *Crawford*, 553 U.S. at 191).  It goes without saying that an interest that can merely be articulated is not weighty.

Merrill and Mr. Helms testified, witnesses need not even know the voter.  9/11/20 at 11; 9/15/20 at 178.  Nor do the witnesses have to watch the voter complete the ballot, presumably to maintain ballot secrecy.  Moreover, even if the witness requirement is a fraud prevention measure, there appears to be little fraud to prevent.   Plaintiff Threadgill-Matthews, for example, testified that she never encountered fraudulent activity despite serving as an absentee election official for over two decades.  9/9/20 at 8–9.

The plaintiffs further allege that the requirement is ineffective because election officials do not verify the identity of the witnesses. Doc. 247 at 9.  Secretary Merrill acknowledged this fact at trial.  9/11/20 at 11.  Plaintiff Threadgill-Matthews also confirmed that, in her experience, the review is cursory.  9/9/20 at 8.  However, the State contends that it can use witness signatures to later investigate potential voter fraud.   Doc. 244 at 10–11.   The witness requirement's efficacy as an investigative tool is unclear.   Mr. Gregory Biggs testified that the witness requirement helped him investigate and prosecute voter fraud cases, but that was decades ago.  9/16/20 at 10–14.  Moreover, Mr. Biggs at times mentioned voter signatures rather than witness signatures in his testimony, leading the court to wonder whether he was conflating the two.[55]  Setting that aside, an investigative

---

[55] For example, when asked whether the witness signature requirement furthered investigations in Greene County, Mr. Biggs replied, "Yes. Yes, it did."  9/16/20 at 10.  He explained that if a signature appeared "suspicious" after "comparing it with a driver's license," then investigators would approach the "victim voter" and ask, "Is this your signature?"  *Id.*  "If it's no, then it's a forged signature. So the signatures are one of the many leads or clues that you would use to help

tool's value is diminished when there are no crimes to investigate. Ms. Woodall, the Houston County Circuit Clerk, says she finds witness signatures helpful, but the few recent instances of voter fraud she testified about did not turn on the requirement. *Id.* at 71–72, 87–90. What's more, Ms. Woodall also seemed to conflate the witness signature requirement with the requirement that voters sign the ballot and corresponding affidavit.[56] Yet the requirement might at least "inspire public confidence" in Alabama's election scheme. *Crawford*, 553 U.S. at 197. The witness requirement thus has some marginal utility as a fraud prevention tool.

Additionally, the plaintiffs argue that other laws adequately safeguard elections in Alabama. Doc. 247 at 9. State law mandates that a voter casting an absentee ballot complete an application containing "sufficient information to identify the applicant." Ala. Code § 17-11-4. Absentee applicants can use their driver's license number or the last four digits of the applicant's social security number to satisfy this requirement. *See* 9/15/20 at 176. The defendants correctly

---

ferret out what was a legal vote or a stolen vote." *Id.* This testimony clearly relates to the requirement that voters sign the ballot themselves, not the challenged witness requirement.

[56] When asked whether the witness signature requirement had "any value" in "helping [her] detect instances of possible voter fraud," Ms. Woodall testified that it was "extremely helpful." 9/16/20 at 71–72. She testified that "because you have the signature on the application whereby the voter is certifying that they're voting or they are asking for an absentee ballot," the "signature on the affidavit envelope is significant and helpful to ensure that you've got two signatures, one on the application, one on the affidavit, that if there is suspicion or concern or complaints, that you have something to compare to." *Id.* at 72. Thus, "that voter [is] saying and affirming that they are the ones that cast their vote, not someone else's vote but their own vote." *Id.* This testimony clearly does not concern the witness signature requirement that is challenged in this case. If anything, it shows that the State can use the voter's signature alone to discover fraudulent activity.

128

point out that an AEM could theoretically process an application without that specific information, doc. 244 at 11, but the AEM could do so only after satisfactorily identifying the applicant. *See* Ala. Code § 17-11-4; 9/15/20 at 176. Furthermore, with certain limited exceptions, a voter must submit a copy of his or her photo ID with an absentee ballot application. *See* Pl. Ex. 22. And because the State apparently maintains a database containing copies of at least some voter signatures, the State could verify the authenticity of the ballot using the voter's signature alone. 9/17/20 at 118. Trial testimony established that some AEMs already do this before sending absentee ballots to voters. *Id.* Finally, the affidavit submitted with absentee ballots requires absentee voters to swear that the information in the affidavit is true. Ala. Code § 17-11-7. For added protection, the State makes falsifying absentee ballot applications or verification documents a felony. Ala. Code § 17-17-24(a); 9/15/20 at 176–78.

Aside from their contention that the witness requirement supplements investigative tools, the defendants do not dispute that these other requirements are effective deterrents to voter fraud. *See* docs. 244 at 10; 245 at 8–9; 246 at 13. In fact, Secretary Merrill confirmed that a bill his office authored proposing to swap the witness requirement for absentee ballots with a photo ID requirement would have strengthened absentee voting laws in Alabama. 9/11/20 at 10–11. Considering the State's current photo ID requirement for absentee voter applications—which will remain in place for absentee voters who are neither disabled nor over age 65—

129

Secretary Merrill's statement undermines the legitimacy of the State's interest in maintaining the witness requirement to prevent fraud. The fact that persons who are essentially unknown to a voter can serve as witnesses, 9/11/20 at 11, also undermines the legitimacy of the witness requirement as an effective fraud deterrent.

In the end, the witness requirement marginally serves the State's interest in preventing voter fraud. The court agrees with the Western District of Virginia that an individual intent on forging the signature of another voter at the risk of a felony charge would not likely be discouraged from "writing out an illegible scrawl on an envelope to satisfy the witness requirement." *League of Women Voters of Va. v. Va. State Bd. of Elections*, 2020 WL 2158249, at *9 (W.D. Va. May 5, 2020). Finally, the court notes that Secretary Merrill testified that Alabama is one of only two states that impose a double witness requirement on absentee voters. 9/11/20 at 10. Moreover, only twelve states require even a single witness signature. *Common Cause R.I.*, 970 F.3d at 15. This underscores that "the incremental interest in . . . the two-witness or notary rule . . . is marginal at best." *Id.* Although the State has a legitimate interest in preventing voter fraud, the evidence produced at trial shows that the State's interests do not justify the burdens that the witness requirement imposes on vulnerable voters during the COVID-19 pandemic.

As a result, because some voters at risk of severe complications from COVID-19 who do not regularly encounter at least two adults simultaneously will be dissuaded from voting due to the health risks associated with complying with the

witness requirement and the steps necessary to mitigate those risks, the plaintiffs have proved that the burdens imposed on those voters outweigh the State's interest in enforcing the witness requirement. The witness requirement is therefore unconstitutional as applied to vulnerable voters who cannot safely satisfy the requirement during the COVID-19 pandemic.

2.

With exceptions for voters entitled to vote absentee under federal law, including the Voting Accessibility for the Elderly and Handicapped Act, Alabama requires absentee voters to provide a copy of their photo identification with their absentee ballot application and certain absentee ballots.[57] Ala. Code §§ 17-9-30(b), (d); 17-11-9. The plaintiffs assert that this requirement is unconstitutional as applied to Thompson and all organizational plaintiffs and their members during the COVID-19 pandemic. Doc. 247 at 17. The plaintiffs therefore seek an order enjoining enforcement of the photo ID requirement. Doc. 75 at 67.

---

[57] Alabama interprets the Voting Accessibility for the Elderly and Handicapped Act to exempt from the photo ID requirement any voter who is over the age of 65 or has a disability and who is "unable to access his or her assigned polling place due to a neurological, musculoskeletal, respiratory (including speech organs), cardiovascular, or other life-altering disorder that affects the voter's ability to perform manual tasks, stand for any length of time, walk unassisted, see, hear, or speak . . . ." *See* Ala. Admin. Code R. 820-2-9-.12(3); Pl. Ex. 22. The court notes that any voter over the age of 65 or with a disability who has a symptomatic case of COVID-19, *i.e.*, a respiratory disorder, would almost certainly qualify for this exception to the photo ID requirement.

131

a.

Under *Anderson-Burdick*, the court must first resolve whether the photo ID requirement sufficiently burdens the right to vote such that strict scrutiny applies. The plaintiffs allege that the photo ID requirement severely burdens elderly and disabled voters who are most susceptible to COVID-19. Doc. 247 at 17. For those vulnerable voters, complying with the requirement could necessitate leaving their homes and risking exposure to infected persons. *Id.* The plaintiffs list Thompson and several Alabama NAACP and People First members as vulnerable voters for whom obtaining a photocopy requires risking COVID-19 exposure because they do not have copiers at home.[58] *Id.*; 9/10/20 at 77–78; 9/11/20 at 129. The defendants respond that the photo ID requirement does not impose a severe burden—or perhaps any burden, for that matter—to these individuals for the same reasons that the witness requirement supposedly did not. Docs. 244 at 9–10; 245 at 6; 246 at 14. Allegedly, free photocopying services provided by third parties like the Mobile County Public Library provide the plaintiffs a method of satisfying the requirement that is no riskier than other everyday tasks like grocery shopping. Doc. 245 at 6–7.

---

[58] During trial, the President of the Alabama NAACP also mentioned Joshua Wall as one such member. 9/10/20 at 82. But unlike the other members described, it is unclear what relevance Mr. Wall has to the plaintiffs' as applied challenge to the photo ID requirement. Although he lacks a photo ID, Mr. Wall does not appear to be particularly susceptible to COVID-19 complications. He does not have any known medical conditions and is under age 65. *Id.* at 115–16. Moreover, Mr. Wall does not possess a photo ID because his religious beliefs preclude him from doing so, not because of the pandemic. *Id.* at 115. Thus, any claim based on Mr. Wall's inability to vote must be facial, and a facial challenge would of course be barred by the Eleventh Circuit's ruling in *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 966 F.3d 1202 (2020).

But, again, the burdens that people accept to feed themselves differ from the burdens that the Constitution contemplates on voting. Moreover, there is no guarantee that these third parties, or even Secretary Merrill's mobile units, will be able to service all of Alabama's vulnerable voters. The Alabama NAACP, which has similarly offered photocopying during its absentee ballot clinics, expressly stated that it cannot meet the high demand for photocopying. 9/10/20 at 55–56. The Alabama NAACP also struggled to educate all vulnerable voters about this program. *Id.* at 56. So too has the Mobile County Public Library. 9/16/20 at 133.

Finally, simply asking vulnerable voters to subject themselves to COVID-19 exposure to make a copy of their ID is itself a significant burden. "[E]very potential exposure is a risk" for those voters. *League of Women Voters*, 2020 WL 4927524, at *9. As explained, that burden does not trigger strict scrutiny. *See Crawford*, 553 U.S. at 206 (Scalia, J. concurring). But even non-severe burdens must be justified by "relevant and legitimate interests of sufficient weight." *Lee*, 915 F.3d at 1318–19 (citation omitted).

b.

The defendants' justifications for the photo ID requirement mirror those offered in support of the witness requirement. They contend that the photo ID requirement deters voter fraud and safeguards voter confidence. Doc. 244 at 10–11. To be clear, the State undoubtedly has a legitimate interest in preventing voter fraud. And, a photo ID requirement serves that interest. *Crawford*, 553 U.S. at 196–97;

*Common Cause*, 554 F.3d at 1353–54.  Indeed, the Eleventh Circuit in *Greater Birmingham Ministries* recently applied the *Anderson-Burdick* test to find that Alabama's fraud prevention interests are generally enough to justify the burdens imposed by the photo ID law.  966 F.3d at 1223–24.  The defendants therefore contend that *Greater Birmingham Ministries* closes this matter.  *See* docs. 245 at 9; 246 at 14.

That was a facial challenge to Alabama's photo ID law, however, and the present challenge is as applied.  *See* 966 F.3d at 1221 (observing that the plaintiffs bore "a heavy burden of persuasion" because they broadly attacked the constitutionality of the photo ID law "in all its applications") (quoting *Crawford*, 553 U.S. at 200).  Moreover, circumstances have changed dramatically since the *GBM* plaintiffs filed that case five years ago.  *See* 966 F.3d at 1208.  The photo ID law is more burdensome as applied to vulnerable voters during a pandemic. Therefore, the court must consider again whether the significant burden these voters face is "justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'"  *Crawford*, 553 U.S. at 191 (citation omitted).

During the COVID-19 pandemic, and as applied to particularly susceptible voters, the State's interest in preserving the photo ID requirement is diminished. Again, the State already exempts from the requirement voters who are either 65 or older or disabled, and who cannot access the polls due to a physical infirmity.  Ala. Admin. Code R. 820-2-9-.12(3).  The State also has an array of tools to combat voter

134

fraud. For example, the requirement that a voter provide identifying information—such as her driver's license number or the last four digits of her social security number—with an absentee ballot application provides sufficient information to identify absentee voters. *See* Ala. Code § 17-11-4; Pl. Ex. 22 at 19. Although the defendants suggest that this information could be stolen, doc. 244 at 11, it is unlikely that a person intent on submitting a fraudulent absentee ballot would find the photo ID requirement a meaningful deterrent.

Evidence produced at trial confirms that the photo ID requirement's value is marginal at best. Mr. Gregory Biggs testified that although he believes the photo ID requirement is a "proactive way to protect [election] integrity," it was irrelevant in the voter fraud cases he prosecuted in the 1990s. 9/16/20 at 24, 36. Ms. Carla Woodall, the circuit clerk for Houston County, similarly testified that photo IDs were not useful during an investigation she assisted with several years ago. 9/16/20 at 71. Ms. Woodall also testified that the photo ID requirement played no role in her detection of the "red flags" she observed in some relatively recent elections. 9/16/20 at 86–89.

At bottom, based on the evidence produced at trial, the State's interest in requiring voters who are either age 65 or older or disabled—a group the State already exempts when they are infirm—to comply with the photo ID requirement is minimal. In comparison, the burden on that limited class of voters is significant. The requirement thus forces some vulnerable voters who wish to vote absentee to choose

between exercising their fundamental right and protecting themselves from the virus. To be sure, some of these vulnerable voters will choose to accept that risk and vote in person—that is their prerogative. But for others, the risks will be too high, and "even one disenfranchised voter . . . is too many." *Lee*, 915 F.3d at 1321 (citation omitted). Accordingly, the photo ID requirement violates the First and Fourteenth Amendment rights of those voters who are either age 65 or older or disabled during the pandemic.

### 3.

The CDC recommends that election administrators offer curbside voting as an alternative to in person voting during the COVID-19 pandemic. Pl. Ex. 451 at 11. In the past, several Alabama counties have provided this service for disabled citizens who need assistance voting, but each time Secretary Merrill has intervened to stop the service. 9/11/20 at 37–38, 40–41. The plaintiffs contend that this de facto ban on curbside voting unconstitutionally burdens their right to vote by requiring them to enter polling places and thereby increase their risk of exposure to the coronavirus. *See* doc. 247 at 22. On the other hand, the defendants say that curbside voting is illegal under Alabama law, incompatible with maintaining ballot secrecy, and

impracticable.[59]   Docs. 244 at 11; 246 at 8.   In deciding this challenge, the court

applies what is by now the all too familiar *Anderson-Burdick* balancing test.

a.

The court begins by determining whether the curbside voting ban's burdens

are severe enough to trigger strict scrutiny.   The plaintiffs predictably say it does,

doc. 247 at 22, but the court is not convinced.   Trial evidence shows that the curbside

voting ban burdens the organizational plaintiffs' members at some level.   Many

Alabama NAACP members, for example, are older adults who are vulnerable to

COVID-19 and thus want to minimize their exposure to the virus.   9/10/20 at 59.

Other Alabama NAACP members have ambulatory issues that make polling places

difficult for them to navigate.   *Id.*   These characteristics also apply to some members

of GBM and People First.   9/9/20 at 134–35, 139–40; 9/11/20 at 106–107.

The defendants have two responses.   First, they say that these voters can avoid

polling places by voting absentee.   Doc. 244 at 10.   However, that assumes the

plaintiffs can comply with the witness and photo ID requirements, which some

cannot do without risking their health, as explained above.   Moreover, the plaintiffs

showed at trial that some disabled voters, including some members of People First,

have strong reasons to vote in person, rather than by absentee ballot, to receive

---

[59] The court notes briefly that Alabama law does not prohibit jurisdictions from implementing curbside voting when it can be done consistently with the State's other election laws.   This is explained in Section II(E)(2)(d), *infra*.

137

assistance from poll workers. One of People First's members, Jenny Lux, testified that she needs assistance on Election Day due to her visual impairment. 9/11/10 at 172. Ms. Lux cannot vote absentee because she does not regularly encounter two adults to serve as witnesses and because obtaining notarization from her bank would require Ms. Lux to go indoors, where she might expose herself to the virus. *Id.* at 181. And, as the evidence at trial showed, standing in line at a polling place poses the same risk. That's particularly true for Ms. Lux because she often votes using an Automark machine, which requires her to spend more time at the polls than other voters. *Id.* at 174. Curbside voting would minimize the risk of exposure to COVID-19 facing voters like Ms. Lux.

Second, the defendants contend that voting in person is not burdensome even for vulnerable voters because election officials are taking steps to mitigate the risks. Doc. 244 at 10. This includes requiring poll workers to wear masks, purchasing masks to provide to voters, purchasing sanitizing products, and enforcing social distancing. 9/17/20 at 160. But these commendable efforts can only do so much. Election officials are barred from requiring voters to wear masks while voting. 9/16/20 at 110. They cannot require temperature checking. *Id.* Not even voters who have COVID-19 can be turned away from the polls, *id.*, because these voters also have a right to vote. This obviously increases the risk vulnerable voters will face when visiting indoor polling places. However, election officials do at least have a plan for isolating voters who are unwilling to comply with public health guidelines.

Probate Judge Bill English, for example, testified that he will segregate voters who decline to wear a mask once they enter the building. 9/17/20 at 161–62. Such voters will either be directed to a designated area away from other voters or required to wait outside until other voters have left the polls. *Id.*

These precautions mitigate the risks associated with voting in person such that strict scrutiny is inapplicable, but it does not follow that "the lack of curbside voting is no burden." Doc. 244 at 10. Even with precautions indoors, a vulnerable voter could encounter an unmasked individual before entering the polling place. Judge English testified that unmasked voters waiting for others to clear out of polling places will do so at the entrance, which could place them in proximity with vulnerable voters entering and exiting the polls. 9/17/20 at 161. Moreover, even masked, face-to-face interactions impose some level of risk that might dissuade justifiably cautious persons from voting. *See League of Women Voters*, 2020 WL 4927524, at *9.

b.

The defendants offer a handful of interests to justify the significant burden that the curbside voting ban imposes. For starters, they contend that allowing curbside voting would "corrupt the process." Doc. 244 at 11. Allegedly, the "practicalities" of curbside voting "would harm Alabama's interests in orderly elections and in ensuring ballot secrecy." *Id.* But several Alabama counties had already adopted the practice before Secretary Merrill intervened to stop them. No

evidence suggests that doing so compromised either the orderliness of those elections or ballot secrecy.  9/11/20 at 37–42; 9/15/20 at 194–95.  To the contrary, evidence showed that curbside voting would further ballot secrecy for some voters. Ms. Lux testified that voting in person using an Automark machine required poll workers to supervise her voting.  9/11/20 at 179.  On at least one occasion, a poll worker scoffed at her political choices.  *Id.*  Voting from the privacy of a vehicle certainly would have been more secretive for Ms. Lux.

Finally, the defendants note that requiring curbside voting would raise "massive logistical problems" where the practice was implemented.  Doc. 246 at 8. These problems include "cost, personnel, geographical constraints, weather, integrity of the ballot, secrecy of the ballot, traffic and time limitations."  *Id.*  But this court has explained that the plaintiffs seek only a negative injunction barring Secretary Merrill from preventing curbside voting, not a positive one requiring its implementation.  Doc. 58 at 50; *see also* doc. 75 at 78.  The defendants recognize as much.  Doc. 246 at 8 n.7.  Under the plaintiffs' requested relief, the only counties that will implement curbside voting are those that determine they can do so practically and consistently with Alabama law.   The defendants' pragmatic objections are thus irrelevant to the court's balancing analysis.

In conclusion, the plaintiffs have shown that the curbside voting ban imposes a significant burden on vulnerable voters during the COVID-19 pandemic.  The State, in contrast, has not provided "relevant and legitimate state interests

140

'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (citation omitted).  Therefore, the curbside voting ban unduly burdens the fundamental right to vote in violation of the First and Fourteenth Amendments.

*        *        *

Consistent with the above discussion and findings, the court makes the following conclusions of law regarding the plaintiffs' constitutional claims pleaded in Count I:

1.     The plaintiffs established that, during the pandemic and as applied to voters who are particularly susceptible to COVID-19 complications, the witness requirement imposes a significant burden on their rights and the rights of their members.  Because the State's interests in maintaining the witness requirement do not justify those burdens, the requirement violates the First and Fourteenth Amendments.

2.     The plaintiffs established that, during the pandemic and as applied to voters who are particularly susceptible to COVID-19 complications because they are either age 65 or older or disabled, the photo ID requirement imposes a significant burden on their voting rights and the rights of their members.  Because the State's interests in maintaining the photo ID requirement do not justify those burdens, the requirement violates the First and Fourteenth Amendments.

3.     The plaintiffs established that, during the pandemic and as applied to voters who are particularly susceptible to COVID-19 complications, the curbside

141

voting ban imposes a significant burden on their voting rights and the rights of their members.  Because the State's interests in maintaining the curbside voting ban do not justify those burdens, the policy violates the First and Fourteenth Amendments.

## E.

The plaintiffs assert in Count II that the photo ID requirement, as applied in the COVID-19 pandemic, violates Title II of the ADA and that the curbside voting ban violates the ADA as applied during the pandemic and also outside of the pandemic.  Doc. 75 at 68-71.  The court will begin its analysis by addressing the plaintiffs' facial challenge to the curbside voting ban after first outlining the legal framework applicable to Title II ADA claims.

To establish a claim under Title II, the plaintiffs must demonstrate: "(1) that [they are] 'qualified individual[s] with a disability;' (2) that [they were] 'excluded from participation in or . . . denied the benefits of the services, programs, or activities of a public entity' or otherwise 'discriminated [against] by such entity;'[60] (3) 'by reason of such disability.'"  *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001) (quoting 42 U.S.C. § 12132).[61]  A plaintiff is a qualified individual if she "meets the essential eligibility requirements" to participate in the program or services at issue

---

[60] A "public entity" is "any State or local government [or] any department, agency . . . or other instrumentality of a State or States or local government."  42 U.S.C. § 12131(1).  The defendants here do not dispute that they qualify as public entities.  *See* docs. 244; 245; 246.

[61] The court discussed the legal framework for the plaintiffs' Title II claims in its memorandum opinion granting the motion for a preliminary injunction, *see* doc. 58 at 51-69, and the court revisits it only to the extent necessary to explain its analysis.

"with or without reasonable modifications . . . ." *United States v. Georgia*, 546 U.S. 151, 153–54 (2006) (quoting 42 U.S.C. § 12131(2)).  To meet the second prong, exclusions under Title II need not be absolute, and a public entity violates Title II when a disabled person cannot readily access the program, service, or benefit at issue. *Shotz*, 256 F.3d at 1080 (citing 28 C.F.R. § 35.150).  However, mere difficulty in accessing a benefit is not, by itself, a violation of the ADA.  *See Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1088 (11th Cir. 2007).  The third prong of the Title II claim requires the plaintiffs to establish a causal link between their disabilities and the exclusion, denial of benefits, or discrimination.  *See Bircoll*, 480 F.3d at 1081, n.11; *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008).

To the extent the plaintiffs succeed in making a prima facie case of discrimination, they must then "propose a reasonable modification to the challenged public program that will allow them the meaningful access they seek."  *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016).  This burden is "not a heavy one . . . [i]t is enough for the plaintiff[s] to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003).  Nevertheless, the ADA does not require public entities to make modifications "that would impose an undue financial or administrative burden . . . ."  *Tennessee v. Lane*, 541 U.S. 509, 532 (2004) (citing 28 C.F.R. §§ 35.50(a)(2), (a)(3)).

1.

The plaintiffs assert a facial challenge to the curbside voting ban, contending that the de facto ban violates the ADA outside of the COVID-19 pandemic because some polling sites in the State are physically inaccessible to voters with disabilities. Docs. 75 at 71; 247 at 24-25.  Specifically, the plaintiffs contend that testimony from trial reveals that Dr. Peebles's, Mr. Porter's, and Ms. Lux's polling places are not readily accessible to them.[62]  Doc. 247 at 24.

a.

Dr. Peebles, who has cerebral palsy and uses a wheelchair, testified that he typically votes in person at his polling site and did so in the March 2020 primary. 9/8/20 at 124, 129.  To access the site, which is located in a hotel, Dr. Peebles must go through the main lobby and use an elevator with the assistance of a caregiver.  *Id.* at 131.  The plaintiffs contend that Dr. Peebles's polling site is inaccessible because he cannot operate the elevator by himself, and they suggest that his need for assistance means the elevator is not "useable" by Dr. Peebles, as required by the relevant regulations.  Doc. 247 at 24 (citing 28 C.F.R. §35.133(a)).  However, the plaintiffs have not provided any authority to support the contention that a person with a disability must be able to use the features of a facility, such as an elevator,

---

[62] The court found that Dr. Peebles and Mr. Porter do not have standing to challenge the curbside voting ban because a decision in their favor would not redress their injuries.  *See* section II(A)(3)(b).  The court addresses the merits of their claim in the alternative for purposes of a potential appeal.

without assistance in order for those features to be accessible, *see* doc. 247, and the court is aware of no such authority. And, Dr. Peebles testified that although "[t]here are some issues [] with whether there is enough room for [him] to activate the button on the elevator and then, turn, back out or pull out of the elevator without risking being hit by the door," he has "always [been] able to vote" at his polling site with assistance. 9/8/20 at 131, 153. Moreover, the plaintiffs did not present evidence that any aspect of the hotel, including its lobby and elevator, runs afoul of applicable ADA regulations.

b.

Mr. Porter has Parkinson's disease, which causes him to have difficulty walking, and he uses a cane to walk. 9/14/20 at 64-68. He testified that he normally votes in person at his polling site, and he voted in person in March. *Id.* at 76. At his polling site, Mr. Porter's disability license plate or placard allows him to park in a disabled parking space, but he still has to walk approximately 100 – 150 feet to enter the site, which proves challenging for him. *Id.* at 68, 77. Although the court does not discount the difficulty walking that distance may present Mr. Porter, his testimony that "[a]s time goes on, the greater the challenge to walk any distance" is not sufficient, without more, to show that his polling site is inaccessible to him or does not comply with the ADA.

c.

Ms. Lux normally votes in person at her polling site.  9/11/20 at 171.  She changed residences recently and is not sure if her new polling site is ADA compliant. *Id.* at 171, 177.  At her former polling site, Ms. Lux had to sit down while waiting because she could not stand in line for a long period due to issues with balance and her back.  *Id.* at 171-75.  In addition, Ms. Lux had to "walk a long distance" to get into her former polling place via a ramp.  *Id.* at 177.  But, as with Mr. Porter's testimony, Ms. Lux's testimony is not sufficient without more to show that the site was not accessible to her or not compliant with the ADA.

d.

The plaintiffs attempt also to establish that two polling sites, the Snowden's Women's Center in Montgomery County and Lowndesboro C.M.E. in Lowndes County, are not ADA compliant by introducing photos of the sites from Google Street View and a Lowndesboro, Alabama website.  *See* 9/10/20 at 62-71; Pl. Exs. 460; 462.  But, the photo from the Women's Center is dated July 2019, and it does not provide any information about the current condition of the site.  Pl. Ex. 462.  The photo of Lowndesboro C.M.E. is undated, and the plaintiffs did not provide evidence regarding the current condition of the site.  Pl. Ex. 460; 9/10/20 at 121-22.  As a result, the plaintiffs failed to establish that the polling sites pictured do not comply with ADA regulations.

To close, based on the evidence adduced at trial, the plaintiffs have not established that any polling site in Alabama is physically inaccessible to voters outside of the COVID-19 pandemic.  Consequently, the defendants are entitled to a judgment in their favor on the plaintiffs' facial challenge to the curbside voting ban under Title II of the ADA.

2.

The plaintiffs also assert that the curbside voting ban violates the ADA as applied in the COVID-19 pandemic because in-person voting is not accessible to voters with conditions that place them at high risk from COVID-19.  Doc. 75 at 68-71.  The defendants challenge whether the plaintiffs have established the elements of their prima facie case under the ADA and whether permitting curbside voting is a reasonable accommodation.

a.

An individual has a disability under the ADA if, among other things, she has "[a] physical or mental impairment[63] that substantially limits one or more of the major life activities of such individual . . . ."  42 U.S.C § 12102(1).  The ADA's implementing regulations direct that "[t]he definition of 'disability' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted

---

[63] "Physical or mental impairment means:  (i) Any physiological disorder or condition . . . affecting one or more body systems . . . ; or [] [a]ny mental or psychological disorder such as intellectual disability . . . ."  28 C.F.R. § 35.108(b)(1)(i).

by the terms of the ADA."[64]  *Id.* at § 35.108(a)(2)(i).  The regulations also expressly provide that physical or mental impairments include "visual, speech, and hearing impairments, and cerebral palsy, . . . heart disease, diabetes, [and] intellectual disability," while major life activities include "walking . . . , interacting with others, and working . . . ."  *Id.* at §§ 35.108(b)(2), (c)(1)(i).  Finally, "'substantially limits' shall be construed broadly . . . [and] is not meant to be a demanding standard."  *Id.* at § 35.108(d)(1)(i).

Turning to the specifics here, the individual plaintiffs are eligible voters, and each has a recognized physical impairment:  Dr. Peebles has cerebral palsy, Mr. Porter has asthma and Parkinson's Disease, Ms. Threadgill-Matthews has hypertension, and Ms. Thompson and Ms. Bettis[65] have diabetes and hypertension. 9/8/20 at 114, 116, 168-69; 9/9/20 at 10; 9/14/20 at 6-7, 64-68.  In addition, People First, GBM, and the NAACP have all identified members who are eligible voters

---

[64] "Because Congress explicitly authorized the Attorney General to promulgate regulations under the ADA, *see* 42 U.S.C. § 12134(a), the regulations 'must [be given] legislative and hence controlling weight unless they are arbitrary, capricious, or plainly contrary to the statute.'"  *Shotz*, 256 F.3d at 1079 n.2 (quotation omitted).

[65] Ms. Bettis testified that she currently takes only over-the-counter supplements to treat her diabetes and hypertension.  9/14/20 at 6-7.  Nevertheless, under the applicable ADA regulations, "[a]n impairment that is . . . in remission is a disability if it would substantially limit a major life activity when active."  28 C.F.R. § 35.108(d)(1)(iv).

with physical impairments.[66, 67]   *See* 9/9/20 at 129-30, 166-67; 9/10/20 at 81, 111; 9/11/20 at 106-07, 137-38, 172, 175, 164.

To be disabling under the ADA, the plaintiffs' impairments must substantially limit a major life activity.  The State defendants contend that the plaintiffs are not disabled under the ADA because the "[p]laintiffs' own choices—not a 'physical or mental impairment'—limit their major life activities." Doc. 244 at 5.  But, this blithe assertion ignores the stark reality of the COVID-19 pandemic and downplays the risks exposure to the deadly virus present to the plaintiffs.  Indeed, based on the risks from exposure to COVID-19, the CDC advises people with underlying conditions, like the plaintiffs, to limit interactions with people outside of their households as much as possible and to avoid others who are not wearing masks.  *See* Agreed Facts at ¶ 62; Pl. Ex. 270 at 8.  This CDC guidance supports a finding that it is the plaintiffs' or their members' underlying medical conditions, not their personal choices, that impact their ability to interact with others or work during the COVID-

---

[66] As discussed above, the plaintiff have not identified any members of BVM, and BVM operates through a network of partner organizations rather than through members of its own.  *See section* II(A)(1)(b), *supra*.  And, the plaintiffs have not cited any authority for the proposition that an organization may assert ADA claims for injunctive relief on behalf of non-member constituents.  Thus, BVM's claims under the ADA fail, and the defendants are entitled to judgment in their favor on those claims.

[67] Judge Davis asserts that organizations cannot maintain ADA claims on behalf of their members, doc. 246 at 11, but he cites no authority for that proposition.  And, at least one other district court in this Circuit has concluded that an organization has associational standing to pursue ADA claims for injunctive and declaratory relief on behalf of its members.  *See Wein v. American Huts, Inc.*, 313 F. Supp. 2d 1356, 1361-62 (S.D. Fla. 2004).

19 pandemic. And, because the ADA must be broadly construed, *see Kornblau v. Dade County*, 86 F.3d 193, 194 (11th Cir. 1996) (citations omitted), the court must consider the circumstances and impact of the State's current public health emergency when determining whether the plaintiffs' physical impairments substantially limit a major life activity. Put differently, as Judge Dee Drell aptly stated, "[t]he determination of a qualifying disability in this case cannot be looked at in a vacuum." *Silver v. City of Alexandria*, -- F. Supp. 3d --, 2020 WL 3639696 (W.D. La. July 6, 2020). Thus, the court concludes that in the context of the COVID-19 pandemic, the plaintiffs' or their members' physical impairments are a qualifying disability under the ADA because their impairments substantially limit the major life activities of interacting with others or working.[68]

b.

i.

Next, the plaintiffs contend that, in the context of the COVID-19 pandemic, the individual plaintiffs and the disabled members of the organizational plaintiffs are excluded from voting in person due to the de facto ban on curbside voting. Doc. 75 The defendants counter that, even if the plaintiffs do not want to risk exposure to COVID-19 by voting in-person at a polling place, they are not excluded from voting

---

[68] Whether the plaintiffs' impairments constitute a disability under the ADA is a legal conclusion. *See Pritchard v. Southern Co. Serv.*, 92 F.3d 1130, 1133 (11th Cir. 1996). Consequently, contrary to the defendants' contention otherwise, it is of limited import that some plaintiffs described themselves as not disabled at trial.

because they can vote absentee.  *See* doc. 244 at 6.  But, based on the ADA's broad remedial purpose, if a state provides voters with a choice between in-person and absentee voting, then the ADA mandates that both options be accessible to voters with disabilities.  *See Nat'l Fed'n of the Blind*, 813 F.3d at 503-04; *Disabled in Action v. Bd. of Elections in New York*, 752 F.3d 189, 198-99 (2d Cir. 2014); *see also* doc. 58 at 68, n.46; 28 C.F.R. § 35.130(b)(1)(ii).  Indeed, "[t]he Supreme Court has cautioned against defining the scope of a public benefit so as to avoid questions of discriminatory effects," noting that, "'the benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled.'"  *Nat'l Fed'n of the Blind*, 813 F.3d at 504 (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985)).[69]

In addition, the availability of absentee voting does not make voting accessible to some members of People First, such as Ms. Lux, because those voters require assistance to vote and should not be forced to give up their privacy to obtain help from someone who, unlike a poll worker, does not have an affirmative obligation to maintain their ballots' secrecy.[70]  9/8/20 at 124-25; 9/11/20 at 137-38,

---

[69] *Alexander v. Choate* involved a claim brought under the Rehabilitation Act, but "[c]ases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa." *Cash v. Smith*, 231 F.3d 1301, 1305 n.2 (11th Cir. 2000) (citation omitted), *superseded by statute on other grounds as stated in Seals v. Lee Brass Foundry LLC*, 271 F. Supp. 3d 1302, 1322 (N.D. Ala. 2017).

[70] To be sure, Ms. Lux testified that one poll worker scoffed at her political choice for president in 2008.  While inappropriate, the conduct Ms. Lux described does not show that the poll worker breached the ballot's secrecy.  *See* 9/11/20 at 179.

172, 179; *see also* Ala. Code. §§ 17-6-34; 17-8-8.  Also, absentee voting does not

provide a fail-safe that guarantees vulnerable voters a chance to cast a ballot.  For

example, Mr. Porter, Ms. Thompson, and Ms. Bettis all testified that they could not

complete the absentee ballot process for the July election due to timing issues or

other mistakes, 9/8/20 at 174-75; 9/14/20 at 18, 40-41, 78, and Ms. Ellis testified

that some members of People First are unable to fill out an application or an absentee

ballot because of their disabilities, *see* 9/11/20 at 136-38.

Moreover, the availability of in-person absentee voting at an AEM's office

does not necessarily provide an adequate substitute for voting at a polling place on

Election Day.   Under the ADA, "[a] public entity, in providing any [] service, may

not, . . . on the basis of disability . . . [a]fford a qualified individual with a disability

an opportunity to participate in or benefit from the [] service that is not equal to that

afforded others; [or] . . . that is not as effective . . . as that provided to others . . . ."

28 C.F.R. § 35.130(b)(1)(ii).  Absentee ballots completed at an AEM's office are not

counted as they are cast, but are stored until poll workers begin counting them after

noon on Election Day.  9/15/20 at 139-40; 9/17/20 at 127-28, 148.  And there is no

guarantee that an in-person absentee vote would not be rejected when the counting

of those ballots commences on Election Day.  Consequently, a voter does not receive

confirmation that her vote was counted when she casts a ballot at the AEM's office,

and that confirmation has a special significance for many voters.[71]  Thus, voting by absentee ballot in person at an AEM's office is not equal to voting at the poll on Election Day.

For all of these reasons, the court finds that the proper inquiry to determine whether the plaintiffs have been excluded from voting is whether the curbside voting ban excludes them from voting in-person on Election Day, instead of whether it excludes them from voting in general.

ii.

To establish an exclusion for purposes of Title II, the plaintiffs do not have to show that they are prohibited from voting in person, but only that voting in person is not "readily accessible" to them.  *See Shotz*, 256 F.3d at 1080 (citing 28 C.F.R. § 35.150).  Relevant to the analysis here, aerosolized droplets containing SARS-CoV-2 may linger in stagnant air for several minutes, and the risk of transmission of COVID-19 is heightened in indoor spaces where many people share a space for a period of time, such as at a polling site.  9/8/20 at 17-18, 46-47; Pl. Ex. 269 at ¶¶ 10, 19-20.  Thus, traditional in-person voting presents a heightened risk of exposure to COVID-19, and several of the plaintiffs' experts opined that vulnerable voters with underlying conditions should not vote in person due to that risk of exposure.  Those

---

[71] Mr. Douglas, the executive director of GBM, testified that GBM's members, especially its Black members, have "a tradition of voting in person" to ensure acceptance of their ballots and confirm their "vote[s] counted in real time."  9/9/20 at 113.  As Mr. Douglas stated, "There's a pride in that."  *Id.*

opinions find support from Dr. Cotti's study and report, which revealed that counties in Wisconsin that had higher numbers of in-person votes cast per polling place had a higher rate of COVID-19 spread at a community level after the state's April primary.  9/10/20 at 156, 174; Pl. Ex. 267 at 3.

The risk of COVID-19 transmission is amplified in Alabama because, as noted above, poll workers in Alabama cannot check voters' temperatures, turn away voters who do not wear masks, or turn away voters who have a known case of COVID-19.  *See* 9/8/20 at 31, 48-49; 9/16/20 at 110; 9/15/20 at 202.  Thus, even with all the precautions State and county officials have taken to protect voters during the pandemic, such as requiring poll workers to wear masks, providing masks to voters who want them, and sanitizing, the plaintiffs or their vulnerable members still may be confronted with unmasked or visibly sick voters at their polling sites, which may dissuade them from voting in person.  Indeed, Mr. Porter testified, for example, that he did not vote in July after not receiving an absentee ballot because he could not risk exposure to COVID-19 at his polling site.  9/14/20 at 78; *see also* 9/8/20 at 175; 9/14/20 at 22.  The risk of COVID-19 exposure from in-person voting also increases for voters with disabilities, such as Ms. Lux, who require assistance at the polls, which prolongs the process of voting.  *See* 9/11/20 at 175.

Taken together, all of this evidence shows that voting in person on Election Day is not readily accessible to the plaintiffs or their members with disabilities during the COVID-19 pandemic.

iii.

Nevertheless, the defendants suggest that voting in person is readily accessible to the plaintiffs because going to their polling places is no riskier than other interactions the plaintiffs have had outside their homes.  Doc. 244 at 6.  Certainly, the plaintiffs have left their homes to attend medical appointments for themselves and loved ones, go to the office, pick up food and groceries, travel to a lawyer's office, take a pet who requires care to a veterinarian and groomer, and do essential errands.  *See* 9/8/20 at 12-23, 169, 171, 173, 199; 9/9/20 at 11-12, 26-27; 9/14/20 at 17, 33-35, 71-72.  But, when the plaintiffs leave their homes, they wear masks,[72] practice social distancing, use gloves or hand sanitizer, and take other steps to minimize their risks, such as shopping during "senior hours."  9/8/20 at 170-73, 193, 228; 9/9/20 at 11-12; 9/14/20 at 10-11, 35-36, 75.  But, more to the point, the plaintiffs should not be required to show that they avoided <u>all</u> contact with people outside their homes and remained sequestered for the past six months for them to prove that voting in person is not readily accessible due to the risk of exposure to COVID-19.  And, as mentioned above, the burden a person may have to accept to tend to his or his family's essential needs in a pandemic is different in kind from the burden he should have to tolerate to access his polling place to exercise the

---

[72] Dr. Peebles did not wear a mask during a high-stress meeting for an unrelated case in order to have access to water, but all the other people in the meeting wore a mask, and they remained more than six-feet apart in the meeting.  9/8/20 at 116-22; 133-34.

fundamental right to vote.  *See  League of Women Voters of Va.*, 2020 WL 4927524,

at *9.  Thus, the plaintiffs' limited activities outside of their homes do not establish

that their polling sites are readily accessible to them on Election Day.

c.

To satisfy the last element of their prima facie case, the plaintiffs must

establish a causal link between their disabilities and their exclusion from voting.  *See*

*Bircoll*, 480 F.3d at 1081, n.11; *Schwarz v. City of Treasure Island*, 544 F.3d 1201,

1212 n.6 (11th Cir. 2008).  In their post-trial brief, the State defendants contend that

the plaintiffs cannot satisfy this element because no plaintiff has shown that he or

she is "actually limiting their trips out of the home and personal contact with others."

Doc. 244 at 7 (emphasis in original omitted).  But, respectfully, this is a gross

mischaracterization of the plaintiffs' testimony.  As detailed above, the individual

plaintiffs testified at length about steps they have taken to reduce contact with people

outside their homes.  *See* section I(E)(1), *supra*.  For example, Ms. Bettis went so

far as to miss the funeral of a close friend's son to avoid contact with others at the

funeral.  9/14/20 at 11.  And, the court rejects the notion that the plaintiffs must prove

they have forsaken all interactions with people outside their homes during the course

of the pandemic before they can show a causal link between the conditions that make

them vulnerable to COVID-19 and their exclusion from the polls.

Undisputed evidence establishes that the CDC recommends that people like

the plaintiffs or their members with underlying conditions minimize their contact

156

with others outside of their homes and avoid people who are not wearing masks.  Pl. Ex. 270 at 8.  In addition, the plaintiffs' experts also recommend that vulnerable voters should not risk going inside a polling place to vote in November.  9/8/20 at 46-48; 9/9/20 at 38, 56-57.  Based on the CDC guidance, the expert opinions, and the risk of COVID-19 transmission indoors, *see* 9/9/20 at 31; section I(A), *supra*, the court finds a causal connection between the plaintiffs' impairments that make them vulnerable to COVID-19 and the inaccessibility of their polling sites during the COVID-19 pandemic.  Thus, the plaintiffs have established a prima facie case for their Title II claims challenging the curbside voting ban as applied in the pandemic.

d.

The final step in the analysis is a review of the reasonable accommodation the plaintiffs propose "that will allow them the meaningful access they seek."  *Nat'l Fed'n of the Blind*, 813 F.3d at 507.  The plaintiffs propose lifting the ban on curbside voting as an accommodation to make in-person voting more accessible to voters with disabilities.  The defendants argue that permitting curbside voting is not a reasonable accommodation because curbside voting violates Alabama law or would constitute a fundamental change to Alabama's voting laws.[73]  Docs. 244 at 8; 246 at 7-9.  Based

---

[73] In their opposition to the plaintiffs' motion for partial summary judgment, the State defendants contend that permitting curbside voting is not a reasonable modification because Alabama law already provides a modification for the plaintiffs, i.e., "[a]ny voter who is 'mobility disabled' or over the age of 70, who so requests, may move to the front of the line at the polling place."  Doc. 206 at 24 (citing Ala. Code 17-9-13(c)).  But, this law does nothing for the plaintiffs who are under

on the evidence, the court concludes the plaintiffs' proposed accommodation is reasonable.

First, to reiterate, the plaintiffs do not request an order mandating curbside voting state-wide, but only an order enjoining Secretary Merrill from prohibiting curbside voting in counties willing to implement the practice. Thus, the defendants' arguments regarding the burdens imposed by the resources required to implement curbside voting are inapposite here.

Second, no provision of Alabama law expressly prohibits curbside voting. *See* Agreed Facts at ¶ 110; 9/15/20 at 184. Relatedly, the defendants point out that no provision expressly allows it either, and assert that, therefore, curbside voting runs afoul of Alabama law. 9/11/20 at 70; 9/15/20 at 184. However, curbside, or drive-up, voting is a form of in-person voting (which State law of course permits)—the practice involves a voter who is present in person to sign the poll book, complete a ballot, and give it a poll worker, who then inserts it into a tabulation machine.[74] *See* 9/11/20 at 175-76; 9/14/20 at 79; 9/15/20 at 157-58. And, simply because no provision of Alabama law explicitly states that a voter may cast a ballot in person

---

70 and not mobility disabled, and who have underlying conditions, such as Ms. Bettis and Ms. Threadgill-Matthews. And, even for plaintiffs who could benefit from this law to go to the front of the line, they still must go inside their polling place to cast a ballot, risking exposure to other voters.

[74] Because the voter is present to cast a ballot in person, curbside voting is fundamentally different in kind from voting remotely by text, phone, or email, and the defendants' arguments drawing comparisons between curbside voting and voting remotely, *see* doc. 246 at 8, are strawmen that the court will not address.

from a car with the help of poll workers does not mean that the practice is prohibited by law.  Indeed, Alabama law expressly provides that poll workers may assist voters who request help completing their ballots.  *See* Ala. Code §§ 17-9-11; 17-9-13; 17-8-1(b)(4).  Moreover, the defendants admit that AEMs can hold events outside of their offices to process and collect absentee ballots, and they encourage the practice, even though Alabama Code provides that "[t]he county commission shall designate the place or office where [the AEM's] duties shall be performed."  Ala. Code § 17-11-2; 9/11/20 at 48-50.  To state the obvious, no provision of the Code on absentee voting explicitly provides that an AEM may travel to nursing homes, college campuses, or parking lots, to accept absentee ballots, *see* Ala. Code §§ 17-11-1 – 17-11-19, as Secretary Merrill encourages AEMs to do to make the process more accessible to voters, *see* 9/11/20 at 48-49.  Thus, just as an AEM may lawfully hold events to collect absentee ballots that are not expressly contemplated by Alabama Code, so too may counties, if they are so inclined, lawfully provide curbside voting as a service to voters.  Similarly, because curbside voting is a form of in-person voting, it would not fundamentally alter elections in Alabama.

The defendants also contend that counties cannot offer curbside voting because the Alabama legislature has not granted counties the authority to implement the practice, which the defendants add may "undercut Alabama's interest in secure and uniform elections."  Docs. 244 at 8; 246 at 8.  These contentions are unavailing.  First, the Alabama legislature has expressly authorized counties to conduct elections,

including by selecting and operating polling sites for in-person voting.[75]  *See* Ala. Code §§ 17-1-1, *et. seq.*  Thus, because curbside voting is a form of in-person voting at a polling site, counties may implement the practice without a grant of additional authority from the legislature.  Next, the defendants did not present any evidence that curbside voting that complies with relevant State laws would be less secure than traditional forms of in-person voting.  *See* 9/11/20 at 37-39, 42; 9/15/20 at 194-95.  Rather, they simply speculated that nefarious poll workers may decide to throw away ballots instead of putting them in the tabulation machine if the ballots are removed from a voter's line of sight.  *See* 9/15/20 at 148-59.  But, poll workers take an oath to maintain the integrity of elections by complying with relevant laws, *see* Ala. Code § 17-8-8; doc. 248- at 148-126, ¶ 8.4.4, and should be trusted to take that oath seriously.  In addition, Alabama's voting practices are already decentralized across the State, with different counties utilizing different procedures.  For example, not every county utilizes electronic pollbooks to verify voters at polling sites, and county probate judges determine how to lawfully handle "voting logistics" in their counties.  *See* 9/15/20 at 167, 186.  Therefore, allowing counties, who believe they can do so without impacting ballot integrity concerns, to implement curbside voting will not

---

[75] The defendants contend that the absence of county commissions, who are responsible for selecting polling sites, as defendants in this action precludes the court from granting relief to the plaintiffs on the curbside voting claims.  But, curbside voting does not necessarily require a county to change the location of their polling sites, and, as mentioned above, the plaintiffs do not seek an order mandating counties to provide curbside voting.

undermine the State's interest in uniform elections even if only some counties offer the service to voters.

For all of these reasons, the court finds that enjoining the curbside voting ban to permit those counties, if any, that are willing to provide the service to do so is a reasonable accommodation. The plaintiffs with standing to assert the claim are entitled to a judgment in their favor against Secretary Merrill on their Title II claim challenging the curbside voting ban.

3.

Next, the plaintiffs assert that the photo ID requirement violates Title II of the ADA as applied in the COVID-19 pandemic because the requirement makes absentee voting inaccessible for Ms. Thompson and members of People First, the Alabama NAACP, and GBM with underlying conditions. Doc. 75.

a.

As discussed above, Ms. Thompson and members of these three organizational plaintiffs are eligible voters with a disability. *See* section, II(E)(2)(a), *supra*. Still, the defendants contend that those plaintiffs are not qualified individuals with disabilities because satisfying the photo ID requirement is an essential eligibility requirement for absentee voting. *See* docs. 244 at 6, n.5; 245 at 9-11. In particular, the defendants contend that the Eleventh Circuit's recent decision in *Greater Birmingham Ministries v. Secretary of State for Alabama*, shows that, contrary to this court's decision at the preliminary injunction stage, the photo ID

161

requirement is an essential eligibility requirement.  Doc. 245 at 9-11.  The court respectfully disagrees.  To be sure, outside of the COVID-19 pandemic, the Eleventh Circuit found that "the burden of presenting a photo ID in order to vote is 'justified by relevant and legitimate state interests "sufficiently weighty to justify"' the burden on Alabama voters."  *Greater Birmingham Ministries*, 966 F.3d at 1223–24 (quoting *Crawford*, 553 at 191).  Simply because a requirement serves a weighty state interest, however, does not make it an essential eligibility requirement.  Instead, "'essential eligibility requirements' are those requirements without which the 'nature' of the program would be 'fundamentally alter[ed].'"  *Mary Jo C. v. New York State & Local Ret. Sys.*, 707 F.3d 144, 158 (2d Cir. 2013) (quoting 28 C.F.R. § 130(b)(7)).  And, "[w]hether a particular aspect of an activity is 'essential' will turn on the facts of the case."  *Schaw v. Habitat for Humanity*, 938 F.3d 1259, 1266 (11th Cir. 2019).[76]

Alabama already exempts a subset of absentee voters with disabilities from the photo ID requirement, including some of the plaintiffs.[77]  *See* Doc. 249-4 at 1. In their post-trial brief, the State defendants insist that this exemption, or carveout,

---

[76] *Schaw* addressed the Fair Housing Amendments Act, but the Eleventh Circuit drew its reasonable accommodation analysis, including the discussion of whether the accommodation would remove an essential requirement, from precedent concerning the ADA.  *See* 938 F.3d at 1265 n.2.

[77] A voter over the age of 65 or with a disability who is "unable to access his or her assigned polling place due to a neurological, musculoskeletal, respiratory [], cardiovascular, or other life-altering disorder that affects the voter's ability to perform manual tasks, stand for any length of time, walk unassisted, see, hear, or speak" does not have to include a copy of a photo ID with an absentee ballot application.  Doc. 249-4 at 1; Ala. Admin. Code R 820-2-0-.12(3).

"is not an exception" to the requirement because "voters still must identify themselves."   Doc. 244 at 6, n.5.   That statement illustrates why the photo ID requirement is not essential—voters provide sufficient information on their absentee ballot applications to identify themselves without the need for a photo ID.   Indeed, Ms. Barnett testified that with a  voter's name, address, and date of birth from the absentee ballot application she has "a good amount of data to be able to identify the voter."   9/17/20 at 113.   In addition to that information, voters also provide driver's license numbers or the last four digits of their social security numbers with an absentee ballot application, and staff in the AEM's office can verify the information provided to confirm the voter's identify before mailing an absentee ballot to the voter.   *See id.* at 114; doc. 249-4 at 1.   Because absentee voters provide information in their absentee ballot application that allows county officials to verify their identities without a photo ID, enjoining the photo ID requirement for absentee voters with disabilities that put them at-risk of severe complications from COVID-19 would not fundamentally alter the nature of Alabama's absentee voting program. Thus, the requirement is not an essential eligibility requirement, *see* doc. 58 at 66-67, and the plaintiffs are qualified individuals with disabilities.

b.

Ms. Schwarzauer contends the photo ID requirements does not exclude the plaintiffs from absentee voting because any individual with a disability is exempt from the requirement.   Doc. 233 at 3.   This contention overlooks that Alabama

163

narrowly interprets the exemption, such that it applies only to voters with specific disabilities.  *See* doc. 249-1 at 1.  Consequently, the exemption does not apply to Ms. Thompson or to all members of People First, GBM, and the Alabama NAACP with underlying medical conditions that place them at heightened risk from COVID-19.  Ms. Thompson and those members must comply with the requirement to vote absentee.

As discussed above, People First, GBM, and the Alabama NAACP identified members with conditions that make them vulnerable to COVID-19 and for whom obtaining a copy of their photo ID requires risking exposure to the virus because they cannot make a copy at home.  *See* section II(D)(2)(a), *supra*; 9/10/20 at 77–78, 94-95; 9/11/20 at 128-29.  While the free curbside copy service offered by the Mobile County Public Library may mitigate that risk for those members who live in the County and have a vehicle they can drive to access the service, it does not help People First members who cannot drive, or vulnerable members of People First, GBM, and the Alabama NAACP who live outside of Mobile County.  *See* 9/11/20 at 115, 129-30, 167; 9/9/20 at 129-30, 166-67; 9/10/20 at 81.  And, for those voters, the need to risk exposure to COVID-19 by leaving their homes or interacting with another person to obtain a copy of their IDs could dissuade them from voting absentee in November.  As a result, absentee voting is not readily accessible to vulnerable members of People First, GBM, and the Alabama NAACP during the COVID-19 pandemic, and the photo ID requirement excludes them from absentee

voting.   In light of the CDC's recommendation that people with underlying conditions minimize their contact with others outside of their homes, Pl. Ex. 270 at 8, the court finds a causal link between this exclusion and the organizational plaintiffs' members' physical impairments.

As to Ms. Thompson, she must leave her house or interact with another person to obtain a copy of her photo ID, risking exposure to COVID-19.   However, after learning of the Mobile County Public Library's curbside notary and copying service in this litigation, Ms. Thompson testified that she would use the service, in spite of her reasonable concerns about COVID-19.   9/8/20 at 197.   Thus, because Ms. Thompson agreed that she could obtain a copy of her ID from the curbside service at the library, complying with the photo ID requirement does not exclude Ms. Thompson from absentee voting, and the defendants are entitled to a judgment in their favor on Ms. Thompson's Title II claim challenging the photo ID requirement.[78]

c.

To make absentee voting readily accessible to People First, GBM, and the Alabama NAACP members with disabilities, the plaintiffs propose that the State

---

[78] This holding is not inconsistent with the court's conclusion that the photo ID and witness requirements impose an unconstitutional burden on Ms. Thompson's fundamental right to vote, notwithstanding the library's curbside services.   *See* section II(D)(2), *supra*.   Even if Ms. Thompson is willing to accept the risk of COVID-19 imposed by the photo ID requirement, thereby making absentee voting readily accessible under the ADA, it does not mean that the State's interests in the requirement justifies the burden for purposes of the *Anderson-Burdick* analysis.

expand the current exemption to the photo ID requirement during the COVID-19 pandemic to apply to all voters with conditions that place them at high risk of severe complications from COVID-19.  Doc. 247 at 15.  According to the defendants, this accommodation is not reasonable because AEMs use the copy of the ID voters submit with their absentee ballot applications to identify the voters.  Doc. 245 at 10. Indeed, Ms. Barnett testified, for example, that she compares the signature on the copy of the photo ID to the signature on the absentee ballot application to help her verify the identity of the voter completing the application.[79]   9/17/20 at 118. However, Ms. Barnett also testified that with the voter's name, address, and date of birth from the application, she has "a good amount of data to be able to identify the voter," and the application also includes the voter's driver's license number or the last four digits of his social security number to further help an AEM verify the voter's identity.  *Id.* at 113-14.  With all of the information provided in the application to identify the would-be absentee voter, a copy of the voter's ID is not essential to verifying the voter's identity.  Indeed, neither Ms. Barnett nor Ms. Woodall, the Circuit Clerk and AEM for Houston County, indicated that they encountered any difficulty verifying the identity of voters who are exempt from the photo ID requirement.

---

[79] If the voter registered to vote using a paper form, then the voter's signature is on file in the AEM's computer system, and the AEM can compare the signature on the application to the signature on file.  9/17/20 at 118.

Because the photo ID requirement is not necessary to verify an absentee voter's identity, enjoining the requirement during the COVID-19 pandemic for voters with conditions that place them at risk of severe complications from the virus would not cause an undue burden on the defendants or fundamentally alter Alabama's absentee voting program. As a result, the court finds that the plaintiffs' proposed modification is reasonable, and People First, GBM, and the Alabama NAACP are entitled to a judgment in their favor against the State and Ms. Schwarzauer on their Title II claim challenging the photo ID requirement.

\*      \*      \*

To conclude, based on the legal framework for ADA claims and the findings in this case, the court makes the following conclusions of law:

1.      The plaintiffs failed to establish that any polling site in Alabama is not accessible to voters with disabilities outside of the COVID-19 pandemic. As a result, they have not established that the defendants have excluded any voter from voting by reason of a disability outside of the COVID-19 pandemic, and the defendants are entitled to judgment in their favor on the plaintiffs' claims presenting a facial challenge to the curbside voting ban under Title II of the ADA.

2.      The defendants are entitled to judgment in their favor on BVM's claims asserted under Title II of the ADA.

3.      Ms. Threadgill-Matthews and the members of People First, the Alabama NAACP, and GBM with underlying health conditions are qualified

167

individuals with disabilities under the ADA.  Due to the curbside voting ban, voting in person on Election Day is not readily accessible to those individuals during the COVID-19 pandemic, and the exclusion is because of their disabilities.  In addition, enjoining enforcement of the ban to permit counties who are willing to do so to offer curbside voting is a reasonable modification.  As a result, the curbside voting ban violates Title II of the ADA as applied in the COVID-19 pandemic, and Ms. Threadgill-Matthews, People First, the Alabama NAACP, and GBM are entitled to a judgment in their favor against Secretary Merrill on that claim.

4.   The photo ID requirement is not an essential eligibility requirement for absentee voting, and Ms. Thompson is a qualified individual with a disability.  Even so, because Ms. Thompson agreed that she can utilize her local library's curbside copying service to comply with the photo ID requirement, she did not establish that the requirement makes absentee voting inaccessible to her during the COVID-19 pandemic.  Consequently, the defendants are entitled to a judgment in their favor on Ms. Thompson's Title II claim challenging the photo ID requirement.

5.   The photo ID requirement is not an essential eligibility requirement, and the members of People First, the Alabama NAACP, and GBM with underlying health conditions are qualified individuals with disabilities.  During the COVID-19 pandemic, the photo ID requirement for absentee voting makes absentee voting inaccessible for those members, and enjoining enforcement of the ban is a reasonable modification.  As a result, People First, the Alabama NAACP, and GBM are entitled

168

to a judgment in their favor on their Title II claim challenging the photo ID requirement as applied in the COVID-19 pandemic.

## F.

The plaintiffs claim in Count III that the curbside voting ban and witness requirement violate Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 ("Section 2"). Doc. 75 at 71-74. Section 2 provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen . . . to vote on account of race or color . . . ." 52 U.S.C. § 10301(a). A plaintiff may file two types of cases under Section 2: vote denial/abridgement and vote dilution. *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 966 F.3d 1202, 1234-35 (11th Cir. 2020). These types of claims are distinct, and the analysis is different depending on the type of claim filed.[80] *Id.* (noting a vote denial claim was "a very different type of claim" than a vote dilution claim).

---

[80] The plaintiffs argue the *Gingles* factors are controlling, but the Eleventh Circuit has "questioned the applicability" of such factors to vote denial cases holding that the lower court's refusal to apply the *Gingles* factor to the vote denial claim was "not error." *Greater Birmingham Ministries*, 966 F.3d at 1234-38. The court further noted that attempting to apply the *Gingles* factors to a vote denial claim was futile. *Id.* at 1235 ("We will attempt [to apply the *Gingles* factors] however, in order to demonstrate the futility of the exercise."). In light of *Greater Birmingham Ministries*, the court declines to apply the *Gingles* factors here.

To succeed on their Section 2 claims, the plaintiffs must first identify a "voting qualification or prerequisite to voting or standard, practice or procedure" that purportedly abridges minority voting rights.  52 U.S.C. § 10301(a).  The plaintiffs bring two challenges under the VRA.  First, they assert that the witness requirement is a "voting qualification or prerequisite" that   abridges Black voters' access to the polls.  Doc. 75 at ¶ 71-74.  Second, the plaintiffs allege the curbside voting ban is a "practice or procedure" that abridges Black voting rights.  Doc. 75 at ¶ 71-74.

The plaintiffs must establish that Black or minority voters have experienced "a denial or abridgement of the right . . . to vote . . . ." 52 U.S.C. § 10301(a); *Greater Birmingham Ministries*, 966 F.3d at 1233.  Section 2 defines this as occurring when, "the political processes leading to nomination or election . . . are not equally open to participation by [the protected class] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  52 U.S.C.  § 10303(b).  The existence of a denial or abridgment is "the critical question" and involves considering "whether the political process is equally open to minority voters[.]"  *Thornburg v. Gingles*, 478 U.S. 30, 63, 79 (1986).  The Eleventh Circuit explained a denial or abridgement exists when there is not "meaningful access to the political process[.]"  *Osborn v. Cox*, 369 F.3d 1283, 1289 (11th Cir. 2004) (quoting *Nippers v. Smith*, 39 F.3d 1494, 1524 (11th Cir. 1994)).

If the plaintiffs demonstrate a denial or abridgement, they must then show that "the challenged law . . . caused the denial or abridgement of the right to vote on account of race." *Greater Birmingham Ministries*, 966 F.3d at 1233. This causation element has two parts. For one, "the challenged law has to 'result in' the denial or abridgement of the right to vote." *Id.* Essentially, the plaintiffs must show that but for the challenged provision, the protected class would have equal access to the polls. 52 U.S.C. § 10301(a) ("[n]o voting qualification . . . shall be imposed . . . *in a manner which results* in a denial or abridgement"). Second, the plaintiffs must show that, "the denial or abridgment of the right to vote [is] 'on account of race or color.'" *Greater Birmingham Ministries*, 966 F.3d at 1233. Stated differently, the plaintiffs must "show[] that racial bias in the relevant community[81] caused the alleged vote-denial or abridgment[.]" *Id.* (quoting *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1238 (11th Cir. 2005) (Tjoflat, J., specially concurring)).

---

[81] It is clear this element of a Section 2 claim does not require the plaintiffs to prove discriminatory intent. Such an interpretation would disregard the plain statutory language and the prior Supreme Court precedent. The Supreme Court unanimously decided that the 1982 amendment to Section 2 does not require proof of discriminatory intent. *See Chisom v. Roemer*, 501 U.S. 380, 294-95 (1991) ("proof of intent is no longer required to prove a § 2 violation . . . proof of discriminatory intent is no longer necessary to establish *any* violation of the section") and *id.* at 406 (J. Scalia, dissenting) ("the statute proscribes intentional discrimination only if it has a discriminatory effect, but proscribes practices with discriminatory effect whether or not intentional"). Instead, consideration of the causal impact of "racial bias in the relevant community" is a consideration of whether "the challenged voting standard or practice causes the discriminatory impact as it interacts with social and historical conditions." *Ohio Democratic Party v. Husted*, 834 F.2d 620, 638 (6th Cir. 2016).

1.

The plaintiffs challenge the absentee voter witness requirement mandating voters sign an affidavit in the presence of two witnesses or a notary and that the witnesses or notary sign the same affidavit acknowledging that they observed the voter sign the affidavit. This requirement forces a voter to either 1) interact with two witnesses or 2) hire and interact with a notary. 9/14/20 at 139-40, 178. And, all parties agree, in the context of the coronavirus pandemic, interacting with individuals outside of one's household increases the risk of exposure to COVID-19. Agreed Facts at ¶ 62. In fact, the CDC advises those at higher risk of severe illness from COVID-19 against interacting with individuals outside of their household, especially those who are not wearing masks. Agreed Facts at ¶ 62; Pl. Ex. 270 at 8. The evidence has shown Alabamians at high-risk for COVID-19 complications and death are following the CDC's guidance.[82]  Pl. Ex. 270 at 30-33.

---

[82] When looking at adults at high risk because of their medical condition in the Birmingham area, 74.4 percent report avoiding crowded or public places, 86 percent stay six feet from others, and 88.8 percent report wearing masks when outside of their home. Pl. Ex. 270 at 30. These percentages remain high for those who are not at high risk. *Id.* In a statewide Auburn University at Montgomery poll, "78.1 percent of Alabama registered voters said that they were 'very' or 'somewhat likely . . . to voluntarily wear a mask or face covering in public if the COVID-19 pandemic continues through the end of the year." *Id.* at 31, n.82. When looking specifically at Black voters under 60 who are at high risk due to a medical condition, 74.8 percent report avoiding public or crowded places that are not job-related. *Id.* at 30-31. Higher percentages of Black voters in that category report maintaining six feet of distance and wearing masks when they must go out in public. *Id.*

a.

The plaintiffs assert the Challenged Provision causes a denial or abridgement of Black individuals' right to vote.  Essentially, the plaintiffs argue that Black Alabamians have less opportunity to vote than White Alabamians because Black voters are less able to meet the witness requirement without increasing their risk of COVID-19 complications or death.  Based on the evidence presented at trial, the court agrees.

i.

To begin, Dr. Traci Burch, an expert on political science and political participation explained, "Black Alabama adults at high-risk for severe illness from COVID-19 are far less able to satisfy these requirements for absentee voting than high-risk White Alabama adults while following CDC guidance to avoid contact with people from outside their household."  Ex. 270 at 7; 9/14/20 at 191-192.  In support of this contention, the plaintiffs proved at trial that Black voters at higher risk are less likely to live in households with two adults over the age of 18.  "22.0 percent of Black adults age 18 to 64 who report being in fair or poor health live in a household with no other adults, meaning that they would need to contact two additional witnesses from outside their household.  This rate is five times higher than that for White adults with health issues; only 3.9 percent of White adults with health issues do not live with any adults."  Pl. Ex. 270 at 34; 9/14/20 at 203-04.  And the disparity is even greater for Black individuals over age 65: "nearly 90 percent of

Black people age 65 and older would need to risk contacting at least one other person outside their household to meet the witness requirement" compared with "77.2 percent of White people and 47.1 percent of Latino people." Pl. Ex. 270 at 37. While the percentages vary based on the study, the racial disparity remains. Ex. 270 at 35-38. With less access to potential witnesses within their households, high-risk Black voters are forced to violate the CDC's guidance and expose themselves to increased risk of COVID-19 infection.

ii.

Unlike in *Greater Birmingham Ministries* and *Brown v. Detzner*, where Alabama and Florida had implemented measures to counteract the disparate impact, the defendants have not shown that the many examples they offered alleviate the disparate burdens Black voters face here.[83] To be clear, the defendants have not sat idly by and have instead undertaken efforts to address the pandemic. But, none of these actions, individually or collectively, alleviate the disparate burdens Black voters face.

---

[83]*Greater Birmingham Ministries*, 966 F.3d at 1236 (noting the disparate burdens minority voters faced to get a voter ID were eliminated by "the wide range of photo IDs" that could be used to vote, the "State's willingness to cover the cost of obtaining . . . required documentation" and the "availability of mobile unit locations and home visits . . . ."); *Brown v. Detzner*, 895 F. Supp. 2d 1236 (M.D. Fla. 2012) (holding decrease in number of in-person early voting days was not a denial or abridgement when the new rules allowed for the same number of early, in-person voting hours and required more weekend early-in person voting).

To begin, Mr. Clay Helms, the Director of Elections and Deputy Chief of Staff to Secretary of State Merrill, testified that he has offered to send staff members to voters' residences, so that they could safely have their ballots witnessed without additional COVID-19 risk.  9/15/20 at 163.  The court does not doubt Mr. Helms sincerity that he "was willing to do what [he] needed to do to help" the voter.  *Id.* However, to the extent this testimony supports any inference the Secretary of State has eliminated the burden of the witness requirement on Black voters, the court expressly finds otherwise.  This testimony was the only evidence provided that the Secretary of State's office offers this service, and there is no evidence that Secretary Merrill's office has in fact ever provided this service to voters.  Further, to the extent that the Secretary of State and Mr. Helms are able to help some voters, it is questionable that they will be able to provide witnesses for the absentee ballots of all voters who are higher-risk for COVID-19, live alone, and lack access to critical resources necessary to vote safely by absentee.  Finally, there is no evidence that voters know about this service, or that the Secretary of State's office has made any effort to advertise the service.

Second, the State has allowed anyone who wants to vote absentee due to concerns about COVID-19 to do so for the upcoming election.  But, the voter must still satisfy the witness requirement, and it is an obstacle for those who live alone or with just one other adult and are at high risk due to underlying conditions.  Third, while the State also allows in-person absentee voting, taking advantage of this would

also not eliminate the increased exposure to COVID-19 for these affected groups. Like regular voting on Election Day, in person absentee voting entails encountering more potentially infectious people (who may not be wearing a mask) and potentially contaminated surfaces than the voter would if they did not have to leave their home. 9/9/20 at 61, 115; 9/15/20 at 201-202.

Fourth, the defendants presented evidence that Secretary Merrill encourages AEMs to offer absentee curbside voting, *see* 9/11/20 at 48-50, and at least one AEM has provided absentee curbside voting in Wilcox County, *see* 9/9/20 at 9, 27. While this is an example of AEMs' efforts to respond to the pandemic, the potential to have a ballot witnessed through a car does not remedy the abridgment either because Black voters are less likely than White voters to have access to a car. 9/9/20 at 89-90. The parties agree that in Alabama, 12.7 percent of Black households do not have a vehicle compared to 3.9 percent of White households. Doc. 228 at ¶13. Further, the plaintiffs have proven Black high-risk Alabamians face poverty at higher rates than their White high-risk counterparts.[84]

---

[84] For Alabamians who are high risk due to a medical condition: 35.6 percent of Black individuals have incomes below $25,000 compared to only 6.6 percent of White individuals. Pl. Ex. 270 at 39. 53.3 percent of Black Alabamians who are high risk due to a medical condition are food insecure, compared to only 20.5 percent of White Alabamians who are high risk due to their health. *Id.* Black Alabamians who are high risk due to their age are more likely than White Alabamians to experience poverty as well. *Id.* 39.8 percent of senior Black individuals have incomes below $25,000 whereas only 14.9 percent of senior White individuals do. *Id.* 27.1 percent of White seniors are food insecure in Alabama compared to the 59 percent of Black seniors who are food insecure. *Id.*

Fifth, for similar reasons, the Mobile County Public Library's curbside notary services at five of its branches do not undercut the disparity in risks faced by Black voters. 9/16/20 at 118-119. Dr. Latesha Elopre, the plaintiffs' expert on internal medicine, infectious diseases, and disparities in access to health care and health outcomes in Alabama, testified that curbside notary services are a reasonably safe way for a high-risk voter to comply with the witness requirement *if the voter was in a car alone*. 9/9/20 at 94. Dr. Elopre's point cuts to the heart of the matter—the Library's services are helpful, but only for voters who have access to a vehicle and live in Mobile County. As stated previously, Black voters are less likely to have a household vehicle than White voters, meaning they would have to ride with a person outside of their household (if they can get a ride) or take public transportation (assuming it is even an option) in violation of CDC guidance. Doc. 228 at ¶13. Further, the Library's director testified that not many residents have used the curbside service, a fact she attributes to citizens not knowing about the service despite her advertisements in a local paper that has free distribution. 9/16/20 at 120-122, 133. And, even if the Library's service becomes widely known and adequately alleviates the disparate impact on Black voters in Mobile County, the benefit would be limited because there was no evidence presented that libraries in other parts of the State are offering this service.

Nor is the electronic notary option the Governor allowed a tool that can counteract the disparate impact. State Ex. 25 at 4. The evidence established that

Black voters are less likely to have access to the technological tools needed to employ a notary remotely and they are less likely to have the means to pay for the cost of the notary. The plaintiffs presented evidence that of forty-two Alabama notaries who responded to their survey, only six stated they do not charge to notarize ballots. 9/13/20 at 206. The others charge $5, $10, or more than $10. *Id.* And, "some also charged if they were required to travel to meet people in order to notarize signatures." *Id.* These fees may seem nominal to some individuals, but they can prove a major obstacle for those living in poverty. In Alabama, 27.7 percent of Black individuals live in poverty compared to only 11.3 percent of White individuals. Doc. 228 at ¶10. Among high-risk Alabamians, the difference in the rates of Black individuals and White individuals experiencing poverty is even more pronounced.[85] Pl. Ex. 270 at 39.

Black voters are also less likely to have access to the internet or a computer in their home making the option of remote notarization a fiction for a sizeable portion of Black voters. The evidence at trial showed that 29.6 percent of Black households do not have broadband internet compared to 17.2 percent of White households. Doc. 228 at ¶ 12. 18.9 percent of Black households do not have a computer, smartphone, or tablet compared to 11 percent of White households. *Id.* at ¶ 13. Similar to the disparities in those experiencing poverty, these numbers are worse when looking at

---

[85] *See* note 6, *supra*.

high-risk Alabamians.  Of those Alabama residents who are high risk due to age, 30 percent of White individuals do not have access to internet at home compared to 50 percent of Black individuals.  9/14/20 at 207.

All of these facts prove that Black voters who are at high-risk are less able to safely meet the absentee voter witness requirement than comparable White voters. Black voters at high risk are more likely to have to break established safety protocols by exposing themselves to a witness outside their home.  They are less likely to be able to utilize additional safety measures like having someone witness their affidavit from outside a window or paying for a notary to do so remotely.  9/14/20 at 207; 9/9/20 at 89-90; Pl. Ex. 270 at 40; Doc. 228 at ¶¶ 10, 13-14.  Because of this, the court holds that the plaintiffs have established that Black individuals have less of an opportunity to vote than White individuals in Alabama during the pandemic, and that their voting rights have been abridged.  Therefore, the plaintiffs have successfully proven the first element of the claim.

iii.

The defendants argue that, despite this evidence of a disparate impact, there is no denial or abridgement because Black and White voters *who are equally at risk* for COVID-19 complications or death due to health or age, "face similar outcomes

. . . ." and have equal access to witnesses.[86]  But, this argument ignores reality in Alabama—all things are not equal in Alabama in relation to COVID-19.  Based on the evidence at trial, Black and White voters are not "equally at risk" for contracting COVID-19.  Agreed Facts at ¶ 68; Pl. Ex. 271 at ¶ 16; 9/9/20 at 49.  .  The plaintiffs have also shown that once infected with COVID-19, Black individuals are more likely to have serious complications and die.  Pl. Ex. 270 at 26; Agreed Facts at ¶ 68; Pl. Ex. 271 at ¶ 14; 9/9/20 at 50-57, 82, 89.  Dr. Elopre explained, "there is strong data that supports . . . looking at cross age groups, that Black people, regardless of health conditions, have higher rates of death compared to Whites."  9//9/20 at 91-92.  Further, Black and White voters do not have equal access to witnesses.  For those in high-risk categories, Black voters are more likely to have to break CDC recommended protocols and expose themselves to the virus in order to fulfill the witness requirement.[87]

The defendants' position that 'all other things being equal' Black voters are at no greater risk and can access witnesses the same as White voters also ignores the plain text of Section 2.  A denial or abridgment is established if "*based on the totality of the circumstances*, it is shown that the political processes leading to nomination

---

[86] Doc. 244 at 11 ("Black and white voters who suffer similar underlying conditions face similar outcomes, 9/8 Rough Tr. at 68, and any voter can easily and safely meet the witness and photo ID requirements.").

[87] *See* sources accompanying analysis at Section II(F)(1)(a)(i)-(ii), *supra*.

or election . . . are *not equally open to participation* by members of a [protected class] . . . ." 52 U.S.C. § 10301(b) (emphasis added). The phrase "based on the totality of the circumstances" requires the court to look at all the facts affecting voters. The defendants' theoretical analysis regarding whether a Black and White voter who are the same age, with the same medical conditions, and are equally able to adhere to the witness requirement safely, have equal access to the polls runs counter to the text by failing to consider "the totality of the circumstances" people of color face, e.g. disparities in health, COVID-19 risks, and access to critical resources for safely adhering to the witness requirement like transportation, funds for a notary, technology, and internet access. Put simply, to discount the evidence of racial inequity the plaintiffs have presented, as defendants argue, would make it nearly impossible for any protected class to prove the abridgment of their voting rights and would limit the VRA to only protecting voters in cases of intentional discrimination. The Supreme Court has expressly discounted this interpretation. *See Chisom v. Roemer*, 501 U.S. 380, 394-95 (1991).

b.

Having found that the plaintiffs have established the first element, the court turns to causation. Again, this entails showing that the absentee voting witness requirement "results in the denial or abridgement of the right" of Black Alabamians "to vote on account of race or color." 52 U.S.C. § 10301(a). The plaintiffs have also made this showing.

i.

The voting abridgement "results" from the absentee voting witness requirement. But for the witness requirement, Black voters could mail in their absentee voting applications without increasing their risk of COVID-19 complications or death. The witness requirement forces high-risk Black voters to choose between safeguarding their health or voting. *Greater Birmingham Ministries*, 966 F.3d at 1234 (noting requirement plaintiffs show "the challenged law . . . 'resulted in' the denial or abridgment of the right to vote").

ii.

The plaintiffs have also shown that the abridgment of Black individuals' right to vote "was 'on account of race or color' . . . ." *Id.* To satisfy this requirement, the plaintiffs must show that the challenged law "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters" to participate in the political process. *Gingles*, 478 U.S. at 47; *see also Husted*, 834 F.3d at 638 (directing courts to ask "whether the challenged [law] causes the discriminatory impact as it interacts with social and historical conditions"). The plaintiffs have shown the existence of pervasive "racial bias in the relevant community." *Greater Birmingham Ministries*, 966 F.3d at 1233. In particular, the historical conditions are generally not in dispute. Alabama's current constitution was drafted in 1901 with the express goal of "dealing with the 'grave problem' of 'Negro domination' and . . . 'establish[ing] white supremacy." Pl. Ex. 264 at 7.

Racial bias led legislators to implement racially discriminatory voting laws like a poll tax and a literacy test. *Id.*; Agreed Facts at ¶ 146. These voting laws remained in place for over forty years until the federal courts intervened to begin dismantling them. Agreed Facts at ¶ 147. Even the passage of the VRA in 1965 did not stop Alabama's leaders from attempting to disenfranchise Black voters again, through efforts by the legislature to create racially gerrymandered voting districts to dilute the efficacy of Black voting power. *See* Agreed Facts at ¶¶ 147, 149-50; 9/14/20 at 122. The federal courts again had to intervene to prevent implementation of such discriminatory policies. *See* Pl. Ex. 264 at 15. And the plaintiffs presented evidence that these discriminatory policies extended to the implementation of the witness and photo ID requirements in the 1990s. Pl. Ex. 264 at 20-21. To be sure, not all advocates for the absentee voting requirements instituted in the 1990s were motivated by racial bias. However, the plaintiffs presented evidence that some state officials still were, *id.* at 21-22, with one State senator "insist[ing]" voter fraud was only perpetrated by Black people, and others praising the resulting drop in absentee voting even though "the unspoken reality was that those numbers undoubtedly represented a suppression of legitimate Black votes," *id.* at 21-22.

Those racially discriminatory voting policies meant Black voters' interests were not represented by the Alabama government, and the State used its power to enact a segregated and unequal education system. Pl. Ex. 264 at 24-25. Alabama's segregated public schools created racial disparities in education still existing today.

Doc. 228 at ¶¶ 3-4.  These educational deficits have been compounded by the State and some private entities adopting racially discriminatory employment practices in the past.  9/14/20 at 140; Pl. Ex. 264 at 31.  And, Alabama's racial bias was not limited to the areas of voting, education, and employment.  9/10/20 at 9, 13-14; Pl. Exs. 268 at ¶ 15 and 270 at 9.  Those in power implemented discriminatory zoning, redlining, and predatory lending which negatively affected housing and healthcare for Black individuals.  Pl. Ex. 268 at ¶ 8.  All of these historical events were caused, at least in part, by racial bias, and these events "produced and maintained" racial residential segregation in Alabama's communities in existence today.  *Id.*  And, the evidence at trial shows racial residential segregation has today "contributed to higher concentrations of poverty and low-quality housing, unemployment and under-employment, uninsured or uninsured" people, food insecurity, "as well as elevated exposures to physical and chemical environmental hazards."  *Id.*  Further, racial bias in healthcare existing today has meant Black patients are less likely to receive necessary medical tests than White patients, even when they have the same symptoms.  Pl. Ex. 268 at ¶15.

This reference to and consideration of the history of discrimination is not designed to suggest that Alabama's current leaders share the prejudiced views of their predecessors.  And, courts must "caution against allowing the old, outdated intentions of previous generations to taint Alabama's ability to enact voting legislation."  *Greater Birmingham Ministries*, 966 F.3d 1202, 1236.  The court

references these acts of racial discrimination and bias because they are directly relevant to the analysis proscribed by Section 2—they caused the racial disparities that exist today that make it harder and less likely for Black voters to be able to vote safely during the pandemic. The racial bias of Alabama's former leaders and White citizens, while certainly "outdated," unfortunately still affects Black Alabamians' health and socioeconomic status today. The racial bias caused the enactment of discriminatory policies which resulted in Black Alabamians having less access today to resources they need to be healthy—like food, doctors, health insurance, and a clean environment—all of which have contributed to the higher COVID-19 infection and death rates for Black individuals. It also led to Black Alabamians lacking resources critical to safely adhere to the witness requirement during the pandemic, like money for a notary, personal transportation, internet, and a computer.

Therefore, after considering the evidence as a whole, the court finds that the history of discrimination shows "racial bias" in the Alabama community "caused the alleged vote-denial or abridgment." *Greater Birmingham Ministries*, 966 F.3d at 1233. The court also finds that racial bias in voting, education, economics, employment, and healthcare has caused Black voters to have less of an opportunity than White voters to safely adhere to the absentee ballot witness requirement. *See Gingles*, 478 U.S. at 47; *Husted*, 834 F.3d at 638. Consequently, the plaintiffs have

shown that the abridgement of their right to vote was on account of their race, and

are due relief on their witness requirement claim under the VRA.[88]

_____

[88] Defendant Schwarzauer argues that "the denial or abridgment is not 'on account of race or color,' but on account of the COVID-19 pandemic and the heightened risk it poses to older persons and persons with certain underlying health conditions." Doc. 189 at 10; Doc. 245 at 12. The evidence at trial establishes that the historical and current racial bias mentioned above has caused high-risk Black voters to be less able to meet the absentee voter witness requirement safely during the pandemic. Alabama's history of racial bias has caused these racial inequities, not the virus.

Defendant Schwarzauer also argues that the witness requirement's facially race neutral language and general applicability to all absentee voters "prevents it from being a violation of the VRA." Doc. 245 at 12 (citing *Lee v. Virginia State Board of Elections,* 843 F.3d 592, 600-01 (4th Cir. 2016), *Ohio Democratic Party v. Husted,* 834 F.3d 620, 631 (6th Cir. 2016), and *Frank v. Walker,* 768 F.3d 744, 753 (7th Cir. 2014)). None of these cases support Defendant Schwarzauer's assertion. In *Lee v. Virginia,* the Fourth Circuit found there was no evidence of "a denial or abridgement of the right to vote" when plaintiffs only showed that "a lower percentage of minorities have qualifying photo IDs and the process of obtaining photo IDs requires those voters to spend time traveling to and from a registrar's office." 843 F.3d at 600-01. The Fourth Circuit relied on the ruling in *Crawford v. Marion County Election Board*, 553 U.S. 181, 198 (2008), that obtaining an ID does not make voting much harder, to find that plaintiffs had only proven a "disparate inconvenience" instead of a "denial or abridgement." *Id.* at 601. The court reasoned that "[i]f Virginia had required voters to present identifications without accommodating citizens who lacked them, the rule might arguably deprive some voters of an equal opportunity to vote." *Id.* at 601. Here, the plaintiffs have shown much more than just disparate inconvenience. They have shown that Black people face higher risks of COVID-19 complications and death.

Defendant Schwarzauer asserts that *Ohio Democratic Party*, the Sixth Circuit found that "despite statistical disparities 'the record does not establish that [the state law] . . . actually makes voting harder for African Americans." Doc. 245 at 12 (quoting *Ohio Democratic Party*, 834 F.3d at 631). The quote Defendant Schwarzauer relies on relates to the Circuit's assessment of the *equal protection claim*—not the voting rights claim, and the "statistical disparities" discussed was evidence that Black voters "use early in-person voting at higher rates than other voters . . . ," *Ohio Democratic Party*, 834 F.3d at 631. In its discussion of the *VRA* claim, the Sixth Circuit expressly held the opposite of what Schwarzauer asserted in her brief. The plaintiffs did not prove a denial or abridgement because "[t]hey failed to establish a cognizable disparate impact." *Id.* at 640. In other words, "the statistical evidence in the record clearly establish[ed] that Ohio's political processes [were] equally open to African Americans." *Id.* at 639. There was no denial or abridgement of the right to vote because Black voters in Ohio were more likely to be registered to vote and Black voter turnout was at least equal to White voter turnout even under the challenged provision. *Id.*

Lastly, *Frank v. Walker* is also distinguishable. The Seventh Circuit held there was no denial or abridgement caused by Wisconsin's voter photo ID law because Black turnout would be higher than White turnout even after subtracting "the difference between the 97.6% of white voters who have photo ID or qualifying documents, and the 95% of black voters who do. . . ." 768 F.3d at 754.

186

2.

The organizational plaintiffs and plaintiff Threadgill-Matthews[89] claim Secretary Merrill's de facto curbside voting ban unlawfully abridges Black Alabamians' right to vote in violation of Section 2 even in the absence of a global pandemic. Doc. 75 at ¶ 215-219. They argue the curbside voting ban makes voting harder for Black voters than White voters. Doc. 247 at 19-24. The plaintiffs contend Black voters are disproportionately burdened by the ban because they are more likely to have disabilities, are at higher risk for COVID-19 complications and death, and are less likely to have safe and feasible opportunities for absentee voting. *Id.*

The plaintiffs' claim fails to meet the first hurdle of Section 2 because the curbside voting ban does not amount to a denial or abridgment of Black voting rights. 52 U.S.C. § 10301(a). The curbside voting ban enacted by Secretary Merrill only applies to in-person voting on Election Day.[90] And, to be sure, the ban is prohibiting Jefferson County, Montgomery County, and perhaps others from offering curbside voting on Election Day. Docs. 181 at ¶ 16 and 182 at ¶ 14. But, the curbside voting ban does not apply to absentee voting. *See* 9/11/20 at 48-50. In fact, Secretary

---

Again, here the plaintiffs have shown Black voters are at higher risk for serious complications and death due to COVID-19, *see* Pl. Ex. 270 at 26 and 9//9/20 at 91-92, and that Black voters in high risk categories are less able to comply with the witness requirement safely, *see* sources accompanying analysis at Section II(F)(1)(a)(i)-(ii), *supra*.

[89] As discussed earlier, none of the other plaintiffs have standing to assert these claims. *See* section I(A)(3)(b).

[90] *See* section I(F)(3), supra (outlining Secretary Merrill's curbside voting ban).

Case 2:20-cv-00619-AKK   Document 250   Filed 09/30/20   Page 188 of 197

Merrill encourages county AEMs to offer absentee curbside voting. *Id.* And, Ms. Threadgill-Matthews testified she assisted one voter with using this option. *See* 9/9/20 at 9, 27. Put simply, based on the evidence, any voter who would benefit from lifting Secretary Merrill's ban on curbside voting on Election Day can do so now by voting curbside at their AEM's office. Because of this, the Plaintiffs have failed to prove a denial or abridgement.[91]

\*　　\*　　\*

Based on the above application of the factual findings in this case to the Voting Rights Act Section 2 legal framework, the court makes the following conclusions of law:

---

[91] This holding is consistent with the court's conclusions that the curbside voting ban both unconstitutionally burdens plaintiffs' fundamental right to vote and violates the ADA. *See* sections II(D)(3) and II(E)(2), *supra*. Different standards apply to these claims, and it is possible for the plaintiffs to satisfy their burden of proof as to one but not the others. For the curbside voting ban to violate the VRA, plaintiffs must prove a denial or abridgment of the right to vote, whether absentee or in-person. In contrast, to prevail on the constitutional claims in Count I, the plaintiffs needed to show that the State's justifications for banning curbside voting outweighed the burdens that the ban imposed on citizens' right to vote. The curbside voting ban can of course burden the right to vote without denying it. As for the ADA, to prevail on their Title II claim challenging the curbside voting ban, the plaintiffs needed to prove, among other things, that in-person voting on election day was not readily accessible to them due to the ban. *See* section II(E)(2)(b)(i), *supra*. And, because a voter does not receive confirmation that her vote counted when she votes absentee, *see* 9/15/20 at 139-40; 9/17/20 at 127-28, 184, casting an absentee ballot curbside at an AEM's office prior to the election is not equal to voting at the poll on election day for purposes of the ADA, *see* 28 C.F.R. § 35.130(b)(1)(ii). Moreover, the curbside voting ban can cause in-person voting to be not readily accessible to voters without denying or abridging the right to vote.

188

1.     The plaintiffs have shown Black voters do not have equal access to safely vote during COVID-19, because of the absentee ballot witness requirement, and, therefore, Black Alabamians' voting rights have been abridged.

2.     The voting abridgment is "on account of race or color" as it is caused, in part, by Alabama's history of racial bias in voting, education, employment, economics, housing, and healthcare.

3.     The absentee ballot witness requirement violates Section 2 to the extent it is enforced during the COVID-19 pandemic.

4.     The plaintiffs have not shown that the curbside voting ban is a denial or abridgement of Black Alabamians' voting rights.

## G.

Finally, in Count V, the plaintiffs allege that the notary option contained in the witness requirement conditions the right to vote on a person's wealth in violation of the Fourteenth Amendment's Equal Protection Clause.  Doc. 75 at 76–77.  As explained above, the witness requirement mandates that absentee voters have their ballots either signed by two witnesses or notarized.  Ala. Code § 17-11-9.  Alabama law also authorizes notaries public to collect a five-dollar fee for notarizing absentee ballots.  *Id.* § 36-20-74.  Plaintiffs say that, "regardless of the COVID-19 crisis," this authorization is unconstitutional.  Doc. 75 at 77 ¶ 232.

Additionally, during the COVID-19 pandemic, the Governor has freed notaries public to notarize absentee ballots by videoconference.  State Ex. 25 at 4.

The court has noted, however, that "videoconferencing is not free.  It requires internet access at a minimum, which is a service that is an unaffordable luxury for many."  Doc. 58 at 38 n.20.  As a result, the plaintiffs say the notary option is unconstitutional "[i]n the COVID-19 crisis," and that it must be enjoined.  Doc. 75 at 77 ¶ 233.  This claim thus presents both a facial and an as applied challenge to the witness requirement.

A "[s]tate violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard."  *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966).  Normally, because wealth is not a suspect classification, wealth-based discrimination claims receive only rational basis review.  *See Jones v. Governor of Fla.*, No. 20-12003, 2020 WL 5493770, at *5 (11th Cir. Sept. 11, 2020).  However, rational basis review does not apply to equal protection challenges that implicate fundamental rights.  *See, e.g.*, *id.* at *4 (noting that rational basis review is reserved for "classifications that neither implicate fundamental rights nor proceed along suspect lines").  Supreme Court cases "solidly establish" that the "basic right to participate in political processes as voters and candidates" is among those rights.  *M.L.B. v. S.L.J.*, 519 U.S. 102, 124 (1996); *Harper*, 383 U.S. at 670.

But the defendants contend that recent caselaw from the Eleventh Circuit rejects this basic tenet of constitutional law.  Allegedly, the Circuit ruled in *Jones v. Governor of Florida ("Jones II")* that "heightened scrutiny does not apply" to the

190

present challenge and that requiring voters to provide documentation verifying their identities is constitutional, even if some individuals must pay to obtain the documents.  Doc. 232 at 1–2.  Thus, the defendants ask the court to apply rational basis review to this claim.  *Id.* at 3–4.  The court has already rejected this request after concluding that *Jones II* was inapposite, 9/18/20 at 67, but the defendants move the court to reconsider.  Doc. 244 at 13.  Their request is again due to be denied.[92]

The claim before the court in *Jones II* dealt with the restoration of voting rights for people convicted of felonies—not the general, fundamental right to vote.  *See* 2020 WL 5493770 at * 4.  Indeed, the Eleventh Circuit made clear that *Jones II* does not address the fundamental right to vote:  "Whatever may be true of the right to vote generally, felons 'cannot complain about their loss of a fundamental right to vote because felon disenfranchisement is explicitly permitted . . . ."  *Id.* (quoting *Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010)).  Because the laws at issue in *Jones II* did not "implicate fundamental rights nor proceed along suspect lines," the Eleventh Circuit applied rational basis review.  *Id.* at *4–8.

Here, the challenge to the notary option of the witness requirement implicates an Alabama citizen's fundamental right to vote.  Thus, *Jones II* does not mandate

---

[92] The defendants also maintain that the plaintiffs failed to plead a wealth-based discrimination claim.  Docs. 232 at 2; 244 at 13 n.14.  The court initially labelled the plaintiffs' challenge a wealth discrimination claim.  *See* doc. 161 at 22.  But a review of the evidence offered at trial and the plaintiffs' amended complaint shows that Count V instead challenges the witness requirement as unduly burdening the right to vote in violation of the Fourteenth Amendment.

that rational basis review applies to the plaintiffs' claim.  To be sure, the Eleventh Circuit did opine that "[o]utside of narrow circumstances, laws that burden the indigent are subject only to rational basis review." *Id.* at *5 (citing *M.L.B.*, 519 U.S. at 123–24).  But the very case that the Circuit cited for that proposition, *M.L.B.*, dictates that voting rights cases fall within that narrow band. *See* 519 U.S. at 124. Therefore, because the plaintiffs' equal protection claim implicates their or their members' basic fundamental right to vote, rational basis review is inappropriate.

Traditional equal protection jurisprudence therefore applies.[93]   Under that jurisprudence, "any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964).  In *Harper*, the Supreme Court ruled that state laws imposing poll taxes categorically failed to satisfy that exacting scrutiny.  "To introduce wealth or payment of a fee as a measure of a voter's qualifications," the Court said, "is to introduce a capricious or irrelevant factor. The degree of the discrimination is irrelevant." *Harper*, 383 U.S. at 668.  In other words, if a state law makes wealth an

---

[93] In an earlier order ruling on the parties' various motions to dismiss, doc. 161, the court observed that the four-factor test applied by the Eleventh Circuit in *Jones v. Governor of Florida ("Jones I")*, 950 F.3d 795 (11th Cir. 2020), controlled this claim.  In *Jones I*, the panel applied "heightened scrutiny" to conclude that Florida's law conditioning the restoration of voting rights for people convicted of felonies on their ability to pay certain fines and fees was likely unconstitutional. *Id.* at 827.  The Circuit considered: "(1) the nature of the individual interest affected; (2) the extent to which it is affected; (3) the rationality of the connection between legislative means and purpose; and (4) the existence of alternative means for effectuating the purpose." *Id.* at 825.  Because the court now understands that plaintiffs' claim is not based on wealth discrimination, *see* note 92, *supra*, the *Jones I* analysis would not apply.  Moreover, because *Jones II* overruled *Jones I*, the four-factor test is no longer valid in either context. *Jones II*, 2020 WL 5493770, at *8.

electoral standard, then that law violates the Fourteenth Amendment regardless of "whether the citizen, otherwise qualified to vote, has $1.50 in his pocket or nothing at all, pays the fee or fails to pay it." *Id.* The plaintiffs contend that *Harper*'s per se rule controls. Docs. 238 at 3; 247 at 10. The defendants correctly note, however, that *Harper*'s bright-line rule "does not apply to voting requirements that are related to legitimate voter qualifications." Doc. 244 at 13 (quoting *Jones II*, 2020 WL 5493770, at *6).

As a purported fraud prevention measure, the witness signature requirement is at least designed to help identify voters. And, because "requiring voters to prove their identity . . . falls squarely within the state's power to fix core voter qualifications," the court agrees that the *Harper* rule does not govern. *Jones II*, 2020 5493770, at *6. Accordingly, the court cannot apply "any 'litmus test' that would neatly separate valid from invalid restrictions," but must instead "identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule." *Crawford*, 553 U.S. at 190. The court will then "make the 'hard judgment' that our adversary system demands." *Id.* In other words, *Anderson-Burdick* balancing applies to this claim as well.

Starting with the plaintiffs' facial challenge to the witness requirement, the court concludes that the law is constitutional. Here, the State offers two familiar interests to justify its rule—preventing voter fraud and protecting the integrity of its elections. Docs. 232 at 4; 245 at 13. These interests are, of course, legitimate and

193

strong. *Lee*, 915 F.3d at 1322 (citing *Common Cause*, 554 F.3d at 1353–54); *see also Crawford*, 553 U.S. at 196. Indeed, they are at their strongest in a facial challenge. When a plaintiff "advance[s] a broad attack on the constitutionality of [a statute], seeking relief that would invalidate the statute in all its applications, they bear a heavy burden of persuasion." *Crawford*, 553 U.S. at 200.

At trial, the plaintiffs offered little evidence that Alabama's law authorizing notaries public to accept fees burdens their right to vote. In their post-trial briefing, they cite the testimony of four witnesses to support their claim. Allegedly, "Plaintiffs Bettis, Peebles, and Thompson, and Ms. Lux testified that the notary aspect of the Witness Requirement is burdensome." Doc. 247 at 11. But this does not withstand analysis.

Only one of those individuals, Dr. Peebles, testified that he might be unable to comply with the witness requirement because he could not afford a five-dollar notary fee. Dr. Peebles initially testified that he would be unable to receive free notarization from his bank because that required going indoors and interacting with others, which would expose him to possible COVID-19 infection. 9/8/20 at 127. Although that constituted a burden in Count I, it does not where, as here, the claim is that the fee itself is burdensome. Dr. Peebles did later testify, however, that a notary public's five-dollar fee might be cost prohibitive. *Id.* at 159. But it is not entirely clear why that would be, because Dr. Peebles also testified that he always has more than five dollars in his bank account. *Id.*

194

The other witnesses that plaintiffs contend are burdened by the notary aspect of the witness requirement never alleged that they could not pay a notary fee. Ms. Bettis testified that she would not feel comfortable having her ballot notarized because she could not be certain that the notary public followed social distancing guidelines. 9/14/20 at 20–21. Ms. Lux testified that she was unwilling to receive notarization from her bank because, like Dr. Peebles, she feared COVID-19 exposure. 9/11/20 at 180–81. But that again is not germane to wealth. Finally, the plaintiffs note that Ms. Thompson is burdened by the notary aspect of the witness requirement, but they fail to cite any of her testimony to support that contention. *See* doc. 247 at 11. And the court's review of her testimony reveals that Ms. Thompson would be willing to obtain free notary services from her local library. 9/8/20 at 196–97. Although risking virus exposure at the library constituted a burden under Count I, the free option alleviates any wealth-based burden she may face.

Ultimately, the plaintiffs failed to prove that the notary aspect of the witness requirement imposes even a slight burden on them, during or outside of the pandemic. Accordingly, the State's interests necessarily justify the rule. The plaintiffs' claims under Count V are therefore due to be dismissed.

\* \* \*

Consistent with the above discussion and findings, the court makes the following conclusions of law regarding the plaintiffs' constitutional claims:

1.     The plaintiffs failed to establish that the notary aspect of the witness

requirement, on its face, burdens their right to vote based on their wealth.  Because the State has a legitimate interest in maintaining the witness requirement, the law does not violate the Fourteenth Amendment.

2.     The plaintiffs failed to establish that the notary aspect of the witness requirement, as applied during the pandemic, burdens their right to vote based on their wealth.  Because the State has a legitimate interest in maintaining the witness requirement, the law does not violate the Fourteenth Amendment.

### III. <u>EQUITABLE RELIEF AND CONCLUSION</u>

Consistent with the court's findings and conclusions, the plaintiffs' motion for reconsideration, doc. 229, is due to be denied, and Judge Davis's and Ms. Schwarzauer's motions for judgment on partial findings, docs. 231, 233, are moot. The plaintiffs are entitled to enter an order declaring that the Challenged Provisions violate the fundamental right to vote, the ADA, and the VRA as applied during the COVID-19 pandemic.

Finally, as previously stated, the plaintiffs also seek an order enjoining the enforcement of the witness requirement, photo ID requirement, and curbside voting ban for the November 2020 general election.  *See* doc. 75 at 78-79.  To show they are entitled to an injunction, the plaintiffs must show that (1) they have suffered an irreparable injury; (2) remedies available at law are inadequate to compensate for the injury; (3) considering the balance of hardships between the parties, an equitable remedy is warranted; and (4) that the public interest will not be disserved by an

injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citations omitted).  Based on the court's findings and conclusions, the plaintiffs have made this showing.   If the Challenged Provisions are not enjoined, they will unconstitutionally and unlawfully violate the rights of the plaintiffs or their members, causing irreparable harm.  Because no monetary sum could compensate for this injury, legal remedies are inadequate.  For those reasons, the balance of hardships weighs in favor of injunctive relief, and the public interest will not be disserved.  The court will issue a separate order and judgement.

   **DONE** the 30th day of September, 2020.


_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE